# No. 25-1818

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA, et al., ex rel. JESSICA PENELOW and CHRISTINE BRANCACCIO,

*Plaintiffs-Appellees,*

v.

JANSSEN PRODUCTS, LP,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 3:12-CV-07758
THE HON. ZAHID N. QURAISHI

## JOINT APPENDIX
## Vol. 1 of 13 (Appx1–274)

Mark W. Mosier
Matthew F. Dunn
Krysten Rosen Moller
Daniel G. Randolph
Kendall T. Burchard
Alexander J. Cave
Mishi Jain
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001-4956
(202) 662-6000

*Counsel for Defendant-Appellant*

David C. Frederick
Ariela M. Migdal
Kyle B. Grigel
Kellogg, Hansen, Todd,
    Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
amigdal@kellogghansen.com
kgrigel@kellogghansen.com

*Counsel for Relators-Appellees*

Sherrie R. Savett
Joy P. Clairmont
Michael T. Fantini
William H. Ellerbe
Berger Montague PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-3000
ssavett@bm.net
jclairmont@bm.net
mfantini@bm.net
wellerbe@bm.net

Pete Marketos
Joshua M. Russ
Andrew O. Wirmani
Adam Sanderson
Whitney L. Wendel
Reese Marketos LLP
750 N. St. Paul Street, Suite 600
Dallas, TX 75201
(214) 382-9810
pete.marketos@rm-firm.com
josh.russ@rm-firm.com
andrew.wirmani@rm-firm.com
adam.sanderson@rm-firm.com
whitney.wendel@rm-firm.com

*Counsel for Relators-Appellees*

# TABLE OF CONTENTS

**VOLUME 1 of 13:**

Memorandum Opinion Granting in Part and Denying in Part Motion to Dismiss (filed May 31, 2017), ECF 86 ........................................Appx1

Order Granting in Part and Denying in Part Motion to Dismiss (filed May 31, 2017), ECF 87 ...........................................................Appx16

Memorandum Opinion Denying Motion for Summary Judgment (filed Dec. 21, 2021), ECF 291 ...........................................................Appx18

Order Denying Motion for Summary Judgment (filed Dec. 21, 2021), ECF 292 ...................................................................................Appx43

Memorandum Opinion Granting in Part and Denying in Part Motions to Exclude Expert Testimony (filed Jan. 10, 2022), ECF 294 ...................................................................................Appx44

Order Granting in Part and Denying in Part Motions to Exclude Expert Testimony (filed Jan. 10, 2022), ECF 295 ...............................Appx93

Final Pretrial Order (filed Nov. 2, 2022), ECF 315 .......................................Appx95

Opinion Granting in Part and Denying in Part Motions in Limine (filed June 28, 2023), ECF 330 .........................................................Appx189

Order Granting in Part and Denying in Part Motions in Limine (filed June 28, 2023), ECF 331 ................................................................Appx219

Opinion Denying Motion to Strike Expert Testimony (filed Jan. 30, 2025), ECF 493 ......................................................................Appx223

Order Denying Motion to Strike Expert Testimony (filed Jan. 30, 2025), ECF 494 ...................................................................................Appx232

Post-Trial Opinion (filed Mar. 28, 2025), ECF 496 ....................................Appx233

Post-Trial Order (filed Mar. 28, 2025), ECF 497 .......................................Appx268

Final Judgment (filed Mar. 28, 2025), ECF 498...........................................Appx270

Janssen's Notice of Appeal (filed Apr. 25, 2025), ECF 503 .......................Appx272

**VOLUME 2 of 13:**

District Court Docket Sheet ......................................................................Appx275

Statement of Interest of the United States (filed Feb. 10, 2017), ECF 75
................................................................................................Appx350

Relators' Second Amended Complaint (filed June 30, 2017), ECF 90........Appx360

Relators' Trial Brief (filed Apr. 5, 2024), ECF 351 ....................................Appx482

Janssen's Proposed Jury Instructions (filed Apr. 19, 2024), ECF 359.........Appx531

**VOLUME 3 of 13:**

Excerpts from Jury Trial Transcript Vol. 1 (May 7, 2024), ECF 444 ..........Appx629

Excerpts from Jury Trial Transcript Vol. 2 (May 8, 2024), ECF 445 ..........Appx711

Excerpts from Jury Trial Transcript Vol. 3 (May 9, 2024), ECF 463 ..........Appx817

Excerpts from Jury Trial Transcript Vol. 4 (May 13, 2024), ECF 446........Appx901

**VOLUME 4 of 13:**

Excerpts from Jury Trial Transcript Vol. 5 (May 14, 2024), ECF 447........Appx964

Excerpts from Jury Trial Transcript Vol. 6 (May 15, 2024), ECF 464......Appx1061

Excerpts from Jury Trial Transcript Vol. 7 (May 20, 2024), ECF 448......Appx1109

Excerpts from Jury Trial Transcript Vol. 8 (May 21, 2024), ECF 465......Appx1190

**VOLUME 5 of 13:**

Excerpts from Jury Trial Transcript Vol. 9 (May 22, 2024), ECF 449......Appx1347

Excerpts from Jury Trial Transcript Vol. 10 (May 23, 2024), ECF 457....Appx1445

Excerpts from Jury Trial Transcript Vol. 11 (May 28, 2024), ECF 458....Appx1491

Excerpts from Jury Trial Transcript Vol. 12 (May 29, 2024), ECF 466....Appx1536

Excerpts from Jury Trial Transcript Vol. 13 (May 30, 2024), ECF 467....Appx1586

**VOLUME 6 of 13:**

Excerpts from Jury Trial Transcript Vol. 14 (May 31, 2024), ECF 450 ....Appx1702

Excerpts from Jury Trial Transcript Vol. 15 (June 3, 2024), ECF 451 ......Appx1756

Excerpts from Jury Trial Transcript Vol. 16 (June 4, 2024), ECF 452 ......Appx1864

Excerpts from Jury Trial Transcript Vol. 17 (June 5, 2024), ECF 468 ......Appx1890

Excerpts from Jury Trial Transcript Vol. 18 (June 6, 2024), ECF 469 ......Appx1923

Excerpts from Jury Trial Transcript Vol. 19 (June 7, 2024), ECF 453 ......Appx1967

**VOLUME 7 of 13:**

Excerpts from Jury Trial Transcript Vol. 20 (June 10, 2024), ECF 470 ....Appx2018

Excerpts from Jury Trial Transcript Vol. 21 (June 11, 2024), ECF 454 ....Appx2120

Excerpts from Jury Trial Transcript Vol. 22 (June 12, 2024), ECF 455 ....Appx2165

Jury Note #3 (filed June 12, 2024), ECF 417 .............................................Appx2171

Excerpts from Jury Trial Transcript Vol. 23 (June 13, 2024), ECF 456 ....Appx2172

Final Jury Instructions (filed June 13, 2024), ECF 424-11 .......................Appx2178

Verdict Form [Redacted] (filed June 13, 2024), ECF 435 .........................Appx2226

Janssen's Memorandum of Law in Support of Motion for Judgment as
    a Matter of Law (filed Aug. 12, 2024), ECF 473-1 ...............Appx2235

Statement of Interest of United States (filed Oct. 18, 2024), ECF 478 ......Appx2299

Relators' Memorandum of Law in Opposition to Janssen's Motion for
    Judgment as Matter of Law (filed Oct. 18, 2024), ECF
    481-1 ......................................................................................Appx2307

**VOLUME 8 of 13:**

Exhibit A-1 to Relators' Opposition to Motion for Judgment as a Matter
    of Law (filed Oct. 18, 2024), ECF 481-2 ...............................Appx2396

**Relators' Trial Exhibits**

RX-0045:    Email from Dolisi to Allison, Bartnett et al Re: FW: Promotional Guidelines - Compliance ..................................Appx2475

RX-0047:    Email from Dolisi to Murphy Re: FW: POA SRL.................Appx2476

RX-0073:    Email from Murphy to Brancaccio, Finkelstein/Penelow, Graham, Bartnett, et al Re: Use of Resources........................Appx2477

RX-0074:    Email from McSherry to Brancaccio, Finkelstein/Penelow, Graham, et al Re: Prezista vs Reyataz Lipid data ..................Appx2478

RX-0088:    Memo from Allison to Dolisi Re: Weekly District PATH Report .....................................................................................Appx2479

RX-0124:    Email from Iacobellis to Libby, Gossett, Mattes ..................Appx2481

RX-0128:    Email from Ruppersberger to Mattes, Gossett, Iacobellis, Kozub, et al Re: Final FBP Gating Deck ..............................Appx2483

RX-0131:    Email from Kozub to Gossett, Long Re: PREZISTA Business Plan Presentation ....................................................................Appx2485

RX-0132:    Presentation: PREZISTA IBP Tactical Plan 2010 2 ..............Appx2486

RX-0139:    Presentation: Careful Communications..................................Appx2520

RX-0149:    Presentation: DTC Pilot ROI Analysis ..................................Appx2544

RX-0168:    Email from Dunn to Bartnett Re: Training and MRC Meeting................................................................................Appx2574

RX-0170:    Email from Iacobellis to Whyte, Broadhurst, Daly, Burnett, Kozub Re: Please Send Training Modules..............................Appx2577

RX-0178:    Email from Mattes to Iacobellis Re: ROI after Dan Berger Prezista Program...................................................................Appx2579

RX-0179:    Prezista Sales Activation Project, Steering Committee Meeting: Findings & Recommendations"...............................Appx2581

RX-0190:    DHHS Letter from Aline Moukhtara to Tibotec, Inc., re: NDA 21-976 .........................................................................Appx2606

RX-0222:    Notes from Conference Call with Management Team -Glenn
            Mattes ....................................................................................Appx2611

RX-0236:    Email from Scientific Intelligence to dist list re: U.S.
            Virology Franchise Sciinsights Voice of Customer Quarterly
            Updated for Q4, 2011 ............................................................Appx2616

RX-0237:    Email from Cavenah to Selvaccio, Lenthe, Ablaschai, Tahan
            Re: Campaign Management Meeting Contact Report ..........Appx2628

RX-0266:    Email from Cruz to Armlin, Cruz, Doran Holshoe, Moyer,
            Rosenberg, Wehle Re: Data from Glasgow ...........................Appx2630

RX-0272:    Email from Iacobellis to Turner, Strand Re: 4 Months to
            Reach Our Team Goals ...........................................................Appx2631

RX-0275:    Presentation:   Compliant   Selling   in   a   Competitive
            Environment ...........................................................................Appx2634

RX-0278:    Email from Kaucher to Montoya Re: Janssen Therapeutics
            Executive Performance Tracker 12-28-12 .............................Appx2682

RX-0296:    Presentation: Patients First Call Assessment Study by GfK
            Healthcare................................................................................Appx2685

RX-0297:    Presentation: 2011 Brand A&U Wave 2 Research Conducted
            by Harris Interactive Inc. ......................................................Appx2724

## VOLUME 9 of 13:

RX-0347:    DeJesus et al., *Pharmacokinetics of Once-Daily Etravirine
            (2010)* ....................................................................................Appx2806

RX-0353:    Prezista, 2007 Business Plan Strategy Review Presentation,
            July 12, 2006, Post HCC .......................................................Appx2816

RX-0360:    Presentation: Health Care Compliance (HCC) Training for
            New Hired Sales Representatives ..........................................Appx2864

RX-0361:    2013 Corporate Integrity Agreement .....................................Appx2970

RX-0376:    MedforceSpreadsheet: Speaker Expenses & Event Data HIV
            2010-2014.xlsx (entire spreadsheet) ......................................Appx3071

RX-0378:    MedforceSpreadsheet: 2010-2014 Full Attendee List.xlsx....Appx3072

RX-0414:    INTELENCE™ (etravirine) [Tablets] Initial U.S. Approval –
            2008 ......................................................................................Appx3073

RX-0418:    Tomaka F, Lefebvre E, Sekar V., *Similar changes in
            metabolic parameters of darunavir (TMC114) and
            atazanavir, each coadministered with low-dose ritonavir in
            healthy volunteers (TMC114-C159). In: American
            Conference for the Treatment of HIV (ACTHIV)*, Dallas, TX,
            31 May–3 June 2007 (The "DART" study) ...........................Appx3105

RX-0423:    2010 Corporate Integrity Agreement .....................................Appx3115

RX-0487:    Spreadsheet produced by Bioscrip, Copy of Intelence Data
            Pull - All Systems REDACTED.xlsx.....................................Appx3185

RX-1003:    Spreadsheet produced by Walgreens: Copy of Intelence 2008-
            2014 (003).xlsx.......................................................................Appx3186

**VOLUME 10 of 13:**

RX-1148:    Prezista Label (June 2006) ....................................................Appx3187

RX-1188:    CMS, CMS Instructions: Requirements for Submitting PDE
            Data (June 24, 2005) .............................................................Appx3231

RX-1353:    Guidelines for the Use of Antiretroviral Agents in HIV-1-
            Infected Adults and Adolescents...........................................Appx3301

RX-1480:    Centers for Medicare and Medicaid Services (CMS) claims
            data and associated lookup tables and documentation
            produced in response to Janssen's July 10, 2018 subpoena to
            CMS........................................................................................Appx3447

RX-1582:    Email from Saladana to Merciela et al RE: Bill O Brien,
            MD...........................................................................................Appx3448

RX-1624:    CIA Settlement Agreement ....................................................Appx3451

RX-1704:    Audio Recording re: N. Bartnett and G. Turett......................Appx3481

RX-1720:    FDA-CDER-DDMAC Submission Consumer Package, NDA
21-9762, Prezista (darunavir) Tablets .....................................Appx3482

**VOLUME 11 of 13:**

RX-1727:    Email from A. Patel to J. Kenig et al. re: Prezista - Lipid Data
& Patient Case Studies ...........................................................Appx3535

RX-1728:    Email from B. Cobb to A. Patel et al. re: 5/12/2010 Meeting
Invitation ...............................................................................Appx3544

RX-1729:    Email from A. Patel to B. Kozub re: DDMAC Advisory
Comments - Draft DTC Ad 2009 ...........................................Appx3545

RX-1751:    Virology Strategic Plan, Presentation to Paul Stoffels ..........Appx3551

RX-1760:    Sept. 6, 2006 Email from D. Chudy on behalf of G. Mattes to
DL-TT BOARD MEMBERS ...................................................Appx3618

RX-1767:    Prezista PowerPoint re: District POAs...................................Appx3620

RX-1768:    Introducing Prezista Once Daily, Unedited Version.............Appx3678

RX-1780:    Email from G. Mattes to M. Gossett re: 07SP Forecast Review
...............................................................................Appx3688

RX-1784:    Tibotec Executive Summary PowerPoint ...............................Appx3690

RX-1785:    Email from G. Mattes to K. McCormick et al. re: Meeting...Appx3743

RX-1786:    Email from G. Ruppersberger to G. Mattes et al. re: "Final
FBP Gating Deck from this morning" ....................................Appx3744

RX-1787:    Tibotec 2009 FBP Gating, Business Analytics PowerPoint ..Appx3745

RX-1789:    Tibotec PBP Board Review PowerPoint.................................Appx3758

RX-1805:    May 3, 2007 Email from F. Lilienthal to C. Long ................Appx3888

RX-1809:    July 28, 2008 Email from J. Witek to C. Long ....................Appx3889

RX-1814:    Email from B. Goldsmith to C. Long et al. re: Strat Plan Deck
as of 2/11/2007 .......................................................................Appx3891

RX-1815:    Dec. 11, 2009 Email from L. Jindia to DL-TT Clinical et al.
            re: Intelence QD - Multimedia Letter....................................Appx3893

RX-1816:    June 16, 2009 Emails between J. Witek to C. Long et al. re:
            Intelence QD in EE Assessment.............................................Appx3894

RX-1831:    July 25, 2011 Email from A. Havens to M. Kushmore re: QD
            dosing importance – A&U follow-up ....................................Appx3901

RX-1851:    Letter from Cesario to C. Tompson .......................................Appx3903

RX-1854:    HCC Final Memo ...................................................................Appx3908

## VOLUME 12 of 13:

## Defendant's Trial Exhibits

DX-1045A: Intelence Package Insert (ORIG-1).......................................Appx3913

DX-1059:    Excerpt from US Department of Health and Human Services
            publication:  "Guidelines for the Use of Antiretroviral Agents
            in HIV-1-Infected Adults and Adolescents Living with HIV"
            ................................................................................................Appx3945

DX-1061:    Excerpt from US Department of Health and Human Services
            publication:  "Guidelines for the Use of Antiretroviral Agents
            in HIV-1-Infected Adults and Adolescents Living with HIV"
            ................................................................................................Appx3947

DX-1063:    Excerpt from US Department of Health and Human Services
            publication:  "Guidelines for the Use of Antiretroviral Agents
            in HIV-1-Infected Adults and Adolescents Living with HIV"
            ................................................................................................Appx3950

DX-1115:    Revised Prezista Label (Oct. 2008).......................................Appx3952

DX-2004:    "Guidance Document on The Promotion of FDA-Regulated
            Products and The Dissemination of Scientific Information,"
            Feb. 16, 2006 ........................................................................Appx3999

DX-2069:    "Guidance Document on Medicare Part D Contracting, Sales
            and Marketing," Apr. 23, 2008 .............................................Appx4021

DX-2088:    Form 2253: 28PRZ0258 (Naïve Launch Visual Aid)............Appx4055

DX-2089:    28PRZ0258 (Naïve Launch Visual Aid) "Introducing Prezista
            Once-Daily".................................................................Appx4166

DX-2091:    28PRZ0251B (HCP Brochure, Tolerability)..........................Appx4186

DX-2100:    Form 2253: 28PRZ0291 (E-Visual Aid)................................Appx4193

DX-2101:    28PRZ0291 (E-Visual Aid).....................................................Appx4194

DX-2164:    28PRZ10003 (ARTEMIS 96-Week Lipids Piece) ................Appx4214

DX-2216:    28PRZ11022 (ODIN Update to Lipids Leave Behind)  ........Appx4226

DX-2259:    Email from Catherine Caucher to "POD Team" re: "ACTION
            REQUIRED: RE: Mumford/ Hughes POD Team Call"........Appx4233

DX-2372:    Relator Christine Brancaccio's Responses to Janssen's First
            Set of Requests for Admission ...............................................Appx4237

DX-3005:    White House Office of National AIDS Policy publication:
            "National HIV/AIDS Strategy"..............................................Appx4261

DX-4232:    Form 2253: Second revised version (28NTL0113R2) of Jan.
            18, 2010 Intelence PSB slide deck titled "Clinical Data –
            INTELENCE (etravirine) Tablets" (28NTL0113).................Appx4311

DX-4263:    "Compliance Guidelines for Promotional Speakers" Slide
            Deck...................................................................................Appx4441

DX-5005:    ADAP Data...........................................................................Appx4471

DX-5007:    Call Notes ............................................................................Appx4472

**VOLUME 13 of 13:**

DX-5009:    Rite Aid Data........................................................................Appx4473

DX-8511:    Penelow's Response to Janssen's First RFA ........................Appx4610

DX-8518:    Email from J. Clairmont to Penelow et al. re: J&J Memo .....Appx4633

DX-8606:    Email from Sara Strand to Kenneth McCormick re: HIV/AIDs medicine coverage problem .................................Appx4635

DX-8851:    Email from E. Sherr to M. Armlin et al. re: Please see the attached "Interim Final Rule on Protected Classes in Medicare Part D.....................................................................Appx4640

DX-8856:    Email from Brancaccio to J. Hausner re: FW: Call Plan .......Appx4643

NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, et al., | |
| Plaintiffs, | Civil Action No. 12-7758 (MAS) (LHG) |
| v. | **MEMORANDUM OPINION** |
| JOHNSON & JOHNSON, et al., | |
| Defendants. | |

**SHIPP, District Judge**

This matter comes before the Court on Defendant Johnson & Johnson's Motion to Dismiss (ECF No. 57) and Janssen Products, L.P.'s ("Janssen Products") (collectively, "Defendants") Motion to Dismiss (ECF No. 58) the First Amended Complaint ("Amended Complaint"). Relators Jessica Penelow and Christine Brancaccio (collectively, "Relators") filed opposition (ECF No. 64) and Defendants replied (ECF Nos. 70, 71). Relators filed a Motion for Leave to File a Sur-Reply. (ECF No. 73.) Janssen Products filed opposition to Relators' Motion.[1] (ECF No. 74.) The United States of America (the "Government") filed a Statement of Interest (ECF No. 75), and Janssen Products filed a response (ECF No. 77). Finally, Relators filed two Notices of Supplemental Authority (ECF Nos. 78, 82) and Janssen Products filed responses (ECF Nos. 79, 84).

The Court has carefully considered the parties' submissions and heard oral argument on May 23, 2017. For the reasons stated below, Janssen Products's Motion to Dismiss is GRANTED in part and DENIED in part, and Johnson & Johnson's Motion to Dismiss is GRANTED.

---

[1] As set forth on the record during the May 23, 2017 oral argument, the Court denies Relators' Motion for Leave to file a Sur-Reply. (ECF No. 73; May 23, 2017 Oral Argument Tr. 1:25-2:5.)

## I.    **Background**

Relators filed the instant action on behalf of the Government, twenty-seven states, and the District of Columbia against Defendants, alleging fifty-eight counts under the Federal False Claims Act ("FCA"), Federal Anti-Kickback Statute ("AKS"), and the false claims acts of various states. The claims arise from Defendants' purported misconduct in connection with two HIV/AIDS drugs: Prezista and Intelence.  (*See* Am. Compl. ¶¶ 107-61, ECF No. 41.)

With respect to Prezista, Relators allege that Defendants' sales representatives and managers falsely promoted the drug as "lipid neutral," which means that "the drug would *not* affect or increase a patient's cholesterol or triglyceride levels, contrary to Prezista's label." (*Id.* ¶ 108.) Relators further plead that because Prezista actually increases lipids in patients, it presents a serious risk of cardiovascular disease for patients.  (*Id.* ¶ 109.)  Relators allege numerous instances where Defendants' sales representatives and managers have misrepresented Prezista's effect on lipids. (*Id.* ¶¶ 110-27.)  Additionally, Relators allege that Defendants misrepresented Prezista as having superior "binding affinity," which relates to the drug's ability to prevent HIV from replicating. (*Id.* ¶¶ 128-35.)   The Amended Complaint reports that Prezista's worldwide sales increased substantially due to Defendants' misrepresentations.  (*Id.* ¶ 140.)

As to the second drug, Intelence, Relators allege that Defendants improperly promoted and marketed the drug for unapproved once-daily dosage and treatment-naïve patients.  (*Id.* ¶¶ 141-61.)  Intelence, according to Relators, was actually intended for twice-daily dosing to patients who were treatment-experienced in that they had "viral strains resistant to an NNRTI[2] and other antiretroviral agents."  (*Id.* ¶ 141.)

---

[2] Non-nucleoside reverse-transcriptase inhibitors.  (Am. Compl. ¶ 13.)

**Appx2**

According to the Amended Complaint, Defendants utilized their nationwide sales force to implement a broad scheme to mislead physicians. (*Id.* ¶¶ 162-92.) Defendants also allegedly implemented a kickback scheme, used dinner programs with planted audience members to ask off-label questions, and paid for speaking engagements to falsely promote Prezista and Intelence as having certain characteristics. (*Id.* ¶¶ 193-207.) As a result of Defendants' misleading marketing and kickback schemes, Relators allege that false claims for reimbursement were submitted to the Government under Medicaid and Medicare programs. (*Id.* ¶¶ 212-19.)

## II.  **Legal Standard**

When analyzing a Rule 12(b)(6) motion, district courts conduct a three-part analysis. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court must accept as true all of a plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court, however, must disregard any conclusory allegations proffered in the complaint. *Id.* at 210-11. Finally, once the well-pleaded facts have been identified and the conclusory allegations ignored, a court must determine whether the "facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

Further, a plaintiff pleading fraud "must meet a heightened pleading standard under Federal Rule of Civil Procedure 9(b)." *Zuniga v. Am. Home Mortg.*, No 14-2973, 2016 WL 6647932, at *2 (D.N.J. Nov. 8, 2016). "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). "A plaintiff alleging fraud must therefore support [her] allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and

**Appx3**

how of the events at issue.'" *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). In the Third Circuit, a viable FCA claim must allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156-57 (3d Cir. 2014) (citations omitted). The Third Circuit does not require a plaintiff to "identify a specific claim for payment *at the pleading stage* of the case to state a claim for relief." *Id.* at 156 (citing *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 308 (3d Cir. 2011)).

### III.    Parties' Positions[3]

#### A.    Motion to Dismiss: Janssen Products

First, Janssen Products argues that merely alleging that Defendants falsely certified Prezista as "reasonable and necessary" for the treatment of patients fails to state a viable claim under the FCA. (Janssen Prods.'s Moving Br. 8-12, ECF No. 58-1.) According to Janssen Products, the Amended Complaint concedes that Prezista was prescribed for its FDA-approved use and that FDA approval inherently renders the drug "reasonable and necessary." (*Id.*; Janssen Prods.'s Reply Br. 1-5, ECF No. 71.) Janssen Products further argues that the Amended Complaint's allegations of misbranding are conclusory and cannot, therefore, give rise to FCA liability. (Janssen Prods.'s Moving Br. 13-15; Janssen Prods.'s Reply Br. 5-7.)

Second, with respect to both Prezista and Intelence, Janssen Products argues that the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies and that Relators

---

[3] The Court summarizes the parties' arguments as set forth in their written submissions. The Court recognizes that the arguments have evolved over the course of the briefing schedule, due to supplemental authorities, substantive correspondence from the parties, and further elaboration at oral argument. The Court does not set forth all of those arguments here, but has considered all of the parties' arguments and addresses the material issues in the Discussion section below.

**Appx4**

have failed to plead with sufficient particularity a "scheme to induce the submission of false claims for government reimbursement using misleading or off-label promotion" or "how that alleged scheme actually caused such claims to be submitted to Medicare and Medicaid." (Janssen Prods.'s Moving Br. 15-22; Janssen Prods.'s Reply Br. 7-11.)

Finally, Janssen Products asserts that Relators' state claims should be dismissed for: (1) the same reasons as the federal claims; (2) failure to mention any conduct that occurred in many of the states; and (3) miscellaneous reasons specific to certain states. (Janssen Prods.'s Moving Br. 22-25; Janssen Prods.'s Reply Br. 11-12.)

In opposition, Relators argue that they have adequately pled Defendants' use of fraud by deliberate suppression of material information about Prezista and unlawful payment for speeches and other financial incentives to prescribing physicians in violation of the AKS. (Relators' Opp'n Br. 9, ECF No. 64.) Relators further note that Defendants have failed to dispute the viability of Relators' FCA claims regarding illegal off-label marketing of Intelence. (*Id.* at 10.) In response to Janssen Products's characterization as to what constitutes "reasonable and necessary," Relators argue that a viable FCA claim persists even where the prescriptions at issue were FDA-approved. (*Id.* at 10-23.)

Next, Relators clarify that their "claims do not arise from the misbranding itself, but from the *submission of claims* for uncovered, misrepresented (and therefore, misbranded), and medically unnecessary drugs, induced by Defendants' deceptive conduct." (*Id.* at 24-28.) Relators additionally argue that they have adequately pled their claims with detail pursuant to Rule 9(b). (*Id.* at 28-44.) Finally, Relators argue that they have sufficiently pled a nationwide scheme such that identification of state-specific conduct is unnecessary, and additionally respond to Janssen Products's miscellaneous state-specific arguments. (*Id.* at 44-47.)

**Appx5**

With regard to Janssen Products's contention as to whether on-label use is always "reasonable and necessary," the Government submitted a Statement of Interest, arguing that "a drug is not per se 'reasonable and necessary' simply because it was prescribed for a FDA-approved indication." (Gov't's Statement of Interest 5, ECF No. 75.) Rather, the Government asserts, other factors are relevant to the "reasonable and necessary" determination, such as "whether a physician prescribed the drug." (*Id.*) Additionally, the Government argues that "[f]raud directed at physicians may . . . establish FCA liability if government reimbursement was a reasonably foreseeable result." (*Id.* at 6-8.) The Government does not take a position as to whether Relators have adequately pled under this theory. (*Id.* at 8.)

In response to the Government's Statement of Interest, Janssen Products clarifies that it is not advocating a per se rule for FDA-approved drugs. (Janssen Prods.'s Resp. to Gov't's Statement of Interest 1, ECF No. 77.)

**B.     Motion to Dismiss: Johnson & Johnson**

Johnson & Johnson argues that Relators' claims against it are solely based on Janssen Products's conduct. (Johnson & Johnson's Moving Br. 5, ECF No. 57-1.) Accordingly, Johnson & Johnson asserts that its parent corporation status is insufficient to support claims arising entirely from claims against Janssen Products. (*Id.* at 4-6; Johnson & Johnson's Reply Br. 2-5, ECF No. 70.) Johnson & Johnson further argues that Relators fail to satisfy Rule 9(b)'s pleading standard because the Amended Complaint does not differentiate the factual allegations with respect to each Defendant. (Johnson & Johnson's Moving Br. 6-8; Johnson & Johnson's Reply Br. 5-6.)

**Appx6**

In their opposition brief, Relators argue that they have adequately pled their claims against Johnson & Johnson.[4] First, Relators assert that Johnson & Johnson was involved in the purportedly fraudulent schemes due to its control over Janssen Products. (Relators' Opp'n Br. 48-50.) Relators, otherwise, do not describe any other allegations in the Amended Complaint specific to Johnson & Johnson, but simply argue that "[a] parent company can be held liable under the FCA because of its involvement in its subsidiary's FCA violations." (*Id.* at 48.) Relators further argue that Johnson & Johnson "may be held liable under an agency theory of liability." (*Id.* at 48-49.)

## IV.  Discussion

### A.  Motion to Dismiss: Janssen Products

1.  Count One: FCA – For Misbranded and Off-Label Prescriptions of Prezista and Intelence

Relators bring their federal claims under 31 U.S.C. § 3729(a)(1)(A), (B), of the FCA. (Am. Compl. ¶¶ 220-27.) The relevant provisions of the FCA prohibit any person from: (1) "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval"; and (2) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). To establish a prima facie case pursuant to these provisions, a plaintiff must plead that: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States ex rel. Wilkins*, 659 F.3d at 305 (quoting *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004)). "A claim is legally false when it does not comply 'with a statute or regulation the

---

[4] The Court notes that during oral argument, however, Relators conceded to their inadequate pleading with respect to Johnson & Johnson. (*See* May 23, 2017 Oral Argument Tr. 19:10-12 ("Your Honor, our complaint is thin as to Johnson & Johnson. We admit that. And if Your Honor chooses to dismiss [the allegations with respect to Johnson & Johnson], we can understand that.").)

**Appx7**

compliance with which is a condition for Government payment.'" *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017) (quoting *United States ex rel. Wilkins*, 659 F.3d at 305).

Relators' claims arise under the Medicare and Medicaid programs. (Am. Compl. ¶¶ 81-94.) Under the Medicare statute, "no payment may be made . . . for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395w-102(e)(3); 42 U.S.C. § 1395y(a)(1)(A). Relators allege that Medicaid similarly "only reimburses for 'reasonable and necessary' medical services, including drugs."[5] (Am. Compl. ¶ 88.) Accordingly, Relators can adequately plead a false claim with respect to Prezista and Intelence if the drugs were not medically "reasonable and necessary." *United States ex rel. Petratos*, 855 F.3d at 487. As Janssen Products concedes that Relators have adequately pled the off-label use of Intelence,[6] the Court focuses its analysis on Prezista.

According to the Third Circuit, "the 'reasonable and necessary' determination is a process involving the FDA,[7] CMS,[8] *and* individual doctors." *Id.* FDA approval does not per se render a drug "reasonable and necessary," but rather a drug "must also be 'reasonable and necessary for [the] *individual patient*' based on 'accepted standards of medical practice and the medical

---

[5] The Court recognizes the separate statutory schemes for Medicare and Medicaid. *See In re Plavix Mktg., Sales Practices & Prods. Liab. Litig.* ("*Dickson*"), 123 F. Supp. 3d 584, 606-10 (D.N.J. 2015). Nonetheless, because the parties group the Medicare and Medicaid allegations in making their arguments with respect to the definition of "reasonable and necessary," the Court will not separately analyze each state's specific Medicaid restrictions at this stage of the litigation.

[6] May 23, 2017 Oral Argument Tr. 7:18-21 ("For Intelence, . . . there are clearly defined off-label allegations for off-label uses, absolutely.").

[7] The Food and Drug Administration.

[8] The Centers for Medicare & Medicaid Services.

**Appx8**

circumstances of the *individual case.*'" *Id.* at 488 (alteration in original).  In light of the guidance from *Petratos*, Relators have adequately pled that despite FDA approval, Prezista was not "reasonable and necessary" for certain patients.

Janssen Products argues that *Petratos* did not specifically address the analysis in *In re Plavix Marketing, Sales Practices and Products Liability Litigation* ("*Dickson*"), 123 F. Supp. 3d 584, 600-11 (D.N.J. 2015), and that *Petratos* concerned reimbursements under Medicare Parts A and B, as opposed to *Dickson*'s analysis under Part D.  (Janssen Prods.'s May 17, 2017 Letter 1, ECF No. 84.)  Although the present case arises under Part D and the Court recognizes the differences between Parts A, B, and D under the Medicare program, the Court finds persuasive the Third Circuit's recent decision in *Petratos*.  *Petratos* interpreted "reasonable and necessary" in Section 1395y(a)(1)(A)—which Part D incorporates by explicit reference—to include the determinations of individual doctors. 855 F.3d at 487-89; 42 U.S.C. § 1395w-102(e)(3).

In *Dickson*, the district court determined that "a FDA approved drug that has been prescribed for its on-label use is necessarily covered under Medicare Part D," but qualified its conclusion by stating: "[o]f course, if a doctor were to give a prescription to a patient who did not require medication at all, such a prescription would not be 'reasonable and necessary.'" *Dickson*, 123 F. Supp. 3d at 605 n.12.  The court further found that the plaintiff did "not allege[] that [the] [d]efendants' marketing caused [the drug] to be prescribed to patients who did not need such a drug." *Id.*  Accordingly, *Dickson* recognized, as the Third Circuit later set forth in *Petratos*, that an individualized assessment of a particular patient's medical circumstances is relevant to whether a drug is "reasonable and necessary."  Applying the definition of "reasonable and necessary," with the benefit of the recent, additional guidance from *Petratos*, the Court finds that the Amended Complaint has adequately pled the FCA claims with respect to Prezista.

9

Janssen Products further argues that the Amended Complaint fails to plead adequate materiality. (Janssen Prods.'s May 17, 2017 Letter 2.) To state a valid FCA claim, a pleading must allege a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement [that is] material to the Government's payment decision." *United States ex rel. Petratos*, 855 F.3d at 489 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016)). Under the FCA, "materiality" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "The materiality standard is demanding." *United States ex rel. Escobar*, 136 S. Ct. at 2003. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*

Janssen Products argues that the Amended Complaint fails to plead materiality with respect to Prezista because "there are no factual allegations showing that the Part D sponsor would not have reimbursed claims for on-label prescriptions of Prezista." (Janssen Prods.'s May 17, 2017 Letter 2.) To the contrary, however, the Amended Complaint pleads that: (1) each of Defendants' claims for government reimbursement, in connection with Prezista and Intelence, included false certifications rendering the claims "ineligible for reimbursement"; and (2) Defendants' "claims for prescriptions caused by [their] misconduct are not reimbursable." (Am. Compl. ¶¶ 213-14.) Moreover, the Court notes that in *Petratos*, the relator failed to "plead that knowledge of the violation could influence the Government's decision to pay," and, therefore, found that the relator did not adequately plead materiality. *United States ex rel. Petratos*, 855 F.3d at 490. In contrast,

10

Relators have adequately pled that Defendants' misconduct would have caused the Government to refuse reimbursement.

    2.    <u>Particularity under Rule 9(b) re: Counts One & Two</u>

Janssen Products argues that Relators have generally failed to comply with Rule 9(b)'s heightened pleading requirements, especially because "they do not identify even one physician who wrote a prescription that was reimbursed by a government payor based on the[] allegedly false statements or when any such prescription was written." (Janssen Prods.'s Moving Br. 17-18 (emphasis removed).) To satisfy Rule 9(b) for a FCA claim, a plaintiff must allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014) (adopting the pleading requirements set forth by the First, Fifth, and Ninth Circuits). Under this standard, a plaintiff need not identify a specific claim for payment to survive a motion to dismiss. *United States ex rel. Walker v. Loving Care Agency, Inc.*, No. 11-6142, 2016 WL 7408848, at *2 (D.N.J. Dec. 22, 2016) (citations omitted). In other words, "[t]he fact that Relators did not identify a single reimbursement is not fatal to their claims at this stage of the proceedings." *United States ex rel. Brown v. Pfizer, Inc.*, No. 05-6795, 2016 WL 807363, at *11 (E.D. Pa. Mar. 1, 2016); *see also United States v. Medco Health Sys., Inc.*, No. 12-522, 2014 WL 4798637, at *11 (D.N.J. Sept. 26, 2014) (stating that a plaintiff need not identify specific claims submitted for reimbursement because "such specific proofs are usually inaccessible to a *qui tam* plaintiff").

For the proposition that the Amended Complaint pleads inadequate particularity, Janssen Products relies on two district court cases that were decided prior to the controlling Third Circuit authority in *Foglia v. Renal Ventures Management, LLC*, 754 F.3d 153 (3d Cir. 2014): *United States ex rel. Lampkin v. Johnson & Johnson, Inc.*, No. 08-5362, 2013 WL 2404238 (D.N.J. May

31, 2013), and *United States ex rel. Piacentile v. Sanofi Synthelabo, Inc.*, No. 05-2927, 2010 WL 5466043 (D.N.J. Dec. 30 2010). Janssen Products attempts to reconcile *Foglia* with these two cases by stating that they applied the more lenient *Foglia* standard. (May 23, 2017 Oral Argument Tr. 12:14-16.) The *Lampkin* and *Piacentile* courts, however, did not apply the *Foglia* standard. In *Foglia*, the Third Circuit specifically refused to require plaintiffs to show "representative samples" of the alleged misconduct because it would be "one small step shy of requiring production of actual documentation with the complaint." *Foglia*, 754 F.3d at 156. In contrast, the *Lampkin* court specifically dismissed the complaint because, *inter alia*, the plaintiff failed to "identify any examples of specific false claims that were made to the government." *United States ex rel. Lampkin*, 2013 WL 2404238, at *5. Similarly, the *Piacentile* court dismissed a FCA claim because the "allegations of the claims that were submitted to the government [were] conclusory." *United States ex rel. Piacentile*, 2010 WL 5466043, at *8.

Here, the Court finds that Relators have adequately pled the submission of false claims under the pleading standard set forth in *Foglia*. First, the Amended Complaint alleges that "Defendants caused false claims to be submitted to the Government Health Care Programs for reimbursement." (Am. Compl. ¶¶ 213, 215, 217.) The Amended Complaint further alleges that Defendants utilized a nationwide scheme of misbranding and kickbacks to cause physicians to prescribe Prezista and Intelence, which resulted in substantial financial success for Defendants. (*Id.* ¶¶ 107-219); *see United States ex rel. Brown*, 2016 WL 807363, at *11 (finding that the plaintiff's allegation of the defendant's "incredible success of [its] marketing efforts in increasing the sale of [its product] and gaining an edge over competitors in the antifungal drug market . . . , coupled with the marketing efforts targeted at hospitals, physicians, and pharmacists, to prescribe [the defendant's drug] for off-label use, gives rise to a strong inference that [the] [d]efendant's off-

label marketing scheme caused the submission of false claims to government health care providers"). Accordingly, the Court finds that Relators have adequately pled Counts One and Two as they relate to Janssen Products.

    3.    <u>State Claims</u>

With respect to Relators' state claims, the Court first dismisses Relators' Maryland claims in light of Relators' concession that they should be dismissed. (Relators' Opp'n Br. 47, ECF No. 64.) Relators further seek leave to amend incorrect statutory references with regard to their Washington and Connecticut claims. (*Id.*) Accordingly, the Court dismisses these claims as well, and grants Relators' request to amend their pleading as it relates to these claims.

As to Relators' Michigan claims, Janssen Products cites the *Merck Sharp* case for the proposition that Relators' claims constitute products liability claims that are barred under state law. (Janssen Prods.'s Moving Br. 24-25 (citing *Attorney Gen. v. Merck Sharp & Dohme Corp.*, 807 N.W.2d 343, 345-46 (Mich. Ct. App. 2011)).) The *Merck Sharp* case, however, dealt specifically with on-label, FDA-approved uses, whereas here, Relators allege "off-label promotion of . . . prescription drug[s] for uses beyond the FDA's approval." *United States ex rel. Brown v. Pfizer, Inc.*, No. 05-6795, 2016 WL 807363, at *14 (E.D. Pa. Mar. 1, 2016). Here, Relators plead off-label use with respect to Intelence and plead that Defendants marketed Prezista in direct contradiction to the label as to the drug's effect on lipids. (May 23, 2017 Oral Argument Tr. 7:18-21; Am. Compl. ¶¶ 108-09, 113-15, 141-61.) Based on the parties' limited briefing on this issue, the Court finds that Relators have adequately pled their Michigan claims at this stage of the litigation.

With respect to the remaining state claims, the Court finds that the Amended Complaint has adequately pled a nationwide scheme of misbranding and the utilization of kickbacks to

**Appx13**

survive a motion to dismiss. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 496 (E.D. Pa. 2016) ("Certainly, [the] [p]laintiff cannot be expected to plead with particularity each and every false claim nationwide without the benefit of at least some discovery, as such information rests solely within [the] [d]efendants' control." (quoting *United States ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 177 (E.D. Pa. 2012))).

### B.    Johnson & Johnson

Finally, the Court agrees with Johnson & Johnson's argument that Relators fail to plead specific allegations against it with sufficient particularity. By defining "J & J" as referencing both Defendants, Relators fail to provide Johnson & Johnson with the requisite notice as to what specifically is being alleged against Johnson & Johnson. (Am. Compl. at 1); *see Foglia*, 754 F.3d at 156 (recognizing that "the purpose of Rule 9(b) is to provide[] defendants with fair notice of the plaintiffs' claims") (alteration in original) (internal quotations omitted). Additionally, Relators have not identified allegations in the Amended Complaint that set forth agency liability in adequate detail, and the Court does not consider factual allegations set forth in Relators' briefs or oral argument where absent from the pleading itself. *In re Burlington Coat Factory Sec. Litig.*, 114 F. 3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.") (citation omitted). As "mere ownership of a subsidiary does not justify the imposition of liability on the parent,"[9] the Court dismisses Relators' claims against Johnson & Johnson under Rule 9(b) of the Federal Rules of Civil Procedure.

---

[9] *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) (citing *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)).

**V.**    <u>**Conclusion**</u>

For the reasons set forth above, Janssen Products's Motion to Dismiss is GRANTED in part and DENIED in part, and Johnson & Johnson's Motion to Dismiss is GRANTED.  An order consistent with this Memorandum Opinion will be entered.

s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** May 31, 2017

**Appx15**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 12-7758 (MAS) (LHG) |
| JOHNSON & JOHNSON, et al., | **ORDER** |
| Defendants. | |

This matter comes before the Court on Defendant Johnson & Johnson's Motion to Dismiss (ECF No. 57) and Janssen Products, L.P.'s ("Janssen Products") (collectively, "Defendants") Motion to Dismiss (ECF No. 58) the First Amended Complaint ("Amended Complaint"). Relators Jessica Penelow and Christine Brancaccio (collectively, "Relators") filed opposition (ECF No. 64) and Defendants replied (ECF Nos. 70, 71). Relators filed a Motion for Leave to File a Sur-Reply. (ECF No. 73.) Janssen Products filed opposition to Relators' Motion.[1] (ECF No. 74.) The United States of America (the "Government") filed a Statement of Interest (ECF No. 75), and Janssen Products filed a response (ECF No. 77). Finally, Relators filed two Notices of Supplemental Authority (ECF Nos. 78, 82) and Janssen Products filed responses (ECF Nos. 79, 84).

The Court has carefully considered the parties' submissions and heard oral argument on May 23, 2017. For the reasons set forth on the record, and other good cause shown,

---

[1] As set forth on the record during the May 23, 2017 oral argument, the Court denies Relators' Motion for Leave to file a Sur-Reply. (ECF No. 73; May 23, 2017 Oral Argument Tr. 1:25-2:5.)

**IT IS** on this <u>31st</u> day of May 2017, **ORDERED** that:

1.      Relators' Motion for Leave to File a Sur-Reply (ECF No. 73) is DENIED.

2.      Johnson & Johnson's Motion to Dismiss (ECF No. 57) is GRANTED.  All claims against Johnson & Johnson are dismissed without prejudice.

3.      Janssen Products's Motion to Dismiss (ECF No. 58) is GRANTED as to Counts Seven, Eight, Twenty-Five, Twenty-Six, Fifty-Five, and Fifty-Six without prejudice.

4.      Janssen Products's Motion to Dismiss (ECF No. 58) is DENIED on all remaining Counts.

5.      By **June 30, 2017**, Relators may file a Second Amended Complaint.  Relators' failure to file a Second Amended Complaint by this deadline will result in the dismissal with prejudice of the claims that have been dismissed in this Order.


s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Appx17**

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al*., *ex rel.* JESSICA PENELOW and CHRISTINE BRANCACCIO,<br><br>Plaintiffs,<br><br>v.<br><br>JANSSEN PRODUCTS, LP,<br><br>Defendant. | Civil Action No. 12-7758 (ZNQ) (LHG)<br><br>**MEMORANDUM OPINION** |

<u>**QURAISHI, District Judge**</u>

This matter comes before the Court upon a Motion for Summary Judgment (the "Motion") filed by Janssen Products, LP ("Janssen"). (ECF No. 187.) Janssen submitted a Brief in Support of the Motion. ("Moving Br.," ECF No. 187-1.) Relators Jessica Penelow and Christine Brancaccio (collectively, "Relators") opposed the Motion, ("Opp'n Br.," ECF No. 287), to which Defendant replied, ("Reply Br.," ECF No. 242.) The Court carefully considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will deny Janssen's Motion.

**I.    BACKGROUND**

Relators filed the instant action on behalf of the federal government, twenty-six states, and the District of Columbia, alleging fifty-six counts under the Federal False Claims Act ("FCA"), the Federal Anti-Kickback Statute ("AKS"), and the false claims acts of various states. ("Second

Am. Compl." at 1–2, ECF No. 90.)  The claims arise from Janssen's purported kickback scheme and off-label ("OL") promotions of two HIV/AIDS drugs: Prezista and Intelence.  *Id.*

## II.     UNDISPUTED MATERIAL FACTS

On December 18, 2012, Relators Penelow, a former Janssen employee, and Brancaccio, a current Janssen employee, filed under seal this *qui tam* action against Janssen and its corporate parent, Johnson & Johnson.  (Def's Statement of Material Facts ("DSMF") ¶ 1, ECF No. 187-2; ECF No. 1.)  The United States and several states declined to intervene in this action.  (*Id.* ¶¶ 3, 6.)  On May 31, 2017, the Court dismissed all claims against Johnson & Johnson and all claims brought by Relators on behalf of the State of Maryland.  (*Id.* ¶ 7; ECF No. 86.)

On June 30, 2017, Relators filed their Second Amended Complaint, the operative complaint in this case.  (*Id. ¶* 10.)  Relators and Janssen engaged in approximately three years of discovery in this matter.  (*Id.* ¶ 11.)  During that time, almost two million pages of documents were produced and seventeen current and former Janssen employees were deposed, including account managers, sales training managers, and sales representatives.  (*Id*. ¶¶ 12, 14.)  The owner of the third-party agency that conducted return on investment analyses was deposed.  (*Id.* ¶ 15.)  Furthermore, four proposed Janssen expert witnesses issued reports discussing Medicare Part D, causation and damages, HIV, and compliance.  (*Id.* ¶ 17.)  In turn, seven proposed expert witnesses issued reports on behalf of Relators concerning similar topics.  (*Id.* ¶ 18.)

The HIV drugs at issue are antiretroviral medications that stop the HIV virus from replicating, which prevents HIV progression, opportunistic infections, and death.  (*Id.* ¶¶ 20, 33.)  Twenty-eight FDA-approved antiretroviral medications were available during the nine-year period (2006 to 2014) over which Relators allege Janssen improperly marketed Prezista and Intelence.  (*Id.* ¶ 21.)  These antiretroviral medications are divided into six different classes based on how the

2

medication disrupts HIV replication.  (*Id.*)  Doctors often prescribe "cocktails" of drugs consisting of two or more antiretrovirals from different classes to interfere with viral replication at multiple points.  (*Id.* ¶ 22.)

When determining which antiretroviral medications to prescribe, the doctor's primary goal is to stop the patient's HIV from replicating.  (*Id.* ¶ 24.)  Doctors also strive to minimize side effects to the patient, ensure patient adherence to the prescribed therapy, enhance the patient's quality of life, and co-manage the patient's other chronic diseases.  (*Id.* ¶ 26.)  Therefore, HIV treatment requires individualized treatment because a regimen that is appropriate for one patient may be inappropriate for another.  (*Id.* ¶ 23.)  Before selecting a treatment regimen, doctors use blood tests to determine which regimen will be most effective, monitor efficacy of such treatment, and look for potential treatment side effects (including lipid abnormalities).[1]  (*Id.* ¶¶ 27–28.)  In addition, doctors consider numerous other factors in choosing the combination of antiretroviral medications to prescribe, including consensus-based treatment guidelines, patient medical history and characteristics, discussions from ongoing clinical trials, academic conferences, personal clinical experience, pharmaceutical promotion, and many other factors.[2]  (*Id.* ¶ 29.)

The Department of Health and Human Services ("HHS") publishes consensus-based HIV treatment guidelines that "reflect the federal government's position on the standard of care for the use of HIV medications as it evolved over time, based on an expert panel's independent evaluation of reliable scientific research."  (*Id.* ¶ 41.)  The HHS guidelines are generally updated multiple

---

[1] Relators and Janssen agree that the viral load (amount of HIV virus in patient's bloodstream), CD4 count (the number of CD4 T-cells, or white blood cells), and viral genotype (the drug resistance-associated mutations) are taken into consideration when selecting an appropriate HIV treatment regimen.  (*Id.* ¶ 27; ECF No. 287 at 7–8.)  However, the parties disagree on whether physicians *always* consider the viral genotype.  (DSMF ¶ 27.)  The parties also disagree on the type of tests used to monitor the treatment and the frequency at which physicians run these tests.  (*Id.* ¶ 28; ECF No. 287 at 7–8.)

[2] Relators dispute whether physicians consider all these factors every time they choose a particular combination of antiretroviral medications and that these factors represent an exhaustive list of what doctors consider in their decision-making process.  (ECF No. 287 at 8.)

times each year to incorporate, among other things, peer-reviewed journals and data presented at major conferences. (*Id.* ¶ 42.)

Medicare Part D ("Part D") provides prescription drug coverage for the elderly and people with certain disabilities. (*Id.* ¶ 50.) It helps cover the costs of "covered Part D drugs," which are FDA-approved medications prescribed for a "medically accepted indication." (*Id.* ¶ 51.) Under the Part D statute, antiretroviral medications are designated as a "protected class of drugs," and the government requires Part D plans to cover "all or substantially all" FDA-approved antiretroviral medications in order "to mitigate the risks and complications associated with an interruption of therapy for . . . vulnerable populations." (*Id.* ¶ 53.) The Center for Medicare & Medicaid Services ("CMS") takes the position that for "HIV/AIDS drugs, utilization management tools such as prior authorization . . . are generally not employed in widely used, best practice formulary models." (*Id.* ¶ 54.)

Medicaid provides healthcare coverage for low-income people. (*Id.* ¶ 55.) It is funded jointly by the federal government and states, with the federal government contributing approximately 50% to 83% of the funding and states contributing the remainder. (*Id.* ¶ 56.) The federal government's share of a state's Medicaid expenditures is called federal financial participation ("FFP"). (*Id.* ¶ 57.) Although the federal government oversees Medicaid, the program is administered on a state-by-state basis, and states have discretion to customize their plans. (*Id.* ¶ 57.) The federal government permits state Medicaid programs to cover any drug that meets the regulatory definition of a "prescribed drug." (*Id.* ¶ 59.) "Prescribed drugs" are "substances prescribed for the cure, mitigation, or prevention of disease, or for health maintenance" by a doctor and dispensed by a pharmacist. (*Id.* ¶ 60.) Thus, a prescribed drug covered by a state Medicaid program is eligible for federal reimbursement. (*Id.* ¶ 61.)

States, however, may exclude or otherwise restrict coverage if a drug's "prescribed use is not for a medically accepted indication." (*Id.* ¶ 62.) Separately, states create and administer their own AIDS Drugs Assistance Programs ("ADAPs") programs through federal block grants that fund "core medical services" for HIV patients, including HIV medications. (*Id.* ¶ 64.) At a minimum, state ADAPs must cover "at least one drug from each class of HIV antiretroviral medications" but otherwise "have significant flexibility in how they administer their ADAPs" and are "given the authority to determine the specific FDA-approved drugs to cover." (*Id.* ¶ 66.) Ultimately, state ADAP programs serve as "payor of last resort" to improve the availability of and access to care for uninsured or under-insured HIV patients, and they fund HIV treatment when no other resources are available to them. (*Id.* ¶ 67.)

Prezista and Intelence—both manufactured, marketed, and sold by Janssen—are antiretroviral medications that are approved by the FDA to treat HIV. (*Id.* ¶ 32.) The FDA approved Prezista, a protease inhibitor, for treatment-experienced patients in June 2006. (*Id.* ¶ 33.) Prezista was later approved for treatment-naïve patients in October 2008. (*Id.* ¶ 34.) In January 2008, the FDA approved Intelence, a non-nucleoside reverse transcriptase inhibitor, for twice-daily use (two tablets, twice a day) and for treatment-experienced patients.[3] (*Id.* ¶ 37.)

Janssen promoted Prezista and Intelence to physicians through sales calls and speaker programs (the "Speaker Programs"). (*Id.* ¶ 38.) During sales calls, Janssen sales representatives spoke to doctors about the benefits of Prezista and Intelence for HIV patients. (*Id.* ¶ 39.) During the Speaker Programs, physicians educated other physicians about Prezista and Intelence. (*Id.* ¶ 40.)

---

[3] "Protease inhibitor" and "non-nucleoside reverse transcriptase inhibitor" refer to two distinct classes of antiretroviral medications used to treat HIV/AIDS.

Appx22

### III.    STATEMENT OF DISPUTED FACTS

There are several major disputes between the parties.   They disagree about the characterization of the FDA labels for Prezista and Intelence.  They also disagree about the drugs' efficacy and the characterization of the HHS treatment guidelines.  Notably, the parties disagree on the factors physicians consider when prescribing antiretroviral medications.  With respect to the Speaker Programs, they dispute material facts concerning compliance issues.  They also dispute material facts concerning remuneration for the physician speakers and material facts surrounding Janssen's attempts to determine the efficacy of Speaker Programs by conducting return on investment analyses.

### IV.    PARTIES' ARGUMENTS

#### A.    Defendant's Motion for Summary Judgment

##### 1.    FCA Claims

Janssen argues that this Court should grant summary judgment as to the FCA claims ("Promotional Claims") because Relators have insufficient evidence to prove the following: (1) "that any claim submitted for a Prezista prescription for an HIV patient with lipid conditions was unreasonable and unnecessary and, therefore, *false*"; (2) "that any of Janssen's four alleged promotional messages *caused* a doctor to write a Prezista or Intelence prescription for any HIV patient"; and (3) "that any of Janssen's four alleged promotional messages were *material* to any decision by the government to pay for a Prezista or Intelence prescription."  (Moving Br. at 2–4, 12–22.)  Janssen asserts that summary judgment must be granted if Relators fail to prove *any one* of the FCA elements.  (*Id.* at 12–13.)

First, although Relators' claims involve four OL promotional messages concerning Prezista and Intelence, Janssen only argues that Relators have insufficient evidence to prove falsity

**Appx23**

as to their claims based on the promotion of Prezista as "lipid friendly" or "lipid neutral." (*Id.* at 13.) Janssen argues that Relators have insufficient evidence from which a jury could conclude that a Prezista prescription written for an HIV patient with lipid conditions was unreasonable and unnecessary because Relators failed to meet the second part of the "reasonable and necessary" analysis under *United States ex rel. Petratos v. Genentech*, 855 F.3d 481, 488 (3d Cir. 2017). (*Id.* at 14.) More specifically, Janssen argues that Relators presented no evidence that "it was unreasonable and unnecessary for the 'individual doctor' to prescribe Prezista to the 'individual patient' based on the particular 'medical circumstance of the individual case.'" (*Id.* at 14–15.) On a "macro, policy level" under *Petratos*, Janssen also argues that Prezista can be considered reasonable and necessary for an HIV patient with lipid conditions because the FDA approved Prezista as a safe and effective HIV treatment and the label for Prezista does not include any warnings about lipids or prescribing limitations for patients with lipid conditions. (*Id.* at 15.)

Second, Janssen argues "Relators have insufficient evidence to prove that any of Janssen's four alleged promotional messages caused a doctor to write a Prezista or Intelence prescription for a government-insured HIV patient." (*Id.* at 16.) In other words, Relators have no evidence that Janssen's OL promotion of Prezista and Intelence was a substantial factor in causing physicians to prescribe these medications for HIV patients. (*Id.*) Janssen claims that Relators obtained no patient-specific evidence, which would have "shed light on why particular doctors chose to prescribe Prezista or Intelence for particular HIV patients." (*Id.* at 17.) Given the complexity of a physician's decision-making process when treating HIV patients, Janssen argues that it is impossible for Relators to prove that the alleged OL promotional messages caused doctors to prescribe Prezista and Intelence without patient-specific evidence. (*Id.* at 17–18.) In addition, to the extent Relators rely on expert reports to establish causation, Janssen argues that the reports of Israel Shaked, Aaron Glatt, and George Sillup are inadmissible. (*Id.* at 18.) Also, Janssen distinguishes this matter from *United States ex rel. Brown*

*v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1037 (C.D. Cal. 2016), where Janssen claims "the circumstances made it reasonable to conclude that the [OL] use was caused by the improper promotion." (*Id.*)

Third, Janssen argues that "Relators have insufficient evidence to prove that any of Janssen's four alleged promotional messages were material to the government's decision to reimburse a Prezista or Intelence prescription." (*Id.*) Janssen contends Relators must show that knowing about Janssen's alleged OL promotion would have affected the government's payment decision. (*Id.* at 19.) In other words, Relators would have to show that "the government's decision to pay would have been different if the government had known about Janssen's alleged improper promotion." (*Id.* at 22.) Janssen maintains that Relators have "no evidence that Janssen's alleged promotional practices were material to any government decision." (*Id.* at 21–22.)

### 2. AKS Claims

As for the AKS claims ("Speaker Claims"), Janssen argues the Court should grant its motion for summary judgment for three reasons. First, "Relators do not have sufficient evidence to demonstrate that Janssen paid doctors who spoke at speaker programs in order to induce them to prescribe more Prezista or Intelence." (*Id.* at 22.) Like in *Celgene*, Janssen notes that the Speaker Programs here were organized by third-party vendors, the speakers were paid a flat fee per event, and the compensation was comparable to that provided by other drug companies. (*Id.* at 24.) Janssen argues that the burden shifts to Relators to identify sufficient evidence from which a reasonable jury could nonetheless conclude that Janssen paid speakers to induce them to prescribe more Prezista and Intelence—not just to compensate them for providing a valuable and lawful service. (*Id.*) To prove intent, Janssen claims that Relators will likely rely on the testimony from a handful of former Janssen employees who were not involved with the design and implementation of the Speaker Programs. (*Id.*) Janssen also notes that Relators will likely rely on the inadmissible testimony that Virginia Evans

intends to offer, which they claim is a legal conclusion. (*Id.*)  Therefore, Janssen argues that none of the testimony Relators have will be a sufficient basis for a jury to conclude Janssen acted with the requisite intent to bribe doctors.  (*Id.*)

Second, Janssen also claims Relators will likely "highlight evidence suggesting that experience prescribing Prezista and Intelence was a factor that Janssen considered in choosing doctors to be speakers." (*Id.* at 25.)  However, Janssen argues that it considered many factors when selecting physicians for the Speaker Programs.  (*Id.*)  Third, Janssen claims that Relators will likely rely on two cases[4] from the Southern District of New York where "the courts denied the pharmaceutical companies' summary judgment motions on claims based on speaker programs."  (*Id.*)  Janssen explains, however, that one of those cases involved extensive evidence that the company specifically analyzed speaker prescription volume to determine whether the honoraria payments increased the speakers' prescriptions. (*Id.* at 25–26.)  Here, Janssen argues that it only analyzed the promotional effectiveness of the Speaker Programs by analyzing whether the *attendees* prescribed more Prezista and Intelence after attending the Speaker Programs.  (*Id.* at 26.)  As for the other case, Janssen emphasizes that "Relators do not have any evidence that Janssen conducted speaker programs in inappropriate locations, that it regularly or significantly exceeded its food and beverage cap, or that it offered doctors any improper trips or entertainment." (*Id.* at 27.)  To the extent Relators may suggest Janssen conducted too many Speaker Programs or should have had more attendees at the programs, Janssen argues that "companies do not violate the AKS by making business decisions that may not be the most efficient."  (*Id.*)

---

[4]  See *United States ex rel. Arnstein v. Teva Pharm. USA, Inc.*, Civ. No. 13-3702, 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019); Order Denying Motion for Summary Judgment, *United States ex rel. Bilotta v. Novartis Pharm. Corp.*, Civ. No. 11-71 (S.D.N.Y. Mar. 31 , 2019) (ECF No. 296) (opinion never issued because of settlement).

## B.    Relators' Opposition

Relators argue that Janssen misstates the applicable legal standard for falsity, causation, and materiality under the FCA.  (Opp'n Br. at 21.)  They argue that summary judgment should be denied because they obtained abundant evidence from which a reasonable jury could conclude that each of the FCA elements has been satisfied.  (*Id.*)

First, Relators argue they have ample evidence to establish that Prezista claims for patients with lipid issues were false under the FCA.  (*Id.* at 32.)  They contend the "evidence shows that as a result of Janssen's false and misleading marketing, claims were submitted to the government for prescriptions for patients with lipid problems."  (*Id.* at 33.)  They argue that the claims were ineligible for reimbursement by the Government because they were medically unreasonable and unnecessary.  Relators maintain that "Prezista was generally not appropriate for patients with lipid problems and there was an alternative drug from a different manufacturer that did not pose lipid concerns."  (*Id.*)  In addition, "Relators' evidence supports an express false certification theory by showing that Janssen caused pharmacies to make false certifications that claims submitted to the government for Prezista for patients with lipid issues complied with the law . . . ."  (*Id.* at 40.)  Relators have "evidence showing that Janssen's illegal marketing caused pharmacies to falsely certify compliance with the law when submitting medically unnecessary claims for Prezista for patients with lipid problems." (*Id.* at 40–41.)

Second, Relators argue there is abundant evidence that Janssen's conduct was a substantial factor in causing physicians to prescribe Prezista and Intelence OL and that it was foreseeable false claims would result.  (*Id.*)  They argue that the "vast body of evidence adduced . . . demonstrates the top-down, widespread, and coordinated illegal promotional efforts by Janssen to boost sales of Prezista and Intelence."  (*Id.* at 24.)  Relators identify evidence that Janssen trained and instructed

its entire sales force to promote Prezista and Intelence OL. (*Id.* at 25–26, 27.) In addition, Relators point to evidence that Janssen's OL marketing campaign extended to its Speaker Programs because Janssen also promoted its OL messages through the physician-speakers. (*Id.* at 27.) Relators contend that "evidence of direct causation at a physician-by-physician or claim-by-claim level is not required to satisfy the substantial factor test in FCA cases." (*Id.* at 22, 31–32.) They also argue that a physician's independent prescribing decision does not break the causal chain. (*Id.* at 30–31.)

Third, Relators argue the Court should deny summary judgment "because the evidence establishes a triable issue of fact from which a jury could conclude that Janssen's false and OL marketing of Prezista and Intelence could have impacted the government's reimbursement of the drugs." (*Id.* at 41.) They argue that Janssen relies on an erroneous standard for FCA liability and that "the proper test for determining materiality in FCA cases is whether the conduct at issue has 'a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property.'" (*Id.* at 43–44.) Relators contend they are able to satisfy that materiality element because: (1) the government conditions payment on whether prescriptions are for medically accepted indications or are reasonable and necessary; (2) the government reimburses prescriptions that are OL or unreasonable and unnecessary goes to the "essence of the bargain"; (3) the government devotes significant efforts to combat OL marketing; and (4) Janssen knew the government devotes significant efforts to fighting OL marketing. (*Id.* at 44–49.)

Contrary to Janssen's arguments concerning the "Speaker Claims," Relators contend they have extensive evidence that Janssen used its nationwide Speaker Programs as a means to pay physicians to induce or reward their prescriptions of Prezista and Intelence. (*Id.* at 12.) They argue that Janssen focuses on limited evidence that is in dispute, which they claim is insufficient

11

to warrant summary judgment. (*Id.* at 17–20.) Relators emphasize that they do not need to prove the *sole* reason Janssen paid speakers was to induce them to prescribe or reward them for prescribing Prezista and Intelence. (*Id.* at 10.) Instead, Relators maintain that "payments to physicians violate the AKS if even 'one purpose' of the payments was to induce or reward the speakers," and Relators claim they have amassed substantial and compelling evidence that at least one purpose of Janssen's payments to speaker physicians was unlawful. (*Id.* at 10–11.) Relators point to sworn deposition testimony of seven current and former Janssen employees who testified that the Speaker Programs focused, in significant part, on inducing and rewarding prescriptions. (*Id.*) In addition, Relators highlight that Janssen paid hundreds of physicians a significant amount of money to give thousands of speeches over the relevant nine-year period. (*Id.* at 12–13.) "Janssen also paid [physicians] to attend training sessions and paid for hotels, meals, and travel expenses, making these events akin to paid vacations." (*Id.* at 13.) "Many speeches were held at inappropriate venues, including thousands at high-end restaurants." (*Id.*) Relators point to expert opinions that support a finding of unlawful inducement or reward. (*Id.*) They also note the existence of a considerable amount of circumstantial evidence in the form of testimony, documents, and data from which an unlawful purpose can be reasonably inferred. (*Id.*)

Moreover, Relators argue that "[o]ther factors considered by courts and the government as indicia of intent to violate the AKS are also well supported in the record." (*Id.* at 14.) They explain that Janssen tracked the prescriptions of the paid speakers *and* all attendees (some of whom were paid speakers as well) to monitor the return on investment of the Speaker Programs. (*Id.*) There is evidence that hundreds of physicians attended the same speech multiple times, and "the speeches were highly repetitive in nature and fairly rudimentary for the doctors attending." (*Id.* at 14–15.) Relators also point to evidence that the information presented during the Speaker Programs was

incomplete, inaccurate, and misleading and that the OL information about Prezista and Intelence was regularly presented by the highest paid speakers.  (*Id.* at 15.)  According to Relators, its expert economist will show that speakers continued to prescribe Prezista and Intelence once they started getting paid for speeches and that "speakers were more likely than non-speakers to prescribe Prezista and Intelence."  (*Id.* at 15–16.)  Additionally, the evidence will establish that Janssen's compliance department had little oversight over the Speaker Programs; instead, the Speaker Programs were controlled by Janssen's sale representatives (who were incentivized to increase sales) and its marketing department.  (*Id.* at 16–17.)

### C.    Defendant's Reply

On reply, Janssen reiterates that Relators have no evidence the Government was defrauded when it paid for HIV medications for HIV patients.  (Reply Br. at 1.)  It contends Relators have no evidence that: (1) "Prezista prescriptions for HIV patients with lipid conditions falsely certified eligibility for reimbursement"; (2) "Janssen's purported promotion was a substantial factor in any prescribing decision"; and (3) Janssen's purported promotion was material to the government programs.  (*Id.* at 1–9.)  With respect to the AKS claims, Janssen argues that "Relators have no admissible evidence that one purpose of Janssen's speaker bureaus was to bribe doctors."  (*Id.* at 9.)

### V.    <u>**JURISDICTION**</u>

The Court exercises subject matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and (b). Venue is appropriate under 31 U.S.C. § 3732(a) because Janssen transacts business in this judicial district.

**Appx30**

## VI.    LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case[,] . . . there can be no genuine issue of material fact.'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)). The inquiry at summary judgment is "whether the evidence presents a sufficient

**Appx31**

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## VII.    DISCUSSION

### A.    The Promotional Claims Under the FCA

"The False Claims Act is meant 'to reach all types of fraud . . . that might result in financial loss to the Government.'" *Petratos*, 855 F.3d at 486 (quoting *Cook Cnty. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003)). Relators bring their federal claims under 31 U.S.C. § 3729(a)(l)(A) and (B) of the FCA. (Second Am. Compl. ¶¶ 218–21.) The relevant provisions of the FCA impose civil liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 372 (a)(l)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 372 (a)(l)(B). Relators must prove the following elements: (1) falsity; (2) causation; (3) scienter; and (4) materiality.[5] *Petratos*, 855 F.3d at 487.

### 1.    Falsity

There are two types of falsity under the FCA: "factual falsity" and "legal falsity." *United States ex rel. Druding v. Care Alts., Inc.*, 952 F.3d 89, 96–97 (3d Cir. 2020). A claim is "factually false" when the claimant misrepresents to the Government what goods or services it provided. *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). A claim is "legally false" when the claimant misrepresents that he or she has complied with "statutory, regulatory, or contractual requirement[s]." *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 94 (3d Cir. 2018). In cases where a relator alleges the defendant caused the submission of false claims rather than submitting the claims itself, legal falsity

---

[5] Janssen does not move for summary judgment under the scienter element of the FCA. (Moving Br. at 12 n.5.)

nevertheless exists because the defendant "created and pursued a marketing scheme that it knew would, if successful, result in the submission by [others] of compliance certifications . . . that [the defendant] knew would be false." *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004). Here, two statutory requirements are relevant to Relators' allegations of legal falsity: (1) compliance under the Medicare statute; and (2) compliance with the AKS.[6]

First, under the Medicare statute, "no payment may be made . . . for any expenses incurred for items or services . . . [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395w-102(e)(3); 42 U.S.C. § 1395y(a)(l)(A). Therefore, a claim is false when it "does not comply with statutory conditions for payment," such as the Medicare statutory requirement that the items and services claimed are "reasonable and necessary." *Petratos*, 855 F.3d at 487 (quoting 42 U.S.C. § 1395y(a)(1)(A)). *See also* 42 C.F.R. § 411.15(k)(l).

Second, a claim may be legally false where there is an underlying violation of the AKS. *Greenfield*, 880 F.3d at 95. The AKS prohibits "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a [f]ederal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A). It is well-settled that "claims for payment made pursuant to illegal kickbacks are false under the [FCA]." *Greenfield*, 880 F.3d at 95 (quoting *United States ex rel. Westmoreland v. Amgen, Inc.*, 812 F. Supp. 2d 39, 52 (D. Mass. 2011)).[7]

---

[6] Janssen does not address legal falsity under the Medicaid statute.

[7] In 2010, Congress amended the AKS to clarify existing law, expressly providing that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). "Although the amendment is not retroactive," plaintiffs may still bring an FCA case for claims submitted before 2010 because the amendment "clarif[ied], [but did] not alter, existing law that claims for payment made pursuant to illegal kickbacks are false under the [FCA]." *Greenfield*, 880 F.3d at 95 (citations omitted).

**Appx33**

Here, Janssen contends Relators have insufficient evidence to prove falsity as to their claims based on the promotion of Prezista as "lipid friendly" or "lipid neutral." (Moving Br. at 13.) It argues that Relators failed to meet the second part of the "reasonable and necessary" analysis under *Petratos* because Relators have no evidence that "it was unreasonable and unnecessary for the 'individual doctor' to prescribe Prezista to the 'individual patient' based on the particular 'medical circumstance of the individual case.'" (Moving Br. at 14–15.) In *Petratos*, the Third Circuit explained that "the 'reasonable and necessary' determination is a process involving the FDA, CMS, and individual doctors." 855 F.3d at 488. Notwithstanding FDA approval, a claim must involve a drug that is "'reasonable and necessary for [the] *individual patient*' based on 'accepted standards of medical practice and the medical circumstances of the *individual case*.'" *Id.* (alteration and emphasis in original) (quoting Medicare Benefit Policy Manual, ch. 15, § 50.4.3). There are instances "when a drug treatment could be approved by the FDA and used for a medically accepted indication, but still not be 'reasonable and necessary'" for an individual patient. *Id.* Therefore, Relators would need to show that Prezista was not reasonable and necessary for patients with lipid conditions.

Relators point to evidence from which a jury could conclude that Janssen's OL promotion of Prezista's lipid profile misled physicians. Relators argue that Janssen made false assertions that Prezista was "lipid neutral" or "lipid friendly" (*i.e.*, the drug would not affect or increase a patient's cholesterol and triglyceride levels) even though the FDA-approved label for Prezista showed the drug caused a substantial increase in patients' lipids. Notably, Relators point to the anticipated expert testimony of Aaron E. Glatt, the HIV expert who opined that the "prescriptions for Prezista as a result of Janssen's false and misleading statements were not 'reasonable and necessary' for the treatment of patients who had concerning levels of lipids, triglycerides and/or cholesterol."

**Appx34**

(Opp'n Br. 37; *see also* Ellerbe Decl., Ex. 75, Glatt Report ¶¶ 153–61.)  According to Glatt, Janssen's OL promotion of Prezista misleadingly minimized the serious risk of cardiovascular disease for HIV/ AIDS patients.

Janssen contends that the label for Prezista does not include any warnings about the lipids or limitations on prescribing the drug to patients with lipid conditions, and Janssen notes that the FDA approved Prezista as a safe and effective HIV treatment after conducting clinical trials that considered potential lipid-related side effects.  (Moving Br. at 15.)  In essence, the parties dispute whether Prezista's label warned about any lipid-related side effects.  (Relators' Response to DSMF at 11–12, ECF No. 287-1; Relators' Counterstatement of Material Facts ("CMF") at 11–12, ECF No. 287-2.)  Contrary to Janssen's position, this constitutes a genuine issue of material fact as to Relators' FCA claims concerning Prezista's lipid profile.  *Anderson*, 477 U.S. at 248.  (Janssen's Response to CMF at 3, ECF No. 243.)  The Court cannot resolve this factual dispute on summary judgment.  *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer*, 54 F.3d at 1127).

Moreover, Relators advance a second legal falsity theory. For patients to receive reimbursement for a claim under a federal health care program, their doctors must certify that the claim complies with federal laws—including the AKS.  When a claim is tainted by an AKS violation, it is automatically legally "false" under the FCA.  *Greenfield*, 880 F.3d at 95.  Therefore, once a violation of the AKS has been established, the first element of the FCA, falsity, has been met.  For the reasons discussed in detail below, the Court separately finds that Relators have adduced sufficient evidence from which a reasonable jury could conclude that Janssen used its nationwide Speaker Programs to induce physicians to prescribe (or to reward them for prescribing) Prezista.  Under either the OL promotion theory or the AKS violation theory, the Court concludes that Relators have raised sufficient questions of material fact to preclude summary judgement as

to whether Prezista claims for benefits made by patients with lipid conditions were false within the meaning of the FCA. *Rhodes*, 302 F. Supp. 3d at 661 (citing *Curley*, 298 F.3d at 276–77).[8]

### 2. Causation

Relators must also establish causation by showing that: (1) Janssen's promotional activities caused doctors to write OL prescriptions; and (2) these prescriptions were subsequently presented to the government for reimbursement. *See, e.g., Celgene*, 226 F. Supp. 3d at 1037. In analyzing these causation elements, the Court applies the "substantial factor" test to determine whether presentment of the claims was a foreseeable and natural consequence of Janssen's conduct. *Id*. at 1037 (citing *United States ex rel. Colquitt v. Abbott Labs.*, Civ. No. 6-1769, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016). *See also Schmidt*, 386 F.3d at 244 (applying ordinary causation principles from negligence law to determine responsibility under the FCA).

Janssen argues that Relators have no evidence that Janssen's OL promotion of Prezista and Intelence was a substantial factor in causing physicians to prescribe these medications for HIV patients. (Moving Br. at 17.) More specifically, Janssen argues that it is impossible for Relators to prove that the alleged OL promotional messages caused doctors to prescribe Prezista and Intelence without patient-specific evidence. (*Id.* at 17–18.) However, Relators are "not required to identify a particular false claim caused by [Janssen's] off-label promotion." *Celgene*, 226 F. Supp. 3d at 1041. In *Celgene*, the court did not require the relator to identify a specific claim but instead allowed the relator to "present[] 'sufficiently detailed circumstantial evidence' that such a claim was submitted" as a result of the pharmaceutical company's conduct. *Id.* at 1041.

---

[8] In passing, Janssen seeks relief as to the analogous state FCA claims. (Moving Br. at 13.) For the same reasons set forth above with respect to the federal FCA, the Court also finds there is sufficient evidence from which a reasonable jury could conclude that the Prezista claims for patients with lipid conditions were false under the analogous state false claims statutes.

**Appx36**

Here, Relators argue that there is abundant evidence that Janssen's conduct was a substantial factor in causing physicians to prescribe Prezista and Intelence OL and that it was foreseeable false claims would result. (Opp'n Br. at 23.) They argue that the "vast body of evidence adduced by [them] demonstrates the top-down, widespread, and coordinated illegal promotional efforts by Janssen to boost sales of Prezista and Intelence." (Relators' CMF ¶¶ 16–17.) Relators identify evidence that Janssen trained and instructed its entire sales force to promote Prezista and Intelence OL. (*Id.* ¶¶ 24, 26, 36, 38–46, 52, 76, 81.) In addition, Relators point to evidence that Janssen's OL marketing campaign extended to its Speaker Programs because Janssen also promoted its OL messages through the physician-speakers. (*Id.* ¶ 51.) They also identify company documents that show Intelence and Prezista were being prescribed in the OL treatment-naïve markets, that Janssen tracked these OL sales, and that Janssen included the OL sales of its drugs into its sales forecasts. (CMF ¶¶ 32–35, 55, 82; Ellerbe Decl., Ex. 76, Sillup Report ¶ 66, ECF. No. 288–11.) For example, Relators' pharmaceutical marketing expert, George P. Sillup, reviewed substantial evidence in this case and explained that Janssen's management took the following actions to facilitate or encourage OL marketing: (1) developed unrealistic sales forecasts before it launched Prezista and Intelence; (2) instructed and trained its national sales force to promote Prezista and Intelence for OL uses; (3) encouraged physicians to write OL scripts through the Speaker Programs, where OL promotion took place; (4) sett compensation policies for sales staff that was based on an expectation of OL marketing; (5) encouraged sales staff to use unapproved studies when promoting Prezista and Intelence; and (6) failed to discipline its sales staff or managers for OL marketing. (Sillup Report ¶¶ 36–103.) He reached these conclusions by analyzing the FDA-approved labels for Prezista and Intelence, the eligible patient population, and Janssen's sales forecasts. (*Id.*) He relied on a highly technical process to determine that Janssen

created unrealistic sales forecasts for Prezista and Intelence, and he also analyzed documents tracking Prezista and Intelence sales to show that a significant proportion of sales were OL.  (*Id.* ¶¶ 36–66.)

Moreover, Sillup also concluded that "Janssen's widespread and top-down campaign of OL marketing for Prezista and Intelence was a substantial factor in driving the volume of OL prescribing for Prezista and Intelence."  (*Id.* ¶ 9.)  He relied on the following to render this causation opinion: (1) guidance from courts, federal agencies, and the Office of the Inspector General that recognize OL marketing can cause physicians to write OL scripts; (2) academic and marketing literature that shows OL marketing influences prescribers; and (3) Janssen's internal and external marketing surveys showing that its OL marketing was causing physicians to write OL scripts.  (*Id.* ¶¶ 104–134.)  For the reasons discussed, the Court finds that a jury could reasonably conclude that Janssen's conduct caused physicians to prescribe Prezista and Intelence OL and that it was reasonably foreseeable that it would result in the submission of OL claims to the government for reimbursement.

### 3.   Materiality

"A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the [FCA]."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016).  In other words, all FCA claims of legal falsity must also meet the FCA's materiality standard, "as falsity and materiality are distinct requirements . . . ."  *Greenfield*, 880 F.3d at 98 n.8.  The FCA "defines 'material' to mean 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"  *Escobar*, 579 U.S. at 183 (quoting 31 U.S.C. § 3729(b)(4)).  *See also United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746,

Appx38

761 (3d Cir. 2017). Accordingly, "materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Escobar*, 579 U.S. at 193 (alteration in original) (citation omitted). The FCA's "materiality standard is demanding." *Id.* at 194. In *Escobar*, the Supreme Court identified the following nonexclusive factors to determine materiality: (i) whether compliance with a particular statute is a "condition of payment"; (ii) whether the violation is substantial and goes to "the essence of the bargain" or is "minor [and] insubstantial"; and (iii) whether the government pays or declines to pay a "particular claim" or "particular type of claim" when it has "actual knowledge that certain requirements were violated." *Id.* at 193 n.5, 194–95. *See United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, Civ. No. 02-2964, 2020 WL 6682483 (E.D. Pa. Nov. 12, 2020). Since these factors are nonexclusive, courts may take into consideration other factors when determining materiality. *Escobar*, 579 U.S. at 194–95; *United States ex rel. Escobar v. United Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016) (acknowledging, on remand, that "[*Escobar*] makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision").

Janssen argues that "Relators have insufficient evidence to prove that any of Janssen's four alleged promotional messages were material to the government's decision to reimburse a Prezista or Intelence prescription." (Moving Br. at 18.) Here, Relators allege that Janssen made the following OL promotions: (1) Prezista as "lipid neutral" or "lipid friendly" and appropriate for patients with lipid conditions; (2) Prezista for treatment-naïve patients (patients who previously had not been prescribed HIV medications to treat their HIV) before it was FDA-approved for that patient population in October 2008; (3) Intelence for once-daily dosing even though it was only approved by the FDA for twice-daily dosing; and (4) Intelence for treatment-naïve patients even though it was never approved by FDA for those patients. Relators allege that claims for prescriptions of Prezista and Intelence were false because they were neither for medically accepted indications nor

reasonable and necessary. *See, e.g., Celgene*, 226 F. Supp. 3d at 1049 (explaining that a medically accepted indication is an explicit condition of payment under Medicare Part D); *United States ex rel. Bergman v. Abbott Labs.*, 995 F. Supp. 2d 357, 367 (E.D. Pa. 2014) (explaining that prescriptions for uses that are "'not reasonable and necessary for treatment,' make those uses ineligible for reimbursement under Medicare and Medicaid regulations"). After reviewing the record, the Court finds that Relators have identified evidence in the form of expert testimony from which a jury could conclude that Janssen's conduct violated an express condition of payment, which would tend to show that it was material to the Government's decision to reimburse the claim. *Escobar*, 579 U.S. at 193. In short, a genuine dispute of material fact exists as to whether the OL promotions were material to the payment decisions at issue here. (Ellerbe Decl. Ex. 82, Schafermeyer Report ¶¶34–59, ECF No. 288-12.)

### B.    Speaker Claims Under the AKS

The AKS prohibits "knowingly and willfully" offering or paying any "remuneration" to induce prescriptions that may later be reimbursed under a federal health care program. 42 U.S.C. § 1320a-7b(b). Relators allege that Janssen violated the AKS by paying physicians to prescribe Prezista and Intelence. To establish that Janssen violated the AKS, Relators must prove the following: (1) the alleged schemes involved "remuneration"; (ii) at least one purpose of the schemes was to "induce" doctors to prescribe more Prezista and Intelence; and (iii) Janssen possessed the requisite scienter. *Id.* In this instance, payments to physicians violate the AKS if even "one purpose" of the payments was to induce or reward the speakers to prescribe Prezista or Intelence. *See United States v. Greber*, 760 F.2d 68, 69 (3d Cir. 1985); *Purcell v. Gilead Scis., Inc.*, 439 F. Supp. 3d 388, 398 (E.D. Pa. 2020) ("It is sufficient if at least 'one purpose of the

payment was to induce' Medicare purchases . . . ."); *United States ex rel. Judd v. Quest Diagnostics Inc.*, Civ. No. 10-4914, 2014 WL 2435659, at *12 n.11 (D.N.J. May 30, 2014) (same).

There is a genuine issue of material fact with respect to the first element of the AKS: whether compensation under the Speaker Programs constitutes "remuneration" under the Act. The AKS defines remuneration as "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6). Courts generally interpret remuneration "expansively to include anything of value in any form whatsoever." *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 805 (S.D.N.Y. 2017) (internal quotation marks omitted), *rev'd on other grounds*, 899 F.3d 163 (2d Cir. 2018). Here, Relators highlight that Janssen paid hundreds of physicians a significant amount of money to give thousands of speeches over the relevant nine-year period. (Relators' CMF ¶¶ 86–87.) Janssen also paid physicians to attend training sessions and paid for their hotels, meals, and travel expenses. (*Id.* ¶¶ 89–91.) Many speeches were held at expensive venues, including thousands of speeches at high-end restaurants. (*Id.* ¶¶ 114–15.) Therefore, a jury could find that the Speaker Programs involved "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).

There also exists a genuine dispute of material fact as to the second element of the AKS: whether one purpose of the Speaker Programs was to induce physicians to prescribe Prezista and Intelence. Relators point to sworn deposition testimony of seven current and former Janssen employees who testified that the Speaker Programs focused, in significant part, on inducing and rewarding prescriptions. (Relators' CMF ¶¶ 19–21, 84.) Relators explain that Janssen tracked the prescriptions of the paid speakers *and* all attendees (some of whom were also paid speakers) to monitor the return on investment of its Speaker Programs. (*Id.* ¶¶ 95–104.) There is evidence that hundreds of physicians attended the same speech multiple times, and the speeches were highly

24

repetitive and rudimentary for the doctors attending.  (*Id.* ¶¶ 112–13, 117–19; Ellerbe Decl., Ex. 75, Glatt Report ¶¶ 183–98.)  Relators also point to evidence that the information presented during the Speaker Programs was incomplete, inaccurate, and misleading, and that the OL information about Prezista and Intelence was regularly presented by the highest paid speakers.  (Relators' CMF ¶¶ 47–51, 110–11.)  Relators point to the analyses of their expert economist to show that speakers continued to prescribe Prezista and Intelence once they started receiving payment and that speakers were more likely than non-speakers to prescribe Prezista and Intelence.  (Ellerbe Decl., Ex. 73, Shaked Report ¶¶ 69–97.)  Additionally, there is evidence that Janssen's compliance department had little oversight over the Speaker Programs; instead, the Speaker Programs were controlled by Janssen's sale representatives (who were incentivized to increase sales) and Janssen's marketing department.  (Relators' CMF ¶¶ 120–22.)  For all of these reasons, viewing the facts in a light most favorable to Relators, the Court finds that a reasonable jury could conclude that one purpose of Janssen's Speaker Programs was to induce the physicians to prescribe more Prezista and Intelence.

**VIII.**  **CONCLUSION**

The Court concludes that Relators have identified evidence raising material facts in dispute on every issue raised by Janssen.  As a result, the Court will deny Janssen's motion for summary judgment.  An appropriate Order will accompany this Opinion.


Date: December 21, 2021

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**Appx42**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* JESSICA PENELOW and CHRISTINE BRANCACCIO,<br><br>     Plaintiffs,<br><br>     v.<br><br>JANSSEN PRODUCTS, LP,<br><br>     Defendant. | Civil Action No. 12-7758 (ZNQ) (LHG)<br><br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |

**QURAISHI, District Judge**

   This matter comes before the Court upon a Motion for Summary Judgment (the "Motion") filed by Janssen Products, LP ("Janssen"). (ECF No. 187.)  Janssen submitted a Brief in Support of the Motion.  ("Moving Br.," ECF No. 187-1.)  Relators Jessica Penelow and Christine Brancaccio (collectively, "Relators") opposed the Motion, ("Opp'n Br.," ECF No. 287), to which Defendant replied, ("Reply Br.," ECF No. 242).  For the reasons set forth in the accompanying Opinion, and for other good cause shown,

   **IT IS** on this **21st** day of **December 2021**,

   **ORDERED THAT** Janssen's Motion for Summary Judgment (ECF No. 187) is hereby **DENIED**.

            s/ Zahid N. Quraishi
            **ZAHID N. QURAISHI**
            **UNITED STATES DISTRICT JUDGE**

**Appx43**

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** *et al.,* *ex rel.* **JESSICA PENELOW and CHRISTINE BRANCACCIO**, <br><br> Plaintiffs, <br><br> v. <br><br> **JANSSEN PRODUCTS, LP**, <br><br> Defendant. | Civil Action No. 12-7758 (ZNQ) (LHG) <br><br> **MEMORANDUM OPINION** |

<u>**QURAISHI, District Judge**</u>

This matter comes before the Court upon several motions to exclude opinions and testimony filed by Janssen Products, LP ("Janssen"), and Relators Jessica Penelow and Christine Brancaccio (collectively, "Relators"). The parties seek to exclude expert reports and testimony under the admissibility requirements of Federal Rule of Evidence 702 and the principles espoused in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the parties' motions to exclude expert testimony will be granted in part and denied in part.

**Appx44**

I.     **BACKGROUND & PROCEDURAL HISTORY**

On December 18, 2012, Relators[1] filed this action on behalf of the federal government, twenty-six states, and the District of Columbia (collectively, "Government Plaintiffs") alleging fifty-six counts under the Federal False Claims Act ("FCA"), the Federal Anti-Kickback Statute ("AKS"), and the false claims acts of various states.  (ECF No. 1.)  The United States and certain States declined to intervene.  (ECF Nos. 46, 48, 55.)  On October 3, 2016, Johnson & Johnson ("J&J") and Janssen filed Motions to Dismiss.  (ECF Nos. 56, 57.)  On May 31, 2017, the Court granted in part and denied in part Janssen's motion but dismissed all claims against J&J.  (ECF Nos. 86, 87.)  Relators subsequently filed the Second Amended Complaint on June 30, 2017.  ("Second Am. Compl.," ECF No. 90.)  On October 14, 2020, Janssen filed a Motion for Summary Judgment.  ("Summary Judgment," ECF No. 187.)  Around the same time, Relators and Janssen filed several motions to exclude expert testimony and opinions.  (ECF Nos. 179, 181, 183, 192, 194, 196, 198, 200, 202.)  Thereafter, the Court stayed the matter to afford the parties the opportunity to attend private mediation, but the mediation was not successful.  (ECF Nos. 233, 236.)

The claims in this action arise from Janssen's purported kickback scheme and off-label ("OL") promotion of two HIV/AIDS drugs: Prezista and Intelence.  (Second Am. Compl. at 1–2.)  With respect to Prezista, Relators allege that Janssen, through its sales representatives and managers, delivered false and misleading messages to physicians by: (1) promoting Prezista as "lipid neutral"; and (2) misstating Prezista's superiority, efficacy, and potency based on the

---

[1] Between 2006 and 2013, Relator Jessica Penelow worked as a sales consultant for Tibotec Therapeutics, a subsidiary of Johnson & Johnson that became known as Janssen in 2011.  ("Second Am. Compl." ¶ 47, ECF No. 90.)  While working for Tibotec, she marketed several HIV drugs, including Prezista and Intelence, to doctors in Manhattan.  (*Id.*)  Similarly, in 2006, Relator Christine Brancaccio started working for Janssen as a sales representative and marketed Prezista and Intelence to providers in Long Island and Queens.  (*Id.* ¶ 49.)

uniqueness of its "binding affinity." (*Id.* ¶¶ 2, 105.)  Relators claim Prezista presents a serious risk of cardiovascular disease because Prezista increases lipids, such as cholesterol and triglycerides. (*Id.* ¶¶ 3–4, 106–08.)  They allege Janssen misrepresented that Prezista "would not affect or increase a patient's cholesterol or triglyceride levels, which is directly contradicted by the FDA-approved label for Prezista." (*Id.* ¶¶ 3, 106.)  Relators also allege Janssen misrepresented Prezista as having superior "binding affinity," which prevents HIV from mutating and becoming resistant. (*Id.* ¶¶ 6, 126.)  Furthermore, Relators contend Janssen's representations about Prezista's superior binding affinity were based on a clinical study that was of limited scientific value and was not included in the drug's FDA-approved labeling.  (*Id.*)  Relators allege numerous instances where Janssen sales representatives and managers misrepresented Prezista's effect on lipids and its superior binding affinity.  (*Id.* ¶¶ 124–25, 137, 183.)  The OL promotion concerning Prezista as a lipid-neutral drug began in 2006 and continued through approximately 2014, and the OL promotion concerning its superior "binding affinity" began around 2007 and continues through present.  (*Id.* ¶¶ 4–5, 106, 126.)

As for Intelence, Relators allege that Janssen, through its sales representatives and managers, provided false and misleading statements to physicians by marketing the drug as safe and effective for: (1) once-daily dosage; and (2) safe and effective for "treatment-naïve patients," which refers to patients who have never taken any antiretroviral medication.  (*Id.* ¶ 9.)  Relators allege Janssen promoted Intelence for once-daily dosing, contrary to its FDA-approved label specifying twice-daily dosing.  (*Id.* ¶ 10.)  This is significant because "if a patient does not carefully follow the FDA-indicated dosing drug regimen, their HIV viral load can increase, potentially weakening the drug's ability to fight the disease."  (*Id.*)  In addition, Relators allege that Intelence was "only indicated for treatment-experienced patients," not treatment-naïve patients.  (*Id.* ¶ 11.)

3

Prescribing Intelence to treatment-naive patients is harmful because it could prematurely "cause [them] to run out of drug options as their diseases progresses." (*Id.* ¶ 12.) Relators allege numerous instances where Janssen sales representatives and managers engaged in OL promotion concerning Intelence "from the time of its launch in 2008, continuing through September 2014." (*Id.* ¶¶ 150, 154, 159.)

Relators allege that Janssen's OL "marketing of Prezista and Intelence was widespread." (*Id.* ¶¶ 13, 160.) According to Relators, Janssen instructed its national sales force to market the drugs OL during pod calls, district calls, district meetings, trial meetings, and plan of action meetings. (*Id.* ¶¶ 161–78.) During these calls and meetings, upper management and district managers encouraged OL marketing, and sales representatives from different districts to share sales strategies and tips about marketing Intelence and Prezista OL. (*Id.* ¶¶ 162–64.) As a result, Janssen representatives engaged in OL marketing during sales calls with physicians, dinner programs, and Speaker Programs. (*Id.* ¶¶ 13, 179–205.) In addition, Relators claim the Speaker Programs amounted to kickbacks in violation of the AKS because Janssen paid speakers at the dinner programs. (*Id.* ¶¶ 13, 71.) According to Relators, the physician-speakers were paid an increasing honorarium based on the number of prescriptions they wrote and their market share of the drugs, which Janssen calculated by determining the percentage of Janssen drugs a doctor prescribed as compared to non-Janssen drugs in the same class. (*Id.*)

Relators allege that Janssen knowingly and misleadingly influenced physicians' medical judgments through its OL promotion of Prezista and Intelence. (*Id.* ¶ 15.) Moreover, they allege Janssen knew the Government Plaintiffs reimbursed a substantial portion of Prezista and Intelence prescriptions. (*Id.* ¶ 16.) Because a significant percentage of HIV/AIDS patients are enrolled in

**Appx47**

Medicaid and Medicare, Janssen allegedly caused claims tainted by the OL marketing and kickback schemes to be submitted to the Government Plaintiffs for reimbursement. (*Id.*)

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualification, reliability, and fit." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)). The party offering the expert testimony bears the burden of establishing the existence of each factor by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended by* 199 F.3d 158 (3d Cir. 2000).

The Third Circuit has "interpreted Rule 702's qualification requirement liberally." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)). A "broad range of knowledge, skills, and training qualify an expert as such." *Paoli*, 35 F.3d at 741. Because both the "substantive" and "formal" qualifications of an expert are viewed

liberally, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." *Id.* Therefore, "[i]f the expert meets [the] liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997) (citation omitted). "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have specialization that the court considers most appropriate." *Pineda*, 520 F.3d at 244 (alteration in original) (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)). However, while "background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003).

As for the "reliability" requirement, the Third Circuit has interpreted reliability "to mean that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Pineda*, 520 F.3d at 244 (internal quotations omitted) (quoting *Paoli*, 35 F.3d at 742). Rule 702 imposes a "gatekeeping" obligation on the trial court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 598; *see also Kumho Tires Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (gatekeeping obligation "applies to all expert testimony"). The purported expert's testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his [or] her belief." *Schneider*, 320 F.3d at 404 (citation omitted). Admissibility turns "on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined." *Kannankeril*, 128 F.3d at 806.

"The evidentiary requirement of reliability is lower than the merits standard of correctness." *Paoli*, 35 F.3d at 744.

To satisfy the "fit" requirement, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. The expert testimony meets the "fit" requirement when it "help[s] the trier of fact to understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. The Third Circuit has also instructed that:

> A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. He or she will often still believe that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct . . . .

*Paoli*, 35 F.3d at 744–45. *See Heller v. Shaw Indus. Inc.*, 167 F.3d 146, 152–53 (3d Cir. 1999) (finding the trial court should admit expert testimony "if there are 'good grounds' for the expert's conclusion" even if the court believes "there are better grounds for some alternative conclusion").

Notably, the court also "must ensure that an expert does not testify as to the governing law of the case." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006). In *Berckeley*, the Third Circuit explained that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Id.* at 218. "Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from

7

rendering a legal opinion."  *Id.* at 217 (quoting *United States v. Leo*, 941 F.2d 181, 195–96 (3d Cir. 1991)).

## III.    <u>DISCUSSION</u>

Janssen moves to exclude certain opinions and testimony of the following experts: James T. O'Reilly, George P. Sillup, Kenneth W. Schafermeyer, Aaron E. Glatt, Virginia B. Evans, Israel Shaked, and Ian Dew.  (ECF Nos. 192, 194, 196, 198, 200, 202.)  Relators move to exclude certain opinions and testimony of the following rebuttal experts: Jon Smollen, Anupam Jena, and Eric S. Rosenberg.  (ECF Nos. 179, 181, 183.)  The Court addresses each expert in turn.

### A.  Janssen's Motion to Exclude the Testimony of James T. O'Reilly

Janssen filed a motion to exclude the expert report and testimony of James T. O'Reilly, ("O'Reilly Motion," ECF No. 192), along with a brief in support of the Motion, ("O'Reilly Moving Br.," ECF No. 192-1).  Relators opposed the Motion, ("O'Reilly Opp'n Br.," ECF No. 282), to which Janssen replied ("O'Reilly Reply," ECF No. 251).  Relators identified O'Reilly as an expert in FDA law, regulatory issues under the FCA, and government reimbursement.  (Chuderewicz Decl., Ex. A, ECF No. 194-3.)

According to Janssen, the problematic nature of O'Reilly's expected testimony becomes evident as early as the third paragraph of his opinion, where he summarizes his conclusion:

> In my opinion, based on the evidence and my education and professional experience, Janssen misbranded Prezista and Intelence and engaged in off[-]label marketing of the drugs that was contrary to their FDA-approved labels, and, thus, the claims submitted to the government healthcare programs for these drugs were false because they were ineligible for reimbursement. Further, this conduct was material to the government's payment decision for reimbursement of claims for Prezista and Intelence.

(Chuderewicz Decl., Ex. A, "O'Reilly Report" ¶ 3, ECF No. 263.)  Janssen counts three legal conclusions in that statement alone.  (O'Reilly Moving Brief at 1, 4.)  Beyond these concerns as

**Appx51**

to potentially improper legal advocacy, Janssen challenges O'Reilly's opinions on the grounds that they believe "he is not qualified to offer any non-legal opinions about the marketing of Intelence and Prezista or about government reimbursement for Intelence and Prezista prescriptions," and Janssen contends "he does not tie any non-legal opinions to reliable principles or methods." (O'Reilly Moving Br. at 2–10.)

In opposition, Relators maintain that O'Reilly does possess the necessary qualifications and that his opinions are reliable.  (O'Reilly Opp'n Br. at 2.)  Relators argue that O'Reilly's opinions "are grounded in well-supported citations to relevant authority."  (*Id.* at 11.)  His "report meets [the good grounds] standard and contains detailed citations to the relevant statutes, regulations, guidelines, policy documents, etc. relevant to his opinions regarding the government regulatory scheme at issue in this case."  (*Id.*)  They note that O'Reilly has the educational, academic, and industry background to explain FDA and Centers for Medicare & Medicaid Services ("CMS") regulatory issues.  (*Id.* at 10.)  In addition, with respect to Janssen's argument that O'Reilly provided a legal opinion, Relators fault Janssen for focusing on O'Reilly's conclusion while ignoring the rest of his opinion that explains the complex regulatory environment at issue in this case.  (*Id*. at 12.)  They cite instances where other courts have allowed experts to opine about the complex Medicare regulatory scheme.  (*Id*. at 13.)  Relators have their own view of what constitutes inadmissible legal conclusions: they insist that O'Reilly's opinions are proper because "they do not go to the ultimate issue to be decided by the jury in the case," *i.e.*, whether Janssen is liable.  (*Id.* at 15.)  Relators temper their position by proposing that the Court defer assessing the admissibility of O'Reilly's potentially legal testimony until trial when there is more context and after hearing Janssen's objections.  (*Id*. at 15 n.1.)

In its reply, Janssen focuses on O'Reilly's testimony regarding intent, stating that it is inadmissible legal advocacy. (*Id.* at 4.) Janssen emphasizes that "O'Reilly intends to instruct the jury on what the law requires and to tell the jury that Janssen violated the law." (O'Reilly Reply at 1.) It argues that "[i]nstructing the jury on what the law requires is exclusively within the province of this Court." (*Id.* at 3.) Furthermore, Janssen argues that O'Reilly is not qualified to reliably opine on matters because his experience is unrelated to the opinion he intends to offer. (*Id.* at 6–7.)

The Court has reviewed O'Reilly's qualifications. He has advised on over-the-counter drug, pharmaceutical, and medical device issues, taught an FDA course as an adjunct law professor for twenty-five years, and currently chairs the FDA committee of the American Bar Association ("ABA"). (O'Reilly Report ¶ 7.) He teaches medical and public health for graduate students at the University of Cincinnati, College of Medicine, and he has authored over 50 textbooks and 220 articles. (*Id.* ¶ 5; *see also Id.* ¶¶ 4–9.) He has also authored the drugs chapter of the special textbook on AIDS for the ABA's Coordinating Committee on AIDS. (*Id.* ¶ 8.) O'Reilly can be reasonably characterized as a lawyer with a specialization in healthcare public policy. (*Id.* at 41–49.) Thus, based on his education and experience, the Court finds that O'Reilly satisfies the liberal minimum qualifications required for expert testimony admissibility. *Paoli*, 35 F.3d at 741. He is, therefore, qualified to speak on general topics concerning FDA regulations and reimbursement. Likewise, his experience is sufficient to render his testimony "reliable." *Pineda*, 520 F.3d at 244

Notwithstanding his qualifications, the question of "fit" remains. The Court must determine whether O'Reilly's testimony will help the trier of fact. *Berckeley*, 455 F.3d at 217. This determination necessarily includes ensuring that he will not provide improper legal opinions that will intrude on the Court's role in explaining the law to the jury. *Berckeley*, 455 F.3d at 218.

10

Although experts can testify about business customs and background information that they have developed through their personal experience and expertise, they cannot give opinions "as to what was required under the law, or whether the defendant complied with the [law]." *Id.* (quoting *Leo*, 941 F.2d at 196–97); *see also Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D.N.J. 2005)).  In *Berckeley*, the Third Circuit confirmed that an expert, a former SEC lawyer with experience in the crucial matter in the case, could testify about customs and business practices in the securities industry at the time the parties entered into their contested agreement.  455 F.3d at 218.  However, the Third Circuit reversed the district court's decision to permit the expert to testify regarding the defendant's compliance with legal duties that arose under the federal securities laws because such testimony represented improper legal opinions.  *Id.*

As a first matter, and consistent with *Berckeley*, the Court rejects Relators' proposed "ultimate issue" test for the admissibility of the portions of O'Reilly's testimony that verge on legal opinion.  455 F.3d at 217.  "Ultimate issue" is inconsistent with the rules of evidence.  Rule 704 expressly states that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  The correct question in this context is whether, and to what extent, O'Reilly's opinion attempts to introduce improper legal testimony.

The Court has reviewed O'Reilly's report and finds acceptable those portions that provide background information regarding the drug approval process, misbranding in general, and the mechanism by which the government reimburses for prescriptions.  Such background information could be helpful to the jury.  Likewise, O'Reilly's observations regarding Janssen's compliance efforts could also prove helpful.  Unfortunately, however, his report quickly devolves into his opinion as to legal issues.  These include but are not limited to: how Janssen's activities constituted OL promotion and therefore misbranding, (O'Reilly Rep. ¶¶ 29–34, 47–49); Janssen's purportedly

purposeful manipulation of Medical Information Requests, (*id.* ¶¶ 40, 42); how Janssen's OL promotion can form the basis for a violation of the FCA, (*id.* ¶¶ 61–62, 70); and the legal test for materiality and its application, (*id.* ¶¶ 71, 73, 84–85). Because these portions of the O'Reilly report, and others like them, risk usurping the Court's primary role in articulating the law to the jury, the Court will exclude them. Under the circumstances, Relators' proposal that the Court defer its decision as to admissibility until trial is unsatisfactory. There are likely to be close cases requiring an admissibility determination at trial, but permitting O'Reilly to testify, in the first instance, as to what are clearly legal opinions would be prejudicial to Janssen. For these reasons, Janssen's motion to exclude the testimony of James T. O'Reilly will be granted in part and denied in part.

### B. Janssen's Motion to Exclude Certain Opinions of George P. Sillup

Janssen filed a motion to exclude the testimony of George P. Sillup, ("Sillup Motion," ECF No. 194), along with a brief in support of the Motion, ("Sillup Moving Br.," ECF No. 194-1). Relators opposed the Motion, ("Sillup Opp'n Br.," ECF No. 284), to which Janssen replied, ("Reply," ECF No. 249). Relators identified Sillup as an expert in pharmaceutical marketing issues relating to Janssen's marketing of Prezista and Intelence, and its Speaker Programs. (Chuderewicz Decl., Ex. A, ECF No. 194-3; Sillup Opp'n Br. at 4.) Sillup's report provides the following summary of the opinion he intends to offer at trial:

> In my professional opinion and based on my understanding of the impact of pharmaceutical marketing and my review of the evidentiary record, I believe that Janssen's widespread and top-down campaign of off-label marketing for Prezista and Intelence was a substantial factor in driving the volume of OL prescribing for Prezista and Intelence.

(Chuderewicz Decl., Ex. B, "Sillup Report" at 8, ECF No. 264.) Sillup organized his report in two sections: (1) Janssen's management took multiple actions to facilitate or encourage OL marketing

("Marketing Opinion"), and (2) the increased numbers of OL scripts were the foreseeable and intended result of Janssen's OL marketing ("Causation Opinion"). (*Id.* ¶¶ 36–134).

Janssen argues that Sillup's Marketing and Causation Opinions are inadmissible because he does not tie the opinions to any reliable principles and methods. (Sillup Moving Br. at 2, 7.) Janssen also contends that Sillup's Causation Opinion is inadmissible because "he is not qualified to offer it" and the opinion "is an impermissible legal opinion." (*Id.* at 4–7.)

In opposition, Relators argue that "Sillup is qualified to offer all of his opinions, and his opinions are reliable." (Sillup Opp'n Br. at 8.) Relators explain that, in analyzing and evaluating Janssen's marketing conduct, Sillup "reviewed extensive evidence in the case and broke down his conclusions into multiple prongs that a jury can readily follow and assess." (*Id.* at 12.) He analyzed highly technical documents, such as the FDA-approved labels for Prezista and Intelence, the eligible patient population, and Janssen's sales forecasts. (*Id.* at 12.) Relators also argue that Sillup's opinion concerning causation "is both within [his] expertise and reliably based on his experience in pharmaceutical marketing, from both the academic and industry perspectives." (*Id.* at 20.) They note that Sillup has the educational, academic, and industry background to explain the marketing surveys Janssen commissioned. (*Id.* at 22.) In addition, with respect to Janssen's argument that Sillup provided a legal opinion, Relators argue that courts have allowed pharmaceutical marketing experts to opine about OL marketing campaigns as a "significant contributing factor" to OL sales. (*Id.* at 22–23.) In the alternative, Relators contend the phrase "substantial factor," the term Sillup used in his report, is a common phrase such that "its use does not take [his] expert opinions into the realm of legal conclusions." (*Id.* at 23.)

In its reply, Janssen reiterates that Sillup's Marketing Opinion "usurps the role of the jury and is untethered from reliable principles and methods." (Sillup Reply at 2–4.) Janssen likewise

reiterates that "Sillup's Causation Opinion is inadmissible because it impinges on the role of the jury, . . . he is unqualified to opine on what caused doctors to prescribe HIV medications for HIV patients, . . . [and] he fails to apply reliable causation methodology." (*Id.* at 5–8.)

Sillup is a Professor in the Pharmaceutical & Healthcare Marketing Department at St. Joseph's University and served as chair of the Department from 2010 through 2017. (Sillup Report ¶¶ 4, 5; Sillup Report at 79.) Sillup holds an M.S. in Human Behavior and Development and a Ph.D. in Human and Organizational Structures. (Sillup Report ¶ 6; Sillup Report at 78.) He teaches courses on pharmaceutical marketing, publishes on the topic, and provides marketing consulting for pharmaceutical companies. (Sillup Report ¶ 5.) His research focuses on strategic planning, forecasting, market practices of pharmaceutical companies, and the effects of those practices on prescription medications. (*Id.*) Notably, he "transitioned to academia full time in 2004 after working 28 years in the pharmaceutical, diagnostic and medical device industry." (*Id.* ¶ 4.) While working in the pharmaceutical industry, he held positions from salesman to Chief Operating Officer and "guided numerous product launches for drugs and devices, which included developing product forecasts, marketing materials and sales training program to support products" across the United States and global market. (*Id.*) The Court finds that Sillup's qualifications are substantial.

According to Sillup, Relators retained him to opine on the following issues: (1) how pharmaceutical manufacturers promote the sale and use of drugs, especially when there are competing drugs in the market; (2) whether Janssen's management facilitated or encouraged the OL marketing done by its sales force and the paid speakers; and (3) whether Janssen's OL promotion and conduct a significant contributing factor in causing physicians to prescribe Prezista and Intelence for OL uses. (*Id.* ¶¶ 8–9.) In reaching his Marketing and Causation Opinions, Sillup

assessed Janssen's strategic corporate documents, financial records, testimony, and relevant academic research.  (*Id.* at ¶¶ 5; Sillup Report, at 94–102.)

As to whether Sillup used reliable principles and methods to reach opinions, the Court finds *Smith v. Pfizer*, 714 F. Supp. 2d 845 (M.D. Tenn. 2010), persuasive.  In that case, the court denied the defendants' motion to exclude testimony of a marketing expert who also concluded that the defendants' OL marketing campaign led to an increase in OL prescriptions.  *Id.* at 855. The defendants argued that he employed no ascertainable methodology.  *Id.*  However, the court found his testimony reliable because he "relie[d] on and frequently cite[d] scholarly articles and studies," applied his "understanding of the drug marketplace and how marketing campaigns generally influence doctors," and examined sales and data.  *Id.* at 857.  *See also* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments (explaining that when an expert witness relies primarily on experience rather than a scientific study, the expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts"); *United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007) (reliability may turn on the proposed expert's "personal knowledge or experience").

Here, like the expert in *Smith*, Sillup reviewed extensive evidence and broke down his conclusions into multiple prongs.  (Sillup Report ¶¶ 5, 18–49; Sillup Report, Ex. A, at 94–102.) In his report, Sillup explained that Janssen's management took the following actions to facilitate or encourage OL marketing: (1) developed unrealistic sales forecasts before it launched Prezista and Intelence; (2) instructed and trained its national sales force to promote Prezista and Intelence for OL uses; (3) encouraged physicians to write OL scripts through the Speaker Programs where OL promotion took place; (4) set compensation policies for sales staff that was based on an expectation of OL marketing; (5) encouraged sales staff to use unapproved studies when promoting

Prezista and Intelence; and (6) failed to discipline its sales staff or managers for OL marketing. (Sillup Report ¶¶ 18–49.)   Indeed, Sillup reached these conclusions by analyzing the FDA-approved labels for Prezista and Intelence, the eligible patient population, and Janssen's sales forecasts.  (*Id.* ¶ 12.)  His report explained the highly technical process of creating sales forecasts for pharmaceutical products, and he relied on this same process to determine that Janssen created unrealistic sales forecasts for Prezista and Intelence.  (*Id.* ¶¶ 18–28.)   Sillup also analyzed documents tracking Prezista and Intelence sales to show that a significant proportion of sales were OL.  (*Id.* ¶¶ 32–34.)   Throughout his report, he referenced documents and testimony to show that Janssen's training of its sales force, its bonus incentive, and corporate culture all encouraged OL marketing.  (*Id.* ¶¶ 34–49.)  To the extent Janssen disagrees with the evidence and testimony Sillup relies upon to render his expert opinions, disagreement about his assumptions "go[] to the weight given to his testimony, rather than [its] admissibility."  *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 391 (3d Cir. 2016).  *See also Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138–139 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."); Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.  Similarly, for the reasons stated above, this Court finds that Sillup used reliable principles and methods to reach his Marketing Opinion.

In the causation portion of his report, Sillup concludes that the increased numbers of OL scripts of Prezista and Intelence were the foreseeable and intended result of Janssen's OL marketing.  (Sillup Report ¶ 45.)  First, the Court finds that Sillup is qualified to offer his opinion based on the specialized knowledge he has acquired through his many years of training, education, and experience.  *Calhoun*, 350 F.3d at 322.  Not only is he a professor in pharmaceutical marketing, but he worked in the pharmaceutical industry for nearly three decades and developed product sales

forecasts, marketing materials, and sales training programs for new drugs. (Sillup Report ¶ 6.) In addition, his research focuses on strategic planning, sales forecasting, market practices of pharmaceutical companies, and the impact of those practices on prescription medications. (*Id.*)

Second, as to the reliability of Sillup's Causation Opinion, the Court notes that he relied on the following: (1) guidance from courts, federal agencies, and the Office of the Inspector General that recognize OL marketing can cause physicians to write OL scripts; (2) academic and marketing literature that shows OL marketing influences prescribers; and (3) Janssen's internal and external marketing surveys showing that its OL marketing was causing physicians to write OL scripts. (*Id.* ¶¶ 49–66.) The Court, therefore, finds that Sillup's opinion concerning causation is tied to reliable methods and principles. *See Smith*, 714 F. Supp. 2d at 857.

Third, courts have allowed experts to opine as to the causal link between pharmaceutical OL marketing efforts and doctors' prescribing decisions. *See, e.g.*, *Smith*, 714 F. Supp. 2d at 856; *United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1039–40 (C.D. Cal. 2016); *Hanrahan v. Wyeth, Inc.*, Civ. No. 04-1255, 2012 WL 2395986, at *5 (E.D. Mo. June 25, 2012). Accordingly, the Court will deny Janssen's motion to exclude the expert report and testimony of George P. Sillup.

### C. Janssen's Motion to Exclude Certain Opinions of Kenneth W. Schafermeyer

Janssen filed a motion to limit the testimony of Kenneth W. Schafermeyer, ("Schafermeyer Motion," ECF No. 196), along with a brief in support of the Schafermeyer Motion, ("Schafermeyer Moving Br.," ECF No. 196-1). Relators opposed the Motion, ("Schafermeyer Opp'n Br.," ECF No. 282), to which Janssen replied ("Schafermeyer Reply," ECF No. 247). Relators identified Schafermeyer as a rebuttal expert to Janssen's expert, Dr. Babette Edgar, who intends to testify

about the statutory and regulatory framework for Medicare Part D ("Part D"). (Chuderewicz Decl., Ex. A, "Schafermeyer Report" ¶ 3, ECF No. 265.)

Schafermeyer's report provides the following summary of the opinion he intends to offer at trial: "It is my opinion that CMS does maintain a 'medically necessary and reasonable' requirement for services under Part D and, based on Dr. Glatt's opinion, that prescriptions relying on Janssen's false and misleading marketing do not meet this standard and should not be covered." (Schafermeyer Report ¶ 59.)  Schafermeyer organized his report in two sections: (1) issues pertaining to Part D, including administration of the drug benefit, funding sources, drug coverage, and utilization management tools; and (2) the financial implications of Janssen's alleged behavior on Part D for promoting Prezista and Intelence for OL and/or medically unnecessary use (the "Coverage and Reimbursement Opinions"). (*Id.* ¶¶ 6–58.)

Janssen contends that Schafermeyer's Coverage and Reimbursement Opinions are inadmissible because he "does not have [the] relevant expertise to offer these Opinions." (Schafermeyer Moving Br. at 3.)  Although "Schafermeyer's experience may be sufficient for him to walk the jury through the Medicare Part D statutory framework, he has no expertise to opine on how CMS makes coverage and reimbursement decisions for antiretroviral medications under Medicare Part D." (*Id.* at 1.)  Janssen notes that Schafermeyer has not worked or consulted for CMS or a Part D sponsor, has not specifically taught about such topics, and has reimbursement knowledge that is not at issue here. (*Id.* at 2–4.)  Janssen argues that Schafermeyer's Coverage and Reimbursement Opinions are based *solely* on his understanding of the regulatory framework and of CMS' factors in making coverage and reimbursement decisions. (*Id.* at 4.)  Janssen concludes that Schafermeyer's education and experience do not "qualify him to testify on the more

specific subject of how CMS makes coverage and reimbursement decisions under Medicare Part D for antiretroviral medications such as Prezista and Intelence." (*Id.* at 4.)

In opposition, Relators argue that Janssen overstated the qualification requirement for expert testimony admission. (Schafermeyer Opp'n Br. at 3, 11.) Noting that precedents show that "rejection of expert testimony is the exception rather than the rule," Relators state that "the liberal standards for admissibility have supported acceptance of expert[s'] opinions outside their narrow area of expertise in many different settings, including with regard to regulatory schemes." (*Id.* at 3–5.) To disprove Janssen's argument that Schafermeyer's Coverage and Reimbursement Opinions are based *solely* on his understanding, Relators point to Schafermeyer's basis for understanding the topic, including materials that Dr. Babette Edgar (Janssen's own expert) uses in her report. (*Id.* at 8–10.) Relators further argue that Janssen's arguments regarding Schafermeyer's lack of experience working or consulting for CMS go to the weight of his testimony, not its admissibility. (*Id.* at 11–12.)

In its reply, Janssen emphasizes four points to prove that "none of [Schafermeyer's] experience is relevant to his Coverage and Reimbursement Opinions." (Reply at 1.) According to Janssen, Schafermeyer does not explain which courses involved teaching Part D, how his teaching history relates to his Coverage and Reimbursement Opinions, or whether his courses taught Part D policy issues in great depth. (*Id.* at 3–4.) Janssen notes that Schafermeyer has neither advised agencies nor private companies on Part D nor consulted for a pharmaceutical company on managed care or reimbursement since 1995, over a decade before Part D existed. (*Id.* at 5.) Janssen then argues that Schafermeyer's previous expert testimony centered on over-inflated drug prices instead of coverage and reimbursement of HIV medications. (*Id.* at 6.) Finally, Janssen argues that Relators attempt to buttress Schafermeyer's credentials by pointing to alleged errors,

which is an inappropriate factor to consider when determining the qualification of an expert.  (*Id.* at 7–8.)[2]

As mentioned above, the qualification requirement of Rule 702 is interpreted liberally with a "broad range of knowledge, skills, and training qualify[ing] an expert."  *Pineda*, 520 F.3d at 244 (quoting *Paoli*, 35 F.3d at 741).  The qualification prong of Rule 702 requires "that the witness possess specialized expertise."  *Id.* (quoting *Schneider*, 320 F.3d at 404).  "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on first[-]hand knowledge or observation."  *Daubert*, 509 U.S. at 592.

Schafermeyer earned an M.S. and Ph.D. in Pharmacy Administration, is a licensed pharmacist, has earned credits in business, economics, and marketing, and is currently a Professor of Pharmacy Administration at St. Louis College of Pharmacy.  (Schafermeyer Report, Ex. A, at 23.)  In a previous role, he "served as the Director of Graduate Studies and headed a Master's degree program in Managed Care Pharmacy."  (*Id.* ¶ 1.)  Since 1976, Schafermeyer has worked with, taught about, and analyzed the operations of pharmacies, their financial performance, their costs of dispensing, and their reimbursement by private and public prescription programs, including government-supported health care programs such as Medicare, Medicaid, TRICARE, and the Federal Employees Health Benefits Program.  (*Id.*)  He has also worked with and taught about the operations of managed care organizations and pharmacy benefit managers ("PBMs").  (*Id.*)  Furthermore, Schafermeyer has testified in four cases since 2015, but Janssen alleges they

---

[2]  In its reply, Janssen appears to raise the issue of reliability for the first time.  (Reply at 3–6.)  "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'"  *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).  In addition, although both parties argue these points, the Court does not have a sufficient basis to rule whether Schafermeyer's testimony is reliable because the argument was, at best,  unclear in the moving brief.  This finding is supported by the fact that neither party has effectively argued for or against the factors for the reliability of Schafermeyer's testimony.  *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 854 (3d Cir. 1990) ("The adversarial process upon which our legal system is based assumes that a fact finder will give the parties an adequate opportunity to be heard; if it does not, it cannot find facts reliably.").

were related to over-inflated drug prices and not the issues in this current matter. (*Id.*; Schafermeyer Reply at 6.) According to Janssen, he has not taught such a course since 2005, around when Part D was enacted. (Schafermeyer Moving Br. at 2–4; Reply at 5.)

Schafermeyer has been involved in pharmacy administration for approximately forty-five years. (Schafermeyer Report ¶ 1.) He has taught classes in pharmacy administration, which included reimbursement by private and public prescription programs. (*Id.*) Moreover, he has consulted on matters related to reimbursement. (*Id.*) Even if Janssen's concerns are taken as true, Schafermeyer's long and storied career in pharmacy administration gives him the specialized knowledge required to qualify as an expert under Rule 702. *See Paoli*, 35 F.3d at 741 ("We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications."). Although the time since Schafermeyer taught or worked in the field may be pertinent, the Court finds that these concerns go to the credibility and weight of his testimony, a function better left to trial before a jury. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). With the policy of liberal admissibility in mind, the Court finds that Schafermeyer is qualified to testify about his Coverage and Reimbursement Opinions.

The Court finds that Janssen's argument regarding Schafermeyer's qualifications is unpersuasive and primarily goes to the weight and credibility of Schafermeyer's testimony. As such, the Court will deny Janssen's motion to limit the expert testimony of Kenneth W. Schafermeyer.

### D.  Janssen's Motion to Exclude Certain Opinions of Aaron E. Glatt

Janssen filed a motion to limit certain testimony of Aaron E. Glatt, ("Glatt Motion," ECF No. 198), along with a brief in support of the Motion, ("Glatt Moving Br.," ECF No. 198-1). Relators opposed the Motion, ("Glatt Opp'n Br.," ECF No. 285), to which Janssen replied ("Glatt Reply," ECF No. 246).  Relators identified Glatt as an expert in the approved labels of Prezista and Intelence, Janssen's marketing of Prezista and Intelence, and the Speaker Programs. (Chuderewicz Decl., Ex. A, ECF No. 194-3.)  Glatt's report provides the following summary of the opinion he intends to offer at trial:

> I conclude, with a reasonable degree of medical certainty, that none of these types of promotional messaging were clinically appropriate given the limited FDA approval, available recommendations and guidelines by respected professional and regulatory agencies, and the standard of care for treatment of HIV/AIDS patients in the infectious disease and broader medical community . . . .

(Chuderewicz Decl., Ex. A, "Glatt Report" ¶ 9, ECF No. 266.)  Glatt's report also contains the following opinion: "There was considerable significance of Janssen's marketing in terms of likely impact on physician's prescribing decisions, potential patient harm, and expansion of the potential market for Prezista and Intelence."  (*Id.* ¶ 11.)  Janssen argues that "Glatt opines repeatedly in his report that those practices likely caused physicians to write Intelence and Prezista prescriptions that they would not otherwise have written" ("Causation Opinion").  (Glatt Moving Br. at 1.) Janssen argues that Glatt's Causation Opinion should be excluded from his report, and he should not be permitted to testify about his Causation Opinion at trial.  (*Id.* at 2.) Janssen contends Glatt's Causation Opinion is inadmissible because: (1) "he is not qualified to offer it" and (2) it "is not reliable."  (*Id.* at 2, 4.)

In opposition, Relators argue that the challenged testimony is "both within Dr. Glatt's expertise and reliable based on Dr. Glatt's broad experience in the field of drug treatment for HIV-

AIDS patients . . . ."  (Glatt Opp'n Br. at 7–8.)  Relators explain that Glatt's experience is further evidenced by his "years of teaching and consultation with other physicians and students, including specifically about the appropriate selection of drug therapies for HIV/AIDS patients" and "career on hospital committees," which dealt with the potential impacts of pharmaceutical marketing on physicians and other prescribers.  (*Id.* at 8.)  Relators explain that Glatt draws on his previous experience but also "carefully describes how the substance or content of Janssen's messaging could mislead physicians and influence their selection and use of Janssen's drugs."  (*Id.* at 10–11.)  In addition, with respect to Janssen's argument that Glatt's opinion is not reliable, Relators argue that he meets the standard applied to expert witnesses relying on experience because he explains how his experience helped shape his conclusions, why his experience is a sufficient basis, and how his experience is "reliably applied to the facts."  (*Id.* at 16.)

In its reply, Janssen argues that "Glatt's Causation Opinion extends beyond the factors that physicians generally consider when making prescribing decisions and impermissibly speculates how all physicians weigh and interpret marketing information when prescribing Prezista and Intelence to HIV patients." (Glatt Reply at 2.)  Janssen emphasizes that Glatt does not have experience in pharmaceutical marketing to support his opinion.  (*Id.* at 3.)  Further, Janssen focuses on Glatt's methodology, stating "Glatt does not identify any methodology that he used to reach his Causation Opinion."  (*Id*. at 5.)

Glatt is a Clinical Professor of Medicine at Icahn School of Medicine at Mount Sinai. (Glatt Report ¶ 1.)  Glatt is the Chairman of the Department of Medicine and Chief of Infectious Diseases and Hospital Epidemiologist at South Nassau Communities Hospital.  (*Id.*)  He is a fellow of the Infectious Disease Society of America, the American College of Physicians, and the Society of Healthcare Epidemiologists of America.  (*Id.*)  He has practiced in the infectious disease field

for over thirty-three years with a "significant focus on treating patients with HIV/AIDS." (*Id.* ¶ 2.) He has authored numerous articles related to HIV/AIDS drugs and treatment. (*Id.* at 74–81.) Glatt has been the spokesperson for the Infectious Diseases Society of America since 2002 and is a member of several Infectious Disease and HIV committees. (*Id.* at 71–73.)

According to Glatt, Relators retained him to opine on the following issues: (1) the drug treatment for patients with HIV/AIDS during the "Relevant Time Period[3]"; (2) the clinical issues related to the HIV/AIDS drug regimen that are particularly important to patients and physicians; (3) the FDA-approved labels and marketing indications for Prezista and Intelence; and (4) the education value of the Speaker programs. (*Id.* ¶¶ 5–7.) In reaching his opinion, Glatt used his professional experience and educational background to assess the FDA label, "the weight of medically accepted standards and the significance of Janssen's messaging, including the likely impact of physician's prescribing decisions," and the "potential patient harm and likely expansion of the market for the drugs." (*Id.* ¶ 6.)

As mentioned above, an expert's testimony is admissible when the expert is qualified, the testimony is reliable, and the testimony fits the facts of the case. When an expert relies primarily on experience rather than a scientific study, the expert must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments. *See also Ford*, 481 F.3d at 219 (reliability may turn on the proposed expert's "personal knowledge or experience"). However, the party seeking admission for expert testimony must prove (and a court must find) that the expert has sufficient bases to make specific conclusions. *See Pfizer Inc. v. Teva Pharm. USA, Inc.*, 461 F. Supp. 2d 271, 275 (D.N.J. 2006).

---

[3] As used by the parties and their experts, "Relevant Time Period" (as well as "Review Period" or "relevant periods") refers to the period of 2006 to 2014, when Janssen's alleged misconduct occurred. (Glatt Report ¶ 2.)

**Appx67**

In *Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.*, Pfizer filed a motion to exclude a rheumatologist's testimony regarding a medicine's therapeutic properties, the absence of therapeutic advantages over other non-steroidal anti-inflammatory drugs ("NSAID"), and physician prescribing practices, specifically the role of marketing materials in influencing physicians to prescribe the drug. 461 F. Supp. 2d at 275. Plaintiff argued that the rheumatologist's testimony should have been excluded in its entirety because it was speculative and not based on a reliable methodology. *Id*. at 275–76. The defendant argued that the rheumatologist should have been permitted to testify because his opinions were "based on his 20 years [of] practicing rheumatology and prescribing NSAID therapies for the treatment of chronic pain." *Id*. at 276.

In *Pfizer*, the court granted narrow exclusions where the rheumatologist did not have a reliable basis for his testimony. *Id.* at 275–78. The court found that the expert's "20 years practicing rheumatology and prescribing NSAID therapies for the treatment of chronic pain" was "not a sufficiently reliable basis for his broad opinions on the prescribing practices and general understanding of all physicians." *Id.* at 277. Moreover, the court found that the rheumatologist could "render an opinion on the accuracy of Celebrex's marketing materials" but "not opine as to physicians' . . . understanding of these materials or the effect that these materials had on their prescription choices" because the latter opinions "are speculative and not based on a reliable methodology." *Id*. Finally, the court found that the rheumatologist did not have a sufficiently reliable basis for his opinions that "prescriptions were heavily influenced by advertising and promotion" because his personal knowledge and experience did not persuade the court that he could "form[] a sufficient basis for his broad conclusions concerning the impact of sales and marketing efforts on . . . prescriptions." *Id*. at 277–78. Ultimately, the court drew a distinction between reliable and unreliable expert testimony from physicians. *Id.* at 275. Because of a

**Appx68**

physician's training and expertise, they can opine on prescribing medication, label accuracies, marketing accuracies, comparisons between various medications, and how they would act in a certain situation. *Id*. at 275–77. However, physicians cannot go beyond their expertise to opine about the effect of marketing materials or put forth broad opinions about prescribing practices and the general understanding of all physicians without more expertise. *Id.* at 277.

The Court has considered Glatt's qualifications and the opinion he intends to offer. The Court finds that Glatt has extensive personal knowledge and expertise in the field of HIV/AIDS drugs and their labels. Glatt is a practicing physician, has practiced medicine for almost forty years, has been involved with infectious disease departments for much of his practice, and has been in several teaching and head positions over the course of his career. (Glatt Report ¶ 1.) He also sat as chair on various hospital committees that dealt "with the potential impact of pharmaceutical advertising on appropriate usage of medications both in the hospital and in the community." (*Id*. ¶ 5.)

Glatt has personal knowledge of pharmaceutical marketing and advertising throughout his career, including "setting up policies and practices that the hospital should engage in in terms of allowing, not allowing pharmaceutical industry representatives to come into the hospital" to prevent undue influence on physicians. (*Id.* ¶¶ 7, 27.) In his current position, Glatt continues to consult with other physicians about recommended drug treatments for patients, and he has seen on numerous occasions the increased usage of a drug for no medical indication after pharmaceutical representatives have visited. (*Id.* ¶¶ 25–30.) Contrary to Janssen's argument, Glatt's personal knowledge and expertise are far greater in comparison to the physician in *Pfizer* on the testimony involved. The Court finds that Glatt's personal knowledge and expertise indicate that he is generally qualified to offer his opinion with respect to HIV, its drugs, its labels, and its marketing.

However, the Court finds inadmissible Glatt's opinions about the effects of Janssen's OL promotions on physicians' prescribing decisions. Although Glatt has some experience with pharmaceutical marketing in hospitals and has firsthand knowledge of many concerns regarding HIV/AIDS due to his career in infectious diseases, he does not have the same qualifications as Sillup, for example, to opine on the effects of OL promotion and marketing. (Glatt Report ¶¶ 1–5; Glatt Report at 91–97.) Relying on the court's guidance in *Pfizer*, this Court will bar Glatt from opining on how Janssen's OL promotion and marketing impacted the physicians' prescribing decisions. 461 F. Supp. 2d at 277–78. Accordingly, the Court grants Janssen's motion to limit the testimony of Aaron E. Glatt.

### E. Janssen's Motion to Exclude the Testimony of Virginia B. Evans

Janssen filed a motion to exclude the expert report and testimony of Virginia B. Evans ("Evans Motion," ECF No. 200), along with a brief in support of the Motion, ("Evans Moving Br.," ECF No. 200-1). Relators opposed the Motion, ("Evans Opp'n Br.," ECF No. 281), to which Janssen replied, ("Evans Reply," ECF No. 244). Relators identified Evans as "an expert in the field of health care compliance." (Evans Opp'n Br. at 9.) Evans' report provides the following summary of the opinion he intends to offer at trial:

> [I]t is my opinion that Janssen's Prezista and Intelence Speaker Programs did not comply with applicable government and industry standards, and that Janssen did not have an effective compliance program to prevent and detect Speaker Program misconduct. Based on my review and analysis, I conclude that Janssen used its Speaker Programs to pay doctors to induce them to prescribe Prezista and Intelence, and/ or to reward them for doing so. I further conclude that Janssen paid its Speaker physicians to promote the off-label use of these drugs to other prescribing physicians.

(Chuderewicz Decl., Ex. A, "Evans Report" ¶¶ 5–6, ECF No. 267.) According to her expert report, Relators asked Evans to opine on whether the Speaker Programs were conducted in compliance

with the laws, regulations, and guidance in the pharmaceutical industry, and whether Janssen's compliance program was "effective" as that term is understood in the healthcare and pharmaceutical industries. (*Id.* ¶ 5.)

Janssen argues that Evans intends to "offer[] legal advocacy, rather than specialized knowledge, that would not help the trier of fact to understand the evidence or to determine a fact in issue." (Evans Moving Br. at 2–7.) Aside from the legal conclusions, Janssen also argues that Evans' "opinion that Janssen's compliance program was 'ineffective' is inadmissible because she fails to tie her opinions to reliable methods or principles." (*Id.* at 7–14.)

In opposition, Relators argue that Evans did not provide legal conclusions. (Evans Opp'n Br. at 11.) They contend Evans "analyzed the evidence in the record under applicable government and industry standards, offered her expert opinion in a written expert report, and provided testimony." (*Id.* at 11–12.) They argue that Evans' report does not improperly summarize evidence and usurp the role of the jury. (*Id.* at 20–23.) Moreover, Relators contend Evans used reliable methods to form her opinions. (*Id.* at 23–35.)

In its reply, Janssen emphasizes that Evans offers legal advocacy that would usurp the role of the jury and the Court. (Evans Reply at 2.) Also, Janssen reiterates that Evans failed to apply reliable methodology to render her non-legal opinions admissible. (*Id.* at 6.)

The Court has reviewed Evans' qualifications because her specialized knowledge and experience in health care compliance is relevant to understanding how she formed her opinions and deciding the issue of reliability. Evans graduated from New York University School of Law and is admitted as a member of the bar in several states. (Evans Report ¶ 7; *id.* at 78.) She worked as a federal prosecutor for over twenty-five years but transitioned into private practice in 2005 and started providing health care consulting services. (*Id.* ¶¶ 5–6.) When she first transitioned into

private practice, she "managed several Independent Review Organization engagements for health care clients under Corporate Integrity Agreements, conducted compliance risk assessments and internal investigations, and worked with Audit Committees and Internal Audit Departments of large health care providers including hospitals, insurers, a national retail pharmacy chain, and an international pharmaceutical company." (*Id.* ¶ 6.) In 2010, she became partner at a large firm's Health Law practice where she represented health care providers in civil and criminal investigations. (*Id.* ¶¶ 6–7.) During that time, she also became a compliance resource for pharmaceutical companies, drug manufacturers, and physician practices. (*Id.* ¶ 6.) She wrote and reviewed compliance policies for many clients and negotiated settlements with state and federal health care agencies in cases involving the FCA, FDA, and other health care matters. (*Id.*) At one point, Evans served as a Vice President, Compliance Officer, and General Counsel for a hospital system. (*Id.* ¶ 7.) Evans also has experience working as a Senior Legal Editor for ThomsonReuters' Health Care & Life Science legal journal, and she is certified in Health Care Research Compliance. (*Id.*)

In her report, Evans used specialized knowledge as a health care compliance expert to determine whether Janssen maintained an effective compliance program by reviewing its compliance policies. Evans noted that she reviewed numerous documents before reaching her conclusions, including but not limited to Janssens' compliance policies on the Speaker Programs, documents concerning its Speaker Programs (*e.g.*, procedures, promotional policies, management guide, and internal emails and communications), summary reports of investigations, honoraria reports, return on investment reports, data collection efforts, transcripts of depositions of witnesses, and Janssen's responses to discovery request. (*Id.* ¶ 8; *id.* at 81–84.) More specifically, Evans reviewed Janssen's Speaker Programs to determine if they complied with the standards set

forth in the Compliance Program Guidance for Pharmaceutical Manufacturers ("OIG Guidance") written by the Office of Inspector General ("OIG") of the Department of Health and Human Services. (*Id.* ¶¶ 8–9.) She sought to determine whether Janssen implemented "controls," as recommended by OIG guidance, to prevent its Speaker Programs from being used to improperly influence physicians' prescribing behavior. (*Id.* ¶ 9.) Evans also reviewed Janssen's compliance program and other internal documents to determine whether Janssen complied with its own policies. (*Id.*) In addition to the OIG Guidance, Evans also relied on other materials about industry standards and practices that help manufacturers implement and maintain effective compliance programs. (*Id.* ¶¶ 9–10.)

After reviewing Evans' approach, the Court rejects Janssen's argument that Evans' methodology was "unreliable and litigation-driven." (Evans Moving Br. at 9.) To the extent Janssen takes issue with the evidence Evans relies upon to render her non-legal opinions, Janssen may cross-examine her and present evidence to the contrary at trial. *Krys v. Aaron*, 112 F. Supp 3d 181, 192 (D.N.J. 2015) (quoting *Daubert*, 509 U.S. at 595). *See also MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1355–356 (Fed. Cir. 2005) (explaining that an expert "must consider *enough* factors to make his or her opinion sufficiently reliable in the eyes of the court . . . [but the] expert need not consider *every* possible factor to render a 'reliable' opinion"). The Court is not required to preclude Evans' expert testimony simply because Janssen believes she "could have performed . . . her analysis in a better manner." *Pfizer*, 461 F. Supp 2d at 274. For the reasons stated above, the Court finds that Evans used "reliable principles and methods" to reach her conclusion concerning the effectiveness of Janssen's compliance program, and her opinion is supported by "sufficient facts and data." *See* Fed R. Evid. 702(b), (c).

Moreover, Evans' testimony about the industry compliance standards and her opinion that Janssen did not have an effective compliance program is admissible because it would help "the trier of fact to understand the evidence [and] to determine a fact in issue . . . ." Fed. R. Evid. 702(a). Evans' opinion would help the jury determine whether Janssen's "conduct or actions meet the underlying bases for an ultimate issue" to be decided in this case. *Krys*, 112 F. Supp. 3d at 193. However, Evans' opinion that "Janssen used its Speaker Programs to pay doctors to induce them to prescribe Prezista and Intelence" is inadmissible because it is a legal conclusion. *Berckeley*, 455 F.3d at 217. Whether Janssen used its Speaker Programs to induce doctors to prescribe Prezista and Intelence is an issue for the jury because it decides an element of the AKS claims. *See* 42 U.S.C. § 1320a-7b(b)(2)(B). Although Federal Rule of Evidence 704(a) allows an expert to proffer testimony that "embraces an ultimate issue to be decided by the trier of fact," the ultimate issue rule does not enable an expert to tell the jury what result to reach. *Krys*, 112 F. Supp. 3d at 192. The Court agrees with Janssen that this is a question of intent for the jury, and Evans cannot provide testimony concerning state of mind or culpability. *Id*. at 203.

The Court, therefore, will grant in part and deny in part Janssen's motion to exclude the expert testimony of Virginia Evans.

### F. Janssen's Motion to Exclude the Testimony of Israel Shaked and Ian Dew

Janssen filed a motion to exclude the testimonies of Israel Shaked and Ian Dew, ("Shaked Motion," ECF No. 202), along with a brief in support of the Motion, ("Shaked Moving Br.," ECF No. 202-1). Relators opposed the Motion, ("Shaked Opp'n Br.," ECF No. 280), to which Janssen replied, ("Shaked Reply," ECF No. 248). Relators retained "Shaked to perform statistical analyses of the prescription claims data and to opine on issues of causation and damages." (Shaked Opp'n Br. at 1.) Shaked's expert report provides many opinions he intends to offer at trial, including: the

positive relationship between compensation paid to physicians and subsequent prescriptions written for Prezista and Intelence; the opinion that Janssen's conduct "influenced" OL prescriptions that were then reimbursed by the government for the relevant periods; and the total damages related to Janssen's alleged violation of the FCA and AKS. (Chuderewicz Decl., Ex. A, "Shaked Report" ¶¶ 13–145, ECF No. 268.) Shaked performed twelve different analyses in which he calculated various metrics to explain the relationships between payments to speakers, effects of payments on prescribing physicians, and the relationship between speakers and non-speakers. (*Id.* at 35–63.) In reaching his conclusions, Shaked relied on Ian Dew for analytical support.[4] (*Id.* ¶ 14; Chuderewicz Decl., Ex. D, "Dew Rebuttal Report" at 3, ECF No. 268-2.)

Janssen challenges the reliability of Shaked's opinions and, by proxy, of Dew's opinions. (Shaked Moving Br. at 4.) Janssen also seems to challenge Shaked's qualification by claiming that he does not have the requisite experience to opine on medical claims because his work centers on financial analyses.[5] (*Id.* at 4.) First, Janssen argues that "Shaked's general causation opinions relating to [OL] promotion and speaker payments should be excluded because they are based on an unreliable methodology for assessing causation." (*Id.* at 10–20.) It contends that Shaked's "[c]orrelation analyses are not generally accepted methods for assessing causation" and fails to consider "confounding factors that may affect physicians' prescribing decisions." (*Id.* at 11, 15.) Second, Janssen argues that "Shaked's general causation opinions relating to [OL] promotion also should be excluded because the two variables being measured in his correlation analyses are based on unsupported assumptions that do not fit the facts of this case and result in an unreliable

---

[4] Ian Dew is a partner at Steck Consulting and has over twenty years of experience in data analysis. (*Id.* ¶ 17, n.6) Shaked utilized Dew to query databases of ADAP, Medicaid, and Medicare. (*Id.*) Shaked describes the data he requested from Dew throughout his report. (*Id.*)

[5] Janssen also asks the Court to exclude Dew because of his alleged lack of qualifications. (Shaked Moving Br. at 9–10.) The Court declines to address this argument because Dew supports Shaked's opinion, has no independent opinion, and Janssen has asked this Court to posit Dew's exclusion on Shaked's exclusion.

methodology." (*Id.* at 20–27.) Janssen contends that Shaked's definition of an "influenced" prescriber and his attribution of a patient's lifelong prescriptions to the first prescriber are both variables based on unsupported assumptions. (*Id.* at 20, 24.) Third, Janssen argues that "Shaked's specific causation opinions identifying false claims and estimating damages resulting from Janssen's alleged improper promotion should be excluded because they are based on unsupported assumptions and errors that do not fit the facts of this case and result in an unreliable methodology." (*Id.* at 27–30.)

In opposition, Relators argue that "Shaked has excellent support for his analyses and opinions here, and his opinions easily satisfy the applicable standards of reliability and admissibility." (Shaked Opp'n Br. at 3.) They argue that Shaked accounted for confounding variables, has a basis for assumptions and definitions for his damages and causation analyses, and can prove causation under the FCA through a general causation analysis rather than a "but for" analysis. (*Id.* at 3–6.) In addition, Relators explain that Shaked is an expert in statistics and uses "common and well-established methods to perform his analyses," applying the methods to comparable groups. (*Id.* at 2.) They note that Shaked has the educational, academic, and industry background necessary to qualify as an expert. (*Id.*)

In its reply, Janssen reiterates that Shaked's general causation opinions are inadmissible because they fail to satisfy the reliability requirement of Federal Rule of Evidence 702. (Shaked Reply at 2.) Janssen argues that Shaked cannot prove any existence of a causal relationship because his assumption that all of Janssen's contacts "influenced" physicians has no reliable basis in the facts. (*Id.* at 4; *see id.* at 11, n.8.) Emphasizing its point that two-variable correlation analyses are not a generally accepted method for assessing causation, Janssen argues that the lack

of a randomized control experiment and the lack of multiple regression analyses cause his general causation opinion to be unreliable. (*Id.* at 5–11.)

The parties' disagreement centers on whether Shaked's analyses have "good grounds" for his conclusions. The "good grounds" analysis implicates the reliability prong; once determined, the fit of the testimony to the facts of the should be adjudged. *See Daubert*, 509 U.S. at 598. "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Paoli*, 35 F.3d at 744. "An expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." *Walker v. Gordon*, 46 Fed. App'x 691, 695–96 (3d Cir. 2002). An expert's report and testimony are reliable if the expert has "good grounds" for his or her opinions. *Paoli*, 35 F.3d at 744. When evaluating whether a particular scientific methodology is reliable, the Third Circuit has instructed district courts to consider the following non-exhaustive factors: (a) whether a method consists of a testable hypothesis; (b) whether the method has been subject to peer review and publication; (c) the known or potential rate of error; (d) the existence and maintenance of standards controlling the technique's operation; (e) whether the method is generally accepted; (f) the relationship of the technique to methods which have been established to be reliable; (g) the qualifications of the expert witness testifying based on the methodology; and (h) the non-judicial uses to which the method has been put. *Id.* at 742, n.8 (citation omitted). *See also Pineda*, 520 F.3d at 247–48.

The Court reviewed Shaked's report to determine whether he used methods with good grounds to reach his general causation opinions. The Difference of Two Population Means Test (the two-factor correlation analysis Janssen references) determines whether there is a statistically significant difference between two independent population means. (Shaked Report at 73.) If the z-score is higher than the critical value, then there is a statistically significant difference between

the two populations.  (*Id.* at 73.)  Here, Shaked clearly explains his rationale for setting up tests, tests each of his hypotheses (*e.g.*, whether payments "influenced" physicians) against the negative hypotheses (*e.g.*, whether payments did not "influence" physicians), and used z-scores to determine whether the results were statistically significant.  (Shaked Report ¶¶ 76, 96, 105, 131, 140.)  Moreover, Shaked calculated the Spearman Rank Correlation values for dollar amounts paid to speakers and their dollar amount of prescriptions.  (*Id.* at 36.)  As understood by the Court and expressed by Shaked, the Spearman Correlation Test measures the positive relationship between two variables; a value of "-1" implies a weak association, a value of "0" implies no association, and a value of "1" implies a positive association.  (Shaked Report at 73–74.)  The Spearman Rank Correlation Significance Test analyzes the strength of the correlation test and the possibility that the correlation is by chance.  (*Id.* at 74.)  Furthermore, contrary to Janssen's argument that Shaked did not run regressions, Shaked ran multiple regressions on the data when challenged by Anupam Jena; however, Shaked chose not to include it in the supplemental report because he believed that the identical results did not need to be included in his report.  (Chuderewicz Decl., Ex B., "Shaked Dep." 291:10–25, ECF No. 202-4.)  With positive values, high z-scores, and high t-values, the values are statistically significant (*i.e.*, cannot be rejected) under accepted statistical checks.[6] (Shaked Report at 74.)  As such, the Court finds that Shaked's report has "good grounds" and is, therefore, reliable.  Since Shaked uses data pertinent to the facts of the case, the Court finds that his analysis is also relevant to the case at hand.

---

[6] When applying the Rank Correlation Significance Test, Shaked calculated a correlation of 0.235 and a t-value of 4.212 for the correlation between a change in total compensation and average annual prescription; he also calculated a correlation of 0.406 and a t-value of 31.944 for the correlation between a change in marketing contacts and OL prescriptions.  (Shaked Report ¶¶ 89, 119.)  According to the t-score table found, the t-values for 99.995% confidence in the result is 3.97 for a data set of 200 values and 3.92 for a data set of 500 values. https://faculty.washington.edu/heagerty/Books/Biostatistics/TABLES/t-Tables/.  As such, the Court finds that the values calculated are reliable.

The *Reference Manual on Scientific Evidence* does note that randomized controlled experiments generally are a better measure of causation than observational studies.  Federal Judicial Center, 220 (3d ed. 2011).  Although the Court does not doubt that Shaked has the capacity to make such a decision, it would be prudent to probe the reason for his choice.  Shaked collected the data for his analyses from a variety of sources, including state databases, and explains that his analysis is a controlled experiment due to the nature of the data.  (Reply at 9; Shaked Dep. 290:7-9.)  Each of Shaked's checks for significance imply that the values are not insignificant.  (Shaked Report ¶¶ 76, 89, 96, 105, 119, 131, 140.)  Furthermore, Shaked ran multiple checks on his analyses to determine whether the conclusions were sound.  (Shaked Dep. 291:18-25.)  Holding that the lack of complete control over all aspects of a study is sufficient to defeat the reliability of the study would mitigate the use of studies in many cases heard in this Court. *See*, *e.g.*, *In re Johnson & Johnson Talcum Powder Products Mktg.*, 509 F. Supp. 3d 116, 166–67 (3d Cir. 2020) ("The Court cannot deem Plaintiffs' experts' opinions unreliable simply because they determined that the case-control studies were entitled to greater weight than the cohort studies, particularly since the experts' explanations of their methods were supported by scientific reasons.").

Considering that Shaked has proven that the variables are strongly correlated through a reliable methodology, the question becomes whether Shaked has a strong basis for asserting that the kickbacks resulted in physicians writing more prescriptions for Prezista and Intelence.  That is a question of weight, not of reliability.  *See In re Johnson & Johnson*, 509 F. Supp. 3d at 167 ("Defendants may disagree with the experts' interpretations of those studies and their usefulness, but such issues go to the weight of the experts' testimony, and not their reliability.").  Many of Janssen's arguments attack Shaked's assumptions and question his choice of methodology: the proper venue for such arguments is at trial during cross-examinations.  *See Daubert*, 509 U.S. at

**Appx79**

596.  The Court's role at this point is to determine whether the methodology is reliable.  *Id.* As it has, the Motion to exclude Shaked's and Dew's report and testimony is denied.

**G.  Relators' Motion to Exclude the Testimony of Jon Smollen**

Relators filed a motion to exclude the expert report and testimony of Jon Smollen ("Smollen Motion," ECF No. 179), along with a brief in support of the Motion, ("Smollen Moving Br.," ECF No. 276).  Janssen opposed the Smollen Motion, ("Smollen Opp'n Br.," ECF No. 210), to which Relators replied, ("Smollen Reply," ECF No. 254).  Janssen identified Smollen as a rebuttal expert to Relators' compliance expert, Virginia Evans, and as an individual who has "specialized knowledge" and analysis regarding "Janssen's efforts to comply with the AKS." (Smollen Opp'n Br. at 1.)   Smollen's report provides the following summary of the opinion he intends to offer at trial:

> Based on my professional experience and expertise, it is my opinion that throughout the Review Period, Janssen proactively identified compliance risks arising from its Speaker Programs, designed and implemented compliance policies and controls to mitigate those risks, and effectively operationalized its policies.

(Ellerbe Decl., Ex. 1, "Smollen Report" at 4, ECF No. 279.)  Smollen opined on (1) whether Janssen had effective compliance policies in place to minimize the risk that its Speaker Program violated the AKS ("Effective Compliance Opinion"), and (2) whether Janssen had effective compliance policies in place overall ("Overall Compliance Opinion").  (Smollen Motion at 4.) After considering OIG and PhRMA ("Pharmaceutical Research and Manufacturers of America") Code guidance, the testimony and evidence provided by Janssen, and his own professional judgment, Smollen concluded the following: (1) Janssen had effective compliance policies to prevent violation of the AKS; and (2) Janssen had effective compliance policies in place overall. (*Id.* at 4.)

Relators argue that Smollen's Effective Compliance Opinion is unreliable because his opinions regarding Janssen's effective compliance "is based on a skewed and unreliable consideration of very limited select evidence in the case and simply ignores a wealth of evidence that contradicts his opinions." (Smollen Moving Br. at 7.) Relators also argue that Smollen's Overall Compliance Opinion is irrelevant, unreliable, and likely to confuse the jury because "it is not relevant to any issues in this case[,] fails to even consider the issue of [OL] marketing at all[,] . . . fails to consider the overwhelming evidence regarding Janssen's [OL] marketing scheme[,] and is likely to confuse the jury." (*Id*.) Relators point to examples of "Smollen providing superficial opinions without ever delving into the underlying facts in the record." (*Id*. at 24.)

In opposition, Janssen argues that Smollen's testimony "would help the jury 'understand the evidence' and 'determine a fact in issue' (that is, whether Janssen intended to violate the AKS)." (Smollen Opp'n Br. at 1.) Janssen argues that Smollen's reluctance to adopt Relators' view of the case for his Effective Compliance Opinion is not a basis for reliability. (*Id*. at 3.) He "reviewed Relators' witnesses' testimony, the testimony from other witnesses, and hundreds of documents, including Relators' witnesses' emails, compliance monitoring and investigation logs, compliance trainings, compliance communications, compliance risk assessments, and compliance policies." (*Id*. at 4–5.) Janssen states that "Smollen did not ignore key deposition testimony" and gave "thoughtful consideration" to all the evidence. (*Id*. at 7, 9.) With respect to Smollen's Overall Compliance Opinion, Janssen argues that Smollen's opinion is relevant and that he opined on the same relevant topics as Evans. (*Id*. at 10.) According to Janssen, Smollen "considered how Janssen operationalized compliance across the company and across all risk," which was also considered in Evans' expert report. (*Id*. at 12.)

In its reply, Relators reiterated that Smollen "ignored substantial deposition testimony" from Mark Wilhelm and Sara Strand[7] and, when asked about this testimony, Smollen "admitted that Janssen's practices violated its own written policies, applicable industry standards, and the law." (Smollen Reply at 1–2.) Relators also allege that Smollen made credibility determinations among witnesses, which was inappropriate for experts to do. (*Id.* at 5–8.)

The Court first considers Smollen's qualifications before addressing the reliability of his opinions. Smollen is qualified to opine on compliance issues due to his education and experience. He held leadership and advisory positions in several pharmaceutical companies, assisted in establishing and enhancing U.S. and global compliance programs, and currently teaches compliance and ethics at Temple Law School. (Smollen Report at 10–12.) In reaching his opinions, he thoroughly walks through Janssen's regulatory procedure, applies the PhRMA Code and OIG recommendations, compares Janssen's policies to the industry standard, and applies the same framework—like Relators' expert, Evans—to come to a different conclusion. (*Id.* at 67.) In this instance, Smollen's report is relevant because it discusses a pertinent issue of the case (compliance), rebuts Relators' experts, and provides helpful information to the jury. As the Court previously mentioned, "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." *Berckeley*, 455 F.3d at 217. Here, the Court finds that the Overall Compliance Opinion and Effective Compliance Opinion are reliable because Smollen applied his professional judgment and expertise in a reliable manner.

---

[7] Mark Wilhelm was a Key Account Director for Janssen's Western Division from 2007 and 2009. Sara Strand was a Regional Business Director for the Eastern Division from 2006 to 2011. Relators included them as witnesses with first-hand knowledge of Janssen's practices. (Smollen Reply at 1–2.)

Relators argue that Smollen should have taken note of Wilhelm's and Strand's testimony in his expert opinion. As a reminder, "[a]n expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." *Walker*, 46 Fed. App'x at 695–96. *See In re Johnson & Johnson*, 509 F. Supp. 3d at 167 ("Defendants may disagree with the experts' interpretations of those studies and their usefulness, but such issues go to the weight of the experts' testimony, and not their reliability."). Although he did not mention Wilhelm, Smollen took note of Strand's testimony.[8] (Smollen Report at 56.) Smollen's failure or unwillingness to respond to testimony from certain witnesses is an issue for cross-examination. Moreover, to the extent Relators assert that Smollen agreed Janssen violated its policies, a quick look at Smollen's deposition reveals that Smollen *only* agreed that certain facts, if proven true, could hypothetically constitute violations of written policies and statutes. (Ellerbe Decl., Ex. 2, "Smollen Dep." 77:10-80:21, 82:15-89:21, 93:3-95:23, 97:8-101:23, ECF No. 279-1.)

Relators raise other arguments that attack assumptions and do not go to the reliability of Smollen's report; as mentioned above, the proper venue for such arguments is trial, not a *Daubert* motion. *Daubert*, 509 U.S. at 596. Accordingly, Relators' motion to exclude Smollen's report and testimony is denied.

### H. Relators' Motion to Exclude Certain Opinions of Anupam Jena

Relators filed a motion to limit the opinions of Anupam Jena, ("Jena Motion," ECF No. 181), along with a brief in support of the Motion, ("Jena Moving Br.," ECF No. 277). Janssen opposed the Motion, ("Jena Opp'n Br.," ECF No. 215), to which Relators replied ("Jena Reply," ECF No. 253). Janssen identified Jena to opine on issues of causation and damages, and to respond

---

[8] Evans focuses on Strand's testimony that she would occasionally send OL Intelence studies to the sales force. However, Evans ignored that Strand testified that she sent OL studies with a directive to her team that the studies were for background only and could not be used on sales calls with HCPs.

to Shaked's opinions and analyses on those same topics.  (Chuderewicz Decl., Ex. A, ECF No. 194-3.)

Jena organized his report into three main sections: (1) HIV treatment background; (2) assessing causation with respect to Janssen's alleged improper promotion in the current case; and (3) assessing causation with respect to Janssen's speaker payments in the current case.  (Ellerbe Decl., Ex. 25, "Jena Report" ¶¶ 16–63, ECF Nos. 279-6.)  Jena organized his rebuttal report in two main sections: (1) a discussion of Shaked and Dew's causation conclusions ("Causation Opinion"), and (2) a discussion of Shaked's damages estimates ("Damages Opinion").  (Ellerbe Decl., Ex. 24 "Jena Rebuttal Report" ¶ 3, ECF. No. 279-5.)  In sum, Jena's reports conclude: (1) Shaked's analysis with respect to causation is flawed because he did not use the appropriate data, methods, and accounting for external factors to correctly conclude that Janssen caused false claims to be written through speaker payments and OL marketing; and (2) the correct damages calculation for Relators' claims is approximately $0 once the analyses accounts for the purported issues.  (Jena Report ¶¶ 10–15, Jena Rebuttal Report ¶¶ 12, 14, 63, 122–125.)

Relators seek to strike portions of Jena's reports and testimony that "are based on erroneous legal principles or which implicate such principles."[9]  (Jena Moving Br. at 4.)  Relators contend that certain parts of Jena's report are inadmissible because: (1) he "applies a standard that is contrary to the law"; (2) he "ignored substantial evidence in the record"; and (3) his opinions on damages "have no basis in the law and do not support reducing damages to zero."  (*Id.* at 8, 17, 19.)  Relators argue that Jena's requirement of a "direct causal link" is "directly contrary" to the law regarding liability and causation under the FCA.  (*Id.* at 12.)  Thus, Relators argue that Jena's

---

[9] Relators have asked this Court to exclude the following paragraphs of Jena's Expert Report: ¶¶ 11, 25, 27–29, 33–34, 54, 57–58, 60, 62, and 64.  (Jena Moving Br. at 4–5.)  Relators have also asked to exclude the following paragraphs of Jena's Expert Rebuttal Report: ¶¶ 3, 5-8, 11 (bullets 3–5), 12–17, 20, 37–40, 43–45, 52–54, 63–65, 84, 86–87, 91, 93–97, 99, 100–15, and 118–25.  (*Id.* at 5.)

opinions are unreliable, irrelevant, and confusing to a jury. (*Id.* at 14.) Relators also argue that Jena failed to review evidence and reviewed only five of the eighteen depositions taken in this case. (*Id.* at 17.) Relators contend that these purported issues cause Jena's Damages Opinion to be unsupported and thus inadmissible. (*Id.* at 20.)

In opposition, Janssen argues that "Jena appropriately evaluated the issues of causation and claimed damages from a scientific perspective using his broad experience in the fields of economics, statistics, and medicine." (Jena Opp'n Br. at 1.) According to Janssen, Jena opines on whether Shaked's correlation analyses are sufficient to show a causal relationship between promotion and prescription numbers or payment and prescription numbers, not whether there is a direct causal relationship between each respectively. (*Id.* at 3–4.) As such, Janssen argues that Jena's opinion is consistent with the generally accepted standards in economics and medicine, as well as the relevant legal standards under the FCA and admission of scientific evidence. (*Id.* at 9.) Janssen further argues that Jena's opinions are based on a sufficient factual foundation, consisting of what he considered to be pertinent court documents and publicly available materials. Finally, Janssen argues Jena's removal of and reductions to Shaked's damages estimates are appropriate under FCA law. (*Id.* at 22–27.)

In its reply, Relators emphasize that Jena applies a direct "but for" test rather than the "substantial factor" test. (Jena Reply at 1–2; Ellerbe Decl., Ex. 23, "Jena Dep." 59:4-60:4, ECF No. 279-5.) Relators argue that Jena's opinions are premised on the application of a "but for" causation; to this point, Relators argue that Jena admitted to using "but for" causation analysis in his deposition. (Jena Reply at 2–3; *see* Jena Dep. 59:4-60:4.) Furthermore, Relators take issue with Jena's position that "prescriptions written 6 months after Janssen's unlawful conduct should not be included in the case for purposes of causation or damages[,]" arguing that the FCA and

AKS do not impose strict temporal cutoffs for false claims. (Jena Reply at 9–10.) Relators also argue that Jena should have considered Wilhelm's and Strand's testimony when considering causation and damages. (*Id*. At 11–13.) Finally, Relators argue that certain of Jena's Damages Opinion is contrary to applicable law because legal precedents do not support his damages calculations. (*Id.* at 13–15.)

Jena is appropriately qualified to opine on the matters in his report. Though Jena does not hold any degrees in statistics, he holds a Ph.D. in Economics and has extensive experience studying and analyzing physician behavior in the microeconomic context. (Jena Report at 35, 41–42, 44–60.) Jena uses the same data as Shaked, "corrects" Shaked's data, methodology, and conclusions (an appropriate subject for a rebuttal expert and an important point of view for the jury), and puts forth calculations based on Jena's expertise *and* Janssen's defense. (*Id.* at ¶¶ 60–63; Jena Rebuttal Report ¶¶ 22–45, 66–125.) Thus, Jena reliably applies his expertise to his Causation Opinion and Damages Opinions, raising criticisms and concerns about Shaked's methodologies. (*Id.*) Although Relators may critique Jena's assumptions, the Court finds that Jena's Causation Opinion and Damages Opinions are reliable because they stem from Jena's analytical modeling expertise and arise from the same set of data Shaked utilized. Furthermore, the Court finds that Jena's opinions are relevant because they provide Janssen's views of causation and damages based on Janssen's view of the facts.

Relators' motion and reply focus heavily on Jena's supposed improper application of a legal standard to the facts of the case. (Jena Reply at 5–6.) Relators argue that the application of an improper legal standard causes Jena's opinion to not fit the facts of the case. (*Id.* at 1–3.) If this were true, it would be a cause for concern. The Court does not find support for Relators' argument that Jena is applying the incorrect legal standard to reach his conclusion. In his report,

Jena points to other factors that doctors may consider, which are supported by his own study of doctors' behavior and his own practice of medicine. (Jena Report at 35, 41–42, 44–60.)  He discusses his rationale for excluding certain calculations and how his method differs from Shaked's.  (*See, e.g.*, Jena Rebuttal Report at ¶¶ 114–24.)

Where Relators point to Jena's testimony as bases for exclusion, the testimony does not support what Relators argue. As one of their primary bases for exclusion, Relators argue that Jena agreed that he applied direct ("but for") causation principles during his deposition.  (Jena Dep. 59:19-60:4.)  Jena admitted several times that he is testifying as a doctor and economist, not as a lawyer.  (Jena Dep. 61:6-12.)  As such, his testimony's reliability and relevance should be considered with respect to his expertise in these fields.  The Court does not find it surprising that Janssen's expert, opining in support of Janssen's defense with respect to causation, discusses at length the absence of direct evidence in the record as to causation.  However, to the extent that Relators believe that Jena applies the incorrect legal test with respect to causation, that issue can be adequately tested by cross-examination.  Ultimately, the Court will articulate the proper legal standard for causation to the jury.

Relators criticize Jena's damage reductions as contrary to law.  (Jena Reply 13–15.)  In part, Relators point to *ZF Meritor* as proof that Jena's report and testimony should be excluded because it apparently shows that an expert cannot form a reliable opinion through a selective review of the evidence. (Jena Moving Br. at 17–18.)  *ZF Meritor* supports the notion that existence of conflicting evidence is not a basis on which to exclude an expert's testimony.  696 F.3d 254, 290 (3d Cir. 2012). "The respective credibility of Plaintiffs' and [Defendant]'s experts [is] a question for the jury to decide."  *Id.* at 290.  The damages expert in *ZF Meritor* was excluded because he could not reliably estimate damages from speculative assumptions and the facts on the

Appx87

record. *Id.* at 294. Here, the facts are bare insofar; as noted in this Court's recent decision denying Summary Judgment, most of the material facts in this case are in dispute. Additionally, the assumptions arise from each party's view of the case; because no facts have been proven at this point, it is difficult for the Court to determine whether Jena's (or Shaked's) assumptions are indeed speculative.

"[E]xclusion of critical evidence is an 'extreme' sanction . . . ." *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710 (3d Cir. 1997). Although Relators may disagree, Jena's opinions are informed by Janssen's version of events, which is not a basis to exclude an otherwise reliable and relevant opinion. Accordingly, the Court will deny Janssen's motion to exclude the expert testimony of Anupam B. Jena.

### I.   Relators' Motion to Limit the Testimony of Eric S. Rosenberg

Relators filed a motion to limit the testimony of Eric S. Rosenberg, ("Rosenberg Motion," ECF No. 183), along with a brief in support of the Motion, ("Rosenberg Moving Br.," ECF No. 278). Janssen opposed the Motion, ("Rosenberg Opp'n Br.," ECF No. 209), to which Relators replied ("Rosenberg Reply," ECF No. 255). Janssen identified Rosenberg as an expert in infectious diseases, HIV therapies, and strategies surrounding the management of HIV-infected individuals. (Ellerbe Decl., ECF No. 187-3 at 3–4; Rosenberg Reply at 1.)

Rosenberg is Janssen's HIV expert and the opposing expert to Relators' HIV expert, Dr. Aaron Glatt. (Ellerbe Decl., Ex 28, "Rosenberg Rebuttal Report" ¶ 3, ECF No. 279-8.) Rosenberg's report provides an overview of a general practitioner's choices when treating a patient with HIV/AIDS, goals of treatment, materials doctors may use to reach their goals of treating patients with HIV/AIDS, and Rosenberg's experience treating patients with HIV/AIDS. (Ellerbe Decl., Ex. 29, "Rosenberg Report" ¶¶ 9–13, ECF No. 279-9.) Rosenberg's rebuttal report provides

additional context on the treatment of HIV/AIDS patients with OL uses of medications, comments on Glatt's report, and provides Rosenberg's personal experience with treating such patients. (Rosenberg Report ¶¶ 34, 42–46; Rosenberg Rebuttal Report ¶¶ 3, 7, 13, 14–16, 19.)

Relators have asked the Court to preclude Rosenberg from testifying beyond clinical or medical background about HIV/AIDs and the types of drugs used in its treatment. (Rosenberg Moving Br. at 5.) Relators assert Rosenberg's report and testimony is inadmissible because: (1) Rosenberg's personal approach to prescribing drugs and utilizing multiple sources of information is irrelevant, and unreliable with no fit to the issues of the case; and (2) testimony about appropriate OL use of drugs is irrelevant to drug marketing practices at issue in the case and is likely to mislead the jury. (*Id*. at 13–14.) Relators do not challenge the use of Rosenberg's testimony for "providing medical background and explanations about HIV/AIDS and the drugs used to treat it," but they do request that this Court limit Rosenberg's testimony when he goes beyond this function. (Rosenberg Reply at 4.)

In opposition, Janssen argues that Rosenberg's testimony is reliable due to his experience and his testimony is relevant because it is a key component of Janssen's causation defense. (Rosenberg Opp'n Br. at 1.) Janssen contends Rosenberg's testimony is reliable because it comes from his experience as a physician specializing in HIV/AIDS. (*Id.* at 4.) Furthermore, Janssen claims that Rosenberg does not opine on inadmissible topics, such as testimony "concerning what all doctors generally consider." (*Id.* at 5.) Finally, Janssen claims that Rosenberg's testimony is relevant because it would help the jury understand Janssen's causation defense. (*Id.* at 7–8.)

Relators argue there are three "fatal problems" with Janssen's argument. (Rosenberg Reply at 6.) First, Janssen attempts to use Rosenberg to opine as to the effects of OL marketing even though Rosenberg himself readily admits he does "not feel qualified to offer an expert opinion

**Appx89**

regarding the effects of promotional marketing." (*Id.* at 5.)  Second, Janssen improperly attempts to misconstrue Rosenberg's testimony as applicable to other doctors.  (*Id.* at 7.)  Relators contend Rosenberg did not offer his opinion to speculate on how other HIV experts treat HIV patients; instead, Rosenberg's report explains what sources of information he relies on when deciding which medication to prescribe.  (*Id.*)  Third, the court should reject the general concept that doctors glean knowledge from various sources because it is well within an average layperson's understanding. (*Id.* at 7–8.)  For these points, Relators ask the Court to exclude all aspects of Rosenberg's opinions beyond the clinical or medical background he provides about HIV/AIDS and the types of drugs used to treat it. [10]  (*Id.* at 15.)

The Court has reviewed Rosenberg's qualifications.  He has a plethora of experience diagnosing and treating patients with HIV/AIDS and has many journal articles on treating HIV/AIDS.  (Rosenberg Report at 24–26, 30–40.)  The Court finds that Rosenberg is qualified to opine on treating and prescribing HIV/AIDS patients.  As such, the Court finds that Rosenberg's professional opinions on HIV/AIDS are very reliable. Rosenberg's personal opinions about prescribing drugs, using multiple sources of information, and the appropriate OL use of drugs are relevant to Janssen's causation defense. Accordingly, the Court finds that Rosenberg's opinions also fit the facts of the case.

The Court agrees with Relators that any attempt to move beyond the purviews of explaining how Rosenberg reaches his prescription decision would be inadmissible.  However, Rosenberg has not. He clearly delineates what his testimony and report opine on (his methods for prescribing

---

[10] Relators have asked this Court to exclude "Dr. Rosenberg's testimony to the extent that it ventures beyond explanations of the disease state and the drugs themselves." (Rosenberg Reply at 4.)  Among other examples, Relators point to several examples that Rosenberg may move beyond his medical and professional expertise to opine on inadmissible points. (Rosenberg Report, ¶¶ 34, 42-46; Rosenberg Rebuttal Report, ¶¶ 7, 16; Ellerbe Decl., Ex. 27, "Rosenberg Dep." 12:22-25, 22:5-7, 25:19-25, 29:8-20, 41:18-42:14, 90:23-92:8, 93:2-14, 134:24-135:5, ECF No. 279-7.)

HIV/AIDS medications to patients) and what it does not (marketing, what the average doctor should do).  (Rosenberg Report ¶¶ 34, 42–46; Rosenberg Rebuttal Report ¶¶ 3, 7, 13, 14–16, 19.)  As the Court found above, Rosenberg is qualified to opine on the subject through his credentials and experience, has good grounds to discuss such topics due to his extensive experience as an HIV/AIDS specialist, and it fits a point that Janssen is raising as a defense (that a doctor considers a variety of factors in prescribing medicine).  The Court finds that these concerns can be raised at trial if they are salient.  *See Daubert*, 509 U.S. at 596.  Therefore, the Court will deny Relators' Motion to limit certain opinions of Eric S. Rosenberg.

IV.    **CONCLUSION**

For the foregoing, the Court rules as follows:

1. Janssen's Motion to Exclude the Testimony of O'Reilly is GRANTED in part and DENIED in part.  Specifically, O'Reilly's testimony is limited to background information regarding the drug approval process, misbranding in general, the mechanism by which the government reimburses for prescriptions, and his observations regarding Janssen's compliance efforts.  As discussed, O'Reilly is not permitted to provide legal conclusions.

2. Janssen's Motion to Exclude the Testimony of Sillup is DENIED.

3. Janssen's Motion to Exclude Certain Opinions of Schafermeyer is DENIED.

4. Janssen's Motion to Exclude Certain Opinions of Glatt is GRANTED.  Glatt will not be permitted to opine on how Janssen's OL promotion and marketing impacted physicians' prescribing decisions.

5. Janssen's Motion to Exclude the Testimony of Evans is GRANTED in part and DENIED in part.  Evans will not be permitted to testify that Janssen used its Speaker Programs to induce doctors to prescribe Prezista and Intelence.

6.  Janssen's Motion to Exclude the Testimony of Shaked and Dew is DENIED.

7.  Relators' Motion to Exclude the Testimony of Smollen is DENIED.

8.  Relators' Motion to Exclude Certain Opinions of Jena is DENIED.

9.  Relators' Motion to Exclude Certain Opinions of Rosenberg is DENIED.

An appropriate order follows.

Dated: January 10, 2022

s/ Zahid N. Quraishi
_____
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *et al., ex rel.* **JESSICA PENELOW and CHRISTINE BRANCACCIO,** | |
| Plaintiffs, | Civil Action No. 12-7758 (ZNQ) (LHG) |
| v. | **ORDER** |
| **JANSSEN PRODUCTS, LP,** | |
| Defendant. | |

**QURAISHI, District Judge**

This matter comes before the Court upon several motions to exclude or limit expert testimony filed by Janssen Products, LP ("Janssen"), and Relators Jessica Penelow and Christine Brancaccio (collectively, "Relators"). For the reasons set forth in the accompanying Opinion, and for other good cause shown,

IT IS on this **10th** day of **January 2022**,

ORDERED that Janssen's Motion to Exclude the Testimony of James T. O'Reilly (ECF No. 192) is hereby **GRANTED** in part and **DENIED** in part; specifically, O'Reilly's testimony is limited to background information regarding the drug approval process, misbranding in general, the mechanism by which the government reimburses for prescriptions, and his observations regarding Janssen's compliance efforts; O'Reilly is not permitted to provide legal conclusions; it is further

ORDERED that Janssen's Motion to Exclude the Testimony of George P. Sillup (ECF No. 194) is **DENIED**; it is further

**ORDERED** that Janssen's Motion to Exclude Certain Opinions of Kenneth W. Schafermeyer (ECF No. 196) is **DENIED**; it is further

**ORDERED** that Janssen's Motion to Exclude Certain Opinions of Aaron E. Glatt (ECF No. 198) is **GRANTED**;  Glatt will not be permitted to opine on how Janssen's OL promotion and marketing impacted physicians' prescribing decisions; it is further

**ORDERED** that Janssen's Motion to Exclude the Testimony of Virginia B. Evans (ECF No. 200) is **GRANTED** in part and **DENIED** in part; Evans will not be permitted to testify that Janssen used its Speaker Programs to induce doctors to prescribe Prezista and Intelence; it is further

**ORDERED** that Janssen's Motion to Exclude the Testimony of Israel Shaked and Ian Dew (ECF No. 202) is **DENIED**; it is further

**ORDERED** that Relators' Motion to Exclude the Testimony of Jon Smollen (ECF No. 179) is **DENIED**; it is further

**ORDERED** that Relators' Motion to Exclude Certain Opinions of Anupam Jena (ECF No. 181) is **DENIED**; it is further

**ORDERED** that Relators' Motion to Exclude Certain Opinions of Eric S. Rosenberg (ECF No. 183) is **DENIED**.

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.,* | : | |
| *ex rel.* JESSICA PENELOW and | : | No. 12-cv-07758 (GC) (LHG) |
| CHRISTINE BRANCACCIO, | : | |
| | : | |
| Plaintiffs, | : | FINAL PRETRIAL ORDER |
| | : | |
| v. | : | |
| | : | |
| JANSSEN PRODUCTS, LP, | : | |
| | : | |
| Defendant. | : | |

This matter having come before the Court for a pretrial conference pursuant to Fed.

R. Civ. P. 16; and Sherrie R. Savett, Joy P. Clairmont, Michael T. Fantini, and William

H. Ellerbe of Berger Montague PC and Joshua M. Russ and Andrew O. Wirmani of Reese

Marketos LLP, and Peter S. Pearlman of Cohn Lifland Pearlman Herrmann & Knopf LLP,

having appeared for Relators Jessica Penelow and Christine Brancaccio ("Relators"), and

Abigail Hazlett, Brian M. Nichilo, and Michael A. Schwartz of Troutman Pepper

Hamilton Sanders LLP and Allison M. Brown and Geoffrey M. Wyatt of Skadden, Arps,

Slate, Meagher & Flom LLP having appeared for Defendant Janssen Products, LP

("Janssen"); the following Final Pretrial Order is hereby entered:

1. **JURISDICTION** (set forth specifically). Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331 and 1345.

2. **PENDING/CONTEMPLATED MOTIONS** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).[1]

---

[1] The parties have met and conferred, and will continue to meet and confer, regarding these contemplated motions and believe they may be able to stipulate to the exclusion of particular topics. When the parties file their pretrial

**Appx95**

**Relators' Contemplated Motions**

1. Motion to exclude any reference to Relators' retention or fee agreement with Relators' counsel. (True MIL).

2. Motion to exclude any argument that Relators were not injured by Janssen's conduct. (True MIL).

3. Motion to preclude Janssen from taking any trial depositions at this juncture of the case, and from presenting any witness through a trial deposition or by remote means. (True MIL).

4. Motion to exclude Janssen from introducing evidence that Prezista or Intelence saved lives or about the devastating effects of HIV/AIDS. (True MIL).

5. Motion to exclude arguments regarding public policy regarding HIV drugs and accessibility to patients. (True MIL).

6. Motion to exclude arguments regarding Janssen's and/or Johnson & Johnson's good character or good reputation. (True MIL).

7. Motion to exclude any reference to Janssen's or Johnson & Johnson's other drugs, such as Covid vaccines, and their service of the public good. (True MIL).

8. Motion to exclude reference to any potential adverse impact a damage award would have on Janssen or the pharmaceutical industry. (True MIL).

9. Motion to exclude reference to treble damages, civil penalties, and attorneys' fees, expenses, and costs. (True MIL).

10. Motion to exclude reference to the United States' and the Plaintiff States' decisions to decline to intervene in the case and their non-participation at trial. (True MIL).

11. Motion to exclude Dr. Jena's opinions on causation and damages as contrary to the law. (True MIL).

12. Motion to exclude Janssen's benefit of the bargain defense regarding damages as contrary to the law. (True MIL).

13. Motion to exclude reference to other pharmaceutical companies' use or implementation of speaker programs, including but not limited to the purpose of the programs, or amounts paid to speakers. (True MIL).

14. Motion to exclude all pleadings as evidence. (True MIL).

15. Motion to allow Relators to call a Janssen corporate representative to testify on substantive issues, and to authenticate Janssen documents.   *To be briefed at trial or in trial brief*

---

motions, they intend to file a joint stipulation of agreed-to in limine topics that do not require briefing.

LHG

**Appx96**

16. Motion to preclude Janssen from introducing any document that it did not produce in discovery.  (True MIL).

17. Motion to exclude any evidence relating to any performance reviews, performance evaluations, performance and/or written warnings, performance and development plans and corrective action plans as irrelevant, unfairly prejudicial and inadmissible under Rules 403 and 404.  (True MIL).

### Janssen's Contemplated Motions

1. Motion in limine to preclude Relators and certain lay witnesses from testifying on why doctors were selected to be speakers for Janssen, whether the doctors were qualified to speak, and Janssen's purpose or intent in paying these doctors for their professional services, based on lack of personal knowledge.  *True MIL*

2. Motion in limine to preclude Relators and certain lay witnesses from providing inadmissible lay opinion testimony on the effect of Janssen's promotion on doctors' prescribing decisions.  *True MIL*

3. Motion to exclude any evidence or argument referencing other investigations, litigation, or settlements (including, but not limited to, corporate integrity agreements) involving Janssen or any other pharmaceutical company (including, but not limited to, Johnson & Johnson or any of its subsidiaries) and the federal government as irrelevant, unfairly prejudicial, and otherwise inadmissible propensity evidence under Rule 404(b).  *True MIL*

4. Motion to exclude any evidence or argument referring to Janssen's promotion of Prezista's lipid profile, Prezista prescriptions written for patients with lipid conditions, or claims submitted for Prezista prescriptions written for patients with lipid conditions as "off-label."  *True MIL*

5. Motion to exclude any evidence referring to Prezista or Intelence prescriptions as "misbranded" or otherwise "illegal."  *True MIL*

6. Motion to exclude any evidence or argument referencing regulatory or other government guidance (including, but not limited to, guidance gleaned from corporate integrity agreements) on speaker programs or other promotional activities after 2014 as irrelevant and unfairly prejudicial.  *True MIL*

7. Motion to exclude any evidence or argument regarding the amount of funds Janssen may have set aside to litigate the case as irrelevant and unfairly prejudicial.  *True MIL*

8. Motion to exclude any evidence or argument referencing Anthony Dolisi's assertion of his Fifth Amendment right to refuse to answer questions in response to a Civil Investigation Demand for Oral Testimony.  *True MIL*

9. Motion to compel the testimony of Dr. H. Clifford Lane (Deputy Director for Clinical Research and Special Projects, National Institutes of Allergy and Infectious Diseases,  *Motion to be filed by 11/10/22; opposition due 11/21/22; reply due 11/28/22; returnable 12/5/22*

*LHG*

**Appx97**

National Institutes of Health) and B. Kaye Hayes (Executive Director and Designated Federal Officer for the Presidential Advisory Council on HIV/AIDS).[2]

3. **STIPULATION OF FACTS** (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

### I. The Parties

1. Defendant Janssen Products, LP ("Janssen") is a subsidiary of Johnson & Johnson and is incorporated in New Jersey.

2. Throughout the relevant time period of 2006 through 2014 (the "Relevant Time Period"), Janssen manufactured, marketed, and promoted Prezista.

3. Throughout the period of 2008 through 2014, Janssen manufactured, marketed, and promoted Intelence.

4. Tibotec Therapeutics ("Tibotec") was previously a subsidiary of Johnson & Johnson and changed its name in 2011 to Janssen Therapeutics, a division of Janssen.

5. Jessica Penelow and Christine Brancaccio are Plaintiff-Relators ("Relators") in this action. Relators bring this action on behalf of the United States, twenty-six states, and the District of Columbia.

6. The United States is one of the real parties of interest in this action.

7. The United States' Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS") administer the Medicare and Medicaid Programs.

8. In addition, the District of Columbia and the following states (collectively, the "Plaintiff States") are the other real parties of interest in this action: California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Washington. Throughout the Relevant Time Period, Prezista and Intelence were provided to Medicaid beneficiaries in the Plaintiff States and were paid for by the Plaintiff States' Medicaid Programs using a combination of the Plaintiff State's funds and federal funds.

9. From the start of the relevant time period in 2006 through 2013, Ms. Penelow worked as a Senior Virology Sales Specialist at Janssen (formerly Tibotec) and was responsible for

---

[2] In May 2022, counsel for Janssen served subpoenas seeking Ms. Hayes's and Dr. Lane's testimony at trial. These subpoenas were properly served in accordance with *U.S. ex rel. Touhy v. Ragen*, 240 U.S. 462 (1951), and all applicable statutes and regulations. Counsel for Janssen has been in contact with counsel for Ms. Hayes, counsel for Dr. Lane, and the assigned Assistant United States Attorney from the District of New Jersey, and are awaiting further responses from them. At this time, Janssen believes that it may become necessary to move to compel Ms. Hayes's and Dr. Lane's testimony.

**Appx98**

selling and marketing Prezista and Intelence to doctors[3] on the Lower East Side of Manhattan, New York.

10. Throughout the Relevant Time Period, Ms. Brancaccio worked as a Virology Sales Specialist at Janssen (formerly Tibotec) and was responsible for selling and marketing Prezista and Intelence to doctors in Queens and Long Island, New York.

## II.  Prezista and Intelence

11. Prezista and Intelence are two antiretroviral drugs ("ARVs") developed to treat patients infected with HIV/AIDS.

12. Prezista was approved for use by treatment-naïve patients on October 21, 2008.

13. Intelence was approved by the FDA on January 18, 2008.

## III.  Prezista and Intelence Compared to Other Anti-Retroviral Drugs

14. Prezista is in the class of protease inhibitors ("PI") ARVs.

15. The other nine PI ARVs are:

   a.  Invirase (squinavir), approved on 12/6/1995.

   b.  Norvir (ritonavir), approved on 3/1/1996.

   c.  Indinavir (crixivan) approved on 3/13/1996.

   d.  Viracept (nelfinavir), approved on 3/14/1997.

   e.  Agenerase (amprenavir), approved on 4/15/1999.

   f.  Kaletra (lopinavir), approved on 9/15/2000.

   g.  Reyataz (atazanavir), approved on 6/20/2003.

   h.  Lexiva (fosamprenavir), approved 10/20/2003.

   i.  Aptivus (tipranavir), approved 6/22/2006.

16. Intelence is in the class of non-nucleoside reverse transcriptase inhibitors (NNRTIs).

17. The other six NNRTIs are:

   a.  Viramune (nevirapine), approved 6/21/1996.

   b.  Rescriptor (delavirdine), approved 4/4/1997.

   c.  Sustiva (efavirenz), approved 4/17/1998.

---

[3] "Doctors" as referred to herein is defined to encompass Medical Doctors as well as other health care providers, including but not limited to Nurse Practitioners, Physicians' Assistance, and Doctors of Pharmacy.

Appx99

    d.  Atripla (efavirenz/emtricitabine/tenofovir), approved 7/12/2006.

    e.  Edurant (rilpivirine), approved 5/20/2011.

    f.  Complera (emtricitabine/rilpivirine/tenofovir), approved 8/10/2011.

## IV. <u>Janssen's Marketing and Promotion of Prezista and Intelence</u>

18. Janssen promoted and marketed Prezista and Intelence to doctors through sales calls and through promotional speaker programs.

## V. <u>HHS Guidelines</u>

19. The Department of Health & Human Services ("HHS") publishes consensus-based HIV treatment guidelines (the "HHS guidelines").

20. The HHS guidelines are generally updated multiple times each year to incorporate, among other things, peer-reviewed journals and data presented at major conferences.

**4. RELATORS' CONTESTED FACTS** (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).

    **A.** **Relators intend to prove the following contested facts with regard to liability:**

### <u>The Relevant Government Health Care Programs</u>

#### a. <u>Medicare</u>

1. Medicare Part D provides prescription drug coverage for the elderly and people with certain disabilities.

2. Under Medicare Part D, the federal Government helps to cover the costs of "covered Part D drugs," which are FDA-approved medications prescribed for a "medically accepted indication." 42 U.S.C. § 1395w-102(e)(1).

3. Under Medicare Part D, the federal Government does not reimburse for claims that are not for a medically accepted indication and/or not reasonable and necessary. 42 U.S.C. §§ 1395w-102(e)(1), (e)(3); 42 U.S.C. § 1395y(a)(l)(A); 42 U.S.C. § 1396r-8(d)(1)(B)(i); 42 C.F.R. § 411.15(k)(1); and 42 C.F.R. § 423.505(i)(4)(iv).

#### b. <u>Medicaid</u>

4. Medicaid provides healthcare coverage for low-income people.

5. Medicaid is funded jointly by the federal Government and states, with the federal Government contributing approximately 50% to 83% of the funding, and states contributing the rest.

6. The federal Government's share of a state's Medicaid expenditures is called federal financial participation ("FFP").

**Appx100**

7.  Although the federal Government oversees Medicaid, the program is administered on a state-by-state basis, and states have discretion to customize their plans.

8.  A prescribed drug covered by a state Medicaid plan is eligible for FFP.  CMS, Medicaid Drug Rebate Program Notice for State Technical Contracts, at 4 (Oct 5. 2016); *see also* 42 C.F.R. § 441.25.

   c.  **ADAP**

9.  States create and administer their own AIDS Drug Assistance Programs ("ADAPs") through federal block grants that fund "core medical services" for HIV patients, including paying for HIV medications. 42 U.S.C. §§ 300ff-22(a)(1), (b)(3)(B).

10. The purpose of the ADAPs is to ensure that low-income HIV patients who do not qualify for Medicare, Medicaid, or private insurance—or whose health insurance provides insufficient coverage—have access to their prescribed HIV medications.

**The Relevant Drugs -- Prezista and Intelence**

11. Drugs used to treat patients infected with HIV/AIDS, antiretrovirals (ARVs), have been developed through funding and research from Government agencies, non-profits, research universities, and pharmaceutical companies.

12. Prezista (darunavir) was developed by Dr. Arun Ghosh of the University of Illinois Chicago and other scientists from the NIH in the 1990s.

13. Tibotec Pharmaceuticals, Ltd. licensed Prezista from the NIH in July of 2001.

14. Johnson & Johnson acquired Tibotec for $320 million on April 18, 2002.

15. Prezista was initially approved by the Food and Drug Administration in 2006 only for treatment-experienced patients, who are currently taking or have previously taken ARV drugs.

16. Prezista's initial approval was based on only 24-weeks of safety and efficacy data.

17. When Prezista launched, the patent exclusivity period for Prezista was scheduled to end in 2015.

18. Prezista's FDA-approved label eliminated all newly diagnosed HIV patients from the potential market for the drug and limited its use to only patients who needed to be switched from another drug.

19. Prezista's initial label listed hypercholesterolemia and hyperlipidemia as Adverse Reactions, and those Adverse Reactions were present in every version of the label in effect from June 23, 2006 through October 20, 2008.

20. Every iteration of Prezista's label approved on or after October 21, 2008 through the end of 2014 contained the Adverse Drug Reactions of hypercholesterolemia, hypertriglyceridemia, and increased low density lipoprotein.

21. Intelence was approved in 2008 based on only 24 weeks of safety and efficacy data.

22. For Intelence, Janssen never supplemented the 24 weeks of safety and efficacy data that it used to gain the FDA's original approval for Intelence in 2008.

23. Intelence was only approved for a subgroup of treatment-experienced patients (*i.e.,* those with "viral strains resistant to an NNRTI and other [ARV] agents"), and its approved label required that it be taken twice-a-day.

**Prezista and Intelence Compared to Other Anti-Retroviral Drugs**

24. From the period of 1987-2014, the FDA approved at least 35 ARVs for treatment for patients infected with HIV/AIDS, two of which were Prezista and Intelence.

25. The FDA has not approved any new protease inhibitors since it approved Prezista on June 23, 2006. Thus, at the time of Prezista's approval, there were nine other approved PIs on the market (and there have not been any approved since Prezista).

26. Eight other PIs could be prescribed for treatment naïve patients, five could be dosed once-a-day, one did not have warnings about lipid side effects in its label (Reyataz), and eight had safety data of at least 48 weeks.

27. The label of Reyataz, a drug in the PI class like Prezista, did not require that it be co-administered with the drug ritonavir, which also increased lipids. The label for Prezista always required that it be co-administered with ritonavir.

28. Prezista was the third most expensive PI in terms of the average amount the federal Government reimbursed for prescriptions ($30.36/day for each patient on the drug) in the Relevant Time Period.

29. At the time Intelence was approved, there were four other approved NNRTIs on the market. All could be prescribed for treatment naïve patients, and three out of four could be dosed once daily. Intelence only ever had 24 weeks of safety data in its label, while all the other NNRTIs had at least 52 weeks of safety data in their labels.

30. Intelence was the most expensive NNRTI ($25.55/day for each patient) in terms of the average amount reimbursed by the federal Government during the Relevant Time Period except for Atripla, which was a combination of three drugs.

31. In addition to the ARVs listed above, the other ARVs approved by the FDA in the period of 1987-2014 include:

   a. Retrovir, approved 11/19/1987.

   b. Videx, approved 10/9/1991.

   c. Zerit, approved 6/24/1994.

   d. Epivir, approved 11/17/1995.

   e. Combivir, approved 9/26/1997.

   f. Ziagen, approved 12/17/1998.

   g. Trizivir, approved 11/14/2000.

    h. Viread, approved 10/26/2001.

    i. Emtriva, approved 7/2/2003.

    j. Epzicom, approved 8/2/2004.

    k. Truvada, approved 8/2/2004.

    l. Stribild, approved 8/27/2012.

    m. Tivicay, approved 8/13/2013.

    n. Triumeq, approved 8/22/2014.

    o. Tybost, approved 9/24/2014.

32. After Indinavir was approved in 1996, the only two drugs approved by the FDA using Phase II trial registrational studies with only 24 weeks of patient safety data (as opposed to Phase III trial registrational studies with at least 48 weeks of patient safety data) were Prezista and Intelence.

33. The following ARVs (including all classes) approved by the FDA did not have any warning about lipid-related conditions as reactions or adverse events in their labels in the period of 2006-2014: Retrovir, Videx, Zerit, Epivir, Viramune, Combivir, Reyataz, Selzentry, and Isentress.

34. In addition to Prezista, the following ARVs (including all classes) were approved by the FDA for use in treatment naïve patients at some point in the 2006-2014 time period: Retrovir, Videx, Zerit, Epivir, Invirase, Norvir, Viramune, Crixivan, Viracept, Rescriptor, Combivir, Sustiva, Ziagen, Agenerase, Kaletra, Trizivir, Viread, Reyataz, Emtriva, Lexiva, Epzicom, Truvada, Atripla, Edurant, Complera, Stribild, Tivicay, Triumeq, and Tybost.

35. In addition to Prezista, the following ARVs (including all classes) were approved by the FDA for once-daily dosing in at least some patient populations: Videx, Epivir, Viramune, Crixivan, Sustiva, Ziagen, Agenerase, Kaletra, Viread, Reyataz, Emtriva, Lexiva, Epzicom, Truvada, Atripla, Edurant, Complera, Stribild, Tivicay, Triumeq, and Tybost.

**Janssen's Marketing and Promotion of Prezista and Intelence**

36. Janssen purposely targeted about 5,200 doctors for its sales calls and marketing, and these providers wrote 80% of the prescriptions for Prezista and Intelence.

37. Also, as Janssen knew from its own documents, about 70% of the claims submitted for Prezista and Intelence were paid by Government payors such as Medicare, Medicaid, and ADAP.

38. Prezista was the first HIV drug that Janssen had ever marketed and sold.

39. Soon after Prezista's launch in June 2006, Janssen's sales were far below its sales forecasts.

Appx103

40. In July 2006, Janssen had only sold 896 prescriptions of Prezista as compared to forecasts of 3,700, meaning that actual sales were less than 25% of the company's forecasts.

41. Janssen established sales goals for each of its sales representatives specifying how many prescriptions of its drugs it expected the doctors in the representatives' territory to prescribe in a given time period.

42. If the sales representatives met or exceeded their sales goals, they were rewarded with bonuses, which were given quarterly and which could amount to up to 20% of their base pay.

43. Emails tracking the sales performance of Prezista and Intelence were regularly circulated among senior Janssen managers and executives, including the current Vice Chairman of Johnson & Johnson's Executive Committee, Joaquin Duato.

44. As approved, Prezista and Intelence had limited indications, side effects, or dosing that limited their marketability.

45. Janssen's senior executives held many meetings and phone calls with sales representatives where they discussed how to increase sales of the drugs.

46. Even before the launch of Prezista, Janssen had identified that it would need to use an off-label ("OL") DART Study to favorably differentiate Prezista's effect on lipids from competitor drugs, Reyataz and Kaletra.

47. Janssen marketed Prezista as being "lipid friendly," having a "lipid neutral" profile, and/or as being "lipid neutral or friendly like Reyataz" through its sales representatives who made sales calls on individual doctors and through the doctors Janssen paid as speakers. As a result, Janssen misbranded Prezista.

48. Prescriptions for Prezista resulting from Janssen's false and misleading statements about Prezista's lipid profile were not reasonable and necessary for the treatment of patients who had concerning levels of lipids, triglycerides, and/or cholesterol and/or had already been prescribed a statin or other drug to address lipids, triglycerides, and/or cholesterol.

49. Subject to individual patient resistance or other issues, it would have been medically inappropriate to prescribe Prezista to a patient who already suffered from or was at high risk of a lipid-related problem, which would include, but not be limited to, any patients who were taking any lipid-lowering drugs or who had a lipid-related diagnosis prior to the first time they were prescribed Prezista.

50. Janssen's marketing of Prezista as "lipid friendly," having a "lipid neutral" profile, or as being "lipid neutral or friendly like Reyataz" caused or would have been a substantial factor in the doctor's willingness to prescribe Prezista for a patient with lipid-related problems. Janssen's unlawful marketing interfered with and corrupted doctors' medical judgment and detrimentally impacted HIV/AIDS patients.

51. Prezista's lipid profile placed it at a competitive disadvantage to Reyataz, which was a competitor's HIV drug on the market at the same time, and which did not cause an

**Appx104**

increase in cholesterol.

52. Marketing Prezista as being "lipid friendly," having a "lipid neutral" profile, or as being "lipid neutral or friendly like Reyataz" caused Prezista to be misbranded.

53. Janssen illegally marketed Prezista through its sales representatives who made sales calls on individual doctors and through the doctors Janssen paid as speakers as being suitable for treatment naïve patients before October 21, 2008, when its label was expanded.

54. Janssen's marketing message that Prezista could be used in patients other than those identified in its label—namely, treatment-experienced adult HIV patients, such as patients with HIV-1 strains resistant to more than one protease inhibitor—was misleading and not an approved indication under Prezista's FDA label prior to October 21, 2008.

55. Janssen's marketing of Prezista as being appropriate for use in treatment naïve patients before October 21, 2008 caused or would have been a substantial factor in the doctor's willingness to prescribe Prezista for a treatment naïve patient. Janssen's unlawful marketing interfered with and corrupted doctors' medical judgment and detrimentally impacted HIV/AIDS patients.

56. Marketing Prezista as being appropriate for treatment naïve patients in the period before October 21, 2008 caused Prezista to be misbranded.

57. In July 2006, just weeks after Prezista's launch, Janssen's President Glenn Mattes, along with Mike Iacobellis, the National Sales Director, and other managers, decided that Janssen needed to promote Prezista for off-label indications in order to expand its market size, sales, and profitability.

58. Janssen senior executives Glenn Mattes, Mark Gossett, and Mike Iacobellis ordered, trained, and bonused employees throughout the company, down to the sales representatives, to engage in off-label or inappropriate promotions of Prezista.

59. Two years later, when Intelence was launched in 2008 with limits on its approved uses, these same executives (Mattes, Gossett, and Iacobellis) directed Janssen employees to market Intelence to doctors for off-label indications in order to expand its market size and boost its sales and profitability.

60. Janssen illegally marketed Intelence as being safe and effective when taken once-a-day ("QD") through its sales representatives who made sales calls on individual doctors and through the doctors Janssen paid as speakers.

61. Janssen illegally marketed Intelence as being safe and effective when taken once a day by directing its sales representatives to refer to and disseminate copies of the off-label study "Pharmacokinetics of Once-Daily Etravirine (ETR) Without and With Once-Daily Darunavir/Ritonavir (DVR/r) in Antiretroviral-Naive HIV-1 Infected Adults," DeJesus et al., Antiretroviral-Naïve HIV-1 Infected Adults, Antiviral Therapy, 2010 15:711-720, doi:10.385/IMP1562 (the "DeJesus Study").

62. Dosing Intelence once-daily is not supported by the weight of medically accepted

standards for HIV/AIDS treatment.

63. Janssen's marketing message that Intelence could be dosed QD safely and effectively was misleading and illegal. It directly contradicted the FDA-approved label which provided for twice-a-day dosing.

64. Janssen's marketing message that Intelence could be dosed QD safely and effectively caused or would have been a substantial factor in the doctor's willingness to prescribe Intelence QD. Janssen's unlawful marketing interfered with and corrupted doctors' medical judgment and detrimentally impacted HIV/AIDS patients.

65. Dosing Intelence once-daily poses serious concerns for patient harm because the drug may not be effective for the full 24 hours between doses; because the dose that remains in the patient's body at the end of the 24 hour period may not be sufficiently strong to suppress the HIV virus on the patient; and because if the patient missed a dose, they would be without the required dosage for an even longer period of time.

66. Intelence's twice-a-day dosing placed it at a competitive disadvantage in the marketplace because prescribing doctors and HIV patients generally prefer a simpler medication regimen (*i.e.*, ARVs that can be taken once a day).

67. Marketing Intelence as being appropriate for QD dosing caused Intelence to be misbranded.

68. Janssen illegally marketed Intelence as being safe and effective for treatment naïve patients through its sales representatives who made sales calls on individual doctors and through the doctors Janssen paid as speakers.

69. Janssen's marketing message that Intelence could be used in patients other than treatment-experienced adult patients who also have evidence of viral replication and HIV-1 strains resistant to an NNRTI and other antiretroviral agents was misleading and not an approved indication under Intelence's FDA label.

70. Janssen's marketing message that Intelence could be prescribed for treatment naïve patients caused or would have been a substantial factor in the doctor's willingness to prescribe Intelence QD. Janssen's unlawful marketing interfered with and corrupted doctors' medical judgment and detrimentally impacted HIV/AIDS patients.

71. Marketing Intelence as being appropriate for treatment naïve patients caused Intelence to be misbranded. It directly contradicted the FDA label which indicated Intelence could only be marketed for treatment experienced adult patients who also have evidence of viral replication and HIV-1 strains resistant to an NNRTI and other antiretroviral agents.

72. Sales representatives across the country delivered the off-label messages about Prezista and Intelence throughout the 2006-2014 time period.

73. Janssen executives directed that Key Account Managers ("KAMs"), District Managers, and sales representatives be trained and/or instructed to promote: (a) Prezista as being suitable for treatment-naïve patients (a patient population that it was not approved for until October 21, 2008); (b) Prezista as "lipid neutral," "lipid friendly," or "lipid neutral or friendly just like Reyataz" (a competitor drug), contrary to Prezista's FDA-approved

label; (c) Intelence as being safe and suitable for treatment-naïve patients (a patient population it was not approved for); and (d) Intelence as being suitable for once-a-day dosing, contrary to its label requiring twice-a-day dosing.

74. Intelence was inferior to protease-inhibitor-based regimens for treatment naïve patients, and it should have been reserved as a treatment option for patients who were both NNRTI-experienced and PI-experienced.

75. At the direction of upper management, Donna Graham, National Sales Trainer from 2007 to 2009, trained the sales representatives to engage in OL promotion of the drugs.

76. If sales representatives did not meet their sales goals, they were denied bonuses, placed on performance reviews, and even fired.

77. It was difficult or impossible for sales representatives to meet their sales targets without OL marketing, such that representatives who refused to engage in OL marketing were denied bonuses or forced out of the company.

78. Janssen closely monitored each sales representative's sales, and each prescribing doctor's prescriptions, of Prezista and Intelence.

79. In some cases, the tracking reports Janssen used showed explicit off-label sales figures. For example, Janssen's Monthly Performance Report dated January 28, 2008 states that "Prezista naïve share grew to 7% by 2007 year end," despite the fact that Prezista was not approved for treatment-naïve patients in 2007.

80. If a doctor was prescribing a competitor's HIV drug, or his/her prescriptions of Prezista and Intelence were low, Janssen would target that doctor for more sales calls during which the sales representatives would provide more off-label information in order to boost the doctor's prescriptions.

81. Janssen would then look at the prescription reports to see if the off-label messaging was effective.

82. Janssen's District Managers, who often accompanied sales representatives on their sales calls to see how they were marketing the drugs to doctors, would coach sales representatives on how to deliver the off-label messages, and would even deliver the off-label messages themselves to doctors on the sales calls.

83. Janssen sales representatives followed Janssen's directives and engaged in OL marketing of the drugs in order to increase their sales and meet their sales targets.

84. Janssen also provided sales representatives with OL studies to use on sales calls.

85. Janssen discussed and provided copies of studies concerning Prezista and Intelence to its sales representatives, including, but not limited to, the following:

    a. The "DART Study": Tomaka F, Lefebvre E, Sekar V. Similar changes in metabolic parameters of darunavir (TMC114) and atazanavir, each coadministered with low-dose ritonavir in healthy volunteers (TMC114-C159). In: American Conference for the Treatment of HIV (ACTHIV), Dallas, TX, 31 May–3 June 2007;

**Appx107**

b. The "Metabolik Study": Aberg, et al., Metabolic Evaluation in Treatment-Naives Assessing the Impact of Two Boosted Protease Inhibitors on Lipids and Other Markers): Comparison of the Metabolic Effects of Darunavir/ritonavir [Prezista/Norvir] versus Atazanavir/ritonavir [Reyataz] over 12 weeks, AIDS Res Hum Retroviruses, 2012 Oct 28(10): 1184-1195; and

c. The "DeJesus Study" (also called the "Glasgow Study"): "Pharmacokinetics of Once-Daily Etravirine (ETR) Without and With Once-Daily Darunavir/Ritonavir (DVR/r) in Antiretroviral-Naive HIV-1 Infected Adults," DeJesus et al., Antiretroviral-Naïve HIV-1 Infected Adults, Antiviral Therapy, 2010 15:711-720, , doi:10.385/IMP1562.

86. The Dart Study, the Metabolik Study, and the DeJesus Study were not part of approved labels for Prezista and Intelence and were directly contradicted by the drugs' respective labels.

87. These studies used small sample sizes: the DeJesus Study had 23 subjects, DART Study had 49 subjects, and Metabolik Study had 34 subjects.

88. The 49 patients enrolled in the DART Study were not infected with HIV.

89. The DART Study, the DeJesus Study (also called the Glasgow Study), and the Metabolik Study were discussed and provided to sales representatives to discuss with and improperly distribute to doctors on sales calls.

90. The DART Study, the DeJesus Study, and the Metabolik Study used sample sizes too small to be statistically relevant.

91. Another aspect of Janssen's unlawful scheme involved the use of Medical Information Request forms ("MIRs"), which are required to originate from the doctors.

92. Janssen improperly coached its sales representatives to prompt doctors to request off-label information about Prezista and Intelence via MIRs, with the belief that providing off-label information to doctors would cause them to increase their prescriptions.

93. Being under constant pressure to submit MIRs, sales representatives improperly prompted doctors to submit MIRs, often added a request for off-label information to an MIR form that a doctor had already signed, and even forged doctors' signatures on MIRs before submitting them to Janssen's Medical Affairs Department.

94. Janssen closely tracked the number of Medical Information Requests (MIRs) submitted by sales representatives.  MIRs were used to provide doctors with information about the drugs, including off-label information.

95. In a weekly report from Mickey Allison to District Manager Tony Dolisi dated September 14, 2006, Allison wrote, under Company Tactics: "MIR forms are being widely used to get the 48-week data into the hands of all customers [doctors]."

96. Janssen employees purposely did not mention off-label topics in their written emails, reports, sales call database, or other writings because they knew that these Janssen practices were unlawful.

14

**Appx108**

97. Janssen trained its employees and managers to avoid mentioning off-label topics and offering remuneration to doctors to induce or reward prescriptions in written emails, reports, sales call database entries, or other writings as part of its "Careful Communications" policy.

98. The market research surveys performed by vendors for Janssen called Awareness and Usage or "A&U" reports show: (a) Among Prezista's class of ARVs, lipid effect was an important consideration for prescribing doctors; (b) Over time, Janssen improved doctors' perceptions of Prezista's effect on lipids; (c) Being able to prescribe a drug once-a-day was a very important attribute; (d) Many of the doctors whom Janssen sales representatives called on and surveyed believed that Intelence could be dosed once-a-day; and (e) Some doctors reported recalling that Janssen sales representatives discussed the OL uses of Prezista and Intelence on their most recent sales call.

99. Janssen performed other surveys of doctors whom its sales representatives targeted showing that its sales representatives discussed OL uses of Prezista and Intelence with those doctors.

100. Other Janssen documents relating to sales forecasts that show that Janssen included future OL sales of its drugs into its sales forecasts; that Intelence and Prezista were being prescribed in the OL treatment-naïve markets; and that Janssen tracked these OL sales.

101. One of Janssen's off-label marketing schemes focused on patently false assertions that Prezista is "lipid neutral" or "lipid friendly" — that is, the drug purportedly would not affect or increase a patient's cholesterol and triglyceride levels — or claims that it was comparable to a competitor drug (Reyataz) in terms of lipids.

102. Janssen sales representatives routinely used the sales message that Prezista had the same lipid profile as Reyataz when they performed sales calls on doctors.

103. These false and misleading messages about the lipid effects of Prezista were delivered by speakers at most Speaker Programs, including the most highly compensated and most frequently appearing speakers, and were also elicited by Janssen-arranged "plants" in the audience.

104. Janssen contracted with a vendor to create marketing reports, which reflect that some of the most prominent marketing messages that sales representatives presented to doctors on sales calls included Prezista being touted as lipid neutral.

105. Janssen paid outside vendors millions of dollars to perform detailed marketing surveys of doctors who received sales calls from its representatives to determine what the doctors thought about Janssen's drugs and their competitors, what aspects of these drugs were most important to these doctors when making choices for their patients, and what marketing messages the doctors recalled receiving from the Janssen sales representatives.

106. Janssen also paid an outside company, Partners in Loyalty Marketing ("PILM"), to conduct return-on-investment analyses of certain HIV promotional initiatives.

107. Janssen tracked the off-label sales of these drugs, and included off-label sales in its sales forecasts.

108. Janssen paid millions of dollars to marketing consultants to provide ongoing feedback about the success of the company's marketing efforts, including the particular impact of the off-label promotional messaging. For instance, over the course of a single calendar year, Janssen paid ZS Associates $708,000 to perform surveys and create presentations of their findings, and it engaged that vendor on similar projects for several years (with at least 10 surveys having been completed by May 6, 2010).

109. As shown in Janssen's market research reports, including its Awareness and Usage reports, surveys of doctors revealed that some of the most prominent marketing messages they recalled hearing from Janssen sales representatives related to once-a-day dosing for Intelence, Intelence's use for treatment-naïve patients, and Prezista being touted as lipid neutral, all of which are off-label messages.

**Janssen's Speaker Program**

110. Janssen had a Speaker Program whereby it paid doctors to give speeches about Prezista and Intelence to other doctors.

111. The Speaker Program was primarily run by Janssen's Marketing Department.

112. Janssen paid 335 doctors to give 8,897 speeches during 2006 to 2014, which equates to 988 speeches per year, or more than three speeches per business day for nine years.

113. Janssen paid 48 doctors over $100,000 each and paid some doctors between $300,000 to $464,000.

114. The 48 doctors that Janssen paid $100,000 or more in honoraria for participation in the Speakers' Bureau were high prescribers of Prezista and/or Intelence, and they continued to prescribe the drugs. One purpose of these payments was to illegally induce doctors to prescribe Prezista and Intelence, or to illegally reward them for doing so.

115. Janssen paid for hotels, meals, and all travel expenses associated with attending speaker training sessions and delivering speeches. Janssen offered speaker positions with higher compensation, including travel expenses for speaker engagements that were designed to suit the speaker's personal travel needs, to doctors who were higher prescribers of Prezista and Intelence. One purpose of these payments was to illegally induce doctors to prescribe Prezista and Intelence, or to illegally reward them for doing so.

116. Janssen paid doctors approximately $1,000 to $3,000 for each speech, and it also paid them about $1,500 to attend annual training sessions.

117. For years up to 2011, Janssen capped the Speaker Program honoraria payments at $50,000 per speaker per year, which was increased to $75,000 per year in 2012. These caps did not include Janssen's payments to doctors for speaker travel expenses, Speaker Training fees, consulting fees, Advisory Board attendance fees, or meal costs.

118. Janssen also paid for hotels, meals, and all travel expenses associated with doctors attending speaker training sessions, speaking events, and advisory board meetings.

**Appx110**

119. Janssen paid over $14 million to doctors just in speaker fees and millions of dollars overall on its Speaker Program. From 2010-2014 alone, Janssen spent more than $4.2 million on speaker travel expenses and food, drinks, and alcohol at speaker events.

120. Janssen increased its overall spending on the Speaker Program from year to year.

121. Speakers continued to prescribe Prezista and Intelence once they started giving paid speeches.

122. Janssen regularly tracked and analyzed prescription data relating to all doctors who prescribed Prezista and/or Intelence nationwide, including speakers.

123. One of the criteria that Janssen used to select doctors to be paid speakers was their prescription volume of Prezista or Intelence.

124. Speakers were more likely to prescribe Prezista and Intelence than non-speakers.

125. Speakers on average prescribed Prezista and Intelence at a higher rate than non-speakers.

126. Speakers, who were a relatively small share of all prescribers, tended to be high prescribers of Prezista and Intelence, and accounted for a disproportionate share of all Prezista and Intelence reimbursements.

127. Speakers accounted for a higher percentage of off-label Prezista and Intelence prescriptions than non-speakers.

128. In reports prepared by Janssen's marketing department, there were slides tracking the sales of the top prescribers of Prezista and Intelence in the country, many of whom were speakers for Janssen, including Joseph Gathe, Roberto Ortiz, Peter Ruane, Clayton Barbour, Nicholaos Bellos, Shannon Schrader, Jesse Sanders, Michael Dunn, Michael Mullen, Andre Brutus, Edwin Dejesus, Felix Carpio-Cedraro, Timothy Kanter, Thanes Vanig, and Jihad Slim.

129. In some cases, if Janssen could not track prescriptions by individual prescribers, it would track prescriptions associated with the institutions where those prescribers practiced as "key accounts."

130. Several of the key accounts were institutions where major speakers practiced, including Elizabeth Race, Lavesa Bhatti, Ralph Liporace, Ian McNicholl, Lauren Foster, Greg Huhn, Roger McAurther, Marian Rabe, Marah Lee, Jeffrey Lennox, Peter Shalit, Dushyantha Jayaweera, Luis Espinoza, Jihad Slim, Peter Alpert, Hilda Ortiz-Morales, Edwin DeJesus, Brad Hare, Monica Ghandi, Felipe Arias, and Antonio Urbina.

131. Sales of Prezista at these key accounts were presented on monthly performance reports for the marketing group so that Janssen could track sales of its drugs at those institutions.

132. Speeches were given to repeat attendees or a low number of attendees, as low as three people.

133. Hundreds of attendees attended the same speech multiple times, and some attended the

same speech over 60 times.

134. Paid speakers attended speeches given by other paid speakers.

135. These speaker-attendees include many of the highest-paid speakers (those receiving over $150,000 in honoraria), such as Michael Sension, Sorana Segal-Maurer, Bruce Rashbaum, Tim Kanter, and David Rubin.

136. Janssen sometimes selected the location of a speech relating to Prezista or Intelence based on its speaker's request to speak at a given location.

137. Janssen provided slide decks to speakers containing the substantive content to be delivered at speeches.

138. Janssen trained and coached speakers on how to deliver speeches.

139. Thousands of speeches were held in restaurants where food and alcohol were served.

140. In a recently issued HHS Special Fraud Alert, the Government noted that it had "significant concerns" about drug and device manufacturers paying speakers for speaker programs. The Special Fraud Alert urged companies to consider the "inherent" kickback risks associated with promotional speaker programs and advised them to consider "alternative less-risky means for conveying information."

141. Regulators, and even the pharmaceutical industry, are aware that paying doctors for promotional activities can be a disguise for kickbacks.

142. In the months before Prezista was approved for promotion by the FDA, in order to determine which doctors it would target to be speakers, Janssen analyzed the prescribing patterns and numbers of ARV prescriptions of the doctors in a given region, and prioritized for inclusion on Janssen's Speakers' Bureau the doctors who had the greatest potential to be prescribers of Janssen's drugs.

143. In the pre-launch period, Janssen compiled lists of doctors to target to become speakers made by its regional sales staff. This list explicitly stated that, in some cases, the reason the doctor was being targeted to become a speaker was that he or she was a "High Prescriber."

144. Janssen also identified doctors at key accounts (hospitals or clinics) as targets to become speakers to increase sales of its drugs from those accounts.

145. Janssen did not perform any legitimate "needs assessment" analysis to demonstrate that it had any real business need for more speakers and speeches while it continued to recruit more and more doctors to be paid speakers.

146. Janssen never performed an analysis of whether the speaker event attendees were learning anything from the events, or even changing their perceptions of Prezista and Intelence, as they did for their sales calls efforts.

147. Janssen tracked the prescriptions of Prezista and Intelence of its paid speakers and all speech attendees, and it also closely monitored the return on investment ("ROI") of its Speaker programs.

148. Janssen tracked prescription volume and dollar values of prescriptions written for all targeted doctors, which included speakers, and it monitored speakers' prescriptions before and after they gave speeches.

149. When calculating whether attendance at a speaker event increased an attendee's prescriptions of Prezista and Intelence, Janssen made no effort to exclude doctors who were both speakers and attendees from the calculation.

150. Many of Janssen's speakers also attended other speaker's events, and so their prescriptions were included in Janssen's ROI analysis.

151. Prescription volume was one of the most important criteria Janssen used to select speakers, and it was more important than the doctors' credentials.

152. Janssen employees told doctors that if they wanted to be added to the Speakers' Bureau or remain on it, they needed to prescribe the drugs, and if their prescriptions decreased, they would be removed.

153. Several doctors were removed from the Speakers' Bureau because their prescriptions were deemed insufficient, including Juan Bailey, Rita Kelly, and Linda Ording-Bauer.

154. Some doctors asked Janssen to be added to the Speakers' Bureau and said that if they were added, they would then prescribe the drugs.

155. Janssen also trained and coached speakers to present OL information at speeches, it provided speakers with "back up slides" that discussed the OL uses of the drugs, and it put "plants" in the audience to ask OL questions at speeches and prompt OL discussions.

156. OL messages were presented at most speaker presentations.

157. A speaker's willingness to incorporate impermissible OL discussions into the talks was also a significant factor that Janssen used in speaker selection and speaker retention, and Janssen coached its Key Account Managers on how to train the speakers to give off-label messages.

158. Janssen arranged for "plants" in the audience to ask off-label questions to prompt off-label discussions at speeches.

159. Off-label information about the drugs was regularly presented by the top paid speakers, such as Michael Sension and Elizabeth Race, and at many or most speeches.

160. The speeches delivered by Janssen speakers lasted about one hour each and were highly repetitive.

161. The slide decks used by Janssen speakers were used for multiple speeches, with little or no variation in content.

162. There was little or no educational value to the approved slideshow presentation for Janssen's speaker program.

163. The content of the approved speaker presentation slideshows for Prezista did not change materially throughout the 2006-2014 time period outside of the Prezista label expansion

**Appx113**

in 2008.

164. The content of the approved speaker presentation slideshows for Intelence for the 2008-2014 time period did not change materially.

165. Many speeches were held at inappropriate venues; for instance, thousands of speeches (over 2,200) were given at high-end restaurants, including steak houses, where alcohol was served.

166. Despite the fact that PhRMA Code requires that meals provided to doctors at speaker events be modest by local standards, Janssen violated this requirement by holding events at extravagant venues like Pied a Terre in Miami Beach, Florida (four times the venue of a Janssen speaker events), which the Greater Miami Convention & Visitors Bureau describes as offering "a sensual dining experience on South Beach" that "awakens the taste buds and surprises the palate with innovative dishes created by chefs from 2- and 3- Michelin starred restaurants in France."

167. Janssen only provided data on the food costs-per-person of 5,482 events, but even among these, 1,917 events had costs in excess of $75 per person, and 158 events costs of $125 or more, even though Janssen's self-imposed limit for speaker events was $125.

168. The Janssen Compliance Department was not responsible for selecting speakers, determining the number of paid speakers or speeches, selecting attendees, limiting repeat attendance, selecting venues, controlling the costs of the events, or monitoring for OL promotion.

169. The operation of the Speaker Program was controlled by the Janssen Marketing Department and implemented by the sales representatives, who were incentivized to increase sales.

170. Janssen compliance personnel rarely attended speeches and had no legitimate means to assess whether OL information was discussed at speeches.

171. In a recently issued HHS Special Fraud Alert, the Government noted that it had "significant concerns" about drug and device manufacturers paying speakers for speaker programs. The Special Fraud Alert urged companies to consider the "inherent" kickback risks associated with promotional speaker programs and advised them to consider "alternative less-risky means for conveying information."

172. Many educational institutions, clinics, and hospitals (including those where some of Janssen's expert witnesses practice) prohibit their doctors or other employees from serving as paid speakers for drug companies.

173. Janssen used its Speaker Programs, including speaker trainings, and Advisory Board meetings as means to disseminate OL information to doctors who were speakers, consultants, and attendees, and to provide social entertainment to doctors.

174. Janssen's Speaker Programs, including speaker trainings, and Advisory Boards were shams in that they served no legitimate purpose and/or were designed to conceal kickbacks.

175. The Speakers' Bureau was a means for Janssen to make payments to speakers to illegally induce them to prescribe Prezista and Intelence, or to illegally reward them for doing so.

176. Janssen's underlying goal behind paying doctors to speak at the Speaker Programs, to attend speaker training sessions, and to participate as consultants in programs like Advisory Boards, was to have doctors maintain or increase their prescription volumes of Prezista and Intelence, including prescriptions that Janssen knew would be submitted and paid for in whole or in part by Government health care programs, including the health care programs of the federal Government and the Plaintiff States' Governments ("Government Health Care Programs").

**Former Janssen Employees Who Have Provided Sworn Deposition Testimony**

177. In addition to Relators' own knowledge and testimony, at least five other former employees provided substantial and corroborating testimony supporting Relators' Off-Label Marketing and Kickback Claims.

178. These five employees held different positions throughout Janssen (two at senior level positions), they worked in various geographic territories of Janssen, and they each independently testified to the same set of core facts establishing Janssen's liability. They had extensive oversight of, and/or interaction with, hundreds of employees throughout Janssen, and they personally participated in the conduct at issue here.

179. The employees are: (a)  Mark Wilhelm, a Key Account Director for the West from 2007 to 2009, who oversaw eight Key Account Managers, about 70 sales representatives, and thousands of doctors' accounts spanning over 30 states, and who had direct involvement with Janssen's Speakers Bureau, including training and coaching about 100 speakers; (b) Sara Strand, a Regional Business Director for the East from 2006 to 2011, who oversaw about six District Managers, 70 sales representatives, and hundreds of doctors' accounts, and who had direct involvement in Janssen's Speakers Bureau; (c) Donna Graham, a National Sales Trainer from 2007 to 2009 and a sales representative from 2006 to 2007 and from 2009 to 2011, who personally trained all of the sales representatives and Key Account Managers across the U.S. on how to promote Prezista and Intelence to doctors on sales calls, and who also acted as a sales representative who promoted the drugs and had involvement in the Speakers Bureau; (d) Matthew Grooms, a sales representative in Missouri, Kansas, and Nebraska from 2006 to 2010, who personally promoted the drugs to doctors on sales calls, and who was involved with the Speakers Bureau; and (e) Joseph Holshoe, a sales representative in Rhode Island and Massachusetts from 2006 to 2009, who personally promoted the drugs to doctors on sales calls, and who was involved with the Speakers Bureau.

180. Former Janssen employees -- Donna Graham, Matthew Grooms, Joseph Holshoe, Sara Strand, and Mark Wilhelm -- are not plaintiffs in this case, have not been promised anything in exchange for their testimony, and have no financial interest in the outcome of the case.

181. Janssen never accused these employees of any acts of dishonesty, and they all left Janssen on their own volition.

## Off-Label Marketing and Kickback Claims

182. Janssen knew that it was causing false claims to be submitted to Government Health Care Programs and false statements to be made to doctors because of its off-label marketing scheme, which included marketing off-label to doctors on sales calls and at speaker dinners, and its kickback scheme, because it had actual knowledge of the falsity of the claims and statements, it acted in deliberate ignorance of the truth or falsity of the claims and statements it caused, and/or it acted in reckless disregard of the truth or falsity of its claims and statements.

183. The claims and statements were false because they were ineligible for payment by Government Health Care Programs as they were for an off-label use or for a medically unreasonable or unnecessary use; were misbranded in violation of the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 355(a) & (d); and/or contained false express certifications of compliance with the law, including the Anti-Kickback Statute.

184. The falsity of the claims that Janssen caused to be submitted to Government Health Care Programs as a result of its off-label marketing and kickback schemes was material to the Governments' decision to pay those claims.

185. Janssen's conduct was a substantial factor in causing false claims to be submitted to Government Health Care Programs, and the submission of false claims to Government Health Care Programs was foreseeable to Janssen and the normal consequence of Janssen's actions.

186. Janssen knowingly made or caused to be made false statements that were material to false or fraudulent claims through its off-label marketing and kickback schemes.

187. The false claims and statements that Janssen made or caused to be made were material to the Government Health Care Programs.

188. The FDA made it clear in its approval letters for Prezista and Intelence that the drugs must not be marketed for OL uses and failure to do so "may "render the product[s] misbranded."

189. The FDA's Division of Drug Marketing, Advertising & Communications (DDMAC) consistently and in multiple letters throughout the Relevant Time Period alerted Janssen that false and misleading messages about Prezista and Intelence, almost identical to those alleged in this case, were improper and should be remedied or immediately halted, including letters finding misleading: (a) materials regarding Prezista suggesting that it can be used in treatment naïve patients; (b) the use of a reprint of a clinical study that was not part of Prezista's approved labeling; (c) materials claiming Prezista has a low impact on cholesterol; (d) promotional materials regarding Intelence suggesting that it could be used in a broader patient population than the approved treatment experienced population.

190. Janssen's systematic OL promotion of these drugs caused or was a substantial factor in causing doctors to prescribe the drugs, and resulted in a substantial increase in their sales. The FDA made it clear in its approval letters for Prezista and Intelence that the drugs must not be marketed for OL uses and failure to do so "may "render the

**Appx116**

product[s] misbranded."

191. Janssen knowingly and willfully offered or provided remuneration to doctors to induce or reward them for prescribing Prezista and Intelence, where payments for those drugs was reimbursed by Government Health Care Programs.

192. Janssen's payments to doctors for giving speeches and for other services such as the trainings and Advisory Board meetings were unlawful remuneration.

193. At least one of Janssen's purposes for offering remuneration to doctors as part of its Speaker Program, including speaker training, trips, meals, and Advisory Boards, was to induce the doctors to write more prescriptions for Prezista and Intelence, or to reward them for writing prescriptions of Prezista and Intelence.

194. Janssen caused pharmacies to submit false statements to Government Health Care Programs regarding their compliance with the Anti-Kickback Statute specifically, or with all "applicable" laws, when in fact prescriptions the pharmacies filled for Prezista and Intelence were not written in compliance with federal or state law.

195. All Janssen employees who directed, participated in, and carried out the off-label marketing scheme and kickback scheme acted under Janssen's direction and within the scope of their employment with Janssen.

196. Janssen knowingly caused false statements or misrepresentations of material facts to be made to permit payment under the Texas Medicaid program that is not authorized.

197. Janssen knowingly concealed or failed to disclose information to permit payment under the Texas Medicaid program that is not authorized.

198. Janssen knowingly caused claims to be presented to the Texas Medicaid program that contained statements or representations that Janssen knew or should have known to be false.

199. Janssen knowingly (meaning acted with knowledge or conscious indifference to the truth of the matter) offered to pay or give, or did pay or give, doctors gifts of money, a donation, or other items of value for the purpose of influencing the writing of prescriptions of Prezista and Intelence that would ultimately be paid for, in whole or in part, by the Texas Medicaid program.

**Medicaid Provider Agreements**

200. The Medicaid provider agreements from the Plaintiff States require providers to make certain certifications in order to participate in, and receive payments from, the State Medicaid Programs.

201. Some Medicaid provider agreements include language requiring providers like Janssen to expressly agree to request payment only for those services that are "medically necessary."

**Government Information Regarding Off-Label Marketing**

202. CMS has many resources specifically targeted to combatting illegal off-label promotion of drugs including: a. CMS Fact Sheet regarding (noting that if off-label promotion "causes Medicaid to be billed for pharmaceuticals used in this way, the people responsible for the promotion may be liable for false claims.") (Off-Label Pharmaceutical Marketing: How to Recognize and Report It (Oct. 2015), available at https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/off-label-marketing-factsheet.pdf, last accessed January 14, 2021; b. Podcasts (Cms.gov, Off-Label Use of Prescription Drugs, https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/podcast-Off-Label-Use-of-Prescription-Drugs-[March-2016].pdf, last accessed January 14, 2021]; c. and CMS' Medicaid Program Integrity Education website (See https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Program/Education, last accessed January 14, 2021.)

203. Further, the Government has made multiple avenues available for observers to report off-label marketing, indicating the importance that the Government attaches to avoiding both the patient harm and the Government expense of such conduct.

204. There have also been numerous Congressional hearings addressing off-label marketing.

**False Claims Act Case Settlements**

205. There have been settlements in FCA cases related to off-label marketing, including settlements involving Janssen: a. Allergan agrees to plead guilty and paid $600 million to resolve allegations of off-label promotion of Botox, available at https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox, last accessed January 14, 2021; b. Wyeth Pharmaceuticals agreed to pay $490.9 million for marketing the prescription drug Rapamune for unapproved uses, available at https://www.justice.gov/opa/pr/wyeth-pharmaceuticals-agrees-pay-4909-million-marketing-prescription-drug-rapamune-unapproved, last accessed January 14, 2021; c. Janssen and its parent company Johnson & Johnson reached settlements related to the off-label promotion of Risperdal for over $2.2 billion, available at https://www.justice.gov/opa/pr/johnson-johnson-pay-more-22-billion-resolve-criminal-and-civil-investigations, last accessed January 14, 2021; d. Janssen affiliate reached a settlement related to the off-label promotion of Topamax, paying criminal penalties and $75 million to settle an FCA case, available at https://www.justice.gov/opa/pr/two-johnson-johnson-subsidiaries-pay-over-81-million-resolve-allegations-label-promotion, last accessed January 14, 2021.

206. In the press release announcing the settlement with Merck related to the unlawful promotion of its drug Vioxx, the U.S. Attorney for Massachusetts stated: "The severity of these criminal and civil sanctions should serve as a reminder of this Office, and this department's unwavering commitment to holding drug companies fully accountable for failures to comply with their public safety and marketing obligations, and to recovering taxpayer funds that have gone towards the purchase of illegally marketed products." Pharmaceutical Company Merck Sharp & Dohme Sentenced in Connection with Unlawful Promotion of Vioxx, available at https://www.justice.gov/opa/pr/us-

pharmaceutical-company-merck-sharp-dohme-sentenced-connection-unlawful-promotion-vioxx, last accessed January 14, 2021.

207. FDA made it clear in its approval letters for Prezista and Intelence that the drugs must not be marketed for off-label uses such that "[m]arketing the product with FPL [final printed labeling] that is not identical to the approved labeling text may render the product misbranded and an unapproved new drug."

## HHS Guidelines

208. Further, the HHS Guidelines consistently noted throughout the Relevant Time Period that Prezista has a negative effect on lipids or causes hyperlipidemia.

## Corporate Integrity Agreements with the Government

209. In 2010, a Janssen affiliate entered a five-year Corporate Integrity Agreement with HHS-OIG that obligated it to monitor sales representatives to ensure that the messages and materials delivered during sales calls were not off-label. The Corporate Integrity Agreement also required it to ensure its speaker programs did not contain off-label messages, including by reviewing the slide decks, the statements made during the program, and sales representatives' activities during the programs.

210. In 2013, Janssen itself (through its parent Johnson & Johnson) entered into a five-year Corporate Integrity Agreement that included similar requirements to control off-label promotions during sales calls on doctors and speaker programs.

B.   **Relators intend to prove the following contested facts with regard to damages:**

## Damages to the United States Government

1. About 70% of claims submitted for Prezista and Intelence were paid by Government payors like Medicare and Medicaid.

2. The United States Government is entitled to damages in the amount of $292,958,336[4] due to Janssen's violation of the False Claims Act stemming from its violations of the Anti-Kickback Statute, pursuant to Section 3729(a)(1)(A) of the False Claims Act.

3. The United States Government is entitled to damages in the amount of $447,013,756 due to Janssen's violation of the False Claims Act stemming from its off-label marketing and/or misbranding of Prezista and Intelence, pursuant to Sections 3729(a)(1)(A) and (B) of the False Claims Act.

4. According to the CMS data, hundreds of thousands of Prezista and Intelence prescriptions were written for off-label uses.

---

[4] The damages figures presented here vary slightly from those presented in the report of Relators' expert Professor Israel Shaked because (a) the damages to the federal Government and the Plaintiff States have been separated, and (b) the state portion of Medicaid payments from states without state false claims act laws have been removed. After removing the state portion of Medicaid payments from states without state false claims act laws, the total kickback damages (to the federal Government and the Plaintiff States) are lower by 0.29%, and the total off-label marketing damages are lower by 0.13%. A summary of all damages and claims to the federal Government and the Plaintiff States is presented in Exhibit A.

5. The total number of false claims that Janssen caused to be submitted to the United States Government stemming from its violations of the Anti-Kickback Statute, pursuant to Section 3729(a)(1)(A) of the False Claims Act, is 378,077.

6. The total number of false claims that Janssen caused to be submitted to the United States Government stemming from its off-label marketing of Prezista and Intelence, pursuant to Sections 3729(a)(1)(A) and (B) of the False Claims Act, is 536,803.

7. Janssen paid speakers in the form of honoraria and other compensation. Once a speaker was paid by Janssen, all Prezista and Intelence prescriptions made by that physician and reimbursed by Medicare, Medicaid, and ADAP Government payors, from the first payment date to the end of 2014, constitute damages to the Government. The amount reimbursed by the federal Government for Prezista prescriptions written by speakers is $225,169,827, and the number of claims Janssen caused to be submitted to the federal Government is 274,105. The amount reimbursed by the federal Government for Intelence prescriptions written by speakers is $67,788,509, and the number of claims Janssen caused to be submitted to the federal Government is 103,972.

8. All Prezista prescriptions written for patients who received any lipid regulating medicine or a lipid-related diagnosis prior to the first time they were prescribed Prezista constitute off-label claims for purposes of Relators' Prezista lipid neutral claim. The amount of the Prezista lipid neutral claims initially written by Influenced physicians[5] from the period of June 2006 to December 2014 reimbursed by the federal Government is $405,191,153, and the number of claims Janssen caused to be submitted to the federal Government is 478,802.

9. All Prezista prescriptions written for patients who did not have a prescription for another ARV medication prior to that patient's first Prezista prescription, and who did not receive a prescription for a non-Prezista ARV drug within 90 days following their first claim of any kind, constitute off-label claims for purposes of Relators' Prezista treatment naïve claim. The amount of Prezista treatment naïve claims initially written by Influenced physicians from the period of June 2006 to September 30, 2008, reimbursed by the federal Government is $1,699,573, and the number of claims Janssen caused to be submitted to the federal Government is 2,758.

10. All Intelence prescriptions written for patients who did not have a prescription for another ARV medication prior to that patient's first Intelence prescription, and who did not receive a prescription for a non-Intelence ARV drug within 90 days following their first claim of any kind, constitute off-label claims for purposes of Relators' Intelence treatment naïve claim. The amount of Intelence treatment naïve claims initially written by Influenced physicians for the period of 2008 to 2014 reimbursed by the federal Government is $14,996,971, and the number of claims Janssen caused to be submitted to the federal Government is 24,368.

11. All Intelence prescriptions with dosing instructions suggesting once-daily usage constitute off-label claims for purposes of Relators' Intelence once daily dosing claim.

---

[5] An "Influenced" physician is a physician who was contacted by Janssen in one of three ways: receiving a sales call from a Janssen representative, attending a speaking event, or speaking at a speaking event.

**Appx120**

The amount of Intelence once-daily dosing claims for the period of 2008 to 2014 reimbursed by the federal Government is $41,822,603, and the number of claims Janssen caused to be submitted to the federal Government is 58,001.

12. The off-label claims that are included in Relators' damages calculation are claims to Government payors resulting from prescriptions initially written by an "Influenced" doctor. Life-long prescriptions of all patients whose first Prezista or Intelence prescription was written by an Influenced physician constitute off-label claims. An "Influenced" physician is a physician who was contacted by Janssen in one of three ways: receiving a sales call from a Janssen representative, attending a speaking event, or speaking at a speaking event.

13. Janssen paid 335 physicians to serve as speakers at its Speaker Programs. Speakers received between $750 to $3,000 per speaking event. Some doctors presented at over 200 events from 2006 to 2014, with some speakers receiving more than $400,000 in honoraria over this time period. The total honoraria for all speakers from June 2006 to 2014 is $14,099,650.

14. Speakers were also paid to train and instruct other doctors who were asked to join Janssen's Speaker Program. The total training fees from June 2006 to December 2014 is at least $688,050.

15. Speakers were paid reimbursements related to their speaking and training events, *i.e.,* travel, lodging, and meals. The speaker expenses from June 2006 to December 2014 total at least $1,571,968.

16. Speakers were paid consulting fees for participating at marketing events such as Advisory Board meetings. The total consulting fees amount to at least $644,857 from June 2006 to December 2014.

17. Janssen reimbursed speakers for expenses related to consulting events, *i.e.,* travel, lodging, and meals. The total consulting expenses amount to at least $269,461 from June 2006 to December 2014.

18. Total compensation paid to doctors on Janssen's Speaker Program amount to at least $17.25 million.

19. Relators will present the total compensation paid to each speaker who participated in the Speaker Program, and the number of speeches they each gave. Relators will also present information regarding the Prezista and Intelence prescriptions written by each speaker.

20. More than 90% of Janssen's paid speakers continued to prescribe Prezista and Intelence following their first speech.

21. Janssen typically selected high prescribers of Prezista and Intelence to be paid speakers.

22. Speakers accounted for 11.10% of all Prezista and Intelence prescriptions in dollars reimbursed by Government payors (constituting $327 million) while accounting for only 0.30% of the total population of physicians who prescribed at least one ARV drug.

23. An increase in compensation paid to speakers by Janssen caused the speakers to

prescribe more Prezista and Intelence.

24. Speakers were more likely to prescribe Prezista and Intelence than non-speakers.

25. Janssen's unlawful marketing activities caused Influenced physicians to prescribe higher proportions of off-label Prezista and Intelence prescriptions than non-Influenced physicians.

26. Influenced physicians, speech attendees, and speakers who are Infectious Disease Specialists prescribed statistically significantly higher rates of off-label Prezista and Intelence to all Prezista and Intelence than non-Influenced physicians, non-attendees, and non-speakers who are Infectious Disease Specialists.

27. Janssen's increasing number of contacts with physicians caused those physicians to prescribe higher proportions of off-label Prezista and Intelence prescriptions than physicians who received less marketing contacts. The off-label percentage of Prezista and Intelence to all Prezista and Intelence rates increases as the number of Janssen marketing contacts increases.

28. Influenced physicians, attendees, and speakers with five or more Medicare patients prescribed statistically significantly higher rates of off-label Prezista and Intelence to all Prezista and Intelence than non-Influenced physicians, non-attendees, and non-speakers with five or more Medicare patients.

29. Attending a Janssen sponsored speaking event caused physicians to prescribe higher proportions of off-label Prezista and Intelence prescriptions than not attending.

30. Being a paid speaker on Janssen's Speaker Bureau caused physicians to prescribe higher proportions of off-label Prezista and Intelence prescriptions than non-speakers.

31. Speakers account for 20.8% and 20.4% of all Prezista and Intelence off-label prescriptions and dollar amounts reimbursed by Medicare, respectively, while accounting for only 1.21% of all physicians who had at least one Prezista or Intelence prescription from June 2006 to December 20-14 paid by Medicare.

32. Influenced physicians with at least 1 ARV initiation make up 11.04% of the physician population that initiated at least 1 ARV patient. However, Influenced physicians initiated 65.64% of all Prezista patients. Influenced physicians with at least 1 ARV initiation make up 11.04% of the physician population that initiated at least 1 ARV patient. However, Influenced physicians initiated 69.01% of all Intelence patients.

33. Prezista sales increased substantially from 2009 ($592 million) to 2014 ($1,831,000) with a compound annual growth rate ("CAGR") of over 25% the same period. Compared to other protease inhibitors, the market share of Prezista was the fastest rising from mid-2011 to mid-2014, reaching a market share of 25.6% by the second quarter of 2014.

34. Intelence sales increased consistently from $243 million in 2010 to $379 million in 2013, at a CAGR of 16%.

**Civil Penalties and Treble Damages**

35.  Under the federal False Claims Act, 31 U.S.C. 3729 *et seq.*, Janssen is liable for three times the amount of damages that the United States sustained because of its conduct. In addition, Janssen is liable for a civil penalty of not less than $5,500 and not more than $11,000 per false statement and/or claim (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990). *See* 28 C.F.R. 85.3(a)(9). In addition to the damages under the federal FCA, Janssen is liable to the Plaintiff States for three times the amount of damages sustained by the Plaintiff States because of Janssen's conduct, plus civil penalties and any other recoveries or relief provided for and permitted by the individual State False Claims Acts.

**Damages to Plaintiff States**

36.  The table in Exhibit A shows the amount Janssen caused the Plaintiff States (and the federal Government) to pay out for Prezista and Intelence prescriptions in violation of their respective false claims act laws stemming from Janssen's unlawful kickbacks to speakers and off-label marketing, as well as the number of illegal claims Janssen caused to be submitted to the Plaintiff States (and the federal Government).

**Relators' Recovery**

37.  Relators Christine Brancaccio and Jessica Penelow are each entitled to the maximum amount permitted by law of the proceeds of this action collected by the United States and the Plaintiff States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. *See* 31 U.S.C. 3730(d)(1).

## 5.  JANSSEN'S CONTESTED FACTS

### A.  Janssen intends to prove the following contested facts with regard to liability.

To succeed on their False Claims Act ("FCA") claims, the Relators must prove: (1) that the Government was defrauded when it paid for Prezista and Intelence, two medications that the Food and Drug Administration ("FDA") approved to treat HIV and that were prescribed to treat HIV-positive patients; and/or (2) that, in violation of the Anti-Kickback Statute ("AKS"), Janssen bribed healthcare providers to prescribe Prezista and Intelence.  As described in Section 12 (Janssen's Legal Issues) below, the Relators must prove each essential element of their claims to prevail at trial.

Janssen disputes each of the Relators' Contested Facts in Section 4 above.  Many of the

Relators' purported Contested Facts are demonstrably untrue, irrelevant to this False Claims Act case, or otherwise inadmissible.  Certain of the Relators' purported Contested Facts are also improper because they include legal arguments or legal conclusions, encroach on the Court's exclusive purview to instruct the jury on the law, and/or reach the ultimate issues that the jury must decide.  Janssen therefore reserves its rights to object in its contemplated pretrial motions or at trial to the admissibility of evidence related to each of the Relators' purported Contested Facts.

Janssen intends to prove at trial that it properly and truthfully promoted Prezista and Intelence to doctors and other healthcare providers directly (through meetings with doctors, commonly referred to as sales calls) and indirectly (through speaker programs).  Janssen further intends to prove at trial that it properly paid doctors to serve as speakers.  Janssen's speaker programs were lawful promotional programs that are common in the pharmaceutical industry, and Janssen intended its speaker programs to promote Prezista and Intelence to doctors, other healthcare providers, caregivers, and HIV-positive patients by educating them about Prezista, Intelence, and other issues affecting HIV treatment.

Janssen intends to prove the following contested facts with regard to liability.

### _Prezista and Intelence are effective and safe HIV medications._

1.    Prezista and Intelence are effective, safe, and lifesaving HIV medications.

2.    Doctors and other healthcare providers prescribed Prezista and Intelence because they are effective and safe, and the right medications for many HIV-positive patients.

3.    Clinical trials and medical studies demonstrate that Prezista and Intelence are effective and safe HIV medications for HIV-positive patients.

**Appx124**

4.      The FDA approved Prezista and Intelence as effective and safe HIV medications for HIV-positive patients.

5.      The FDA approved Prezista, a protease inhibitor ("PI"), under its Accelerated Approval Program for treatment-experienced patients (that is, patients who had previously taken antiretroviral medications) in June 2006.  In October 2008, the FDA approved Prezista for treatment naïve patients (that is, patients who had not previously taken antiretroviral medications).  From 2006 through 2014, the FDA approved 18 additional updates to Prezista's label.

6.      The FDA approved Intelence, a non-nucleoside reverse transcriptase inhibitor ("NNRTI"), under its Accelerated Approval Program for treatment-experienced patients in January 2008.  From 2008 through 2014, the FDA approved 9 additional updates to Intelence's label.

7.      The Accelerated Approval Program allows the FDA to approve, on an expedited basis, medications that treat serious conditions and fill an unmet medical need.

8.      The United States Department of Health and Human Services ("HHS") periodically publishes consensus-based guidelines that help physicians choose treatment regimens for their HIV patients, titled Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents Living with HIV ("HHS Guidelines").  HHS retains experts in HIV research and treatment, community members with knowledge of HIV care, and appointed representatives of relevant government agencies to evaluate available scientific research and to write and issue the HHS Guidelines.

9.      The HHS Guidelines help doctors who treat HIV-positive patients select the best treatment regimens for their patients, considering each patient's unique health and personal

circumstances.  Among other things, the HHS Guidelines provide guidance and recommendations based on FDA-approved HIV medications' effectiveness, safety profile, and tolerability.

10.    HHS generally updates its Guidelines multiple times each year to incorporate, among other things, information published in peer-reviewed journals and data presented at major conferences.

11.    The HHS Guidelines "reflect the federal government's position on the standard of care for the use of HIV medications as it evolved over time, based on an expert panel's independent evaluation of reliable scientific research."

12.    Prezista has appeared in every edition of the HHS Guidelines since the FDA approved it in 2006.

13.    Patients are to take Prezista with another HIV medication called ritonavir. Taking ritonavir with Prezista has a "boosting" effect, which makes Prezista more effective.

14.    The HHS Guidelines recommended that nearly all PIs (including Reyataz) be boosted with ritonavir, even if the FDA-approved label does not require a booster.

15.    The HHS Guidelines acknowledge—and it is well-known and understood among doctors and other healthcare providers who treat HIV-positive patients—that PIs (particularly when boosted with ritonavir) may have an "adverse effect on lipids."

16.    In November 2008, the HHS Guidelines categorized Prezista as a "preferred PI." And, starting in December 2009, the HHS Guidelines listed Prezista and Reyataz boosted with ritonavir as the only two "preferred PI" medications.  The HHS Guidelines did not recommend prescribing Reyataz without a booster.

17.     The HHS Guidelines noted that Prezista was "preferred" (in part) because of its favorable lipid profile, and included information favorably comparing Prezista's lipid profile to boosted Reyataz's lipid profile.

18.     Neither Prezista's FDA-approved label nor the HHS Guidelines warned that certain patients should not take Prezista because of its potential adverse effect on lipids.

19.     The HHS Guidelines included Intelence starting in January 2008.

20.     The October 14, 2011 HHS Guidelines described a study which concluded that using Intelence once-daily could be a good NNRTI option for some treatment-naïve patients.

21.     Prezista and Intelence were the right HIV medications for many HIV-positive patients.

### _Janssen properly and truthfully promoted Prezista and Intelence._

22.     Janssen properly and truthfully promoted Prezista and Intelence to doctors, other healthcare providers, caregivers, and HIV-positive patients.

23.     Janssen promoted Prezista and Intelence to educate doctors and other healthcare providers about the medications and to increase the number of patients taking them.

24.     Janssen did this directly through sales calls with doctors and other healthcare providers and indirectly through speaker programs.

25.     Each department within Janssen had a role in the process.

26.     Business Analytics sought to understand how doctors were treating HIV-positive patients and the reasons why doctors prescribed a particular medication.

27.     Marketing brainstormed ideas on how to appropriately and more effectively promote Prezista and Intelence.

**Appx127**

28.    Janssen created promotional materials to aid sales calls and made slide decks to aid speaker programs.

29.    Janssen's promotional materials and speaker slide decks were drafted, reviewed, edited, and approved by employees in a variety of departments, including Business Analytics, Marketing, Medical, Compliance, Regulatory, and Legal.

30.    Janssen submitted its promotional materials and speaker slide decks to the FDA for review and comment through what is commonly referred to as the FDA's 2253 process.

31.    The FDA had the opportunity to comment on Janssen's promotional materials and speaker slide decks and, when it did so, Janssen considered the FDA's comments and made further edits or changes as need be.

32.    Once the FDA's comments were addressed, Janssen allowed its Sales organization to start using the promotional materials during sales calls and its speakers to use the speaker slide decks during speaker programs.

33.    Janssen trained its Sales employees to use Janssen-approved promotional materials during sales calls.  Janssen provided a variety of training, conducted by different departments.  Janssen's training often included real-world role-play training.

34.    From time to time, Janssen informed Sales employees about articles, studies, or other publicly available information that were not part of the Janssen-approved promotional materials but discussed Prezista, Intelence, or other information related to HIV treatment.

35.    It was important to Janssen that its Sales employees were aware of the information that was also available to the doctors and other healthcare providers on whom they called.

**Appx128**

36.    When Janssen gave this type of information to Sales employees, Janssen told the employees (in writing and verbally) that the information was for their personal knowledge and not to be used promotionally during a sales call.

37.    If a doctor or other healthcare provider asked a Sales employee about information not included in Janssen's approved promotional materials, the Sales employee could have the doctor complete a Medical Information Request ("MIR").  The MIR would be routed to and answered by Janssen's Medical department.

38.    District managers, regional managers, and the national sales director oversaw, managed, and monitored Sales employees to ensure that information Sales employees shared with doctors and other healthcare providers was proper and truthful.

39.    Business Analytics, Marketing, Medical, Compliance, Regulatory, and Legal department employees, as well as the executives in charge of Janssen's HIV business, also oversaw and monitored Sales employees to ensure that information shared with doctors and other healthcare providers was proper and truthful.

40.    Janssen instructed its Sales employees that they were expected to (and must) abide by Janssen's policies and expectations regarding proper and truthful promotion.

41.    Janssen used speaker programs to educate doctors, other healthcare providers, caregivers, and patients about Prezista, Intelence, and HIV-related issues.  Janssen wanted its speaker programs to encourage the doctors and other healthcare providers in attendance to prescribe Prezista and Intelence to their HIV-positive patients more often.

42.    Janssen conducted four types of speaker programs: (1) Prezista speaker programs; (2) Intelence speaker programs; (3) Disease Awareness Speaker Bureau ("DASB") programs (which did not discuss any particular HIV medication, but covered HIV-related topics

**Appx129**

generally); and (4) Community Speaker Bureau ("CSB") programs (which were geared toward HIV-positive patients, their caregivers, and others involved in HIV care).

43. Speaker programs are common in the pharmaceutical industry and play an important and beneficial role in disseminating promotional messages and providing educational content.  For HIV in particular, the National HIV/AIDS Strategy for the United States is:  "We must also ensure that all health and wellness practitioners (peer counselors, intake specialists, healthcare providers, nurses, and other health professionals) are also educated about HIV, especially in programs for underserved communities."

44. Janssen considered its business needs for speaker programs and set parameters and budgets for speaker programs that met those needs.

45. Janssen's business needs considered (among other things) that Prezista and Intelence were brand new medications (and that Prezista's and Intelence's FDA approvals changed several times), that HIV was a rapidly evolving disease, and that there were thousands of doctors, other healthcare providers, and patients that Janssen wanted to reach.

46. Janssen employees from the Marketing, Medical, Regulatory, Legal, and Compliance departments worked collaboratively to plan for and implement Janssen's speaker programs.  Among other things, the cross-functional team considered the rationale for (and goals of) the speaker programs, speaker program content, the anticipated number of programs and speakers, speaker compensation, speaker training, and speaker selection.

47. Janssen selected qualified doctors to serve as speakers, considering (among other things) the doctors' training and work experience, their academic and clinical research, their clinical experience, their presentation skills, and their experience prescribing HIV medications, including Prezista and Intelence.

**Appx130**

48.     Janssen did not select doctors to serve as speakers to reward the doctors for past prescriptions or to encourage the doctors to prescribe more in the future.

49.     Janssen employees in the Sales department could recommend that a particular doctor be considered as a speaker, but the cross-functional team (which did not include Sales) made the final determination as to who would be selected as speakers.

50.     Janssen required its speakers to sign contracts, to complete training, to conduct at least three speaker programs a year, and to abide by Janssen's policies.

51.     Janssen paid its speakers fair market value for their time and services (between $250 and $2,500, in line with industry standards), and capped annual speaker compensation (also in line with industry standards).

52.     Speakers who did not complete the requisite number of programs or abide by Janssen's policies were retrained or removed from Janssen's speaker bureau as appropriate.

53.     Among other things, Janssen required speakers to present the Janssen-approved and FDA-submitted speaker slide decks.  Speakers could answer program attendees' questions about content not included in the speaker slide decks based on the speakers' own professional experience and opinion.

54.     Janssen held speaker programs at medical offices or restaurants that were appropriate for a professional program.  When speaker programs included food, Janssen capped the amount per person ($125 for a dinner program at a restaurant, in line with industry standards).

55.     Speaker program attendees were doctors, other healthcare providers, caregivers, or HIV-positive patients.  All were appropriate attendees for speaker programs.

56.     Sales employees attended each speaker program and were required to report any potential violations of Janssen's policies.

57.     From time to time, Janssen employees from other departments (including Compliance) attended speaker programs too.

58.     Janssen used well-respected third-party vendors to track, monitor, and organize speaker programs, which ensured that (i) speakers were properly trained; (ii) speakers did not exceed the annual compensation cap; (iii) speaker program venues were appropriate; (iv) food and beverage costs were at or below the policy limitations; and (v) speaker programs complied with Janssen's policies.

59.     Janssen analyzed whether its speaker programs were an effective way to promote Prezista and Intelence.  These types of analyses are commonly referred to as return-on-investment ("ROI") analyses, and Janssen intentionally considered only how *attending* a speaker program may have impacted prescribing.  Janssen intentionally *excluded* the speaker from this analysis.

***Doctors and other healthcare providers prescribed Prezista and Intelence to HIV-positive patients for a variety of patient- and doctor-specific reasons.***

60.     HIV treatment is uniquely and highly individualized.  A regimen that is appropriate for one patient may be inappropriate for another.

61.     By using different HIV medications, in different combinations, doctors and other healthcare providers design individualized regimens for each patient based on a variety of considerations, including the patient's drug resistance, viral load, CD4 count, potential adverse effects, drug interactions, comorbidities, pregnancy or potential for pregnancy, patient preferences, adherence potential, tolerability, convenience, and cost.

38

**Appx132**

62.     Doctors and other healthcare providers closely monitor HIV-positive patients and require they undergo regular blood testing.  Blood tests that measure the patient's viral load and CD4 counts tell the treating doctor whether the prescribed HIV treatment regimen is working—that is, the blood tests measure whether the patient is experiencing virologic failure (an increase in the viral load above an established threshold) or immunologic failure (a decrease in the CD4 cell count below an established threshold).

63.     Doctors and other healthcare providers also closely monitor HIV patients for potential side effects, including side effects that may pose other health or quality of life challenges.

64.     Doctors may switch an HIV patient's treatment regimen if the patient experiences virologic failure, immunologic failure, or side effects.

65.     Why a doctor chooses one HIV treatment over another is complex and fact-dependent.

66.     When deciding how to best treat their patients' HIV, doctors consider a number of factors, including patient-driven factors (e.g., comorbidities, drug tolerability and interactions, and history of medication adherence), experience-driven factors (e.g., the healthcare provider's own professional experience, medical training, and knowledge of scientific literature and clinical guidelines (including the HHS Guidelines)), and drug-specific factors (e.g., tolerability, convenience, drug-to-drug interactions, and potential adverse events). Doctors also may consider pharmaceutical promotion (e.g., Janssen's promotion of Prezista or Intelence, Bristol Myers Squibb's promotion of Reyataz, ViiV Healthcare's promotion of Epivir or Retrovir, and Boehringer Ingelheim's promotion of Viramune or Aptivus).

67.     Relators collected, and intend to introduce at trial, data that they claim proves that Janssen's promotion was a substantial factor when doctors chose Prezista or Intelence.  It does not.  None of the data can reliably identify what doctors considered when prescribing Prezista or Intelence, let alone whether Janssen's promotion (even if improper or untruthful) was a substantial factor in the prescribing decision.

68.     Relators proffer experts that they claim prove that Janssen's promotion was a substantial factor when doctors chose Prezista or Intelence.  They do not.  None of the experts can testify about what doctors considered when prescribing Prezista or Intelence, let alone whether Janssen's promotion (even if improper or untruthful) was a substantial factor in the prescribing decisions.

69.     Instead, the doctors and other healthcare providers who interacted with Janssen or served as Janssen speakers prescribed Prezista and Intelence because they believed they were the right medications to treat their HIV patients.

***It is the United States' policy to pay for HIV medications for HIV-positive patients***.

70.     During the relevant time period, Medicare, state Medicaids, and state ADAPs (AIDS Drug Assistance Programs) paid for Prezista and Intelence prescriptions for HIV-positive patients.  Medicare, Medicaid, and ADAP continue to pay for Prezista and Intelence prescriptions for HIV-positive patients today.

71.     It is the United States's policy—implemented at the federal and state levels through CMS—that Medicare, Medicaid, and ADAPs pay for HIV medications for HIV-positive patients.

72.     Because HIV was a deadly epidemic, the federal government set up a special payment system to ensure that HIV-positive patients had easy access to HIV medications,

**Appx134**

including Prezista and Intelence, and that prescription costs were covered by government insurance programs.

73.     It is a strategic and general policy goal stated by the White House Office of National AIDS Policy that "[f]ederal and state governments should ensure access to appropriate HIV treatment by promoting unimpeded coverage of all HIV medications included in the HHS HIV Treatment Guidelines."

74.     The policy further advises that "[p]ublic and private insurers and health care providers must also take steps to ensure that all HIV care providers have the knowledge and training to provide quality HIV care consistent with the latest treatment guidelines."

75.     Medicare Part D provides prescription drug coverage for the elderly and people with certain disabilities.

76.     Under Part D, the federal government helps to cover the costs of "covered Part D drugs," which are FDA-approved medications prescribed for a "medically accepted indication."

77.     Part D does not require that a drug be "reasonable and necessary" to be covered under the benefit.

78.     A "medically accepted indication" under Part D is any use that is FDA-approved or that is supported by citations in specified compendia.

79.     The Medicare Prescription Drug Benefit Manual states that the "medically-accepted indication refers to the diagnosis or condition for which a drug is being prescribed, not the dose being prescribed for such indication."

80.     While Part D generally must cover only two FDA-approved medications in a given therapeutic class, HIV medications are a special case.  The government requires that Part

41

**Appx135**

D reimburse "all or substantially all" HIV medications to ensure uninterrupted therapy to vulnerable patients.

81.    Since Part D's inception, CMS's stated priority has been to ensure that beneficiaries have timely access to covered Part D drugs.  This priority is especially true for HIV-positive patients—CMS generally opposes implementing utilization management tools (such as requiring prior authorizations) for HIV medications.

82.    The Medicare Prescription Drug Benefit Manual states: "For HIV/AIDS drugs, utilization management tools such as prior authorization and step therapy are generally not employed in widely used, best practice formulary models."

83.    Medicaid, which provides healthcare coverage for low-income people, is jointly funded by federal and state governments.

84.    The federal government allows state Medicaid programs to cover any medication that is a "prescribed drug"—that is, a medication "prescribed for the cure, mitigation, or prevention of a disease, or for health maintenance"—and that is prescribed by a doctor and dispensed by a pharmacy.

85.    State Medicaid programs may choose not to cover a medication that "is not for a medically accepted indication."

86.    For patients to realize the public health benefits of HIV therapies, CMS, HHS, the Health Resources & Services Administration ("HRSA"), and the Centers for Disease Control and Prevention ("CDC") direct state Medicaid programs to align their Medicaid policies and practices with the HHS Guidelines.

87.    States create and administer their own ADAP programs through federal block grants that fund "core medical services" for HIV-positive patients, including HIV medications.

**Appx136**

88.     The purpose of the ADAPs is to ensure that low-income HIV patients who do not qualify for Medicare, Medicaid, or private insurance—or whose health insurance provides insufficient coverage—have access to their prescribed HIV medications.

89.     Ultimately, state ADAP programs serve as "payors of last resort" to improve the availability of and access to care for uninsured or underinsured HIV patients, and fund HIV treatment when no other resources are available to them.

90.     Medicare, Medicaid, and ADAP (through guidance, policies, regulations and laws) set out to pay for HIV medications (including for Prezista and Intelence) when prescribed to treat HIV-positive patients.

### _Relators and their witnesses are not credible_.

1.     The Relators are not credible and are not believable.

2.     The Relators' testimony is motivated by their self-interest and biases.

3.     Sara Strand, Mark Wilhelm, Donna Graham, Joseph Holshoe, Matthew Grooms, and Russ Moyer are not credible and are not believable.

4.     The testimony of Ms. Strand, Mr. Wilhelm, Ms. Graham, Mr. Holshoe, Mr. Grooms, and Mr. Moyer is motivated by their self-interest and biases.

### B. Janssen intends to prove the following contested facts with regard to damages.

Even if the Relators can prove that Janssen violated the False Claims Act, the Relators must separately prove that the Government (that is, Medicare, Medicaid, and ADAP) suffered actual damages. As described in Section 12 (Janssen's Legal Issues), the Relators must prove damages by a preponderance of the evidence. The measure of damages in this case is the difference between the amount of money the Government paid for Prezista and Intelence and the value of what the Government actually received.

The Relators rely on their purported expert, Israel Shaked, to proffer a damages model that is contradicted by the facts of this case, that is not supported by the facts in this case, and/or is contrary to the law.

Janssen intends to prove the following contested facts with regard to damages.

***Professor Shaked relied on incomplete or improper data sets to identify claims for reimbursement that he opined violated the False Claims Act and that he opined must be included in damages.***

1.    Professor Shaked relied on diagnostic codes in CMS claims data to identify patients that may have had "lipid issues."  Professor Shaked included in damages any prescription written for any HIV-positive patient who, at any time prior to starting Prezista, was evaluated or treated for a lipid-related issue at least once (what Professor Shaked deems "Lipid Neutral Claims").

2.    Relators' and Professor Shaked's reliance on the CMS claims data is not consistent with the practice of medicine.  The CMS claims data is a partial record of patients' medical bills.  An indication within the CMS data that a patient was evaluated or even treated for lipid-related issues and was subsequently prescribed Prezista is unremarkable because (among other reasons) Prezista is the right medication for many HIV-positive patients with lipid conditions.

3.    Professor Shaked also improperly included patients who only may have been tested for (but did not actually have) lipid conditions, or who may have had a lipid condition that resolved well before the patient was prescribed Prezista.

4.    Dr. Anupam Jena will explain the limitations of the CMS claims data and correct Professor Shaked's overbroad definition of "lipid claims."

**Appx138**

5.      Professor Shaked also relied on the CMS claims data for Prezista and Intelence to identify what he deems "Treatment Naïve Claims."  Professor Shaked improperly included patients who may not have been treatment-naïve.

6.      Dr. Jena will explain the limitations of the CMS claims data and that complete patient medical records are the only reliable source to determine whether a patient is treatment-naïve.  Dr. Jena will more accurately identify potentially treatment naïve patients by correcting Professor Shaked's overbroad definition of "Treatment Naïve Claims."

7.      For what Professor Shaked deems as Intelence "Once-Daily Dosing Claims," Professor Shaked used limited pharmacy data to estimate the rate at which healthcare providers prescribed Intelence for once-daily use.  Professor Shaked made a series of unsupported assumptions to estimate the number of "Once-Daily Dosing Claims."

8.      Dr. Jena will explain that the pharmacy data has several limitations, including: (1) only records from three pharmacies (BioScrip, Rite Aid, and Walgreens) were analyzed; (2) the pharmacy data does not identify the prescribing doctor; (3) the pharmacy data does not include dosing instructions for every prescription; and (4) even when dosing instructions are included, the instructions are not necessarily clear or consistent.  Dr. Jena also will correct errors in Professor Shaked's methodology used to calculate Once-Daily Dosing Claims.

***Professor Shaked's damages methodology relied on factual assumptions that are contradicted or not supported by the facts in this case.***

9.      The Relators' attorneys provided Professor Shaked with factual assumptions that are untrue or unsupported.

10.     Professor Shaked testified that he adopted the Relators' attorneys' assumptions to render his opinions, and took no steps to verify whether the assumptions were true, accurate, reliable, or otherwise supported by the facts in this case.

**Appx139**

11.    As a result, because the assumptions on which Professor Shaked relied are untrue or unsupported, his opinions are unreliable and flawed.

12.    The Relators' attorneys told Professor Shaked to assume that every time a Janssen Sales employee called on a doctor, that Sales employee delivered all four promotional messages that the Relators claim were improper.  That assumption is not supported by the facts in this case and is contradicted by, among other things, Ms. Penelow's testimony (for example).

13.    The Relators' attorneys told Professor Shaked to assume that every doctor who had contact with Janssen—because Janssen Sales employees called on the doctor or because the doctor attended a speaker program—had their medical judgment permanently hijacked.  That assumption is not supported by the facts in this case and is contradicted by doctors who had contact with Janssen.

14.    The Relators' attorneys told Professor Shaked to assume that every doctor who Janssen paid as a speaker had their medical judgment permanently hijacked, even when prescribing to patients who already were on a Prezista or Intelence treatment regimen when the doctor-speaker began treating the patients.  That assumption is not supported by the facts in this case and is contradicted by doctors who served as speakers.

15.    The Relators' attorneys told Professor Shaked to assume that if a patient was first prescribed Prezista or Intelence in ways that Professor Shaked assumes are "off-label" by a doctor who received a sales call or attended a speaker program, that patient's lifelong supposed "off-label" Prezista and Intelence prescriptions were caused by Janssen's supposed improper promotion.  The Relators' attorneys told Professor Shaked to use this assumption, even if the patient later was prescribed Prezista or Intelence by a doctor who never received a sales call and never attended a speaker program.  In other words, only the doctor who starts a patient on

46

**Appx140**

Prezista or Intelence matters to Professor Shaked. This assumption is not supported by the facts in this case.

16.    The Relators' attorneys told Professor Shaked to use a different assumption for speaker programs. The Relators' attorneys told Professor Shaked to assume that if a patient was prescribed Prezista or Intelence by a doctor who was not a speaker, but then switched doctors and was treated by a doctor-speaker, the doctor-speaker's Prezista or Intelence prescriptions were caused by Janssen's payments to the speaker. In other words, now the doctor who starts a patient on Prezista or Intelence does not matter to Professor Shaked. This assumption is not supported by the facts in this case.

17.    Professor Shaked did not develop any of these assumptions and does not have the requisite education or professional experience to opine on whether these assumptions are accurate or supported by the facts.

18.    Building on his incorrect and unsupported assumptions, Professor Shaked performed a simplistic correlation analysis that does not account for any confounding factors to opine that Janssen caused every Prezista or Intelence prescription that he has deemed improper and prescribed in violation of the False Claims Act.

19.    Professor Shaked assumed (without analysis) that Medicare's, Medicaid's, and ADAP's actual damages are the full amounts that those government health insurance programs paid for those supposedly improper and unlawful prescriptions.

***Dr. Jena will deduct Prezista and Intelence claims that were not caused by Janssen and/or did not result in damages to the Government.***

20.    Dr. Jena, using his experience and expertise as a doctor and economist, will remove claims for reimbursement for Prezista or Intelence prescriptions that Janssen did not cause, and/or that did not result in damages to the Government.

21.    Dr. Jena's deductions are necessary to estimate the Government's actual damages, if any.

22.    Dr. Jena's deductions include:

  i. Prezista and Intelence prescriptions that were likely written because patients needed to take Prezista or Intelence.

  ii. Prezista and Intelence prescriptions to patients who were successfully treated with Prezista or Intelence.

  iii. Prezista and Intelence prescriptions written by doctors who had successfully treated other patients with Prezista or Intelence.

  iv. Medicaid rebates—that is, money that Janssen credited to Medicaid for Prezista and Intelence.

  v. Prezista and Intelence prescriptions when the Government received the benefit of the bargain because patients were successfully treated with Prezista or Intelence.

  vi. The cost of alternative HIV medications.

23.    Dr. Jena will further correct several errors Professor Shaked made when applying his proffered methodologies to reach his opinions.

24.    Dr. Jena's analyses—which accurately rely on the facts in this case—will substantially reduce the maximum potential damages in this case.

**6.  RELATORS' WITNESSES** (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).

  **A.  On liability, Relators intend to call the following fact witnesses who will testify in accordance with the following summaries:**

  1.  **Relator Christine Brancaccio**, 14 Whitehall Court, Holbrook, NY 11741. Ms.

**Appx142**

Brancaccio worked as a Janssen sales representative from 2006 to 2014 in the New York One District, which encompassed the territories of Long Island and Queens. She continues to work at Janssen today. She is expected to testify in conformity with the factual allegations in her Second Amended Complaint, discovery responses, and deposition testimony. In general, her testimony will include facts regarding: Janssen's company-wide off-label marketing and Speaker Program/kickback schemes relating to its prescription HIV/AIDS treatment drugs Prezista and Intelence; Prezista's and Intelence's FDA approved uses and indications, and limited marketability; senior personnel's illegal efforts and directives given to Janssen employees aimed toward increasing sales of these drugs; Janssen's pressure on sales representatives and others to participate in the off-label marketing and kickback schemes; off-label marketing that occurred on sales calls, which included the improper use of off-label studies and improper use of Medical Information Request forms; Janssen's tracking of doctors' prescriptions before and after sales calls and paid speeches; the effect of off-label promotion on doctors' prescription behavior and sales; Janssen's use of Return on Investment analyses; the Janssen's use and improper implementation of the Speaker Program as a means to induce (and/or reward) paid doctors to prescribe Prezista and Intelence, including for off-label purposes, and to disseminate off-label information to doctors; the practice of not reporting off-label marketing activity out of fear of retaliation; the practice of not committing illegal or improper practices to writing; and Janssen's submission of false claims for reimbursement to Government Health Care Programs.

2. **Relator Jessica Penelow**, 30 Heron Road, Livingston, NJ 07039. Ms. Penelow served as a Janssen sales representative from 2006 to 2013 in the New York One District for the lower east side of Manhattan territory. She was forced out of Janssen in 2013 because of the pressure to promote the drugs off label. She is expected to testify in conformity with the factual allegations in her Second Amended Complaint, discovery responses, and deposition testimony. In general, her testimony will include facts regarding: Janssen's company-wide off-label marketing and Speaker Program/kickback schemes relating to its prescription HIV drugs Prezista and Intelence; Prezista's and Intelence's FDA approved uses and indications, and limited marketability; senior personnel's illegal efforts and directives given to Janssen employees aimed toward increasing sales of these drugs; Janssen's pressure on sales representatives and others to participate in the off-label marketing and kickback schemes; off-label marketing that occurred on sales calls, which included the improper use of off-label studies and improper use of Medical Information Request forms; Janssen's tracking of doctors' prescriptions before and after sales calls and paid speeches; the effect of off-label promotion on doctors' prescription behavior and sales; Janssen's use of Return on Investment analyses; Janssen's use and improper implementation of the Speaker Program as a means to induce (and/or reward) paid doctors to prescribe Prezista and Intelence, including for off-label purposes, and to disseminate off-label information to doctors; the practice of not reporting off-label marketing activity out of fear of retaliation; the practice of not committing illegal or improper practices to writing; and Janssen's submission of false claims

for reimbursement to Government Health Care Programs.

3. **Mark Wilhelm**, 24954 North Turkey Creek Road, Evergreen, CO 80439. Mr. Wilhelm served as a Key Account Director for the West from 2006 to 2009, whereby he oversaw all of the Key Account Managers, sales representatives, doctors' accounts, and sales of Prezista and Intelence in 30 states in the West. He is expected to testify in conformity with his deposition testimony. In general, his testimony will include the facts regarding: Janssen's company-wide off-label marketing and Speaker Program/kickback schemes relating to its prescription HIV drugs Prezista and Intelence; Prezista's and Intelence's FDA approved uses and indications, and limited marketability; Prezista's initial sales being far below forecasts; senior executives' illegal efforts and directives given to Janssen employees aimed toward increasing sales of these drugs; Janssen's pressure on sales representatives and others to participate in the off-label marketing and kickback schemes; off-label marketing that occurred on sales calls, which included the improper use of off-label studies and improper use of Medical Information Request forms; Janssen's tracking of doctors' prescriptions before and after sales calls and paid speeches; the effect of off-label promotion on doctors' prescription behavior and sales; Janssen's use of Return on Investment analyses; Janssen's use and improper implementation of the Speaker Program, Advisory Board meetings, training sessions, and other marketing events as a means to induce (and/or reward) paid doctors to prescribe Prezista and Intelence, including for off-label purposes, and to disseminate off-label information to doctors; Janssen's company-wide practice of not committing illegal or improper practices to writing; and Janssen's submission of false claims for reimbursement to Government Health Care Programs.

4. **Sara Strand**, 21 East Huron Street, #805, Chicago, IL 60611. Ms. Strand served as the Regional Business Director for the East from 2006 to 2011, where she oversaw District Managers, sales representatives, doctors' accounts, and sales of Prezista and Intelence in the East. She is expected to testify in conformity with her deposition testimony. In general, her testimony will include the facts regarding: Janssen's company-wide off-label marketing and Speaker Program/kickback schemes relating to its prescription HIV drugs Prezista and Intelence; Prezista's and Intelence's FDA approved uses and indications, and limited marketability; Prezista's initial sales being far below forecasts; senior executives' illegal efforts and directives given to Janssen employees aimed toward increasing sales of these drugs; Janssen's pressure on sales representatives and others to participate in the off-label marketing and kickback schemes; off-label marketing that occurred on sales calls, which included the improper use of off-label studies and improper use of Medical Information Request forms; Janssen's tracking of doctors' prescriptions before and after sales calls and paid speeches; the effect of off-label promotion on doctors' prescription behavior and sales; Janssen's use of Return on Investment analyses; Janssen's use and improper implementation of the Speaker Program, Advisory Board meetings, training sessions, and other marketing events as a means to induce (and/or reward) paid doctors to prescribe Prezista and Intelence,

including for off-label purposes, and to disseminate off-label information to doctors; Janssen's company-wide practice of not committing illegal or improper practices to writing; and Janssen's submission of false claims for reimbursement to Government Health Care Programs.

5. **Donna Graham**, 24954 North Turkey Creek Road, Evergreen, CO 80439. Ms. Graham served as a sales representative from 2006 to 2007 and then 2009 to 2011, and as Janssen's National Sales Trainer from 2007 to 2009 where she trained all of the sales representatives and Key Account Managers across the country how to promote Prezista and Intelence. She is expected to testify in conformity with her deposition testimony. In general, her testimony will include the facts regarding: Janssen's company-wide off-label marketing and Speaker Program/kickback schemes relating to its prescription HIV drugs Prezista and Intelence; Prezista's and Intelence's FDA approved uses and indications, and limited marketability; senior executives' illegal efforts and directives given to Janssen employees aimed toward increasing sales of these drugs, including their directives given directly to her to train sales representatives and others to promote the drugs for off-label purposes; Janssen's pressure on sales representatives and others to participate in the off-label marketing and kickback schemes; off-label marketing that occurred on sales calls, which included the improper use of off-label studies and improper use of Medical Information Request forms; Janssen's tracking of doctors' prescriptions before and after sales calls and paid speeches; the effect of off-label promotion on doctors' prescription behavior and sales; Janssen's use of Return on Investment analyses; Janssen's use and improper implementation of the Speaker Program, Advisory Board meetings, training sessions, and other marketing events as a means to induce (and/or reward) paid doctors to prescribe Prezista and Intelence, including for off-label purposes, and to disseminate off-label information to doctors; Janssen's company-wide practice of not committing illegal or improper practices to writing; and Janssen's submission of false claims for reimbursement to Government Health Care Programs.

6. **Matthew Grooms**, 10810 Northeast 106th Terrace, Kansas City, MO 64157. Mr. Grooms served as a sales representative from 2006 to 2010 who sold Prezista and Intelence to doctors in states located in the Mid-South District. He is expected to testify in conformity with his deposition testimony. In general, his testimony will include facts regarding: Janssen's company-wide off-label marketing and Speaker Program/kickback schemes relating to its prescription HIV drugs Prezista and Intelence; Prezista's and Intelence's FDA approved uses and indications, and limited marketability; senior personnel's illegal efforts and directives given to Janssen employees aimed toward increasing sales of these drugs; Janssen's pressure on sales representatives and others to participate in the off-label marketing and kickback schemes; off-label marketing that occurred on sales calls, which included the improper use of off-label studies and improper use of Medical Information Request forms; Janssen's tracking of doctors' prescriptions before and after sales calls and paid speeches; the effect of off-label promotion on doctors' prescription behavior and sales; Janssen's use of

Return on Investment analyses; Janssen's use and improper implementation of the Speaker Program as a means to induce (and/or reward) paid doctors to prescribe Prezista and Intelence, including for off-label purposes, and to disseminate off-label information to doctors; the practice of not committing illegal or improper practices to writing; and Janssen's submission of false claims for reimbursement to Government Health Care Programs.

7. **Joseph Holshoe**, 1315 Bastogne Court, Fort Wainwright, AK 99703. Mr. Holshoe served as a sales representative from 2006 to 2009 who sold Prezista and Intelence to doctors in states located in the New England District. He is expected to testify in conformity with his deposition testimony. In general, his testimony will include the facts regarding: Janssen's company-wide off-label marketing and Speaker Program/kickback schemes relating to its prescription HIV drugs Prezista and Intelence; Prezista's and Intelence's FDA approved uses and indications, and limited marketability; senior executives' illegal efforts and directives given to Janssen employees aimed toward increasing sales of these drugs; Janssen's pressure on sales representatives and others to participate in the off-label marketing and kickback schemes; off-label marketing that occurred on sales calls, which included the improper use of off-label studies and improper use of Medical Information Request forms; Janssen's tracking of doctors' prescriptions before and after sales calls and paid speeches; the effect of off-label promotion on doctors' prescription behavior and sales; Janssen's use of Return on Investment analyses; Janssen's use and improper implementation of the Speaker Program as a means to induce (and/or reward) paid doctors to prescribe Prezista and Intelence, including for off-label purposes, and to disseminate off-label information to doctors; the practice of not committing illegal or improper practices to writing; and Janssen's submission of false claims for reimbursement to Government Health Care Programs.

8. **Michael Schiff**, 1220 Fair Oaks Avenue, Oak Park, IL 60302. Michael Schiff is the corporate representative of nonparty Partners in Loyalty Marketing, Inc. ("PILM"). He is expected to testify in conformity with his deposition testimony. His expected testimony will include the facts regarding PILM's Return on Investment analyses ("ROI") performed for Janssen in connection with its Speaker Program, the PILM reports about ROI, and Janssen's purpose behind its Speaker Program as it relates to doctors' prescriptions.

9. **Michael Iacobellis**, 4475 Allegiance Street, Center Valley, PA 18034. Mr. Iacobellis was the National Sales Director from April 2008 to June 2011, where he led the sales organization relative to their products. He is expected to testify in conformity with his deposition testimony. This includes facts regarding: Janssen's marketing and sale of Prezista and Intelence; that Prezista was Janssen's first HIV drug on the market; Prezista's and Intelence's FDA approved uses and indications, and limited marketability; Prezista's sales being below forecasts after its launch; discussions and meetings among senior executives and others on how to promote and market the drugs in order to increase their sales; Janssen's expectations, monitoring, and evaluation of sales

**Appx146**

representatives regarding sales; Janssen's tracking of doctors' prescriptions, including speakers; Janssen's use of and tracking of Medical Information Request forms; Janssen's use and implementation of the Speaker Program which was aimed toward increasing paid speakers' and attendees' prescriptions; Janssen's use and implementation of Advisory Boards; Janssen's targeting of doctors who accounted for the majority of prescription volume; Janssen's tracking of sales, including off-label sales; Janssen's use of marketing research reports and their findings; and the submission of claims to Government Health Care Programs.

10. **Glenn Mattes**, 4524 Everview Drive, Doylestown, Pa. 18902. Mr. Mattes was Janssen's President from 2006 to 2011. He is expected to testify in conformity with his deposition testimony. This includes facts regarding: Janssen's marketing and sale of Prezista and Intelence; that Prezista was Janssen's first HIV drug on the market; Prezista's and Intelence's FDA approved uses and indications, which limited the drugs' marketability and sales; Prezista's sales being below forecasts after its launch; discussions and meetings among senior executives and others regarding the drugs' uses and unapproved off-label uses, and how to promote and market the drugs in order to increase their sales; Janssen's expectations, monitoring, and evaluations of sales representatives regarding sales; Janssen's tracking of doctors' prescriptions, including speakers' prescriptions; Janssen's use of and tracking of Medical Information Request forms; the use of marketing research reports and their findings; Janssen's tracking of sales, including off-label sales; Janssen's use and implementation of the Speaker Program which caused an increase in paid speakers' and attendees' prescriptions; Janssen's use and implementation of Advisory Boards; Janssen's analysis of Return on Investment relating to its Speaker Program; Janssen's Corporate Integrity Agreements and Certificates of Compliance; and the submission of claims to Government Health Care Programs.

11. **Mark Gossett**, 316 Valdez Avenue, Half Moon Bay, Ca. Mr. Gossett served as Janssen's Vice President of Sales and Marketing from March 2007 to January 2010. He is expected to testify in conformity with his deposition testimony. This includes facts regarding: Janssen's marketing and sale of Prezista and Intelence; that Prezista was Janssen's first HIV drug on the market; Prezista's and Intelence's FDA approved uses and indications, which limited the drugs' marketability and sales; Prezista's sales being below forecasts after its launch; discussions and meetings among senior executives and others regarding the drugs' uses and unapproved off-label uses, and how to promote and market the drugs in order to increase their sales; the drugs' approved and unapproved market segments; Janssen's expectations, monitoring, and evaluations of sales representatives regarding sales; Janssen's tracking of doctors' prescriptions, including speakers' prescriptions; Janssen's use of and tracking of Medical Information Request forms; the use of marketing research reports and their findings; Janssen's use and funding of off-label studies; Janssen's tracking of sales, including off-label sales; Janssen's long term planning and sales forecasts, including for off-label uses; Janssen's use and implementation of the Speaker

Program which caused an increase in paid speakers' and attendees' prescriptions; Janssen's use and implementation of Advisory Boards; Janssen's analysis of Return on Investment relating to its Speaker Program; Janssen's Certificates of Compliance; and the submission of claims to Government Health Care Programs.

12. **Nancy Bartnett**, 323 Avenue A, Bayonne, NJ. Ms. Bartnett served as a Key Account Manager at Janssen beginning in 2006. She was later assigned to oversee the New York District around 2009. She is currently employed by Janssen. Ms. Bartnett is expected to testify in conformity with her deposition testimony. This includes facts regarding: Janssen's marketing and sale of Prezista and Intelence; Prezista's and Intelence's FDA approved uses and non-approved uses; discussions and meetings regarding how to promote and market the drugs in order to increase their sales; Janssen's monitoring and evaluation of sales representatives regarding sales; her oversight of and participation on sales calls and promotion of the drugs; Janssen's use of off-label studies; Janssen's tracking of doctors' prescriptions, including speakers; Janssen's use of and tracking of Medical Information Request forms; Janssen's tracking of sales; Janssen's use and implementation of the Speaker Program, including whether the Program was used to disseminate off-label information; Return on Investment analyses regarding the Speaker Program; and Janssen's use and implementation of Advisory Boards.

13. **Anthony Dolisi**, 112 Coverly Place, Melville, NY 11747. Mr. Dolisi was a director of health sciences at Janssen in 2005 to 2006, a Key Account Director for the East in 2007 to 2008, and a District Manager from 2009 to 2015. As a Key Account Director, he handled key accounts in the Northeast. As a District Manager, he was responsible for New York South, which included Staten Island, Brooklyn, Queens, and Long Island. In that role, he oversaw the sales activities of the two Relators. Mr. Dolisi is expected to testify in conformity with his deposition testimony. This includes facts regarding: Janssen's marketing and sale of Prezista and Intelence; Prezista's and Intelence's FDA approved uses and non-approved uses; Prezista's sales being below forecasts; discussions and meetings with senior management and others regarding how to promote and market the drugs in order to increase their sales; Janssen's monitoring, evaluation, and compensation of sales representatives regarding sales; his oversight of Relators' sales calls and promotion of the drugs; Janssen's dissemination of off-label studies and information to sales representatives; Janssen's tracking of doctors' prescriptions, including speakers; Janssen's use of and tracking of Medical Information Request forms; Janssen's use and implementation of the Speaker Program, including whether the Program was used to disseminate off-label information; Janssen's marketing efforts aimed toward institutions; Return on Investment analyses regarding the Speaker Program; and Janssen's use and implementation of Advisory Boards. Mr. Dolisi refused to answer any questions posed by the Government as part of a Civil Demand Investigation, whereby he exercised his right against self-incrimination under the Fifth Amendment.

**Appx148**

14. **Benjamin Kozub**, 246 Corbett Avenue, San Francisco, CA 94114. Mr. Kozub started work at Janssen in 2007 where he served as Product Director over Prezista, and Cross-Regional Brand Lead over Intelence, whereby he oversaw the marketing of the drugs. He left Janssen in October 2011. Mr. Kozub is expected to testify in conformity with his deposition testimony. This includes facts regarding: Janssen's marketing and sale of Prezista and Intelence; Prezista's and Intelence's FDA approved and non-approved uses and market segments, and limitations on the drugs' marketability; discussions and meetings regarding how to promote and market the drugs in order to increase their sales; Janssen's consideration of performing trials or studies regarding Intelence once a day dosing, and sales forecasts based on such dosing; Janssen's use of off-label studies; Janssen's tracking of doctors' prescriptions, including speakers; Janssen's tracking of sales, including off-label sales; Janssen's use of marketing research reports; Janssen's use of and tracking of Medical Information Request forms; Janssen's use and implementation of the Speaker Program; Janssen's marketing efforts aimed toward institutions; Return on Investment analyses regarding the Speaker Program; and Janssen's use and implementation of Advisory Boards.

15. **Debbie Kenworthy**, 1125 Trenton Harbourton Road, Titusville, NJ. Ms. Kenworthy started work at Janssen in 2010. From 2010 to 2015, she worked in Insight and Analytics, which involved marketing research, sales, and forecasting. Ms. Kenworthy is expected to testify in conformity with her deposition testimony. This includes facts regarding: Janssen's marketing and sale of Prezista and Intelence; Prezista's and Intelence's FDA approved and non-approved uses; discussions and meetings regarding how to promote and market the drugs in order to increase their sales; Janssen's tracking of sales and doctors' prescriptions, including off-label sales and prescriptions; Janssen's marketing and field surveys and research used to guide Janssen's marketing messages and aid the sales representatives; Janssen's use of marketing research reports; Janssen's use of and tracking of Medical Information Request forms.

16. **Catherine Kaucher**, 246 Pierce Street, Philadelphia, PA 19148. In 2006, Ms. Kaucher worked in the Compliance Department as an Oversight and Monitoring Analyst. She then served as the Compliance Officer from 2011 to 2015. Ms. Kaucher is expected to testify in conformity with her deposition testimony. This includes facts regarding: Janssen's marketing and sale of Prezista and Intelence; the Compliance Department's policies and responsibilities regarding Janssen's promotion and sale of Prezista and Intelence, Janssen's Speaker Program, Janssen's use of Advisory Boards, and Janssen's use of Medical Request Forms; Compliance's responsibility over inquiries, audits, and investigations; Janssen's Corporate Integrity Agreements and their requirements.

17. **Russell Moyer**, Pelham, New Hampshire. Mr. Moyer served as a sales representative who sold Prezista and Intelence to doctors in states located in the New England District. He is expected to testify about Prezista's and Intelence's FDA approved uses and indications, and limited marketability; senior

personnel's efforts and directives given to Janssen employees aimed toward increasing sales of these drugs; Janssen's pressure on sales representatives to meet their sales goals; Janssen's marketing of these drugs through sales calls; Janssen's use of off-label studies regarding these drugs; Janssen's use of and tracking of Medical Information Request forms; the tracking of doctors' prescriptions before and after sales calls and paid speeches; Janssen's use of Return on Investment analyses; Janssen's use and implementation of the Speaker Program; the practice of not committing improper practices to writing; and Janssen's submission of false claims for reimbursement to insurance programs funded by the United States which were ineligible for reimbursement.

18. **Juan Bailey**, Mount Sinai Downtown Union Square Infectious Diseases, 10 Union Square East, New York City, New York 10003. Dr. Bailey was a doctor who prescribed Prezista and Intelence, and he was paid by Janssen to serve on its Speaker Program. He is expected to testify about Janssen's marketing of Prezista and Intelence; Janssen's use and implementation of its Speaker Program, including the manner in which Janssen trained and coached speakers to speak about the drugs, the conditions imposed for serving on the Program and remaining on it, and the fact that he was removed from the Speaker program and the reasons given to him, as well as his understanding of why he was dismissed from the program.

19. Custodian of Records of Advance Health Media, LLC. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

20. Custodian of Records of MedForce, Inc. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

21. Custodian of Records of Partners in Loyalty Marketing, Inc. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

22. Custodian of Records of Centers for Medicare & Medicaid Services ("CMS"). He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

23. Custodian of Records of The AIDS Drug Program ("ADAP"). He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

24. Custodian of Records of Rite Aid Corp. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

25. Custodian of Records of Walgreen Co. He or she is expected to testify about the

documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

26. Custodian of Records of BioScrip, Inc. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

27. Custodian of Records of the U.S Food and Drug Administration. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

28. Custodian of Records of The Division of Drug Marketing, Advertising and Communications ("DDMAC") and/or its successor, the Office of Prescription Drug Promotion. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

29. Custodian of Records of the Department of Justice. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

30. Custodian of Records of ZS Associates. He or she is expected to testify about the documents that were produced in this litigation, the location and collection of those documents, and the authenticity of the documents.

31. Janssen's corporate representative. He or she is expected to testify about facts regarding: Janssen's marketing and sale of Prezista and Intelence; how Prezista was Janssen's first HIV drug on the market; Prezista's and Intelence's FDA approved uses and indications, which limited the drugs' marketability and sales; Prezista's sales being below forecasts after its launch; discussions and meetings among senior executives and others regarding the drugs' uses and unapproved off-label uses, and how to promote and market the drugs in order to increase their sales; Janssen's expectations, monitoring, and evaluations of sales representatives regarding sales; Janssen's tracking of doctors' prescriptions, including speakers' prescriptions; Janssen's use of and tracking of Medical Information Request forms; the use of marketing research reports and their findings; Janssen's tracking of sales, including off-label sales; Janssen's use and implementation of the Speaker Program which caused an increase in paid speakers' and attendees' prescriptions; Janssen's use and implementation of Advisory Boards; Janssen's analysis of Return on Investment relating to its Speaker Program; Janssen's Corporate Integrity Agreements and Certificates of Compliance; and the submission of claims to Government Health Care Programs. S/he will also testify about the authenticity of Janssen's documents.

**B. On damages, Relators intend to call the following fact witnesses who will testify in accordance with the following summaries:**

1. **Mark Wilhelm**, 24954 North Turkey Creek Road, Evergreen, CO 80439. Mr. Wilhelm is expected to testify in conformity with his deposition testimony. This

**Appx151**

includes the facts that Janssen's off-label promotion of Prezista and Intelence was a substantial factor in influencing doctors to prescribe the drugs, and it caused an increase in the drugs' sales. Mr. Wilhelm is also expected to testify that Janssen used its Speaker Program as a means to induce doctors to prescribe Prezista and Intelence, including for off-label purposes. The Speaker Program was profitable for Janssen in that it experienced an increase in prescriptions by speakers and attendees. Janssen caused doctors to submit false claims for reimbursement for Prezista and Intelence to Government Health Care Programs.

2. **Sara Strand**, 21 East Huron Street, #805, Chicago, IL 60611. Ms. Strand is expected to testify in conformity with her deposition testimony. This includes the facts that Janssen's off-label promotion of Prezista and Intelence was a substantial factor in influencing doctors to prescribe the drugs, and it caused an increase in the drugs' sales. Ms. Strand is also expected to testify that Janssen used its Speaker Program as a means to induce doctors to prescribe Prezista and Intelence, including for off-label purposes. The Speaker Program was profitable for Janssen in that it experienced an increase in prescriptions by speakers and attendees. When Jansen engaged in the off-label promotion of the drugs to doctors, the doctors then prescribed the drugs to patients covered by Government Health Care Programs.

**C. Janssen objects to the following fact witnesses for the reasons stated:**

1. **Janssen's objections to Christine Brancaccio:** Janssen objects to Ms. Brancaccio's testimony to the extent that her testimony would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

2. **Janssen's objections to Jessica Penelow:** Janssen objects to Ms. Penelow's testimony to the extent that her testimony would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

3. **Janssen's objections to Mark Wilhelm:** Janssen objects to Mr. Wilhelm's testimony to the extent that his testimony would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

4. **Janssen's objections to Sara Strand:** Janssen objects to Ms. Strand's testimony to the extent that her testimony would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

5. **Janssen's objections to Donna Graham:** Janssen objects to Ms. Graham's testimony to the extent that her testimony would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

6. **Janssen's objections to Matthew Grooms:** Janssen objects to Mr. Groom's testimony to the extent that his testimony would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

7. **Janssen's objections to Joseph Holshoe:** Janssen objects to Mr. Holshoe's testimony to the extent that his testimony would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

8. **Janssen's objections to Michael Schiff:** Janssen objects to the extent that Relators' description of Mr. Schiff's expected testimony mischaracterizes Mr. Schiff's prior testimony at his deposition.

9. **Janssen's objections to Michael Iacobellis:** Janssen objects to the extent that Relators' description of Mr. Iacobellis's expected testimony mischaracterizes Mr. Iacobellis's prior testimony at his deposition.

10. **Janssen's objections to Glenn Mattes:** Janssen objects to the extent that Relators' description of Mr. Mattes's expected testimony mischaracterizes Mr. Mattes's prior testimony at his deposition.

11. **Janssen's objections to Mark Gossett:** Janssen objects to the extent that Relators' description of Mr. Gossett's expected testimony mischaracterizes Mr. Gossett's prior testimony at his deposition.

12. **Janssen's objections to Nancy Bartnett:** Janssen objects to the extent that Relators' description of Ms. Bartnett's expected testimony mischaracterizes Ms. Bartnett's prior testimony at her deposition.

13. **Janssen's objections to Anthony Dolisi:** Janssen objects to the extent that Relators' description of Mr. Dolisi's expected testimony mischaracterizes Mr. Dolisi's prior testimony at his deposition.

14. **Janssen's objections to Benjamin Kozub:** Janssen objects to the extent that Relators' description of Mr. Kozub's expected testimony mischaracterizes Mr. Kozub's prior testimony at his deposition.

15. **Janssen's objections to Debbie Kenworthy:** Janssen objects to the extent that Relators' description of Ms. Kenworthy's expected testimony mischaracterizes Ms. Kenworthy's prior testimony at her deposition.

16. **Janssen's objections to Catherine Kaucher:** Janssen objects to the extent that Relators' description of Ms. Kaucher's expected testimony mischaracterizes Ms. Kaucher's prior testimony at her deposition.

17. **Janssen's objections to Russ Moyer:** Janssen objects to Mr. Moyer's testimony to the extent that his testimony would include facts outside of his personal knowledge, or

would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

18. **Janssen's objections to Juan Bailey:** Janssen objects to Dr. Bailey's testimony to the extent that his testimony would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Evid. 602 & 701, respectively.

19. **Janssen's objections to alleged testimony of "Janssen's corporate representative":** Janssen objects to Relators' attempt to call a Rule 30(b)(6) deposition witness as a trial witness. During discovery, Relators noticed a Rule 30(b)(6) deposition and then voluntarily withdrew their notice, waiving their right to seek or use such testimony at trial. "Federal Rule of Civil Procedure 30(b)(6) allows corporate representatives to testify to matters within the corporation's knowledge during deposition, and Rule 32(a)(3) permits an adverse party to use that deposition testimony during trial." *Union Pump Co. v. Centrifugal Tech., Inc*., 404 F. App'x 899, 907-08 (5th Cir. 2010). At trial, "[h]owever, a corporate representative may not testify to matters outside his own personal knowledge 'to the extent that information [is] hearsay not falling within one of the authorized exceptions.'" *Id.*; *see also TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 454 (M.D. Pa. 2013) ("Although Rule 30(b)(6) allows a corporate designee to testify to matters within the corporation's knowledge during deposition, at trial the designee 'may not testify to matters outside his own knowledge to the extent that information is hearsay not falling within one of the authorized exceptions.'"). Relators may question current and former Janssen employees at trial, including any question regarding authenticity of documents. And, those witnesses will testify based on their personal knowledge. Relators are not, however, entitled to demand the testimony of a Janssen corporate representative at trial, and the Court should preclude Relators from doing so. Additionally, a Janssen corporate representative is not necessary to authenticate documents because Janssen is not objecting to the authenticity of the documents produced from its employees' Janssen files, except for certain documents that were saved to Relators Christine Brancaccio's files and that do not appear to be authentic business records.

20. **Janssen's objections to Mark Wilhelm's damages testimony**: Janssen objects to Mr. Wilhelm testifying regarding damages. Mr. Wilhelm has no personal knowledge to testify regarding any alleged damages to Medicare, Medicaid or ADAP.

21. **Janssen's objections to Sara Strand's damages testimony**: Janssen objects to Ms. Strand testifying regarding damages. Ms. Strand has no personal knowledge to testify regarding any alleged damages to Medicare, Medicaid or ADAP.

### 7. JANSSEN'S WITNESSES

#### A. On liability, Janssen intends to call the following fact witnesses who will testify in accordance with the following summaries:

1. **Andre Brutus**. 1 Brookdale Plaza, Brooklyn NY 11212. Dr. Brutus is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Brutus also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

2. **Robert Chavez.** 24 E. 12th Street, New York NY 10003. Dr. Chavez is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Chavez also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

3. **Douglas Cunningham.** 4350 North 19th Ave. Suite 6, Phoenix AZ 85015. Dr. Cunningham is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Cunningham also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

4. **Patrick Dalton.** 54 W. 16th Street APT 98, New York NY 10011. Dr. Dalton is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Dalton also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

5. **Raymond Elliott.** 1111 W Broward Blvd, Fort Lauderdale FL 33312. Dr. Elliott is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Elliott also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

6. **Joe Eron.** 101 Manning Drive, Chapel Hill NC 27514. Dr. Eron is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Eron ialso expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

7. **Ian Frank.** 210 S. 25th Street, Unit 405, Philadelphia PA 19103. Dr. Frank is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Frank also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

**Appx155**

8. **Jeffrey Green.** 71 Bristol Dr., Boynton Beach FL 33436.  Dr. Green is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Green also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

9. **Ricky Hsu.** 154 W. 14th Street, New York NY 10001.  Dr. Hsu is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Hsu also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

10. **Don Kaminsky.** 10 Union Square East, New York NY 10003.  Dr. Kaminsky is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Kaminsky also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

11. **Alex McMeeking**. 110 E. 40th Street, New York NY 10016. Dr. McKeeking is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. McKeeking  also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about  Janssen's speaker programs. (Live, live remote, or by trial deposition)

12. **Anthony Mills.** 9201 W Sunset Blvd, Ste. 812, Los Angeles CA 90069. Dr. Mills is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Mills also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs.

13. **HarishMoorjani**. 302 Chappaqua Rd, Briarcliff Manor NY 10510. Dr. Moorjani is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Moorjani also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

14. **Frank Palella.** 645 North Michigan Ave. Suite 900, Chicago IL 60611. Dr. Palella is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Palella also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

15. **Elizabeth Race.** 3208 Beverly Drive, Dallas TX 75205. Dr. Race is expected to testify about when, how and why she prescribes Prezista and Intelence to HIV-positive patients.  Dr. Race also is expected to testify about how Janssen accurately and

truthfully promoted Prezista and Intelence, and about  Janssen's speaker programs. (Live, live remote, or by trial deposition)

16. **Bruce Rashbaum.** 1640 Rhode Island Ave. NW, Suite 800, Washington DC 20036. Dr. Rashbaum is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Rashbaum also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

17. **David Rubin.** 138-47 Horace Harding Expressway, 2nd FL, Queens NY 11367. Dr. Rubin is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Rubin also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

18. **Nadim Salomon.** 317 E. 17th Street, New York NY 10003. Dr. Salomon is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Salomon also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

19. **Shannon Schrader.** 4101 Greenbriar, Suite 200, Houston TX 77098. Dr. Schrader is expected to testify about when, how and why she prescribes Prezista and Intelence to HIV-positive patients.  Dr. Schrader also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and abuot Janssen's speaker programs. (Live, live remote, or by trial deposition)

20. **Sorona Segal-Mauer.** 138-47 Horace Harding Expressway, 2nd FL, Queens NY 11367. Dr. Segal-Mauer is expected to testify about when, how and why she prescribes Prezista and Intelence to HIV-positive patients.  Dr. Segal-Mauer also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

21. **Michael Sension.** 1101 NW 1st Street, Ft. Lauderdale FL 33311. Dr. Sension is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Sension also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

22. **Stanley Yancovitz**. 5900 Arlington Avenue, Apt. 9U, Bronx NY 10471. Dr. Yancovitz is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Dr. Yancovitz also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

23. **Kathy Aratoon.** 8268 164th Street, Queens NY 11432. Ms. Aratoon is expected to testify about when, how and why she prescribes Prezista and Intelence to HIV-positive patients.  Ms. Aratoon also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

24. **Abby Freedberg.** 31 Washington Sq FL 4, New York NY 10011. Ms. Freedberg is expected to testify about when, how and why she prescribes Prezista and Intelence to HIV-positive patients.  Dr. Freedberg also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

25. **Rita Kelly.** 205 Belle Mead Ave, East Setauket NY 11733. Ms. Kelly is expected to testify about when, how and why she prescribes Prezista and Intelence to HIV-positive patients.  Ms. Kelly also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

26. **Mark  Miller.** 275 7th Ave., 12th Floor, New York NY 10011. Mr. Miller is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients.  Ms. Miller also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

27. **Linda Ording-Bauer.** 205 Belle Mead Ave, East Setauket NY 11733. Ms. Ording-Bauer is expected to testify about when, how and why she prescribes Prezista and Intelence to HIV-positive patients.  Ms. Ording-Bauer also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

28. **Karen Weisz.** 3330 Noyac Rd BLDG A, Sag Harbor NY 11963. Ms. Weisz is expected to testify about when, how and why she prescribes Prezista and Intelence to HIV-positive patients.  Ms. Weisz also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

29. **Michael Daly.** 1215 Waverly Walk, Philadelphia PA 19147. Mr. Daly is expected to testify regarding his role and responsibilities in Janssen's Marketing department, including how Marketing developed promotional messages and oversaw Janssen's various speaker programs.  Mr. Daly is further expected to testify regarding how Marketing worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs. (Live)

30. **Jason Kenig.**  Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Mr. Kenig is expected to testify regarding his role and responsibilities in Janssen's Marketing department, including how Marketing developed promotional

**Appx158**

messages and oversaw Janssen's various speaker programs. Mr. Kenig is further expected to testify regarding how Marketing worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs. (Live)

31. **Ben Kozub.** 246 Corbett Ave, San Francisco CA 94114. Mr. Kozub is expected to testify regarding his role and responsibilities in Janssen's Marketing department, including how Marketing developed promotional messages and oversaw Janssen's various speaker programs. Mr. Kozub is further expected to testify regarding how Marketing worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs. (Live)

32. **Maureen Kushmore.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Ms. Kushmore is expected to testify regarding her role and responsibilities in Janssen's Marketing department, including how Marketing developed promotional messages and oversaw Janssen's various speaker programs. Ms. Kushmore is further expected to testify regarding how Marketing worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs. (Live)

33. **Candice Long.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Ms. Long is expected to testify regarding her role and responsibilities in Janssen's Marketing department, including how Marketing developed promotional messages and oversaw Janssen's various speaker programs. Ms. Long is further expected to testify regarding how Marketing worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs. (Live)

34. **Kim Saladana**. Ms. Saladana currently resides in Canada. Ms. Saladana is expected to testify regarding her role and responsibilities in Janssen's Marketing department, including how Marketing developed promotional messages and oversaw Janssen's various speaker programs. Ms. Saladana is further expected to testify regarding how Marketing worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs. (Live, live remote, or by trial deposition)

35. **Seham (Se-Se) Yennes.** 34 Winding Way, Princeton NJ 08540. Ms. Yennes is expected to testify regarding her role and responsibilities in Janssen's Marketing department, including how Marketing developed promotional messages and oversaw Janssen's various speaker programs. Ms. Yennes is further expected to testify regarding how Marketing worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs. (Live, live remote, or by trial deposition)

36. **Ron Falcon.** 83 Quakertown Rd, Pittstown NJ 08867. Dr. Falcon is expected to testify regarding his role and responsibilities in Janssen's Marketing and Medical departments.

Dr. Falcon is expected to testify regarding how Marketing developed promotional messages, oversaw Janssen's various speaker programs, and worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs.  Dr. Falcon is further expected to testify about how the Medical department reviewed proposed promotional messages and materials, and worked with other Janssen departments to accurately and truthfully market Prezista and Intelence." (Live)

37. **Alexia Burnett Salinas.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Ms. Burnett Salinas is expected to testify regarding her role and responsibilities in Janssen's Sales and Marketing departments.  Ms. Burnett Salinas is expected to testify about how Sales accurately and truthfully promoted Prezista and Intelence to doctors and other healthcare providers.  Ms. Burnett Salinas is further expected to testify that she was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence.  She also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence.  Ms. Burnett Salinas also is expected to testify regarding  how Marketing developed promotional messages, oversaw Janssen's various speaker programs, and worked with other Janssen departments to accurately and truthfully market Prezista and Intelence and to properly use speaker programs. (Live)

38. **Brian Baugh.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Dr. Baugh is expected to testify regarding his role and responsibilities in Janssen's Medical department, including how the Medical department reviewed proposed promotional messages and materials.  Dr. Baugh is further expected to testify regarding how Medical worked with other Janssen departments to accurately and truthfully market Prezista and Intelence. (Live)

39. **Guy De La Rosa.** 538 Shoemaker Dr., Fountainville PA 18923. Dr. De La Rosa is expected to testify regarding his role and responsibilities in Janssen's Medical department, including how the Medical department reviewed proposed promotional messages and materials.  Dr. De La Rosa is further expected to testify regarding how Medical worked with other Janssen departments to accurately and truthfully market Prezista and Intelence. (Live)

40. **Jim Witek.** 7412 Ferry Rd., New Hope PA 18938. Dr. Witek is expected to testify regarding his role and responsibilities in Janssen's Medical department, including how the Medical department reviewed proposed promotional messages and materials.  Dr. Witek is further expected to testify regarding how Medical worked with other Janssen departments to accurately and truthfully market Prezista and Intelence. (Live)

41. **Michael Iacobellis.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Mr. Iacobellis is expected to testify regarding his role and responsibilites in Janssen's Sales department, including how Sales accurately and truthfully marketed Prezista and Intelence to doctors and other healthcare providers.

Appx160

Mr. Iacobellis is further expected to testify that he was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence. Mr. Iacobellis also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

42. **Timothy McSherry.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Mr. McSherry is expected to testify regarding his role and responsibilities in Janssen's Sales Department, including how Sales accurately and truthfully promoted Prezista and Intelence to doctors and other healthcare providers. Mr. McSherry is further expected to testify that he was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence. Mr. McSherry also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

43. **Nancy Bartnett.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Ms. Bartnett is expected to testify regarding her role and responsibilities in Janssen's Sales department, including how Sales accurately and truthfully promoted Prezista and Intelence to doctors and other healthcare providers. Ms. Bartnett is further expected to testify that she was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence. Ms. Bartnett also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

44. **Anthony Dolisi.** Reed Smith, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103. Mr. Dolisi is expected to testify regarding his role and responsibilities in Janssen's Sales department, including how Sales accurately and truthfully promoted Prezista and Intelence to doctors and other healthcare providers. Mr. Dolisi is further expected to testify that he was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence.Mr. Dolisi also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

45. **Scott Libby.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Mr. Libby is expected to testify regarding his role and responsibilities in Janssen's Sales department, including how Sales accurately and truthfully promoted Prezista and Intelence to doctors and healthcare providers. Mr. Libby is further expected to testify that he was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence. Mr. Libby also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

46. **Ronald Martin.** 8 Pleasant Ave., Lincoln Park NJ 07035. Mr. Martin is expected to testify regarding his role and responsibilities in Janssen's Sales department, including how Sales accurately and truthfully promoted Prezista and Intelence to doctors and other healthcare providers.  Mr. Martin is further expected to testify regarding how he trained sales representatives and others in the Sales department to accurately and truthfully promote Prezista and Intelence. (Live)

47. **Deb O'Connor.** 213 Neptune Place, Sea Girt NJ 08750. Ms. O'Connor is expected to testify regarding her role and responsibilites in Janssen's Sales department, including how Sales accurately and truthfully marketed Prezista and Intelence to doctors and other healthcare providers.   Ms. O'Connor is further expected to testify that she was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence. Ms. O'Connor also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

48. **Bill Whyte.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Mr. Whyte is expected to testify regarding his role and responsibilities in Janssen's Sales department, including how Sales accurately and truthfully marketed Prezista and Intelence to doctors and other healthcare providers.   Mr. Whyte is further expected to testify that he was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence. Mr. Whyte also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

49. **Doyletta Minix.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933. Ms. Minix is expected to testify regarding her role and responsibilities in Janssen's Sales department, including how Sales accurately and truthfully promoted Prezista and Intelence to doctors and other healthcare providers.  Ms. Minix is further expected to testify that she was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence. Ms. Minix also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

50. **Nancy Peterson.** 95 W River Road W., Rumson NJ 07760.  Ms. Peterson is expected to testify regarding her role and responsibilities in Janssen's Sales department, including how Sales accurately and truthfully promoted Prezista and Intelence to doctors and other healthcare providers.  Ms. Peterson is further expected to testify that she was instructed (and instructed others) to accurately and truthfully promote Prezista and Intelence. Ms. Peterson also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

**Appx162**

51. **Eric Sherr.** 46 Lambert Rd, Cross River NJ 10518. Mr. Sherr is expected to testify regarding his role and responsibilities in Janssen's Sales department, including how Sales accurately and truthfully promoted Prezista and Intelence to doctors and other healthcare providers. Mr. Sherr also is expected to testify that the Sales department properly used speaker programs to market Prezista and Intelence to speaker program attendees and to educate those attendees about HIV treatment options, including Prezista and Intelence. (Live)

52. **Vicky O'Reilly.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933.  Ms. O'Reilly is expected to testify regarding her role and responsibilities in Janssen's Business Analytics department, including how Business Analytics studied the HIV market to develop business plans and forecasts, and to support other Janssen departments.  (Live)

53. **Gregg Ruppersberger.** 1385 Colony Way, Yardley PA 19067.  Mr. Ruppersberger is expected to testify regarding his role and responsibilities in Janssen's Business Analytics department, including how Business Analytics studied the HIV market to develop business plans and forecasts, and to support other Janssen departments.  (Live)

54. **Debbie Kenworthy.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933.  Ms. Kenworthy is expected to testify regarding her role and responsibilities in Janssen's Business Analytics department, including how Business Analytics studied the HIV market to develop business plans and forecasts, and to support other Janssen departments.  (Live)

55. **Mike Driscoll.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933.  Mr. Driscoll is expected to testify regarding his role and responsibilities in Compliance, including how Compliance monitored whether Janssen's efforts to market Prezista and Intelence directly to healthcare providers and to properly use speaker programs complied with company policies.  Mr. Driscoll also is expected to testify about how Compliance worked with and supported other Janssen departments.  (Live)

56. **Catherine Kaucher.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933.  Ms. Kaucher is expected to testify regarding her role and responsibilities in Compliance, including how Compliance monitored whether Janssen's efforts to market Prezista and Intelence directly to healthcare providers and to properly use speaker programs complied with company policies.  Ms. Kaucher also is expected to testify about how Compliance worked with and supported other Janssen departments. (Live)

57. **Erin Parsons.** Johnson & Johnson, 1 Johnson And Johnson Plaza, New Brunswick NJ 08933.  Ms. Parsons is expected to testify regarding her role and responsibilities in Compliance, including how Compliance monitored whether Janssen's efforts to market Prezista and Intelence directly to healthcare providers complied with company policies.  Ms. Parsons also is expected to testify about how Compliance worked with and supported other Janssen departments.  (Live)

**Appx163**

58. **Amit Patel.** 16755 Coyote Drive, #10, San Diego CA 92127. Mr. Patel is expected to testify regarding his role and responsibilities in Compliance, including how Compliance monitored whether Janssen's efforts to market Prezista and Intelence directly to healthcare providers and to properly use speaker programs complied with company policies.  Mr. Patel also is expected to testify about how Compliance worked with and supported other Janssen departments.  (Live, live remote, or by trial deposition)

59. **Michael Schiff.** Douglas Conover, 1901 South Calumet Avenue, No. 1406, Chicago IL 60616. Mr. Schiff is expected to testify about the work he performed for Janssen to evaluate Janssen's consumer and physician marketing programs regarding Prezista, Intelence and HIV.  (Live, live remote, or by trial deposition)

60. **Mark Gossett.** 316 Valdez Ave, Half Moon Bay CA 94019. Mr. Gossett is expected to testify regarding his role and responsibilities as the Vice President of Janssen's HIV business, including how Janssen accurately and truthfully marketed Prezista and Intelence to doctors and other healthcare providers, and properly used speaker programs.  (Live, live remote, or by trial deposition)

61. **Glenn Mattes.** 4524 Everview Drive, Doylestown PA 18902. Mr. Mattes is expected to testify regarding his role and responsibilities as the President of Janssen's HIV business, including how Janssen accurately and truthfully marketed Prezista and Intelence to doctors and other healthcare providers, and properly used speaker programs.  (Live)

62. **H. Clifford Lane.** Paul Robertson, Office of the General Counsel, Public Health Division, NIH Branch, 31 Center Drive - Bldg. 31, Room 2B-50, Bethesda MD 20892. Dr. Lane (a voting member and Co-Chair of the Department of Health and Human Services Panel on Antiretroviral Guidelines for Adults and adolescents, a working group of the Office of AIDS Research Advisory Council (the "Panel")) is expected to testify regarding how the Panel evaluates, considers and recommends HIV treatments cited in the Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents Living with HIV (the "Guidelines"), and (in some instances) makes specific treatment recommendations.  Dr. Lane also is expected to testify that the Guidelines reflect the federal government's position on the standard of care for HIV treatment.  (Live, live remote, or by trial deposition)

63. **B. Kaye Hayes.** Anna Jagelewski, Office of the General Counsel, Public Health Division, Public Health and Science Branch, U.S. Department of Health and Human Services, 200 Independence Avenue, SW, Washington DC 20201. Ms. Hayes (the Executive Director and Designated Federal Officer for the Presidential Advisory Council on HIV/AIDS ("PACHA")) is expected to testify regarding the National HIV/AIDS Strategy ("NHAS") and how PACHA monitors implementation of the NHAS.  Ms. Hayes also is expected to testify about PACHA's recommendations "to ensure that all HIV care providers have the knowledge and training to provide quality HIV care consistent with the latest [HHS] treatment guidelines," and to ensure open access to, and reimbursement of, HIV medications for HIV-positive patients.  (Live, live remote, or by trial deposition)

64. **Cal Cohen.** 17125 Avenue Le Rivage, Boca Raton FL 33496. Dr. Cohen is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Cohen also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

65. **Juan Bailey.** 317 E. 17th Street, New York NY 10003. Dr. Bailey is expected to testify about when, how and why he prescribes Prezista and Intelence to HIV-positive patients. Dr. Bailey also is expected to testify about how Janssen accurately and truthfully promoted Prezista and Intelence, and about Janssen's speaker programs. (Live, live remote, or by trial deposition)

### B. Relators object to the following fact witnesses for the reasons stated:

1. **Relators' objections to Andre Brutus**: Relators object to Dr. Brutus' testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

2. **Relators' objections to Robert Chavez**: Relators object to Dr. Chavez's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

3. **Relators' objections to Douglas Cunningham**: Relators object to Dr. Cunningham's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

4. **Relators' objections to Patrick Dalton**: Relators object to Dr. Dalton's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

5. **Relators' objections to Raymond Elliott**: Relators object to Dr. Elliott's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

6. **Relators' objections to Joe Eron**: Relators object to Dr. Eron's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

**Appx165**

7. **Relators' objections to Ian Frank**: Relators object to Dr. Frank's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

8. **Relators' objections to Jeffrey Green**: Relators object to Dr. Green's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

9. **Relators' objections to Ricky Hsu**: Relators object to Dr. Hsu's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

10. **Relators' objections to Don Kaminsky**: Relators object to Dr. Kaminsky's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

11. **Relators' objections to Alex McMeeking**: Relators object to Dr. McMeeking's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

12. **Relators' objections to Anthony Mills**: Relators object to Dr. Mills' testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

13. **Relators' objections to Harish Moorjani**: Relators object to Dr. Moorjani's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

14. **Relators' objections to Frank Palella**: Relators object to Dr. Palella's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further that Janssen did not provide a sufficient description of his expected testimony herein

15. **Relators' objections to Elizabeth Race**: Relators object to Dr. Race's testimony to the extent that it would include facts outside of her personal knowledge, or would offer

inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

16. **Relators' objections to Bruce Rashbaum**: Relators object to Dr. Rashbaum's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

17. **Relators' objections to David Rubin**: Relators object to Dr. Rubin's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

18. **Relators' objections to Nadim Salomon**: Relators object to Dr. Salomon's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

19. **Relators' objections to Shannon Schrader**: Relators object to Dr. Schrader's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

20. **Relators' objections to Sorona Segal-Maurer**: Relators object to Dr. Segal-Maurer's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

21. **Relators' objections to Michael Sension**: Relators object to Dr. Sension's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

22. **Relators' objections to Stanley Yancovitz**: Relators object to Dr. Yancovtiz's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

23. **Relators' objections to Kathy Aratoon**: Relators object to Ms. Aratoon's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her

**Appx167**

expected testimony herein.

24. **Relators' objections to Abbe Friedberg**: Relators object to Ms. Friedberg's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

25. **Relators' objections to Rita Kelly**: Relators object to Ms. Kelly's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

26. **Relators' objections to Mark Miller**: Relators object to Mr. Miller's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

27. **Relators' objections to Linda Ording-Bauer**: Relators object to Ms. Ording-Bauer's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

28. **Relators' objections to Karen Weisz**: Relators object to Ms. Weisz's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

29. **Relators' objections to Michael Daly**: Relators object to Mr. Daly's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

30. **Relators' objections to Jason Kenig**: Relators object to Mr. Kenig's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

31. **Relators' objections to Ben Kozub**: Relators object to Mr. Kozub's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

32. **Relators' objections to Maureen Kushmore**: Relators object to Ms. Kushmore's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

33. **Relators' objections to Candice Long**: Relators object to Ms. Long's testimony to the

extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

34. **Relators' objections to Kim Saladana**: Relators object to Ms. Saladana's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

35. **Relators' objections to Seham (Se-Se) Yennes**: Relators object to Ms. Yennes' testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

36. **Relators' objections to Ron Falcon**: Relators object to Dr. Falcon's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

37. **Relators' objections to Alexia Burnett Salinas**: Relators object to Ms. Burnett Salinas' testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

38. **Relators' objections to Brian Baugh**: Relators object to Dr. Baugh's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

39. **Relators' objections to Guy De La Rosa**: Relators object to Dr. De La Rosa's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further that Janssen did not provide a sufficient description of his expected testimony herein.

40. **Relators' objections to Jim Witek**: Relators object to Dr. Witek's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

41. **Relators' objections to Michael Iacobellis**: Relators object to Mr. Iacobellis' testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

42. **Relators' objections to Timothy McSherry**: Relators object to Mr. McSherry's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description

of his expected testimony herein.

43. **Relators' objections to Nancy Bartnett**: Relators object to Ms. Bartnett's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

44. **Relators' objections to Anthony Dolisi**: Relators object to Mr. Dolisi's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

45. **Relators' objections to Scott Libby**: Relators object to Mr. Libby's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

46. **Relators' objections to Ronald Martin**: Relators object to Mr. Martin's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

47. **Relators' objections to Deb O'Connor**: Relators object to Ms. O'Connor's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

48. **Relators' objections to Bill Whyte**: Relators object to Mr. Whyte's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

49. **Relators' objections to Doyletta Minix**: Relators object to Ms. Minix's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

50. **Relators' objections to Nancy Peterson**: Relators object to Ms. Peterson's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

51. **Relators' objections to Eric Sherr**: Relators object to Mr. Sherr's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

52. **Relators' objections to Vicky O'Reilly**: Relators object to Ms. O'Reilly's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

**Appx170**

53. **Relators' objections to Gregg Ruppersberger**: Relators object to Mr. Ruppersberger's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

54. **Relators' objections to Debbie Kenworthy**: Relators object to Ms. Kenworthy's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

55. **Relators' objections to Mike Driscoll**: Relators object to Mr. Driscoll's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

56. **Relators' objections to Catherine Kaucher**: Relators object to Ms. Kaucher's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

57. **Relators' objections to Erin Parsons**: Relators object to Ms. Parson's testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

58. **Relators' objections to Amit Patel**: Relators object to Mr. Patel's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

59. **Relators' objections to Michael Schiff**: Relators object to Mr. Schiff's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

60. **Relators' objections to Mark Gossett**: Relators object to Mr. Gossett's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

61. **Relators' objections to Glenn Mattes**: Relators object to Mr. Mattes' testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively.

62. **Relators' objections to H. Clifford Lane**: Relators object to Dr. Lane's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

63. **Relators' objections to B. Kaye Hayes**: Relators object to Ms. Hayes' testimony to the extent that it would include facts outside of her personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of her expected testimony herein.

64. **Relators' objections to Cal Cohen**: Relators object to Dr. Cohen's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

65. **Relators' objections to Juan Bailey**: Relators object to Dr. Bailey's testimony to the extent that it would include facts outside of his personal knowledge, or would offer inadmissible lay opinion testimony. *See* Fed. R. Civ. P. 602 and 701, respectively. Relators further object that Janssen did not provide a sufficient description of his expected testimony herein.

66. **Relators' Note:** Relators object to Janssen taking any trial depositions at this juncture of the case, and presenting any of its witnesses at trial through trial depositions or by remote means. Relators will file a Motion in Limine so that the Court can address this issue in advance of trial. In Relators' view, Janssen should not be permitted to present any witnesses at trial through trial depositions or by remote means. Fact discovery ended in this case over 3 years ago, in March 2019. Janssen has known about the 30 doctors listed on its Witness List since the inception of this case given that they are paid speakers and/or doctors who were subject to Janssen's sales calls (and all or most of them were mentioned in Relators' Complaint or listed in blanket fashion in Janssen's Initial Disclosure Statements). Thus, Janssen had every opportunity to depose these witnesses during the Court-ordered period for fact discovery, but it chose not to do so. There is no Federal Rule of Civil Procedure or Court order that allows Janssen to depose these numerous witnesses at this time, years after fact discovery has ended. In addition, there is nationwide service of process under the False Claims Act, at 31 U.S.C. § 3731(a). This mechanism allows Janssen to present all of its witnesses live at trial. In accordance with Fed. R. Civ. P. 43(a) and case law, trial witnesses should appear live so that the jury can properly assess their demeanor and credibility, and observe Relators' cross examination of them in person.

8. **EXPERT WITNESSES** (No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein).

   **A. Relators' expert witnesses are:**

1. **Virginia Evans. J.D.**, Virginia B. Evans, LLC, 1294 Waldemar Drive, Charlottesville, VA 22903. Ms. Evans will testify in conformity with her Expert Report and deposition testimony. She is expected to testify about facts surrounding, *inter alia,* Janssen's Speaker Program/kickback scheme relating to its prescription HIV drugs Prezista and Intelence; industry standards and government guidance regarding speaker programs; and  Compliance issues surrounding Janssen's Speaker Program and off-label marketing.

2. **Aaron Glatt, M.D.**, Hazel Place, Woodmere, New York 11598. Dr. Glatt will testify in conformity with his Expert Report and deposition testimony. He is expected to testify about, *inter alia,* the background of HIV/AIDs and its treatment; the limited approved uses and indications of Prezista and Intelence; how off-label use of Prezista and Intelence can negatively impact patients' health; how off-label marketing impacts doctors' prescriptions behavior; and the lack of value of Janssen's Speaker Program.

3. **James T. O'Reilly. J.D.**, 24 Jewett Drive, Cincinnati, OH  45215. Mr. O'Reilly will testify in conformity with his Expert Report and deposition testimony. He is expected to

testify about, *inter alia,* Janssen's company-wide off-label marketing scheme relating to Prezista and Intelence; the FDA approval process; the approval process for Prezista and Intelence and related marketing materials; federal laws regarding the misbranding or off-label marketing of drugs; Government reimbursements for Prezista and Intelence; and the materiality of Janssen's conduct to the Government's payment decisions.

4. **Kenneth Schafermeyer, Ph.D.**, Pharmacy Administration Consultants, 5628 N. Magnolia Avenue, St. Louis, MO 63139. Dr. Schafermeyer will testify in conformity with his Expert Report and deposition testimony. He is expected to testify about, *inter alia,* regulatory issues, including the Government payment systems under Medicare Part D, the financial impact of Janssen's conduct on Medicare Part D, and CMS' reimbursement rules for prescriptions that are off-label or not medically necessary.

5. **George P. Sillup, Ph.D.**, M.S., Saint Joseph's University, 5600 City Avenue, Philadelphia, PA 19131. Mr. Sillup will testify in conformity with his Expert Report and deposition testimony. He is expected to testify about, *inter alia,* the facts surrounding Janssen's company-wide off-label marketing and Speaker Program/kickback schemes relating to its prescription HIV drugs Prezista and Intelence; the causal relationship between Janssen's off-label marketing and doctors' prescriptions; Janssen's improper use and implementation of its Speaker Program, including for the purpose of disseminating off-label information about the drugs.

6. **Professor Israel Shaked, Ph.D.**, The Michel-Shaked Group, 2 Park Plaza, Suite 500, Boston, MA 02116. Professor Shaked will testify in conformity with his Expert Reports and deposition testimony. He is expected to testify about, *inter alia,* the prescription claims data, the causal relationship between Janssen's off-label marketing and kickback schemes and doctors' prescriptions of Prezista and Intelence, and damages.

7. **Ian M. Dew**, Steck Consulting, LLC, 2021 L Street, NW, Suite 101-304, Washington, DC 20036. Ian Dew will testify in conformity with his Expert Report and deposition testimony. He is expected to testify about, *inter alia,* the claims data as it relates to liability and damages issues.

 B. **Janssen's objections to the qualifications of Relators' experts are:**

1. **Janssen's objections to Virginia Evans, J.D.:**  Janssen objects to the extent that Relators' description of Ms. Evans' expected testimony includes topics that the Court has previously excluded.  01/10/2022 Order at 31 [D.E. 294].  Janssen further objects to the extent that Relators' description of Ms. Evans' expected testimony includes testimony that would cover topics outside of her expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible.  *See* Fed. R. Evid. 401, 402, 403, 702, & 801 respectively.

2. **Janssen's objections to Aaron Glatt, M.D.:** Janssen objects to the extent that Relators' description of Dr. Glatt's expected testimony includes topics that the Court has previously excluded.  01/10/2022 Order at 27 [D.E. 294].  Janssen further objects to the extent that Relators' description of Dr. Glatt's expected testimony includes testimony that would cover topics outside of his expertise, and/or would be hearsay, irrelevant, or

otherwise inadmissible.  *See* Fed. R. Evid. 401, 402, 403, 702, & 801 respectively.

3. **Janssen's objections to James T. O'Reilly, J.D.:** Janssen objects to the extent that Relators' description of Mr. O'Reilly's expected testimony includes topics that the Court has previously excluded.  01/10/2022 Order at 12 [D.E. 294].  Janssen further objects to the extent that Relators' description of Mr. O'Reilly's expected testimony includes testimony that would cover topics outside of his expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible.  *See* Fed. R. Evid. 401, 402, 403, 702, & 801 respectively.

4. **Janssen's objections to George P. Sillup, Ph.D.:** Janssen objects to the extent that Relators' description of Mr. Sillup's expected testimony includes testimony that would cover topics outside of his expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible.  *See* Fed. R. Evid. 401, 402, 403, 702, & 801 respectively.

5. **Janssen's objections to Israel Shaked, Ph.D.:** Janssen objects to the extent that Relators' description of Professor Shaked's expected testimony includes testimony that would cover topics outside of his expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible.  *See* Fed. R. Evid. 401, 402, 403, 702, & 801 respectively.

6. **Janssen's objections to Ian M. Dew:** Janssen objects to the extent that Relators' description of Mr. Dew's expected testimony includes testimony that would cover topics outside of his expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible.  *See* Fed. R. Evid. 401, 402, 403, 702, & 801 respectively.

   **C. Janssen's expert witnesses are:**

1. **Babette Edgar.** BluePeak Advisors LLC 2652 FM 407, Suite 215, Bartonville TX 76226. Ms. Edgar is expected to testify regarding Medicare Part D's reimbursement of HIV medications, including Prezista and Intelence. (Live)

2. **Jon Smollen.** 2117 Pine Street, Philadelphia PA 19103. Mr. Smollen is expected to testify regarding pharmaceutical industry standards and government guidance regarding the proper use of speaker programs, and Janssen's efforts to comply with industry standards and government guidance. (Live)

3. **Eric Rosenberg, MD.** 87 Hampton Circle, Hull MA 02045. Dr. Rosenberg is expected to testify regarding HIV care and treatment. (Live)

4. **Anupam (Bapu) Jena, MD.** 70 Temple Road, Wellesley MA 02482.  Dr. Jena is expected to testify regarding the factors doctors consider when selecting HIV treatment, as well as the data that would be required, and the methodology that must be used, to reliably evaluate whether Janssen caused doctors to prescribe Prezista or Intelence. Dr. Jena also is expected to testify regarding the data that would be required, and the methodology that must be used, to calculate actual damages in this case if the jury were to find that Janssen violated the False Claims Act. (Live)

**D. Relators' objections to the qualifications of Janssen's experts are:**

1. **Relators' objections to Babette Edgar**: Relators object to Ms. Edgar's testimony to the extent that it would cover topics outside of her expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible. See Fed. R. Evid. 401, 402, 403, 702, 703, and 801, respectively.

2. **Relators' objections to Jon Smollen**: Relators object to Mr. Smollen's testimony to the extent that it would cover topics outside of his expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible. See Fed. R. Evid. 401, 402, 403, 702, 703, and 801, respectively. Relators further object to Mr. Smollen's testimony to the extent that it is inconsistent with evidence in the record.

3. **Relators' objections to Eric Rosenberg, MD:** Relators object to Dr. Rosenberg's testimony to the extent that it would cover topics outside of his expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible. See Fed. R. Evid. 401, 402, 403, 702, 703, and 801, respectively.

4. **Relators' objections to Anupam (Bapu) Jena, MD**: Relators object to Dr. Jena's testimony to the extent that it would cover topics outside of his expertise, and/or would be hearsay, irrelevant, or otherwise inadmissible. See Fed. R. Evid. 401, 402, 403, 702, 703, and 801, respectively. Relators further object to Dr. Jena's testimony to the extent it is contrary to law.

9. **RELATORS' EXHIBITS** (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).

A. **Relators intend to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):**

See attached Exhibit B.

Relators have obtained business record declarations from certain third parties in order to authenticate their documents that appear on Relators' Exhibit Lists. Relators have produced these declarations to Janssen.

B. **Janssen objects to the introduction of Relators' exhibits (set forth number of an exhibit and grounds for objection):**

See Exhibit C for Janssen's objections to Relators' exhibits.

## 10. JANSSEN'S EXHIBITS

### A. Janssen intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

See Exhibit D for Janssen's exhibit list.

### B. Relators object to the introduction of Janssen's exhibits (set forth number of exhibit and grounds for objection):

See Exhibit E for Relators' objections to Janssen's exhibits.

## 11. RELATORS' LEGAL ISSUES

### <u>False, Misleading, Misbranding and Off-Label Marketing Claims</u>

Whether Janssen is liable for violations of Sections 3729(a)(1)(A) and (B) of the federal False Claims Act, 31 U.S.C. 3729, *et seq.* ("FCA") and the analogous provisions of the Plaintiff States' false claims acts ("Plaintiff States' Analogs")[6] as a result of Janssen's false, misleading, misbranding, and/or off-label promotion of two of its HIV/AIDS treatment drugs, Prezista and Intelence.

Specifically, with regard to a violation of Section 3729(a)(1)(A) of the FCA and the Plaintiff States' Analogs, whether Janssen knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States and the Plaintiff States, as a result of its false, misleading, and/or off-label promotion of Prezista and Intelence to doctors, including whether:

- Janssen presented or caused to be presented a claim for payment to the United States and Plaintiff States;

- The claim was false or fraudulent because it was ineligible for reimbursement as it was for an off-label use or for a medically unreasonable or unnecessary use; was misbranded in violation of the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 355(a) & (d); and/or contained false express certifications of compliance with the law.

- The falsity was material to a decision to pay the claim; and

---

[6] The "Plaintiff States" are California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Washington. The Plaintiff States' Analogs include all of the Plaintiff States (except for Texas which is discussed separately below because the elements of proof under the Texas law are slightly different) and are set forth in the Second Amended Complaint Counts III, V, VII, IX, XI, XIII, XV, XVII, XIX, XXI, XXIII, XXV, XXVII, XXIX, XXXI, XXXIII, XXXV, XXXVII, XXXIX, XLI, XLIII, XLV, XLVII, LI, LIII, LV.

- Janssen had sufficient knowledge that the claim was false or fraudulent.

Specifically, with regard to a violation of Section 3729(a)(1)(B) of the FCA and the Plaintiff States' analogs, whether Janssen knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States and the Plaintiff States, as a result of its false, misleading, and/or off-label promotion of Prezista and Intelence to doctors, including whether:

- Janssen made or used, or caused to be made or used, a record or statement material to a false or fraudulent claim;

- The record or statement was false because it was for an off-label use or for a medically unreasonable or unnecessary use; was misbranded in violation of the Food, Drug and Cosmetics Act, 21 U.S.C. §§ 355(a) & (d); and/or contained false express certifications of compliance with the law.

- The falsity was material to a decision to pay the claim; and

- Janssen had sufficient knowledge that the record or statement was false.

## Kickback Claims

Whether Defendant is liable for violations of Section 3729(a)(1)(A) of the federal FCA and the Plaintiff States' Analogs[7] for knowingly presenting, or causing to be presented, false or fraudulent claims for payment to the United States and Plaintiff States, as a result of knowingly paying kickbacks to doctors for its Speaker Program and other services with at least the one purpose of inducing them to prescribe Prezista and Intelence, or to reward them for doing so.

Specifically, with regard to a violation of Section 3729(a)(1)(A) of the FCA and the Plaintiff States' analogs, whether Janssen knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States and Plaintiff States, including whether:

- Janssen presented or caused to be presented a claim for payment to the United States and Plaintiff States;

- The claim was false or fraudulent because it violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), including whether:

    o Janssen offered or paid any remuneration;

    o The offer or payment of remuneration was made with at least one purpose to

---

[7] *See* Second Amended Complaint Counts II, IV, VI, VIII, X, XII, XIV, XVI, XVIII, XX, XXII, XXIV, XXVI, XXVIII, XXX, XXXII, XXXIV, XXXVI, XXXVIII, XL, XLII, XLIV, XLVI, XLVIII, LII, LIV, LVI.

induce or reward Prezista and Intelence prescriptions which may be paid in whole or part by Medicare, Medicaid and/or ADAP; and

- o   Janssen did so knowingly.

- •   The falsity (*i.e.,* the violation of the AKS) was material to a decision to pay the claim; and

- •   Janssen had sufficient knowledge that the claim was false or fraudulent.

### Claims under Texas Law[8]

Whether Janssen knowingly caused false statements or misrepresentations of material facts to be made to permit payment under the Texas Medicaid program that were not authorized.

Whether Janssen knowingly concealed or failed to disclose information to permit payment under the Texas Medicaid program that were not authorized.

Whether Janssen knowingly caused claims to be presented to the Texas Medicaid program that contained statements or representations that Janssen knew or should have known to be false.

Whether Janssen knowingly (meaning acted with knowledge or conscious indifference to the truth of the matter) offered to pay or give, or did pay or give, doctors gifts of money, a donation, or other items of value for the purpose of influencing the writing of prescriptions of Prezista and Intelence that would ultimately be paid for, in whole or in part, by the Texas Medicaid program.

### Damages and Other Relief

If Defendant is found liable for violation(s) of the federal FCA and/or the Plaintiff States' Analogs and/or Texas law, what is the total amount of damages the United States and Plaintiff States are entitled to, including the amount of trebled damages, the total amount of civil penalties, and the amount of reasonable attorney's fees, expenses, and costs.

## 12. JANSSEN'S LEGAL ISSUES

Relators allege Janssen violated the False Claims Act through its promotional messages ("Promotional Claims") and speaker programs ("Speaker Claims") related to Prezista and Intelence.  Janssen has not violated the federal False Claims Act, or any analogous state statute,[9] which, contrary to Relators' position, is as follows.

---

[8] *See* Second Amended Complaint Counts XLIX and L.

[9] For their state law claims, Relators have not produced any evidence of what constitutes a "false" claim under each state's respective law, and what factors, if any, are material to each state's decision to pay claims submitted for reimbursement of HIV medication prescriptions.  As a result, Janssen has not addressed any legal issues related

**Appx178**

**Promotional Claims**

For the Promotional Claims, Relators allege Janssen violated the False Claims Act when it improperly promoted HIV medications Prezista and Intelence, causing doctors to prescribe these medications to government-insured HIV patients, which then caused the Government to pay for Prezista and Intelence prescriptions that it would not have paid for otherwise.

To show Janssen violated the False Claims Act for the Promotional Claims, Relators must prove by a preponderance of the evidence the following:

*First*, Janssen caused a doctor to write a Prezista or Intelence prescription that was submitted to a Government health insurance program as a claim for reimbursement. This means that Relators must prove that Janssen's promotion was a substantial factor in causing a doctor to write a Prezista or Intelence prescription that was submitted to a Government health insurance program as a claim for reimbursement.

*Second*, the claim for reimbursement was false. Government health insurance programs provide coverage for prescription medications, but are allowed (and under some circumstances do) place limitations on what the insurance programs will and will not cover. Relators allege that claims for payment of Prezista and Intelence prescriptions were not eligible for coverage under Government health insurance programs because they were either not medically reasonable and necessary[10] <u>or</u> were not for a use approved by the FDA.

*Third*, the falsity was material to the Government health insurance program's decision to pay the claim.

*Fourth*, Janssen knew that the claim was false.

It is, however, legal for pharmaceutical companies to provide truthful, non-misleading information that is not included in a medication's label. That is, it is lawful to provide information that is about off-label studies or uses so long as it is truthful and not misleading. *See United States v. Caronia*, 703 F.3d 149, 168-69 (2d Cir. 2012).

---

to those alleged claims.

[10] It is Janssen's position that Medicare does not require medications covered by Medicare Part D (the Medicare part at issue in this case) be "reasonable and necessary" to be eligible for reimbursement. Medicare Part D plan sponsors—that is, the health plans, insurers and employers that administer Medicare Part D—*may* exclude certain medications from coverage for a variety of reasons, including because the Part D plan sponsor has determined that the medication is not reasonable and necessary. No Part D plan sponsor in this case has made such a determination. Nevertheless, in denying Janssen's motion to dismiss Relators' complaint in this case, this Court found that Prezista prescriptions may be ineligible for reimbursement if they not reasonable and necessary. Janssen respectfully reserves its rights to raise this legal argument in the future, including on appeal.

**Speaker Claims**

For the Speaker Claims, Relators allege that Janssen improperly paid doctors to work as consultants to educate other doctors about Prezista and Intelence, and that Janssen violated the federal Anti-Kickback Statute and False Claims Act because it intended these payments to induce the doctors they paid to prescribe Prezista and Intelence or reward them for doing so.

To show Janssen violated the False Claims Act for the Speaker Claims, Relators must first prove by a preponderance of the evidence that Janssen violated the Anti-Kickback Statute. This means Relators must prove by a preponderance of the evidence the following:

*First*, Janssen paid money—including any kickback or bribe—to doctors who were speakers at its speaker programs.

*Second*, one purpose of the payments was to induce the doctors who were speakers to prescribe Prezista and Intelence.

*Third*, Government health insurance programs paid for Prezista or Intelence prescriptions resulting from such unlawful payments.

*Fourth*, Janssen acted knowingly and willfully with respect to all of these elements.  To act "knowingly" means that Janssen was conscious and aware of the nature of its actions and of the surrounding facts and circumstances. To act "willfully" means that Janssen knew its conduct was unlawful and intended to do something that the law forbids.

Because a violation of the Anti-Kickback Statute requires proof that Janssen acted knowingly and willfully, if Janssen acted in good faith, that is a complete defense to the alleged violation.  Good faith is a defense because it is inconsistent with the requirement of the Anti-Kickback Statute that Janssen acted knowingly and willfully.  A person acts in good faith when he or she has an honestly held belief, opinion, or understanding about the existence of a fact or in the truth of statements, even though the belief, opinion, or understanding turns out to be inaccurate or incorrect.  Therefore, in this case, if Janssen made an honest mistake or had an honest misunderstanding about the existence of a fact or in the truth of statements then it did not act knowingly and willfully.

For purposes of the False Claims Act, a claim submitted for reimbursement to a Government health insurance program in violation of the Anti-Kickback Statute is a false claim.  If Relators prove that Janssen violated the Anti-Kickback Statute, to find Janssen liable under the False Claims Act for the Speaker Claims, Relators must then prove by a preponderance of the evidence that the falsity was material to the Government's decision to pay the claim.

**Appx180**

**Damages**

If Relators are able to prove by a preponderance of the evidence that Janssen violated the False Claims Act for the Promotional Claims and/or the Speaker Claims, to award any damages, Relators must prove by a preponderance of the evidence that the Government suffered an actual monetary loss. The purpose of the False Claims Act is to make the United States whole. Damages, if any, must be fair compensation for the Government's losses, no more and no less. Damages are not allowed as a punishment and cannot be imposed or increased to penalize Janssen. In this case, the measure of damages is the difference between the amount of money the Government paid for Prezista and Intelence and the value of what the Government actually received. *See, e.g., United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010); *United States ex rel. Wall v. Circle C Constr., LLC*, 813 F.3d 616, 617 (6th Cir. 2016).

13. **CHOICE OF LAW:** (If there is any issue as to what state's law is applicable to any count of the complaint, set forth the choice of law question. This issue shall be separately briefed in accordance with an order to be entered herewith).

    N/A

14. **MISCELLANEOUS**

    **Joint**

    Pursuant to this Court's Letter Order dated June 14, 2021 (Dkt 259), Janssen produced documents from the custodial files of Amit Patel, Kimberlee Saladana, and Michael Driscoll. The parties are working together to schedule the depositions of these witnesses. Both parties have supplemented their Exhibit Lists with documents produced from these witnesses' files.

    **Relators**

    **Relators' Position on Janssen's Contemplated Motions**

    Relators intend to oppose every one of Janssen's Contemplated Motions at the appropriate time, but we hereby address a few of them below.

    With regard to Janssen's proposed motion in limine to preclude Relators and certain lay witnesses from testifying based on lack of personal knowledge (No. 1), Relators intend to contest this motion as not a true or appropriate motion in limine that can be ruled upon in advance of trial. Whether a witness has personal knowledge of a particular fact can only be determined once the witness testifies and speaks about the bases of his/her knowledge. Janssen can make its objections at trial.

    With regard to Janssen's proposed motion to exclude any evidence or argument referring

**Appx181**

to Janssen's promotion of Prezista's lipid profile, Prezista prescriptions written for patients with lipid conditions, or claims submitted for Prezista prescriptions written for patients with lipid conditions as "off-label" (No. 4), Relators intend to contest this motion as totally inappropriate as a motion in limine and more akin to a motion to dismiss. It improperly attempts to prevent Relators from presenting evidence and argument as to their Prezista lipid claims which the Court has already upheld in denying summary judgment.

With regard to Janssen's proposed motion to exclude any evidence referring to Prezista or Intelence prescriptions as "misbranded" or otherwise "illegal" (No. 5), Relators will contest this motion as being contrary to the law, as Relators allege that the prescriptions were in fact misbranded and illegal under the law.

With regard to Janssen's proposed motion to exclude any evidence or argument referencing Anthony Dolisi's assertion of the Fifth Amendment (No. 8), Relators will oppose this motion based on case law decided by the Third Circuit and other courts holding that evidence of depositions of non-party witnesses who exercised their Fifth Amendment privileges is admissible, and juries may be permitted to draw adverse inferences therefrom. Anthony Dolisi was Relators' direct supervisor. Relators both testified that he directed them to promote Prezista and Intelence for off label purposes. When the government deposed Mr Dolisi about these issues, he refused to answer almost every question based upon the Fifth Amendment. The jury in this case should be aware of these relevant facts, and should be permitted to draw adverse inferences related thereto.

### Relators' Counsels' Attorney Work Product Memorandum

Relating to Janssen's request for Relators' counsels' attorney work product, in connection with Relators' expert Professor James O'Reilly, discussed below by Janssen, Relators state as follows: The materials that Janssen now seek are classic attorney work product as they reflect the mental impressions, opinions, and analyses of Relators' counsel regarding the facts, evidence, legal claims, and damages in this case. The materials themselves are designated as "Confidential Attorney Work Product", "Protected From Disclosure Under Joint Stipulation". Janssen has no right to obtain this work product, and the fact that these materials were provided to Professor O'Reilly does not change this fact. Indeed, under the parties' agreed-upon and Court-ordered Stipulation dated May 22, 2019 (ECF 153), communications and memos, including work product, exchanged between counsel and experts are protected against disclosure unless the expert relies on the information as a basis for his opinions. (*Id.*, ¶¶ 3-4). That exception does not apply here. None of Relators' experts (including Prof. O'Reilly) mentioned these memos in their written expert reports, they did not list these memo in their Materials Relied Upon, and they did not offer any testimony whatsoever that they ever relied upon these memos when forming their opinions. Janssen cannot produce any evidence to the contrary, as none exists. Thus, in accordance with the Stipulation that Janssen agreed to, these work product memos are protected against disclosure. Finally, Janssen raised this issue with Relators over two and a half years ago, in March 2020, after Prof O'Reilly had been deposed. Relators responded in writing on March 10, 2020. Janssen then dropped the issue entirely. There is

no Federal Rule of Civil Procedure or Court Order that allows Janssen to now make a motion to compel regarding these materials several years after fact and expert discovery have ended.  Its request is substantively and procedurally improper, and it should be denied.  It has no valid basis to obtain Relators' counsels' attorney work product and should be precluded from doing so.

### Relators' Position on Janssen's Contested Facts Regarding Damages

Relators also note that Janssen has previously filed a Daubert motion against Prof. Shaked raising many of the same arguments as asserted herein in Janssen's Section B above setting forth contested facts regarding damages, and the Court denied their motion in its entirety.  (Dkt. 294).

### Janssen

### Janssen's Positions on Witness Issues

- During the June 21 and September 6, 2022 final pretrial conferences, the Court stated that it would seek guidance from Judge Castner on her preference for the presentation of testimony from doctors and other witnesses who do not reside in the District and who may be unavailable to travel to Trenton, New Jersey for the trial.  Janssen therefore awaits further guidance from the Court before taking a position on whether remote testimony or trial depositions are appropriate or necessary.

*Judge Quraishi will permit either in person or remote testimony of physicians. The parties are directed to confer on this issue. If the parties cannot reach an agreement, they may submit a joint letter, no longer than five pages.*

- As described in Section 6(C)(19) above, Relators are seeking trial testimony that is not allowed under the Federal Rules.  Relators' counsel made the strategic decision to notice Rule 30(b)(6) depositions.  Relators' counsel then made the strategic decision to withdraw its notice and to not seek Rule 30(b)(6) depositions.  Now, with trial imminent, Relators are improperly seeking a Rule 30(b)(6) deposition witness as a trial witness to testify on "substantive issues."  At trial, "a corporate representative may not testify to matters outside his own personal knowledge 'to the extent that information [is] hearsay not falling within one of the authorized exceptions.'"  *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 F. App'x 899, 907-08 (5th Cir. 2010); *see also TIG Ins. Co. v. Tyco Int'l Ltd.*, 919 F. Supp. 2d 439, 454 (M.D. Pa. 2013) ("Although Rule 30(b)(6) allows a corporate designee to testify to matters within the corporation's knowledge during deposition, at trial the designee 'may not testify to matters outside his own knowledge to the extent that information is hearsay not falling within one of the authorized exceptions.'").

    Additionally, a Janssen corporate representative is not necessary to "authenticate Janssen documents."  Janssen is not objecting to the authenticity of the documents produced from its files, except for certain documents that Relator Christine Brancaccio saved to her Janssen files and that do not appear to be authentic business records.

- Relators' proffered regulatory expert, Professor James O'Reilly, testified at his deposition that Relators' counsel provided him with "materials" that were not produced

in this case and that he read and considered when evaluating whether to serve as an expert for Relators. Mr. O'Reilly testified that the materials included (among other things) general background on the case. Mr. O'Reilly decided to serve as an expert witness based on the information contained in these materials.

In March 2020, Janssen requested a copy of the materials Mr. O'Reilly described, and Relators' counsel responded that it is not discoverable under the Stipulation pertaining to expert witnesses (See ECF 153) because Mr. O'Reilly did not rely on the materials to render his opinion.

Based on Mr. O'Reilly's testimony, however, the materials were the factual prerequisites to his retention, and he considered and relied on the information in the materials when he agreed to testify on Relators' behalf. Janssen is therefore entitled to them.

- Relators and certain of their witnesses raised common interest and other privileges in response to subpoenas, requests for documents, and at depositions. Janssen does not believe that all of these privilege assertions were appropriate and intends to continue to try to resolve these issues without court intervention.

### Janssen's Positions on Relators' Contemplated Motions

- Janssen intends to oppose every one of Relators' Contemplated Motions at the appropriate time, but would like to make the following points.

- Relators' contemplated motion in limine No. 11 is a motion to challenge or exclude Dr. Jena's expert testimony. The parties jointly agreed that all motions to challenge or exclude expert testimony must be filed contemporaneously with any motions for summary judgment. The Court reviewed and entered the parties' draft joint stipulated scheduling order, setting an October 14, 2020 deadline. *See* 9/10/20 Order at 1 [D.E. 178]. In accordance with the Court's deadline, Relators filed a motion to exclude Dr. Jena's opinions on causation and damages, arguing (among other things) that Dr. Jena's opinions were contrary to law. *See Relators' Mem. Of Law in Supp. Of Mot. to Exclude Certain Ops. Of Janssen's Expert Dr. Anupam Jena* at 4 [D.E. 277]. The Court denied Relators' motion, finding that "to the extent that Relators believe that Jena applies the incorrect legal test with respect to causation, that issue can be adequately tested by cross-examination" and that "[a]lthough Relators may disagree, Jena's opinions are informed by Janssen's version of events, which is not a basis to exclude an otherwise reliable and relevant opinion." *See* 1/10/2022 Mem. Op. at 41, 44 – 45 [D.E. 294]. Relators are now improperly seeking a second bite at the apple. They should not be permitted to do so.

### Janssen's Positions on Trial Logistics

- Relators filed the original complaint under seal in this matter nearly ten years ago. The parties have been actively litigating the matter for almost six years. Given the length of

**Appx184**

time this matter has been pending, Janssen respectfully requests that the Court schedule this case for trial at the Court's earliest convenience.

- Janssen requests the use of a case-specific questionnaire for potential jurors and will propose a questionnaire for the parties to agree upon prior to trial.

**15. JURY TRIALS** - Not later than _____.

*Judge Quraishi will set a trial date after the Motions in limine are decided.*

*Unless otherwise ordered:*

A.  Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken. Trial briefs are due ~~15~~ 30 days before trial. *Opposition due 15 days before trial*

B.  Counsel for each party shall submit to the Judge, with a copy to opposing counsel, written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper. Jury instructions are due 15 days before trial.

C.  Joint proposed verdict form/special interrogatories are to be submitted to the trial judge 15 days before trial.

D.  Proposed voir dire are to be submitted to the trial judge 15 days before trial.

E.  ~~Motions in limine are due 45 days before trial. Oppositions are due 30 days before trial.~~ *Motions in limine are to be filed by 11/23/22; opposition due 12/5/22; reply due 12/12/22; returnable 12/19/22*

F.  Deposition designations are due 45 days before trial. Counter designations and objections are due 15 days before trial.

G.  Notice of any evidence the parties intend to offer in their case in chief under Fed. R. Evid. 404 is due 45 days before trial. Oppositions are due 30 days before trial.

**16. NON-JURY TRIALS** - Not later than _____.

A.  Each side shall submit to the Judge and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B with citation to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

*LHG*

**Appx185**

    B.    Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law. There is reserved to counsel the right to submit additional proposed findings of fact and conclusions of law during the course of the trial on those matters that cannot reasonably be anticipated.

**17. TRIAL COUNSEL** (List the names of trial counsel for all parties). Trial counsel for Relators are: Joshua Russ, Andrew Wirmani, Pete Marketos, and Allison Cook of Reese Marketos LLP, and Sherrie Savett, Joy Clairmont, Michael Fantini, and William Ellerbe of Berger Montague PC.

Trial counsel for Janssen are Abigail A. Hazlett, Brian M. Nichilo, and Michael A. Schwartz of Troutman Pepper Hamilton Sanders LLP and Allison Brown and Geoffrey M. Wyatt of Skadden, Arps, Slate, Meagher & Flom LLP.

**18. BIFURCATION** (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).

The parties agree that the issues of liability and damages SHALL NOT be tried separately.

**19. ESTIMATED LENGTH OF TRIAL**

The parties estimate there will need to be twenty-five days of trial.

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.

                             **COUNSEL FOR RELATORS**

                             **BERGER MONTAGUE PC**
                             Sherrie R. Savett
                             Joy P. Clairmont
                             Michael T. Fantini
                             William H. Ellerbe
                             1818 Market Street, Suite 3600
                             Philadelphia, PA 19103
                             Tel.: (215) 875-4844
                             E-Mail: wellerbe@bm.net
                                    ssavett@bm.net
                                    jclairmont@bm.ne
                                    mfantini@bm.net

**Appx186**

**REESE MARKETOS LLP**
Peter D. Marketos
Joshua M. Russ
Andrew O. Wirmani
Allison N. Cook
750 N. St. Paul Street
Dallas, TX 75201
Tel: (214) 382-9810
E-mail:pete.marketos@rm-firm.com
          josh.russ@rm-firm.com
          andrew.wirmani@rm-firm.com
          allison.cook@rm-firm.com

**COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP**
Peter S. Pearlman
Park 80 West-Plaza One
250 Pehle Avenue | Suite 401
Saddle Brook, NJ 07663
Tel: (201) 845-9600
Email:  psp@njlawfirm.com

**COUNSEL FOR JANSSEN**

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
Abigail A. Hazlett
Brian M. Nichilo
Michael A. Schwartz
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
Phone:  (215) 981-4000
Fax:  (215) 981-4750
Abigail.Hazlett@troutman.com
Brian.Nichilo@troutman.com
Michael.Schwartz@troutman.com

**Appx187**

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Allison M. Brown
One Manhattan West
New York, NY 10001-8602
Phone: (212) 735-3222
Fax: (212) 735-2000
Allison.Brown@skadden.com

Geoffrey M. Wyatt
1440 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 371-7008
F: (202) 393-5760
Geoffrey.Wyatt@skadden.com

DATED: <u>November 2, 2022</u>

_____
UNITED STATES MAGISTRATE JUDGE

(RELATORS' EXHIBITS A, B, AND E TO FOLLOW)

(JANSSEN'S EXHIBITS C AND D TO FOLLOW)

**Appx188**

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA, *et al.,* ,** | Civil Action No. 12-7758 (ZNQ) (JBD) |
| Plaintiffs, | **OPINION** |
| v. | **(TO BE FILED UNDER TEMPORARY SEAL)** |
| **JANSSEN PRODUCTS, L.P.,** | |
| Defendant. | |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon two omnibus Motions in Limine (the "Motions") filed by Defendant Janssen Products, LP ("Janssen") ("Janssen Motion", ECF No. 319) and Relators Jessica Penelow and Christine Brancaccio ("Relators") ("Relators Motion", ECF No. 318).

Janssen filed a brief in support of its Motion ("Janssen Moving Br.", ECF No. 319-1) and Relators opposed ("Relators Opp'n Br.", ECF No. 320). Janssen filed a reply. ("Janssen Reply Br.", ECF No. 323.) Relators filed a brief in support of their Motion ("Relators Moving Br.", ECF No. 318-1) and Janssen opposed ("Janssen Opp'n Br.", ECF No. 321). Relators filed a reply. ("Relators Reply Br.", ECF No. 322.)

Having reviewed the parties' submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Plaintiff's Motion in Limine will be GRANTED IN

1

PART and DENIED IN PART and Defendants Motion in Limine will be GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Relators filed the instant action on behalf of the Government, twenty-seven states, and the District of Columbia against Defendants, alleging fifty-eight counts under the Federal False Claims Act ("FCA"), Federal Anti-Kickback Statute ("AKS"), and the false claims acts of various states. The claims arise from Defendants' purported misconduct in connection with its sales and marketing of two HIV/AIDS drugs: Prezista and Intelence. (*See* Am. Compl. ¶¶ 107-61, ECF No. 41.)

## II.    JURISDICTION

The Court exercises subject matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and (b). Venue is appropriate under 31 U.S.C. § 3732(a) because Janssen transacts business in this judicial district.

## III.    LEGAL STANDARD

A motion in limine is filed pre-trial and requests that the Court "prohibit opposing counsel from referring to or offering evidence on matters prejudicial to the moving party." *Laufen Int'l, Inc. v. Larry J. Lint Floor & Wall Covering, Co.,* Civ. No. 10-199, 2012 WL 1458209, at *1 (W.D. Pa. Apr. 27, 2012). The purpose of a motion in limine is to bar "irrelevant, inadmissible, and prejudicial" issues from being introduced at trial, thus "narrow[ing] the evidentiary issues for trial[.]" *Id.* Evidence should not be excluded pursuant to a motion in limine, unless it is clearly inadmissible on all potential grounds. *Leonard v. Stemtech Health Sciences, Inc.,* 981 F. Supp.2d 273, 276 (D. Del. 2013) (citing *Laws v. Stevens Transport, Inc.,* No. 2:12–cv–544, 2013 WL 4858653, at *1 (S.D. Ohio Sept. 11, 2013)). The movant bears the burden of demonstrating that the evidence is inadmissible on any relevant ground, and the court may deny a motion in limine

when it lacks the necessary specificity with respect to the evidence to be excluded. *Id*. (citing *Berry v. Mission Grp. Kan., In*c., Civ. No. 08-2439, 2010 WL 2160897, at *1 (D. Kan. May 28, 2010)). Evidentiary rulings, especially ones that encompass broad classes of evidence, should generally be deferred until trial to allow for the resolution of questions of foundation, relevancy, and potential prejudice in proper context. *Id. (*citing *Looney Ricks Kiss Architects*, Civ. No. 07-572, 2010 WL 5393864, at *1 (W. D. La. Dec. 22, 2010); *Diehl v. Blaw–Knox*, Civ. No. 01-0770, 2002 WL 34371510, at *1 (M.D. Pa. July 15, 2002)).

## IV.  DISCUSSION

### A.  JANSSEN'S MOTIONS

#### 1. Whether the Court Should Preclude Relators and Various Fact Witnesses from Offering Lay Opinions About the Supposed Effect of Janssen's Promotional Activities on Doctors' Prescribing Decisions

Janssen's first motion seeks to preclude trial testimony by Relators and other former Janssen employees about the effects of Janssen's promotional activities under Rule 701(c). (Janssen Moving Br. at 1.) Janssen argues that Relators and their proposed witnesses do not possess any specialized experience, knowledge, or credentials to opine on pharmaceutical marketing. (*Id*. at 3.) Janssen contends that the proposed testimony is also inadmissible under Rule 701 because it is not rationally based on any of the witnesses' perceptions. (*Id*.) Janssen maintains that the proposed witnesses' opinions are based on pure speculation. (*Id*. at 3–4.) Janssen claims that even if the proposed testimony were based on common sense, it would not be helpful to the jurors in determining a fact issue. (*Id*. at 5.) Further, Janssen argues that the witnesses' testimony will not be helpful to the jury to determine a fact issue. (*Id*.)

In opposition, Relators maintain that the seven witnesses are former Janssen sales representatives and regional managers who personally promoted the drugs and who witnessed

first-hand the effects of Janssen's unlawful marketing.  (Relators Opp'n Br. at 1.)  Relators argue that the proposed testimony does not require scientific or specialized knowledge.  (*Id*. at 2.) Relators contend that the witnesses at issue are sales representatives and managers who personally engaged in or oversaw the promotion of Janssen products to doctors.  (*Id*. at 2–3.)  Relators argue that all seven proposed witnesses have direct, first-hand knowledge about the issues and is not pure speculation as Janssen suggests.  (*Id*. at 5.)  Relators further argue that the witnesses' testimony will help the jury determine causation.  (Id.)

In reply, Janssen reiterates that the proposed witnesses do not have the qualifications to opine on the effects of the pharmaceutical marketing and such testimony would be speculative. (Janssen Reply Br. at 1.)

Federal Rule of Evidence[1] 701(c) states that a lay witness's testimony may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c).  "Subsection (c) was added to address the risk that parties may try to evade the requirements of Rule 702 by 'proffering an expert in lay witness clothing.'"  *Campmor, Inc. v. Brulant, LLC*, Civ. No. 09-5465, 2013 WL 12147616, at *5 (D.N.J. April 30, 2013) (quoting *Hirst v. Inverness Hotel Corp*., 544 F.3d 221, 227 (3d Cir. 2008) (internal citations and quotation marks omitted).   The Third Circuit, however, recognizes that an expert witness is not always necessary when the testimony is of a specialized or technical nature:

> When a lay witness has particularized knowledge by virtue of her experience, she may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of Rule 702.

---

[1] For the sake of brevity, all references herein to "Rule" will be to the Federal Rules of Evidence.

*Donlin v. Philips Lighting North American Corp.*, 581 F.3d 73, 81 (3d Cir. 2009) (citations omitted); *see also United States v. DeMuro*, 677 F.3d 550, 562 (3d Cir. 2012) ("we have allowed professionals to give lay opinions when opinions are based on personal knowledge of the issues, along with specialized experiences") (citation omitted); *United States v. Thompson*, 393 F. App'x 852, 857–59 (3d Cir. 2010) (the district court did not err in permitting a company employee to testify as lay witness about GPS tracking device).

Janssen's first Motion in Limine seeks to preclude testimony on the effects of Janssen's promotional activities had on doctors. Janssen argues that the proposed testimony is based on pure speculation. (Janssen Moving Br. at 3.) Specifically, Janssen asserts that while the witnesses have testified that their opinions are generally based on increased sales following the alleged off-label promotion, "the truth is that their opinions are based on pure speculation." (Id. at 3–4.) Janssen, however, was afforded the opportunity to question and cross examine these witnesses at their depositions a to whether they did, in fact, have personal knowledge of the effect of the promotional activities. To preclude such evidence in this case based on the fact that the witnesses' personal knowledge and perceptions were not fully explored in their pre-trial deposition is an "extreme and unreasonable measure." *United Linen Wholesale, L.L.C. v. Northwest Co.*, Civ. No. 06-5934, 2010 WL 3724519, at *2 (D.N.J. Sept. 13, 2010). Had Janssen wished to question these proposed witnesses at their depositions concerning their personal knowledge, it was free to do so. If, as Janssen claims, the witnesses lack sufficient knowledge to offer a lay opinion as to promotional marketing effects, that will be explored before they are permitted to testify at trial. *See id.* The witness's personal knowledge and perceptions will need to satisfy the Court pursuant to Rule 701 at that time. Accordingly, the Court will not preclude this evidence based on this argument at this juncture.

Janssen's first Motion in Limine will therefore be denied without prejudice.

### 2. Whether the Court Should Exclude Evidence or Argument Referring to Prezista or Intelence Prescription as "Misbranded" or Otherwise "Illegal"

Janssen seeks to exclude Relators from referencing Prezista or Intelence prescriptions as "misbranded" or "illegal." (Janssen Moving Br. at 5.)  Janssen argues that because this is not a "misbranding" case, Relators' use of these terms would suggest that Janssen violated the Food, Drug, and Cosmetic Act ("FDCA") and confuse the jury. (*Id*. at 6.)  Janssen argues that any evidence or argument using the terms "misbranded" or "illegal" should be excluded under Rules 401 and 403. (*Id*.)  Whether Prezista and Intelence were "misbranded" is not relevant to any claims or defenses because a purported marketing-based violation of the FDCA's misbranding provisions is not actionable under the False Claims Act ("FCA"). (*Id*.)  The term "illegal" brings the same references because of the clear import of such an argument would be that Janssen is engaged in misbranding, which is no pertinent to any issue. (*Id*. at 8)  Further, Janssen argues that even if the terms "misbranded" or "illegal" had probative value in an FCA case, it would be outweighed by the danger of confusing the issues where the jury must decide. (*Id*.)  Relying on Rule 403, evidence that could confuse the dispositive issue in the case should be properly excluded. (*Id*. at 9.)  Since the FDCA has nothing to do with what Relators must prove, referencing Prezista or Intelence prescriptions as "misbranded" or "illegal" will confuse the jury. (*Id*.)

In opposition, Relators argue that they should be permitted to introduce evidence and argument referring to Prezista and Intelence Prescriptions and "misbranded" or otherwise "illegal" because the court has already upheld their misbranding theory. (Relators Opp'n Br. at 12.) Relators maintain that the Court has already rejected Janssen's challenges to Relators' misbranding theory in its decision on Janssen's Motion to Dismiss. (*Id*. at 13.)  Relators argue that the Court has already recognized that their misbranding theory is viable under the FCA. (*Id*. at 15.)  Further,

Relators assert that there is nothing unduly prejudicial or confusing about a party offering evidence and argument about a theory of the case.  (*Id*. at 16.)

In reply, Janssen claims that they are moving to narrow the evidence presented to the jury to questions that are actually at issue.  (Janssen Reply Br. at 3.)  Janssen asserts that Relators must prove that their claim that Prezista and Intelence prescriptions were false and referring to the prescriptions as "misbranded" has no relevance to the falsity theories.  (*Id*.)

Under Rule 401, "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence."  Fed. R. Evid. 401.  Relators' theory under Count One is specifically that Janssen violated the FCA by misbranding and off-labeling Prezista and Intelence.  (Am. Compl. ¶ 222.)  In deciding Janssen's Motion to Dismiss, the Court found that Relators adequately pled that Prezista[2] was not reasonable and necessary for certain patients to sustain their "misbranded and off-label prescriptions" theory under the FCA.  (*See* ECF No. 86 at 9.)  Accordingly, Relators referring to Prezista and Intelence as "misbranded" is relevant to their theory of FCA violations.

While the Court finds this relevant, Rule 403 permits a district court to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice[.]"  Fed R. Evid. 403.  "A district court has broad discretion to determine the admissibility of relevant evidence in response to an objection under Rule 403."  *United States v. Balter*, 91 F.3d 427, 442 (3d Cir. 1996).  Rule 403 is a balancing test, and "[l]ike any balancing test, the Rule 403 standard is inexact, requiring sensitivity on the part of the trial court to the subtleties of the particular situation, and considerable deference on the part of the reviewing court to the hands-on judgment

---

[2] Janssen conceded that Realtors adequately pled the off-label use of Intelence.  (*See* ECF No. 86 at 8 n.6.)

of the trial judge." *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986). Here, Janssen argues that referencing Prezista and Intelence as "misbranded" and "illegal" will be unduly prejudicial and confuse the jury under Rule 403.

The relevant provisions of the FCA prohibit any person from: (1) "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval"; and (2) "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). Here, nothing within Relators' Complaint indicates their theories would require them to refer to the prescriptions as "illegal" or "misbranded" to bring a successful FCA claim against Janssen. A jury finding that the prescriptions were in fact, illegal or misbranded, under the FCA is the ultimate finding Relators seek to receive in Count One. (*See* generally, Am. Compl.) Accordingly, referring to the prescriptions as "illegal" or "misbranded" is unduly prejudicial and confusing to the jury. The Court will therefore preclude Relators from referring to the prescriptions as "illegal" and "misbranded."

Janssen's Motion to Exclude Evidence or Argument to Prezista or Intelence Prescription as "Misbranded" or Otherwise "Illegal" will therefore be granted.

### 3. Whether the Court Should Exclude Testimony or Argument Referring to Janssen's Promotion of Prezista's Lipid Profile, Prezista Prescriptions Written for Patients with Lipid Conditions, or Claims Submitted for Prezista Prescriptions Written for Patients with Lipid Conditions as "Off-Label."

Janssen contends that the vast majority of prescriptions Relators claim were fraudulent were *on-label* prescriptions. (Janssen Moving Br. at 10.) Janssen argues that Relators should be precluded from referring to this case as an "off-label" case and referring to Prezista prescriptions written for patients with lipid conditions as "off-label." (*Id*. at 11.) Further, Janssen argues that describing this as an "off-label" case is confusing and misleading to the jury. (Id. at 12.) Janssen

**Appx196**

claims that Relators must prove a different theory of falsity for on-label prescriptions than for off-label prescriptions. (*Id.*) Janssen argues that Relators should be precluded from using the term "off-label" to describe on-label prescriptions under Rule 403. (Id. at 13.) In opposition, Relators argue that Janssen's attempt to preclude them from referring to their conduct as "off-label" is a transparent attempt to relitigate an issue Janssen already lost on its Motion to Dismiss and Motion for Summary Judgment. (Relators Opp'n Br. at 17.) Relators contend that Janssen has twice tried to dismiss Relators' Prezista lipid claim, and twice has been denied. (*Id.*) Relators additionally argue that there is "no merit to Janssen's contention that relator's lipid claim is somehow 'on-label' as opposed to 'off-label[.]'" (*Id*. at 19.)

In reply, Janssen argues that its Motion seeks to exclude the "off-label" language rather than relitigate the viability of Relators' Prezista lipid theory of liability. (Janssen Reply Br. at 6.) Janssen contends that "while Relators are free to present their Prezista lipid claims to the jury, they must do so correctly and precisely, and any evidence or argument referring to such Prezista promotion or prescriptions as 'off-label' must be excluded." (*Id*. at 8.)

In denying Janssen's Motion for Summary Judgment, the Court rejected Janssen's argument that this is not an off-label case and recognized that whether Prezista's label warned about any lipid-related side effects constituted a genuine issue of material fact for the jury to determine. (*See* ECF No. 291 at 18.) The Court accepted Relators' legal theories as to proving the elements of FCA and Anti-Kickback Statute violations. (*Id*. at 18–19.) Specifically, the Court held that whether Prezista's label warned about any lipid-related side effects "constitute[d] a genuine issue of material fact as to Relators' FCA claims concerning Prezista's lipid profile." (*Id*. at 18.) The Court additionally held that "[u]nder either the OL promotion theory or the AKS violation theory, . . . Relators have raised sufficient questions of material fact to preclude summary

judgment as to whether Prezista claims for benefits made by patients with lipid conditions were false within the meaning of the FCA." (*Id.* at 18–19.)  Accordingly, because the Court has already determined that the jury will decide the scope of Prezista's label as to lipids, Relators are entitled to present their theory—that Janssen's promotion of Prezista was off-label—to the jury.

Further, the Court finds that referencing off-label prescriptions is not unduly prejudicial pursuant to Rule 403.  Janssen argues that describing this as an off-label case would confuse the jury and mislead them regarding fundamental issues and Relators' burden of proof.  (Janssen Moving Br. at 12.)  The Court will, however, properly instruct the jury that Relators bear the burden of proof to establish the elements of an FCA action.  Any prejudicial effect the evidence may have will therefore not substantially outweigh its probative value.

Accordingly, Relators will not be precluded from referencing off-label prescriptions based on this argument. Janssen's third Motion in Limine will therefore be denied without prejduice.

### 4. Whether the Court Should Exclude Any Evidence or Argument Referencing Anthony Dolisi's Assertion of his Fifth Amendment Right to Refuse to Answer Questions in Response to a Civil Investigative Demand for Oral Testimony

Janssen seeks to preclude Relators from offering evidence or argument referencing Anthony Dolisi's ("Dolisi") invocation of his Fifth Amendment right during his June 2016 Civil Investigative Demand deposition under Rule 403. (Janssen Moving Br. at 13.) Specifically, Dolisi was deposed on June 20, 2016 by an Assistant United States Attorney in relation to a Civil Investigation Demand. (*Id.* at 14.) At that deposition, Dolisi asserted his Fifth Amendment right to not testify as to matters within the scope of his employment with Janssen. (*Id.*)

Dolisi, however, later revoked his Fifth Amendment invocations and sat for a full deposition with Relators' counsel and answered all of their questions on key issues of this case. (*Id.* at 16.)

10

Relators now seek to introduce his previously revoked Fifth Amendment invocations as impeachment evidence against Dolisi.  (Relators Opp'n Br. at 24.)

The Court will grant Janssen's motion. Any "potential probative value of [Dolisi's] invocation of the Fifth Amendment is . . . reduced by the fact that [he] subsequently answered all of the questions," and "the potential prejudice . . . is high," such that it substantially outweighs any probative value.  *In re Urethane Antitrust Litigation*, Civ. No. 08-5169, 2016 WL 475339, at *5 (D.N.J. Feb. 8, 2016) (quoting *Harrell v. DCS Equipment Leasing Corp.*, 951 F.2d 1453, 1464-65 (5th Cir. 1992)) (internal citations omitted); *see also* Rule 403 (court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice).  Relators will therefore be precluded from referencing Dolisi's prior invocation.

### 5. Whether the Court Should Exclude Evidence or Argument Referencing Regulatory or Other Government Guidance on Speaker Programs Or Other Promotional Activities After 2014

Janssen indicates that Relators' claims challenge Janssen's conduct with respect to speaker programs and promotional events between the years 2006 and 2014.  (Janssen Moving Br. at 18–19.)  Janssen seeks to preclude evidence and testimony regarding government guidance on these topics that was issued after 2014.  (*Id.* at 19.)  Janssen argues that post-2014 guidance and related testimony are not relevant because the regulatory changes that post-date the challenged conduct are not probative of whether that behavior was unlawful at the time it occurred.  (*Id.* at 19–20.)  Janssen maintains that introduction of post-2014 guidance would distract jurors from considering what Janssen actually knew when it engaged in the behavior at issue here.  (*Id.* at 20–21.)

Here, Relators concede that reference to post-2014 guidance is irrelevant to Janssen's scienter.  (Relators Opp'n Br. at 29.)  Rather, Relators seek to introduce this evidence to demonstrate materiality.  (Id.)  Relators rely on *United Health Servs. Inc. v. Escobar*, 579 U.S. 176

11

(2016) for its position that the government has always—before, during, and after the relevant time period—considered Anti-Kickback Statute violations and false and misleading marketing, misbranding, and off-label marketing to be material.  (*Id*. at 29–30.)  Relators indicate that Janssen points to HHS-OIG guidance from 2020 and that guidance is also relevant to materiality.  (*Id*. at 31.)

In reply, Janssen reiterates that the government guidance issued after 2014 should be excluded because it is not relevant to the conduct at issue and would be unfairly prejudicial and confusing to the jury.  (Janssen Reply Br. at 11.)  Janssen argues that Realtors' reliance on *Escobar*, 579 U.S. 176, is misplaced, claiming that "[n]owhere in *Escobar* does the Supreme Court say that the government can issue guidance that retroactively applies to claims that are more than a decade old."  (*Id*. at 11.)

Here, the Court finds that post-2014 guidance—guidance issued after the Relevant Time Period—is not relevant.  Regulatory changes made after the Relevant Time Period are irrelevant as to whether the behavior was unlawful at the time it occurred.  *See United States v. Allergan Inc*., 746 F. App'x 101, 109 (3d Cir. 2018).  Accordingly, the Court will preclude Realtors from introducing any evidence of guidance on speaker programs or other promotional activities after 2014 as part of their case in chief.

The Court will, however, not preclude Realtors from introducing such evidence in rebuttal or on cross-examination should Janssen raise post-2014 regulatory guidance at trial.

### 6. Whether the Court Should Preclude Any Evidence Or Argument Referencing Other Investigations, Litigation, or Settlements Involving Janssen Or Any Other Pharmaceutical Company and the Federal Government

Janssen seeks to preclude evidence of other government investigations, litigation and settlements including: (1) a 2013 settlement by Johnson & Johnson and Janssen related to the

**Appx200**

marketing of anti-psychotic and heart failure drugs, (2) a 2010 settlement by Ortho-McNeil-Janssen Pharmaceuticals related to that company's marketing of anti-epileptic drug, and (3) investigations related to prescription medications manufactured by Allergan, Wyeth Pharmaceuticals, and Merck. (Janssen Moving Br. at 21.) Janssen argues that evidence of other government investigations, litigation, and settlements is not relevant. (*Id*. at 22.) Janssen contends that the 2013 settlement by Johnson & Johnson and Janssen related to the marketing of anti-psychotic and heart failure drugs and has no bearing on whether Relators can prevail on their FCA claims. (*Id*.) Further, Janssen asserts that the 2010 settlement with Ortho-McNiel-Janssen Pharmaceuticals is also irrelevant to the instant matter because it involved other medications, and it was based on alleged conduct by a company that is not a part of this lawsuit. (*Id*. at 23.) Janssen argues that this evidence is not material to the government's reimbursement decision in this case because it is based on the marketing of different medications for non-FDA approved conditions. (*Id*.) Janssen additionally argues that even if this evidence is relevant, it would still be inadmissible under Rule 403 because it would mislead the jury into thinking Janssen or unrelated non-parties acted improperly in prior cases. (*Id*. at 24.)

Janssen further contends that evidence related to prior government investigations, settlements, and litigation is also barred by Rule 404 because it would unfairly suggest that Janssen and other pharmaceutical companies have a propensity to engage in bad conduct. (*Id*. at 25.)

In opposition, Relators argue the evidence Janssen seeks to preclude bears directly on materiality. (Relators Opp'n Br. at 33.) Relators contend that within the same time period of Janssen's alleged unlawful off-label and kickback schemes, Janssen and/or its affiliates entered into two settlements with the federal government and two Corporate Integrity Agreements ("CIAs") with the United States Department of Health and Human Services. (*Id*.) Relators claim

13

that both settlements and CIAs from 2010 and 2013 required extensive actions by Janssen and/or its affiliated entities aimed at improving Janssen's compliance with federal healthcare laws when promoting its drugs. (*Id*. at 34.) Relators argue that the steps Janssen took or did not take before, during, or after the 2010 CIA with Otho-McNeil-Janssen Pharmaceuticals, are directly relevant to materiality and scienter. (*Id*. at 35.) Further, Relators assert that the 2013 settlement and CIA involved the unlawful promotion of drugs and that it implemented strict requirements to ensure compliance with federal healthcare requirements. (*Id*. at 37.) Relators argue that these provisions of the 2013 CIA included provisions related directly to preventing off-label marketing of all of Janssen's drugs. (*Id*.) Relators additionally contend that the 2013 CIA entitled "Speaker Program Controls," which required Janssen to implement specific controls on speaker venues. (*Id*. at 38.)

As to Janssen's Rule 404 argument, Relators maintain that the disputed evidence here falls outside the scope of Rule 404(a)(1) because they seek to introduce this evidence to establish their burden of proof on key elements. (*Id*. at 40.) Relators additionally argue that to the extent this evidence is considered Rule 404 material, it falls within the permitted use set forth in Rule 404(b)(2). (*Id*.) Further, Relators assert that this evidence is not unduly prejudicial because it demonstrates "Janssen's inadequate compliance oversight of its speaker program and OL marketing by its sales personnel, and establishes materiality under the FCA." (*Id*. at 41.)

In reply, Janssen reiterates that other government investigations, litigation, and settlements involving Janssen, affiliated companies or other pharmaceutical companies is inadmissible under Rules 401 and 403. (Janssen Reply Br. at 13.) Janssen argues that Relators have failed to explain the relevance of the 2010 and 2013 investigations because they fail to "attempt to establish that either the 2010 or 2013 investigations involved conduct that had any similarity to Janssen's alleged conduct in this litigation." (*Id*. at 14.)

Here, the evidence Janssen seeks to preclude is relevant and probative to Relators' FCA claims. The 2010 CIA (Relators Opp'n Br. at Ex. K, ECF No. 320-11) required improved policies and procedures to address compliance with Anti-Kickback Statutes, training obligations related to promotional functions, investigations of potential off-label promotion, and an internal monitoring program to evaluate and monitor interactions with physicians. (*See* ECF No. 320-11.) Further, the 2013 CIA included a section entitled "Speaker Program Controls," which required Janssen to implement specific controls on speaker programs. (See Relators Opp'n Br. at Ex. L, ECF No. 320-12 at 35.) Evidence of whether Janssen complied with such settlements and CIAs is therefore probative to its scienter and materiality in the instant matter. The compliance steps Janssen took or did not take before, during, and after the execution of both the 2010 and 2013 settlements and CIAs are directly relevant to scienter and materiality, both of which are essential elements to Relators' claims. *See United States ex rel. Petratos v. Genentech Inc*., 855 F.3d 481, 487 (3d Cir. 2017).

Additionally, such evidence is not barred under Rule 404. While character evidence is generally barred, Rule 404 permits evidence of prior acts if it is being used to prove another purpose "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Rule 404(b)(2). Here, evidence of the 2010 and 2013 settlements and CIAs are permitted as long as Relators introduce such evidence for a purpose other than showing that Janssen acted in accordance with his character or a particular character trait in the past.

Further, Janssen's concern that admission of materials related to other government investigations and settlements would confuse the jury can be cured by issuing a limited instruction. Limiting instructions are an appropriate way to ensure that a jury understands the purpose for

which evidence of prior acts may be considered, and such instructions are generally sufficient "to cure any risk of prejudice[.]" *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *see United States v. Universal Rehabilitation Servs. (PA) Inc.*, 205 F.3d 657, 668 (3d Cir. 2000) ("we have also consistently held that this prejudicial effect is typically cured through a curative instruction to the jury" (discussing the prejudicial effect of a witness's guilty plea)); *United States v. Scarfo*, 41 F.4th 136, 180–81 (3d Cir. 2022). Accordingly, Janssen's motion as it relates to the evidence of other government investigations, settlements, and CIAs will be denied based on this argument. The Parties will, however, be permitted the opportunity to meet and confer to submit a proposed limiting instruction on the issue.

### 7. Whether the Court Should Bar Relators and Certain Lay Witnesses from Testifying About Why Doctors Were Selected to be Speakers for Janssen, and Janssen's Purpose or Intent in Paying These Doctors for their Professional Services

Janssen claims that Relators and certain of their witnesses, Mark Wilhelm, Donna Graham, Joseph Holshoe, Sara Strand, and Matthew Grooms intend to testify regarding Janssen's alleged "improper implementation of the Speaker Program." (Janssen Moving Br. at 26.) Janssen seeks to preclude such testimony because these witnesses have no personal knowledge of decisions regarding Janssen's speaker program. (*Id.* at 26–27.) Janssen argues that deposition testimony from Relators' witnesses confirms that they have no personal knowledge of the selection process. (*Id.* at 29.)

In opposition, Relators argue that Janssen "has contorted the testimony of these witnesses in an attempt to downplay their actual knowledge of the issues." (Relators Opp'n Br. at 42.) Relators assert that these witnesses all have direct personal knowledge of these matters. (*Id.*)

In reply, Janssen clarifies that it only moves to preclude Relators and their witnesses from testifying on two specific topics; it does not move to preclude testimony about all aspects of

Janssen's speaker programs as Relators suggest.  (Janssen Reply Br. at 18.)  Janssen argues that Relators and their witnesses should be precluded from testifying about why doctors were selected to be speakers for Janssen because the witnesses were not involved in the ultimate selection decision.  (*Id.* at 19.)  Janssen next contends that "Relators and their witnesses should be precluded from testifying that the purpose of Janssen's payments to speakers was to induce the speakers to prescribe Prezista and Intelence because, as sales employees, they were not involved in determining the amounts the speakers were paid, or in preparing any analytics whatsoever regarding speaker payments or prescriptions".  (*Id.*)

Rule 602 demands that a witnesses have "personal knowledge" of a matter about which they are testifying.  Fed. R. Evid. 602.  Janssen seeks to preclude testimony from Relators' witnesses concerning the decision-making process in the speaker engagements because it claims the witnesses lack personal knowledge on the matter to testify pursuant to Rule 602.

Janssen seeks to preclude Relators' witnesses from testifying as to why doctors were selected for speaking events and whether the purpose of Janssen's payments to speakers was to induce them to prescribe Intelence.  Sara Strand's deposition testimony ("Strand Dep.", ECF No. 320-2) indicates that the marketing department ultimately made the decision as to who would be selected for the speakers.  (Strand Dep. 85:4–8.)  Jessica Penelow additionally testified ("Penelow Dep.", ECF No. 320-5) that she was not privy to the information as to why a speaker would be denied. The witnesses, however, were able to testify as to the criteria.  (Penelow Dep. 66:2–8.) When asked who was involved in selecting doctors to be on the speakers bureau, Joseph Marion Holshoe testified ("Holshoe Dep.", ECF No. 324-7) that he "[couldn't] say exactly" and he did not have any role in selecting speakers.  (Holshoe Dep. 81:11–24.)

Relators cite testimony from sales representatives indicating their involvement with planning and running the speaker program, but the testimony demonstrates that the sales representatives did not have personal knowledge as to how the speakers were ultimately selected. The Court declines to bar the sales representatives' testimony at this time because its admissibility may depend on the exact nature of the witnesses' testimony and the extent to which Relators can rehabilitate their knowledge at trial. This denial is without prejudice to Janssen's right to raise this objection at trial (presumably under Rule 602) at which time the Court will address it. Janssen's seventh Motion in Limine will therefore be denied without prejudice.

### 8. Whether the Court Should Exclude Evidence or Argument Regarding the Amount of Funds Janssen May Have Set Aside to Litigate this Case

Janssen seeks to exclude evidence that a financial reserve maintained hundreds of millions of dollars for litigation costs for the possibility of the instant litigation. Relators do not oppose this argument. Accordingly, the Court will grant Janssen's eighth Motion in Limine.

## B. RELATORS' MOTIONS

### 1. Whether the Court Should Exclude Any Comment, Reference, or Evidence Concerning the Government's Decision Not to Intervene in This Case

Relators first seek to exclude any evidence or argument regarding the Government's non-intervention under Rules 402 and 403. (Relators Moving Br. at 2.) Relators argue that the Government's non-intervention is not relevant to the merits of the instant action. (Id. at 2–3.) Relators contend that courts consistently find that the Government's decision not to intervene is irrelevant, citing to several extra-jurisdictional cases. (*Id*. at 3.) Relators assert that not only is it not relevant, but evidence of the Government's non-intervention is highly prejudicial because it undermines the FCA's *qui tam* provisions. (Id. at 4.)

18

In opposition, Janssen argues that the Government's inaction is highly relevant to materiality. (Janssen Opp'n Br. at 1.)  Janssen asserts that the Government's non-intervention supports a conclusion that it does not consider the regulatory violation to be material.  (*Id*.)  Janssen contends that the Government's decision not to intervene in this matter strongly "strongly supports a finding that materiality is absent and is therefore highly relevant and admissible.  (Id. at 4.)  Janssen argues that in the alternative, if the Court decides to exclude evidence of the Government's non-intervention, then the Court should revisit the issue at trial should Relators "open the door" to suggesting that Relators represent the Government or that this is the Government's lawsuit.  (*Id*. at 6.)

In reply, Relators argue that the Government's non-intervention in a *qui tam* case is inherent in the statutory design of the FCA.  (Relators Reply Br. at 1.)  Relators contend that Janssen's response brief fails to cite a case in which the court has permitted evidence of the Government's non-intervention decision at trial.  (Id.)  Specifically, Relators argue that the cases Janssen cites are both factually and procedurally inapposite.  (Id. at 2.)

Rule 401 of the Federal Rules of Evidence defines relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 401.  Here, evidence of the Government's non-intervention is not relevant.  Presently, the Court has not been presented with any evidence nor testimony "linking the Government's non-intervention with its actual motivation for doing so."  *See U.S. ex rel. El-Amin v. George Washington University*, 533 F. Supp.2d 12, 20 (D.C. Cir. 2008).  Evidence of the Government's non-intervention is not probative of how it determined the merits of the instant case.  Accordingly, the Court finds that evidence of the Government's non-intervention will be precluded.  The Court will grant Relators' first Motion

Appx207

in Limine, but it will revisit this issue at trial should Relators present evidence or argument at trial that "opens the door" as to the Government's involvement or lack thereof.

**2. Whether the Court Should Preclude Any Comments, References, or Evidence Related to the Imposition of Treble Damages and Statutory Penalties.**

Relators next seek to preclude any comment, reference, or evidence related to the imposition of treble damages or statutory penalties because such evidence is irrelevant and highly prejudicial. (Relators Moving Br. at 4.) Janssen does not oppose this Motion. (Janssen Opp'n Br. at 37.) Janssen, however, argues that it is entitled to cross-examine Relators about their significant financial interest in the outcome of this case. (*Id*. at 38.) On this issue, the Court will make a determination should the issue arise at trial.

The Court therefore will preclude any evidence related to the imposition of treble damages or statutory penalties as prejudicial under Rule 403. *See Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 131-32. Relators' second Motion in Limine will therefore be granted.

**3. Whether the Court Should Preclude Any Comment, Reference, or Evidence to the Collateral Consequences of Finding Janssen Liable**

Relators next seek to preclude Janssen from arguing or presenting evidence that a judgment or verdict adverse to Janssen in this case would result in collateral consequences. (Relators Moving Br. at 6.) Janssen does not oppose this Motion. (Janssen Opp'n Br. at 39.) The Court therefore finds that evidence of collateral consequences of an adverse verdict against Janssen is prejudicial under Rule 403 and will be precluded. *See Shannon v. United States*, 512 U.S. 573, 579 (1994). Relators' third Motion in Limine will therefore be granted.

**4. Whether the Court Should Preclude Any Comment, Reference, or Evidence Related to Janssen's Alleged Good Character or Reputation**

Relators argue that Janssen should not be permitted to introduce evidence of Janssen's good character or reputation. (Relators Moving Br. at 8.) Relators contend that such evidence is

inadmissible character evidence under Rule 404(b).  Janssen does not oppose this Motion.  The Court therefore finds that evidence of Janssen's good character or reputation, such as evidence of good corporate citizenship, socially valuable research and development efforts, etc., is inadmissible character evidence under Rule 404(b).  *See In re Tylenol (Acetaminophen) Marketing*, Civ. No. 12-7263, 2016 WL 3125428, at *11 (E.D. Pa. June 3, 2016).  The Court will therefore preclude such evidence and grant Relators' fourth Motion in Limine.

### 5. Whether the Court Should Exclude Any Comment, Reference, or Evidence Related to Comparing Janssen's Speaker Program with Other Companies' Speaker Programs

Relators seek to exclude evidence of other companies' speaker programs under Rules 401 and 403.  (Relators Moving Br. at 10.)  Relators argue that any suggestion by Janssen that speaker programs were common in the industry would mislead the jury , "potentially leading the jury to believe that the 'everyone was doing it' defense is viable."  (*Id*. at 11.)  Relators contend that this evidence would lead to "mini trials" about programs that are not at issue in this case, which would distract and confuse the jury.  (*Id*. at 12.)

In opposition, Janssen argues that evidence regarding similar speaker programs and industry custom is highly relevant.  (Janssen Opp'n Br. at 8.)  Janssen contends that the Court has already recognized that evidence that Janssen promoted its prescription medications through similar speaker programs to those employed by other pharmaceutical companies is "pertinent" to this case.  (Id.)  Janssen maintains that courts considering the scienter requirement of a FCA claim "routinely consider evidence of industry custom or practice to be relevant because it speaks directly to whether there is a 'common misunderstanding' of government regulations and whether the defendant 'acted according to that understanding.'" (*Id*.) (citing *Skibo el rel. United States v. Greer Labs., Inc*., 841 F. App'x 527, 533–34 (4th Cir. 2021).  Janssen argues that other pharmaceutical

companies' speaker programs reflect industry-wide practices regarding the government regulations at issue here. (*Id*. at 9.) Further, Janssen contends that this evidence will not confuse the issues or mislead the jury because jurors are "more than capable of evaluating evidence of industry-wide speaker programs and the extent to which Janssen comported itself in accordance with those practices without using that evidence for an improper use." (*Id*. at 11–12.) Janssen argues that the cases Relators cite to support their position do not involve FCA or Anti-Kickback claims.

In reply, Relators argue that if Janssen's knowledge of other companies' speaker programs is relevant, "then so to is its knowledge of enforcement actions and settlements related to other speaker programs. (Relators Reply Br. at 6.)

To succeed on Anti-Kickback and FCA claims, Relators must prove defendants acted knowingly and willfully. 31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1320a-7b(b)(2). Other pharmaceutical companies' speaker programs reflect industry wide practices regarding the government regulations that Relators contend Janssen knowingly and willfully violated. Accordingly, evidence regarding other companies' speaking programs is therefore relevant.

The Court additionally finds that the prejudicial effect of this evidence does not substantially outweigh its probative value. Evidence of industry standards is highly probative and any concern of misleading the jury can be cured with a limiting instruction. *See Axiall Corp. v. Descote S.A.S.*, Civ. No. 15-250, 2017 WL 9487085, at *5 (W.D. Pa. Oct. 27, 2017).

Further, the Court has already determined that evidence of prior settlements and litigation was relevant for the Relators' to prove scienter and materiality. The Court will therefore permit evidence of other speaking engagements based on this argument. Accordingly, Relators request

to exclude evidence of other companies' speaker programs under Rules 401 and 403 will be denied without prejudice.

### 6. Whether the Court Should Preclude Any Comment, Reference, or Evidence Relating to Relators' Fee Agreement With Counsel or Relators' Ability to Recover Attorneys Fees, Costs, and Expenses Under the FCA

Relators next seek preclusion of evidence relating to Relators' fee agreements with counsel or Relators' ability to recover attorney fees, costs, or expenses under the FCA. (Relators Moving Br. at 12.) Relators argue that the existence and terms of their fee arrangement are irrelevant and prejudicial. (*Id*. at 13.) Janssen does not oppose this Motion. (Janssen Opp'n Br. at 37.) Relators' sixth Motion in Limine will therefore be granted.

### 7. Whether the Court Should Preclude Any Comment, Reference, or Other Evidence Related to Relators Not Having Been Damaged by Janssen's Conduct

Relators claim their operative complaint alleges that Janssen's conduct has caused harm to the United States as well as to several States. (Relators Moving Br. at 15.) Relators contend that whether or not they suffered any injuries as a result of Janssen's conduct is irrelevant and only serves to confuse the jury. (*Id*.) Relators argue that because this case is about harm suffered by the Government, whether Relators individually suffered damages would be "irrelevant, confusing, prejudicial, and a waste of time." (*Id*. at 16.)

In opposition, Janssen argues that this Motion should be denied because the evidence is relevant to Relators' allegations that they were injured by Janssen and it bears on their credibility. (Janssen Opp'n Br. at 14.) Janssen contends that Relator Jessica Penelow ("Penelow") claims she was denied certain promotions or positions because she supposedly refused to improperly promote Prezista or Intelence. (*Id*. at 15.) Janssen claims it should have the opportunity to question Penelow and the other Relator in front of the jury about this and similar allegations because

Relators have placed the question of injury at issue through their statements and testimony. (*Id.*) Further, Janssen argues that this evidence is relevant to Relators' credibility. (*Id.* at 15–16.)

In reply, Relators assert that they are not intending to prevent Janssen from cross-examining Relators regarding their allegations in this case. (Relators Reply Br. at 8.) Relators argue that Janssen should not be permitted to argue or suggest that Relators must suffer harm or damages to prevail. (*Id.* at 9.)

The instant matter involved FCA and Anti-Kickback Statute claims, neither of which require Relators to prove individual damages or harm. Evidence concerning lack of harm or damages is therefore irrelevant to Relators' claims. The Court will therefore preclude any reference to Realtors' lack of harm. Relators' seventh Motion in Limine will therefore be granted.

### 8. Whether the Court Should Preclude Any Comment, Reference, or Evidence Regarding Earlier Versions of the Complaint or the Fact that the Complaint was Amended

Relators next seek to preclude evidence regarding previous versions of the complaint. (Relators Moving Br. at 16.) Janssen does not oppose this Motion. (Janssen Opp'n Br. at 39.) The Court will therefore preclude such evidence and grant Relators' eighth Motion in Limine.

### 9. Whether the Court Should Preclude Any Comment, Reference, or Evidence Regarding the Public Policy Behind HIV Drugs and Patient Accessibility

Relators seek to preclude Janssen from making the argument that it is the United States' policy to pay for HIV medications because it is "calculated to mislead the jury into believing that the government will pay for HIV medications even when the underlying claims are known to be false." (Relators Moving Br. at 18.) Relators contend that the relevant issue is not whether HIV patients should have access to Prezista and Intelence, or whether governmental policy favors improving access to HIV drugs, but rather, "whether the Government would reimburse for claims

that resulted from Janssen's specific promotional activity and payment of alleged kickbacks." (*Id.* at 19.) Relators contend that such evidence will confuse the jury. (*Id.*)

In opposition, Janssen argues that the evidence at issue is directly relevant to the question of materiality, or, why the Government payors paid for Prezista and Intelence. (Janssen Opp'n Br. at 18.) Janssen contends that Government policies concerning the coverage of HIV treatment are relevant to whether the alleged falsity of the claims for reimbursement for Prezista and Intelence was material to the Government payors' decision to pay those claims. (*Id.*)

In reply, Relators argue that Janssen "should not be permitted to argue for jury nullification based on HIV policy or the importance of treating the disease." (Relators Reply Br. at 9.)

The materiality inquiry focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," which is always the Government payors in the FCA context. *Petratos*, 855 F.3d at 491. Further, the FCA's materiality standard is "demanding" and "rigorous," requiring more than a showing that the government payor "designates compliance with a particular . . . requirement as a condition of payment. *Id.* at 489–90. To prevail, Relators materiality element hinges on the Government payor's perspective. Janssen is entitled to rebut Relators' materiality evidence by presenting evidence of Government payment policy. The Court will therefore deny Relators' ninth Motion in Limine based on this argument. To avoid jury confusion, the Court will permit parties to meet and confer and propose a limiting instruction on this issue.

### 10. Whether the Court Should Exclude Evidence Regarding Documents that Janssen Did Not Produce During Discovery

Relators claim that Janssen's trial exhibit list contains numerous documents that Janssen failed to produce during discovery, despite the fact that these documents were responsive to Relators' requests for production. (Relators Moving Br. at 20.) Relators argue that because

Janssen failed to disclose the responsive documents, the admission of these documents would unfairly prejudice Relators. (*Id*.) Relators contend that this evidence would cause prejudice and surprise to them because Janssen did not provide any indication that these documents existed or that it might rely on these documents at trial. (*Id*. at 23.) Relators assert that they were deprived of the opportunity to depose Janssen's witnesses about these documents as a result of their non-disclosure. (*Id*.) Relators argue that the prejudice caused by the non-disclosure cannot be cured at this late date, considering it is now several years after discovery and the case is ready for trial. (*Id*. at 24.) To cure the prejudice, Relators maintain that they would have to be given the opportunity to depose Janssen's witnesses and "submit new expert reports regarding the newly identified studied and compliance policies produced by Janssen, which might require additional expert discovery regarding new opinions." (*Id*.) Such a process, Relators contend, would be costly and timely. (*Id*.) Further, Relators argue that the admission of the newly discovered evidence would prevent the trial from going forward. (*Id*.) Relators additionally claim that Janssen's failure to disclose these documents suggests bad faith or willful failure to comply with its discovery obligations. (*Id*. at 25.) Finally, Relators assert that while these documents are important, they are "not so important that excluding them would deprive Janssen of its ability to put on its defense." (*Id*.)

In opposition, Janssen argues that it should deny Relators' Motion because it did not violate its discovery obligations as to any of the disputed documents. (Janssen Opp'n Br. at 24.) Janssen argues that Relators cannot establish a violation of Federal Rules of Civil Procedure 37 because Janssen either timely produced the challenged evidence or had no obligation to do so. (*Id*. at 25). Janssen contends that it produced "exact or near-duplicates of all four of the [scientific] studies published within the 'Relevant Time Period' applicable to Relators' document requests[.]" (*Id*.)

**Appx214**

Janssen asserts that the two remaining articles identified by Relators were published outside the Relevant Time Period and were not produced. (*Id*. at 26.) Janssen further maintains that the 13 performance reviews of Relators and their witnesses are not subject to pretrial disclosure rules because they are only intended for impeachment purposes. (*Id*.) Specifically, Janssen contends that Relators' Third Request for Production Nos. 12 and 31 sought documentation of Janssen's compliance with its GCC program and Healthcare Compliance Program. (*Id*. at 27–28.) Janssen argues that Relators Third set of Requests for Production do not seek all documents related to Janssen's compliance efforts generally. (*Id*. at 28.) As a result, Janssen contend that these three exhibits were not responsive to the discovery requests, and it was under no obligation to produce them. (*Id*.) Furthermore, Janssen contends that any purported discovery violation was substantially justified or harmless. (*Id*.)

In reply, Relators argue that as to the "scientific studies" (exhibits DX1075, DX1089, DX1098, and DX1102), if the produced versions are equivalent to the unproduced ones, then there should be no prejudice to Janssen to be required to use the produced versions. (Relators Reply Br. at 10.) As to DX6073-74, DX6079-83, and DX6085-88, the exhibits Janssen categorizes as "performance reviews," Relators claim they do not intend to exclude Janssen from using those exhibits for impeachment purposes and they only seek a ruling from the Court on whether Janssen can use them as part of its case in chief. (*Id*. at 11.) Finally, Relators contend that the "compliance documents" (DX2293-94 and DX2333) are responsive to Relators' Third Requests for Production Nos. 12 and/or 31 because "these documents reflect Janssen's efforts to comply with its obligations under its April 28, 2013 Corporate Integrity Agreement." (*Id*.)

In determining whether to exclude non-disclosed evidence, district courts must consider four factors: "(1) the prejudice or surprise of the party against whom the excluded evidence would

have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000).  In addition, the Court should also consider the party's explanation for failing to disclose as well as the importance of the excluded evidence, the latter of which is often the most significant factor.  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012)

First, as to the six scientific studies, Relators, in reply, indicate that they do not seek to exclude DX1080 and DX1105 from trial because they were published after the Relevant Time Period.  (Relators Reply Br. at 10 n 2.)  As to the remaining four studies, Janssen contends that it produced exact or near-duplicates of the same.  (Janssen Opp'n Br. at 25.)  Accordingly, if the produced versions are equivalent to the unproduced ones, then there should be no prejudice to Janssen in being required to use the produced versions.  Permitting introduction of these exhibits, should they not be "near duplicates" or "exact," would result in prejudice to Relators.  The Court will therefore exclude DX1075, DX1089, DX1098, and DX1102 on the basis that they were not produced in discovery.

As to the performance reviews,  Janssen indicates that these documents "are only intended for impeachment purposes[.]" (Janssen Opp'n Br. at 26.)  Relators submit that they "do not seek to exclude Janssen from using those exhibits for impeachment purposes."  (Relators Reply Br. at 11.)  Relators "only seek a ruling from the Court that Janssen cannot use these exhibits as trial exhibits in its case in chief.  (*Id*.)  Admission of this evidence into Janssen's case in chief will cause prejudice and surprise to Relators.  Relators were deprived of the opportunity to depose Janssen's witnesses about these documents.  To cure this prejudice would require the Court to

permit additional depositions which would delay the trial. Further, this case was filed almost ten years ago, having conducted several years of discovery. The Court will therefore exclude DX6073-74, DX6076, DX6079-83, and DX6085-88 from Janssen's case in chief but will permit the evidence as impeachment evidence only.

Finally, exhibits DX2293-94 and DX2333 will be excluded. These documents reflect Janssen's effort to comply with the April 28, 2013 CIA, and as set forth above, Janssen's compliance efforts are probative. Relators and their experts were not able to review and assess these documents. For Relators to cure this nondisclosure would require the Court to delay trial for Relators to fully review this evidence. The Court finds that is unfair and prejudicial to Relators for Janssen to have waited over three years to disclose these documents. Janssen will therefore be precluded from using DX2293-94 and DX2333 in its case in chief.

### 11. Whether Janssen Should Be Precluded from Taking Any "Trial Depositions" and/or From Presenting Trial Depositions or Remote Testimony at Trial

Finally, Relators contend Janssen seeks to present testimony from doctors and other witnesses through "trial deposition" or remotely. (Relators Moving Br. at 26.) Relators claim that Janssen's reasoning to excuse these witnesses from live testimony is because they live outside of New Jersey and have busy schedules. (*Id*.) In their Moving brief, Relators indicate that this issue is contemplated as a motion in limine in the Final Pretrial Order (ECF No. 315). Relators additionally contend that "the parties met and conferred on these issues on November 10 and will submit a joint five-page letter to the Court in due course." (*Id*. at 26 n.9.) The Court however, is not yet in receipt of such letter. The Court will therefore reserve on deciding this Motion until the parties have submitted their joint letter.

**V.    CONCLUSION**

Accordingly, for the reasons stated herein, the Court will GRANT IN PART and DENY IN PART the Motions.[3]  An appropriate Order will follow.


Date: **June 28, 2023**


s/ Zahid N. Quraishi

**ZAHID N. QURAISHI**

**UNITED STATES DISTRICT JUDGE**

---

[3] As a final, housekeeping matter, the Court notes that portions of this Opinion refer to certain documents and information that was placed under seal at the request of the parties. The Court has therefore instructed the Clerk's Office to place this Opinion under temporary seal, and will order the parties to meet and confer and advise as to whether they will be filing an appropriate motion to seal under Local Civil Rule 5.1 to permanently seal this Opinion,

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**JANSSEN PRODUCTS L.P.,**<br><br>Defendant. | Civil Action No. 12-7758 (ZNQ) (JBD)<br><br>**ORDER** |

**QURAISHI, District Judge**

    **THIS MATTER** comes before the Court upon two omnibus Motions *in Limine* (the "Motions") filed by Defendant Janssen Products, LP ("Janssen") ("Janssen's Motion", ECF No. 319) and Relators Jessica Penelow and Christine Brancaccio ("Relators") ("Relators' Motion", ECF No. 318). Having reviewed the submissions filed in connection with the Motion, for the reasons set forth in the accompanying Opinion, and other good cause shown,

    **IT IS** on this **28th** day of **June**,

    **ORDERED** that Janssen's Motion (ECF No. 319) is hereby **GRANTED** in part and **DENIED** in part; and it is further

    **ORDERED** that Relators' Motion (ECF No. 318) is hereby **GRANTED** in part and **DENIED** in part and it is further

    **ORDERED** that, as to Janssen's Motion to preclude Relators and various fact witnesses from offering lay opinions about the supposed effect of Janssen's promotional activities on doctors' prescribing decisions (within Janssen's Motion), the Motion to Preclude Evidence is hereby **DENIED WITHOUT PREJUDICE**; and it is further

    **ORDERED** that, as to Janssen's Motion to exclude evidence or argument referring to Prezista

1

or Intelence prescriptions as "misbranded" or otherwise "illegal" (within Janssen's Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Janssen's Motion to exclude any testimony or argument referring to Janssen's promotion of Prezista's lipid profile, Prezista prescriptions written for patients with lipid conditions, or claims submitted for Prezista Prescriptions written for patients with lipid conditions as "off-label" (within Janssen's Motion), the Motion to Exclude is hereby **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that, as to Janssen's Motion to exclude any evidence or argument referencing Anthony Dolisi's assertion of his Fifth Amendment right to refuse to answer questions in response to a civil investigative demand for oral testimony (within Janssen's Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Janssen's Motion to exclude evidence or argument referencing regulatory or other government guidance on speaker programs or other promotional activities after 2014 (within Janssen's Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Janssen's Motion to exclude any evidence or argument referencing other investigations, litigation, or settlements involving Janssen or any other pharmaceutical company and the federal government (within Janssen's Motion), the Motion to Exclude is **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that, as to Janssen's Motion to bar Relators and certain lay witnesses from testifying about why doctors were selected to be speakers for Janssen, and Janssen's purpose or intent in paying these doctors for their professional services (within Janssen's Motion), the Motion to Exclude is **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that, as to Janssen's Motion to exclude any evidence or argument regarding the amount of funds Janssen may have set aside to litigate this case (within Janssen's Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Relator's Motion to exclude any comment, reference or evidence concerning the Government's decision not to intervene in this case (within Relators' Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Relators' Motion to exclude any comment, reference, or evidence related to the imposition of treble damages and statutory penalties (within Relators' Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Relators' Motion to preclude any comment, reference or evidence related to the collateral consequences of finding Janssen liable (within Relators' Motion), the Motion to Preclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Relators' Motion to exclude any comment, reference, or evidence related to Janssen's good character or reputation (within Relators' Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Relators' Motion to exclude any comment, reference, or evidence related to comparing Janssen's speaker programs with other companies' speaker programs (within Relators' Motion), the Motion to Exclude is hereby **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that, as to Relators' Motion to exclude any comment, reference, or evidence relating to Relators' fee agreement with counsel or Relators' ability to recover attorneys' fees, costs, and expenses under the FCA (within Relators' Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Relators' Motion to exclude any comment, reference, or other evidence related to Relators' not having been damaged by Janssen's conduct (within Relators' Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

**ORDERED** that, as to Relators' Motion to exclude any comment, reference, or other evidence regarding earlier versions of the complaint or the fact that the complaint was amended (within

Relators' Motion), the Motion to Exclude is hereby **GRANTED**; and it is further

ORDERED that, as to Relators' Motion to Preclude any comment, reference, or other evidence regarding the public policy behind HIV drugs and patient accessibility (within Relators' Motion), the Motion to Preclude is hereby **DENIED WITHOUT PREJUDICE**; and it is further

ORDERED that, as to Relators' Motion to exclude any comment, reference, or other evidence regarding documents that Janssen did not produce in discovery (within Relators' Motion), the Motion to Exclude is hereby **GRANTED**; and is it further

ORDERED that, as to Relators' Motion to preclude Janssen from taking any "trial depositions" and/or from presenting trial depositions or remote testimony at trial (within Relators' Motion), the Motion to Preclude is hereby **DENIED WITHOUT PREJUDICE** as premature; and it is further

ORDERED that the parties are to meet to confer and, within **14 days** of the entry of this Order, either file a motion to seal the Opinion or advise the Court that the Opinion may be unsealed..


s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**Appx222**

<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

**UNITED STATES OF AMERICA,** *et al.***, *ex*
*rel.* **JESSICA PENELOW and CHRISTINE**
**BRANCACCIO,**

          Plaintiffs,

          v.

**JANSSEN PRODUCTS, LP,**

          Defendant.

---

Civil Action No. 12-7758 (ZNQ) (JBD)

**OPINION**

---

<u>**QURAISHI, District Judge**</u>

      This matter comes before the Court upon Defendant Janssen Products, LP's ("Janssen") Motion to Strike the testimony of Israel Shaked ("Shaked") and Ian Dew ("Dew") pursuant to Federal Rule of Evidence 702 ("Rule 702"), (the "Motion", ECF No. 402). Janssen filed a Brief in Support of the Motion, ("Moving Br.", ECF No. 402-1) and Relators Jessica Penelow and Christine Brancaccio (collectively, "Relators") filed a Brief in Opposition ("Opp'n Br.", ECF No. 408). Janssen has not filed a Reply.

      The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will **DENY** Janssen's Motion.

## I.     <u>BACKGROUND & PROCEDURAL HISTORY</u>

      The factual background of this matter is set forth in detail in *United States ex rel. Penelow v. Janssen Products, LP*, Civ No. 12-7758, 2021 WL 6052425 (D.N.J. Dec. 21, 2021). Briefly, in

2012, Relators[1] filed an action on behalf of the federal government, twenty-six states, and the District of Columbia alleging fifty-six counts under the Federal False Claims Act ("FCA"), the Federal Anti-Kickback Statute ("AKS"), and the false claims acts of various states. *Id.* at *1. The claims in this action arise from Janssen's purported kickback scheme and off-label ("OL") promotion of two HIV/AIDS drugs: Prezista and Intelence. *Id.*

On December 21, 2021, the Court denied Janssen's motion for summary judgment and allowed the FCA and AKS claims to proceed. *Id.* at *7–11. On January 10, 2022, the Court considered several motions by both parties to exclude expert opinion and testimony, including Janssen's first challenge of Shaked and Dew, Relators' damages experts, in a *Daubert* motion. *United States ex rel. Penelow v. Janssen Products, LP*, Civ No. 12-7758, 2022 WL 94535, at *14–15 (D.N.J. Jan. 10, 2022). Shaked's proposed testimony concerned the relationship between Janssen's OL marketing scheme and prescription rates and the total damages related to Janssen's alleged FCA and AKS violations. *Id.* In reaching his conclusions, Shaked conducted multiple statistical analyses and relied on Dew, a consultant, to assist him in gathering the necessary data. *Id.* at *14.

In its *Daubert* motion, Defendant challenged the reliability of Shaked's opinions, and by proxy, of Dew's opinions. *Id.* at *15. The Court denied Defendant's *Daubert* motion as to these witnesses and permitted Shaked to testify at trial. *Id.* at *15–16. First, the Court found that Shaked used a reliable methodology with "good grounds" to reach his opinion on causation regarding OL promotion and prescription rates. *Id*. at *16. Since Shaked used data pertinent to the facts of the

---

[1] Between 2006 and 2013, Relator Jessica Penelow worked as a sales consultant for Tibotec Therapeutics, a subsidiary of Johnson & Johnson that became known as Janssen in 2011. ("Second Am. Compl." ¶ 47, ECF No. 90.) While working for Tibotec, she marketed several HIV drugs, including Prezista and Intelence, to doctors in Manhattan. (*Id.*) Similarly, in 2006, Relator Christine Brancaccio started working for Janssen as a sales representative and marketed Prezista and Intelence to providers in Long Island and Queens. (*Id.* ¶ 49.)

**Appx224**

case, the Court additionally found that his analysis was relevant. *Id.* The Court further explained that the proper venue for challenges to Shaked's assumptions and choice of methodology is at trial during cross-examination. *Id.*

In May 2024, the Court presided over a 24-day trial. Amid trial, following Shaked's testimony but before the jury's verdict was entered, Janssen filed its Motion. The Court did not immediately rule on the Motion but held it under advisement until after trial. On June 13, 2024, the jury returned its verdict, finding that Janssen violated the Federal FCA and the FCA of twenty-six states by unlawfully promoting Prezista and Intelence and considered Janssen liable for $150,005,920 in damages. The Court entered judgment and Janssen's Motion remained pending.

## II.    LEGAL STANDARD

Rule 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualification, reliability, and fit." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).

3

To satisfy the qualification requirement, an expert must possess "specialized knowledge regarding the area of testimony." *Betterbox Comm'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327 (3d Cir. 2002) (quotation marks and citation omitted). "The basis of this specialized knowledge can be practical experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quotation marks and citations omitted). The qualification requirement is interpreted "liberally," *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008), and "a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (citation omitted).

To be reliable, the purported expert's testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his [or] her belief." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted). Finally, to satisfy the "fit" requirement, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.* "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (citation omitted). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

Rule 702 "has a liberal policy of admissibility." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citation omitted). "If the expert meets [these] liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility." *Id.* at 809.

### III.   <u>DISCUSSION</u>

The Court previously held that Shaked's analyses were admissible because "[m]any of Janssen's arguments attack Shaked's assumptions and question his choice of methodology: the proper venue for such arguments is at trial during cross-examination." *United States ex rel. Penelow*, 2022 WL 94535, at * 16. Shaked's general theory of causation and damages was to look at the relationships between payments to speakers, effects of payments on prescribing physicians, and the relationship between speakers and non-speakers. *Id.* From these analyses, Shaked deduced that: there was a "positive relationship between compensation paid to physicians and subsequent prescriptions written for Prezista and Intelence"; Janssen's conduct "influenced OL prescriptions that were then reimbursed by the government for the relevant periods"; and the total number of damages related to Janssen's alleged violations of the FCA and AKS. *Id.*

In the instant action, Janssen again challenges the factual assumptions underlying Shaked's opinions. Specifically, Janssen argues that Shaked's analysis is dependent on erroneously assuming that (1) every single sales call and speaker event contained an OL message for both Prezista and Intelence; (2) every instance of OL messaging effectively "influenced" doctors in writing prescriptions; and (3) exposure to alleged OL messaging or receipt of a speaker fee tainted all subsequent prescriptions. (Moving Br. at 5–9.) Relators frame Janssen's Motion as challenging (1) Shaked's definition of an "influenced" physician; (2) Shaked's analyses showing a correlation between OL messaging and/or payments to speakers; and (3) Shaked's methods for determining damages. (Opp'n Br. at 1.) For the reasons stated below, and in the Court's prior opinion on this issue, the Court will deny Janssen's Motion.

First, Janssen argues that Shaked's definition of an "influenced" physician, which Shaked used to assess causation and damages, relied on the assumption that every sales call and speaker

**Appx227**

event contained an OL message for both Prezista and Intelence and that, during certain periods of time, all four of Janssen's OL messages for these drugs were presented at every sales call and speaker event.  (Moving Br. at 5.)  Janssen points to certain trial testimony that allegedly undermines Shaked's methodology.  (*Id.* at 5–6.)  Relators argue that Shaked's definition of an "influenced" physician, i.e., "a doctor who was subject to a Janssen sales call, was a paid speaker, or was an attendee at a speaker event" is based on good grounds and supported by the trial testimony of several sales representatives.  (*Id.* at 3.)

According to Shaked, an "influenced" doctor is simply one who was exposed to Janssen's OL marketing campaign in some form.  (Opp'n Br. at 5.)  This definition assumes, based on the evidence, that at least one OL message was delivered during the first point of contact and that additional OL messages were delivered over time.  (*Id.* at 6.)  Relators claim that it was reasonable for Shaked "to assume that a Janssen sales representative delivered the relevant OL messages to each [i]nfluenced doctor within his or her territory during the multiple points of influence over the 9-year relevant period here."  (*Id.* at 8.)

The Court agrees with Relators that Shaked's definition of an influenced physician is based on reasonable assumptions and is unpersuaded by Janssen's argument that certain trial testimony undermined Shaked's methodology.  Janssen largely cherry-picks trial testimony that is taken out of context but, as Relators highlight, the trial featured significant testimony of several sales representatives whom all attested that Janssen's OL promotion was widespread and reached physician's simultaneously through sales calls and speaker events.  (*Id.* at 9–11) (citing testimony).

Secondly, Janssen argues that Shaked incorrectly assumed that every instance of OL messaging "influenced" a prescription.  (Moving Br. at 8.)  Relators contend that Shaked did not make such an assumption.  (Opp'n Br. at 13.)  Instead, Relators contend that Shaked analyzed the

6

OL prescription rates of influenced physicians in comparison to those of non-influenced physicians as well as rates of paid speakers and non-speakers. (*Id.*) Shaked then opined that there is a strong correlation between Janssen's OL marketing and the high rates of Prezista and Intelence prescriptions by influenced physicians. (*Id.*)

As Relators note, the Court already addressed this causation argument in its prior opinion on Janssen's *Daubert* motion. There, the Court explained that it "reviewed Shaked's report to determine whether he used methods with good grounds to reach his general causation opinions." *United States ex rel. Penelow*, 2022 WL 94535, at *16. The Court then considered Shaked's statistical methods. As the Court explained in its prior opinion,

> [t]he Difference of Two Population Means Test (the two-factor correlation analysis Janssen references) determines whether there is a statistically significant difference between two independent population means. (Shaked Report at 73.) If the z-score is higher than the critical value, then there is a statistically significant difference between the two populations. (*Id.*) Here, Shaked clearly explains his rationale for setting up tests, tests each of his hypotheses (*e.g.*, whether payments "influenced" physicians) against the negative hypotheses (*e.g.*, whether payments did not "influence" physicians), and used z-scores to determine whether the results were statistically significant. (Shaked Report ¶¶ 76, 96, 105, 131, 140.) Moreover, Shaked calculated the Spearman Rank Correlation values for dollar amounts paid to speakers and their dollar amount of prescriptions. (*Id.* at 36.) As understood by the Court and expressed by Shaked, the Spearman Correlation Test measures the positive relationship between two variables; a value of "-1" implies a weak association, a value of "0" implies no association, and a value of "1" implies a positive association. (*Id.* at 73–74.) The Spearman Rank Correlation Significance Test analyzes the strength of the correlation test and the possibility that the correlation is by chance. (*Id.* at 74.) Furthermore, contrary to Janssen's argument that Shaked did not run regressions, Shaked ran multiple regressions on the data when challenged by Anupam Jena; however, Shaked chose not to include it in the supplemental report because he believed that the identical results did not need to be included in his report. (Chuderewicz Decl., Ex B., "Shaked Dep." 291:10–25, ECF No. 202-4.) With positive values, high z-scores, and high t-values, the values are statistically significant (*i.e.*, cannot be rejected) under

7

> accepted statistical checks.[2]  (Shaked Report at 74.)  As such, the
> Court finds that Shaked's report has "good grounds" and is,
> therefore, reliable.

(*Id.*)  At trial, Shaked testified to the same approved methodology, analyses conducted, and

conclusions reached.

Given that courts have allowed experts to opine as to the causal link between

pharmaceutical OL marketing efforts and doctors' prescribing decisions, and that Relators elicited

testimony from several sales representatives at trial who say they witnessed the OL marketing

scheme's impact on prescription rates, (Opp'n Br. at 14.) (citing testimony), the Court rejects

Janssen's challenge to Shaked's correlation testimony.  *See, e.g.*, *Smith v. Pfizer Inc.*, 714 F. Supp.

2d 845, 856 (M.D. Tenn. 2010); *United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d

1032, 1039–40 (C.D. Cal. 2016); *Hanrahan v. Wyeth, Inc.*, Civ. No. 04-1255, 2012 WL 2395986,

at *5 (E.D. Mo. June 25, 2012).

Finally, Janssen argues that Shaked's method of calculating damages is flawed because he

attributed a patient's lifelong OL Prezista and Intelence prescriptions to the influenced physician

who first prescribed the medication.  (Moving Br. at 9.)  Although a damages expert may not rely

on assumptions wholly without evidence in the record, *Elcock*, 233 F.3d at 738, that is not what

happened here.  Shaked (and Dew)

> determined the first time each influenced doctor prescribed Prezista
> and Intelence, they then identified the date of the first sales call or
> speaking event associated with each prescriber, they quantified the
> number of sales calls and speaking events for each prescriber, and
> they quantified total speaking events and fees paid for each speaker.
> They further determined the average number of contacts per doctor

---

[2] When applying the Rank Correlation Significance Test, Shaked calculated a correlation of 0.235 and a t-value of 4.212 for the correlation between a change in total compensation and average annual prescription; he also calculated a correlation of 0.406 and a t-value of 31.944 for the correlation between a change in marketing contacts and OL prescriptions.  (Shaked Report ¶¶ 89, 119.)  According to the t-score table found, the t-values for 99.995% confidence in the result is 3.97 for a data set of 200 values and 3.92 for a data set of 500 values. https://faculty.washington.edu/heagerty/Books/Biostatistics/TABLES/t-Tables/.  As such, the Court finds that the values calculated are reliable.

and confirmed that doctors were called upon by Janssen multiple times.

(Opp'n Br. at 16.)  Evidently, Shaked based his assumptions on data pertinent to the facts of the case.

In sum, an expert may make an assumption of fact "so long as such assumptions have a reasonable basis in the available record." *Brill v. Marandola*, 540 F. Supp. 2d 563, 568 (W.D. Pa. 2008).  Here, the Court finds once again that Shaked has a basis for his assumptions and definitions for his damages and causation analyses.  These assumptions are reasonably sufficient to pass muster under *Daubert*.  *Elcock*, 233 F.3d at 755; *Paoli*, 35 F.3d at 744 (3d Cir. 1994) ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). Accordingly, striking Shaked and Dew's testimony is not warranted, and Janssen's Motion will be denied.  *Elcock*, 233 F.3d 734 at 755 (explaining that expert reports do not warrant exclusion merely for relying on assumptions—they only warrant exclusion where such assumptions lack evidence or are wholly unreasonable); *see also Stecyk v. Bell Helicopter Textron, Inc.,* 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.").

## IV.    <u>CONCLUSION</u>

For the foregoing, the Court will **DENY** Janssen's Motion to Strike the testimony of Shaked and Dew.  An appropriate order will follow.

Dated: January 30, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *et al.*, *ex rel.* **JESSICA PENELOW and CHRISTINE BRANCACCIO**, <br><br> Plaintiffs, <br><br> v. <br><br> **JANSSEN PRODUCTS, LP**, <br><br> Defendant. | Civil Action No. 12-7758 (ZNQ) (JBD) <br><br> **ORDER** |

**QURAISHI, District Judge**

      This matter comes before the Court upon Defendant Janssen Products, LP's ("Janssen") Motion to Strike the testimony of Israel Shaked and Ian Dew pursuant to Federal Rule of Evidence 702, (ECF No. 402). For the reasons set forth in the accompanying Opinion, and for other good cause shown,

      **IT IS** on this **30th** day of **January 2025**,

      **ORDERED** that Janssen's Motion to Strike the testimony of Israel Shaked and Ian Dew (ECF No. 402) is **DENIED**.

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *et al.***,** *ex* *rel.* **JESSICA PENELOW and CHRISTINE BRANCACCIO,** | |
| Plaintiffs, | Civil Action No. 12-7758 (ZNQ) (JBD) |
| v. | **OPINION** |
| **JANSSEN PRODUCTS, LP,** | |
| Defendant. | |

<u>**QURAISHI, District Judge**</u>

    **THIS MATTER** comes before the Court upon Defendant Janssen Products, LP's ("Janssen") Motion for Judgment as a Matter of Law ("Rule 50 Motion", ECF No. 473), Janssen's Motion for a New Trial ("Rule 59 Motion", ECF No. 474), and Relators Jessica Penelow and Christine Brancaccio's (collectively, the "Relators") Motion for Entry of Judgment ("Judgment Motion", ECF No. 475). Relators opposed Janssen's Rule 50 and Rule 59 Motions ("Rule 50 Opp'n Br." and "Rule 59 Opp'n Br.", ECF Nos. 481, 480), and Janssen replied ("Rule 50 Reply Br." and "Rule 59 Reply Br.", ECF Nos. 485, 486). Janssen opposed Relators' Motion for Entry of Judgment ("Judgment Opp. Br.", ECF No. 479), and Relators replied ("Judgment Reply Br.", ECF No. 488.) The Court has carefully considered the parties' submissions and decides the motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court: (1) grants in part, and denies in part,

**Appx233**

Janssen's Motion for Judgment as a Matter of Law; (2) denies Janssen's Motion for a New Trial; and (3) grants in part, and denies in part, Relators' Motion for Entry of Judgment.

## I.    **BACKGROUND**[1]

Relators filed the instant action on behalf of the Government, twenty-six states and the District of Columbia, alleging fifty-six counts under the federal False Claims Act ("FCA"), the federal Anti-Kickback Statute, and the false claims act of various states ("state FCAs").  (*See* Second Am. Compl., ECF No. 90.)  The claims arise from Janssen's purported kickback scheme and off-label ("OL") promotions of two HIV/AIDS drugs:  Prezista and Intelence.  (*Id.* ¶¶ 1–16.)

On May 6, 2024, a jury trial commenced on Relators' claims against Janssen.  The jury received stipulated facts, substantial documentary evidence, and testimony from 12 fact witnesses and 5 expert witnesses.  After a six-week trial, on June 13, 2024, the jury found Janssen liable for unlawfully promoting Prezista or Intelence under the federal FCA, as well as under each of the state FCAs.  (Verdict Form, ECF No. 434.)  The jury determined that Janssen submitted 159,574 claims in violation of the FCA and awarded $120,004,736 to the United States as a result of these violations.  (*Id.* at 2.)  Separately, the jury determined that Janssen submitted false claims in violation of the state FCAs, and awarded a lumpsum of $30,001,184 to the States, collectively, as a result of these violations.  (*Id.* at 4–5.)  Following the jury's verdict in favor of Relators on the federal FCA and state FCA claims, Janssen filed the instant renewed Motion for Judgment as a Matter of Law pursuant to Rule 50(b) and Motion for a New Trial pursuant to Rule 59.  (ECF Nos. 473, 474).  Relators, in turn, filed a Motion for Entry of Judgment. (ECF No. 475.)

The Court addresses Janssen's Rule 50 and Rule 59 Motions first, followed by Relators' Motion for Entry of Judgment.

---

[1] As the parties are familiar with the factual and procedural background of this matter, the Court omits most of the lengthy history of this over twelve-year-old case.

**Appx234**

II.   **LEGAL STANDARD**

A.   **Motion For Judgment as a Matter of Law**

Judgment as a matter of law is appropriate where there is no "legally sufficient evidentiary basis" for a reasonable jury to find in favor of the prevailing party.  Fed. R. Civ. P. 50(a); *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) ("Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.").  In considering the evidence, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube, Inc.*, 4 F.3d at 1166.  "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability." *Id.*  To that end, the proper inquiry on a motion for judgment as a matter of law is "whether there is evidence upon which the jury could properly find a verdict for [the prevailing] party." *Id.* (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).  In other words, judgment as a matter of law should be granted if the record is "critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (quoting *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001)).  Finally, "[t]he burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high[.]" *State Farm Mut. Auto. Ins. Co. v. Lincow*, 444 F. App'x 617, 621 (3d Cir. 2011) (quoting *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010)).

B.   **Motion For a New Trial**

Rule 59(a) provides that a court may award a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Fed. R. Civ.

**Appx235**

P. 59(a).  The purpose of a motion under Rule 59 is "to correct manifest errors of law or fact or to present newly discovered evidence."  *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (quoting *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)).  Courts have the discretion to grant a new trial on several grounds, including: "(1) that the verdict is against the weight of the evidence; (2) that the damages are excessive; or (3) that the district court made substantial errors in the admission or rejection of evidence or in its instructions to the jury."  *Winnicki v. Bennigan's*, Civ. No. 01-3357, 2006 WL 2506738, at *1 (D.N.J. Aug. 28, 2006) (citing *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, (1940)).  Thus, "the decision whether or not to grant a new trial is committed to the sound discretion of the district court."  *Id.* (citing *Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995)).

"[A] new trial should be granted only when the verdict is contrary to the weight of the evidence or when a miscarriage of justice would result if the verdict were to stand."  *Brennan v. Norton*, 350 F.3d 399, 430 (3d Cir. 2003).  A district court may not "grant a new trial because it would have come to a different conclusion than that reached by the jury."  *Lyles v. Flagship Resort Dev. Corp.*, 371 F. Supp. 2d 597, 602 (D.N.J. 2005).  Therefore, "[i]n determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version."  *Lightning Lube, Inc.*, 4 F.3d at 1166.  "The motion may be granted if 'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'"  *Lyles*, 371 F. Supp. 2d at 602 (quoting *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 166 F. Supp. 2d 19, 28 (D.N.J. 2001)).

III.    **DISCUSSION**

A.    **Janssen's Motion for Judgment as a Matter of Law**

Prior to closing arguments, the Court held a conference with counsel to discuss the jury charge and jury verdict form.  (*See* 6/11/24 Tr. at 7898:17–7916:17, ECF No. 454.)  The parties raised a number of disputes regarding the jury instructions and verdict form.  (*Id.*)  With respect to Relators' state law claims, Relators asked the Court to instruct the jury that they "must also find" Janssen liable under every state FCA should the jury find Janssen liable under the federal FCA. (*Id.* at 7898:17–7916:17; *see* Proposed Jury Instructions 68, Disputed Instruction No. 25, ECF No. 424-1.)  Janssen objected and asserted Relators had failed to provide a legal or factual basis for the state law claims.  (*Id.*)  While the Court ultimately accepted Relators' jury instruction on this charge over Janssen's objections, the Court expressed concerns regarding how Relators had presented the state law claims at trial.  (6/11/24 Tr. at 7906:7–12.)  Accordingly, the Court permitted Janssen to file a motion for judgment as a matter of law pursuant to Rule 50(b) post-trial should the jury find Janssen liable on the state law claims, and reserved on deciding the motion. (*Id.*)

Following the jury's finding in favor of Relators on the federal FCA and state FCA claims, Janssen moved for judgment as a matter of law pursuant to Rule 50(b).  (ECF No. 473.)  Janssen makes four primary arguments:  (1) Relators failed to introduce evidence on which a reasonable jury could find that Janssen caused the submission of false claims, Janssen's OL marketing was material to the Government's payment decisions, and the at-issue claims were false under the False Claims Act; (2) Relators failed to prove that Janssen violated any of the state False Claims Acts; (3) the jury's verdict on the number of claims and amount of damages are arbitrary and based on unsupported evidence, and cannot otherwise be sustained because of critical errors; and (4) the

jury's verdict must be set aside because Relators' claims are barred under the government action and public disclosure bars of the FCA and by the Constitution. (Rule 50 Moving Br. 1–3, ECF No. 473-1.) The Court addresses each of these arguments in turn.

> 1.    Jury's Finding of Liability Under the Federal False Claims Act

Janssen first contends that despite the jury's verdict finding that Janssen violated the FCA, this Court should enter judgment in its favor because Relators failed to prove the required elements of causation, materiality, and falsity under the FCA. (*See* Rule 50 Moving Br. 1–2, 7–37.) In support of its argument, Janssen asserts: (1) Relators "introduced no evidence on which a reasonable jury could find that Janssen caused the submission of false claims"; (2) Relators "introduced no evidence on which a reasonable jury could find that Janssen's alleged off-label marketing was material to the [G]overnment's payment decisions"; and (3) Relators "introduced no evidence on which a reasonable jury could find the at-issue claims were false." (*Id.* at 1–2.) In response, Relators contend that they introduced sufficient evidence to support the jury's findings on causation, materiality, and falsity. (Rule 50 Opp'n Br. 2–3, ECF No. 481.) After reviewing the evidence presented at trial, the Court finds there was a sufficient evidentiary basis for a reasonable jury to find Janssen liable under the FCA for the submission of false claims. Fed. R. Civ. P. 50(a).

With respect to causation, Relators were required to prove that Janssen's conduct was a "substantial factor" in inducing providers to submit claims for reimbursement from Medicare, Medicaid, or the federal AIDS Drug Assistance Program ("ADAP"), and that it was "reasonably foreseeable or anticipated as a natural consequence" that the submission of claims would result from Janssen's conduct. (*See* Final Jury Instructions 32, ECF No. 424-11); *United States ex rel. Penelow v. Janssen Prods., LP*, Civ. No. 12-7758, 2021 WL 6052425, at *9–10 (D.N.J. Dec. 21, 2021) (explaining "substantial factor" standard); *see also United States ex rel. Schmidt v. Zimmer*,

386 F.3d 235, 244 (3d Cir. 2004) (explaining "this Court applie[s] ordinary causation principles from negligence law in determining responsibility under the FCA" and, therefore, defendant's conduct must be "a substantial factor in bringing about" the filing of a false claim).[2]

At trial, Relators presented substantial evidence that Janssen trained and instructed its sales force to promote Prezista and Intelence OL, and that its sales force observed an increase in physicians' prescriptions after they delivered OL messages to physicians. (RXL78 at 2; 5/15/2024 Tr. at 1708:8–1709:13, 1726:20–1727:6, ECF No. 464; 5/22/2024 Tr. at 3255:15–3256:23, ECF No. 449; 5/23/2024 Tr. at 3508:4–16, ECF No. 457; 5/30/2024 Tr. at 4726:11–4727:23, ECF No. 467; 5/9/2024 Tr. at 748:25–749:13, ECF No. 463.) Relators also introduced marketing reports by a third-party marketing research firm that found that Janssen's sales force had the highest effectiveness of any sales force in causing "lift"—an increase in prescriptions through their promotion. (6/3/2024 Tr. at 5410:6–11, 5443:11–5444:6, 5447:2–6, 5448:10–5449:18, 5470:1–5477:9, 5480:25–5485:23, ECF No. 451.) In addition, Relators elicited expert testimony on causation in which witnesses opined on how Janssen encouraged OL marketing, thereby causing physicians to prescribe Prezista and Intelence OL. For example, pharmaceutical marketing expert George Sillup testified that Janssen's "off-label marketing caused physicians to prescribe Prezista and Intelence off-label," that Janssen's specific OL messaging "caused physicians to prescribe off-label for those specific reasons," and that Janssen's OL messaging directed at physicians "had

---

[2] Janssen argues that as part of the "substantial factor" test, Relators were required to prove that Janssen's conduct was the "but-for cause of the submission of any false claim." (Rule 50 Reply Br. 1, ECF No. 485.) Janssen, however, does not contest that the Court properly instructed the jury on the legal standard for causation, in which the Court instructed the jury to assess whether Janssen's conduct was a "substantial factor" in causing the submission of false claims to Medicare, Medicaid, and/or ADAP, and it was "reasonably foreseeable or anticipated as a natural consequence" that false claims would result from such conduct. (*See* Rule 50 Moving Br.; Rule 59 Moving Br.) As Janssen concedes that courts in the Third Circuit apply the "substantial factor" standard to assess causation in cases brought under the FCA, (Rule 50 Moving Br. 8), and that the jury instruction on causation was correct, the Court applies the "substantial factor" test in assessing whether Relators provided sufficient evidence of causation. *Zimmer*, 386 F.3d at 235.

a lasting impact on physicians' prescribing behavior." (5/22/2024 Tr. at 3046:24–3047:9.) Data expert Ian Dew further identified hundreds of thousands of "prescription drug event" data demonstrating physicians influenced by Janssen's OL marketing submitted claims for Prezista and Intelence to the Centers for Medicare & Medicaid Services ("CMS") and the Government for reimbursement. (*See* 5/31/24 Tr. 5222:2–5228:18, 5262:15–25, ECF No. 450; RX1480; DX5005; RX487; DX5009; RX1003.) Relators further introduced testimony from damages expert Israel Shaked, who performed statistical analyses and concluded that thousands of doctors who received Janssen's OL marketing prescribed the drugs OL at much higher rates than doctors who were not contacted by Janssen. (*See* 5/31/24 Tr. at 5409:3–5411:05, 5545:14–5552:11.)

Janssen contends that despite this substantial evidence, the record is insufficient to demonstrate causation because Relators did not present any "doctor-[specific] or patient-specific evidence to demonstrate the alleged off-label marketing effect on prescribing in any individual doctor's office." (Rule 50 Moving Br. 13, ECF No. 473-1.) Janssen raised this same argument at summary judgment and the Court squarely rejected Janssen's contention. *Janssen Prods., LP*, 2021 WL 6052425, at *9 (rejecting Janssen's argument that causation must be proven through patient-specific evidence and holding that Relators could prove causation by presenting "sufficiently detailed circumstantial evidence" that false claims were presented as a result of Janssen's conduct); *see also United States ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1037 (C.D. Cal. 2016) (holding that relator was not "required to identify a particular false claim" to prove causation under the FCA).

Here, examining the record before it, the Court finds that Relators produced sufficient evidence from which the jury could reasonably adduce that Janssen's OL marketing was a substantial factor in causing physicians to submit claims for reimbursement to Government payors,

**Appx240**

and that it was reasonably foreseeable that false claims would result from such conduct.  Relators proffered detailed documentary evidence, as well as expert and fact testimony, that demonstrated claims for Prezista or Intelence were submitted to the Government as a result of Janssen's OL marketing.   Janssen raised challenges regarding the sufficiency, reliability and accuracy of Relators' proffered evidence at trial.   (*See, e.g.*, 6/11/24 Tr. at 8091:3–8092:18).   The jury evaluated both parties' arguments and concluded that Relators had sufficiently proven causation.[3] A reasonable jury could therefore have found that Janssen's OL marketing caused the submission of claims to the Government, and judgment as a matter of law is inappropriate on this issue.  *See In re Lemington Home for the Aged*, 777 F.3d at 626 (explaining that the Court must give the non-moving party "the benefits of all reasonable inferences" when assessing a Rule 50(b) motion, "even though contrary inferences may be drawn" from the evidence).

Turning next to materiality, Relators were required prove that Janssen's OL marketing violations were material to the Government's payment decision.  In other words, Relators were required to prove that Janssen's unlawful promotion "had a natural tendency to influence, or was capable of influencing, the payment or receipt of money or property."  (Final Jury Instructions 34, Instruction No. 19.4.)  The Court need only summarize some of the evidence Relators presented at trial on this issue.  Relators introduced multiple Corporate Integrity Agreements ("CIA") and

---

[3] Janssen also argues that "Relators' theory of causation . . . is too remote from its causal agent . . . to satisfy the proximate cause requirement."  (*See* Rule 50 Moving Br. 15–17.)  The Court finds this argument unpersuasive.  Fraud directed at physicians may establish FCA liability if reimbursement by the Government was a reasonably foreseeable result of the fraud.  *See Marcus v. Hess*, 317 U.S. 537, 544 (1943) (concluding the FCA applies to fraudulent conduct that causes a third party to submit claims to the United States for amounts higher than would have been submitted); *United States v. Lagerbusch*, 361 F.2d 449, 449 (3d Cir. 1966) (holding that an employee was liable under the FCA for making false representations to obtain money from his employer, a government contractor reimbursed by the United States, and stating "[w]e have no doubt that the False Claims Act covers such an indirect mulcting of the [G]overnment.").  The Court further notes that the jury was instructed on the requirement to find proximate cause, and Janssen does not contend this jury instruction was erroneous.  (*See* Final Jury Instructions 32, Instruction No. 19.2 (explaining causation requires that the jury find that the submission of claims was "reasonably foreseeable or anticipated as a natural consequence" of Janssen's conduct; *see generally* Rule 50 Moving Br.)

Settlement Agreements that Janssen entered during the relevant period in order to resolve Government allegations concerning Janssen's OL marketing of prescription drugs, which Relators argued to the jury were evidence of materiality.  (*See* RX423; RX361; RX1624; Rule 50 Opp'n Br. 20, ECF No. 481.)  Relators elicited testimony from Janssen's president Glen Mattes who testified that OL marketing was illegal and material to the Government's payment decisions, including that if the Government "discovered that there was off-label marketing . . . and Medicare and Medicaid has [sic] reimbursed for those drugs . . . [the Government] will demand that money back." (5/22/24 Tr. at 2923:01–09; *see also id.* at 2930:08–12 (agreeing that "if there are products that are being sold for reimbursement by Medicare and Medicaid and it turns out that those were sold in violation of the law, the Government is going to come back and get its money").)  Relators also introduced expert testimony from compliance expert Virginia Evans who testified that Government payors do not cover the cost of prescription products when they were provided in violation of the FCA, including for OL uses, and that if the Government pays for false claims under Medicare and Medicaid without knowledge of the fraudulent conduct, they will "attempt to recoup that money" after discovering such falsity.  (5/28/24 Tr. at 3762:5–3763:22; 3796:01–23, ECF No. 458.)  Relators introduced similar expert witness testimony from Sara Strand, who testified that Government payors would not pay for claims that were the result of OL marketing, and that if such a claim had been paid, the Government would require the manufacturer to reimburse the Government.  (5/9/24 Tr. at 905:6–12.)

Janssen contends that Relators failed to prove materiality because: (1) "the federal [G]overnment has had full knowledge of Relators' allegations for over a decade, yet CMS is still paying for Prezista and Intelence;" (2) the Government had "actual knowledge of Relators' allegations;" and (3) Relators' proof of materiality consisted entirely of evidence that the

Government, and not necessarily CMS, generally cares about OL marketing, which fails to establish that the OL marketing would have altered CMS's payment decisions.  (*See* Rule 50 Moving Br. 17–23.)  Janssen appropriately raised these arguments during trial, including that "Medicare Part D pays for off-label" uses and medications, (6/11/24 Tr. at 8103:3–4), and that "CMS continues to reimburse" Prezista and Intelence despite awareness of Relators' allegations" (*id.* at 8063:2–6; *see also id.* at 8104:5–7 (arguing to the jury that "almost 200,000 prescriptions off-label were written for and paid for by prescribers who had nothing to do with [Janssen]"); *id.* at 5061:3–6 (arguing to the jury that "there isn't a shred of evidence in this case about what the Plan D sponsors evaluated when determining and certifying that a claim is reimbursable by Medicaid").)  The jury considered both parties' arguments and determined that Janssen's OL marketing violations were material to the Government's payment decisions.  As the Court may not "weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version," the Court is satisfied, based on the foregoing, that Relators presented sufficient evidence from which a reasonable juror could find that Janssen's OL marketing violations were material to the Government's reimbursement decisions.  *Lightning Lube, Inc.*, 4 F.3d at 1166.

With respect to falsity, Relators were required to prove that the claims submitted to Medicaid, Medicare, or ADAP, or caused to be submitted by Janssen, were false.  (Final Jury Instructions 31, Instruction No. 19.1).  The Court instructed the jury that a claim made to a federal health care program, including Medicaid, Medicare or ADAP, is false "if it seeks reimbursement for a prescription that is not eligible for reimbursement."  (*Id.* at 22, 31.)  During trial, Relators introduced testimony from HIV expert Aaron E. Glatt, who opined that while Janssen promoted Prezista for treatment-naïve patients, Prezista's label was not indicated for treatment-naïve patients

from 2006–2008, nor did recognized compendia support the use of Prezista in treatment-naïve patients.  (*See* 5/20/24 Tr. at 2329:24–2333:20, ECF No. 448.)  Glatt also testified that while Janssen promoted Intelence for once-a-day dosing and for treatment-naïve patients, Intelence's label was only indicated for twice-a-day and for a "very specific group of experienced patients." (*Id.* at 2307:9–2315:23, 2316:8–19.)  Relators also elicited testimony from Janssen's national sales director, Michael Iacobellis, who testified that prescribing Intelence for once-daily dosing was contrary to the drug's indicated label and that such messages would be "off-label" and not approved by the FDA.  (5/14/24 Tr. at 1461:1–21, ECF No. 447.)  In other words, Relators introduced evidence that demonstrated Janssen's marketing of Prezista and Intelence were OL, and that this OL marketing violated an express condition of payment for reimbursement under Medicare, Medicaid, or ADAP.  Taken together, the Court finds that a reasonable jury could have found that claims for Prezista and Intelence submitted to Medicare, Medicaid, or ADAP were OL and ineligible for reimbursement.

After reviewing the record in full, the Court is satisfied that there is ample evidence to support the jury's verdict of liability under the FCA.  It is not the Court's role to second-guess the jury's fact-finding and consideration of the evidence.  Drawing all reasonable and logical inferences in Relators' favor, the Court finds that Janssen has failed to carry its high burden of demonstrating that "any verdict other than the one directed would be erroneous under the governing law" and therefore denies Janssen's Rule 50 Motion as to liability under the federal FCA. *Brownstein v. Lindsay*, 742 F.3d 55, 63 (3d Cir. 2014) (quoting *Macleary v. Hines*, 817 F.2d 1081, 1083 (3d Cir. 1987)); *see Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993).

**Appx244**

2.    Jury's Finding of Liability Under the State False Claims Acts

In addition to finding that Janssen violated the FCA, the jury found that Janssen violated each of the twenty-seven state FCAs.[4]  Janssen argues that the Court should grant Janssen judgment as a matter of law on the state law claims because Relators failed to present any evidence specific to Relators' state law claims.  Janssen's argument is two-fold:  1) Relators failed to establish the coverage requirements of any of the state Medicaid and ADAP programs which have their own coverage schemes that are distinct from Medicare; and 2) Relators failed to prove causation, materiality and falsity as to these programs.  (Rule 50 Moving Br. 38–43).[5]

As a preliminary matter, to the extent that Janssen contends the jury only considered potential liability stemming from the fraudulent submission of Medicaid and ADAP claims when assessing liability under the state FCAs, and not under the federal FCA, the Court rejects this notion.[6]  (See Rule 50 Moving Br. 8–10, 38 (arguing that Relators' state law claims "implicates 'the conditions of payment' established by the respective states' Medicaid and ADAP programs" but that Relators' claims under the FCA implicates the conditions of payment established by Medicare Part D).)  It is well-established that causing a physician to fraudulently submit a claim

---

[4] The twenty-seven state FCAs at issue are those of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and the District of Columbia.

[5] Janssen also contends that the Court erred in instructing the jury that they must also find Janssen liable on the state law claims if they found Janssen liable on the federal FCA claim.  (Rule 50 Moving Br. 40, n. 26.)

[6] At trial, for example, counsel for Janssen argued that in order for a state to recover damages for Medicaid fraud under the FCA, Relators' claims "have to be litigated . . . under the state False Claims Act."  (6/11/24 Tr. at 7901:7–13.)  As the Court explains above, this contention is incorrect.  Many states have recovered, and continue to recover, in multi-state actions filed under the federal FCA without their own FCA statute.  For example, Ohio and Kentucky have successfully recovered millions of dollars in Medicaid fraud actions, without having state FCAs. See, e.g., AG Announces Settlement to Recover $446,800 for Ohio Medicaid Program, Circleville Herald (May 15, 2017), https://www.circlevilleherald.com/community/ag-announces-settlement-to-recover-for-ohio-medicaidprogram/article_341e1daf-fb18-5aa0-838b-f46b760f1029.html; Mark Payne, DaVita Healthcare Partners Settles Claims for $22 M, Washington Examiner (Jan. 8, 2015), https://www.washingtonexaminer.com/policy/healthcare/1221674/davita-healthcare-partners-settles-fca-claims-for-22m/.

13

**Appx245**

to any federal healthcare program, including Medicaid and ADAP, can give rise to liability under the federal FCA. *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016) (explaining that Medicaid is a "joint state-federal program" and that FCA liability may arise where a company causes the submission of fraudulent Medicaid claims); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, Civ. No. 02-6074, 2005 WL 2667207, at *2–3 (N.D. Ill. Oct. 17, 2005) (discussing the legislative history of the FCA and explaining the FCA applies to "circumstances where claims are submitted to State, local, or private programs funded in part by the United States" including "claims submitted to state Medicaid agencies or intermediaries"). The Court thus properly instructed the jury that Medicare, Medicaid, and ADAP are each "federal health care programs" within the ambit of the FCA and that the submission of false claims under any of these programs could give rise to liability under the FCA. (Final Jury Instructions 22, 30–34, Instruction Nos. 17, 19.) Accordingly, when evaluating Janssen's liability under the FCA, the jury evaluated whether claims for Prezista or Intelence submitted under Medicaid and ADAP programs were false, caused by Janssen's unlawful conduct, and material to the Government's payment decisions.

Notwithstanding this fact, the Court agrees with Janssen that Relators failed to introduce sufficient evidence from which a reasonable juror could find Janssen liable on the state FCAs. During trial, Relators presented no evidence regarding the scope or elements of each state FCA, what type of fraudulent claims would lead to liability under these state FCAs, and what amount of damages each state suffered as a result of the statutory violations. Instead of introducing evidence specific to their state law claims, Relators premised their entire case on the legal argument that because Janssen's conduct violated the federal False Claims Act, Janssen's conduct also violated each of the analogous state statutes. (*See* Proposed Jury Instructions 68–69, Disputed Instruction No. 25; Rule 50 Opp'n Br. 50–56.)

14

**Appx246**

At trial, Relators urged the Court to adopt a jury instruction that would direct the jury to find liability on all the state FCAs should the jury find liability under the FCA.  (*See* 6/11/24 Tr. at 7898:17–7916:17; Proposed Jury Instructions 68–69, Disputed Instruction No. 25.)   In proposing this jury instruction, Relators generally cited each state's FCA, but otherwise failed to provide the Court with any further analysis regarding the elements of each statute, their scope, or how they mirrored the FCA.  (Proposed Jury Instructions 68–69, Disputed Instruction No. 25.)  Relators cited to a single case in which the Government proposed a similar jury instruction.  *See United States ex rel. Kester v. Novartis Pharm. Corp.*, Civ. No. 11-08196, ECF No. 476 (S.D.N.Y. July 2, 2015) (proposing the court instruct the jury that they must find defendant liable on all state FCAs should they find the defendant liable under the FCA).  However, it is now clear that the case Relators relied upon settled before the parties could brief this proposed jury instruction, and it was never adopted by that court.  *Id.*  In fact, Relators cite to no authority in which a court actually made this finding, or adopted a similar proposed jury instruction, and the Court is further unaware of any such authority.  (*See* Proposed Jury Instructions 68–69, Disputed Instruction No. 25; Rule 50 Opp'n Br. 50–56.)

While it appears that courts have occasionally observed that federal and state FCA claims "succeed or fail together," courts have generally only held so where "no party has alleged a material difference between the standards applicable to the FCA and equivalent state laws."  *See, e.g.*, *United States ex rel. Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 543 n. 159 (E.D. Pa. 2022).  Here, however, Janssen does challenge the congruence of the state FCAs to the FCA.  (*See* 6/11/24 Tr. at 7898:17–7916:17; Proposed Jury Instructions 69–70, Disputed Instruction No. 25.)  Janssen, for example, disputes whether false ADAP claims would give rise to liability under each state FCA.  (Rule 50 Reply Br. 18, n. 14, ECF No. 485.)   Because Janssen raised arguments

**Appx247**

"specific to the state statutes," it was Relators' burden to articulate the elements of each state FCA, how each state FCA mirrored the federal FCA, and whether the state analog applied to fraudulent Medicaid and ADAP claims. *See U.S. ex rel. Portilla v. Riverview Post Acute Care Ctr.*, Civ. No. 12-1842, 2014 WL 1293882, at *9 (D.N.J. Mar. 31, 2014) (noting parallel outcomes on federal and NJFCA are appropriate where "the parties raise no arguments specific to the state statutes").

While the Court did adopt Relators' proposed instructions at trial, the Court also notes that before the parties' closing arguments, it specifically cautioned Relators regarding the lack of evidence they had introduced on their state law claims and emphasized that the Court's acceptance of Relators' verdict sheet should not be taken as acceptance that Relators' evidence was sufficient. The Court explained, in relevant part:

> I want to make sure that Relators are on notice that if there is a verdict of liability on those state claims, by no means are you covered by the fact that I've approved this verdict sheet. If anything, you might have actually caused yourself a greater issue because you've condensed this verdict sheet, where you're not allowing the jurors to allocate damages to each state, and you're not allowing them to make a determination as to the number of false claims per state. You're not even allowing them to determine the number of false claims for the states as a group.

(6/11/24 Tr. at 7906:15–25.) In fact, the Court predicted that this issue would become a focus of the parties' post-trial briefing. (*Id.* at 7906:9–12) ("I have some concerns about how the state law claims were presented during this trial, and I'm reserving on that decision because I have allowed Janssen to file a Rule 50 motion.").

After consideration of the parties' post-trial briefing and the trial evidence, the Court now finds that Relators failed to present sufficient evidence or analysis regarding the elements or scope of each state FCA at trial, despite the Court's warning prior to closing arguments, and that it was

16

error to accept Relator's proposed jury instruction.[7]  As a result, the record is "critically deficient of that minimum quantity of evidence" from which a jury might find Janssen liable under the state FCAs.  *In re Lemington Home for the Aged*, 777 F.3d at 626.  Accordingly, the Court will grant judgment as a matter of law to Janssen on Relators' state law claims, and will vacate the jury's award of $30,001,184 to the States under the state FCAs.

To be clear, whether or not Relators carried their burden of proof under the state law claims has no bearing on the jury's finding of liability and damages under the federal FCA.  In assessing Janssen's liability under the federal FCA, the jury independently determined that Janssen had caused the submission of 159,574 claims to the Government, and that the United States suffered $120,004,736 as a result of these violations.  (Verdict Form 2; *see also* Final Jury Instructions, Instruction Nos. 26, 28; 6/11/24 Tr. at 7946:16–7947:24.)  Accordingly, the damages the jury awarded to the States under the state FCAs is wholly severable from the damages the jury independently awarded to the United States under the federal FCA.

### 3.    Jury Verdict on Damages

Janssen next argues that the jury's verdict on the number of claims and amount of damages cannot be sustained because:  (1) the jury was instructed on the wrong measure of damages; (2) Relators' damages model was based on erroneous assumptions; (3) the number of claims and amount of damages are arbitrary and based on unsupported evidence; and (4) there is no basis to

---

[7] Relators also failed to prove by a preponderance of the evidence the damages each state suffered as a result of any violations of the state FCAs.  Attesting to this failure, while the jury awarded the States a lumpsum award of $30,001,184, Relators provided the Court with no method of allocating this award among the state parties.  (*See* Verdict Form.)  During trial, Relators claimed they were in touch with the National Association of Medicaid Fraud Units ("NAMFCU"), and that NAMFCU could help distribute any lumpsum awarded to the States.  (6/11/24 Tr. at 7899:15–19; 7902:15–20.)  In Relators' post-trial briefing, however, other than vaguely asserting in a footnote that the States are "all . . . members of [NAMFCU]," Relators fail to detail NAMFCU's involvement in the instant action or how NAMFCU would allocate this award.  (*See* Judgment Reply Br. 9, n.6, ECF No. 488).

identify the number of federal as opposed to state claims or damages. The Court finds each of these arguments unpersuasive.

a)    *Measure of Damages*

Janssen first contends that the Court's instruction to the jury that the amount of damages is "the full amount paid by the Government" to Janssen "as the result of [the] false claims," (Final Jury Instructions, Instruction No. 26), was incorrect because under Third Circuit precedent, FCA damages are equal to "the difference in cost between that contracted for and that received." *United States v. Hibbs*, 568 F.2d 347, 351 (3d Cir. 1977). While the Third Circuit applies this measure of damages in certain cases brought under the FCA, it is more aptly employed, for example, where the Government has paid for goods or services that return a tangible benefit to the Government. *Hibbs*, 568 F.2d at 347 (applying this standard where "the damages [we]re essentially similar to those sustained when a defective article is purchased in a fraudulent transaction"). Here, however, the Government received no measurable or tangible benefit from Janssen's conduct. Janssen contends that the Government was conferred the benefit of "effective treatment for patients with HIV," but such an alleged benefit is intangible and impossible to calculate. (Rule 50 Moving Br. 45); *see U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012) (explaining that the "benefit of the bargain" standard is "not . . . the methodology generally employed by courts evaluating FCA claims based on Medicaid or Medicare fraud" and concluding that the appropriate measure of damages in such a case is "the full amount the [G]overnment paid based on materially false statements" because the Government received "no tangible benefit" from defendant's conduct); *United States ex. rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877 (M.D. Fla. 2007) (holding that the damages were "the amount of money the Government paid out by reason of the false claims").

18

Here, because the Government did not receive any tangible or measurable benefit from Janssen's conduct, the Court finds that the proper measure of damages is the full amount the Government paid for the false claims, and that the Court did not err in instructing the jury on this measure of damages. *See United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (holding that where "[t]he [G]overnment offers a subsidy . . . with conditions" and "the conditions are not satisfied, nothing is due" and "the entire amount that [the defendant] received" for the false claims "must be paid back"); *see also United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003); *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 386 (4th Cir. 2015).

### b)    Reliability of Relators' Damages Experts' Calculations

Janssen next argues that Relators' damages experts' calculations lacked factual basis and were based on erroneous assumptions. (Rule 50 Moving Br. 46–47.) As Relators point out, this is the third time that Janssen has raised such arguments challenging the reliability of the methodology employed by Relators' damages experts, and the Court has rejected Janssen's arguments each time. (*See* ECF No. 294 at 31–37; ECF No. 493; 6/10/24 Tr. at 7748:16–7749:23, 7753:12-16, ECF No. 470.) The Court declines to revisit these issues and maintains that the proper mechanism for Janssen's challenges to the assumptions and choice of methodology employed by Relators' damages experts was at trial during cross-examination. (ECF No. 493 at 7–9); *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.") Indeed, Janssen was afforded multiple opportunities to cross examine Relators' expert witnesses during trial and did so at length. (*See* 6/3/24 Tr. at 5497:12–5593:7; 6/10/24 Tr. at 7732:18–7742:25; *see also* 6/7/24 Tr. at 7300:3–7307:11, 7345:4–7371:25, ECF No. 453; 6/10/24 Tr. at 7750:3–15.)

c)    *Basis of Jury Award*

Janssen next contends that the number of claims and the amount of damages the jury awarded were arbitrary and based on unsupported evidence.  A court reviewing a jury verdict has an "obligation . . . to uphold the jury's award if there exists a reasonable basis to do so."  *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 351-52 (3d Cir. 2001) (quoting *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989)).

Here, the jury returned a verdict of $120,004,736 for Relators on the federal FCA violation and found that Janssen caused 159,574 false claims to be submitted in violation of the federal FCA.[8]  (Verdict Form.)  Janssen argues that because Relators' damages expert, Shaked, proposed that the jury find damages in either $446.7 million or $361.9 million, reflecting the submission of either 593,996 or 481,265 false claims, and the jury reached a different finding, the jury's award "rests on [] guesswork or speculation" and cannot be sustained.  (Rule 50 Moving Br. 48–49.)  The Court disagrees and finds that the evidence adduced at trial supports the jury's verdict to a reasonable degree of certainty.  See *Evans*, 273 F.3d at 351–52.  At trial, Relators presented evidence that established varying amounts of damages the Government incurred as a result of Janssen's OL marketing and promotion.  (*See* ECF No. 481-2.)  Relators, for example, presented differing damages estimates based on the type of drug and specific OL promotions the reimbursements were related to.  (*Id.*)

The jury also heard testimony from Janssen's damages expert, Anupam Jena, who challenged the reliability of some of Shaked's data analyses, but testified that other parts of Shaked's estimates were "correct."  (*See* 6/10/24 Tr. at 7617:11–7621:12; 6/7/24 Tr. 7316:1–22).  Janssen further challenged the reliability and sufficiency of some of the damages data Relators

---

[8] Because the Court will grant judgment as a matter of law to Janssen on the state law claims, and will vacate the jury's award of $30,001,184 on these violations, the Court only addresses the jury's damages award under the FCA.

presented, including by arguing that the ADAP data Relators presented did not demonstrate that the prescribing physicians were contacted by Janssen.  (*See* 6/11/24 Tr. at 8091–92.).

In light of the numerous challenges raised regarding Relators' proffered evidence of damages, "it was within the jury's realm, as the finder of the facts, to reject []the extreme figures proffered by the litigants as incredible and substitute an intermediate figure as a matter of its judgment from all of the evidence." *Fuji Photo Film Co. v. Jazz Photo Corp.*, 249 F. Supp. 2d 434, 453 (D.N.J. 2003), *aff'd*, 394 F.3d 1368 (Fed. Cir. 2005); *Cosimano v. Twp. of Union*, Civ. No. 10-5710, 2017 WL 1395493, at *3 (D.N.J. Apr. 17, 2017) (explaining a jury is "free to accept or reject the figure calculated by Plaintiff's expert" and that the jury "can choose to reduce the expert's number based upon such things as their determination as to her credibility or the underlying assumptions upon which the calculations were made").  Mindful of its role to be "deferential to a jury's damages verdict," the Court finds that there was a reasonable basis from which the jury could conclude that Janssen caused the submission of 159,574 false claims in violation of the federal FCA, and that the Government sustained $120,004,736 in damages as a result. *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 392 (3d Cir. 2016).

> d)    *Number of False Claims*

Janssen further argues that because Relators' state law claims fail as a matter of law, the jury's finding of the number of claims cannot be sustained because it includes federal and state claims, with no basis in the record to disaggregate them.  (Rule 50 Moving Br. 49.)  This contention is incorrect.  As the Court noted *supra* III(A)(2), whether or not Relators carried their burden of proof under the state law claims has no bearing on the jury's finding that Janssen's conduct caused the submission of false Medicare, Medicaid, or ADAP claims under the federal FCA.

While Relators ultimately failed to carry their burden on the proving the state law claims, the jury reasonably found that Janssen's conduct violated the FCA and that Janssen caused the

submission of 159,574 false claims to the Government.  The jury instructions and question two of the Verdict Form were clear in directing the jury to only identify the number of false claims that were submitted to the Government, and not to identify any claims that were submitted to the states. (*See* 6/11/24 Tr. 7946:16–7947:24 (confirming that the jury must only identify "the number of false or fraudulent claims that were submitted to the United States").[9]  Accordingly, the Court finds that the number of claims the jury identified as false or fraudulent under the FCA can be sustained, notwithstanding the Court's granting of judgment as a matter of law on Relators' state law claims.

Drawing all reasonable and logical inferences in the nonmovant's favor, the Court finds that Janssen fails to meet its heavy burden of showing that "a miscarriage of justice would result if the verdict were to stand" on the FCA claim.  *Klein*, 992 F.2d at 1290.  Accordingly, Defendant's Motion for Judgment as a Matter of Law will be denied as to this issue.

### 4.    Government Action and Public Disclosure Bars

Finally, Janssen argues that this Court has no subject matter jurisdiction under the FCA's government action and public disclosure bars.  (Rule 50 Moving Br. 52–53.)  Specifically, Janssen contends that:  (1) the government action bar precludes Relators claims because Janssen entered a CIA with the Government in 2010 to settle allegations related to the OL marketing of another drug; and (2) the public disclosure bar precludes Relators' claims because allegations related to the OL marketing of other drugs were publicly disclosed in connection with two CIAs that Janssen executed in 2010 and 2013.  Janssen's arguments are unpersuasive.

---

[9] Jury Instruction No. 28 was initially drafted to instruct the jury to identify "the number of false or fraudulent claims that were submitted to the United States, *the states, and the District of Columbia*."  (Final Jury Instructions 45, Instruction No. 28.)  Prior to delivering the written instructions to the jury, counsel for Relators confirmed that this instruction should be revised to remove mention of "the states, and the District of Columbia" and should only instruct the jury for a finding on the "number of false or fraudulent claims that were submitted to the United States."  (6/11/24 Tr. 7946:16–7947:24.)

**Appx254**

The government action bar is inapplicable to the instant case because Relators' allegations were not "the same as allegations already made by the [G]overnment" and were not "based on the same underlying facts." *See Sturgeon v. Pharmerica Corp.*, 438 F.Supp.3d 246, 262 (E.D. Pa. 2020). Here, assuming the 2010 CIA is sufficient to trigger the government action bar under the FCA, the Government's allegations which led to the 2010 CIA related to the alleged OL marketing of the drug Topamax—not Prezista or Intelence—and were thus substantially dissimilar to Relators' claims here. *See* RX423; *Sturgeon*, 438 F.Supp.3d at 262 (explaining that a relator's allegations must be "similar enough to be characterized as feeding off of the [G]overnment's allegations" for the government action bar to apply and that the bar does not apply where a relator seeks to "remedy fraud that the [G]overnment has not yet attempted to remedy").

With respect to the public disclosure bar, after Janssen filed its Rule 50 Motion, the United States filed a statement of interest, exercising its right to object to dismissal of this action based on the public disclosure bar for FCA claims accruing on or after March 23, 2010.[10] (U.S. Statement of Interest, ECF No. 478.)

The public disclosure bar of the FCA provides in relevant part:

> The court shall dismiss an action or claim under this section, *unless opposed by the Government*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed – (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

---

[10] The FCA's public disclosure bar was amended on March 23, 2010. Congress amended the FCA in 2010 and in so doing "overhauled the public disclosure bar," "radically chang[ing] the 'hurdle' for relators." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 298 (3d Cir. 2016). In *Graham County Soil and Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010), the Supreme Court held that this amendment was not retroactive. Thus, it applies only to FCA claims accruing on or after the effective date of the amendment.

Appx255

31 U.S.C. § 3730(e)(4)(A) (2010) (emphasis added).

Because the public disclosure bar of the FCA provides that the Court shall dismiss an action "*unless opposed by the Government,*" and here, the Government exercised its right by objecting to such dismissal, the Court denies Janssen's motion to dismiss this action on these grounds. *Id.*

Janssen also asks the Court to hold that the *qui tam* provisions of the FCA are unconstitutional because it represents an impermissible delegation of executive power to a private party. (Rule 50 Moving Br. 54–55.) Janssen relies on a recent decision in the Middle District of Florida in which the district court departed from the longstanding and nationwide consensus that these provisions do not violate the separation of powers, and instead held that the *qui tam* provisions are an unconstitutional exercise of executive power. *United States ex rel. Zafirov v. Florida Medical Associates, LLC*, Civ. No. 19-1236, 2024 WL 4349242 (M.D. Fla. Sept. 30, 2024). The Court declines to follow this singular non-precedential and out-of-circuit court decision, and instead follows every federal circuit court of appeals that has addressed this issue and holds that the FCA's *qui tam* provisions are constitutional. *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993).

**B.    Janssen's Motion for a New Trial**

Janssen also moves for a new trial pursuant to Rule 59 and raises many of the same arguments it raises in its Rule 50 Motion. (*See generally* Rule 50 Moving Br.; Rule 59 Moving Br., ECF No. 474-1.) Janssen argues that Relators failed to prove elements of their FCA and state

24

FCA claims, and that these failures of proof, exacerbated by errors in at least three of the Court's jury instructions, "created an atmosphere of confusion for the jury" that justifies a new trial. (Rule 59 Moving Br.)

### 1.    Jury's Finding of Liability Under the Federal False Claims Act

Janssen first contends, as it did in its Rule 50 Motion, that Relators failed to prove causation, materiality, and falsity of a claim under the FCA, and that this evidentiary failure warrants a new trial. Although the standard for granting a new trial is "less demanding" than the standard for granting judgment as a matter of law, the Court finds that even under the less demanding standard, Janssen has failed to establish that the jury's finding of liability under the federal FCA is contrary to the great weight of evidence. *Boehringer Ingelheim Vetmedica, Inc.*, 166 F. Supp. 2d at 28; *Dougherty v. Marshalls of MA, Inc.*, 460 Fed. Appx. 132, 135 (3d Cir. Jan. 26, 2012) (explaining where a motion for a new trial is based predominantly on the weight of the evidence, the motion should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience.") As the Court explained *supra* III(A)(1), Relators presented substantial evidence at trial that supports the jury's findings on causation, materiality, and falsity under the FCA. Thus, with respect to the jury's finding of liability under the FCA, the Court finds that the record does not show that the jury's verdict resulted in a miscarriage of justice or shocks the conscience. *Dougherty*, 460 F. App'x at 135.

### 2.    Purported Errors in the Jury Instructions

Janssen next contends that three of the Court's instructions to the jury—Instruction No. 23 (Federal and State FCAs), Instruction No. 26 (Measure of Damages), and Instruction No. 22 (FDA Approval)—contained errors that the jury proved unable to navigate in delivering its verdict. (Rule 59 Moving Br. 3–4.)

**Appx257**

The standard for ordering a new trial based on a claim of erroneous jury instructions is high.  "A new trial on the ground of erroneous jury instructions is permissible only when it is clear that an error in [the] instructions as a whole was such as to have misled the jury." *New Idea Farm Equip. Corp. v. Sperry Corp.*, 916 F.2d 1561, 1567 (Fed. Cir. 1990).  In reviewing jury instructions, the court must consider the entire trial record, because "instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury." *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1522 (Fed. Cir. 1995), *rev'd on other grounds*, 520 U.S. 17 (1997).

As discussed *supra* III(A)(3)(a), the Court finds that Instruction No. 26, which instructed the jury on the measure of damages, was proper.  With respect to Instruction No. 22, Janssen argues that the instruction "effectively instructed the jury to ignore the undisputed testimony of Dr. Amit Patel," who testified that standard practice in the industry interpreted silence from the FDA's Division of Drug Marketing, Advertising, and Communications ("DDMAC") as approval.  (Rule 59 Moving Br. 4.)  Jury Instruction 22 instructed:

> You have heard testimony from a Janssen employee, Dr. Amit Patel, about the FDA's silence in response to certain of Janssen's promotional advertising submissions regarding Prezista and lipids. You also heard him testify that Janssen considered the FDA's silence in response to those advertising submissions as the FDA's indirect or tacit approval of Janssen's advertising. I am instructing you that there is no statute or regulation that says that the FDA's silence means that it has approved a promotional advertising submission.

Janssen contends that the Court erred in not including the language "or disapproved" as Janssen proposed including in its proposed jury instructions.  (Rule 59 Moving Br. 12–13 (explaining Janssen's proposed language would have clarified "there is no statute or regulation that says that the FDA's silence means that it has approved *or disapproved* a promotional

26

**Appx258**

advertising submission.").)  Janssen argues that the Court's failure to include Janssen's proposed language improperly influenced the jury to find scienter and falsity.  (*Id.*)

The Court is not persuaded there was any error in this jury instruction.  Janssen does not challenge the accuracy of this jury charge, but rather asserts this jury charge was somehow misleading because the Court did not adopt Janssen's exact proposed language.  However, "[a] trial judge is not required to adopt the exact wording of a point for charge submitted by counsel." *Posttape Associates v. Eastman Kodak Co.*, 537 F.2d 751, 757 (3d Cir.1976).  Rather, a court assesses whether the jury charge, taken as a whole, accurately instructed the jury. *See Colegrove v. Cameron Mach. Co.*, 172 F. Supp. 2d 611, 634 (W.D. Pa. 2001) ("[i]f the jury charge, taken as a whole, accurately instructed the jury, then there is no error in [the Court] rejecting a party's suggested point for charge in favor of another statement of the applicable law.")  Here, the Court finds that it accurately instructed the jury on this issue, and the Court's omission of the phrase "or disapproved" did not mislead the jury.  In fact, adopting Janssen's proposed language would have had the very misleading effect Janssen now attempts to raise in its motion.  The Court rightfully rejected it.

With respect to Instruction No. 23, for the reasons outlined *supra* in III(A)(2), the Court agrees with Janssen that it was error to adopt Relators' instruction.  The Court must accordingly determine whether this error had a "substantial influence" on the jury's remaining verdict of liability under the federal FCA.  *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993), *cert. denied*, 510 U.S. 982 (1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir.1992) (a new trial is only warranted when "the[ ] errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial"); *see also Inter Med. Supplies Ltd. v. EBI Med. Sys., Inc.*, 975 F. Supp. 681, 686 (D.N.J. 1997), *aff'd and remanded*, 181 F.3d 446 (3d

Cir. 1999) (citation omitted) ("[E]ven if the court determines that an error was made, it should not grant a new trial unless it also determines that the error was so prejudicial that []refusal to take such action appears to the court inconsistent with substantial justice"). In this case, the jury's finding of liability under the federal FCA was independent of its finding of liability under the state FCAs. The jury was first tasked with determining liability under the FCA *before* it could then determine whether Janssen violated the state FCAs. In other words, had the Court properly instructed the jury that liability on the state analogs did not necessarily follow liability on the FCA, it is "highly probable" that the jury's finding of liability under the FCA would have been the same. *Forrest v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005) (citing *McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 924 (3d Cir.1985) (an error is harmless if it is "highly probable" that it did not affect the outcome of the case). The Court thus finds that although it adopted Instruction No. 23, the Court did not fail to apprise the jury of Relators' burden of proof under the FCA, nor did the Court confuse the jury as to its role in identifying the number of false claims that were submitted to the Government.

After reviewing the evidence in full, the Court cannot conclude that the jury's verdict was against the great weight of the evidence on the FCA claim. On the state law claims in which the Court is overturning the jury's verdict and finding that judgment as a matter of law should be granted in favor of Janssen, a new trial is not warranted because the Court's decision effectively resolves these issues. *See Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 257 (D. Del. 2001) (overturning the jury's verdict and granting judgment as a matter of law on certain issues but nonetheless denying motion for a new trial because the court's decision was "sufficient to resolve [any] issues").

**Appx260**

### 3.    Jury Deliberations and Verdict

Janssen's final argument in support of its Rule 59 Motion is that the jury's damages award reflects an "improper compromise verdict" because the number of claims and damages found by the jury are "untethered to any evidence presented at trial." (Rule 59 Moving Br. 38–39.) Janssen further points to the "timeline of communications from the jury during deliberations" and the fact that the jury concluded its deliberations on a Thursday evening just before 5 PM, as evidence that the jury was "forced to compromise on an impermissible global damages figure because such evidence was not available, and because certain members of the jury were not available to deliberate the following day." (*Id.* at 41–42.) The Court finds these arguments unavailing.

As discussed *supra* III(A)(3), the Court finds that there exists a reasonable basis and sufficient evidence underlying the jury's verdict and findings. Furthermore, Janssen's speculations as to whether the jury rushed in its deliberation is without merit. The jury deliberated for over two full days, and reached a unanimous verdict, awarding damages in an amount far less than what Relators sought. The Court is convinced that the jury properly discharged its duty in evaluating the evidence, and that the jury's verdict was reasonable in light of the evidence presented. *See Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir. 1989) (rejecting defendant's contention of compromise verdict stating that, on review, court must ascertain "only whether the jury's verdict is reasonable in light of the evidence presented, and not to indulge in unsubstantiated and speculative assertions"), *overruling recognized on other grounds*, *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1099, n.10 (3d Cir. 1995).

Having presided over the trial in this matter and having carefully reviewed the arguments and evidence presented by counsel in connection with this Rule 59 Motion, the Court finds that Janssen fails to raise any arguments sufficient to justify the "extraordinary relief" of granting a new trial, and the Court declines Janssen's invitation to "usurp[] the jury's prime function as the

trier of fact[.]"  *Boehringer*, 166 F. Supp. 2d at 29; *Marra v. Phila. Housing Authority*, 497 F.3d 286, n. 18 (3d Cir. 2007).  The jury's verdict finding Janssen liable under the FCA was not against the weight of the evidence; rather, it was in accordance with the weight of the evidence.  The jury was tasked with determining which of the parties' accounts was more credible, bearing in mind Relators' burden of proof on each of its claims.  The jury carried out its duty to evaluate the evidence and assess the credibility of all the witnesses.  There was an abundance of evidence to support the jury's verdict in favor of Relators on the FCA claim.  *See United States v. Copple*, 24 F.3d 535, 547, n.17 (3d Cir. 1994).  As such, the Court does not find that a miscarriage of justice would result if the jury's verdict as to liability and damages under the FCA stands.  *See Brennan*, 350 F.3d at 430.  Accordingly, Janssen's Motion for a New Trial will be denied.

### C.      Relators' Motion for Entry of Judgment

Having addressed Janssen's Rule 50 and Rule 59 Motions, the Court next turns to Relators' Motion for Entry of Judgment.  (*See generally* Judgment Moving Br., ECF No. 475-1.)

#### 1.      Trebling of Damages

Under the FCA, a defendant is liable for "3 times the amount of damages which the Government sustains because of the [defendant's] act."  31 U.S.C. § 3729(a)(1); *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 122 (2003) ("[I]f the [FCA] claim succeeds, the defendant is liable to the Government for . . . treble damages"); *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1297 (11th Cir. 2021) (observing that the FCA "mandat[es] the imposition of treble damages").  The jury found that the Government suffered $120,004,736 in damages as a

result of Janssen's conduct. As such, the Court will enter judgment in the amount of $360,014,208 against Janssen.[11]

### 2.    Civil Penalties

In addition to compensatory damages, the FCA requires that the Court assess civil penalties against Janssen based on the number of false claims that they submitted. Under the FCA, the Court must assess a fine between $5,500 and $11,000 per false claim.[12]  31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9). It is within this Court's discretion whether to impose the maximum, the minimum, or some intermediate penalty. *Cook Cnty., Ill.*, 538 U.S. 119, 132 (2003); *see also United States v. Rogan,* 02-3310, 2006 WL 8427270, at *25 (N.D. Ill. Oct. 2, 2006) ("Though the imposition of civil penalties are mandatory, 31 U.S.C. § 3729, the court determines the amount of the penalty.")

In making this determination, courts look to the totality of the circumstances, including the egregiousness of the conduct, the Government's damages, the right of the Government to be made completely whole, and general fairness principles. *See United States ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007). Additionally, courts fixing civil penalties generally will consider the gravity of the offense, a defendant's acceptance of responsibility or lack of remorse, the need for deterrence, and possible recidivism. *See United States v. Saavedra*, 661 Fed. App'x 37, 46 (2d Cir. 2016); *Amerigroup Illinois, Inc.*, 488 F. Supp. 2d at 740. Relators seek a statutory violation of $9,000 per claim, whereas Janssen requests that

---

[11] Janssen again contends that the "entire federal damages figure is invalid" because "some portion of the jury's federal damages award must be based on federal funding for the state claims that underlie the jury's state damages award." (Judgment Opp'n Br. 17–18.) As discussed *supra* III(A)(2), the jury's award of damages to the Government under the FCA is wholly severable from the damages the jury awarded to the States as a result of the state FCA violations.

[12] Congress has since increased the civil penalty range for an FCA violation. *See* 28 C.F.R. § 85.5. However, a penalty range of $5,500 to $11,000 was the range in effect during the relevant time period. 28 C.F.R. § 85.3(a)(9); (Judgment Moving Br. 7, n.4). Accordingly, the Court applies this range in assessing a penalty.

the Court's penalty assessment be "limited to no more than an amount equal to the actual damages found by the jury." (Judgment Moving Br. 36; Judgment Opp'n Br. 40, ECF No. 479.)

> a)    *The Number of False Claims*

Janssen contends that any penalty imposed should not be based on "the number of claims those physicians and Plan Sponsors ultimately made to healthcare programs," but on "the conduct in which Relators allege Janssen engaged," because "the verdict form is hopelessly unclear" regarding the number of false claims submitted to the Government. (Judgment Opp'n Br. 25–28, n.5.) The Court finds this argument unavailing.

As noted *supra* III(A)(3), the jury found Janssen caused the submission of 159,574 false claims to the Government, and Relators' failure to independently prove their state law claims does not vitiate this finding in any manner. The Court is further unpersuaded by Janssen's argument that assessing a penalty based on the number of false claims physicians submitted would improperly punish Janssen "for the acts of others." (Judgment Opp'n Br. 26.) It is well-established that liability under the FCA extends to third parties whose fraudulent conduct causes the submission of false claims to the Government. *See Marcus*, 317 U.S. at 544. Janssen reaped significant benefits from its fraudulent conduct, and Janssen cannot escape the correspondingly significant penalties mandated by the FCA by simply arguing that it was not the actual party submitting claims to the Government. *See Lagerbusch*, 361 F.2d at 449 ("We have no doubt that the False Claims Act covers such an indirect mulcting of the [G]overnment."). Accordingly, the Court determines the penalty to be assessed based on the jury's finding that Janssen caused the submission of 159,974 false claims to the Government.

> b)    *The Penalty*

In enacting the FCA and mandating "significant" damages, Congress determined that an FCA violation is a serious offense and that a civil penalty within the express statutory range was

**Appx264**

necessary for the effective operation of the FCA. *U.S. ex rel. Chandler v. Cook County, Ill.*, 277 F.3d 969, 977 (7th Cir. 2002) ("It could not be more clear that Congress, in adopting [the FCA damages scheme] addressed the situation with careful precision as to what sort of damage scheme was necessary to achieve the goals of the statute"). The Court is thus mindful of its role to grant "substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes," and declines to impose a penalty below the minimum statutory range, as Janssen requests this Court do. *U.S. v. Bajakajian*, 524 U.S. 321, 334 (1998) (quoting *Solem v. Helm*, 463 U.S. 277 (1983)); (Judgment Opp'n Br. 30–33 (arguing that the Court should impose a "1:1 ratio as a benchmark" for the relationship between actual damages and any assessed penalties).)

The facts in the record support a civil penalty near the middle of the statutory range of $5,500 and $11,000. The Court is convinced that Janssen engaged in a deliberate and calculated scheme that spanned several years and involved the unlawful marketing of its products. The evidence at trial also demonstrated that Janssen was aware of the seriousness of its conduct, and entered into at least three agreements with the Government in the past to resolve allegations related to OL marketing of other drugs. *See* RX423; RX361; RX1624. Further, despite the jury's verdict, Janssen refuses to accept responsibility for its conduct. *See Saavedra*, 661 Fed. App'x at 46 (affirming the district court's award of maximum statutory penalties where defendant issued a press release following the jury's verdict showing "a disturbing refusal to accept responsibility"). Following the jury's verdict, Janssen issued a press release stating the jury's decision was "predicated on a clearly erroneous jury instruction that is contrary to the law" and that Janssen is "confident [the jury's verdict] will be reversed on appeal." Zoey Becker, *J&J to seek appeal of $150M verdict in long-spanning HIV meds off-label marketing case*, FiercePharma (June 17,

2024), https://www.fiercepharma.com/marketing/jjs-janssen-seek-appeal-150m-verdict-long-spanning-hiv-meds-false-claims-act-litigation.

While the need for deterrence, possible recidivism, Janssen's evidenced pattern of misconduct, and its refusal to accept responsibility counsel in favor of the Court imposing a higher civil penalty, the lack of evidence regarding patient harm and general fairness principles counsel against the Court imposing the maximum penalty. For example, while Janssen's OL marketing may have caused harm to some patients, Relators presented no evidence that any such harm resulted. The Court is also mindful of its duty to impose a fine that is not "grossly disproportionat[e] to the gravity of [the] defendant's offense." *Bajakajian*, 524 U.S. at 334 (holding that a fine violates the Excessive Fines Clause of the Eighth Amendment "if it is grossly disproportional to the gravity of a defendant's offense").

Balancing these factors, the Court finds that a penalty near the middle of the statutory range both reflects the seriousness of the offense, and is not so grossly disproportionate to the jury's finding of actual damages that it would constitute excessive punishment or a breach of due process under the U.S. Constitution. (*See* Judgment Opp'n Br. 3–4, 28); *Yates*, 21 F.4th at 1314 (observing that "[penalties] falling below the maximum statutory fines for a given offense . . . receive a strong presumption of constitutionality").

The Court thus imposes a fine of $8,000 for each false claim under the FCA. Such a penalty would amount to over ten times the actual damages suffered by the Government, which the Court finds adequately serves Relators' interests and reflects the seriousness of the offense without being unfair to Janssen. *See United States v. Saavedra*, Civ. No. 11-6425, 2015 WL 7621481, at *1–2 (S.D.N.Y. June 16, 2015), *aff'd*, 661 F. App'x 37 (2d Cir. 2016) (awarding $11,000 per false statement which amounted to a civil penalty of eleven times the actual damages suffered by the

**Appx266**

Government where the defendant's conduct was "deliberate" and the defendant refused to accept responsibility for his actions). The jury found 159,574 false claims. As such, the Court will award $1,276,592,000 in civil penalties.

**IV.    <u>CONCLUSION</u>**

For the reasons stated above, the Court will **GRANT IN PART** and **DENY IN PART**, Janssen's Motion for Judgment as a Matter of Law. The Court will **DENY** Janssen's Motion for a New Trial. The Court will **GRANT IN PART** and **DENY IN PART** Relators' Motion for Entry of Judgment. An appropriate Order and Judgment consistent with this Opinion will follow.

Date: March 28, 2025

<u>s/ Zahid N. Quraishi</u>
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, *et al.*, *ex rel.* **JESSICA PENELOW and CHRISTINE BRANCACCIO**,<br><br>Plaintiffs,<br><br>v.<br><br>**JANSSEN PRODUCTS, LP**,<br><br>Defendant. | Civil Action No. 12-7758 (ZNQ) (JBD)<br><br>**ORDER** |

**QURAISHI, District Judge**

 **THIS MATTER** comes before the Court upon Defendant Janssen Products, LP's ("Janssen") Motion for Judgment as a Matter of Law ("Rule 50 Motion", ECF No. 473), Janssen's Motion for a New Trial ("Rule 59 Motion", ECF No. 474), and Relators Jessica Penelow and Christine Brancaccio's (collectively, the "Relators") Motion for Entry of Judgment (ECF No. 475). Relators opposed Janssen's Rule 50 and Rule 59 Motions (ECF Nos. 481, 480), and Janssen replied (ECF Nos. 485, 486). Janssen opposed Relators' Motion for Entry of Judgment (ECF No. 479), and Relators replied (ECF No. 488.) The Court has carefully considered the parties' submissions and decides the motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth in the accompanying Opinion,

 **IT IS** on this **28th** day of **March 2025**, **ORDERED** as follows:

 1. Janssen's Motion for Judgment as a Matter of Law (ECF No. 473) is **GRANTED IN PART** and **DENIED IN PART**.

**Appx268**

      a.   Janssen's Motion for Judgment as a Matter of Law is **GRANTED** with respect to Relators' state law claims.

      b.   Janssen's Motion for Judgment as a Matter of Law is **DENIED** with respect to Relators' claim for off-label promotion under the federal False Claims Act.

2.   Janssen's Motion for a New Trial (ECF No. 474) is **DENIED**.

3.   Relators' Motion for Entry of Judgment (ECF No. 475) is **GRANTED IN PART** and **DENIED IN PART**.

4.   The Court will enter a **FINAL JUDGMENT** consistent with this Order.

5.   The Clerk of the Court shall close this case.

<u>s/ Zahid N. Quraishi</u>
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

2

**Appx269**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, *et al.*, *ex rel.* **JESSICA PENELOW and CHRISTINE BRANCACCIO**,<br><br>Plaintiffs,<br><br>v.<br><br>**JANSSEN PRODUCTS, LP**,<br><br>Defendant. | Civil Action No. 12-7758 (ZNQ) (JBD)<br><br>**FINAL JUDGMENT** |

**QURAISHI, District Judge**

 **THIS MATTER** comes before the Court upon Defendant Janssen Products, LP's ("Janssen") Motion for Judgment as a Matter of Law ("Rule 50 Motion", ECF No. 473), Janssen's Motion for a New Trial ("Rule 59 Motion", ECF No. 474), and Relators Jessica Penelow and Christine Brancaccio's (collectively, the "Relators") Motion for Entry of Judgment (ECF No. 475). Relators opposed Janssen's Rule 50 and Rule 59 Motions (ECF Nos. 481, 480), and Janssen replied (ECF Nos. 485, 486). Janssen opposed Relators' Motion for Entry of Judgment (ECF No. 479), and Relators replied (ECF No. 488.) The Court has carefully considered the parties' submissions and decides the motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth in the accompanying Opinion,

 **IT IS** on this **28th** day of **March**, **ORDERED** as follows:

1. **JUDGMENT** is hereby entered for Relators and against Janssen with respect to Count I, Relators' claim under the federal False Claims Act for off-label promotion as follows:

a.  The United States is hereby awarded $360,014,208 in trebled damages.

b.  The United States is hereby awarded $1,276,592,000 in statutory civil penalties, which consists of a $8,000 penalty for each of the 159,574 false claims the jury found Janssen caused to be submitted.

c.  The United States shall be awarded post-judgment interest on all foregoing amounts from today's rate at the prevailing statutory rate, calculated as the weekly average 1-year constant maturity (nominal) Treasury yield, as published by the Federal Reserve System each Monday for the preceding week.

2.  This is a **FINAL JUDGMENT** disposing of all claims and all parties. Any relief not expressly granted herein is hereby **DENIED**.

3.  The Clerk of the Court instructed to mark this case **CLOSED**.

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

2

**Appx271**

Allison M. Brown
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Phone: (212) 446-4757
Alli.Brown@kirkland.com

Geoffrey M. Wyatt
(admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone: (202) 389-3393
Geoffrey.Wyatt@kirkland.com

Abigail Hazlett
(admitted *pro hac vice*)
Michael A. Schwartz
(admitted *pro hac vice*)
Brian Nichilo
**TROUTMAN PEPPER**
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
Phone: (215) 981-4000
Fax: (215) 981-4750
Abigail.Hazlett@troutman.com
Michael.Schwartz@troutman.com
Brian.Nichilo@troutman.com

*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* JESSICA PENELOW and CHRISTINE BRANCACCIO, <br><br> Plaintiffs, <br><br> v. <br><br> JANSSEN PRODUCTS, LP, <br><br> Defendant. | Case No. 12-7758 (ZNQ)(JBD) <br><br> **NOTICE OF APPEAL** <br><br> Hon. Zahid N. Quraishi |

Notice is given that Defendant Janssen Products, LP, pursuant to 28 U.S.C.

§ 1291, hereby appeals to the United States Court of Appeals for the Third Circuit

1

**Appx272**

from the final judgment, ECF 498, entered on March 28, 2025, and all adverse

orders, rulings, findings, stipulations, and conclusions merged in the judgment.

Dated: April 25, 2025                    Respectfully submitted,

                                          /s/ Allison M. Brown
                                          Allison M. Brown
                                          **KIRKLAND & ELLIS LLP**
                                          601 Lexington Avenue
                                          New York, NY 10022
                                          Phone: (212) 446-4757
                                          Alli.Brown@kirkland.com

                                          Geoffrey M. Wyatt
                                          (admitted *pro hac vice*)
                                          **KIRKLAND & ELLIS LLP**
                                          1301 Pennsylvania Avenue, N.W.
                                          Washington, DC 20004
                                          Phone: (202) 389-3393
                                          Geoffrey.Wyatt@kirkland.com

                                          Abigail Hazlett
                                          (admitted *pro hac vice*)
                                          Michael A. Schwartz
                                          (admitted *pro hac vice*)
                                          Brian Nichilo
                                          **TROUTMAN PEPPER**
                                          3000 Two Logan Square
                                          Eighteenth and Arch Streets
                                          Philadelphia, PA 19103
                                          Phone: (215) 981-4000
                                          Fax: (215) 981-4750
                                          Abigail.Hazlett@troutman.com
                                          Michael.Schwartz@troutman.com
                                          Brian.Nichilo@troutman.com

                                          *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a true and correct copy of the foregoing Notice of Appeal was served by the undersigned this 25th day of April, 2025 via ECF on all counsel of record.

Dated: April 25, 2025                    Respectfully submitted,

/s/ Allison M. Brown
Allison M. Brown
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Phone: (212) 446-4757
Alli.Brown@kirkland.com
*Attorney for Defendants*