No. 25-1818

# In The United States Court of Appeals for the Third Circuit

United States of America; State of California; State of Colorado; State of Connecticut; State of Delaware; State of Florida; State of Georgia; State of Hawaii; State of Illinois; State of Indiana; State of Iowa; State of Louisiana; Commonwealth of Massachusetts; State of Michigan; State of Minnesota; State of Montana; State of Nevada; State of New Jersey; State of New Mexico; State of New York; State of North Carolina; State of Oklahoma; State of Rhode Island; State of Tennessee; State of Texas; Commonwealth of Virginia; State of Washington; and District of Columbia ex rel. Jessica Penelow and Chrisine Brancaccio,

*Plaintiffs-Appellees*,

v.

Janssen Products, L.P.,

*Defendant-Appellant.*

On Appeal from the United States District
Court for the District of New Jersey
(Case No. 12-cv-7758) (District Judge Zahid N. Quraishi)

**BRIEF OF WASHINGTON LEGAL FOUNDATION AS AMICUS
CURIAE SUPPORTING DEFENDANT-APPELLANT AND REVERSAL**

Cory L. Andrews
Washington Legal Foundation
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
candrews@wlf.org

*Counsel for Amicus Curiae
Washington Legal Foundation*

July 21, 2025

## RULE 26 DISCLOSURE STATEMENT

Washington Legal Foundation is a nonprofit corporation under Section 501(c)(3) of the Internal Revenue Code. It has no parent, issues no stock, and no public company holds a ten-percent or greater interest.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ...................................................... i

TABLE OF AUTHORITIES ................................................... iii

INTEREST OF AMICUS CURIAE ........................................... 1

INTRODUCTION ................................................................ 2

SUMMARY OF ARGUMENT ................................................ 4

ARGUMENT .................................................................... 7

I.   THE FCA'S QUI TAM PROVISIONS VIOLATE ARTICLE II ...................... 8

    A.   The Vesting Clause: Executive power belongs to the President alone—no bounty hunters allowed ........................ 8

    B.   The Appointments Clause: Relators behave as Officers of the United States ............................................. 11

    C.   The Take Care Clause: Relators hijack the Executive's discretion ................................................ 14

II.  HISTORY CANNOT OVERRIDE CONSTITUTIONAL TEXT ...................... 15

CONCLUSION ................................................................ 19

COMBINED CERTIFICATIONS .......................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Buckley v. Valeo,*
424 U.S. 1 (1976) ....................................................... 5, 12

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ........................................................ 16

*Freytag v. Comm'r,*
501 U.S. 868 (1991) ........................................................ 13

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ........................................................ 10

*Lucia v. SEC,*
585 U.S. 237 (2018) ..................................................... 5, 13

*Marvin v. Trout,*
199 U.S. 212 (1905) ..................................................... 7, 17

*Morrison v. Olson,*
487 U.S. 654 (1988) ..................................................... 5, 13

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ........................................................ 7, 15

*N.Y. Times v. Sullivan,*
376 U.S. 254 (1964) ........................................................ 16

*Riley v. St. Luke's Episcopal Hosp.,*
252 F.3d 749 (5th Cir. 2001) ........................................... 3, 12

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020) ..................................................... 8, 12

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ......................................................... 9

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) ........................................................ 14

*United States ex rel. Kelly v. Boeing Co.,*
9 F.3d 743 (9th Cir. 1993) .................................................. 3

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,*
985 F.2d 1148 (2d Cir. 1993) ................................................................. 3

*United States ex rel. Marcus v. Hess,*
317 U.S. 537 (1943) .......................................................................... 17

*United States ex rel. Polansky v. Exec. Health Res.,*
599 U.S. 419 (2023) ................................................................ 1, 12, 17

*Unted States ex rel. Relators v. Muskingum Watershed Conservancy
Dist.,* 2017 WL 4102369 (N.D. Ohio Sept. 15, 2017) ......................... 15

*United States ex rel. Stone v. Rockwell Int'l Corp.,*
282 F.3d 787 (10th Cir. 2002) ............................................................ 3

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.,*
41 F.3d 1032 (6th Cir. 1994) ............................................................. 3

*United States v. Nixon,*
418 U.S. 683 (1974) ........................................................................ 11

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
529 U.S. 765 (2000) .......................................................................... 2

*Wisconsin Bell, Inc. v. United States ex rel. Heath,*
145 S. Ct. 498 (2025) ................................................................ 12, 13

**Constitutional Provisions:**

U.S. Const. art. I, § 8, cl. 11 ................................................................ 11

U.S. Const. art. II, § 1, cl. 1 ............................................................. 4, 8

U.S. Const. art. II, § 2, cl. 2 ............................................................. 5, 12

U.S. Const. art. II, § 3 ..................................................................... 6, 14

**Statutes**:

31 U.S.C. § 3730(b)(1) .................................................................... 5, 10

31 U.S.C. § 3730(c)(1) .................................................................... 6, 15

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

31 U.S.C. § 3730(c)(3) ............................................................................ 10

An Act in Addition to the Act, Entitled "An Act for the Punishment of Certain Crimes Against the United States," 1 Stat. 596 (1798) ..... 16

**Other Sources and Authorities:**

13 Op. O.L.C. 207 (1989) .............................................................. 7, 16, 17

William Blackstone, *Commentaries on the Laws of England* (Philadelphia, J.B. Lippincott Co. 1893) (1765) .................................. 9

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* (2008) ............................................................................................... 15

Christine Kexel Chabot, *The Founders' Purse*, 110 Va. L. Rev. 1027 (2024) ............................................................................................... 11

*The Federalist* No. 47 (James Madison) ................................................ 14

Alexander Hamilton, *Pacificus No. 1* (1793) .......................................... 9

Gary Lawson, *The Constitution's Congress*, 89 B.U. L. Rev. 399 (2009) ............................................................................................... 15

Letter from A Farmer, II, *Balt. Md. Gazette* (Feb. 29, 1788) .................. 9

Letter from George Washington to William Rawle (Mar. 13, 1793) ...... 10

Letter from Richard Harrison to Alexander Hamilton (May 24, 1791) ................................................................................ 17

John Locke, *Two Treatises of Government* (Thomas Hollis ed., London, A Millar et al. 1764) (1689) ............................................... 9

Nicholas R. Parrillo, *Against the Profit Motive* (2013) .......................... 13

Proclamation of Neutrality (Apr. 22, 1793) ........................................... 14

U.S. Dep't of Justice, *False Claims Act Settlements Exceed $2.9 Billion in Fiscal Year 2024* (Jan. 15, 2025) ........................................ 2

## INTEREST OF AMICUS CURIAE*

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free markets, individual rights, limited government, and the rule of law. It often appears as an amicus curiae to champion Article II's limits on the False Claims Act. *See United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419 (2023); *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, No. 24-13581 (11th Cir., pending).

The FCA has taken on a life of its own in recent years. Enacted during the Civil War, the statute was designed to deter and punish government procurement fraudsters and wartime opportunists. Today, the opportunists are less often the statute's targets than its putative enforcers. Enterprising relators have transformed the FCA into a vehicle for debilitating lawfare over just about anything that touches—even remotely—the federal fisc. In 2024, nearly a thousand qui tam suits underscored this dynamic, some targeting defendants for reasons unrelated to public welfare. *See* U.S. Dep't of Justice, *False Claims Act*

---

* No party's counsel authored any part of this brief. No one, apart from WLF and its counsel, contributed money intended to fund the brief's preparation or submission. All parties consent to WLF's filing this brief.

*Settlements Exceed $2.9 Billion in Fiscal Years 2024* (Jan. 15, 2025), https://perma.cc/9WTZ-2YZG.

These lawsuits contravene our constitutional structure. Only the Executive may represent the interests of the United States in litigation. Congress cannot delegate that power to private actors. Officers in the Executive Branch are appointed to an office of public trust and act under obligation of oath, at peril of impeachment. And Article II's directives protect against the abuse of prosecutorial discretion. The FCA upends that design by allowing private relators to wield the tremendous power of public prosecution with no constitutional checks on their discretion. This Court should take these constitutional infirmities seriously.

## INTRODUCTION

In *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), the Supreme Court held that the FCA's "partial assignment of the Government's damages claim" to the relator, alongside "the long tradition of qui tam actions in England and the American Colonies," showed that qui tam actions were "cases and controversies" under Article III. *Id.* at 774–77. The Court, however, left open whether the FCA's partial assignment of the government's right of

action "violate[s] Article II, in particular the Appointments Clause of § 2 and the 'Take Care' Clause of § 3." *Id.* at 778 n.8. Fully preserved below, those questions are squarely presented here.

Although invited to, the District Court never seriously grappled with them. In three dismissive sentences, the District Court's entire analysis stood simply on "every federal court of appeals that has addressed this issue and holds that the FCA's *qui tam* provisions are constitutional." Appx256 (citing *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148 (2d Cir. 1993)).

But this vital question of first impression in this Court warrants a more exacting inquiry. Unfortunately, the courts of appeals' uniform take on the FCA's qui tam provisions risks devolving into a lockstep exercise of follow-the-leader, in which appeals courts mechanically cite precedent from sister circuits to uphold the statute without rigorously probing its

full range of potential Article II infirmities. While most of these decisions address the Appointments and Take Care Clauses to varying degrees, not one considers the Vesting Clause. And many offer only cursory engagement with the deeper separation-of-powers implications of delegating executive authority to private relators. Such selective analysis, leaning heavily on prior rulings without fresh scrutiny, betrays the constitutional imperative to safeguard the Executive's exclusive prerogative to enforce federal law.

## SUMMARY OF ARGUMENT

No one disputes that the False Claims Act's aim to ferret out fraud against the public fisc is a worthy goal. But good intentions cannot override constitutional limits. These structural protections are not picayune formalities; they are a crucial bulwark of our liberties.

Start with the Vesting Clause. Article II, Section 1, Clause 1 vests "the executive Power" solely in the President, a deliberate choice to ensure unified, accountable enforcement of the nation's laws. U.S. Const. art. II, § 1, cl. 1. The FCA, however, permits private relators to sue "in the name of the Government" for public wrongs, wielding the Executive's sword with only limited executive oversight. 31 U.S.C. § 3730(b)(1). This

arrangement, however practical, upsets the constitutional balance. The Constitution entrusts the President with plenary executive authority, save for explicit exceptions. By allowing relators to pursue public rights for private gain, the FCA encroaches on the President's singular role. Congress has stretched its authority too far.

The Appointments Clause exposes another defect. Article II, Section 2, Clause 2 requires that those exercising "significant authority" as officers of the United States be appointed by the President, often with Senate confirmation. U.S. Const. art. II, § 2, cl. 2; *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). Qui tam relators, suing to recover penalties for the United States, wield such authority, yet they do so without such appointment.

Relators may argue that their temporary status or lack of formal employment exempts them, but this view clashes with precedent recognizing even limited prosecutorial roles as requiring proper appointment. *See Morrison v. Olson*, 487 U.S. 654, 671 (1988). The FCA's structure, offering bounties akin to early officers' fees, confirms that relators occupy a continuous and formal enough role to demand Article II's safeguards. *See Lucia v. SEC*, 585 U.S. 237, 245 (2018). This

conflict—between statutory innovation and constitutional rigor—demands this Court's scrutiny to ensure that those wielding executive power remain accountable to the people.

Even if the Vesting and Appointments Clauses do not wholly dispatch the FCA's qui tam provision, the Take Care Clause finishes the job. The Constitution obliges the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. This duty requires the President to weigh competing priorities, balancing enforcement with the public good, as Washington did in directing prosecutions and granting pardons during and after the Whiskey Rebellion.

The FCA, however, grants relators broad discretion to initiate suits, often driven by private gain rather than the broader public interest. Even when the government intervenes, relators retain significant control, constraining the President's ability to align enforcement with the Executive's broader policy goals. *See* 31 U.S.C. § 3730(c)(1). Because this delegation impermissibly fragments the Executive's undivided authority, the FCA erodes the careful separation of powers that safeguards individual liberty.

Historical pedigree offers no reprieve. Yes, early Congresses enacted such statutes, but their actions do not override the Constitution's text. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 36 (2022) ("the text controls"). Those early laws, unlike the FCA, imposed fewer barriers to presidential oversight and reflected a nascent government's practical needs, not a considered constitutional endorsement. *See* 13 Op. O.L.C. 207, 235 (1989). And cases like *Marvin v. Trout*, 199 U.S. 212 (1905), sidestepped Article II's deeper questions, limiting their weight.

The FCA's modern framework, revived in 1986, goes much further, insulating relators from executive control in ways its predecessors did not. But the Constitution demands a unitary Executive, answerable to the people, to wield the sword of federal enforcement. The FCA's qui tam provisions, however well-intended, do violence to that principle. This Court must ensure that innovation does not outstrip constitutional bounds.

## ARGUMENT

The False Claims Act's qui tam provisions are unconstitutional. They violate the Vesting Clause, which demands that the President control all federal law enforcement, not just what Congress permits. They

7

violate the Appointments Clause, which balances executive authority with legislative oversight. And they violate the Take Care Clause, which embodies the Framers' vision of a unitary Executive. In short, the qui tam provisions hand private relators—self-styled bounty hunters—the reins of federal law enforcement, stripping the President of control over litigation brought in the government's name. That's not just a policy misstep—it's a direct assault on the Constitution's text and structure.

## I.    THE FCA'S QUI TAM PROVISIONS VIOLATE ARTICLE II.

### A.    The Vesting Clause: Executive power belongs to the President alone—no bounty hunters allowed.

The Constitution's opening salvo in Article II is unmistakable: "The executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1. The singular "a" and the verb "vested" leave no room for ambiguity—all executive power resides in one President, not in Congress, subordinate officials, or private bounty hunters. Unlike Article I, which grants Congress only enumerated powers, or Article III, which shares judicial power with inferior courts, Article II's Vesting Clause is absolute. It entrusts the President alone with the nation's executive authority, ensuring accountability to the people. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–

04 (2020). As Alexander Hamilton put it, this "general clause" grants the President the full sweep of executive power, subject only to specific constitutional exceptions. Alexander Hamilton, *Pacificus No. 1* (1793), https://perma.cc/V6KB-GXQ3.

Law enforcement is the quintessence of that power. The Framers, echoing John Locke and William Blackstone, understood that in a civilized society, individuals surrender their natural right to enforce the law to a centralized authority. *See* John Locke, *Two Treatises of Government* 4, 136–39 (Thomas Hollis ed., London, A Millar et al. 1764) (1689); 1 William Blackstone, *Commentaries on the Laws of England* 119–20 (Philadelphia, J.B. Lippincott Co. 1893) (1765). The President, as the "avenger of public wrongs," holds the exclusive authority to prosecute public rights, whether in criminal or civil cases. *See* Letter from A Farmer, II, *Balt. Md. Gazette* (Feb. 29, 1788); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 344–45 (2016) (Thomas, J., concurring) (only the government can sue for public rights violations).

President Washington embodied this, directing prosecutions during the Whiskey Rebellion while ordering dismissals and granting pardons when justice demanded, as when he instructed a *nolle prosequi* for two

9

innocent rebels in 1793. *See* Letter from George Washington to William Rawle (Mar. 13, 1793), https://perma.cc/K6XQ-72AG.

Yet the FCA's qui tam provisions turn this principle on its head. They place the Executive's sword in the hands of private citizens by supplanting prosecutorial discretion with a bounty to enforce federal law. They allow self-appointed relators—unharmed by the alleged fraud—to sue "in the name of the Government" for penalties and damages owed to the United States. 31 U.S.C. § 3730(b)(1). These relators aren't vindicating personal injuries, like a plaintiff suing for discrimination under Title VII; they're enforcing public rights, a role reserved for the Executive. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576–77 (1992) (suits for "undifferentiated public interest" belong to the Executive).

Worse still, the FCA insulates relators from presidential control. The government gets a mere 60-day window to intervene, and even then, it must show "good cause" to take over or dismiss later. *Id.* § 3730(c)(3). If it declines, relators—motivated by bounties as high as 30%—can press on, relegating the Executive to a bystander in its own litigation. This isn't just a practical inconvenience—it's a textual violation of Article II, which demands that the President control all federal law enforcement, not just

what Congress permits. *See United States v. Nixon*, 418 U.S. 683, 693 (1974).

The Constitution's structure reinforces this rule. Congress can authorize private rights of action, like those under civil rights laws, where individuals remedy concrete, personal injuries. *See Martinez v. UPMC Susquehanna*, 986 F.3d 261, 264–65 (3d Cir. 2021) (age discrimination suit for private injury). But qui tam suits are different. The bulk of the recovery goes to the government, with relators pocketing a bounty—essentially a salary for acting as federal enforcers. *See* Christine Kexel Chabot, *The Founders' Purse*, 110 Va. L. Rev. 1027, 1093–99 (2024). This confirms they are acting for the United States, making presidential oversight nonnegotiable. The Constitution carves out one exception: Congress's power to grant Letters of Marque and Reprisal, allowing privateers to act as government agents in wartime. U.S. Const. art. I, § 8, cl. 11. No such "Qui Tam Clause" exception exists for domestic law enforcement, proving the Framers knew how to authorize private enforcers when they wanted to—and didn't here.

## B.    The Appointments Clause: Relators behave as Officers of the United States.

The District Court elided yet another flaw: Qui tam relators violate the Appointments Clause by exercising "significant authority" without being appointed as officers of the United States. U.S. Const. art. II, § 2, cl. 2. An "Officer" is one who wields "significant authority pursuant to the laws of the United States," including conducting litigation to vindicate public rights. *Buckley*, 424 U.S. at 126, 140.

Qui tam relators fit the bill—they sue "for the United States" to recover penalties and damages, a "quintessentially executive power." *Seila Law*, 591 U.S. at 219. Yet they're self-appointed, bypassing the President's appointment power and Senate confirmation. Even if relators have a partial interest in the bounty, the non-bounty part of the claim belongs solely to the government. That violates Article II. *Riley*, 252 F.3d at 772 (Smith, J., dissenting).

Justice Thomas, joined by Justices Kavanaugh and Barrett, has signaled that this raises serious Article II concerns, inviting review in an "appropriate case." *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting; Kavanaugh, J., concurring); *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498, 515 (2025) (Kavanaugh, J., concurring, joined by

Thomas, J.) ("The Act's *qui tam* provisions raise substantial constitutional questions under Article II.").

Qui tam defenders argue that relators aren't officers because their role is temporary or lacks formal employment. That's unpersuasive. The Supreme Court has recognized even temporary prosecutors, like independent counsel, as officers. *Morrison*, 487 U.S. at 671. Relators' bounties, often vastly exceeding the salaries of appointed government officials, mirror the fee-based compensation of early federal officers. *See* Nicholas R. Parrillo, *Against the Profit Motive* 1–48 (2013). Their "office" is continuous under the FCA, even if filled case-by-case. *See Lucia*, 585 U.S. at 245 (continuous office requires an appointment).

By prescribing the exclusive means for appointing any "Officer of the United States," the Appointments Clause safeguards the Constitution's "structural integrity" by ensuring that those who wield significant federal authority are "accountable to political force and the will of the people." *Freytag v. Comm'r*, 501 U.S. 878, 884 (1991). But political accountability collapses if, as here, private enforcers of federal law have no need to answer to one of the elected branches.

## C.    The Take Care Clause: Relators hijack the Executive's discretion.

The qui tam provisions also gut the President's duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The Framers separated legislative and executive powers to prevent tyranny, ensuring the President alone decides how to enforce the law. *See The Federalist* No. 47 (James Madison). This discretion—whether to prioritize certain cases, under-enforce statutes for public welfare, or halt prosecutions—protects liberty and balances national priorities. *See In re Aiken Cnty.*, 725 F.3d 255, 264 (D.C. Cir. 2013) (Kavanaugh, J.) (prosecutorial discretion protects against oppressive enforcement). As in the Whiskey Rebellion, President Washington exemplified this discretion, directing prosecutions and dismissals to align with justice and policy as when he ordered prosecutions for neutrality violations in 1793. *See* Proclamation of Neutrality (Apr. 22, 1793).

The FCA, however, hands all this discretion to private relators, who decide when, where, and how to sue, driven by profit rather than public interest. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). These "bounty hunters" impose unpredictable litigation costs, with 979 qui tam suits filed in 2024 alone, often targeting defendants for

14

ideological reasons, like halting fracking activities. *See* U.S. Dep't of Just., *False Claims Act Settlements* (Jan. 15, 2025); *United States ex rel. Relators v. Muskingum Watershed Conservancy Dist.*, 2017 WL 4102369, at \*5 (N.D. Ohio Sept. 15, 2017).

Even if the government intervenes, relators retain rights to continue as parties, constraining executive control. 31 U.S.C. § 3730(c)(1). This "shadow executive" undermines the President's ability to set enforcement priorities, risking conflicts with public welfare, national security, or economic stability. *See* Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive* 4–5 (2008). Only a unitary Executive, answerable to the people, can faithfully execute the laws.

## II.   HISTORY CANNOT OVERRIDE CONSTITUTIONAL TEXT.

Defenders, like Senator Grassley, point to early qui tam statutes enacted by the First Congress to claim constitutional legitimacy. But history cannot trump clear constitutional text. *N.Y. State Rifle*, 597 U.S. at 36 ("to the extent [history] contradicts what the text says, the text controls").

Early Congresses weren't infallible—their first statute, prescribing state officials' oaths, was blatantly unconstitutional. *See* Gary Lawson,

*The Constitution's Congress*, 89 B.U. L. Rev. 399, 404–06 (2009). Or take the Sedition Act, which criminalized "false, scandalous, and malicious" statements against the government. An Act in Addition to the Act, Entitled "An Act for the Punishment of Certain Crimes Against the United States," 1 Stat. 596 (1798). Although the Sedition Act was never tested in court, "the attack upon its validity has carried the day in the court of history." *N.Y. Times v. Sullivan*, 376 U.S. 254, 276 (1964).

Nor is early presidential acquiescence to qui tam suits dispositive. Although one or more Presidents might accept a novel practice that violates Article II, "the separation of powers does not depend on the views of individual Presidents, nor on whether the encroached-upon branch approves the encroachment." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010) (internal quotation marks and citation omitted). A President cannot "choose to bind his successors by diminishing their powers." *Id*.

Those early qui tam "stop-gap measures" were unthinkingly adopted from English practice—rooted in parliamentary supremacy, not the Constitution's separation of powers—and quickly fell into disuse as the Executive developed enforcement capacity. *See* 13 Op. O.L.C. 207,

16

235 (1989) (Barr Memo); *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting).

At all events, early qui tam statutes, unlike the FCA, didn't explicitly bar presidential control. The modern FCA's limits—requiring "good cause" for intervention or dismissal—create a novel insulation from executive oversight, unlike their founding-era counterparts. The 1791 case of customs inspector Samuel Dodge shows why. When President Washington pardoned Dodge, the government remitted its fine, but the relator kept his share—not because the President lacked control, but because the fine was already paid, and the pardon's scope was debated. *See* Letter from Richard Harrison to Alexander Hamilton (May 24, 1791). This reflects practical limits, not constitutional ones. Early cases like *Trout*, 199 U.S. at 212 , and *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) upheld qui tam statutes but never squarely addressed Article II's Vesting or Take Care Clauses, limiting their relevance. What isn't considered isn't decided.

The FCA's modern provisions, revived in 1986, go far beyond their early counterparts. They create a system in which relators operate as a "shadow body" of enforcers, insulated from the President's Article II

authority. That's a bridge too far. Congress can always incentivize private suits for private rights. It is free to expand non-litigation bounty systems, like the Centers for Medicare & Medicaid Services' incentive programs, which allow whistleblowers to report fraud and receive rewards—without filing suit. But Congress cannot privatize the Presidency. Nor can it discard the Constitution's crucial structural limits.

In sum, the FCA's qui tam provisions defy Article II's text, structure, and purpose. They disperse executive power to unappointed relators, erode presidential accountability, and threaten the separation of powers. The Framers crafted a system where one President, answerable to the people, wields the Executive's sword. It's time to honor that design.

# CONCLUSION

This Court should reverse and remand with instructions to enter judgment for Janssen.

Respectfully submitted,

/s/ Cory L. Andrews
Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302

*Counsel for Amicus Curiae*
*Washington Legal Foundation*

July 21, 2025

# COMBINED CERTIFICATIONS

1.      <u>Service</u>: I certify that I filed this brief electronically with the Clerk of Court using the Court's CM/ECF system. I further certify that all parties required to be served have been served.

2.      <u>Type Volume, Typeface & Typestyle</u>: This brief complies with the type-volume limit of Fed. R. App. P. because it contains 3,388 words. This brief also complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a) because it was prepared in 14-point font using a proportionally spaced typeface, Century Schoolbook.

3.      <u>Bar Membership</u>: This brief complies with Local Rule 46.1(e) because Cory L. Andrews is a member of the bar of this Court.

4.      <u>Paper copies</u>: The electronic version of this brief is identical to the paper copies to follow.

5.      <u>Virus Scan</u>: SentinelOne® Agent version 23.4.4.223 scanned this brief for viruses and detected none.

<u>/s/ Cory L. Andrews</u>
CORY L. ANDREWS

July 21, 2025