No. 25-1818

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

UNITED STATES *ex rel.* JESSICA PENELOW, et al.,
*Plaintiffs-Appellees*,

vs.

JANSSEN PRODUCTS LP,
*Defendant-Appellant.*

On Appeal from the United States District Court for the District of New Jersey,
No. 3:12-cv-07758-ZNQ-JBD, Hon. Zarid N. Quraishi

## BRIEF OF *AMICI CURIAE* THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND THE AMERICAN TORT REFORM ASSOCIATION IN SUPPORT OF DEFENDANT-APPELLANT

MICHAEL H. MCGINLEY
BRIAN A. KULP
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104

ANDREW R. VARCOE
MARIEL A. BROOKINS
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

STEVEN A. ENGEL
  *Counsel of Record*
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

H. SHERMAN JOYCE
LAUREN SHEETS JARRELL
AMERICAN TORT REFORM ASSOCIATION
1101 Connecticut Avenue, NW
Suite 400
Washington, DC 20036

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America ("Chamber") is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

The American Tort Reform Association ("ATRA") is a nonprofit, tax-exempt organization incorporated in the District of Columbia. ATRA has no parent corporation, and no publicly held company has 10% or greater ownership in ATRA.

Dated: July 21, 2025

*/s/ Steven A. Engel*
Steven A. Engel
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
(202) 261-3369
steven.engel@dechert.com

*Counsel of record for* Amici Curiae

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* .............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ..............................................................................5

I.    The *Qui Tam* Provisions of the False Claims Act Are Unconstitutional.........5

    A.    The *Qui Tam* Provisions Violate Article II's Vesting Clause..............5

        1.    The Framers' Understanding of Executive Power Predated the Constitution. ...................................................................6

        2.    Article II Vests All Executive Power in the President. .............7

    B.    The *Qui Tam* Provisions Violate the Appointments Clause. ...............9

    C.    The *Qui Tam* Provisions Violate the Take Care Clause. ....................15

    D.    History Cannot Salvage the *Qui Tam* Provisions' Affront to Article II.. ........................................................................17

        1.    Abuses in Early English *Qui Tam* Practice Led to Its Decline ...............................................................17

        2.    Early Congressional Enactments Do Not Support the Constitutionality of the *Qui Tam* Provisions ...........................19

        3.    The False Claims Act Revived an Unconstitutional Practice...22

II.    The Constitutionally Excessive Fine Imposed Here Highlights the Article II Problems with *Qui Tam* Litigation .......................................24

    A.    The Excessive Fines Clause Applies to *Qui Tam* Actions..................24

    B.    Profit-Driven Relators Naturally Pursue as Excessive a Fine as the Court Will Permit ..........................................................26

CONCLUSION ...........................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) ........................................................... 15

*Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989) ...................................................................... 24, 25

*Buckley v. Valeo*,
424 U.S. 1 (1976) ..................................................................... 9, 10, 11

*Confiscation Cases*,
74 U.S. 454 (1869) ............................................................................ 9

*Cook County v. United States ex rel. Chandler*,
538 U.S. 119 (2003) ........................................................................ 25

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015) ................................................................. 8, 11, 14

*Edmond v. United States*,
520 U.S. 651 (1997) ........................................................................ 11

*Edmonson v. Leesville Concrete Co.*,
500 U.S. 614 (1991) ........................................................................ 25

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) ..................................................................... 2, 12

*Freytag v. Commissioner*,
501 U.S. 868 (1991) ..................................................................... 4, 11

*Genty v. Resolution Tr. Corp.*,
937 F.2d 899 (3d Cir. 1991) ............................................................. 8

*United States ex rel. Grant v. Zorn*,
107 F.4th 792 (8th Cir. 2024) .................................................. 5, 26, 27

*Heckler v. Chaney*,
470 U.S. 821 (1985)................................................................16

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
520 U.S. 939 (1997)..............................................................3, 23

*United States ex rel. Kelly v. Boeing Co.*,
9 F.3d 743 (9th Cir. 1993) .......................................................8

*King v. Burnell*,
Carth. 478 (K.B. 1700) ..........................................................10

*Marsh v. Chambers*,
463 U.S. 783 (1983)................................................................21

*Martin v. Hunter's Lessee*,
14 U.S. 304 (1816)...............................................................8, 19

*United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*,
961 F.2d 46 (4th Cir. 1992) ...................................................4, 22

*Morrison v. Olson*,
487 U.S. 654 (1988)................................................................13

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)..................................................4, 17, 20, 22

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
17 F.4th 376 (3d Cir. 2021) .....................................................8

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
599 U.S. 419 (2023)..........................................................3, 4, 19, 22

*Printz v. United States*,
521 U.S. 898 (1997)................................................................15

*Riley v. St. Luke's Episcopal Hosp.*,
252 F.3d 749 (5th Cir. 2001) ................................................12, 19

*Robertson v. United States ex rel. Watson*,
560 U.S. 272 (2010)..................................................................6

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020)................................................................8, 13, 22, 25

*Springer v. Gov. of Philippine Islands*,
    277 U.S. 189 (1928)................................................................13

*State Farm Mut. Auto Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)................................................................27

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)................................................................16

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021)................................................................14

*United States v. Bajakajian*,
    524 U.S. 321 (1998)................................................................24, 27

*United States v. Comstock*,
    560 U.S. 126 (2010)................................................................20

*United States v. Donziger*,
    38 F.4th 290 (2d Cir. 2022) ................................................................13

*United States v. Germaine*,
    99 U.S. 508 (1878)................................................................13

*United States v. McNinch*,
    356 U.S. 595 (1958)................................................................22

*United States v. Nixon*,
    418 U.S. 683 (1974)................................................................9

*United States v. Texas*,
    599 U.S. 670 (2023)................................................................16

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000)................................................................13, 17, 19, 25

*Walz v. Tax Comm'n of City of New York*,
    397 U.S. 664 (1970)................................................................17

*Yates v. Pinellas Hematology & Oncology, P.A.*,
    21 F.4th 1288 (11th Cir. 2021) ............................................................25

*United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*,
    751 F. Supp. 3d 1293 (M.D. Fla. 2024)......................12, 14, 17, 23, 24

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ...........................................................2, 3, 7

U.S. Const. art. II, § 2, cl. 2 .................................................................9

U.S. Const. art. II, § 3 ...............................................................2, 4, 16

**Statutes**

31 U.S.C. § 3729(a)(1)..................................................................10, 23

31 U.S.C. § 3730...............................................................................13

31 U.S.C. § 3730(b)(1)........................................................................10

31 U.S.C. § 3730(c)(1)..................................................................12, 23

31 U.S.C. § 3730(d) ......................................................................14, 23

Act of Apr. 30, 1790, ch. 9, 1 Stat. 112 ...............................................21

Act of Aug. 4, 1790, ch. 35, 1 Stat. 145 ..............................................20

Act of Feb. 25, 1791, ch. 10, 1 Stat. 191 .............................................20

Act of July 20, 1790, ch. 29, 1 Stat. 131..............................................20

Act of July 31, 1789, ch. 5, 1 Stat. 29.................................................20

Act of Mar. 2, 1863, ch. 67, 12 Stat. 696.............................................22

Act of May 31, 1790, ch. 15, 1 Stat. 124 .............................................20

Act of Sept. 1, 1789, ch. 11, 1 Stat. 55 ...............................................20

Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 ...............................................20

12 Edw. 2, ch. 6 (1318) (Eng.)...........................................................18

5 Edw. 3, ch. 5 (1331) (Eng.)....................................................................18

**Other Authorities**

1 *Annals of Cong.* (1789) ....................................................................8, 19

Melissa Ballengee, Bajakajian*: New Hope for Escaping Excessive
    Fines Under the False Claims Act*, 27 J.L. Med. & Ethics 366
    (1999)............................................................................................26

J. Randy Beck, *The False Claims Act and the English Eradication of
    Qui Tam Legislation*, 78 N.C. L. Rev. 539 (2000)................................18, 19, 23

1 William Blackstone, *Commentaries on the Laws of England* (1765) ...............7, 8

3 William Blackstone, *Commentaries on the Laws of England* (1768) ...................7

4 William Blackstone, *Commentaries on the Laws of England* (1769) ...............6, 7

James T. Blanch, *The Constitutionality of the False Claims Act's* Qui
    Tam *Provision*, 16 Harv. J.L. & Pub. Pol'y 701 (1993)....................................12

3 Sir Edward Coke, *Institutes of the Laws of England* (4th ed. 1797) ...................18

Cong. Globe, 37th Cong., 3d Sess. 956 (1863) ........................................22

*Constitutionality of the* Qui Tam *Provisions of the False Claims Act*,
    13 Op. O.L.C. 207 (1989)............................................................3, 16-18, 20-23

Edward S. Corwin, *The President: Office and Powers 1787-1957* (4th
    ed. 1957) ........................................................................................10

Timothy Cunningham, *A New and Complete Law-dictionary* (1765)....................10

Richard O. Faulk & John S. Gray, *Alchemy in the Courtroom? The
    Trasmutation of Public Nuisance Litigation*, 2007 Mich. St. L.
    Rev. 941 (2007) ...............................................................................26

4 William S. Holdsworth, *A History of English Law* (1924)..................................18

Joan H. Krause, *"Promises to Keep": Health Care Providers and the
    Civil False Claims Act*, 23 Cardozo L. Rev. 1363 (2002)..................................26

Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275 (1989)................................21

8 Legal Observer, No. 204 (1834) .........................................................18

Letter from James Madison to President Monroe (Dec. 27, 1817), in 3 *Letters and Other Writings of James Madison* (J.B. Lippincott & Co. 1867).................................................................................................21

John Locke, *Two Treatises on Civil Government* (George Routledge & Sons ed., 1884) ........................................................................6, 7, 15

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* (1890) .......................................................................................11

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940* (2013) ......................................14

Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671 (2014) ..................................................................15

S. Rep. No. 99-345 (1986).....................................................................23

The Federalist No. 29 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................................................................................................11

The Federalist No. 47 (James Madison) (Clinton Rossiter ed., 1961) ...................15

The Federalist No. 72 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................................................................................................11

*The Test for Determining "Officer" Status Under the Appointments Clause*, 49 Op. O.L.C. __ (Jan. 16, 2025) ...........................................3

U.S. Dep't of Justice, *Fraud Statistics—Overview* (Jan. 15, 2025), https://bit.ly/4bfrXgs.................................................................23, 24

Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689 (2004) .........................................21

2 Noah Webster, *American Dictionary of the English Language* (1828) ...........................................................................................11

# INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The American Tort Reform Association ("ATRA") is a broad-based coalition of businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote reform of the civil justice system with the goal of ensuring fairness, balance, and predictability in civil litigation. For more than three decades, ATRA has filed *amicus curiae* briefs in cases involving important liability issues.

In recent years, profit-driven relators have abused the False Claims Act's ("FCA") *qui tam* mechanism. That abuse has exacted a substantial economic toll on

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund this brief's preparation or submission. Counsel for all parties consented to this brief's filing.

businesses nationwide, and the Chamber and ATRA have a significant interest in preventing such harm to their members. They submit this brief to explain why *qui tam* lawsuits under the FCA violate Article II of the Constitution and, relatedly, why the fine in this case violates the Excessive Fines Clause. The Constitution does not allow unappointed and unharmed private actors to litigate on the United States' behalf. Nor does it tolerate the historically massive fine imposed on Janssen Products, LP ("Janssen").[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Article II vests "[t]he executive Power" in one elected President, who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. The Framers adopted that unitary structure to promote accountability and ensure that "a President chosen by the entire Nation" would "oversee the execution of the laws." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 499 (2010). Yet the President can ensure that the laws are faithfully executed only when he "oversee[s] the faithfulness of the officers who execute them." *Id.* at 484.

The FCA's *qui tam* provisions violate this core constitutional requirement by wresting the executive Power from the President's hands. Private relators are not injured parties seeking to recover for personalized harms. They are unaccountable

---

[2] This brief focuses solely on these constitutional issues, but as Janssen's brief explains, the district court's judgment is infirm for other reasons too.

bounty hunters charged with pursuing claims that, in their judgment, the United States should have asserted. All the while, they are "motivated primarily by prospects of monetary reward rather than the public good." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997).

That cannot be. Three Justices have rightly recognized "[t]here are substantial arguments that the *qui tam* device is inconsistent with Article II." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting); *see id.* at 442 (Kavanaugh, J., joined by Barrett, J., concurring). Shortly after the 1986 amendments to the FCA "resuscitat[ed] the dormant qui tam device," the Office of Legal Counsel likewise concluded that this private enforcement scheme for the vindication of public rights is "patently unconstitutional." *Constitutionality of the* Qui Tam *Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 209, 238 (1989) (hereafter, "OLC Memo").[3]

Indeed, when measured against Article II's text, "this is not even a close question." *Id.* at 209. The Framers vested the entire "executive Power" in the President alone. U.S. Const. art. II, § 1, cl. 1. And they "carefully husband[ed] the appointment power" to ensure that the President remained accountable for the

---

[3] OLC later took a different view about the Appointments Clause. *See, e.g.*, *The Test for Determining "Officer" Status Under the Appointments Clause*, 49 Op. O.L.C. __, slip op. at 12 (Jan. 16, 2025). The Office's original position was correct and consistent with subsequent Supreme Court precedent.

"Officers of the United States" who wielded executive Power in his name.  *See Freytag v. Commissioner*, 501 U.S. 868, 881-84 (1991).  The FCA runs roughshod over these safeguards, empowering "self-appointed private attorney[s] general" to exercise substantial executive Power outside the Executive Branch.  *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992).  Article II forbids such privatization of the President's responsibility to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

The "primary counterargument" for upholding the FCA's *qui tam* provisions emphasizes *qui tam*'s "historical pedigree."  *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting).  But the "adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text"—even laws passed near the Founding— "cannot overcome or alter that text."  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 36 (2022) (citation omitted).  And *qui tam*'s historical roots are limited at best.  Unlike the FCA, many of the early enactments provided relators with only a bounty, not a cause of action, and many provided redress to relators who *themselves* suffered injury.  In all events, the early *qui tam* statutes—some of which authorized private *criminal* enforcement—reflected an ill-considered, pre-ratification understanding of the Chief Executive.  Such scattered (and largely inapposite) historical episodes cannot excuse the manifest conflict between the modern FCA's *qui tam* provisions and Article II's text.

The Article II problem with *qui tam* has predictably spawned constitutionally excessive penalties. *See, e.g.*, *United States ex rel. Grant v. Zorn*, 107 F.4th 792, 798 (8th Cir. 2024). All agree that the Excessive Fines Clause applies to *qui tam* penalties, since the relator is not a private party, but a representative of the United States. Yet the profit-driven relator is not bound by the Executive's obligation to consider the public interest in the enforcement of the laws, including ensuring a proportionate penalty for any FCA violation. That lack of accountability contributed to a constitutionally excessive fine of well over $1 billion here.

The Court should reverse.

## ARGUMENT

## I.    The *Qui Tam* Provisions of the False Claims Act Are Unconstitutional.

The *qui tam* provisions of the FCA violate Article II several times over. They empower self-appointed private persons to initiate and conduct litigation on behalf of the United States, in violation of Article II's Vesting Clause and the Appointments Clause. And they inhibit both the President's prosecutorial discretion and his control over declined *qui tam* actions, in violation of the Take Care Clause.

### A.    The *Qui Tam* Provisions Violate Article II's Vesting Clause.

Congress may not authorize bounty hunters to litigate for the United States. Rather, the Framers understood that "[a] basic step in organizing a civilized society" was to take the "sword" of law-enforcement actions "out of private hands and turn

5

it over to an organized government, acting on behalf of all the people." *Robertson v. United States ex rel. Watson*, 560 U.S. 272, 282-83 (2010) (Roberts, C.J., dissenting from dismissal of writ of certiorari as improvidently granted). To that end, the Constitution established a unitary and accountable Executive who alone was responsible for enforcing federal law.

### 1. The Framers' Understanding of Executive Power Predated the Constitution.

The Framers' conception of centralized executive authority finds roots in the political theory of John Locke. As he explained, "in the state of Nature[,] every one has the executive power of the law of Nature." John Locke, *Two Treatises on Civil Government* 197 (George Routledge & Sons ed., 1884) ("Locke"). But "when they enter into society," individuals "give up" the "executive power they had in the state of Nature into the hands of the society." *Id.* at 258. That is, the people delegate their executive authority to public officials, whose power is "to be directed to no other end but the peace, safety, and public good of the people." *Id.* at 259.

William Blackstone's *Commentaries* reflect a similar understanding. "In a state of society," he reasoned, the right "to put [the law] in execution" is "transferred from individuals to the sovereign power," who "alone" bears "the sword of justice by the consent of the whole community." 4 William Blackstone, *Commentaries on the Laws of England* *7-8 (1769) ("Blackstone"). And when the public "delegate[s] all its power and rights, with regard to the execution of the laws, to one visible

magistrate," that officer is "the proper person to prosecute for all public offences." 1 Blackstone *258-59.

This understanding of executive power was not strictly limited to "criminal" offenses. It instead extended to the pursuit of relief for all "infraction[s] of the public rights belonging to th[e] community." 4 Blackstone *2. Vindicating those public rights is the prerogative of the sovereign actor whom the people have empowered to administer the laws. *See id.*

The common law recognized that one who personally "suffered the damage" from a public infraction might have a *concomitant* right to demand redress "in his own name." Locke 196. But that would not permit him to pursue relief on behalf of the public writ large. "[N]o person" other than the official entrusted with the executive authority "can have an action for a public nuisance, or punish it," unless that "private person suffers some extraordinary damage." 3 Blackstone *219-20. Because individuals give up the executive power by entering society, "the law gives no *private* remedy for any thing but a *private* wrong." *Id.* at *219.

### 2. Article II Vests All Executive Power in the President.

The Framers enshrined this basic understanding in Article II's text, which vests "[t]he executive Power" in a single "President." U.S. Const. art. II, § 1, cl. 1. By entrusting "the President alone" with "all" the Nation's executive Power, the

7

Framers sought to ensure that he would remain accountable for all those who act on his behalf. *Seila Law LLC v. CFPB*, 591 U.S. 197, 203, 213 (2020).

Consistent with this need for accountability, the Framers opted not to vest "[p]rivate entities" with "the 'executive Power.'" *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). They instead insisted "that the first Magistrate should be responsible for the executive department" in its entirety. 1 *Annals of Cong.* 480 (1789) (James Madison). Given that design, it would be "utterly inadmissible" for Congress to vest executive authority "in any other person" besides the President. *Martin v. Hunter's Lessee*, 14 U.S. 304, 330 (1816).

But that is precisely what Congress did with the FCA's *qui tam* provisions. The legislature "sought to disperse some quantum of executive authority amongst the general public." *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 750 (9th Cir. 1993). That defies Article II. Congress cannot "deputize citizens to act as private attorneys general," *United States ex rel. Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 380 (3d Cir. 2021), roving about to "enforc[e] . . . public right[s]" without any personalized injury, *Genty v. Resolution Tr. Corp.*, 937 F.2d 899, 912 n.7 (3d Cir. 1991). Such "public offences" may be prosecuted only by the President, who is vested with all the Nation's executive Power. 1 Blackstone *259. To uphold a redelegation of that power to private entities would dash the constitutional scheme.

8

Supreme Court precedent confirms the point. The executive Power includes the "exclusive authority and absolute discretion to decide whether to prosecute a case" on the United States' behalf. *United States v. Nixon*, 418 U.S. 683, 693 (1974). And the "[s]ettled rule" has long been that courts cannot entertain "any suit, civil or criminal, as regularly before them, if prosecuted in the name and for the benefit of the United States," unless the government is represented by the Executive. *Confiscation Cases*, 74 U.S. 454, 457 (1869). "[A]ll such suits, so far as the interests of the United States are concerned, are subject to the direction, and within the control of, the Attorney-General," who answers to the President and may thus exercise executive Power on his behalf. *Id.* at 458-59. Because *qui tam* plaintiffs are not similarly accountable, the FCA contravenes the Vesting Clause.

**B.    The *Qui Tam* Provisions Violate the Appointments Clause.**

*Qui tam* litigation also conflicts with the Appointments Clause, which works in tandem with Article II's Vesting Clause to ensure that "executive Power" is exercised only by appointed "Officers of the United States." U.S. Const. art. II, § 2, cl. 2.

The key test for an "Officer" is whether the person "exercis[es] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). Such authority includes the power to "conduct[] civil litigation in the courts of the United States for vindicating public rights." *Id.* at 140. And that

9

describes the power of an FCA relator to a tee:  The relator may sue "for the United States" and "in the name of the Government" for "penalt[ies]" and "damages which the Government [has] sustain[ed]."  31 U.S.C. §§ 3729(a)(1), 3730(b)(1).

*Buckley* forbids such a diffusion of executive Power.  There, the Court struck down the FEC's original structure, which permitted congressional leaders to appoint commissioners.  *See* 424 U.S. at 113.  That violated the Appointments Clause, because the commissioners performed executive "functions" by wielding "enforcement power" to "seek judicial relief" for violations of law.  *Id.* at 138-40.  Such executive "functions may be discharged *only* by persons who are 'Officers of the United States' within the language" of the Appointments Clause.  *Id.* at 140 (emphasis added).

In considering whether one exercises an executive "function," *Buckley*'s interpretation reflects the original public meaning of an "Officer."  "Etymologically, an 'office' is an *officium*, a duty; and an 'officer' was simply one whom the King had charged with a duty."  Edward S. Corwin, *The President: Office and Powers 1787-1957*, at 70 (4th ed. 1957).  In keeping with that understanding, the Crown argued prior to the Founding that "every Man is a publick officer who hath any duty concerning the publick."  *King v. Burnell*, Carth. 478, 479 (K.B. 1700).  Later dictionaries reflected the same understanding.  *See Officer*, 2 Timothy Cunningham, *A New and Complete Law-dictionary* (1765) (recounting *Burnell* formulation);

*Officer*, 2 Noah Webster, *American Dictionary of the English Language* (1828) ("A person commissioned or authorized to perform any public duty.").

The Framers likewise regarded an "Officer" as one "invested with some portion of the sovereign functions of the government." Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* 2 (1890). In Alexander Hamilton's words, persons to whose "management" the "executive details" of government "are committed ought to be considered as the [President's] assistants or deputies" and thus "ought to derive their offices from his appointment." The Federalist No. 72, at 435-36 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Those executive appointees alone are "the officers who may be [e]ntrusted with the execution of [the] laws." The Federalist No. 29, at 183 (Alexander Hamilton).

This understanding of the word "Officer" explains why the Appointments Clause was no mere matter of "etiquette or protocol." *Buckley*, 424 U.S. at 125. It was instead viewed, for multiple reasons, to be "among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). First, "[t]he Appointments Clause prevents Congress from dispensing power too freely" to those who might wield it improperly. *Freytag*, 501 U.S. at 880. And second, it "ensures that those who exercise the power of the United States are accountable to the President, who himself is accountable to the people." *Ass'n of Am. R.R.*, 575 U.S. at 63 (Alito, J., concurring); *see Freytag*, 501 U.S. at 884.

The FCA's *qui tam* provisions place both concerns in stark relief.  Indeed, Congress could hardly have dispensed the executive Power more freely, "effectively permit[ting] all private persons in the entire world to appoint themselves special fraud prosecutors in the name of the United States."  James T. Blanch, *The Constitutionality of the False Claims Act's* Qui Tam *Provision*, 16 Harv. J.L. & Pub. Pol'y 701, 742 (1993).  Congress also shielded relators from removal—and thus presidential supervision—by providing them a "right to continue as a party" even after duly appointed officials intervene.  31 U.S.C. § 3730(c)(1).  The result is a relator "that is not accountable to the President, and a President who is not responsible for the [relator]."  *Free Enter. Fund*, 561 U.S. at 495.  That violates Article II.

In holding otherwise, some courts have reasoned that relators do not occupy a "continuing and formalized relationship of employment with the United States." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc). *But see id.* at 767-69 (Smith, J., dissenting).  There are two problems with that argument.

*First*, relators unquestionably wield "core executive power." *United States ex rel. Zafirov v. Fla Med. Assocs., LLC*, 751 F. Supp. 3d 1293, 1300 (M.D. Fla. 2024). So, whether or not relators are "public officers in a strict sense," they may not be "charged with the exercise of executive functions" unless appointed through the

method Article II commands. *Springer v. Gov. of Philippine Islands*, 277 U.S. 189, 203 (1928). Certainly, they cannot exercise the core executive function of prosecuting claims on the public's behalf for penalties that are "essentially punitive in nature." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000). This "power to seek daunting monetary penalties against private parties" is a "quintessentially executive power." *Seila Law*, 591 U.S. at 219.

*Second*, the employment argument reads "Officer" too narrowly. While the word often "embraces the ideas of tenure, duration, emolument, and duties," *United States v. Germaine*, 99 U.S. 508, 511 (1878), the Supreme Court has never held such indicia to be necessary. To the contrary, *Morrison v. Olson* held that an independent counsel—a temporary prosecutor appointed for a single investigation—was "clear[ly]" an "'officer' of the United States." 487 U.S. 654, 671 & n.12 (1988). The Second Circuit held the same for a court-appointed "special prosecutor" charged with litigating a "particular case." *United States v. Donziger*, 38 F.4th 290, 299 (2d Cir. 2022).

As in *Morrison* and *Donziger*, a *qui tam* relator functions as a single-case officer empowered to sue on the government's behalf. *See* 31 U.S.C. § 3730. While the "office is limited in tenure" and "'temporary' in the sense that [relators are] appointed essentially to accomplish a single task," those limits do not foreclose officer status "in the constitutional sense." *Morrison*, 487 U.S. at 671-72 & n.12.

13

Rather, "the office of an FCA relator is continuous" by operation of law, "even if it is not continually filled." *Zafirov*, 751 F. Supp. 3d at 1314. And the FCA empowers individuals to appoint themselves to that office.

Relators also receive "emoluments." *See* 31 U.S.C. § 3730(d). Indeed, their fractional share of recovery mirrors the "bounties" many officers received, instead of "fixed salaries," in the first century of the Nation's existence. Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940*, at 1-48 (2013). And as in this case, that promised bounty can dwarf the fixed statutory salary paid to regularly appointed officers.

At bottom, "there is not even a fig leaf of constitutional justification" for empowering "private entities" to prosecute alleged FCA offenders on the government's behalf. *Ass'n of Am. R.R.*, 575 U.S. at 62 (Alito, J., concurring). The legitimacy of such an exercise of executive Power depends upon both (1) a constitutional appointment and (2) ongoing accountability to the President—who is the lone actor whom the people have empowered to vindicate public rights. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 11-12 (2021). Relators possess neither of those constitutional prerequisites. As independent and self-appointed bounty hunters, they operate well outside Article II's carefully crafted scheme.

### C.    The *Qui Tam* Provisions Violate the Take Care Clause.

*Qui tam* litigation violates the Take Care Clause too.  The Framers knew that there "can be no liberty" if a single body "should enact tyrannical laws," to have them then "execute[d]" "in a tyrannical manner."  The Federalist No. 47, at 303 (James Madison) (emphasis and citation omitted).  So they divided the Nation's lawmaking and law-enforcement powers.  That "separation of legislative and executive functions helps prevent tyranny precisely because a discretionary decision by executive officers intervenes between the enactment of the prohibition and its application to any particular individual."  Zachary S. Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 702 (2014).

At the same time, "[t]he Constitution does not leave to speculation who is to administer the laws enacted by Congress"—and exercise discretion in their execution.  *Printz v. United States*, 521 U.S. 898, 922 (1997).  "[T]he President, it says, 'shall take Care that the Laws be faithfully executed.'"  *Id.* (citation omitted).  Included within that charge "is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior."  *In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013) (opinion of Kavanaugh, J.).  That power is especially important "where the public good demands not the execution of the law."  Locke 196.

Simply put, "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch, not within the purview of private plaintiffs (and their attorneys)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021).  For good reason:  "Private plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's" compliance with the law.  *Id.*

The FCA's *qui tam* provisions cannot be squared with these principles either. They permit unharmed private parties to commandeer the Executive's enforcement discretion and decide whether, where, when, and how to sue alleged violators.  This "allows Congress to circumvent the Executive's check and to have its laws enforced directly by its own private bounty hunters."  OLC Memo 211.  Not only does this reallocation of power threaten individual liberty, but it can also undermine the Executive's "overall policies."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

That is why the Framers entrusted these sorts of enforcement decisions to one, publicly accountable President.  "[O]nly a unitary executive properly can balance the competing interests at stake, including law enforcement, foreign affairs, national security, and the overriding interest in just administration of the laws."  OLC Memo 232.  That is, only the President can "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, so as to best serve the "public-welfare needs of the American people," *United States v. Texas*, 599 U.S. 670, 680 (2023).

16

**D.      History Cannot Salvage the *Qui Tam* Provisions' Affront to Article II.**

Historical practice cannot wash away these constitutional shortcomings. *See Zafirov*, 751 F. Supp. 3d at 1317-22. After all, "[t]he Constitution, not history, is the supreme law." OLC Memo 233; *see Bruen*, 597 U.S. at 36. Historical practice thus cannot cure constitutional infirmities even when it "covers our entire national existence and indeed predates it." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 678 (1970).

At any rate, *qui tam* suffers from a checkered history. It did not become ubiquitous until Congress amended the FCA in 1986—two centuries after the Founding. Those modern amendments, of course, are the very provisions at issue.

**1.      Abuses in Early English *Qui Tam* Practice Led to Its Decline.**

*Qui tam* actions originated in medieval times, "when private individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf." *Stevens*, 529 U.S. at 774. This practice was originally aimed at getting "private claims into the respected royal courts, which generally entertained only matters involving the Crown's interests." *Id.* But as the "royal courts began to extend jurisdiction to suits involving wholly private wrongs" in the 14th century, "the common-law *qui tam* action gradually fell into disuse." *Id.* at 775.

Around that time, Parliament was "[f]aced with limited public enforcement resources and the difficulty of implementing national policies" over an expansive region. J. Randy Beck, *The False Claims Act and the English Eradication of* Qui Tam *Legislation*, 78 N.C. L. Rev. 539, 567 (2000). It therefore began experimenting with statutory *qui tam* litigation. *See id.* at 567-73. Unlike the common-law practice, some of these statutes permitted uninjured plaintiffs to "sue[] the Offender" and receive a bounty "as the King's gift." 12 Edw. 2, ch. 6 (1318) (Eng.); *see also, e.g.*, 5 Edw. 3, ch. 5 (1331) (Eng.).

Over the next two centuries, however, *qui tam* "proved a vexatious device that ultimately could not be reconciled with the institutions of free and responsible government." OLC Memo 235. The persons "occupied in this branch of executive jurisprudence" did not "give impartial efficiency to the laws," but acted instead as "instrument[s] of individual extortion, caprice, and tyranny." 8 Legal Observer No. 204, at 20 (1834) (citation omitted). Informers unearthed old and forgotten statutes "as means to gratify ill-will." 4 William S. Holdsworth, *A History of English Law* 356 (1924). They threatened enforcement suits to "levy[] blackmail" against others. *Id.* And they stirred up litigation simply in the hopes of recovering money. *Id.*

These abuses led to considerable outrage—prompting Lord Coke to denounce the informers as "viperous vermin" who "vex and depauperize the subject" for "malice or private ends, and never for love of justice." 3 Sir Edward Coke, *Institutes*

18

*of the Laws of England* 194 (4th ed. 1797).  Parliament responded by curbing *qui tam* abuses in the late 1400s.  *See* Beck, *supra*, at 574-89.  And, by the Jacobean era, "many of the old enactments were repealed" entirely.  *Stevens*, 529 U.S. at 775.

Some English *qui tam* statutes did remain in effect up through the Founding.  But even those lend little support to the constitutionality of *qui tam* litigation.  After all, "the Constitution's creation of a separate Executive Branch coequal to the Legislature was a structural departure from the English system of parliamentary supremacy, from which many legal practices like *qui tam* were inherited."  *Polansky*, 599 U.S. at 450 (Thomas, J., dissenting) (citation omitted).  And the English history only underscores the hazards posed by legislative transfers of executive power to private hands.

Article II eliminated those hazards.  The Framers vested in one publicly accountable President "the power of appointing, overseeing, and controlling those who execute the laws."  1 *Annals of Cong.* 481 (1789) (James Madison).  That choice forecloses statutes—like the FCA—from "vest[ing]" the "executive power" in "any other person."  *Martin*, 14 U.S. at 330.

> **2.     Early Congressional Enactments Do Not Support the Constitutionality of the *Qui Tam* Provisions.**

Some courts have responded that "the First Congress enacted a number of statutes authorizing qui tam actions."  *Riley*, 252 F.3d at 752.  But even "a longstanding history of related federal action does not demonstrate a statute's

constitutionality." *United States v. Comstock*, 560 U.S. 126, 137 (2010). And early congressional practice provides a weak precedent for the modern-day FCA.

For starters, many early *qui tam* enactments are not "relevantly similar." *Bruen*, 597 U.S. at 29. They operated differently from the current law, which places unharmed plaintiffs in the government's shoes to litigate on its behalf. Most of the early statutes offered only a reward to informers for bringing a matter to the government's attention, without providing them a cause of action to sue for the sovereign.[4] Other early statutes sought to redress private injuries, with the government receiving only incidental recoveries.[5] These two categories differ in kind and thus have little bearing on the inquiry. *See Bruen*, 597 U.S. at 29-30, 46-50.

As to the few enactments that allowed informers to pursue the sovereign's claims, these "were essentially stop-gap measures, confined to narrow circumstances" to assist the fledging Executive. OLC Memo 213. And the "transitory and aberrational" *qui tam* device "never gained a secure foothold within our constitutional structure." *Id.* It produced "little actual litigation" and was

---

[4] *See, e.g.*, Act of July 31, 1789, ch. 5, §§ 8, 29, 38, 1 Stat. 29, 38, 45, 48; Act of Sept. 1, 1789, ch. 11, § 21, 1 Stat. 55, 60; Act of Aug. 4, 1790, ch. 35, §§ 55, 69, 1 Stat. 145, 173, 177; Act of Sept. 2, 1789, ch. 12, § 8, 1 Stat. 65, 67; Act of Feb. 25, 1791, ch. 10, §§ 8, 9, 1 Stat. 191, 195-96.

[5] *See, e.g.*, Act of May 31, 1790, ch. 15, § 2, 1 Stat. 124, 124-25; Act of July 20, 1790, ch. 29, § 1, 1 Stat. 131, 131.

curtailed by Congress in short order.  Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 728 (2004); *see* OLC Memo 235-36.

Moreover, there is "no evidence" Congress ever "considered the constitutional status of qui tam."  OLC Memo 214.  The early *qui tam* statutes instead have all the hallmarks of action "taken thoughtlessly, by force of long tradition" from an archaic English device, "and without regard to the problems" presented to the new constitutional order.  *Marsh v. Chambers*, 463 U.S. 783, 791 (1983).  The Framers themselves recognized that early congressional practice should receive little weight where, as here, "the question of Constitutionality was but slightly, if at all, examined."  Letter from James Madison to President Monroe (Dec. 27, 1817), in 3 *Letters and Other Writings of James Madison* 54, 55-56 (J.B. Lippincott & Co. 1867).

Reliance on congressional practice also proves too much.  For many "qui tam provisions authoriz[ed] individuals to sue under *criminal* statutes to help enforce the law."  Harold J. Krent, *Executive Control over Criminal Law Enforcement: Some Lessons from History*, 38 Am. U. L. Rev. 275, 296-97 & n.104 (1989) (emphasis added).  An early larceny statute, for example, gave half the fine "to the informer and prosecutor," and provided that, "on conviction," the offender would "be publicly whipped."  Act of Apr. 30, 1790, ch. 9, §§ 16-17, 1 Stat. 112, 116.  The government

can hardly dispute that outsourcing such "core executive power" to the plaintiffs' bar would violate Article II.  *Seila Law*, 591 U.S. at 219.

For all these reasons, "postenactment history" should not receive "more weight than it can rightly bear" in discerning the original meaning of Article II. *Bruen*, 597 U.S. at 35.

### 3.    The False Claims Act Revived an Unconstitutional Practice.

The early *qui tam* provisions had fallen into disuse by the antebellum period. During the Civil War, however, the country's resources were stretched to the breaking point, and Congress revived the concept with the FCA.  *See United States v. McNinch*, 356 U.S. 595, 599 (1958).

Congress viewed aggressive enforcement as critical to the war effort.  So, it turned to the "unusual" practice of "authorizing private parties" to sue "on the Government's behalf."  *Polansky*, 599 U.S. at 423.   In the legislature's view, allowing "any person" to sue "for the United States" and share in the proceeds, *see* Act of Mar. 2, 1863, ch. 67, § 4, 12 Stat. 696, 698, was the "most expeditious way" of enforcing the law, Cong. Globe, 37th Cong., 3d Sess. 956 (1863) (Sen. Howard). To that end, Congress "let loose a posse of *ad hoc* deputies to uncover and prosecute frauds against the government." *Milam*, 961 F.2d at 49.

After the Civil War crisis receded, *qui tam* once again "fell into relative desuetude." OLC Memo 209.  Eventually, "both Houses of Congress voted to repeal

the FCA['s] *qui tam* provisions" in the early 1940s, albeit in different sessions. Beck, *supra*, at 558. Congress restricted the role and recovery of relators in 1943, *see id.* at 559-61, and those restrictions all but signaled the death knell for the anachronistic device.

By 1986, though, Congress had become "dissatisfied with the way the executive branch was enforcing government procurement laws." OLC Memo 209. Accordingly, in the 1986 amendments, Congress sought to "encourage more private enforcement suits" and "check" the Executive's enforcement discretion. S. Rep. No. 99-345, at 23-24, 26 (1986). For instance, Congress "eliminate[d] a defense to a *qui tam* suit—prior disclosure to the Government—and therefore change[d] the substance of the existing cause of action." *Schumer*, 520 U.S. at 948. Congress also afforded relators "the right to continue as a party," even where the government intervenes. 31 U.S.C. § 3730(c)(1). And Congress significantly increased the bounty for relators and their attorneys. *See id.* §§ 3729(a)(1), 3730(d).

The 1986 amendments thus ushered in a new era of litigation, with *qui tam* actions surging more than a hundredfold. *Compare* U.S. Dep't of Justice, *Fraud Statistics—Overview* (Jan. 15, 2025), https://bit.ly/4bfrXgs, *with Zafirov*, 751 F. Supp. 3d at 1302 (citing pre-1986 statistics). That explosion of relator-driven litigation has harmed businesses nationwide and created major problems for the Executive in ensuring the faithful execution of the laws. Even though many *qui tam*

actions are meritless or contrary to the public interest, their sheer volume prevents the government from effectively supervising the litigation. *See Zafirov*, 751 F. Supp. 3d at 1302-03. Hence, the 1986 amendments have threatened the Executive's authority and accountability in a way that the earlier FCA did not. Indeed, private relators now far surpass the Executive Branch as the primary executors of the statute. *See Fraud Statistics*, *supra*. That alternative method of law enforcement can hardly be squared with Article II's text or this Nation's history.

## II.   The Constitutionally Excessive Fine Imposed Here Highlights the Article II Problems with *Qui Tam* Litigation.

The constitutional violations in this case go beyond Article II. As Janssen persuasively explains, the punitive sanctions here transgress the limits of the Excessive Fines Clause. And that is an increasing problem in *qui tam* actions. It can only be expected that profit-driven relators and their counsel, not bound by any duty to consider the public interest, would exploit the FCA in a manner that results in constitutionally excessive fines.

### A.   The Excessive Fines Clause Applies to *Qui Tam* Actions.

The Excessive Fines Clause does not apply in "private civil" actions. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265 (1989). It instead limits "the government's power" to levy "fines," meaning "payment[s] to a sovereign as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998) (citations omitted).

Neither Relators nor the Government disputes that the gigantic penalty here is a fine under that standard. *See* ECF 488 at 16 (Relators); ECF 484 at 2-5 (Government). Nor could they. The Supreme Court has recognized that FCA treble damages serve "punitive objectives." *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003). And the same goes for the FCA's per-claim civil penalties. *See Stevens*, 529 U.S. at 784-85. That punishment is "compulsory irrespective of the magnitude of the financial injury to the United States." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021). The Government also receives the "lion's share" of that punitive award. *Id.* at 1311.

Relators' concession that "FCA awards are subject to the Eighth Amendment's limit on excessive fines" is telling, ECF 488 at 16, because that means this is *not* a "private civil" action, *Browning-Ferris*, 492 U.S. at 265. Rather, the government has outsourced its "traditional, exclusive function" of protecting the public fisc to "an avatar in litigation." *Yates*, 21 F.4th at 1310. That it cannot do. When "the government delegates some portion of [its] power to private litigants," that "does not change the governmental character of the power exercised." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 626 (1991). And had this massive fine been pursued by properly appointed officers—instead of "stand-in[s] for the government," *Yates*, 21 F.4th at 1309 (citation omitted)—nobody disputes that would constitute an exercise of "quintessentially executive power," *Seila Law*,

591 U.S. at 219.  Relators' concession further confirms that they are exercising executive Power, and thus that this suit runs afoul of Article II.

### B.    Profit-Driven Relators Naturally Pursue as Excessive a Fine as the Court Will Permit.

The FCA also has naturally driven profit-seeking relators and their attorneys to pursue exorbitant penalties.  The statute's *qui tam* mechanism "combines the prosecutorial power of the government with private lawyers aggressively pursuing litigation that could generate hundreds of millions" in contingency-based revenue. *See* Richard O. Faulk & John S. Gray, *Alchemy in the Courtroom? The Transmutation of Public Nuisance Litigation*, 2007 Mich. St. L. Rev. 941, 968 (2007).  That troubling dynamic foreseeably results in constitutionally excessive fines.

Nowhere is that truer than in the healthcare industry.  *See, e.g.*, *Zorn*, 107 F.4th at 800.  After all, "[w]hen numerous small claims are at issue, the FCA's per claim fines can metamorphize from rough remedial justice to grossly disproportionate penalties."  Melissa Ballengee, Bajakajian*: New Hope for Escaping Excessive Fines Under the False Claims Act*, 27 J.L. Med. & Ethics 366, 368 (1999). And medical providers "tend to submit a large number of relatively small claims each year."  Joan H. Krause, *"Promises to Keep": Health Care Providers and the Civil False Claims Act*, 23 Cardozo L. Rev. 1363, 1370 (2002).  Accordingly, "the statutory penalties quickly can reach astronomical proportions."  *Id.*

This case provides a prime example. The jury returned a $120 million verdict for the Relators. Appx2228. But the resulting $1.28 billion in statutory penalties is more than *ten times higher* than actual damages. In addition, "Relators presented no evidence" that Janssen's conduct caused any harm to patients. Appx266. They alleged "purely economic harm," which is far "less reprehensible" than if Janssen had "endanger[ed] the health or safety of others." *Zorn*, 107 F.4th at 799; *see State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).

The fact that the FCA authorizes this excessive punishment does not shield it from constitutional scrutiny. Courts "must be mindful not to give 'undue deference' to legislative judgments about excessiveness." *Zorn*, 107 F.4th at 800 (citation omitted). And this case again shows why. Janssen did not itself present any false claims. Instead, it adopted a sales practice, which the jury found induced others to submit 159,574 false claims. This centralized training practice hardly merits 159,574 times the punishment one would face for defrauding the government through a single false claim. Mechanically imposing such ten-figure punishment— as the District Court did—is "grossly disproportional to the gravity of [Janssen's] offense." *Bajakajian*, 524 U.S. at 334. Indeed, Janssen does not even "fit into the class of persons for whom the [FCA] was principally designed"—those who actually present false claims to the government. *Id.* at 338.

Under Article II, constitutionally accountable officers are charged with exercising judgment in the enforcement of laws and protecting individual liberty. Yet *qui tam* relators have no such obligation to the public weal. Instead, they have exploited the FCA's per-claim penalties to extract constitutionally excessive fines, as in this case. This Court should reject that effort.

## CONCLUSION

The judgment below should be reversed.

Respectfully submitted,

*/s/ Steven A. Engel*

MICHAEL H. MCGINLEY                    STEVEN A. ENGEL
BRIAN A. KULP                                      *Counsel of Record*
DECHERT LLP                                        DECHERT LLP
Cira Centre                                            1900 K Street, NW
2929 Arch Street                                   Washington, DC 20006
Philadelphia, PA 19104                          (202) 261-3369
                                                             steven.engel@dechert.com
ANDREW R. VARCOE
MARIEL A. BROOKINS
U.S. CHAMBER LITIGATION        H. SHERMAN JOYCE
CENTER                                               LAUREN SHEETS JARRELL
1615 H Street, NW                               AMERICAN TORT REFORM
Washington, DC 20062                         ASSOCIATION
                                                             1101 Connecticut Avenue, NW
                                                             Suite 400
                                                             Washington, DC 20036

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that I am a member of the Bar of this Court. This Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,496 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This Brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman font.

This Brief complies with L.A.R. 31.1(c) because the text of the electronic brief is identical to the text in the paper copies and because a virus-protection program, the latest version of VirusTotal, has been run on the file and no virus was detected.

Dated: July 21, 2025                       */s/ Steven A. Engel*
                                           Steven A. Engel

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I caused the foregoing Brief to be filed electronically with the Clerk of Court of the United States Court of Appeals for the Third Circuit using the CM/ECF system.  All participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.


Dated: July 21, 2025                          */s/ Steven A. Engel*
                                              Steven A. Engel