No. 25-1818

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA EX REL. JESSICA PENELOW
AND CHRISTINE BRANCACCIO, ET AL.,

*Plaintiffs-Appellees*,

AND

UNITED STATES OF AMERICA,

*Intervenor-Appellee*,

v.

JANSSEN PRODUCTS, LP,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of New Jersey, No. 3:12-cv-07758-ZNQ-JBD,
Hon. Zahid N. Quraishi

## RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

Peter D. Marketos
Joshua M. Russ
Andrew O. Wirmani
Adam C. Sanderson
Whitney L. Wendel
REESE MARKETOS LLP
750 N. St. Paul Street, Suite 600
Dallas, Texas 75201
(214) 382-9810
pete.marketos@rm-firm.com

David C. Frederick
Ariela M. Migdal
Kyle B. Grigel
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com

*Counsel for Appellees*

September 17, 2025

*(additional counsel listed on inside cover)*

Sherrie R. Savett
Joy P. Clairmont
Michael T. Fantini
William H. Ellerbe
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000
ssavett@bergermontague.com

*Counsel for Appellees*

**STATEMENT CONCERNING ORAL ARGUMENT**

Plaintiffs-Appellees respectfully request oral argument. This case involves complex statutory and constitutional questions, as well as an extensive evidentiary record stemming from a multi-week trial. Plaintiffs-Appellees believe that oral argument will be of material assistance in resolving the issues involved.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................v

INTRODUCTION ...............................................................................1

STATEMENT OF THE ISSUES..........................................................3

STATEMENT OF RELATED CASES ..................................................5

STATEMENT OF THE CASE ..............................................................6

I.      Statutory And Regulatory Framework ...........................................6

II.     Factual Background ........................................................................7

        A.      Janssen Introduced Prezista And Intelence To A Mature
                Market...........................................................................7

        B.      Janssen Launched A Campaign Of Deception.....................9

                1.      The company disseminated three deceptive
                        messages............................................................9

                2.      Janssen employed deceptive tactics.........................11

        C.      Janssen Knew Its Conduct Violated The Law ...................13

III.    Procedural History .......................................................................15

STANDARD OF REVIEW ................................................................16

SUMMARY OF ARGUMENT ...........................................................17

ARGUMENT ....................................................................................20

I.      THE JURY PROPERLY FOUND JANSSEN'S VIOLATIONS
        MATERIAL....................................................................................20

        A.      Janssen's Conduct Met The Indicia Of Materiality ...........21

                1.      Janssen's violations were recurring and significant,
                        and violated conditions of payment .........................21

2.    Janssen violations went to the essence of the government's bargain, as Janssen knew ..............................23

B.    Janssen's Materiality Arguments Fail .................................26

1.    Pharmacies need not have made representations.....................26

2.    The government's actions do not defeat materiality................27

3.    Janssen cannot downplay its misstatements as minor ....................................................................31

4.    Janssen's challenges to the evidence of materiality fail ......................................................................32

II.    THE JURY PROPERLY FOUND FALSITY ...............................32

A.    The Claims Were False Because They Were Not Reimbursable................................................................33

1.    Janssen's false statements to doctors caused FCA violations ..................................................................33

2.    The claims were not for "medically accepted indications" and "reasonable and necessary" ...........36

B.    Janssen's Falsity Arguments Fail .......................................41

1.    Janssen incorrectly argues the federal programs will reimburse claims from fraudulent promotion ..........41

2.    Janssen argues incorrectly that drugs need not be for medically accepted indications and reasonable and necessary ........................................................42

3.    Janssen failed to prove the claims were for medically accepted indications ................................44

4.    Janssen's arguments that the claims were reasonable and necessary fail.....................................46

C.    DOJ's Position Is Not To The Contrary...............................49

D.    The Court Properly Instructed The Jury On Falsity...........50

III.  RELATORS PROVED THE REMAINING ELEMENTS...........................52

    A.  Relators Proved Causation ..................................................52

        1.  Relators satisfied the governing "substantial factor" test, and the district court instructed the jury correctly ....................................................................52

        2.  Janssen misstates the legal standard .........................53

        3.  Janssen's evidentiary challenges to causation fail...................55

    B.  Janssen Failed To Challenge Scienter And Janssen Knew Its Promotion Was False ........................................56

IV.  JANSSEN'S CONSTITUTIONAL ARGUMENTS FAIL...........................57

    A.  *Qui Tam* Is Constitutional ..................................................57

    B.  The District Court Awarded Constitutional Penalties........................58

V.  JANSSEN IS NOT ENTITLED TO A NEW TRIAL...................................61

CONCLUSION .................................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF BAR MEMBERSHIP

# TABLE OF AUTHORITIES

Page

## CASES

*Alexander v. Choate*, 469 U.S. 287 (1985) ....................................................7

*AstraZeneca Pharms. LP v. Secretary U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 116 (3d Cir. 2025) ...............................................6

*Auffmordt v. Hedden*, 137 U.S. 310 (1890) .........................................58

*Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig., In re*, 701 F. Supp. 2d 356 (E.D.N.Y. 2010) ...............................56

*Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184 (3d Cir. 1990) .........................17

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998) .........................................................62

*Caldwell v. Abbott Lab'ys*, 2014 WL 4726271 (M.D. La. Sept. 23, 2014) .........................................................45

*California v. Rooney*, 483 U.S. 307 (1987) ............................................50

*Celexa & Lexapro Mktg. & Sales Pracs. Litig., In re*, 915 F.3d 1 (1st Cir. 2019) .........................................................25

*CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184 (3d Cir. 2007) ........................................................60

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) ............................................56

*Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330 (Fed. Cir. 2011) .................62

*Diamond v. Secretary of Health & Hum. Servs.*, 2015 WL 367010 (N.D. Ohio Jan. 27, 2015) .........................................38

*DiFiore v. CSL Behring, LLC*, 879 F.3d 71 (3d Cir. 2018) ....................................53

*Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177 (3d Cir. 2015) ........................................................61

*General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987) .........................................................62

*Grant ex rel. U.S. v. Zorn*, 107 F.4th 782 (8th Cir. 2024), *cert. denied*, Nos. 24-549 & 24-845 (U.S. June 23, 2025)...................................................60

*Griffin v. United States*, 502 U.S. 46 (1991).......................................................62, 63

*Harris v. City of Philadelphia*, 35 F.3d 840 (3d Cir. 1994) .......................17, 33, 56

*Hofkin v. Provident Life & Accident Ins. Co.*, 81 F.3d 365 (3d Cir. 1996).................. 62

*Hughes v. Boston Sci. Corp.*, 631 F.3d 762 (5th Cir. 2011) .............................46, 56

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ....................................................16

*Mallinckrodt ARD LLC v. Verma*, 444 F. Supp. 3d 150 (D.D.C. 2020) .................37

*Morse v. Fusto*, 804 F.3d 538 (2d Cir. 2015) ...........................................................62

*Murray v. United of Omaha Life Ins. Co.*, 145 F.3d 143 (3d Cir. 1998).................52

*Neurontin Mktg. & Sales Pracs. Litig., In re*, 712 F.3d 21 (1st Cir. 2013).................55

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .................57

*Pennsylvania Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs.*, 80 F.3d 796 (3d Cir. 1996) ...................................................58

*Pratt v. Petelin*, 733 F.3d 1006 (10th Cir. 2013) ......................................................62

*Redland Soccer Club, Inc. v. Department of Army*, 55 F.3d 827 (3d Cir. 1995).......................................................................................52

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ..............7, 16, 48

*Rickhoff v. Secretary of Dep't of Health & Hum. Servs.*, 2012 WL 6177411 (D. Ariz. Dec. 11, 2012) .........................................................44, 46

*Robinson v. First State Cmty. Action Agency*, 920 F.3d 182 (3d Cir. 2019) ...........................................................................................51

*Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128 (3d Cir. 1997) ...................17, 51

*Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838 (8th Cir. 2003) ........................................................................43

*Strom ex rel. U.S. v. Scios, Inc.*, 676 F. Supp. 2d 884 (N.D. Cal. 2009) .................34

*U.S. ex rel. Behnke v. CVS Caremark Corp.*, 2025 WL 1758623
(E.D. Pa. June 25, 2025) ............................................................21

*U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745 (S.D. Tex.
2010) ..........................................................................................34

*U.S. ex rel. Bergman v. Abbott Lab'ys*, 995 F. Supp. 2d 357 (E.D. Pa.
2014) ..........................................................................................34

*U.S. ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032 (C.D. Cal.
2016) ..........................................................................................53

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390
(4th Cir. 2013) ...........................................................................59

*U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890 (9th Cir. 2017)................29,
30, 34, 36

*U.S. ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308 (3d Cir. 2019) ...........................28

*U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015) ...........................59

*U.S. ex rel. Feldman v. Van Gorp*, 2010 WL 5094402 (S.D.N.Y. Dec. 9,
2010), *aff'd*, 697 F.3d 78 (2d Cir. 2012) ......................................32

*U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner- Lambert Co.*,
147 F. Supp. 2d 39 (D. Mass. 2001)......................................32, 34, 35, 36, 49

*U.S. ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89 (3d Cir.
2018) ....................................................................................47, 54

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d
908 (4th Cir. 2003) ............................................................... 32-33

*U.S. ex rel. Hinkle v. Caris Healthcare, L.P.*, 2017 WL 3670652
(E.D. Tenn. May 30, 2017).....................................................35, 49

*U.S. ex rel. Int'l Bhd. of Elec. Workers v. Farfield Co.*, 5 F.4th 315
(3d Cir. 2021).............................................................20, 21, 22, 23,
24, 27, 28, 30, 34, 43

*U.S. ex rel. Krahling v. Merck & Co.*, 2024 WL 3664648 (3d Cir.
Aug. 6, 2024) .............................................................................29

*U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) ...........................................25, 34

*U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017).............29, 32, 37, 38, 47, 54

*U.S. ex rel. Polansky v. Pfizer, Inc.*:

    914 F. Supp. 2d 259 (E.D.N.Y. 2012), *aff'd*, 822 F.3d 613 (2d Cir. 2016)............................................................................46

    822 F.3d 613 (2d Cir. 2016) ............................................44, 45, 46

*U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3d Cir. 2004) ...................52, 53

*U.S. ex rel. Solis v. Millennium Pharms., Inc.*, 2015 WL 1469166 (E.D. Cal. Mar. 30, 2015) ...............................................................35

*U.S. ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746 (3d Cir. 2017) ....22, 29, 56

*U.S. ex rel. Streck v. Takeda Pharm. Am., Inc.*, 2023 WL 3093476 (N.D. Ill. Apr. 26, 2023), *aff'd sub nom. U.S. ex rel. Streck v. Eli Lilly & Co.*, 2025 WL 2618821 (7th Cir. Sept. 11, 2025) ............................... 21-22

*United Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016) ...........20, 21, 23, 26, 27, 28, 30, 33, 36

*United States v. Bajakajian*, 524 U.S. 321 (1998).............................................59, 60

*United States v. Berkeley HeartLab, Inc.*, 2017 WL 4803911 (D.S.C. Oct. 23, 2017) ...........................................................................28

*United States v. Care Alternatives*:

    952 F.3d 89 (3d Cir. 2020) ...............................................26, 33, 35

    81 F.4th 361 (3d Cir. 2023) ......................................20, 21, 22, 23, 28, 29, 30, 33, 52

*United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012)..........................................35

*United States v. DISH Network L.L.C.*, 954 F.3d 970 (7th Cir. 2020) ...................59

*United States v. Gomez-Rojas*, 507 F.2d 1213 (5th Cir. 1975) ..............................57

*United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977)...............................................54

*United States v. Mackby*, 339 F.3d 1013 (9th Cir. 2003) .......................................59

*United States v. Neifert-White Co.*, 390 U.S. 228 (1968)........................................20

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008)......................................55, 60

*United States v. Saavedra*, 2015 WL 7621481 (S.D.N.Y. June 16, 2015), *aff'd*, 661 F. App'x 37 (2d Cir. 2016) ..................................................60

*United States v. UnitedHealthcare of Georgia, Inc.*, --- F. Supp. 3d ---, 2025 WL 1184109 (M.D. Ga. Apr. 23, 2025)..................................................31

*United States v. Waalee*, 133 F. App'x 819 (3d Cir. 2005)......................................54

*United States v. Wasserson*, 418 F.3d 225 (3d Cir. 2005)......................................50

*United States v. Zehrbach*, 47 F.3d 1252 (3d Cir. 1995)..................................17, 43

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765 (2000).................................................................................................57, 58

*Vioxx Prods. Liab. Litig.*, *In re*, 2010 WL 2649513 (E.D. La. June 29, 2010) ..................................................................................................42

*Webb v. City of Philadelphia*, 562 F.3d 256 (3d Cir. 2009)....................................26

*Wilburn v. Maritrans GP Inc.*, 139 F.3d 350 (3d Cir. 1998)............................. 62-63

*Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288 (11th Cir. 2021) ...........................................................................................58

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ........................16, 52

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const.:

Art. II .....................................................................................................19

§ 1 .....................................................................................................58

§ 2, cl. 2 ........................................................................58

§ 3 ..................................................................................58

Art. IV, § 3, cl. 2 ..........................................................57

Amend, VIII ..................................................................58

False Claims Act, 31 U.S.C. § 3729 *et seq.* .......................................1, 6, 16, 19, 20, 33, 34, 35, 54, 57, 58

31 U.S.C. § 3729(a)(1)..........................................16, 58

31 U.S.C. § 3729(a)(1)(A)-(B) ..............................6, 33

31 U.S.C. § 3729(b)(4) ...............................................20

31 U.S.C. § 3730(b) .....................................................6

31 U.S.C. § 3730(h)(1) ...............................................53

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* .....................31-32

Public Health Service Act, 42 U.S.C. § 201 *et seq.*...................................7

§ 340B, 42 U.S.C. § 256b ...........................................7

§ 340B(a)(1), 42 U.S.C. § 256b(a)(1)..........................37

§ 340B(a)(4)(J), 42 U.S.C. § 256b(a)(4)(J) ................37

21 U.S.C.:

§ 321(n).........................................................................33

§ 331(a) ....................................................................33-34

§ 352(a) ........................................................................34

§ 352(n) ........................................................................34

§ 352(bb).......................................................................34

§ 355(a) ........................................................................34

42 U.S.C.:

§ 300ff-26 ..................................................................................7

§ 300ff-26(a) .............................................................................7

§ 300ff-26(b) ...........................................................................43

§ 300ff-27(b)(7)(F) ....................................................................7

§ 426(b) .....................................................................................6

§ 1395w-102(e)(1) ...................................................................37

§ 1395w-102(e)(3)(A) .......................................................38, 44

§ 1395y(a)(1)(A) ......................................................................38

§ 1396b(i) .................................................................................39

§ 1396b(i)(10) ..........................................................................37

§ 1396r-8(a) ..............................................................................37

§ 1396r-8(b) ..............................................................................37

§ 1396r-8(d)(1) .........................................................................42

§ 1396r-8(d)(1)(B) ....................................................................42

§ 1396r-8(k)(2)-(4) ...................................................................37

§ 1396r-8(k)(3) ...................................................................37, 42

§ 1396r-8(k)(6) ....................................................................37-38

20 C.F.R. § 404.1505 ........................................................................6

21 C.F.R. § 201.57(a)(6) ............................................................44, 45

28 C.F.R. § 85.3(a)(9) (2010) ..........................................................58

42 C.F.R.:

§ 50.504.............................................................................37, 39

§ 423.566(b)(1) ....................................................................38

§ 440.230(b) ........................................................................39

§ 440.230(d) .................................................................39, 44

§ 447.502 ............................................................................37

45 C.F.R. § 75.403(a) ..................................................................39

**LEGISLATIVE MATERIALS**

S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266 .......................49

**ADMINISTRATIVE MATERIALS**

Ctrs. for Medicare & Medicaid Servs.:

Medicare, *Your Guide to Medicare Drug Coverage* (Apr. 2025), https://tinyurl.com/mrhry7ra.........................................................38

Medicare Prescription Drug Benefit Manual, Chapter 6 – Part D Drugs and Formulary Requirements (rev. Jan. 15, 2016), https://www.cms.gov/Medicare/Prescription-Drug-Coverage/ PrescriptionDrugCovContra/Downloads/Part-D-Benefits-Manual-Chapter-6.pdf ..................................................................45

Final Rule, Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194 (Jan. 28, 2005)........................................41, 44

Health Res. & Servs. Admin.:

HIV/AIDS Bureau, AIDS Drug Assistance Program (ADAP) Manual (2012), https://tinyurl.com/5n8vk68r............................37, 38

Policy Clarification Notice 16-02 (rev. Oct. 22, 2018), https://tinyurl.com/bdetsp4f...............................................................38

Policy Notice 07-03 (Sept. 2007), https://tinyurl.com/3t32xdbn ....................37

U.S. Dep't of Just., *Shire Pharmaceuticals LLC to Pay $56.5 Million to Resolve False Claims Act Allegations Relating to Drug Marketing and Promotion Practices* (Sept. 24, 2014), https://tinyurl.com/yypfmwx7 ......................................................................25

## OTHER MATERIALS

Sammy Almashat & Sidney Wolfe, Public Citizen, *Pharmaceutical Industry Criminal and Civil Penalties: An Update* (Sept. 27, 2012), https://www.citizen.org/wp-content/uploads/2073.pdf......................25

Br. for U.S. as Amicus Curiae, *Petratos v. Genentech Inc.*, No. 15-3805 (3d Cir. May 23, 2016), 2016 WL 3012033..................................................25

Settlement Agreement Between the United States of America et al., Relators Victoria Starr et al., Janssen Pharmaceuticals, Inc., and Johnson & Johnson (Oct. 2013), https://tinyurl.com/yc4n7ksc ....................14

## INTRODUCTION

Janssen orchestrated a nationwide campaign to promote its HIV drugs, Prezista and Intelence, for medically inappropriate and dangerous uses to boost sales. It misled doctors on sales calls, used sham "studies," and deployed audience plants to parrot its false statements. It induced doctors to prescribe Prezista – a drug that negatively affects lipids – to patients with high lipid levels; to prescribe Intelence for once-daily dosing (when FDA approved only twice-daily dosing); and to prescribe both drugs for treatment-naïve patients, contradicting their labels and accepted medical standards. HIV patients thus faced risks for cardiac injuries, toxic (or inadequate) drug doses, and exhausted treatment options.

These tactics produced the enormous profits Janssen sought, but at taxpayer expense. The HIV epidemic is concentrated in marginalized communities, and many patients rely on public assistance for healthcare. Janssen's deception therefore directed thousands of medically inappropriate prescriptions at three federal healthcare programs: Medicare Part D, Medicaid, and the AIDS Drug Assistance Program ("ADAP").

Janssen knowingly caused nonreimbursable claims to be submitted to the government in violation of the False Claims Act ("FCA"). The U.S. Department of Justice ("DOJ") had investigated Janssen for similar misconduct – deceptively promoting two other drugs, Risperdal and Topamax, for improper, off-label uses.

Janssen entered Corporate Integrity Agreements ("CIAs") with DOJ in connection with those investigations, paying more than $2 billion in fines and pleading guilty to federal criminal charges. Despite those stiff penalties, Janssen continued to promote Prezista and Intelence deceptively.

During a five-and-a-half-week trial, Plaintiffs-Appellees ("Relators") introduced overwhelming evidence of liability: damning admissions from top executives (including Janssen's president and national sales director), first-hand accounts from former sales managers, acknowledgments of legal risk in internal compliance documents, and unrebutted expert witness testimony. The jury found Janssen liable for causing the submission of 159,574 false claims costing the United States more than $120 million. The district court awarded civil penalties of $8,000 per claim (below the statutory maximum) and rejected various Janssen arguments for judgment and a new trial.

The Court should uphold the jury's verdict. The claims were false because the federal programs will not reimburse for prescriptions caused by deceptive drug promotion and because they will pay only for prescriptions for medically accepted indications that are reasonable and necessary.

The Court should reject Janssen's request for a do-over. Unable to identify a valid basis for reversal, Janssen lobs scattershot objections, many of which it forfeited and some of which it raises for the first time on appeal. It asks this Court

to usurp the jury's role and reweigh evidence.  And it trivializes the health risk its false statements created for HIV patients – showcasing the very disregard for patient safety that earned Janssen two federal investigations and the FCA verdict it now seeks to upend.

## STATEMENT OF THE ISSUES

1.      Whether the jury reasonably found Janssen's false statements material given their scale, recurrence, and seriousness, and Janssen's knowledge that the government would not reimburse these claims.

2.      Whether the jury reasonably found Janssen caused the submission of false claims where Janssen's false and misleading off-label promotion violated the federal programs' conditions of payment and its deceptive statements caused prescriptions that were not reasonable and necessary or for medically accepted indications.

3.      Whether the district court plainly erred in instructing the jury to apply the "substantial factor" causation standard, where Janssen assented to that instruction before the district court.

4.      Whether the district court abused its discretion in rejecting Janssen's proposed alternative jury instruction regarding the consequences of FDA's silence, where Jannsen acknowledged its proposed alternative instruction would not change the instruction's meaning.

5.    Whether the district court properly rejected Janssen's constitutional arguments where no appellate court has held the *qui tam* provisions unconstitutional and Janssen challenges penalties within the statutory range.

6.    Whether the district court properly rejected Jannsen's request for a new trial where there is no error, Janssen forfeited its objections to the general verdict, and overwhelming evidence supports each theory.

## STATEMENT OF RELATED CASES

Relators are unaware of any related cases or proceedings.

## STATEMENT OF THE CASE

### I.    Statutory And Regulatory Framework

The FCA, enacted in 1863 under President Lincoln, has served as a bedrock anti-fraud tool throughout its history.  It prohibits any person from "knowingly" (1) "present[ing], or caus[ing] to be presented," "a false or fraudulent claim for payment or approval," or (2) "mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B).  The act's *qui tam* provision allows "private persons" to sue as relators "in the name of the Government" and litigate the case in exchange for a portion of the overall recovery.  *Id.* § 3730(b).

This case involves "false or fraudulent claim[s]" submitted to three federal programs that help HIV patients pay for needed medications.

*Medicare.*  Medicare provides insurance to older Americans and those with disabilities.  *See* 42 U.S.C. § 426(b); 20 C.F.R. § 404.1505.  Medicare Part D "subsidizes the cost of prescription drugs," operating in partnership with "private insurance companies" called "sponsors," which contract with "pharmacies that dispense prescription drugs" at reduced rates.  *AstraZeneca Pharms. LP v. Secretary U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 116, 120 (3d Cir. 2025).

*Medicaid.*  "Medicaid is a joint state-federal funding program" through which the federal government "subsidizes" the costs of "medical services for the needy."

*Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985). "[T]he Federal Government approves a state plan for the funding of medical services." *Id.* "Once a State voluntarily chooses to participate . . . , the State must comply with the requirements" of the Medicaid statute and with all "applicable regulations." *Id.*

**ADAP.** ADAP "provide[s] therapeutics to treat HIV/AIDS" to some of the nation's poorest individuals, serving as a payer of last resort. *See* 42 U.S.C. §§ 300ff-26(a), 300ff-27(b)(7)(F). Under ADAP, the Health Resources and Services Administration ("HRSA") funds state-run programs, *id.* § 300ff-26, which must comply with the federal laws and regulations governing "covered entities" under Section 340B of the Public Health Service Act, 42 U.S.C. § 256b.

## II.    Factual Background[1]

This case concerns Janssen's false and misleading off-label[2] promotion of two HIV drugs, Prezista and Intelence, between June 2006 and December 2014.

### A.    Janssen Introduced Prezista And Intelence To A Mature Market

HIV is no longer a death sentence. Appx1128-1133 (Glatt). Since the early 2000s, patients have had access to effective treatments. Appx1128-1133. The

---

[1] On reviewing a jury verdict, "the [C]ourt should give credence to the evidence favoring" the appellee and "must disregard all evidence favorable to the [appellant] that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

[2] Off-label statements include those that deviate from the indications and uses in a drug's FDA-approved label and misleading statements minimizing the risks in a drug's label. Appx4450-4453; Appx1292.

medical community's priorities shifted to finding treatment regimens patients would adhere to and preserving future treatment options should patients develop treatment resistance.  Appx1128-1133.

Janssen entered this crowded market late, debuting Prezista in 2006. Appx1285-1286 (Mattes); Appx3187.  The drug faced immediate challenges.  First, FDA approved it only for patients for whom at least two prior treatment regimens had failed.  Appx748 (Strand); Appx1281-1282 (Mattes); Appx3200.  Second, FDA classified Prezista's elevation of lipid levels as an "adverse reaction" in 2006 and a "serious [adverse drug reaction]" in 2008.  Appx1138-1141 (Glatt); Appx3218-3220.  That disadvantaged Prezista against competitors, like Reyataz, with superior lipid profiles.  Appx3220, Appx3962; Appx1206-1207 (Glatt).  Cardiovascular effects matter for HIV patients, who require protection "not only . . . from their HIV, but [from] heart disease or stroke" caused by medications.  Appx1132, Appx1138-1141 (Glatt).

When Janssen released Intelence in 2008, it faced similar headwinds.  Like Prezista, FDA approved Intelence only for highly treatment-experienced patients. Appx3913-3914.  FDA also approved Intelence only for twice-daily dosing, a disadvantage against Intelence's once-daily competitors (like Sustiva).  Doctors and patients prefer once-daily as easier for patients to take.  Appx1172-1173 (Glatt); Appx3914.

FDA's limitations restricted both drugs' reach. The treatment-experience requirements alone ruled out roughly 98% of the HIV market. Appx1175, Appx1281-1282 (Glatt). Sales fell short of Janssen's expectations. Following Prezista's release, prescriptions were less than one quarter of projections. Appx2611.

## B.    Janssen Launched A Campaign Of Deception

Janssen's President Glenn Mattes excoriated managers over sales shortfalls and insisted they promote the drugs to broader patient populations. *E.g.*, Appx703 (Graham); Appx908-920 (Wilhelm). Thus began Janssen's coordinated, top-down campaign to market Prezista and Intelence sales for improper, off-label uses.

### 1.    The company disseminated three deceptive messages

*First*, Janssen told doctors Prezista was "lipid friendly" and "lipid-neutral," and had a "low impact on lipids," "comparable to" its competitor, "Reyataz." *E.g.*, Appx1915-1917 (Bartnett); Appx2493, Appx2499. This "violated the standard of care for HIV patients." Appx1192-1210 (Glatt). By encouraging doctors to prescribe Prezista for patients with high lipid levels, Janssen exposed those individuals to heightened risk of "heart disease" and "stroke." Appx1126, Appx1138-1141, Appx1207-1208 (Glatt). FDA warned Janssen in April 2009 that Janssen's claims that Prezista had a "low impact on cholesterol" and similar

statements were misleading.  Appx3548.  Yet Janssen persisted with this "lipid-neutral" messaging for years.  Appx1649 (Patel).

*Second*, Janssen promoted both drugs for "treatment-naïve" patients – those who have never taken HIV drugs, contrary to their labels and against medical best practice.[3]  Appx1170-1174, Appx1179-1180, Appx1184-1187 (Glatt).  This widened the customer base, but endangered patients' health.  With improper drug sequencing, treatment-naïve patients risked developing viral mutations that could cause future treatments to fail.  Appx1130-1134, Appx1137-1138 (Glatt).  Doctors could "run out of drugs [for these] HIV patient[s]," and "the vast majority of these patients will die."  Appx1178 (Glatt); ECF #448, at 2323:12-14.

*Third*, Janssen told doctors patients could take a double dose of Intelence once a day, instead of a single dose twice a day.  It knew doctors and patients prefer once-daily medications, which "made their life a lot easier."[4]  Intelence's competitors, including its main competitor, Sustiva, all could be taken once-daily, giving them a "competitive advantage."[5]  Once-daily Intelence dosing exposed patients to higher

---

[3] In 2008, Prezista's label was changed to include treatment-naïve patients with different dosages.  Relators did not seek damages for claims related to Prezista treatment-naïve patients after the label change.

[4] Appx1072-1073 (Brancaccio); *see* ECF #466, at 4356:2-4357:22 (Holshoe) ("[T]he simpler the regimen, the better it is for the patient to remember to take it."); Appx1134-1136 (Glatt); Appx1412-1413 (Sillup); Appx1335-1336 (Mattes).

[5] ECF #448, at 2302:3-2303:15 (Glatt); Appx808-809 (Strand).

drug toxicity after dosing, while creating dangerous periods of underexposure later in the day, fostering virologic resistance.  Appx1167-1169 (Glatt).

### 2.    Janssen employed deceptive tactics

Janssen systematically directed employees to disseminate these false and misleading statements to physicians.   Appx193-202; Appx982-986 (Iacobellis). Mattes instructed sales representatives to "realize the goal of driving broader audience penetration" and "increase dramatically the number of patients per using [physician]."   Appx832-835 (Strand); Appx1357 (Mattes); Suppl.Appx196-197. The company even established sales targets for improper off-label uses.  *E.g.*, Suppl.Appx39, Suppl.Appx41; Appx3752, Appx3754.

To hit these targets, Janssen employed a variety of deceptive promotional tactics:

- Janssen's representatives misled doctors on sales calls. *E.g.*, Appx1915, Appx1918 (Bartnett).

- Janssen managers scripted and rehearsed talking points for sales representatives to deliver to physicians emphasizing improper off-label uses.  Appx832-835 (Strand).

- Sales representatives used sham studies – which Janssen conducted or financed – featuring small populations and short observational periods. Some were not double-blind, and, in one case, used only healthy patients

who did not even have HIV.  Some authors were Janssen's paid speakers.  *E.g.*, Appx2478; Appx2806-2815; Appx1065 (Brancaccio); Appx1164-1166, Appx1210, Appx1214 (Glatt).

- Sales representatives coached speakers to present deceptive off-label messages and arranged for audience "plants" at promotional speaker events to discuss off-label uses.  *E.g.*, Appx869-870 (Strand).

- Janssen tied compensation and performance evaluations to promotion of its deceptive off-label messages.  Appx1596 (Grooms); ECF #468, at 6298.  Employees who did not comply faced threats of discipline and termination.  *E.g.*, Appx886-888 (Strand); Appx1601-1602 (Grooms).[6]

Janssen made more than 620,000 sales contacts with 5,000+ HIV doctors during the relevant period.  Appx1722 (Dew); Appx1809 (Shaked).  The company tracked the physicians' weekly prescriptions against sales calls, *e.g.*, Appx1606-1607 (Grooms); Appx1708-1709 (Dew); Suppl.Appx8, Suppl.Appx10-11, Suppl.Appx15-17, intensified targeting when competitors exceeded Janssen's market share, *e.g.*, Appx1587-1589 (Grooms); and measured how its messaging

---

[6] After learning Janssen withheld documents about one employee fired for objecting to Janssen's messaging, the district court instructed the jury it could infer the withheld material was unfavorable to Janssen.  ECF #452, at 5774:5-5815:4; Appx1973 (Rosenberg); ECF #453, at 7174:2-11 (Rosenberg).

shifted prescribing patterns, Appx950 (Wilhelm); Appx2579-2580; Suppl.Appx8, Suppl.Appx10-11, Suppl.Appx15-17.

These tactics worked.   Prescriptions for Prezista and Intelence soared. Appx1414-1415 (Sillup); Appx1789-1791 (Shaked).  Statistical analysis confirmed that physicians Janssen targeted prescribed the drugs for improper, off-label uses at twice the rate of their uncontacted peers.  Appx1778-1783 (Shaked); Appx2435. Janssen's marketing consultants remarked that these increases represented "the strongest sales force lift that [they] ha[d] seen."  Appx1810 (Shaked).  Janssen lauded these successes internally, too:   "When we professionally challenge providers . . . WE CHANGE PRESCRIBING BEHAVIOR!"  Appx2580.

Janssen profited greatly, but at taxpayer expense.  *E.g.*, Appx1897-1899 (Kenworthy); Appx1959-1960 (Rosenberg); Appx2573.  Between 2006 and 2014, Medicare, Medicaid, and ADAP reimbursed Janssen at least $2.35 billion for Prezista and Intelence prescriptions.  Appx1763-1764 (Shaked).

### C.    Janssen Knew Its Conduct Violated The Law

Janssen knew this risked FCA liability.   When it brought Prezista and Intelence to market, the government already had begun investigating Janssen for making false and misleading off-label statements to doctors about *other* drugs.  In 2010, following a lengthy investigation, Janssen entered a CIA with DOJ for deceptively promoting its anti-seizure drug, Topamax, off-label.  Appx3115-3183;

ECF #465, at 2712:24-2713:8 (Mattes).  Three years later, it entered a similar CIA

concerning its anti-psychotic, Risperdal.    Appx2970-3038; Appx3451-3480.

Janssen paid more than $2 billion and pleaded guilty to federal criminal charges.

Appx3451-3480.[7]

These experiences confirmed what Janssen long had known.    The

government, its "biggest customer," would not pay for drugs promoted using

deceptive, off-label statements to doctors.  Appx2635-2681.  Janssen's executives

understood promoting a drug for "a different use," "a different dosage," or to "a

different patient population tha[n] it was intended for" was "[a]bsolutely" "not

legal."  Appx995-996 (Iacobellis); Appx2923.  The government "does not cover the

cost" of drugs marketed for non-approved indications or purposes that are not

"medically necessary" or "reasonable and necessary."    Appx1494, Appx1502

(Evans).  If the government is charged for such claims, it will "chase . . . and attempt

to recoup that money."  Appx1494-1495 (Evans).

Janssen's    contemporaneous    compliance    documents    confirmed    the

government "does not want to cover the cost of Rx products when" Janssen "[s]ell[s]

off-label" and "[m]isrepresent[s] product[s]."  Suppl.Appx50.  Mattes, and national

sales director, Michael Iacobellis, knew the government considers off-label drug

---

[7] An unredacted version of the 2013 Risperdal Settlement Agreement is
publicly available at https://tinyurl.com/yc4n7ksc.

marketing schemes serious offenses and "w[ould] demand [its] money back" if it discovered violations of those rules.[8]  So Janssen educated employees about the enormous settlements pharmaceutical companies paid to resolve FCA enforcement actions concerning off-label marketing.[9]

Janssen did not heed those cautions.  Instead, the same executives who promoted Topamax and Risperdal – including Mattes and marketing executive Candice Long – repurposed the same playbook that had cost the company more than $2 billion and used it to promote Prezista and Intelence.  Appx1262 (Mattes); ECF #452, at 6075:17-22 (Long).

## III.    Procedural History

Relators Jessica Penelow and Christine Brancaccio sued Janssen in 2012, alleging FCA violations through a false and misleading marketing scheme to cause submission of false claims.  Appx432-433 (¶¶ 218-221).  In 2024, the district court presided over a five-and-a-half-week trial.  The two Relators and five other former employees, including sales representatives from across the country, a national sales trainer, and senior sales managers, testified against Janssen.

---

[8] Appx1351 (Mattes); Appx1000, Appx1002 (Iacobellis).

[9] *Supra* note 7; Appx1000, Appx1002 (Iacobellis); *see also* Appx894 (Strand) (government "would not pay" for claims resulting from "illegal off-label marketing").

On June 13, 2024, the jury found Janssen violated the FCA by "unlawfully promoting Prezista or Intelence," causing submission of 159,574 false claims to government payors. Appx2229-2230. It found $120,004,736 of damages to the United States.

On March 28, 2025, the district court trebled damages, *see* 31 U.S.C. § 3729(a)(1), and imposed civil penalties of $8,000 per false claim (within the statutory range of $5,500 to $11,000 per violation). The court entered judgment against Janssen for $1.64 billion. Appx270-271. It found "Janssen engaged in a deliberate and calculated scheme that spanned several years and involved the unlawful marketing of its products" and "was aware of the seriousness of its conduct." Appx265.

## STANDARD OF REVIEW

"[A] jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 268 (3d Cir. 2012). The Court "review[s] the evidence . . . in the light most favorable to" the appellee, *LePage's Inc. v. 3M*, 324 F.3d 141, 146 (3d Cir. 2003) (en banc), and "must draw all reasonable inferences in favor of" the prevailing party, *Reeves*, 530 U.S. at 150. "[I]t may not make credibility determinations or weigh the evidence." *Id.*

"This court has consistently held that it will not consider issues that are raised for the first time on appeal." *Harris v. City of Philadelphia*, 35 F.3d 840, 845 (3d Cir. 1994). "Where a party has not made a clear, specific objection" to a jury instruction contemporaneously, it "waives the issue on appeal unless the error was so fundamental and highly prejudicial as to constitute plain error." *United States v. Zehrbach*, 47 F.3d 1252, 1260 n.6 (3d Cir. 1995) (en banc) (cleaned up). The Court reviews preserved objections only for "abuse of discretion," "[u]nless a trial judge misstates the law," *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 191 (3d Cir. 1990) (Alito, J.), and upholds the verdict if "the jury instructions, as a whole, stated the correct legal standard," *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 135 (3d Cir. 1997).

## SUMMARY OF ARGUMENT

Relators proved each element of their FCA claim. This Court defers to the district court's instructions and the jury's assessment of the evidence. Janssen's arguments – many unpreserved – attack strawmen, misstate governing law, and improperly ask this Court to reweigh evidence.

**I.** Relators proved materiality. Janssen's FCA violations were deliberate, systematic, and caused substantial taxpayer losses. They endangered HIV patients and harmed the integrity of federal healthcare programs, violating express and implied conditions of payment. Janssen knew the government would not pay for

these uses.  It forfeited its lead argument concerning whether pharmacies certified compliance.  And Janssen cannot show the government would have continued to pay the claims had it known the nature of Janssen's violations.

**II.**    Relators proved falsity – that the claims submitted were not reimbursable.  The federal programs will not cover prescriptions resulting from false and off-label drug promotion.  Moreover, the federal programs will pay only for "medically accepted indication[s]" that are "reasonable and necessary."  The jury heard extensive evidence that Janssen violated these conditions by promoting (1) Prezista to patients with lipid conditions; (2) Prezista and Intelence to treatment-naïve patients; and (3) Intelence for once-daily dosing.  The district court properly instructed the jury on falsity.  Janssen's objections to a different instruction (not the falsity instruction) are unpersuasive and largely unpreserved.

**III.**    Relators proved the remaining FCA elements.  They proved causation with expert analysis of the effects of Janssen's promotion on doctors, Janssen's own marketing surveys, and its employees' testimony.  The district court properly instructed the jury on causation, and Janssen's forfeited objection that the Court also should have instructed on but-for causation lacks merit.

Janssen forfeited its challenge to scienter.  What it now labels a "scienter" argument is merely a complaint that the district court rejected its proposed

alternative phrasing of an unrelated instruction – a phrasing Janssen conceded would not change the instruction's meaning.

**IV.**    Nothing in the Constitution requires reversal.   The FCA's *qui tam* provisions are lawful, as the United States explains and as Article II, Supreme Court and appellate precedent, and historical practice confirm.   Nor are the penalties unconstitutionally excessive.   They fall in the middle of the range Congress authorized.  Even substantial penalties comport with the Constitution where, as here, they reflect the scale, harm, and reprehensibility of a defendant's conduct.

**V.**    Janssen is not entitled to a new trial.   It forfeited any challenge to the validity of the general verdict by failing to request that the jury itemize false claims by legal theory.   Even if this Court rejected one or more of Relators' theories, considerable evidence supporting the remaining theories would sustain the verdict.

**ARGUMENT**

At trial, Relators proved each FCA element:  Janssen "(1) made a false statement," indeed, thousands, "(2) with scienter, (3) that was material, (4) causing the government to make a payment."  *United States v. Care Alternatives*, 81 F.4th 361, 366 (3d Cir. 2023) ("*Care Alternatives II*") (citing *United Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 181-82 (2016)).  The Supreme Court "has consistently refused to accept a rigid, restrictive reading" of the statute, which reaches "all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White Co.*, 390 U.S. 228, 232-33 (1968).

## I.    THE JURY PROPERLY FOUND JANSSEN'S VIOLATIONS MATERIAL

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. §3729(b)(4).  This Court undertakes "a 'holistic'" inquiry into whether the violations are "'minor or insubstantial'" or instead go to the "'essence of the bargain.'"  *Care Alternatives II*, 81 F.4th at 367 & n.1 (quoting *Escobar*, 579 U.S. at 193-94 & n.5). It assesses the aggregate amount of money at stake, *see U.S. ex rel. Int'l Bhd. of Elec. Workers v. Farfield Co.*, 5 F.4th 315, 347 (3d Cir. 2021), whether the violation was recurring, and its significance, see *Care Alternatives II*, 81 F.4th at 371.

A condition is material "if a reasonable [person] would attach importance to it" or "if the defendant knew or had reason to know" that the government would

attach importance to it. *Escobar*, 579 U.S. at 193 (cleaned up); *see Farfield*, 5 F.4th at 345. This Court asks whether the government would make payments in the "mine run of cases," despite "actual knowledge" of the false claims. *Care Alternatives II*, 81 F.4th at 367; *see Escobar*, 579 U.S. at 193 n.5, 194-95. "[E]vidence that the defendant knows that the Government consistently refuses to pay claims" based on "noncompliance with the particular statutory, regulatory, or contractual requirement" is probative. *Id.* at 194-95. It is "relevant . . . but not dispositive" whether the government expressly designates the legal requirement a "condition of payment." *Id.* at 190; *see also Care Alternatives II*, 81 F.4th at 370.

Under this standard, the jury properly found Janssen's violations material.

### A. Janssen's Conduct Met The Indicia Of Materiality

#### 1. Janssen's violations were recurring and significant, and violated conditions of payment

Janssen's violations were substantial by any measure. The $120,004,736 in pre-trebling damages the government "incurred as a result of Janssen's [conduct]," Appx252, Appx266-267, dwarfs the $150,000 this Court found material in *Farfield*. 5 F.4th at 347; *see also U.S. ex rel. Behnke v. CVS Caremark Corp.*, 2025 WL 1758623, at *27 (E.D. Pa. June 25, 2025) ("tens of millions of dollars" is neither "minor [n]or insubstantial"); *U.S. ex rel. Streck v. Takeda Pharm. Am., Inc.*, 2023 WL 3093476, at *3 (N.D. Ill. Apr. 26, 2023) ($61 million not "minor or

inconsequential"), *aff'd sub nom. U.S. ex rel. Streck v. Eli Lilly & Co.*, 2025 WL 2618821 (7th Cir. Sept. 11, 2025).

The violations were recurring and systematic, not "occasional," *Care Alternatives II*, 81 F.4th at 372, involving 159,574 false claims over nine years, Appx264, far longer than the "[ ]substantial" false certifications ("once a week for more than two years") in *Farfield*, 5 F.4th at 347. As in *Care Alternatives II*, Janssen "had longstanding problems" with compliance. 81 F.4th at 372; *see supra* pp.13-14.

The violations were significant, endangering HIV patients. Unlike the "technical[ and] formulaic" violations in *U.S. ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 765 (3d Cir. 2017), Janssen's false statements caused doctors to prescribe drugs to inappropriate patient populations and dose them in inefficacious and perilous ways. When Janssen misrepresented Prezista as "lipid-neutral" and "lipid friendly" despite FDA warnings about misrepresenting Prezista's lipid side effects, it exposed patients with lipid conditions to heightened risks of "heart disease," "stroke," and other serious conditions. Appx1126, Appx1138-1141, Appx1207-1208. Similarly, Janssen's promotion of once-daily Intelence dosing and use in treatment-naïve patients risked drug resistance and regimen failure – potentially fatal consequences. Appx1177-1180. This Court consistently finds violations material where they endanger public safety. *See Farfield*, 5 F.4th at 347

(violations significant where they could have caused unskilled workers to build public infrastructure).

Finally, Janssen violated the federal programs' express conditions of payment by causing doctors to write prescriptions that were not reasonable and necessary or for medically accepted indications. *See infra* pp.36-41; *see Escobar*, 579 U.S. at 190 (violating express condition of payment is "relevant" to materiality).

### 2. Janssen violations went to the essence of the government's bargain, as Janssen knew

Janssen's violations are material for the further reason that its "leadership also clearly understood the importance of . . . compliance" with the rules against deceptively promoting drugs for off-label uses. *Care Alternatives II*, 81 F.4th at 372; *see infra* pp.33-36. "A defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment." *Escobar*, 579 U.S. at 191; *see also Farfield*, 5 F.4th at 345 (violations material where defendant had "actual knowledge that compliance was a de facto condition of . . . payment").

Janssen knew it was violating a material condition when it made deceptive statements about its drugs to doctors. It settled FCA enforcement actions during the same period for promoting *other* drugs in violation of this condition. *Supra* pp.13-14. The "testimony of [Janssen's] witnesses," as well as its compliance materials,

23

"reveal[] actual knowledge that compliance was a de facto condition of . . . payment." *Farfield*, 5 F.4th at 345; *see supra* pp.13-15; *infra* p.34.

When a company promotes drugs for non-approved indications, the government "does not cover the cost" and will "chase . . . and attempt to recoup that money." Appx1494-1495, Appx1502 (Evans). Its president and national sales director likewise knew "the government does not permit payment for or reimbursement for drugs that are promoted off-label." ECF #465, at 2714:1-4 (Mattes); Appx994-995, Appx1354 (Iacobellis)]. Janssen knew federal programs would not pay for drugs it "[s]ell[s] off-label" by "[m]isrepresent[ing]" their safety and efficacy, Suppl.Appx50, and that the federal programs "w[ould] demand [their] money back" if they discovered that conduct, Appx1002 (Iacobellis); *see* Appx894 (Strand). Janssen trained its employees on contemporaneous FCA settlements involving violations of that condition. *Supra* note 7; *supra* pp.14-15.

The government's actions confirm that it took the prohibition on deceptive off-label marketing seriously. During the relevant period, DOJ regularly investigated – and secured public FCA settlements against – manufacturers whose "sales representatives and other agents . . . made false and misleading statements"

about drugs to physicians.[10] *Supra* pp.13-14. Between 2001 and 2012, 14 of the 20 largest pharmaceutical settlements nationwide involved FCA violations for such "unlawful promotion."[11] *See, e.g., In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1, 6 (1st Cir. 2019) ($149 million 2010 FCA settlement over claims that company "fraudulently market[ed]" drugs for "off-label treatment").

DOJ's positions in this case confirm that fraudulent statements to doctors are material to the government. DOJ's 2017 Statement of Interest (Appx355), incorporated in its 2024 Statement (Appx2300), confirmed that "fraud directed at physicians may establish FCA liability if government reimbursement was a reasonably foreseeable result." (citing *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544 (1943)); *see also* Br. for U.S. as Amicus Curiae 18, *Petratos v. Genentech Inc.*, No. 15-3805 (3d Cir. May 23, 2016), 2016 WL 3012033 (similar).

The evidence allowed the jury to reasonably find Janssen's misleading and false promotion – to the wrong patient populations, with incorrect dosing, and minimizing a serious side effect – was "so central to the provision of" health care

---

[10] U.S. Dep't of Just., *Shire Pharmaceuticals LLC to Pay $56.5 Million to Resolve False Claims Act Allegations Relating to Drug Marketing and Promotion Practices* (Sept. 24, 2014), https://tinyurl.com/yypfmwx7.

[11] Sammy Almashat & Sidney Wolfe, Public Citizen, *Pharmaceutical Industry Criminal and Civil Penalties: An Update* 5, 45 (Sept. 27, 2012), https://www.citizen.org/wp-content/uploads/2073.pdf.

"that the Medicaid [and other] program[s] would not have paid these claims had [they] known of these violations." *Escobar*, 579 U.S. at 196.

## B.     Janssen's Materiality Arguments Fail

### 1.     Pharmacies need not have made representations

Janssen asserts (19-20) without authority that, if the pharmacies submitting the claims made no representation regarding Janssen's compliance, there could be no misrepresentation (and hence no "material" one). Janssen waived this argument by failing to raise it in the district court. Appx2235-2298. In any event, this argument, which sounds in falsity and quotes the district court's falsity analysis, Br. 20, misses the mark. Relators did not have to show pharmacies made express representations; they proved legal falsity through implied certification. What matters is whether a claim "was in fact reimbursable," not whether it contained an express representation of compliance. *United States v. Care Alternatives*, 952 F.3d 89, 97 (3d Cir. 2020) ("*Care Alternatives I*"); *see infra* p.33.

Janssen's argument (at 20-21) that the statutes do not use the term "off-label" is a red herring not raised below and therefore waived. *See Webb v. City of Philadelphia*, 562 F.3d 256, 263-64 (3d Cir. 2009). Janssen presents no exceptional circumstances justifying discretionary review. The federal programs reimburse only for "medically accepted indication[s]" that are "reasonable and necessary." *Infra* pp.36-41. The uses here do not meet those conditions. Nor must conditions of

payment be expressly stated.  *See Escobar*, 579 U.S. at 181.  And Janssen's argument (21) that an off-label claim can be for a "medically accepted indication" has no application, because the other way to be a "medically accepted indication" – inclusion in certain compendia – concededly does not apply[12] and because none of the claims was reasonable and necessary.  *Infra* p.39.

## 2. The government's actions do not defeat materiality

Janssen's primary argument (at 23-26) is that the government's payment of claims during this litigation defeats materiality.  This Court has held otherwise.  *See*, *e.g.*, *Farfield*, 5 F.4th at 342 (finding materiality although "the Government took no action at various stages of the Project and this litigation").  Janssen "pointed [the Court] to no record evidence showing that the Government 'consistently refuses to pay claims in the mine run of cases based on noncompliance with'" false, misleading, and off-label promotion of the kind it engaged in, "'despite its actual knowledge that certain requirements were violated.'"  *Id.* at 346 (citation omitted).  On the contrary, the evidence established the government will "seek to recoup" such payments.  Appx1494-1495, Appx1502 (Evans).

---

[12] Appx1184-1185 (Glatt); Appx1187 ("recognized compendia" did not "support the use of Prezista in treatment-naive patients" from 2006 to 2008); Appx1174 (compendia "do not recommend [Intelence] for treatment-naive patients").

a.     The government's knowledge of *allegations* cannot defeat materiality. "The Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing." *United States v. Berkeley HeartLab, Inc.*, 2017 WL 4803911, at *7 (D.S.C. Oct. 23, 2017).   Rather, the question is whether the government had "actual knowledge that certain requirements were violated" in fact. *Escobar*, 579 U.S. at 195; *see Care Alternatives II*, 81 F.4th at 374.

Janssen bore the burden of rebutting Relators' evidence of materiality.  *See id.* at 375.   It was not "incumbent upon the Relators to present some evidence suggesting the government's apparent disregard of" the defendant's misconduct "was not the result of its having concluded those inadequacies were immaterial." *Id.*; *see Farfield*, 5 F.4th at 346 (finding materiality where defendant failed to show government would have paid); *U.S. ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 318 (3d Cir. 2019) (defendant failed to show "Medicare generally pays this type of claim 'in full despite its actual knowledge that certain requirements were violated'") (citation omitted).

Janssen does not meet this burden.   It cites (at 25) Relators' answers to requests for admission, but those merely state that, as required, Relators provided the government with the complaint and all material evidence they possessed.   Trial was the first time all evidence was presented, including expert analysis linking

information in Janssen's data on sales calls and speaker events with data from the government (CMS), indicating which doctors were influenced and which prescriptions they wrote. Relators did not previously provide this information to the government, because they did not have it. Janssen's attempt to distinguish *Care Alternatives II* (at 28 n.7) fails – the government there also lacked key evidence prior to trial. The jury here weighed the evidence and found the claims material.

Janssen relies on *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481 (3d Cir. 2017), but that relator "did not allege regulatory or statutory violations," *U.S. ex rel. Campie v. Gilead Scis.*, *Inc.*, 862 F.3d 890, 906 (9th Cir. 2017) (distinguishing *Petratos*); rather, he *agreed* the violation would not have been material to the government's payment decision. 855 F.3d at 490; *accord Spay*, 875 F.3d at 764 (relator did "not contest" CMS employees knew of the violations and continued paying). By contrast, here, Relators proved the government would not have paid the claims had it known about the false, misleading, and off-label promotion. *Supra* pp.13-14.

Janssen cites *U.S. ex rel. Krahling v. Merck & Co.*, 2024 WL 3664648 (3d Cir. Aug. 6, 2024), where, unlike here, the government admitted it "had a lot of information available to it." *Id.* at *8 (cleaned up). And the misrepresentations in *Krahling* were "minor [and] insubstantial," so the government's knowledge was not the sole factor defeating materiality. *Id.* at *7-9.

**b.**     The government's decision not to intervene or take enforcement action does not defeat materiality.  Br. 25-26.  "[I]ntervention decisions are, at best, of minimal relevance."  *Farfield*, 5 F.4th at 346.  "[T]he Supreme Court did not mention" the government's failure to intervene in *Escobar* "as a pertinent materiality factor."  *Id.*; *see also Care Alternatives II*, 81 F.4th at 374 n.14.  If "relators' ability to meet the element of materiality were stymied by the government's choice not to intervene," as Janssen urges, "this would undermine the purposes of the Act."  *Farfield*, 5 F.4th at 346 (cleaned up).

The same is true of the government's Statements of Interest (Br. 25).  Neither the *Escobar* Court nor this Court has held that filing such a Statement affects materiality.  This Court reversed the district court's holding of no materiality in *Care Alternatives II*, even though "the government notified the District Court" that it "wished to remain an interested party in the proceedings" and took no enforcement action.  81 F.4th at 367, 374-75.

*FDA's* failure to take action (Br. 25) is even less relevant.  *See Campie*, 862 F.3d at 906 (rejecting arguments that "read too much into" FDA continued approval "and its effect on the government's payment decision").  "[I]t is not the FDA's purpose to prevent fraud on the government's fisc."  *Id.* at 905.

Janssen invokes (at 26) the drugs' "protected" status under Medicare Part D. But Topamax and Risperdal, the subjects of Janssen's CIAs, had a similar status.

Appx1505 (Evans). That medications are taken by "vulnerable population[s]" makes false marketing to inappropriate patient groups and minimizing their side effects more, not less, significant. *United States v. UnitedHealthcare of Georgia, Inc.*, --- F. Supp. 3d ---, 2025 WL 1184109, at *8 (M.D. Ga. Apr. 23, 2025).

### 3.    Janssen cannot downplay its misstatements as minor

Janssen asks this Court to weigh evidence, downplaying its misleading promotion of Prezista by characterizing (at 21) the side effects as "minor." Unrebutted evidence established that prescribing Prezista to patients with elevated lipid levels could cause permanent cardiac injury and death. *Supra* p.9. Janssen's cavalier comparison (at 22) of those risks to "dry mouth" and "hiccups" is callous and exemplifies Janssen's dismissiveness of acute medical risk.

Similarly, Janssen argues (at 28) Relators' claims were insignificant because, regardless of whether patients took Intelence once or twice a day, "the dosage (*i.e.*, the number of pills) remained the same." But unrebutted testimony explained once-daily dosing has not been proven effective or safe and could endanger patients, causing them to have too *much* Intelence in their system initially (increasing drug toxicity risk) and too *little* later (to suppress the virus). Appx1161, Appx1167 (Glatt); *supra* pp.10-11.

Janssen attacks a strawman, citing (at 22) inapposite government statements that claims are not FCA violations based *solely* on violations of the Federal Food,

Drug, and Cosmetic Act. Relators never asserted that theory, and Janssen does not respond to Relators' argument – that the government will not reimburse claims based on deceptive off-label statements to doctors about drugs. *Infra* pp.33-36; *supra* p.25.

### 4.     Janssen's challenges to the evidence of materiality fail

Janssen argues (27) the CIAs were irrelevant because they concerned different drugs, but they show Janssen knew the government will not pay for drugs deceptively promoted for off-label uses. *See U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner- Lambert Co.*, 147 F. Supp. 2d 39, 52 (D. Mass. 2001). It contends that evidence executives knew the government would recoup prescriptions resulting from misleading statements was aimed at too high a level. But it cites only the inapposite *Petratos*. *Supra* p.29. Here, the court instructed the jury it could draw an adverse inference that Janssen hid evidence about off-label promotion in discovery because that evidence was bad for Janssen. *Supra* p.12 n.6.

Janssen faults Relators (without citation) for not calling a government witness (at 28), but courts do not require one. *See*, *e.g.*, *U.S. ex rel. Feldman v. Van Gorp*, 2010 WL 5094402, at *2-3 (S.D.N.Y. Dec. 9, 2010) (upholding jury finding of materiality without "testimony by a government official" on behalf of a relator), *aff'd*, 697 F.3d 78, 95-96 (2d Cir. 2012); *U.S. ex rel. Harrison v. Westinghouse*

*Savannah River Co.*, 352 F.3d 908, 915-17 (4th Cir. 2003) (verdict for relator; no reference to government witness).

## II.  THE JURY PROPERLY FOUND FALSITY

The FCA prohibits causing the submission of any "false or fraudulent claim" to the government.  31 U.S.C. § 3729(a)(1)(A)-(B).  The falsity inquiry "'simply asks whether the claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government.'"  *Care Alternatives II*, 81 F.4th at 368 (quoting *Care Alternatives I*, 952 F.3d at 97).  "Defendants can be liable for violating" implied "requirements even if they were not expressly designated" as conditions of payment.  *Escobar*, 579 U.S. at 181.  Janssen must establish there was *no* ground on which the jury could have found this element satisfied.  *Id.*  Relators need only establish that Janssen violated one condition of payment.  *Infra* pp.61-63.

### A.  The Claims Were False Because They Were Not Reimbursable

### 1.  Janssen's false statements to doctors caused FCA violations

The claims violated the FCA because the government will not reimburse prescriptions caused by false and misleading promotion to physicians.  Janssen did not contest this theory in its Motion for Judgment, *see* Appx2279, and has forfeited any objection to it, *see Harris*, 35 F.3d at 845.

**a.**  Drugs promoted with false and misleading advertising are "misbranded," 21 U.S.C. § 321(n), and may not be sold in the United States, *id.*

§ 331(a); *see also id.* § 352(a), (n), (bb) (prohibiting "[f]alse or misleading advertisement or promotion of compounded drug[s]"); *id.* § 355(a) (prohibiting sale of unauthorized drugs). It has long been understood that purchases "induced by the [defendants'] frauds" violate the FCA. *Marcus*, 317 U.S. at 542. That includes "uncovered" drug uses "induced by Defendant's fraudulent conduct." *Parke-Davis*, 147 F. Supp. 2d at 52.[13]

The jury also heard – and was entitled to credit – considerable evidence that the federal programs treat not lying to physicians about their drugs' safety and efficacy as a "de facto condition of . . . payment" and that Janssen had "actual knowledge" of that requirement. *Farfield*, 5 F.4th at 345; *supra* pp.23-25.

There are obvious reasons the government imposes this requirement. "[P]hysicians [can]not legitimately exercise their medical judgment" where "defendants provide[] false information on which the physicians relied." *U.S. ex rel. Hinkle v. Caris Healthcare, L.P.*, 2017 WL 3670652, at *6 (E.D. Tenn. May 30, 2017). Robbing physicians of the chance to "make considered medical judgments" exposes patients to immediate risk. *Strom ex rel. U.S. v. Scios, Inc.*, 676 F. Supp. 2d 884, 891 n.2 (N.D. Cal. 2009). Suppose, for example, a company lied to doctors by

---

[13] *See, e.g.*, *U.S. ex rel. Bergman v. Abbott Lab'ys*, 995 F. Supp. 2d 357, 369 (E.D. Pa. 2014) (same); *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 777 (S.D. Tex. 2010) (same); *see also, e.g.*, *Campie*, 862 F.3d at 902-04, 905 n.8 (FCA claim based on drug manufacturer's promotional misrepresentations).

claiming its painkiller doubled as a cancer treatment, causing physicians to prescribe it as a chemotherapy alternative.  That conduct would violate the FCA – even though the painkiller may have a valid medically accepted indication (treating cancer-related pain) and may be reasonable and necessary for that use.  The deception would cause the government to reimburse treatments patients never received and could cost those individuals their lives.

**b.** Relators established that Janssen's promotional misconduct violated this condition of payment.  Critically, Relators did not "[m]erely alleg[e] off-label marketing." *U.S. ex rel. Solis v. Millennium Pharms., Inc.*, 2015 WL 1469166, at *5 (E.D. Cal. Mar. 30, 2015).[14]  They proved "more" – that Janssen engaged in a company-wide, top-down "course of fraudulent conduct" by "knowingly making false statements to doctors" about the drugs' "safety and efficacy." *Parke-Davis*, 147 F. Supp. 2d at 51-52; *see supra* pp.9-13.  The jury was entitled to weigh that evidence in finding falsity. *See Care Alternatives I*, 952 F.3d at 98.

Janssen violated this condition in numerous ways.  It ordered sales representatives to give doctors false and misleading information, even over the representatives' objections. *Supra* pp. 11-12; *cf. Parke-Davis*, 147 F. Supp. 2d at 45 (company's "medical liaisons . . . were instructed to make exaggerated or false

---

[14] "[O]ff-label promotion that is false or misleading is not entitled to First Amendment protection." *United States v. Caronia*, 703 F.3d 149, 165 n.10 (2d Cir. 2012); *cf.* Br. 20 n.5.

claims" about drug's dosage to doctors). It bankrolled sham studies to promote the drugs. *Supra* pp.11-12; *cf. Campie*, 862 F.3d at 904 (company "made false statements regarding test results"); *Parke-Davis*, 147 F. Supp. 2d at 48-49 (company used "contrived data, falsified 'leaks' from clinical trials, [and] scientifically flawed reports"). And it engaged in various other misconduct described above. *Supra* pp.11-12. That evidence alone permitted the jury to find falsity under the Court's general falsity instruction.

### 2. The claims were not for "medically accepted indications" and "reasonable and necessary"

Janssen also violated express conditions of payment. As Janssen acknowledges, the jury was instructed it could "find falsity if a reimbursement claim falsely certified that it was for a 'medically accepted indication' and was 'reasonable and necessary.'" Br. 30 (quoting Appx2202). The jury was permitted to find falsity on that basis here. Each of the federal programs expressly condition payment on compliance with those "statutory, regulatory, [and] contractual requirement[s]." *Escobar*, 579 U.S. at 192. The jury was also entitled to credit unrebutted evidence that the government would impose those conditions here. None of the claims in this case was for "medically accepted indication[s]" that were "reasonable and necessary."

**a.** Each of the federal programs will reimburse only for a "medically accepted indication" – one that "has been approved by the FDA or listed in

authoritative compendia." *Petratos*, 855 F.3d at 487.  Medicare Part D sponsors reimburse for "covered part D drug[s]," which is limited to "drugs" that are prescribed for a "medically accepted indication."  42 U.S.C. § 1395w-102(e)(1). Janssen concedes (at 31) as much.

The same goes for Medicaid.  Subject to certain limited exceptions not relevant here, for a state Medicaid program to reimburse for a drug using federal funds, that "drug must be a 'covered outpatient drug.'"  *Mallinckrodt ARD LLC v. Verma*, 444 F. Supp. 3d 150, 158 (D.D.C. 2020) (quoting 42 U.S.C. § 1396r-8(a), (b), (k)(2)-(4)); *see* 42 U.S.C. § 1396b(i)(10) (conditioning federal reimbursement on a rebate agreement).  The phrase "'covered outpatient drug[s]' does not include any drug . . . used for a medical indication which is not a medically accepted indication." *Id.* § 1396r-8(k)(3); *see* 42 C.F.R. § 447.502.

ADAP programs, as Section 340B covered entities, must procure "covered outpatient drugs" at reduced prices through Section 340B's drug discounting program.  *See* 42 U.S.C. § 256b(a)(1), (4)(J); 42 C.F.R. § 50.504.  To "ensure the quality, . . . effectiveness, and appropriateness of services for people living with HIV/AIDS," ADAP Manual 38 (2012), prevent "fraud and abuse," and ensure "clinical quality,"[15] ADAP programs can purchase "covered outpatient drugs" at reduced rates *only* for a "medically accepted indication," 42 U.S.C. § 1396r-8(k)(3),

---

[15] HRSA, Policy Notice 07-03, at 3 (Sept. 2007), https://tinyurl.com/3t32xdbn.

(6); *see* ADAP Manual 79-80.  Prescriptions must "[a]dhere to established HIV clinical practice standards," including "pertinent clinical guidelines."[16]

**b.**  Even where a use is for a "medically accepted indication," federal programs will not pay for it unless it is also "reasonable and necessary" – meaning that prescribing the drug for a particular population must not depart from "accepted standards of medical practice," including the "preferred method of administration" and the "frequency or duration" of treatment.  *Petratos*, 855 F.3d at 488.

Like Medicare Parts A and B, 42 U.S.C. § 1395y(a)(1)(A), Medicare Part D pays only for "reasonable and necessary" treatments.  While it grants sponsors some flexibility as to *which* drugs they "determine[ ] not to be medically necessary," 42 C.F.R. § 423.566(b)(1); *see* 42 U.S.C. § 1395w-102(e)(3)(A), all reimbursement requests must comport with that standard:  "Congress has prohibited payment under [P]art D for 'any expense incurred for items or services that are not reasonable and necessary.'"  *Diamond v. Secretary of Health & Hum. Servs.*, 2015 WL 367010, at *6 (N.D. Ohio Jan. 27, 2015) (citing provisions) (cleaned up).  Medicare plan sponsors employ numerous measures to ensure that "drugs are used correctly and only when medically necessary."[17]

---

[16] HRSA, Policy Clarification Notice 16-02, at 5 (rev. Oct. 22, 2018), https://tinyurl.com/bdetsp4f.

[17] Medicare, *Your Guide to Medicare Drug Coverage* 22 (Apr. 2025), https://tinyurl.com/mrhry7ra.

A similar rule applies to Medicaid programs, as nothing "permit[s] a State to provide services under its plan . . . that are not reasonable in amount, duration, and scope to achieve their purpose." 42 U.S.C. § 1396b(i). Those programs instead cover treatment that is calibrated to "reasonably achieve" the treatment's purpose, while empowering agencies to limit services that are not a "medical necessity." 42 C.F.R. § 440.230(b), (d). Consistent with those commands, each state Medicaid program indicates it will reimburse only for "medically necessary" treatments. ECF #481-4, at 2-4 (citing state plans).

ADAP programs, as federal fund recipients, must provide only "necessary and reasonable" services. 45 C.F.R. § 75.403(a); *see* 42 C.F.R. § 50.504.

**c.** Separately, the jury heard (and was entitled to credit) unrebutted expert testimony that each of the federal programs here would not pay for any of the claims because they were not both for a "medically accepted indication" and "reasonable and necessary." Relators' compliance expert, Virginia Evans, testified – in this specific context – that the government payors simply "will not pay" for drugs that are not "reasonable and necessary," Appx3796, and "for an indication for which [they] ha[ve] not been approved," Appx1502. Indeed, the federal programs "will chase and attempt to recoup" any payments made in violation of those conditions. Appx1494-1495. As the factfinder, the jury was permitted to credit that testimony

and conclude that violating those conditions satisfied the district court's general falsity instruction, Instruction 19.1.  Appx2211.

     **d.**    Relators proved Janssen violated these conditions of payment through the three false statements analyzed above.

*First*, Janssen marketed Prezista to physicians who treated patients with lipid conditions, which contradicted the FDA-approved label describing Prezista's lipid risk.  *Supra* pp.9-10.  Unrebutted expert testimony established that promoting Prezista to "lipid impacted HIV patients" contravened the prevailing "standard of care," Appx1217 (Glatt), risking "cardiac injuries" without offsetting benefit, Appx1207-1208 (Glatt).

*Second*, Janssen promoted Prezista and Intelence for treatment-naïve patients, contradicting their FDA indications for patients who had unsuccessfully tried other therapeutics.[18]  Those uses served no medically accepted indication, Appx1170, Appx1184-1185 (Glatt); found no support in "recognized compendia" or medical "guidelines," Appx1174, Appx1187 (Glatt); violated the prevailing "standard of care," Appx1179, Appx1187 (Glatt); and risked patients exhausting effective treatment later in life.  *Supra* p.10.

---

[18] Appx3200; Appx3914; Appx4420; *accord* Appx1170, Appx1184-1185 (Glatt).

*Third*, Janssen promoted once-daily use of Intelence.  This contradicted its label authorizing only twice-daily dosing, Appx1161 (Glatt), as Iacobellis acknowledged, Appx1034.  Compendia and agency guidelines "say the exact same thing."  Appx1164 (Glatt).  *Supra* pp.10-11.

### B. Janssen's Falsity Arguments Fail

#### 1. Janssen incorrectly argues the federal programs will reimburse claims from fraudulent promotion

Janssen does not contest – here or at trial – that it knowingly made false statements to doctors.  Br. 29-39.  It argues those misstatements were not "material" because certain programs will reimburse some claims involving "off-label" drug use.  Br. 21 (citing Final Rule, Medicare Program; Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4261 (Jan. 28, 2005) ("Pt. D Final Rule")).  Janssen forfeited its contention (at 20) that government payors impose no conditions on fraudulent marketing, and it offers no evidence that any program would reimburse for off-label uses resulting from false and misleading promotion to physicians.

Janssen mischaracterizes the district court's opinion, using strategic bracketing to suggest (at 20) the court assumed *all* "[off-label] marketing violated an express condition of payment."  On the contrary, the district court's falsity holding rested on evidence that "[1] Janssen's marketing of Prezista and Intelence were [off-label]" and "[2] this [off-label] marketing violated an express condition of payment for reimbursement under Medicare, Medicaid, or ADAP."  Appx244.

"Taken together, . . . a reasonable jury could have found that claims for Prezista and Intelence . . . were [off-label] *and* ineligible for reimbursement." Appx244 (emphasis added). Ample evidence, Appx238-244, confirmed the government would try to recoup payments caused by "fraudulent conduct," Appx242.

### 2.    Janssen argues incorrectly that drugs need not be for medically accepted indications and reasonable and necessary

Janssen argues (at 32) that ***Medicaid*** does not require a "medically accepted indication," because the statute provides that a State "*may* exclude" its "coverage of a covered outpatient drug if . . . the prescribed use is not for a medically accepted indication." 42 U.S.C. § 1396r-8(d)(1)(B) (emphasis added). In context, however, that provision merely confirms that lacking a "medically accepted indication" is an "exception[ ] to the Medicaid mandatory reimbursement requirement." *In re Vioxx Prods. Liab. Litig.*, 2010 WL 2649513, at *11 (E.D. La. June 29, 2010). Without that clarifying language, a state Medicaid program could (mistakenly) conclude that the general command that it *must* reimburse for *all* "covered outpatient drug[s]," 42 U.S.C. § 1396r-8(d)(1), overrides the statute's more specific prohibition on reimbursing for any drug "used for a medical indication which is not a medically accepted indication," *id.* § 1396r-8(k)(3). If Congress had intended to permit state Medicaid programs to pay for "covered outpatient drugs" not used for medically accepted indications, it would not have included that specific prohibition. *Id.*

In any event, even if Janssen were correct that Medicaid's authorizing statute only "permitted, but did not require," state Medicaid programs to exclude uses with no medically accepted indication, witness testimony would fill that gap. *Farfield*, 5 F.4th at 345. The jury was entitled to credit Evans' testimony that the government "is not going to pay," at least in this context, for uses that are not "medically accepted indications" and that are not "reasonable necessary." Appx1502.

Janssen notes that state ***ADAP*** programs "vary," Br. 31 (citing 42 U.S.C. § 300ff-26(b)), but still offers no evidence that any ADAP program would reimburse for drugs serving no medically accepted indication. ADAP's authorizing statute, federal regulations, and policy statements foreclose that conclusion. Nor does it matter that the jury did not hear evidence about particular ADAP programs. *See* Br. 31-32. The jury heard cross-cutting evidence about what the federal programs, including ADAP, are "not going to pay for." Appx1502 (Evans). *Supra* pp.39-40. In any event, "it is the judge's job to instruct the jury on" the content of statutes and regulations, and the district court did that properly here. *Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). Janssen raises (at most) a forfeited challenge to the jury instructions, *see Zehrbach*, 47 F.3d at 1260 n.6, not to evidentiary sufficiency.

Janssen insists (at 32-33) that Medicare sponsors, state Medicaid programs, and ADAP "are not required to" exclude services that are not "reasonable and

necessary." It improperly contorts provisions confirming programs' power to *deny* reimbursement for services they otherwise would have to pay for, *see* 42 U.S.C. § 1395w-102(e)(3)(A); Pt. D Final Rule, 70 Fed. Reg. at 4230; 42 C.F.R. § 440.230(d), into a rule that federal programs will *pay for* unreasonable and unnecessary services. They won't – as unrebutted expert evidence proved. *See supra* pp.39-40.

### 3.    Janssen failed to prove the claims were for medically accepted indications

Janssen erroneously argues that "medically accepted indication[s]" only describe "the diagnosis or condition" for which a drug may be used, not how the drug is administered. Br. 33-34 (emphasis omitted). A drug's "indications" include, "*inter alia*, the drug's indications, contra-indications, limitations of use, use by specific populations, and dosage instructions." *U.S. ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 615 (2d Cir. 2016); *see* 21 C.F.R. § 201.57(a)(6) (noting "[i]ndications" includes "[m]ajor limitations of use," for example, "lack of effect in particular subsets of the population"); *see, e.g., Rickhoff v. Secretary of Dep't of Health & Hum. Servs.*, 2012 WL 6177411, at *4 (D. Ariz. Dec. 11, 2012) ("medically accepted indication[s]" include the "form" in which a drug is administered).

The informal guidance provided by the contemporary Medicare Part D Manual, ch. 6, § 10.6,[19] does not support Janssen's argument. It confirms "an enrollee may request . . . an exception to a dose restriction . . . *based on medical necessity criteria.*" *Id.* (emphasis added). But something can be medically necessary only if it "meet[s] the definition for a 'medically accepted indication.'" *Caldwell v. Abbott Lab'ys,* 2014 WL 4726271, at *7 (M.D. La. Sept. 23, 2014).

Janssen argues that the lipid claims satisfy medically accepted indications because "prescribing Prezista for someone with a lipid condition is not off the FDA label." Br. 33-34 (cleaned up). The label, however, confirms Prezista can affect patients' lipids "in a negative way."[20] *See Polansky*, 822 F.3d at 615; 21 C.F.R. § 201.57(a)(6). The jury thus properly rejected Janssen's disturbing suggestion (at 34) that marketing Prezista for patients with high lipids by minimizing that serious reaction was permissible because the label did not state that a physician "cannot use" the drug "in a person with a lipid condition."

Janssen insists (at 34) the drugs served a "medically accepted indication" when promoted for treatment-naïve patients because these were, broadly, HIV drugs going to HIV patients. But HIV patients are not all alike, as Janssen concedes (at

---

[19] *Available at* https://www.cms.gov/Medicare/Prescription-Drug-Coverage/ PrescriptionDrugCovContra/Downloads/Part-D-Benefits-Manual-Chapter-6.pdf.

[20] Appx1192-1193, Appx1197 (Glatt); Appx1915, Appx1918 (Bartnett); *supra* pp.9-10.

6), and a drug's use must match the patient population receiving it, *see Rickhoff*, 2012 WL 6177411, at *4.  In Janssen's only cited case, the "[p]laintiff d[id] *not* accuse [the defendant] of marketing to those populations" for whom a drug was not indicated.  *U.S. ex rel. Polansky v. Pfizer, Inc.*, 914 F. Supp. 2d 259, 266 (E.D.N.Y. 2012) (emphasis added), *aff'd*, 822 F.3d 613 (2d Cir. 2016).  Here, Relators proved Janssen did precisely that.

Janssen argues that the labels "do not *prohibit* physicians" from prescribing the drugs to treatment-naïve individuals.  Br. 35 (emphasis added).  But those drugs were not *authorized* for that use.  A label need not "prohibit" physicians from prescribing fentanyl to children with the common cold to make that prescription violate its medically accepted indications.  Here, FDA limited both drugs' "indication" to "use by [a] specific population[]," *Polansky*, 822 F.3d at 615 – treatment-experienced patients.

### 4. Janssen's arguments that the claims were reasonable and necessary fail

Finally, Janssen cannot prevail on falsity because its submitted claims were not "reasonable and necessary."  Janssen postulates (at 35) each claim was reasonable and necessary because "CMS has not issued a national coverage determination limiting reimbursement."  But it offers no evidence such a coverage determination was required.  Agency silence is not approval, *see Hughes v. Boston Sci. Corp.*, 631 F.3d 762, 774 (5th Cir. 2011), and "the 'reasonable and necessary'

determination does not end with [agency] approval," *Petratos*, 855 F.3d at 487-88 (determination rests on "medical circumstances," not agency rules).  Nor was the government silent:  FDA cautioned Janssen against promoting Prezista as having a "low impact" on lipid levels.  Appx1649 (Patel).

Janssen insists Relators needed to proffer each "individual patient's medical records," but cites inapposite cases (at 36).  *Petratos* confirms that, under CMS guidance, the "reasonable and necessary" determination is based on "accepted standards of medical practice."  855 F.3d at 488.  While a relator opposing summary judgment must establish that "at least one" false claim occurred, *U.S. ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 98 (3d Cir. 2018), it need not proffer patients' medical records.  For good reason:  no jury could feasibly review patient charts supporting 159,574 false claims.  Regardless, expert evidence analyzed individualized patient data showing which claims involved treatment-naïve or lipid-affected patients.  ECF #450, at 5234:13-5235:16 (Dew).

No evidence supports Janssen's argument (at 37) that once-daily dosing for Intelence is "reasonable and necessary" merely because it (theoretically) could improve patient compliance.  While it is "common sense" that, all else equal, doctors and patients prefer medication that can be taken once a day rather than twice, Appx1134-1136 (Glatt); *see also* Appx1947 (Rosenberg), all else is not equal.  Research never established Intelence "could be given once daily," Appx1161-1162

(Glatt), and applicable guidelines declined to authorize it, *supra* p.8.  While "the pharmaceutical industry trie[s] to come up with combinations of drugs that can be taken less frequently," they are "not always able to."  Appx1134-1135 (Glatt).

Janssen quotes out-of-context testimony by Dr. Glatt to suggest (at 36) that some hypothetical treatment-naïve patient could benefit from Prezista and Intelence. But the testimony makes clear in context that would be true only in a hypothetical world where "no alternative agent" was better.  Appx1242-1249 (Glatt); Appx1176-1177 (Glatt).  The jury had sufficient evidence to disregard that conjecture.  The jury weighed Janssen's cherry-picked quotations against extensive countervailing evidence.  Janssen's request that this Court reweigh that evidence is inappropriate. *See Reeves*, 530 U.S. at 150.

Janssen cites (at 37) irrelevant physician testimony.  Dr. Hsu, for example, stated without explanation that he "would hope" his prescriptions were "based on [his] best medical judgment."  Appx1704 (Hsu); *see also* Appx1925 (Frank), Appx1929 (McMeeking) (other doctors' similar statements).  The jury was entitled to find their testimony self-serving and unpersuasive when weighed against evidence showing what businesses know:  pharmaceutical marketing works to change prescribing patterns. *Infra* pp.52-55.

### C.    DOJ's Position Is Not To The Contrary

DOJ confirms (at 35) the district court correctly instructed the jury on falsity and cites language in the court's post-trial ruling and the evidence indicating the jury applied this standard properly.    Nevertheless, DOJ identifies (at 36) isolated "language" in the court's opinion "reflect[ing] an incorrect understanding of the law."  But the daylight DOJ sees between its position and the district court's opinion is illusory.  The court never suggested off-label marketing, "without more," satisfies falsity.  Instead, it concluded Relators showed "more" by proving Janssen lied to doctors about the safety and efficacy of its drugs.  Appx243-244.  DOJ's brief does not engage with that theory or cite authority undermining it.

To the extent DOJ argues (at 37-38) "false marketing" never can make reimbursement requests false, that misstates the law.  "'[C]laims may be false even though the services are provided as claimed.'"  *Parke-Davis*, 147 F. Supp. 2d at 53 (quoting S. Rep. No. 99-345, at 9 (1986)).  Deceiving doctors about drugs endangers patient safety by subverting physicians' "exercise [of] their medical judgment." *Hinkle*, 2017 WL 3670652, at *6; *see also supra* pp.34-35 (offering an illustration). Accordingly, the government secured numerous settlements against pharmaceutical companies during this period for conduct like Janssen's.  *Supra* pp.13-14, 24-25. Janssen knowingly continued its fraudulent promotion anyway.  *Id.*

Regardless, this Court should not vacate based on mere "suggestion[s]" in portions of an unpublished order. It "reviews judgments, not statements in opinions." *California v. Rooney*, 483 U.S. 307, 311 (1987) (per curiam). Remanding for the district court to revise the cited wording would waste judicial resources without altering the underlying judgment.

### D.    The Court Properly Instructed The Jury On Falsity

The district court's falsity instruction, "Instruction No. 19.1 – False Claims Act – Elements – Falsity," accurately stated the legal standard: "Relators must prove by a preponderance of the evidence that the claims submitted or caused to be submitted by Janssen were false." Appx2211. It instructed "that a claim made to a federal health care program is false if it seeks reimbursement for a prescription that is not eligible for reimbursement." Appx2211.

Janssen does not challenge that instruction. Instead, it complains about Instruction 17. But Janssen "did not file a post-trial motion for a new trial based on" Instruction 17, *United States v. Wasserson*, 418 F.3d 225, 239-40 (3d Cir. 2005), and Instruction 17 did not instruct the jury on falsity. Captioned "Overview of Relators' Claims," Appx2202, it summarized the case's legal concepts but was not an instruction about what law to apply. Janssen offers no reason to suppose the jury failed to apply the falsity standard provided in Instruction No. 19.1. Thus, any error

in Instruction 17 would be harmless, as the "instructions, as a whole, stated the correct legal standard." *Ryder*, 128 F.3d at 135.

Instruction 17 contained no errors anyway. Janssen criticizes (at 37-38) the instruction that "federal health care programs . . . *will* cover and pay for . . . any FDA-approved use on the label," Appx2202 (emphasis added), arguing that "the statutory definition does not use that term." Br. 37. But that instruction states only what the federal payors *will* cover. It never states the converse: that the government will not reimburse for anything other than an FDA-approved use. Janssen never explains (at 37-38) why this instruction could "suggest[ ]" otherwise, much less explain how such a "suggest[ion]" could amount to plain error when combined with Instruction 19.1.

Janssen (at 38) and the United States (at 38-39) fault Instruction 17 for suggesting that, to be a "medically accepted indication," a drug must have *both* an FDA-approved use *and* citations in compendia. But, as the United States observes (at 39-40), Janssen forfeited that disjunctive "or" challenge by failing to raise it at the charge conference. Appx2131-2133. Janssen does not even try to satisfy plain-error review. *See Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187 (3d Cir. 2019). Nor could it. Even if the jury errantly followed Instruction 17, rather than 19.1 – which this Court cannot assume – there was no "miscarriage of justice," *id.*, because Janssen does not contest that it promoted its drugs for uses that were

listed in compendia either, *see Murray v. United of Omaha Life Ins. Co.*, 145 F.3d

143, 156 (3d Cir. 1998).

Janssen lastly complains (at 38) the jury was instructed on the "medically

accepted indication" and "reasonable and necessary" standards. But each federal

program imposes both as conditions of payment. *Supra* pp.36-40.

## III.    RELATORS PROVED THE REMAINING ELEMENTS

### A.    Relators Proved Causation

#### 1.    Relators satisfied the governing "substantial factor" test, and the district court instructed the jury correctly

An FCA relator must prove that the defendant's material, false statement

"caus[ed] the government to make a payment." *Care Alternatives II*, 81 F.4th at

366. This Court applies "ordinary causation principles." *U.S. ex rel. Schmidt v.*

*Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004). Causation is satisfied if the jury

concluded Janssen's "conduct has been a substantial factor in bringing about"

presentation of a material false claim, and that its presentation "was a normal

consequence of the situation created by" Janssen. *Id.* (applying FCA to Medicare

marketing). Causation is a fact question. *See Redland Soccer Club, Inc. v.*

*Department of Army*, 55 F.3d 827, 851 (3d Cir. 1995). This Court should reverse

the jury's verdict only if Relators' evidence was "critically deficient." *ZF Meritor*,

696 F.3d at 268.

No cause for reversal exists.   The district court's causation instruction, Instruction 19.2, Appx2212, closely resembled this Court's language in *Schmidt*, 386 F.3d at 244.   The evidence supported the jury's conclusion.   In addition to Dr. Shaked's statistical analysis, unrebutted expert testimony showed "Janssen's specific off-label messages caused physicians to prescribe off-label" and tied Janssen's conduct to particular doctors' off-label prescriptions.   Appx1414-1415 (Sillup).   Relators also introduced a marketing survey and sales representatives' testimony confirming the obvious:   Janssen spent considerable money promoting false messages about its drugs because they worked.   *See*, *e.g.*, *U.S. ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032, 1040-41 (C.D. Cal. 2016) ("systematic campaign to promote off-label prescriptions" caused doctors to "prescribe[] at a higher rate," and "marketing to doctors is generally effective").

## 2.   Janssen misstates the legal standard

Janssen argues (at 39-41) the court was required to instruct the jury on "but-for" causation.   But as the district court observed, Janssen acknowledged in its post-trial briefing that "substantial factor" causation is the correct standard.   Appx239 n.2.   Regardless, Janssen cites no case suggesting the district court had to provide a "but for" instruction.   *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 75 (3d Cir. 2018), articulated the causation standard for FCA *retaliation* claims, an unrelated separate statutory provision, 31 U.S.C. § 3730(h)(1).   *DiFiore* did not hold that failure to

instruct on but-for causation in that context (much less other contexts) would be error. And the unpublished *United States v. Waalee*, 133 F. App'x 819, 823 (3d Cir. 2005) (cited at Br. 40), discusses neither the FCA nor "substantial factor" causation. Nor does Janssen explain why the term "substantial factor" was not sufficiently "plain." *Id.*

To the extent Janssen argues that, regardless of the instruction, Relators had to prove but-for causation separately, it misstates the law and cites inapposite cases. Br. 39-40. In *Petratos*, the Court *rejected* the relator's argument that he could prove materiality by proving "the alleged fraud was the 'but for' cause of the submitted claim." 855 F.3d at 491. Materiality, not causation, was at issue. *See id.* And in *United States v. Hibbs*, 568 F.2d 347 (3d Cir. 1977), the Court did not dispute that "the defendant caused certifications containing false information to be supplied to" the government, holding only that government was not "damaged by the doing of [this] prohibited act." *Id.* at 351.

Finally, Janssen argues (at 41) Relators failed to prove causation because no doctor testified to prescribing either drug because of Janssen's marketing. It cites no case requiring doctor-by-doctor (much less claim-by-claim) proof of causation, nor does the FCA require it. *See Greenfield*, 880 F.3d at 96-97.

### 3.    Janssen's evidentiary challenges to causation fail

Janssen argues (42) Dr. Shaked's expert testimony is unreliable, because if a doctor exposed to false marketing wrote an off-label prescription, he included all future off-label prescriptions by that physician for that drug in his analysis.  The district court did not abuse its discretion by rejecting this argument (twice), finding "good grounds" for Dr. Shaked's report.  Appx78; *see also* Appx2107-2116.  Dr. Shaked's approach was supported by clinical practice, where patients stay on the drugs for many years.

Janssen also errs in suggesting (at 42-43) that Relators' statistical evidence shows only correlation, not causation.  "[C]ourts have long permitted parties to use statistical data to establish causal relationships."  *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 42 (1st Cir. 2013) (collecting cases).  A contrary rule requiring a district judge "to address each of the [159,574] claim[s] . . . is a formula for paralysis."  *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008).  Dr. Shaked analyzed all prescriptions and compared the off-label prescriptions of doctors exposed to the false marketing with those who did not receive those messages.  The jury weighed the cited (at 43) testimony of Dr. Jena about supposedly confounding variables and found it unpersuasive.

**B.     Janssen Failed To Challenge Scienter And Janssen Knew Its Promotion Was False**

Relators proved scienter, which requires "*the knowing* submission of a false claim." *Spay*, 875 F.3d at 756.  Relators introduced evidence that Janssen knowingly caused submission of non-reimbursable claims.  *Supra* pp.9-13.  Janssen raised no scienter argument in its Motion for Judgment, Appx2235-2298, and may not now challenge that element, *see Harris*, 35 F.3d at 845.

Janssen attempts (at 44-45) to recast a challenge to a jury Instruction No. 22 as a challenge to scienter.  But Janssen forfeited this argument, too, by failing to raise "with sufficient specificity" any scienter-specific concerns.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 815 (1985); *see* Appx2235-2298.  In any event, the challenged instruction gets the law right:  "[T]here is no statute or regulation that says that the FDA's silence means that it has approved a promotional advertising submission."  Appx2218; *accord Hughes*, 631 F.3d at 774 ("FDA's silence should be treated as approval"); *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 375 (E.D.N.Y. 2010) (similar).

Moreover, Janssen's only suggested change to Instruction 22 was adding two words, stating that FDA's silence does not mean it approved "*or disapproved*" the advertising.  Br. 45 (emphasis added) (quoting Appx2139).  But Janssen represented to the district court that adding this would not "change the meaning of the instruction."  Appx2139.  And even if this Court thought the instruction was "less

than even-handed," that would not furnish a basis for reversal because the "charge, taken as a whole, was complete and accurate." *United States v. Gomez-Rojas*, 507 F.2d 1213, 1223 (5th Cir. 1975). Because the jury heard Dr. Patel's testimony and considered the FDA issue – even asking the judge a follow-up question about it, *see* Br. 45 (citing Appx2168) – this instruction was not an abuse of discretion.

## IV.  JANSSEN'S CONSTITUTIONAL ARGUMENTS FAIL

### A.  *Qui Tam* Is Constitutional

As the United States explains (at 18-34), the FCA's relator provisions comply with the Constitution. The FCA "effect[s] a partial assignment of the Government's damages claim," allowing FCA plaintiffs to sue without themselves wielding executive power. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000); *see* Art. IV, § 3, cl. 2.

Any doubt about the FCA's constitutionality was "liquidate[d] & settle[d]," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 35-36 (2022), by the Act's unbroken 162-year history and by the "well[-]nigh conclusive" history of similar relator statutes from both "before and after the framing of the Constitution," *Stevens*, 529 U.S. at 776-77 (citing examples). This pedigree explains why every appellate panel to consider a constitutional challenge to the FCA's relator provisions has rejected it. *See* DOJ Br. 18-19.

Janssen argues the FCA violates Article II, §§ 1, 3. But Relators, as partial assignees, do not wield executive power. *See Stevens*, 529 U.S. at 773 & n.4; DOJ Br. 27-34. Nor are relators executive "Officer[s]" who require appointment, Art. II, § 2, cl. 2, as they lack the "tenure, duration, continuing emolument, [and] continuous duties" required. *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890); *see also* DOJ Br. 19-26. Even if relators *were* "Officers," their authority would not be "so 'significant' that it must only be exercised by [executive] officers." *Pennsylvania Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs.*, 80 F.3d 796, 806 (3d Cir. 1996).

## B.    The District Court Awarded Constitutional Penalties

The district court awarded penalties of $8,000, well within the FCA's range ($5,500 to $11,000). 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9) (2010). Regardless of whether the Eighth Amendment applies, *see Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1307 (11th Cir. 2021); *see also* DOJ Br. 42 & n.4, these penalties satisfy all constitutional limits, *see id.* at 49-50.[21]

**1.**    "Penalties falling below the maximum statutory fines . . . receive a strong presumption of constitutionality." *Yates*, 21 F.4th at 1314 (cleaned up). Courts accordingly uphold civil penalties within the FCA's range. *See* DOJ Br. 43-44 (collecting cases). As for aggregate penalties, "[s]omeone whose maximum penalty reaches the mesosphere only because the number of violations reaches the

---

[21] Janssen challenges only the penalties, not damages.

stratosphere can't complain." *United States v. DISH Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020).  Nothing upsets this presumption here.  The penalties comply with the considerations enumerated in *United States v. Bajakajian*, 524 U.S. 321, 334 (1998):  the gravity of the offense, the harm caused, and the maximum penalty the defendant faced.

*Gravity.*  Reprehensibility "is perhaps the most important indicium." *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 388 (4th Cir. 2015) (cleaned up).  Here, "Janssen engaged in a deliberate and calculated scheme that spanned several years and involved the unlawful marketing of its products" to vulnerable patients, despite knowing the potential harm.  Appx265; *see also supra* pp.9-11; DOJ Br. 45-46.

*Harm.*  This case is "readily distinguishable from . . . *Bajakajian*," where there was "no fraud on the United States" and "no loss to the public fisc." *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 408-09 (4th Cir. 2013).  Janssen caused government programs to reimburse for medically unnecessary and even harmful prescriptions, *cf. Bajakajian*, 524 U.S. at 339, costing taxpayers more than $120 million and endangering patients.  Moreover, "[f]raudulent claims make the administration of Medicare more difficult" and "undermine public confidence in the system." *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003).  The district court also appropriately considered "the need for deterrence" given Janssen's penchant for "recidivism." Appx266.

***Maximum penalties.***  The court properly found that a penalty near the middle of the range is not "grossly disproportionate."  Appx266; *see* DOJ Br. 44-46.  It imposed penalties lower than those in other FCA cases.  Appx266 (comparing with *United States v. Saavedra*, 2015 WL 7621481, at *1-2 (S.D.N.Y. June 16, 2015), *aff'd*, 661 F. App'x 37 (2d Cir. 2016)).

**2.**  Janssen invokes inapposite cases challenging punitive damages.  Br. 53 (citing *CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 188-89 (3d Cir. 2007); *Grant ex rel. U.S. v. Zorn*, 107 F.4th 782, 798-800 (8th Cir. 2024) (combined statutory and punitive damages)); *see also* DOJ Br. 50-51 (arguing *Zorn* is an outlier and wrongly decided); *see generally* DOJ Br. 46-50 (arguing due process does not apply to FCA penalties involving fraud).  None holds FCA statutory penalties, standing alone, unconstitutionally excessive.  It makes sense that "a fine expressly authorized by statute could be higher than a penalty selected *ad hoc* by a jury."  *Rogan*, 517 F.3d at 454; *see also* DOJ Br. 46-51.

Janssen protests (at 54-55) that Relators did not prove individual harms to patients.  But they proved harm to the public fisc, which suffices, and that Janssen endangered vulnerable patients.  *Supra* pp.9-13.  Moreover, the district court accounted for the lack of individualized evidence of patient harm and cited it as one reason not to award the statutory maximum.  Appx266.  Janssen's accusation that the court did not analyze the *Bajakajian* factors is unfounded.  Appx264-267.

Janssen challenges the jury's findings. It claims (at 54) the case did not involve indifference to health and safety, breezing past contrary trial evidence. *Supra* pp.9-11. Its argument (at 55) the jury rejected certain false claims only underscores the appropriateness of the penalties, which corresponded to the number of false claims the jury found.

Challenging the disparity (at 56) between compensatory damages and penalties, Janssen again cites cases involving punitive damages, but the "ratio" framework does not apply to penalties within the statutory range. *See* DOJ Br. 50-53. Nor did the court overlook Janssen's ratio argument; rather, it rejected Janssen's request to award penalties below the statutory minimum. Appx265.

## V.    JANSSEN IS NOT ENTITLED TO A NEW TRIAL

If this Court rejects any of Relators' specific theories, that would not entitle Janssen to a new trial. *Cf.* Br. 45-47.

Janssen forfeited any argument alleging uncertainty in the general verdict. When a party "fails to object to . . . a general verdict . . . , that party waives any objection in that regard." *Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 191 (3d Cir. 2015). Janssen "failed to ask for a special verdict" as to the Relators' separate theories "or otherwise object to the form of the verdict sheet" as to those theories; it therefore "cannot now complain that it is impossible to know whether the verdict would have been different" had any theories "been

withdrawn from the jury's consideration." *Morse v. Fusto*, 804 F.3d 538, 551-52 (2d Cir. 2015); *see also Pratt v. Petelin*, 733 F.3d 1006, 1012 (10th Cir. 2013) (similar). That goes for legally inadequate theories, too. *See General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987).

Even without waiver, the factual insufficiency of any individual theory would be harmless error. In *Griffin v. United States*, the Supreme Court held that a court should not upend a criminal verdict "merely on the chance . . . that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." 502 U.S. 46, 59-60 (1991). The Federal Circuit has predicted that "the Third Circuit would likely find the rationale of *Griffin* persuasive and applicable in the civil context." *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1338-39 (Fed. Cir. 2011); *see also Hofkin v. Provident Life & Accident Ins. Co.*, 81 F.3d 365, 369 (3d Cir. 1996) (noting that "[a] Rule 50 motion must be denied if there is evidence reasonably tending to support the recovery by [one party] as to any of its theories of liability") (cleaned up). As it should: Criminal defendants – afforded greater protection than their civil counterparts – should not face stiffer headwinds on appeal.

Janssen responds (at 45-46) with cases reprising the so-called "general verdict" rule. *See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 534-35 (3d Cir. 1998); *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 361 (3d Cir.

1998).    Neither addresses the issue of forfeiture or acknowledges *Griffin*'s distinction between legal and factual insufficiency when analyzing whether a general verdict may stand.

## CONCLUSION

The jury's verdict and the district court's judgment should be affirmed.

Dated:  September 17, 2025

Peter D. Marketos
Joshua M. Russ
Andrew O. Wirmani
Adam C. Sanderson
Whitney L. Wendel
REESE MARKETOS LLP
750 N. St. Paul Street, Suite 600
Dallas, Texas 75201
(214) 382-9810
pete.marketos@rm-firm.com
josh.russ@rm-firm.com
andrew.wirmani@rm-firm.com
adam.sanderson@rm-firm.com
whitney.wendel@rm-firm.com

Sherrie R. Savett
Joy P. Clairmont
Michael T. Fantini
William H. Ellerbe
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000
ssavett@bergermontague.com
jclairmont@bergermontague.com
mfantini@bergermontague.com
wellerbe@bergermontague.com

Respectfully submitted,

/s/ *David C. Frederick*

David C. Frederick
Ariela M. Migdal
Kyle B. Grigel
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dfrederick@kellogghansen.com
amigdal@kellogghansen.com
kgrigel@kellogghansen.com

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,948 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.   As permitted by Federal Rule of Appellate Procedure 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

3.      In addition, pursuant to Third Circuit L.A.R. 31.1(c), the undersigned hereby certifies that the text of the electronic brief filed with the Court is identical to the paper copies, that a virus detection program (CrowdStrike) has been run on the electronic file, and that no virus was detected.


Dated:  September 17, 2025                          */s/ David C. Frederick*
                                                    David C. Frederick

## CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies that, on September 17, 2025, I caused an electronic copy of the foregoing to be electronically filed with the United States Court of Appeals for the Third Circuit using the CM/ECF system, which automatically will send notification of such filing to counsel of record.

*/s/ David C. Frederick*
David C. Frederick

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit L.A.R. 28.3(d) and 46.1, I, David C. Frederick, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

Dated:  September 17, 2025

*/s/ David C. Frederick*
David C. Frederick