No. 25-1818

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

UNITED STATES ex rel., JESSICA PENELOW, et al.,

*Plaintiffs-Appellees*, and

UNITED STATES OF AMERICA,

*Intervenor-Appellee,*

v.

JANSSEN PRODUCTS, LP,

*Defendant-Appellant.*

---

On Appeal from The United States District Court
For the District Of New Jersey

---

## BRIEF OF *AMICUS CURIAE* THE ANTI-FRAUD COALITION
## IN SUPPORT OF APPELLEES

---

Jennifer Verkamp
MORGAN VERKAMP LLC
4410 Carver Woods Dr., Suite 200
Cincinnati, OH 45242
Telephone: (513) 651-4400

Claire Sylvia
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone: (415) 836-9000

Jacklyn DeMar
THE ANTI-FRAUD COALITION
1220 19th Street, N.W., Suite 501
Washington, DC 20036
Telephone: (202) 296-4826

## CORPORATE DISCLOSURE STATEMENT

The Anti-Fraud Coalition (TAF Coalition, formerly Taxpayers Against Fraud Education Fund) is a corporation organized under § 501(c)(3) of the Internal Revenue Code. It has no parent corporation and no stock owned by a publicly owned company.

TAF Coalition represents no parties in the matter and has no pecuniary interest in its outcome.

Dated: September 24, 2025     */s/ Jennifer M. Verkamp*
             Jennifer M. Verkamp
             Morgan Verkamp LLC

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF AMICUS CURIAE ...............................................................1

SUMMARY OF ARGUMENT ......................................................................1

ARGUMENT .........................................................................................2

I.    Fraud on Physicians Causes Materially False Claims...................................2

II.   *Qui Tam* Actions, Including Declined Litigation, Have Fueled Government
      Recoveries. ...............................................................................6

III.  Materiality Does Not Require Stopped Payment While FCA Actions Are
      Pending. ..................................................................................11

IV.   The FCA is Constitutional........................................................16

V.    Congress Set FCA Penalties at a Level Commensurate with the Public
      Harm. .....................................................................................23

CONCLUSION ......................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Bowsher v. Synar*,
  478 U.S. 714, 723 (1986) ...................................................................21

*Cent. Va. Cmty. Coll. v. Katz*,
  546 U.S. 356 (2006) ..........................................................................21

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ..........................................................................21

*Marcus v. Hess*,
  317 U.S. 537 ........................................................................................6

*Marvin v. Trout*,
  199 U.S. 212 (1905) ..........................................................................23

*Stop Ill. Health Care Fraud v. Sayeed*,
  100 F.4th 899 (7th Cir. 2024) .................................................... 24, 27

*The Laura*,
  114 U.S. 411 (1885) .................................................................... 22, 23

*Thompson v. Quorum Health Res., LLC*,
  485 Fed. App'x 783 (6th Cir. 2012) .....................................................9

*U.S. ex rel. Al-Sultan v. Public Warehousing Co.*,
  2017 U.S. Dist. LEXIS 37643 2017 ...................................................12

*U.S. ex rel. Am. Sys. Consulting, Inc., v. ManTech Advanced Sys. Int'l*,
  600 Fed. Appx. 969 (6th Cir. 2015)....................................................12

*U.S. ex rel. Bassan v. Omnicare, Inc.*,
  No. 15-4179 (S.D.N.Y.) (2015) ..........................................................15

*U.S. ex rel. Bawduniak v. Biogen*,
  No. 12-cv-10601 (D. Mass.) ...............................................................10

*U.S. ex rel. Bellman v. Gilead Sciences, Inc.*,
  No. 16-6228 (S.D.NY) ........................................................................15

*U.S. ex rel. Brown v. Amedisys Home Health, Inc.,*
No. 10-cv-2323 (E.D. Pa.) ...................................................................16

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.,*
741 F.3d 390 (4th Cir. 2013) .............................................................24

*U.S. ex rel. Chandler v. Cook County, Ill.,*
538 U.S. 119 (2003).............................................................................28

*U.S. ex rel. CIMZNHCA, LLC v. UCB, Inc.,*
970 F.3d 835 (7th Cir. 2020) ...........................................................16

*U.S. ex rel. Delaney v. eClinicalWorks,*
No. 2:15-CV-00095 (D. Vt.) (2015) ..................................................15

*U.S. ex rel. Drakeford v. Tuomey,*
792 F.3d 364 (4th Cir. 2015) .............................................................24

*U.S. ex rel. Eisenstein v. City of New York,*
556 U.S. 928 (2009)............................................................................17

*U.S. ex rel. Escobar v. Universal Health Servs.,*
579 U.S. 176 (2016)................................................................... passim

*U.S. ex rel. Galmines v. Novartis Pharms. Corp.,*
2013 U.S. Dist. LEXIS 83100, (E.D.PA. June 13, 2013)......................4

*U.S. ex rel. Hunt v. Cochise Consultancy, Inc.,*
587 U.S. 262 (2019)............................................................................17

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.,*
647 F.3d 377 (1st Cir. 2011)................................................................6

*U.S. ex rel. IBEW Local Union No. 98 v. Farfield Co.,*
5 F.4th 315 (3d Cir. 2021) ............................................................. 9, 11

*U.S. ex rel. Kelly v. Boeing Corp.,*
9 F.3d 743 (9th Cir. 1993) ................................................................16

*U.S. ex rel. Kreindler & Kreindler v. United Tech. Corp.,*
985 F.2d 1148 (2d Cir. 1993) ..........................................................16

*U.S. ex rel. Lutz v. Berkeley HeartLab, Inc.*,
  2017 U.S. Dist. LEXIS 174733 (D.S.C. Oct. 23, 2017)......................................13

*U.S. ex rel. Petratos v. Genentech Inc.*,
  855 F.3d 481 (3d Cir. 2017) ................................................................5

*U.S. ex rel. Petratos v. Genentech Inc.*,
  2:11-cv-03691, ECF No. 35-1 (D.N.J. Oct. 07, 2013)........................................14

*U.S. ex rel. Polansky v. Exec. Health Res., Inc.*,
  599 U.S. 419 (2023)............................................................... 17, 18, 19

*U.S. ex rel. Polukoff v. St. Mark's Hosp.*,
  895 F.3d 730 (10th Cir. 2018) ...........................................................5

*U.S. ex rel. Prose v. Molina Healthcare of Illinois, Inc.*,
  17 F.4th 733 (7th Cir. 2021) ............................................................13

*U.S. ex rel. Quaresma v. Journey to Hope, Health and Healing, Inc.*,
  728 F.Supp.3d 251 (D.R.I. 2024) ........................................................26

*U.S. ex rel. Rahimi v. Rite Aid Corp.*,
  2019 U.S. Dist. LEXIS 54854 (E.D. Mich. Mar. 30, 2019) .................................13

*U.S. ex rel. Riley v. St. Luke's Episcopal Hospital*,
  252 F.3d 749 (5th Cir. 2001) ...........................................................16

*U.S. ex rel. Stevens v. Vermont Agency of Nat. Res.*,
  529 U.S. 765 (2000)............................................................... 16, 17, 21

*U.S. ex rel. Stone v. Rockwell Int'l Corp.*,
  282 F.3d 787 (10th Cir. 2002) ..........................................................16

*U.S. ex rel. Streck v. Eli Lilly & Co.*,
  2025 U.S. App. LEXIS 23449 (7th Cir. 2025) ............................................12

*U.S. ex rel. Ubl v. IIF Data Solutions*,
  650 F.3d 445 (4th Cir. 2011) ...........................................................10

*U.S. ex rel. Yates v. Pinellas Hematology & Oncology, P.A.*,
  21 F.4th 1288 (11th Cir. 2021) ................................................. 19, 23, 24

*U.S. ex rel. Zafirov v. Fla. Med. Assocs., et al.*,
  Nos. 24-13581 (11th Cir.) ........................................................22

*U.S. v. Bornstein*,
  423 U.S. 303 (1976) ..................................................................6

*U.S. v. Mallory*,
  988 F.3d 730 (4th Cir. 2021) ...................................................13

*United States v. American Health Foundation, Inc.*,
  2023 U.S. Dist. LEXIS 56071 (E.D. Pa. Mar. 31, 2023) ......................27

*United States v. Mackby*,
  339 F.3d 1013 (9th Cir 2003) ...................................................24

*United States v. Simms*,
  5 U.S. 252 (1803) ......................................................................22

**Statutes**

31 U.S.C. § 3729(a)(1)(A) .............................................................6

31 U.S.C. § 3730(b)(1) ............................................................ 19, 20

31 U.S.C. § 3730(b)(2) ...............................................................18

31 U.S.C. § 3730(b)(4)(B), (c)(3) ...............................................19

31 U.S.C. § 3730(b)(4), (c)(1) .....................................................18

31 U.S.C. § 3730(c)(3) ..................................................................7

31 U.S.C. §§ 3730(c)(1), (2)(C) ...................................................19

31 U.S.C.§ 3730(c)(2)(A) .............................................................19

31 U.S.C. § 3730 (d)(1) ...............................................................20

Act of April 30, 1810, ch. 37, § 4 ...............................................22

Act of February 20, 1792, ch. 7, § 25, 1 Stat. 232........................22

Act of July 22, 1813, ch. 16, § 3 .................................................22

Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129...................................................22

Act of June 5, 1794, ch. 50, §§ 3, 6 ................................................................22

Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101.....................................................22

Act of March 3, 1813, ch. 42, § 8 ....................................................................22

Act of May 8, 1794 ch. 23 ............................................................................... 22

**Other Authorities**

132 Cong. Rec. H9388 (October 7, 1986) .........................................................6

145 Cong. Rec. E1546 (daily ed. July 14, 1999) ..............................................7

S. Rep. No. 99-345......................................................................... 6, 7, 28

*False Claims Act Enforcement: $20 Returned for Every $1 Spent* (Sep. 23, 2025),
https://www.taf.org/fraud-by-the-numbers-september-5/. ....................................8

*Fraud by the Numbers: Billions Are Lost to Fraud* (Sep. 23, 2025),
https://www.taf.org/fraud-by-the-numbers-september-2/ ....................................8

GAO Report, *Fraud Risk Management* (April 16, 2024),
https://www.gao.gov/products/gao-24-105833 ....................................................7

DOJ Fraud Statistics (Jan. 2025),
https://www.justice.gov/archives/opa/media/1384546/dl ...................................7

**Rules**

Fed. R. App. 4(a)(1)(B)......................................................................................17

Fed. R. Civ. P. 25 .............................................................................................20

## INTEREST OF AMICUS CURIAE[1]

TAF Coalition is a nonprofit, public-interest organization dedicated to combating fraud against the Government and protecting public resources through public-private partnerships. TAF Coalition is committed to preserving effective anti-fraud legislation at both federal and state levels. It works to publicize the *qui tam* provisions of the False Claims Act (FCA) and its state equivalents, has participated in litigation as a *qui tam* relator and as *amicus curiae,* and has provided testimony to Congress about ways to improve the FCA. TAF Coalition is supported by whistleblowers and their counsel, membership dues and fees, and private donations, and has a strong interest in ensuring proper interpretation and application of the FCA. It is the 501(c)(3) arm of Taxpayers Against Fraud, founded in 1986.

## SUMMARY OF ARGUMENT

TAF Coalition clarifies several points regarding the correct interpretation of the FCA. First, corporate-driven efforts to lie to physicians about the safety and efficacy of drugs, including their approved indications for use, can cause materially false claims to be submitted to the Government. Second, *qui tam* cases, including

---

[1] No party's counsel authored this brief, in whole or in part, and no person other than *Amicus Curiae* TAF Coalition, its members, or its counsel made a monetary contribution that was intended to fund preparing or submitting this brief. Counsel for all parties consented to this brief's filing.

declined matters, are a vital part of securing fraud recoveries for the United States, representing the overwhelming amount of funds returned to the public fisc. Third, the Government's decision to use its "pay-and-chase" mechanism for identifying and recouping funds is not dispositive of materiality and is ubiquitous in pending FCA matters. Finally, the FCA is constitutional, and its imposition of civil penalties is important to redress the harm caused by fraudulent schemes.

## ARGUMENT

### I.    Fraud on Physicians Causes Materially False Claims.

Corporate-driven efforts to lie to physicians about the safety and efficacy of drugs, including their FDA-approved or medically-accepted indications for use, can cause materially false claims to be submitted to the Government. This basic proposition is strongly supported by (1) the underlying reimbursement mechanism; (2) the precepts of *U.S. ex rel. Escobar v. Universal Health Servs.*, 579 U.S. 176 (2016); and (3) the FCA's liability provisions.

1.    Material falsity of the claims in this case is rooted in the underlying statutory and regulatory scheme for approval and reimbursement of prescribed medications. This mechanism is highly-regulated and specific, by design: The interplay between the Food, Drug, and Cosmetics Act (FDCA) and federal healthcare reimbursement mechanisms ensure that patients receive medications that are safe and effective for use; the physicians' decision-making is not subject to

deceitful promotion; and federal healthcare programs only pay for drugs that are reasonable and necessary. The Government and Relators address how these underlying requirements tie together to limit payment of prescriptions to safe and effective uses of drugs, so we do not address that here. [2]

We address Janssen's effort to deconstruct these elements without reading them as a whole. Relators appear to have introduced evidence at trial that Janssen engaged in a concerted, corporate-wide practice to lie to physicians about the safety profile of their drugs (including with sham studies) and uses not supported by the FDA-approved label with the purpose of increasing prescriptions for unapproved and non-medically-accepted uses in the targeted patient population; and Janssen knew that its deceptive promotions had a substantial effect on the physicians' prescribing patterns. Penelow Br. at 22-30. Janssen's knowing effort to corrupt the decision-making of physicians—the gatekeepers of patient care paid for by the Government—is plainly within the scope of the FCA.

The fact that an off-label prescription by a single prescriber or an illegal marketing practice, standing alone, may not establish the existence of false claims is of no moment. Rather, as the district court concluded (Appx244), "taken together"

---

[2] *E.g.,* Govt. Brief at 48-49 (misleading doctors about the safety profile of a drug may lead a doctor to prescribe the drug for a patient for whom it is not actually reasonable and necessary); Penelow Br. at 64 (deceiving doctors about drugs endangers patient safety by subverting physicians' medical judgment).

with other evidence, the facts can establish that a concerted fraudulent marketing scheme to promote drugs for use not in the label, not in any compendia, and based on lies on safety and efficacy, can cause physicians to prescribe claims that are not reasonable and necessary and ineligible for reimbursement. *See U.S. ex rel. Galmines v. Novartis Pharms. Corp.*, 2013 U.S. Dist. LEXIS 83100, *33 (E.D.PA. June 13, 2013) (relator "pleads facts which suggest that the off-label use [] is medically *risky*, not that it is medically *necessary*. Given these allegations, defendant's] off-label marketing materially affected government reimbursements.").

2.      Janssen argues that express representations about its marketing scheme must appear on pharmacy claims, and that the underlying requirements needed to be contained in one "express condition," (Janssen Br. at 31-32), but *Escobar* rejects that reasoning. The Supreme Court clarified that legal falsity turns not on whether underlying legal requirements are expressly designated as conditions of payment but "whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Escobar*, 579 U.S. at 181. Liability can attach at least "when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Id.*

In *Escobar*, the representations deemed sufficient were simply billing codes for services and provider billing numbers. These codes were misleading in that they would lead "anyone" to "wrongly[] conclude" that those services and providers had complied with "core" federal healthcare requirements. *Id.* at 189. The claims at issue here contained payment codes that conveyed to the payor that the drugs prescribed comport with the underlying requirements about their eligibility for payment. *Escobar* does not compel the claims to contain additional express representations or demand that the underlying requirement be contained in a single express condition.

The Government and Relators both synthesize the bottom-line reimbursement conditions: Federal healthcare programs do not pay for drugs that are not for a medically-accepted indication and are not reasonable and necessary for the use prescribed.[3] The definition of what is "reasonable and necessary" requires, among other things, that the use is safe and effective.[4] FDCA compliance – including FDA approval and truthful marketing to physicians – is an important part of ensuring patients receive safe and effective treatment, and these requirements are material to the Government's payment of claims. *See infra* p.11. Thus, lying to physicians to

---

[3] A "medically accepted indication" is one that has been approved by the FDA or listed in authoritative compendia. *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486-487 (3d Cir. 2017).

[4] *U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 742 (10th Cir. 2018) (citing Medicare Program Integrity Manual § 13.5.1).

increase prescriptions for unapproved and non-medically-accepted uses can cause false claims because they violate these material requirements of federal healthcare reimbursement.

3.    Finally, Janssen's focus on the fact that the pharmacies, not it, submitted the claims is unmoored from the statute. The FCA plainly imposes liability for causing the submission of false claims. 31 U.S.C. § 3729(a)(1)(A) ("knowingly … *causes* to be presented, a false or fraudulent claim for payment or approval"). It is beyond dispute that "unlawful acts by non-submitting entities may give rise to a false or fraudulent claim even if the claim is submitted by an innocent party." *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 390 (1st Cir. 2011); *U.S. v. Bornstein*, 423 U.S. 303 (1976) (subcontractor liable under the FCA for causing a contractor to submit claims); *Marcus v. Hess*, 317 U.S. 537, 544-45 (FCA reaches "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud").

## II.    *Qui Tam* Actions, Including Declined Litigation, Have Fueled Government Recoveries.

1.    The FCA is "the primary vehicle by which the Government prosecutes civil fraud." 132 Cong. Rec. H9388 (October 7, 1986); *see also* S. Rep. No. 99-345, at 2 (1986). In 1986, Congress looked at its $200 billion deficit and found it "imminently important" to amend the statute to provide more tools to the Government. *Id.*  To do so, the 1986 FCA amendments added more incentives for

*qui tam* relators to come forward and more mechanisms for there to be a "coordinated effort of both the Government and the citizenry" to detect and deter fraud. S. Rep. No. 99-345, at 2-3 (1986); 145 Cong. Rec. E1546 (daily ed. July 14, 1999) (statement of Rep. Berman) (with the 1986 amendments, "Congress wanted to encourage those with knowledge of fraud to come forward…[and] we wanted relators and their counsel to contribute additional resources to the government's battle against fraud"). The statute itself specifically contemplates that "[i]f the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action." 31 U.S.C. § 3730(c)(3).

Today, the deficit is $1.97 trillion.[5] A recent Government Accountability Office report estimated "total direct annual financial losses to the government from fraud to be between $233 billion and $521 billion, based on data from fiscal years 2018 through 2022." GAO Report, *Fraud Risk Management* (April 16, 2024).[6] In 2024, *qui tam* cases represented approximately $2.4 billion of $2.9 billion—more than 83%—of civil fraud recoveries. DOJ Fraud Statistics (Jan. 2025).[7] DOJ statistics attribute nearly $218 million of 2024 recoveries to declined *qui tam*s. *Id.*

---

[5] https://fiscaldata.treasury.gov/americas-finance-guide/national-deficit.

[6] https://www.gao.gov/products/gao-24-105833.

[7] https://www.justice.gov/archives/opa/media/1384546/dl.

7

Given the increases in federal spending and the vast amount of fraud the GAO estimates, relator-driven litigation is needed more than ever. Fraud recoveries as a percentage of federal spending have been, on average, continuously decreasing. *See Fraud by the Numbers: Billions Are Lost to Fraud* (Sep. 23, 2025) (Fraud recoveries "between .03% and .18% of total spending").[8] A study conducted by TAF Coalition shows that for each dollar spent on fraud enforcement, the Government receives up to a twenty-dollar return on investment, making it an extremely high-value focus for returning money to the federal fisc. *False Claims Act Enforcement: $20 Returned for Every $1 Spent* (Sep. 23, 2025).[9]

    2.    Amicus National Association of Manufacturers' contention that the *qui tam* statute and declined cases, in particular, have run amuck (NAM Br. at 7-8) disregards the billions of dollars returned to the Treasury by *qui tam* cases. In FY22 **declined *qui tam*s** were over half of all civil fraud recoveries.[10] NAM correctly cites that 2024 *qui tam* filings are up from 2023, but fails to mention that all civil filings nationwide have increased by 22% and that *qui tam* filings make up less than .2% of those filings.[11] Moreover, DOJ statistics do not track matters in which DOJ

---

[8] https://www.taf.org/fraud-by-the-numbers-september-2/

[9] https://www.taf.org/fraud-by-the-numbers-september-5/.

[10] *Supra* n.7.

[11]https://www.uscourts.gov/data-news/reports/statistical-reports/federal-judicial-caseload-statistics/federal-judicial-caseload-statistics-2024 (listing all civil filings).

intervened at the end of the litigation to settle a previously-declined matter that was conducted by a *qui tam* relator, nor does DOJ track declined *qui tam* cases that are voluntarily dismissed rather than litigated.[12]

3.    Janssen argues that the declination of the matter supports that the conduct is immaterial to the Government (Janssen Br. at 38), but this Circuit has already rejected the argument that declination of a *qui tam* case has a significant impact on materiality. *U.S. ex rel. IBEW Local Union No. 98 v. Farfield Co.*, 5 F.4th 315, 346 (3d Cir. 2021). The Government has unequivocally rejected Janssen's (and NAM's argument) that declined relators can continue actions over the Government's objection. Rather: "It is the government that determines whether the action should go forward and, if so, who should litigate it." Govt. Br. at 37.

Both the Government and the courts have recognized that the Government's decision not to proceed is not to be construed as an indication that a relator's claims are without merit or contrary to the Government's enforcement interests. *E.g.*, *Thompson v. Quorum Health Res., LLC*, 485 Fed. App'x 783, 790 (6th Cir. 2012)

---

[12] *E.g.,* Michael D. Granston, Dept. of Justice Memorandum, Factors for Evaluating Dismissal (January 10, 2018) (Granston Memo) at fn. 5 (since 2012 "more than 700 *qui tam* actions have been dismissed by relators after the government elected not to intervene. The frequency with which relators voluntarily dismiss declined *qui tam* actions has significantly reduced the number of cases where the government might otherwise have considered seeking dismissal pursuant to section 3730(c)(2)(A)").

9

("the government's decision not to intervene does not necessarily indicate that . . . the [*qui tam*] case had no merit. The government may choose not to intervene for a variety of reasons") (alternations in original); *U.S. ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 457 (4th Cir. 2011) (same).[13]

The public-private partnership plays a critical role in redressing fraud, just as Congress intended. As Senator Grassley, one of the sponsors of the 1986 amendments, has observed, the Government is outmanned when it comes to identifying fraud and abuse in the public fisc.[14] *Qui tam* relators effectively support the Government's efforts to investigate, litigate and resolve fraud matters, but they also effectively litigate fraud cases with experienced FCA litigators in declined matters. While this matter is an excellent example, another is one of the biggest fraud settlements in history, *U.S. ex rel. Bawduniak v. Biogen*, No. 12-cv-10601 (D. Mass.). In that declined case alleging kickbacks to induce physicians to prescribe the defendant's drugs, the relator and his counsel litigated the action and settled for $900

---

[13] Granston Memo at 1 ("Moreover, a decision not to intervene in a particular case may be based on factors other than merit, particularly in light of the government's limited resources").

[14] https://www.grassley.senate.gov/news/news-releases/grassley-false-claims-act-our-most-important-tool-fight-fraud-against-taxpayers ("History shows that the government simply cannot do so on its own").

million, the vast majority of which went back to the Treasury as the FCA contemplates.[15]

### III. <u>Materiality Does Not Require Stopped Payment While FCA Actions Are Pending.</u>

1.    Materiality is a holistic inquiry, with no one factor dispositive. *Escobar,* 579 U.S. at 194-95; *Farfield*, 5 F.4th at 342. At bottom, a matter is material under the FCA if: (1) a reasonable person would attach importance to it in determining his choice of action; or (2) if the defendant knew or had reason to know that the recipient of the representation would attach importance to it in determining his choice of action even if a reasonable person would not. *Escobar*, 579 U.S. at 193.

Here, those conditions were satisfied. Compliance with the FDCA and the Government's reimbursement methodology is central to the Government's goals of protecting patient care and the integrity of the limited resources of federal programs. Relators introduced corporate testimony and evidence of Corporate Integrity Agreements establishing Janssen's knowledge that deceptive marketing schemes, like the one at issue, which induced physicians to prescribe drugs for unapproved or non-medically accepted, and, ultimately, not reasonable and necessary uses for the patient population, render the claims for those prescriptions ineligible for payment.

---

[15]https://www.justice.gov/archives/opa/pr/biogen-inc-agrees-pay-900-million-settle-allegations-related-improper-physician-payments

2.    Janssen argues this evidence was outweighed by the evidence presented to the jury regarding the Government's knowledge of the FCA action and its lack of intervention. Janssen's arguments, in addition to eviscerating the role of the jury, turn a blind eye to all the potential reasons the Government may continue to pay, or allow a *qui tam* relator to conduct the litigation.

Courts have consistently recognized that the Government may have many reasons to continue paying even upon learning of possible wrongdoing, including that stopping the payment of claims could potentially jeopardize the public health, safety and welfare, or interfere with contractual rights. *See  U.S. ex rel. Streck v. Eli Lilly & Co.*, 2025 U.S. App. LEXIS 23449, *59 (7th Cir. 2025) (Government payment cannot be evaluated in a vacuum; "the facts presented give reasonable alternative explanations for the government's continued payments … without rendering the jury's materiality finding irrational"); *U.S. ex rel. Am. Sys. Consulting, Inc., v. ManTech Advanced Sys. Int'l*, 600 Fed. Appx. 969, 977 (6th Cir. 2015) ("termination could cause incremental losses [for a technology support contract] that exceed the benefits"). Indeed, "the more dependent the government became on a fraudulent contractor, the less likely it would be to terminate the contract." *U.S. ex rel. Al-Sultan v. Public Warehousing Co.,* 2017 U.S. Dist. LEXIS 37643, *18-19 (N.D. Ga. March 16, 2017).

This is particularly true in the healthcare context, where the Government's decision also significantly affects Medicare and Medicaid beneficiaries. *U.S. ex rel. Rahimi v. Rite Aid Corp.*, 2019 U.S. Dist. LEXIS 54854, *20-21 (E.D. Mich. Mar. 30, 2019) ("the Government may have continued to pay to avoid 'adversely affecting[ing] (sic) the millions of Medicaid beneficiaries who rely on [defendant] to meet their prescription needs'"); *U.S. ex rel. Prose v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 733, 744 (7th Cir. 2021) (Government "may have needed time to work out a way not to prejudice Medicaid recipients who had nothing to do with this problem").

3.    Critically, in healthcare, the Government has long followed a "pay-and-chase" model in the delivery of services, which ensures that patients do not experience delay in receiving medical services and providers are not delayed payment. As another court explained, "the Government does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be wrongdoing," and "years of investigation" cuts for (not against) materiality. *U.S. ex rel. Lutz v. Berkeley HeartLab, Inc.*,  2017 U.S. Dist. LEXIS 174733, *21-23 (D.S.C. Oct. 23, 2017), *aff'd U.S. v. Mallory*, 988 F.3d 730 (4th Cir. 2021). Thus, the critical importance of the Government's *continued* payment for federal healthcare beneficiaries militates against its weight in the materiality analysis.

13

The Government's model makes sense given the amount of federal funds involved and that fraud is generally concealed from the Government. Certainly, false and misleading statements to physicians about the medically-accepted indications of the drugs do not appear on the eventual claim. The Government's interests in adhering to existing payment processes while monitoring Relators' pursuit of evidence at trial is reasonable. Neither healthcare providers nor beneficiaries would be served by a rule requiring that Government funding be cut off prior to establishment of liability. Nor is such a rule contemplated by *Escobar*, which emphasized that the Government must have "actual knowledge" of the false claims in order for its continued payment to become relevant to materiality. 597 U.S. at 195.

More importantly, Relators' ultimate burden is not to show that the Government would have rejected every claim after it had knowledge of the allegations (or evidence) in this matter, but to demonstrate that compliance with the underlying statutes and regulations at issue was important to Government payment decisions. Plainly put, a "defendant's false statement or omission that is capable of influencing the agency's action can give rise to FCA liability—regardless of whether the government pays for the claims or pursues some other course of action." United States Statement of Interest, *Petratos,* 2:11-cv-03691, Doc. 35-1 (D.N.J. Oct. 07, 2013), at 6.

14

4.    In fact, continued payment occurs routinely, and for any number of reasons that signal nothing about the significance of the noncompliance to the Government's payment decision or the defendant's understanding of that. Indeed, in most FCA matters, the Government does not stop payment while it investigates, litigates, and obtains a judgment or resolution. By way of example, members of TAF Coalition have represented relators in many matters that did not involve stopped payment. *E.g., U.S. ex rel. Bassan v. Omnicare, Inc.*, No. 15-4179 (S.D.N.Y.) (2015 *qui tam* matter against Omnicare/CVS for dispensing drugs without valid prescriptions to elderly and disabled individuals in assisted-living and other residential long-term care facilities; intervened in 2019, tried in 2025 to a $135 million damages verdict, without stopping payment);[16] *U.S. ex rel. Bellman v. Gilead Sciences, Inc.*, No. 16-6228 (S.D.N.Y.) (2016 *qui tam* matter alleging kickbacks to physicians who spoke at or attended Gilead speaker events to induce them to prescribe Gilead's HIV/AIDS drugs; intervened and resolved in 2024 for $202 million, without stopping payment);[17] *U.S. ex rel. Delaney v. eClinicalWorks*, No. 2:15-CV-00095 (D. Vt.) (2015 *qui tam* matter against EHR vendor for

---

[16]  https://www.justice.gov/usao-sdny/pr/statement-us-attorney-jay-clayton-verdict-us-v-omnicare-and-cvs-health-corporation

[17]https://www.justice.gov/usao-sdny/pr/us-attorney-announces-202-million-settlement-gilead-sciences-using-speaker-programs

misrepresenting its software capacity and paying kickbacks to promote its product; intervened and resolved in 2017 for $155 million, without stopping payment);[18] *U.S. ex rel. Brown v. Amedisys Home Health, Inc.,* No. 10-cv-2323 (E.D. Pa.) (2010 *qui tam* matter against home-health company for upcoding therapy visits; intervened and resolved in 2014 for $150 million, without stopping payments).[19]

These cases, like this one, all involve substantial violations that have the natural tendency to influence, or be capable of influencing, the payment of money by the Government. 31 U.S.C. §3729(b)(4).

## IV.    The FCA is Constitutional.

1.    Every circuit court confronted with Article II challenges has landed in the same place: The False Claims Act is constitutional.[20] The Supreme Court, when confronted with an Article III challenge, landed there too: *U.S. ex rel. Stevens v.*

---

[18]    https://www.justice.gov/archives/opa/pr/electronic-health-records-vendor-pay-155-million-settle-false-claims-act-allegations

[19]https://www.justice.gov/archives/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations

[20] *See U.S. ex rel. Kelly v. Boeing Corp.*, 9 F.3d 743,757 (9th Cir. 1993); *U.S. ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1154-55 (2d Cir. 1993); *U.S. ex rel. Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749 (5th Cir. 2001); *U.S. ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002). Most recently, the Seventh Circuit reinforced this consensus, observing that the "ancient pedigree" of *qui tam* actions, "together with their widespread use at the time of the Founding, suggests that the False Claims Act as a whole is not in imminent danger of unconstitutionally usurping the executive power." *U.S. ex rel. CIMZNHCA, LLC v. UCB, Inc.*, 970 F.3d 835, 847 (7th Cir. 2020).

*Vermont Agency of Nat. Res.*, 529 U.S. 765, 787 (2000) ("We hold that a private individual has standing to bring suit in federal court on behalf of the United States under the False Claims Act").

For over 160 years, the FCA has enabled members of the public to bring civil actions to redress certain frauds on the Government and incentivized such private suits by awarding successful plaintiffs a share of the proceeds. *See U.S. ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424 (2023) (describing statutory history). This mechanism, known as *qui tam*, has deep roots in American law, existing "immediately before and after the framing of the Constitution." *Stevens*, 529 U.S. at 776. When pursuing these actions, plaintiffs act as "partial assignee[s] of the United States," *id.* at 773 n.4 (emphasis omitted), combining their knowledge of wrongdoing with their own resources to help the Government combat fraud. The Supreme Court has explicitly held that in proceeding with such actions under the statute, *qui tam* plaintiffs are not Government officers, but private persons. *U.S. ex rel. Hunt v. Cochise Consultancy, Inc.,* 587 U.S. 262, 272 (2019); *see also U.S. ex rel. Eisenstein v. City of New York,* 556 U.S. 928, 931-32, 937 (2009) (relators who bring "[a] private enforcement action under the FCA" are not subject to the more generous timeframe for appeal that Fed. R. App. 4(a)(1)(B) provides when "the United States or its officer or agency is a party").

2.    The Government's Brief articulates why *qui tam* relators do not violate the Appointments Clause and do not diminish the power of the Executive under the Vesting and Take Care Clauses. Govt. Br. at 29-35. TAF Coalition joins those arguments and discusses below the collective experiences of its members that *qui tam* plaintiffs are not office-holders, wield no Executive power, and control of *qui tam* litigation is firmly in the hands of the United States.

Before any defendant learns of the case, the FCA relator must file their complaint under seal and serve it only on the Government (31 U.S.C. § 3730(b)(2)), at which point the Government has exclusive power to investigate. During this investigative phase, the case remains sealed, unserved and static. These seal periods can be lengthy; in this matter, the seal lasted over three years. The relator cannot advance the case, conduct discovery, or disclose the lawsuit's existence to anyone. The Government chooses whether and when to interview the relator, whether and when to contact other witnesses and which ones, whether and when to seek documents and which ones, what approach to take with a particular defendant, and whether and what information to share with the relator.

After investigating, the Government alone controls the action's fate. It can intervene and take over the case, conducting it with Government resources. 31 U.S.C. §§ 3730(b)(4), (c)(1). Or it can dismiss the action—a power that is extremely broad, succeeding "in all but the most exceptional cases." *Polansky*, 599 U.S. at 437-

38. Lastly, it can allow the relator to conduct the action with their own resources. 31 U.S.C. §§ 3730(b)(4)(B), (c)(3). In short, *qui tam* actions do not proceed without the Government's approval. The Government "determine[s] whether to take it over or allow the relator to litigate it, before it can proceed or even be unsealed." Govt. Br. at 44.

If the Government intervenes in the case, the relator can continue as a separate party, represented by private counsel, but is subject to Government control. *U.S. ex rel. Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1311 (11th Cir. 2021). The Government has "primary responsibility" for the litigation, "shall not be bound" by acts of the relator, and may request that the court limit the relator's involvement if it interferes with or unduly delays the Government's prosecution of the case. *See* 31 U.S.C. §§ 3730(c)(1), (2)(C). Only the Government speaks for the Government, exercises Government powers, or commands Government resources.

Even when it allows the relator to conduct the action, it can for good cause take the case over at any time, including for the purpose of seeking to dismiss the action over the relator's objection. 31 U.S.C.§ 3730(c)(2)(A); *Polansky*, 599 U.S. at 440. The relator cannot settle the action and release any claims on behalf of the Government without the Government's approval and consent. Nor can the relator voluntarily dismiss the action without the Government's written consent. 31 U.S.C.

§ 3730(b)(1). Relator proceeds in a declined matter as a private litigant without Government powers.

Indeed, a relator's power is narrower than that of a private litigant because *qui tam* actions are subject to extensive governmental controls that do not constrain other litigation. A relator cannot file publicly, prevent Government declination or intervention, use Government resources, or release Government claims, or dismiss the case without Government consent. A relator may pursue only the Government claims the FCA authorizes, 31 U.S.C. § 3730(b)(1), and is subject to multiple guardrails, such as the Government's authority to limit its role in the litigation, the first-to-file bar, the public disclosure bar, and even dismissal over their objections. 31 U.S.C. § 3730(c), (e). If a relator dies, only their estate may be substituted, like any other private litigant. Fed. R. Civ. P. 25. A relator draws no salary and is represented by private counsel using their own resources. 31 U.S.C. § 3730 (d)(1). Relators may also be liable for costs if they do not prevail. *Id.,* § 3730(g).

In short, relators are private citizens, not officers. Their personal actions to bring forward information regarding fraud against the United States, and to be prepared to litigate (here, for 12 years), in exchange for an award, have been a successful part of *qui tam* actions since the founding of this nation.

3.      The lengthy history of *qui tam* practice in this country is matched only by its depth, comprised of more than two centuries of *qui tam* statues, including

those drafted, enforced, litigated, and adjudged by the authors of the Constitution. As the Supreme Court held in *Stevens* when evaluating the FCA under Article III (529 U.S. at 777-78), such history should prove "well nigh conclusive" under Article II as well. Indeed, "early congressional enactments 'provid[e] "contemporaneous and weighty evidence" of the Constitution's meaning.'" *Haaland v. Brackeen*, 599 U.S. 255, 290 (2023), *quoting Bowsher v. Synar*, 478 U.S. 714, 723 (1986). The fact that *qui tam* practices continued throughout the early Congresses further reinforces their constitutionality. *See Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 385-86 (2006) (Thomas, J., dissenting) (agreeing with majority "that the practice of the early Congresses can provide valuable insight into the Framers' understanding of the Constitution").

The historical record of such *qui tam* enactments abounds – since the First Congress through modern day, Congress has passed, the Executive has enforced, and the Judiciary has interpreted statutes analogous to the False Claims Act, *i.e.*, statutes permitting an uninjured plaintiff to initiate litigation on behalf of the Government and receive a share of the proceeds. Prominent signatories to the Constitution, including Alexander Hamilton and James Madison (the authors of the Federalist Papers, which included extensive writings on the separation of powers doctrine), were on the committees that drafted and approved these statutes. Further, Presidents James Madison and George Washington signed many of these statutes

into law. *See, e.g.*, Act of April 30, 1810, ch. 37, § 4; Act of July 22, 1813, ch. 16, § 3; Act of March 3, 1813, ch. 42, § 8 (all signed into law by President James Madison); Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102; Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129; Act of February 20, 1792, ch. 7, § 25, 1 Stat. 232, 239; (all signed into law by President George Washington). Oliver Ellsworth, the Chief Justice of the Supreme Court from 1796 to 1800, oversaw the passage of these early *qui tam* statutes. *See, e.g.*, Act of May 8, 1794 ch. 23 (serving on Senate Committee); Act of June 5, 1794, ch. 50, §§ 3, 6 (voting for passage).[21]

These statutes were not simply colonial remnants but were regularly litigated and enforced in the courts. For example, in *United States v. Simms*, 5 U.S. 252, 256 (1803), the Supreme Court addressed and approved *qui tam* enforcement of Virginia's *qui tam* gambling law, adopted as federal law. The Court reasoned that "a *qui tam* action" was "the object of congress," and that adopting Virginia's law "manifest[ed] very clearly an intention of congress . . . to leave things as they were, only adapting the existing laws to [federal governance]." *Id*. at 257-58. Many decades later, in *The Laura*, the Court concluded an informer award under a *qui tam* statute was not an encroachment upon the President's power of pardon. 114 U.S.

---

[21] *See also* extensive briefing of historical record in *U.S. ex rel. Zafirov v. Fla. Med. Assocs., et al.*, Nos. 24-13581, -13583 (11th Cir.): Doc. 38 (Govt. Br.); Doc. 41 (Zafirov Br.); Docs. 48. 50. 54, 57-8, 61, 63, 66-68 (Amici Briefs, including legal history scholars).

411 (1885).[22] "[T]he practice and acquiescence under [*qui tam* legislation], commencing with the organization of the judicial system ... has, indeed, fixed the construction" of the Constitution. *Id.* at 416 (internal quotation marks omitted).

And these are merely a few examples of a robust history of *qui tam* enactment and enforcement. *Yates*, 21 F.4th at 1313 ("*qui tam* actions were viewed as a routine enforcement mechanism in the early Republic," and the modern "FCA *qui tam* actions serve the same enforcement purpose" as those Founding-era statutes); *Marvin v. Trout*, 199 U.S. 212, 225 (1905) (noting that *qui tam* statutes existed "for hundreds of years in England, and in this country ever since the foundation of our government"); *see supra* n. 21 (historical record briefing). When, as here, acts of early Congresses have "not been disputed during a period of nearly a century," the inference of their validity is "conclusive." *The Laura*, 114 U.S. at 414-416.

## V.    Congress Set FCA Penalties at a Level Commensurate with the Public Harm.

TAF Coalition adopts the United States' analysis of Janssen's Eighth Amendment argument (Govt. Br. at 52-64) and writes separately to address two related points: (1) that the harm caused by fraud is much broader than economic

---

[22] Amicus WLF takes issue with an informer's award being retained in 1791 after a subsequent pardon of the defendant but doesn't grapple with the Supreme Court's decision on this topic. WLF Br. at 23.

harm; and (2) amici's contention that *qui tam* actions cause unconstitutional penalties.

1.    That damages under the FCA are calculated based on claims paid by the Government does not mean the statute is aimed only at the economic harm derived directly from the Government's payment of claims it would not have paid. As appellate courts considering this question have observed, when Government programs are defrauded, the Government is harmed in multiple ways "untethered to the value of any ultimate payment." *Yates,* 21 F.4th at 1316. Fraud undermines public trust in Government programs such as Medicare, *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir 2003), or military defense, *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 409 (4th Cir. 2013). Fraud also makes administration of Government programs more difficult, *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015); *Mackby*, 339 F.3d at 1019; requires the Government to "spend time and resources investigating the fraud," *Stop Ill. Health Care Fraud v. Sayeed*, 100 F.4th 899, 907 (7th Cir. 2024); forces the Government to incur the expense of constant vigilance to detect fraud, *Bunk*, 741 F.3d at 409; and may "encourage others similarly situated to act in a like fashion." *Id.*; *supra* n.6, GAO report at 18, n.25 ("Nonfinancial losses due to fraud … lead to other potentially harmful outcomes. For example, fraud can impact government outcomes or program reputation").

In the healthcare context, the FCA is a mechanism for ensuring that contractors do not use Government funding to cause potential patient harm by putting profits over patient health and safety. *E.g.*, DOJ Press Release (Jan. 2025) ("enforcement of the False Claims Act also protects patients from medically unnecessary or potentially harmful actions");[23] DOJ Press Release (Oct. 2024) ("We are committed to protecting taxpayer-funded healthcare programs and the patients served by those programs, and we will continue to thoroughly investigate schemes that put patient safety at risk").[24]

FCA cases involving healthcare programs recoup Government payment for goods or services that have the potential to cause a variety of potential patient harms, regardless of whether actual harm to individual patients is established.[25] For example, services that are not medically reasonable and necessary, and therefore not eligible for Government payment, target potentially harmful medical interventions.[26]

---

[23]https://www.justice.gov/archives/opa/pr/false-claims-act-settlements-and-judgments-exceed-29b-fiscal-year-2024

[24]https://www.justice.gov/usao-ma/pr/brookline-hospital-pay-65-million-resolve-false-claims-act-liability-concerning-kickback

[25]  While the trial court here observed that the lack of evidence of actual patient harm was a reason to award less than the maximum penalty, it acknowledged that Janssen's conduct may have caused harm to some patients.  Appx265-266.

[26]  *E.g.*,  https://www.justice.gov/archives/opa/pr/acadia-healthcare-company-inc-pay-1985m-settle-allegations-relating-medically-unnecessary (2024 settlement of allegations including lack of training and supervision); https://www.justice.gov/archives/opa/pr/national-dental-management-company-

FCA cases premised on violations of the Anti-Kickback Statute prevent potential harm from distorted medical decision-making,[27] and cases involving off-label marketing target potentially harmful unapproved uses of drugs.[28] Cases involving the failure to provide treatment at all[29] or to provide treatment that amounts to the

---

pays-24-million-resolve-fraud-allegations (2010 resolution of allegations of procedures on children that were medically unnecessary or that did not meet professionals standards of care).

[27] *E.g.*, https://www.justice.gov/usao-wdny/pr/pfizer-agrees-pay-nearly-60-million-resolve-false-claims-allegations-relating-improper (2025 resolution of allegations of kickbacks to induce prescriptions for migraine medication); https://www.justice.gov/usao-ma/pr/qol-medical-and-its-ceo-agree-pay-47-million-allegedly-paying-kickbacks-induce-claims (2024 resolution of allegations that company paid kickbacks to increase sales of expensive drug even to patients who did not have the rare condition the drug treats).

[28] *E.g.*, https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html (2008 $425 million resolution of criminal and civil allegations against pharmaceutical manufacturer involving off-label promotion of drugs, including potent pain medication that posed life-threatening harm); https://www.justice.gov/archives/opa/pr/pharmaceutical-companies-pay-2145-million-resolve-allegations-label-promotion-zonegran (2010 resolution of criminal and civil allegations of off-label promotion of epilepsy drug, including for use in children under the age of 16); https://www.justice.gov/archives/opa/pr/abbott-labs-pay-15-billion-resolve-criminal-civil-investigations-label-promotion-depakote (2012 resolution of criminal and civil allegations involving off-label promotion of seizure drug to, inter alia, control agitation in elderly patients with dementia).

[29] *E.g.*, *U.S. ex rel. Quaresma v. Journey to Hope, Health and Healing, Inc.*, 728 F.Supp.3d 251 (D.R.I. 2024) (alleged failure to provide required opioid treatment program services).

same thing[30] often involve actual harm to patients but also serve to prevent future harm.[31] FCA damages in all these types of cases are calculated on the basis of the amount of the claims for the goods or services, not compensation for personal injury. Treble damages and penalties is the mechanism Congress chose to protect public health and safety by making the cost of engaging in potentially harmful conduct exceed the benefit.

2.    The Chamber Amici's contention that the FCA "foreseeably results in constitutionally excessive fines," because "profit driven relators" will naturally pursue penalties that are as excessive as a court will permit, (Chamber Br. at 35), is fallacious. As the United States explained, a court's exercise of discretion within the statutory civil penalty range set by Congress is unlikely to ever be excessive within the meaning of the Eighth Amendment. Govt. Br. at 41-53.

At best, this argument reflects a disagreement with Congress's determination about how best to address the problem of fraud and the variety of harms it imposes on society. Fraud is hard to detect and for that reason often goes unremedied. That

---

[30] *E.g.*, *United States v. American Health Foundation, Inc.*, 2023 U.S. Dist. LEXIS 56071 (E.D. Pa. Mar. 31, 2023) (allegations that services at long term facility were so below the standard of care as to be worthless).

[31] Patient harm is not limited to physical harm. *Stop Ill. Health Care Fraud*, 100 F.4th at 907 ("The defendants accessed the private health information of hundreds of vulnerable seniors in Illinois without their permission and exploited their records for profit through unsolicited marketing calls. These harms … are not explicitly captured in the FCA's loss calculation…").

was true when the 1986 amendments were enacted, S. Rep. No. 99-345, at 2-3, and remains true decades later. GAO report, *supra* n.6, at 34. Lack of resources to investigate and pursue fraud limits the Government's ability to address it. *Id.* (noting that an OIG official observed that due to lack of resources they can investigate only "the worst of the worst"). The FCA addresses these issues both by enlisting private citizens and their counsel to detect and pursue fraud, S. Rep. No. 99-345, at 2, 8, and by imposing treble damages and penalties to both compensate for the harm to the Treasury and to deter future fraud.  *U.S. ex rel. Chandler v. Cook County, Ill.*, 538 U.S. 119, 130-32 (2003).

What amicus characterizes as "surging" *qui tam* suits since the 1986 amendments (Chamber Br. at 32) has actually resulted in "surging" monetary recoveries to the Government to redress "surging" fraudulent conduct. *See supra* n.7 (DOJ statistics). As large as those recoveries have been, the problem of fraud is far larger. GAO Report, *supra* n.6, at 1, 18. And the actual monetary recoveries achieved do not account for the value to the Government of the deterrent effect on others who might have engaged in similar activities.

## CONCLUSION

The judgment should be affirmed.

September 24, 2025

Respectfully submitted,

/s/ *Jennifer M. Verkamp*
Jennifer Verkamp
MORGAN VERKAMP LLC
4410 Carver Woods Dr., Suite 200
Cincinnati, OH 45242
Telephone: (513) 651-4400

Claire Sylvia
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone: (415) 836-9000

Jacklyn DeMar
THE ANTI-FRAUD COALITION
1220 19th Street, N.W., Suite 501
Washington, DC 20036
Telephone: (202) 296-4826

Counsel for *Amicus Curiae*
The Anti-Fraud Coalition

## COMBINED CERTIFICATIONS

1.    I am a member of the bar of this Court.

2.    This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6495 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word 2016 in 14-point Times New Roman, a proportionally spaced typeface.

2.    I electronically filed this brief with the U.S. Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

3.    The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.    This document was scanned for viruses using Trellix, and no virus was detected.

 */s/ Jennifer M. Verkamp*
Jennifer M. Verkamp