Page 1

UNITED STATES COURT OF APPEALS

THIRD CIRCUIT

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

Jessica Penelow; Christine Brancaccio        Main Case No.

       v.                                    25-1818

Janssen Products, L.P.

      Appellant.

- - - - - - - - - - - - - - - - - - - - - -x


          United States Court of Appeals



         March 18, 2026

         10:24 AM


B E F O R E:

HON. PAUL BRIAN MATEY

HON. ARIANNA JULIA FREEMAN

HON. CINDY KYOUNGA CHUNG

CIRCUIT JUDGES

A P P E A R A N C E S:

COVINGTON & BURLING

Attorneys for Appellant Janssen Products, L.P.

850 10th Street Northwest

One City Center

Washington, DC 20001

BY:   MARK  W. MOSIER, ESQ.

DECHERT

Attorneys for Appellant Chamber of Commerce

2929 Arch Street

Cira Centre

Philadelphia, PA 19104

BY:   MICHAEL H. MCGINLEY, ESQ.

U.S. DEPARTMENT OF JUSTICE CIVIL DIVISION APPELLATE

Attorneys for Appellee and Amicus United States of America

950 Pennsylvania Avenue Northwest

Washington, DC 20530

BY:   DANIEL WINIK, ESQ.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

Attorneys for Appellee Penelow and Brancaccio

1615 M Street Northwest

Sumner Square, Suite 400

Washington, DC 20036

BY:   DAVID  C. FREDERICK, ESQ.

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 3

P R O C E E D I N G S

JUDGE MATEY:  All right.  We will now hear argument in case number 25-1818, Penelow v. Janssen Products.  Mr. Mosier?

MR. MOSIER:  Good morning, Your Honor.  May it please the Court, Mark Mosier, on behalf of Janssen.  I would like to reserve five minutes of my time for rebuttal.

JUDGE MATEY:  That's granted.

MR. MOSIER:  I would like to start with the issue on which Janssen and the Government agree.  A relator cannot prove an FCA violation based solely on off-label marketing.  As the Government explains, pharmaceutical marketing is regulated by the FDA, not by federal healthcare programs.  Those programs do not consider marketing in making reimbursement decisions.  They instead consider the eligibility requirements for reimbursement established by the rules and regulations that govern Medicare Part D, Medicaid, and the ADAP program.

The Government agrees that the unprecedented judgment in this case should not be affirmed.  The Government suggests that the Court should simply reject the off-label marketing theory and then send the case back for further proceedings.  But we don't think that's necessary.  Without the flawed, off-label marketing theory, relators necessarily fail to prove materiality, a necessary element of their claims.

Relators tried this case on only one theory of materiality, that off-label promotion is material to the

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 4

Government's payment decision.  That was the jury instruction. That was the reasoning of the post-trial order.  That means that if the Court agrees with Janssen and the Government, as it should, the Court can reverse the judgment and end its opinion there.

The Government addresses falsity when it is talking about why the off-label marketing theory fails, and we agree with them that that is a problem on falsity, but it is also a problem on materiality.  And that's why that's the element we have chosen to focus on.  On falsity, there are other theories of falsity that the relators have raised, such as whether or not any particular claim was for a medically accepted indication or whether it was reasonable and necessary.  And as we discussed in our briefs, and I'd be happy to walk through, we don't think they can establish falsity under either of those theories.

But I think the critical point is that there has never been any argument -- there has never been any evidence that any false representation about medically accepted indication or reasonable and necessary would be material to the Government's payment decision.  There's never been any evidence that if Medicaid or Part D knew that a particular HIV patient had elevated lipids and the doctor still prescribed Prezista to that patient, that they would have denied coverage for that claim.  That has never been the theory of the case.

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

The theory of the case has always been for materiality: Off-label marketing is material to the Government's payment decision.  And if you agree with us and the Government that that just is not a viable theory because Medicare, Medicaid, the ADAP program don't take into account marketing, then there is no basis on which a jury could have found or this jury found materiality.

JUDGE MATEY:  So you see, all of this is taking it out of the fact realm, right?  Because generally we look at materiality as a question of fact that the jury has to weigh in the context of all of the evidence presented.  I think if that's the standard, then you would agree there was enough from the jury -- there was enough here for the jury to make that conclusion.  You need us to say as a matter of law, it cannot proceed under that theory?

MR. MOSIER:  So what the jury was asked to say is whether there is evidence to establish that off-label promotion was material to the Government's payment decision.  And we say the problem with that --

JUDGE CHUNG:  I think that that's a legal problem.  It seems you forfeited that.  You never made that argument below.

MR. MOSIER:  No, we did.  In page 1 of the motion for judgment as a matter of law, we say very clearly that the Court -- or that we're entitled to a judgment as a matter of law because there was no evidence and a jury couldn't find

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 6

materiality based on off-label promotion. On page 8 and 9 --

JUDGE CHUNG: But you were arguing sufficiency. You weren't arguing legality, the legality of the materiality instruction. I mean, there's definitely some there about off-label marketing. That's not the falsity at issue. That has to be material. It has to be in the falsity of the claim. But I just don't see you making the legal argument. What I saw, I reviewed it very carefully, is that you were making a sufficiency per the instruction that was given.

MR. MOSIER: So on page 8 and 9, again, of the JMOL motion, we quote and cite the Government's brief from the Solis case, the same one we cite here in which the Government says that they do not support the view that off-label promotion alone is sufficient to establish falsity. So we make that. That was the opening brief on the motion for judgment as a matter of law.

Then in the opposition, the relators put a lot more emphasis on this theory of a false certification based on off-label promotion, I think because they recognized they hadn't established -- and in fact, their expert had conceded that the largest group of claims for the lipid claims, that that's a medically accepted indication. So in their opposition to the JMOL motion, they put more weight on this theory. Then, in the reply brief. We addressed it at length of why this theory fails.

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 7

I think this is important. The District Court in the post-trial ruling. There were other issues where it said that we hadn't properly preserved, such as whether or not the causation should include "but for" causation. The District Court didn't suggest that we hadn't adequately preserved this issue. It decided that issue.

And even in the Government's brief, it draws a distinction between the theory that off-label promotion fails as a matter of law and are challenged to the jury instruction 17 that has some errors with relation to medically accepted indication. With respect to the jury instruction, the Government said we didn't properly preserve that. We disagree with that.

But on the main, legal argument, the Government doesn't take the position that we didn't properly preserve that. And that's why the Government says the case should be vacated at a minimum and remanded. So I do think we've properly preserved that. This has been an issue. It was an issue throughout the entire case of whether they could establish their claim based on off-label promotion.

And again, coming back to materiality, there's never been any suggestion that had they gone down the road, which I think they could have for, like, medically accepted indications -- certainly under Medicare Part D, that's a requirement that a claim be for a medically accepted

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 8

indication.  The problem when you get to materiality for them to walk that through, even if they established that any claim was not for a medically accepted indication, so they could establish falsity, they then would need to show that that was material.

And coming back to Judge Matey's question of whether materiality should be a question of fact, the Supreme Court in Escobar recognized that materiality can be established as a matter of law.  In this Court's decision in Petratos, it affirmed the dismissal at the pleading stage for lack of materiality.  In Spay, the Court affirmed the summary judgment ruling on materiality.

The question of materiality, you look to -- it's certainly what the Court has said.  The Supreme Court said this in Escobar.  This Court said it in Petratos, is the fact that the Government continues to pay is strong evidence that something is not material.  There could be other evidence going the other way in some circumstances.

But here the Government never stopped paying claims for Prezista and Intelence.  And we know now -- we know from the Government's brief in this case why they haven't stopped paying, because off-label promotion is simply not a factor they take into consideration.  There's no question that --

JUDGE MATEY:  Right.  So I mean, Escobar clearly says inaction by the Government is evidence of immateriality.  But

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 9

why isn't that then a jury question?  I mean, it seems like --
are you asking for the Escobar standard to then become a legal
standard?  And if so, what do we do with Care Alternatives,
which seems to already perhaps answer that question?

MR. MOSIER:  So a couple of things.  One, Escobar
itself recognized that it can be decided as a matter of law,
and that's how the Court applied it in Petratos.  In Care
Alternatives, what the Court recognizes is especially when
there's questions and disputed issues of fact as to the
Government's awareness, that can then preclude deciding
materiality as a matter of law.

Here, the allegations and evidence were presented to
the Government over a decade ago.  The Government has never
explained, never taken the position that if we had known
something different at the time, we wouldn't have reimbursed
those claims.  In fact, and I think this is what's critical
about the Government's brief here, is the Government has told
us why they continued to pay and why even today, knowing all of
the evidence that came out at trial, the jury's verdict, they
still think it was proper to pay those claims based on, or at
least with respect to off-label marketing, because that is just
not a factor that federal health care programs take into
account.

So when the relators in 2012 went to the Government
with allegations of off-label promotion, the Government's

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 10

response -- would continue to pay for the claims because that's just not a factor they take into account.  Now, if there's evidence --

JUDGE CHUNG:  Can I ask you about --

MR. MOSIER:  Sure.

JUDGE CHUNG:  -- causation?

MR. MOSIER:  Yes.

JUDGE CHUNG:  You argue that "but for" causation is required but not sufficient.  What is sufficient in your view?

MR. MOSIER:  And where we go from that, and that was drawn from Petratos, is "but for" is the cause in fact standard.  But what this Court has recognized, you would also have a proximate causation requirement.  And so I think that's what the cases that say "but for" is required but not enough is getting at.  You would need both "but for" and then apply a proximate cause.

JUDGE CHUNG:  So if you were to state a good jury instruction to the jury as to what they had to find for causation, what would that be?

MR. MOSIER:  So certainly on the cause in fact, but for they would have to say --

JUDGE CHUNG:  Um-hum.

MR. MOSIER:  -- that if the same prescriptions would have been written in the absence of off-label marketing, right. That would be "but for," right. They'd have to show that these

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 11

prescriptions would not have been written in the absence of off-label marketing.

JUDGE CHUNG:  Um-hum.

MR. MOSIER:  That would be a "but for" standard.  I mean, the --

JUDGE CHUNG:  And then what would you say for the second part, the proximate?

MR. MOSIER:  Proximate cause is often stated in terms of that it was reasonably foreseeable that this action would occur as a result of your action.

JUDGE CHUNG:  So as far as proximate cause goes, you don't have a quibble with the instruction that was given?

MR. MOSIER:  Yeah, we haven't raised a challenge on proximate cause on appeal --

JUDGE CHUNG:  It's just what you're saying is that there was no actual causation instruction --

MR. MOSIER:  Correct.  The term --

JUDGE CHUNG:  -- apart from "but for"?

MR. MOSIER:  Yeah.  And part of the dispute and the issues with the substantial factor -- and what the instruction said was substantial factor.  But we think from the Restatement and the common law history that shows that substantial factor incorporates and includes the "but for" causation, except for the rare circumstance which no one argued applies here, when you have independent, concurrent causes leading to the same

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 12

harm.

JUDGE CHUNG: And the off-label marketing might come into play in causation. And your argument, as far as I understand about Dr. Shaked, if I'm saying that right, about his testimony, is that the underlying assumptions were incorrect and therefore just totally has to be discounted. But if in fact, the jury did credit his testimony, would that establish causation?

MR. MOSIER: Not under a "but for" standard, we would say. And I think that's why this fight is so important of whether it's substantial factor --

JUDGE CHUNG: But let's say he accounted for it and he acknowledged, okay, eleven percent of noninfluenced doctors still write off label and twenty-two percent of influenced doctors write off label. So you could in, like, a very rough sense, not maybe in a statistically regressed sense, but like you could say, well, that eleven percent difference is where you start as far as actual causation. Is it your position stats can never prove causation?

MR. MOSIER: No, absolutely not.

JUDGE CHUNG: Okay.

MR. MOSIER: No, it's not that. It's that this particular model here didn't rise to the level of what was necessary. And there were a number of flaws. One, it is the assumptions. And Dr. Shaked testified that he relied on

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

assumptions given to him by counsel.  If the assumptions weren't reliable, his model is not going to be reliable.  So one of the assumptions that he relied on is that every sales call that a Janssen rep made to a doctor over an eight-year period involved delivering off-label messages for both Prezista and Intelence.  When the evidence didn't support that, the relator's own testimony was that they didn't deliver both messages every time.

There was also then the assumption that that one message or that one meeting, even if it's a five-minute meeting, affected the prescribing decisions of that doctor for the next eight years.  And I think this is where the "but for" causation becomes important because it becomes very implausible and unsupported by the record to say, if a doctor met and talked to a Janssen sales rep in 2006, that a prescription written in 2012, the "but for" cause of that prescription was the meeting six years earlier, not everything that had happened in between --

JUDGE CHUNG: But that seems to be more of, like, a sufficiency question rather than legal.  Because that's more about, did the experts prove that continuity of care and keeping them on the same med means that the initial prescription caused it?  That seems to me to be a different question than what you started with as far as the assumption that every single prescription by anyone who ever had a contact

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 14

must be a result of the off-label marketing.

MR. MOSIER:  That's also an assumption that we think --

JUDGE CHUNG:  Right.  That was --

MR. MOSIER:  Yeah.

JUDGE CHUNG:  Well, I thought that's what you're saying is the main faulty assumption, although I understand --

MR. MOSIER:  Yes.

JUDGE CHUNG:  -- you're arguing there are other, but the other ones you're arguing seem more to be sufficiency to me than legal.

MR. MOSIER:  I mean, I don't think so.  On the issue of -- another error that we have pointed out is the way that Dr. Shaked kind of constructed or treated prescriptions for patients that were initially prescribed by an influenced doctor, in his words, and then if the patient then changed doctors.  So what he did -- if two patients go to an influenced doctor, one --

JUDGE CHUNG:  Right.  That's what I was just talking about with continuity of care.

MR. MOSIER:  Yes, yes.

JUDGE CHUNG:  Yeah.

MR. MOSIER:  Okay.  Yeah.  And one doctor or one of the patients has high lipids, and one doesn't.  So in Dr. Shaked's model, the influenced prescriber's percentage of off-

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 15

label prescriptions would be fifty percent because one had high lipids, one didn't.  Then if both those patients went to a non-influenced doctor, that doctor kept both of the patients on the same Prezista, the same medication.  What Dr. Shaked says is for the patient who is off-label, the decision to prescribe off-label needs to be attributed back to the first doctor because he made the initial determination.  So we're going to count that for the initial doctor.

But for the on-label patient, for that patient, the second doctor used his independent judgment and came to his own conclusion that this is the proper drug for him.  So for that prescription, we're going to keep it with the second doctor.  And so then the percentages come that the original doctor, now actually his off-label percentage is sixty-seven percent, because we count back the off-label prescription, and the other doctor is a hundred percent on label, even though in reality they both were 50/50.

And so it's a different assumption for off-label promotions.  They get attributed back.  Different assumption for on-label.  They don't.  And that accounts for the difference that he's been able to show just by taking different assumptions as to off-label promotions and on-label promotions.

JUDGE MATEY:  I thought I heard you say that substantial factor incorporates "but for" causation.  And if so then what -- is the error here that the parsing that you've now

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 16

illuminated wasn't part of the jury instruction?

MR. MOSIER: Yeah, we do think the jury needed to be explained that. And it is common in different pattern jury instructions to instruct a jury what "substantial factor" means. Because I don't think a lay jury would understand that substantial factor includes "but for" causation.

And as we point out in our brief, and we cite a Tenth Circuit decision, June, talking about this, that the term "substantial factor" that the Second Restatement uses was thought to be so confusing, even among lawyers, that the Third Restatement has moved away from that and doesn't use "substantial factor" anymore, because that's a term that's not illuminating, but instead can be confusing as requiring "but for" causation. And so we do think the error in the jury instruction wasn't to explain --

JUDGE CHUNG: That's what I was trying to ask you is, is your position that they should not have used the word "substantial factor", or is your position they should have been instructed on the concept of actual cause is "but for", and then proximate cause could be substantial factor with reasonable foreseeability?

MR. MOSIER: I think you could do it either way in a jury instruction that if -- you could either just describe in the jury instruction cause in fact as "but for" causation, and give an explanation that this event would not have happened in

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 17

the absence of off-label marketing or whatever example you want to, or if you use the term "substantial factor", you would then define it for the jury and explain to them how to apply that.

Sometimes courts do that and say a substantial factor has to be more than a trivial amount. It doesn't have to be the only cause. But then they add in the language on "but for", but it has to be something that in the absence of that act, there would not have been injury. And so I think that's where we would have land --

JUDGE MATEY: Going back to the materiality point for a moment, because you're talking about how the position of the United States to not consider these claims material is illuminated by their clarification that they're just not worried about off-label marketing. Why should that matter if Congress has already said, here's the standard that we're going to allow for or disallow for reimbursement? What does the administrative practice do to change that?

MR. MOSIER: So it doesn't change that. I mean, what the different standard is -- what Congress has said is it empowers the FDA to regulate marketing. There's just different statutory and regulatory regimes for reimbursement. And that's why I think the focus needs to be for proving falsity on medically accepted indication. This issue of reasonable and necessary, that comes from Medicare Part B. And so there's a question of whether any of the payers here have actually

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 18

imposed that --

JUDGE CHUNG:  Elective.  Right.

MR. MOSIER:  It's elective.

JUDGE CHUNG:  Right.  That's where part A and part B -- Petratos was talking about part A and part B.  It could apply to part D if a prescription drug plan or an MA-PD adopts that.

MR. MOSIER:  So here it would be the --

JUDGE CHUNG:  What would that evidence look like?

MR. MOSIER:  You would want to look at the part D sponsor agreements and what the part D sponsor plan looks like.  There was no evidence of that put in the record.  And while generally there is the ability and discretion of a part D sponsor to adopt a reasonable and necessary requirement, here we don't have any evidence of any part D sponsor that did.  But we would want to look specifically, not just at the general rule of what a part D sponsor does, but specifically what it does as to HIV.  Because the federal government has made very clear that they want part D sponsors, state Medicaid agencies, to allow broad reimbursement for HIV patients to get HIV drugs.

So the idea and the thought -- and there's no evidence in the record to suggest this, that any part D sponsor has ever imposed restrictions on reimbursing HIV drugs for HIV medications.  There's nothing in the record, and there's plenty of statements from CMS, even from the White House, of the

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

federal policy to make HIV drugs broadly available for HIV patients.

JUDGE MATEY:  Thank you, Counsel.

MR. MOSIER:  Thank you.

JUDGE MATEY:  We'll hear from you on rebuttal.

MR. MOSIER:  Thank you.

JUDGE MATEY:  Mr. McGinley?

MR. MCGINLEY:  Good morning, Your Honors.  May it please the Court, Michael McGinley, on behalf of amici in support of appellant.  The FCA's qui tam provisions are unconstitutional.  Article 2 vests all executive power in the president, who is singularly charged to take care that the laws be faithfully executed.  And officers who wield executive power on behalf of the United States must be appointed consistent with Article 2's appointments clause.  That carefully crafted structure ensures accountability and preserves individual liberty.

But the FCA's qui tam procedures destroy that accountability by vesting a core executive power, the power to pursue claims and penalties on behalf of the United States, in private individuals who are not controlled by the president.  In fact, when Congress resuscitated the qui tam device in 1986, the Justice Department's Office of Legal Counsel viewed it as, quote, "patently unconstitutional".

The Government's primary defense of the law now relies

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

on historical pedigree, but the history is muddled at best. The Supreme Court has long warned that history alone cannot immunize a constitutional defect. The unitary structure of Article 2 marked a deliberate departure from our English forebears. The early qui tam provisions were different from the modern FCA, and they were rarely used before falling out of favor.

The mere adoption in an early Congress is not talismanic. Indeed, Marbury v. Madison invalidated an act of the First Congress. That leaves only the Government's suggestion that relators are not officers for appointments clause purposes, but that fails to save the statute as well.

For starters, it is wrong. Relators are officers of the United States who Congress has empowered to exercise significant, executive authority to sue, quote, for and in the name of the United States. Under Buckley and Seila Law, that enforcement authority triggers the appointments clause. Like special counsel, relators also occupy a continuing office.

JUDGE MATEY: Tell us about that. What is the office that they occupy?

MR. MCGINLEY: The office is the office of the relator. I mean, in the statute, Congress says there is something called a relator, which we think is most closely analogous to a special counsel. The fact that it's for a specific case or purpose doesn't change that it's a continuing

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 21

office.  That's true of special counsel.

JUDGE MATEY:  There can be more than one -- more than special counsel, though, right?  I mean, special counsels come and go.  Independent counsel came and went.  How is there a substitution here that is permissible under the FCA?

MR. MCGINLEY:  A substitution of the individual?

JUDGE MATEY:  Yeah.

MR. MCGINLEY:  Yeah, so I'd say two things on that. First, I think the relevant point in time that we should be looking at is the point in time of the appointment, because it is the appointments clause, of course, and the law is agnostic as to who becomes the relator.  It doesn't say Jessica Penelow is the relator with respect to case X, Y, and Z.  It says if you bring a suit in the name of the United States alleging this type of fraud, you are the relator.

And so it's not personal in nature, but what it does is it says once that relator self-declares as the relator and takes over the case, even if the Government intervenes, that person has a continuing ability to participate in the case, has a right to participate.  The fact that they can't be knocked out by the Government makes it worse, not better.  And so it then becomes a removal restriction that further violates the appointments clause.

JUDGE MATEY:  No, I understand that point.  I mean, Maurice and Freytag and Lucia, they all involved positions that

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 22

people could be swapped in and out of, which is different here. Is that important to our understanding of what the continuing office test in Lucia meant, or does it simply deal with the fact that those cases didn't, et cetera?

MR. MCGINLEY: So I mean, I think it's somewhat -- as a quirk of this case, I don't know that it's absolutely necessary. But even if it were, the relator can be swapped out. We point out in the briefing that in case of death, the estate continues to act on behalf of the relator. In the case of bankruptcy, the bankruptcy estate continues to act. When there's a dismissal of a case for a procedural reason that doesn't finally resolve the case, a new relator can step in for the same matter.

So I think even if you look at it under that rubric, it still works. But I think that if we were to say that just merely because somebody can't be replaced, that takes them out of the appointments clause context, I think that just puts a finer point on the vesting clause and take-care problem, because that means now that somebody who's not even an officer of the United States is exercising the serious power to pursue potentially ruinous fines and penalties on private companies and individuals. I think this case is a perfect example of the problem. Here you have --

JUDGE CHUNG: Can I ask you about the posture of your challenge or appellants. It's a facial challenge, which means

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 23

there are no set of circumstances under which the law would be valid.  Why isn't it valid if the Government intervenes and accepts the case or intervenes and dismisses the case?

MR. MCGINLEY:  So a few answers to that, Your Honor. The first one is here the Government has not done that, obviously.  Instead what you have is actually the worst of both worlds.  The Government's standing on the sideline saying, we think that this is an unlawful pursuit.

JUDGE CHUNG:  Sure, but --

MR. MCGINLEY:  Right.

JUDGE CHUNG:  -- why isn't that a lawful set of circumstances?

MR. MCGINLEY:  So even if the Government comes in after the sealing period, the relator still has exercised Article 2 --

JUDGE CHUNG:  I'm saying during the sealing period, if the Government accepts and dismisses, or the Government accepts and just prosecutes the case, why isn't that a lawful set of circumstances?

MR. MCGINLEY:  Because the relator has still exercised the power of the United States to initiate a suit which then forced the Government to investigate and make a decision.  Now, I would grant you that I think that is less problematic than the situation here, but I think it's --

JUDGE CHUNG:  That doesn't mean it's not

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 24

constitutional.

MR. MCGINLEY:  Doesn't mean that it's constitutional.

JUDGE CHUNG:  Now, I understand your arguments about sort of the broader statute and the multiple means it takes. But I mean, looking at Stevens, it seems that at least the founding-era law could be read to say that a private citizen can initiate suit on behalf of the United States.

Now, to your point of whether or not they can continue to prosecute it or all of these other things -- but looking at just the lawful set of circumstances where it can be applied, I mean, why doesn't the founding-era law support the notion that this is a lawful -- and when I say "lawful", I mean within the sealing period, I either decide --

MR. MCGINLEY:  Sure.

JUDGE CHUNG:  -- I'm the Government, I'm doing it, or I'm the Government and it's gone.

MR. MCGINLEY:  So first thing I'd say on Stevens is obviously, as Your Honor knows, that was an Article 3 decision.

JUDGE CHUNG:  Sure.

MR. MCGINLEY:  So the Court very explicitly in footnote 8 says, we're not deciding the Article 2 problem.

JUDGE CHUNG:  Sure.

MR. MCGINLEY:  And the break from England and the --

JUDGE CHUNG:  Yup.

MR. MCGINLEY:  -- construction of Article 2 makes a

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 25

big difference.  I would say to you, if you wanted to decide this case by saying, here we don't need to decide whether there's an Article 2 violation during the sealing period if the Government then dismisses, then I think that's fine, because we are in a scenario here where the Government did not intervene or dismiss.  Frankly, I think --

JUDGE CHUNG:  But that's not the posture of the challenge.  The posture of the challenge is a facial challenge, not an as-applied challenge.

MR. MCGINLEY:  And we're fine with you saying that in a facial matter, even the initiation of a suit is a violation of Article 2.  I think what I'd point you to on the history is, I would say, number 1, Bruen teaches us that you don't just look and say, is there something that looks kind of like this in the history?  A lot of the statutes -- and I point you to page 20 of our brief --

JUDGE CHUNG:  Um-hum.

MR. MCGINLEY:  -- but also the eighty-nine OLC opinion goes through this.  And Stevens, to an extent, goes through it and says a lot of the early statutes were pure bounty statutes, which means you had an informer who would go to the Government and say, I think this unlawful thing happened.  If the Government pursued it and got money, that person got a bounty. That's unlike the modern FCA.

JUDGE CHUNG:  Explicitly what Stevens did not rely

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

upon.

MR. MCGINLEY:  Correct.  And then there's a set where the private relator had to independently have standing, had to have an injury that they suffered.  We think those are different.  Then all that you're left with is a small handful of instances where Congress passed laws.  There's not evidence that they were widely used.  And more importantly, there's not evidence that there was great debate as to whether or not these violated Article 2 at the time.

As I mentioned, we know that the mere passage by the First Congress does not automatically make something constitutional.  Otherwise the Judiciary Act would have been upheld in Marbury v. Madison.

I would also point you to the fact that in Chadha, the dissent in Chadha by Justice White points out that there were a number of precursors to the legislative veto in early Congress, and the Court was not bothered by the fact that it was striking down the legislative veto there.  So the mere vintage --

JUDGE CHUNG:  So it sounds like mostly what you're arguing is that it's a small-enough subset that was not subject to Constitutional debate, such that we shouldn't read any principle into it?

MR. MCGINLEY:  Correct.  And I would say it's not just that, but I think even if you go back into English history and if you go forward into American history, what you see is that

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 27

it was a practice that, at most, waxed and waned, and it would come into play when there was some expediency. In the early Republic, we didn't have an executive branch during the First -- we had a very nascent one, but they needed to populate the executive branch.

So naturally, Congress turned to some measures to enforce the law without even considering whether or not that violated Article 2. It went out of disfavor, largely because of abuses. Then during the Civil War, when there was a massive amount of claims being made to the Government, Congress brought it back into play. Again, it was abused, and it was repealed and taken out of favor.

And then in 1986, Congress was very explicit in saying, we are doing this because we don't trust the executive branch to properly enforce the laws. I don't know how more clear of a violation of Article 2 you could get from Congress to say, we don't like how the executive's acting. We're going to let private people step into its shoes.

And I think even if you look at some of those early cases that considered the constitutionality, which my friends point to, I point you to the Ninth Circuit's decision in Kelly, which similarly is very upfront in saying the FCA is a diffusion of executive power and justifies on that basis -- I think actually proves the opposite. Then going back into English history, what you saw was that it actually fell out of

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 28

disfavor because of rampant abuse.

Lord Coke was highly critical of the qui tam provisions, in part because they were abusive and they allowed private individuals to harass individuals. So I think that shows you the history is not on anybody's side one way or the other, and I think there's a lot of things that could be said in our favor on the history.

JUDGE MATEY: Just one last point about the scope of your challenge from Judge Chung's questions. I understand your position to be if you want to say that the appointment is defective under Article 2 as to both an intervened and a nonintervened case, that certainly is consistent with a facial challenge. Is there a nonintervened, facial challenge that you can sustain? Because I'm just not sure what your point is on that. You made some other points about saying --

MR. MCGINLEY: Yeah.

JUDGE MATEY: -- well, they didn't intervene here. But Judge Chung's point was, but that might be a different set of circumstances. So is it an all-or-nothing argument in your mind?

MR. MCGINLEY: I don't think it has to be. I think it can be facial even on the nonintervention point. You could say in any case where there's not an intervention, which is the facts here, then it's a clear Article 2 violation. I think there still is an Article 2 violation, even before the sealing

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 29

period happens, because someone has done something on behalf of the United States who is not empowered to do so.

And that thing is initiating a case against a different private individual or entity in the name of the United States and forcing the United States Government to make a choice as to whether to get in or not.  I think the violation becomes even more obvious and egregious when the Government does what it did here and just stands on the sidelines and lets the relator go forward.

But even in an intervened case, the relator still has statutory authority to act independently of the Government in the name of the Government without any injury to itself.  So I think the Article 2 problem certainly persists in an intervened case.  And then maybe it gets a little weaker in a case where the Government steps in early and dismisses.

But something still happened where somebody exercised power on behalf of the United States in violation of Article 2. And you can look at it either under the appointments clause or under the vesting clause and take-care clause.  I think they're just two sides of the same coin.

JUDGE MATEY:  All right.  Thank you, Counsel.

MR. MCGINLEY:  Thank you, Your Honor.

JUDGE MATEY:  Mr. Winik?

MR. WINIK:  Good morning, Your Honor.  May it please the Court, Daniel Winik for the Government.  I'm here to

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

address three issues:  the Constitutional issues, on which we've intervened, and the falsity issue, on which we're participating as amicus.  And I want to make sure I get to answer the Court's questions about the Constitutional issue, which is where the Government's interests mainly lie.

But I want to begin by very briefly addressing a few of the things Mr. Mosier said about our position on the merits issue that I think quite seriously misunderstand our position on that issue.  So let me be very clear.  We think false representations to doctors by a pharma company can lead to False Claims Act liability when they cause doctors to write prescriptions that are nonreimbursable. At least for Medicare, that's true if the doctor wouldn't otherwise have considered the prescription reasonable and necessary for the patient, or if it's for a use that is neither FDA approved nor medically accepted.

The District Court erred in its post-trial JMOL opinion in a limited fashion.  It erred to the extent it ignored the reimbursability issue in addressing falsity.  Some of the language in the opinion seems to suggest that false representations alone or even off-label marketing without false representations could, without more, make subsequent claims false.  And we think that's not right.

But we don't think that a case like this, a case premised on false marketing by pharma companies to doctors,

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 31

cannot support False Claims Act liability.  It certainly can.  And we certainly are not suggesting that the evidence here was insufficient to support False Claims Act liability.

That's why we've suggested the Court can simply, if it agrees with our position on the law, vacate the judgment and remand for the District Court to apply the proper standard to the record.  And we've said nothing to dispute the proposition that the District Court, upon doing so, could reinstate the judgment.  For that matter, if this Court wants to apply the law to the facts, it could affirm if it thinks the facts are sufficient.

And finally, just briefly as to materiality, we don't take a position on materiality.  It's not an issue we've addressed, but the notion that our brief explains why we continued to pay, I think is just a grievous misreading of our brief.  I'm happy to turn to the Constitutional issues and in particular the Article 2 issue.

JUDGE CHUNG:  Could I ask a couple of --

MR. WINIK:  Of course.

JUDGE CHUNG:  -- questions about the FCA first?  You had noted that the falsity instruction was erroneous.  Was the materiality instruction erroneous where it said relators must prove that Janssen's alleged, off-label marketing violations were material rather than the --

MR. WINIK:  We've not taken a position --

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 32

JUDGE CHUNG: -- false claim? I mean, the falsity of the material -- the falsity of marketing, that's not the element. Isn't it the falsity of the claim that has to be material?

MR. WINIK: That's right. So we have not addressed that instruction or --

JUDGE CHUNG: I'm asking you now.

MR. WINIK: -- materiality more generally. Yeah. But as to falsity, Your Honor is correct that the --

JUDGE CHUNG: No, but I'm asking you for materiality. The false statement that has to be material is the falsity in the claim, not the falsity in the marketing?

MR. WINIK: That's right. And that's consistent with the argument we're making on falsity, which is that it isn't the representations that get you falsity. It's the --

JUDGE CHUNG: Okay. And I also want to get your position on the knowingly instruction, which I know you also didn't brief. But they said "knowingly" means that Janssen had actual knowledge, acted with deliberate indifference to the truth or falsity of their statements. Isn't it knowledge with regard to the falsity of the claim, not of the marketing?

MR. WINIK: Again, I want to be careful about not addressing issues on which I've not been authorized by the Solicitor General to speak. But generally speaking, yes, the test for the False Claims Act standard is you have to know that

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 33

you are -- you have to know that you are submitting or causing the submission of a false claim --

JUDGE CHUNG:  Yeah, and I'm not asking you specific to this -- I'm asking the law for it.

MR. WINIK:  Well, so what I want to be careful about there is you have to know that you are submitting or causing the submission.  I'm actually not sure as to whether -- in a case where the way you are violating the act is causing the submission --

JUDGE CHUNG:  Causing --

MR. WINIK:  Yeah, I just frankly don't know ---

JUDGE CHUNG:  But the knowledge is knowingly causing a false submission.  It's not about the knowledge of the falsity of your marketing.  I mean, I could say a true statement:  I'll pay you $10,000 to prescribe this drug to me because I really need it.  I mean, that would be a true statement, but I would still know that I caused a false submission.

MR. WINIK:  I think that's right. Again, I want to be careful of not --

JUDGE CHUNG:  Okay.

MR. WINIK:  -- getting ahead of what --

JUDGE CHUNG:  I'm sorry.  I don't mean to put you in --

MR. WINIK:  -- I've been authorized by the Solicitor General to say on an issue where we're --

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 34

JUDGE CHUNG: Okay. I'm sorry. I didn't mean to put you --

MR. WINIK: No, no, no, no worries.

JUDGE CHUNG: -- in an uncomfortable position.

MR. WINIK: Of course, of course. Thank you, Your Honor. So on the Article 2 issues, I'll start with the vesting and take-care clause. So it's well established Congress can authorize private persons to bring suits enforcing federal law. Private suits enforcing the antitrust laws, the securities laws, the environmental laws, and so forth are brought all the time.

We recognize qui tam suits differ somewhat from suits under those provisions, chiefly in the sense that relators don't have to have suffered a personal injury to bring suit. And we've recognized that those differences would create significant Article 2 questions if qui tam suits were a novel development in American Law, but they're not.

As this Court recognized in footnote 12 of its decision in Polansky, qui tam has deep historical roots. Abundant evidence since the founding shows that Congress, the executive branch, and courts have all accepted qui tam suits as a constitutionally permissible means of redressing and deterring violations of federal law.

I want to speak briefly just to the nature of the challenge here, which came up in questions from Judge Chung and

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 35

Judge Matey.  I don't think this case presents any challenge to the constitutionality of the qui tam provisions in cases where the Government has intervened.  That didn't happen in this case.

I think if the Court said anything about that, that would be an advisory opinion.  I do think it -- I don't think we regard this as, like, a Salerno issue.  I think if the other side had established that the qui tam provisions were unconstitutional in cases where the Government declined to intervene, the Court could say that the case should have been dismissed on that basis, just in resolving the rights of the parties here.  But we don't think this case presents the quite-different question whether the qui tam provisions are unconstitutional in the circumstance where the Government intervenes.

But as to the history, you heard from Mr. McGinley the idea that the history was anecdotal or doesn't really reflect a founding-era consensus.  With respect, I think that's incorrect in a number of respects.  First, it's incorrect as to Stevens. I mean, the history that Mr. McGinley is criticizing as anecdotal or thoughtless here is the same history of the Supreme Court found well-nigh dispositive as to the Article 3 issue in Stevens --

JUDGE MATEY:  They reserved on that question, Counsel, right?

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 36

MR. WINIK:  They reserved as to Article 2.  I don't dispute that.  But as to the relevance of the history, there is no reason why that body of history would have been taken so seriously as to Article 3 and not as to Article 2.

And even if you set Stevens aside and look at the merits, it's not just that the First Congress enacted some provisions.  It's five points.  One, it's the enactment of those provisions, not just in the First Congress, but in early Congresses.  The Slave Trade Act, for example, enacted in the Third Congress, had a qui tam provision.  There were a number of others.

Second, it's the significant, founding-era history of the enforcement of those provisions.  There was a lot of litigation brought and adjudicated by Constitutional luminaries.  Under the Slave Trade Act, for example, the New York Manumission Society, founded by two of the three authors of The Federalist Papers, brought a number of suits.

They went to the Supreme Court.  Chief Justice Marshall wrote the opinion in Adams v. Woods.  So the idea that everybody sort of just didn't pay attention to these provisions or they were never really enforced --

JUDGE MATEY:  The history is certainly engaging, right?  But it is not entirely consistent with the provisions of the modern False Claim Act, right?  And so we would have to then pick apart -- I don't think that the United States is

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 37

urging that simply because there were individuals who were authorized to bring suits on behalf of the sovereign here and there, that shows that this FCA is constitutional as to all purposes, right?  We would need to carve out those suits that don't really match the, perhaps, power and presence and purpose of the modern qui tam relator, right?  And so that may wind up with a narrower subset of history.

MR. WINIK:  So let me try to answer that in a couple of ways.  So we certainly agree that among the large body of founding-era qui tam provisions, some of them are appropriate analogues here and some of them are not, right?  The ones that didn't provide both a bounty and the cause of action are not appropriate analogues.  The ones that didn't allow suit by relators who didn't have a personal injury are not appropriate analogues.  Maybe the ones that might have allowed for criminal penalties are not appropriate analogues.  So you're right that there's a subset you look at.

To the extent Your Honor is asking whether the modern False Claims Act differs in some way from sort of the relevant body of founding-era analogues, my answer is that the modern False Claims Act is a fortiori constitutional.  It has extensive mechanisms of government control which were not present, at least as an explicit matter, in the early statutes.

And I think the mechanisms of control reinforce the extent to which relators are not acting here for the United

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 38

States.  The only unilateral power that relators have under the False Claims Act is to file a complaint under seal, bring it to the attention of the Government, which can then conduct whatever degree of investigation it thinks appropriate, and allow the Government to decide whether it's going to intervene and dismiss the suit at the outset, intervene and take it over, or allow the relator to pursue it, subject to extensive control by the Government going forward, including the power to intervene and dismiss the suit at any later point.

JUDGE MATEY:  So is it the history, then, that limits the constitutional concerns that might otherwise be present? Because I don't take you to be arguing that Congress could replicate this function in other areas and create nonofficers who exercise significant authority but do so for a limited time in, say, foreign affairs or commerce or whatnot.  You're grounding it on this mechanism matches historical analogues that are sufficiently close, and that shows that there can't be an appointments problem?

MR. WINIK:  That's right.  Our argument is specific to qui tam litigation, and I've been speaking mainly in terms of the vesting and take-care clauses.  But just very briefly on appointments, the straightforward reason for rejecting Janssen's argument on the appointments clause is that relators do not occupy a continuing office.  And what continuing means and doesn't mean -- I want to be precise about that, if I may

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 39

have just a moment to do that.

What we mean by continuing is what Chief Justice Marshall meant by it in Maurice, that one of the basic requirements of an office is that the duties continue even though the person occupying it be changed. That's how you know they are duties of the office and not of a person. And that basic feature of an office is lacking in the False Claims Act, which says expressly that when someone brings an action under the qui tam provisions, no person other than the Government can intervene --

JUDGE MATEY: I think it's interesting that the Article 2, Section 2 uses "officer", not "office". And so I might understand your argument as to office, but one can be an officer in both common understanding and constitutional theory without actually having an office they correspond to, right?

MR. WINIK: I don't think that's correct, Your Honor. I think an officer is someone who occupies an office, and a relator does not occupy an office because the role of a relator, which is the role of pursuing a particular qui tam action, cannot be handed off to any other relator. Indeed the statute is express in saying it cannot. And that's what we mean by continuing. What we --

JUDGE MATEY: Other than case law, though, what's the best answer as to why that's the only definition of an officer that could be understood as controlling here? I certainly

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 40

think it's a fair reading, right?  But some of that does come from the cases that this has arisen under, right?  I mean, Lucia and Freytag and Morrison.  And they were all dealing with specified offices, but does that mean that the court meant us to limit our understanding of Article 2 to only those kinds of concepts?

MR. WINIK:  So we certainly don't agree that -- we certainly don't think that's the only requirement for something to be an office.  There are many others addressed in those other statutes -- addressed in those other cases.  But the relevant cases for this, the most relevant cases, are Germaine and Auffmordt.  Not many of the modern cases, all of which, as Your Honor has noted, deal with things that clearly were offices within the governmental workforce.  And the question was whether the people had been appointed in a way corresponding to their powers.

But Germaine and Auffmordt are the relevant ones.  The Supreme Court dealt there with civil surgeons in Germaine, appointed on an ad hoc basis to conduct pension examinations.  In Auffmordt it was about merchant appraisers to conduct customs appraisals.  And in both cases, statutes created those roles.  Statutes gave them a function in the statutory scheme, just as is true with relators.

But the Supreme Court said those are not officers because they are ad hoc roles.  They are fundamentally personal

Page 41

roles as opposed to continuing offices.  That is the basic reason why relators are not officers within the meaning of the appointments clause.

JUDGE MATEY:  All right.  Thank you, Counsel.

MR. WINIK:  Thank you, Your Honor.

JUDGE MATEY:  Mr. Frederick?

MR. FREDERICK:  Thank you, Judge Matey.  And may it please the Court, David Frederick, for relators.  I'd like to start with Judge Matey's questions on materiality, and then Judge Chung, go to your questions about the falsity and causation elements.

Judge Matey, you're absolutely right.  This is a jury question.  And the issue about the Government funding was actually answered by the theory of the case.  This is an historical fraud that occurred between 2006 and 2014.  During that period, Janssen falsely misrepresented the safety profile of its drugs to a critical subset of HIV patients.  And by misrepresenting the dangers associated with Prezista and Intelence, it increased its sales.

And those increases in sales led to Government reimbursements because HIV drugs are typically covered by government payors because of the nature of the patient population that have particular needs.  And so the Government issue about continuing to pay for Prezista and Intelence that they're asserting is beside the point.

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 42

Why?  The fraud stopped in 2014.  The relators left the company in 2013 and 2014.  Their firsthand knowledge ended at that point.  Also, Risperdal had been a drug that Janssen had also been gone after by the Government for falsely representing the safety characteristics of Risperdal.  By 2014, there was a corporate monitor, a series of corporate monitors, installed at the company to stop the very off-label marketing that was causing doctors to prescribe drugs that should not have been prescribed.

So Judge Matey, when you ask about materiality, the jury had all of this information in front of it.  Materiality is a classic jury question.  Escobar talks about the Government's actual knowledge and continuing to pay.  But we're in a situation where the Government didn't actually have the knowledge.  The claims had not been pursued to trial.  They were allegations by the relators.  This was under seal.

And so the period of the fraud ended up stopping while the Government had the case under seal.  And it was only until the jury exercised that the Government got the full range of the evidence about the medical reasons why these were not appropriate drugs.

Now, Judge Chung, you asked about falsity, and I want to make sure that you understand our theory of the case, which is that the doctors were being hoodwinked into mis-prescribing drugs that were not appropriate for those patient populations.

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 43

And that led to a subset of increased sales and reimbursements. If you look at the 2005 CMS manual, which was introduced through the cross-examination of their expert, Dr. Jena, and this is at appendix 3235 and 3250, CMS makes absolutely clear these will not be drugs that are reimbursed if they are not for reasonable and necessary indications.

The medical testimony at the case through Dr. Glatt, was that these can't be for reasonable and necessary indications because the label says don't have this for patient treatment-naive patients, those who had not taken an HIV medication before. And that's for both drugs. And for Prezista, those patients -- and thirty percent of them had lipid conditions -- should not be prescribed Prezista because it has a lipid effect. There's an alternative drug, Reyataz, that was available that didn't have the adverse, lipid effect.

So what Janssen was doing was going out through many promotional opportunities to doctors, 5,000 doctors, and telling them falsehoods about the medical effects of their drug to get them to write. Now, Dr. Shaked, in his statistical analysis, had taken data that had been scrubbed through Mr. Dew and that had been influenced in terms of the medical coding by Dr. Glatt, to isolate every single one of the doctors that Janssen had influenced.

They had their codes, and they knew what they wrote the prescriptions for. They knew that the conditions, based on

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 44

data they had gotten from three large pharmacies, that these were not for the conditions that the patients had. They then took all of that information and coding, went to the CMS database, and they went through millions, hundreds of millions of records to determine where was the uplift in sales.

And so Dr. Shaked has a very interesting Venn diagram, and I want to direct you to the appendix at 2470, where he shows the subset of the sales that were reimbursed in the universe of off-label marketing, that he did not control for because they were not part of the influenced doctor population, and then part of the entire universe of the sales of these two drugs. And what was very clear to the trial court, after taking two Daubert challenges to Dr. Shaked and rejecting them, was that this was a perfectly valid method of isolating the causative element of the improper marketing by Janssen to these doctors.

JUDGE MATEY: So can you elaborate, then, on the standard of causation that the jury was instructed on? They did not, as near as I can read, hear an explanation of the causal standard that was relevant here. They heard the phrase "substantial factor", but they didn't hear that "but for" is part of that, nor did they hear what "substantial factor" really means. So what do you make of that instruction?

MR. FREDERICK: No error here. And in fact, there hasn't been a -- there's been an improper waiver of the "but

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 45

for" argument that they make.  The jury was properly instructed

under this Court's Zimmer case -- it's U.S. ex rel. Schmidt v.

Zimmer -- that substantial factor is the appropriate causation

standard.  Janssen has been talking about "but for", but let's

be very clear about what they wanted.

They wanted an instruction that the jury would have to

find doctor by doctor by doctor that there had been improper,

false claims attributed to that doctor's prescriptions.  That

has never been the law.  The law in the Third Circuit has

always been substantial factor causation.  And the evidence at

trial through Sillup, Shaked, and Dew show that doctors that

were targeted by Janssen prescribed much more Prezista and

Intelence than their peers.

In fact, the peers who had not been influenced had a

median score of zero, meaning that if you were not influenced

by Janssen in this improper campaign, it was almost -- very

unlikely at all that you would be writing one of these

prescriptions.  And so the evidence, Your Honor, was ample that

the jury would have been entitled to conclude that Janssen's

false, promotional activities were a substantial factor because

it was a reasonable and natural cause.  And if you were to take

it, even at the level --

JUDGE CHUNG:  I think that goes -- I see where you're

saying that that is sufficient evidence, but there does seem to

me to be a legal component regarding one of the assumptions,

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 46

which your colleague already discussed, which is that all off-label prescriptions by noninfluenced doctors could be said to be a cause. Now again, certainly the evidence seemed to show that many or even most of the off-label prescriptions by influenced doctors were caused by marketing. But given that noninfluenced doctors also wrote eleven percent of their prescriptions off-label, it seems weird to say that but twenty-two percent, the entire twenty-two percent, of off-label prescriptions were caused by marketing.

MR. FREDERICK: Well, the eleven percent that you allude to is an average. It is not the median score. And I think to the extent --

JUDGE CHUNG: Sure. I understand that --

MR. FREDERICK: That's statistically quite important because statistically the average was distorted in ways --

JUDGE CHUNG: That doesn't mean you could -- I guess I'm saying as a legal matter, though, I'm not seeing that that means that every single drug in that twenty-two percent can be legally said to have been caused.

MR. FREDERICK: Here's where the evidence actually is our friend. And this is an evidentiary question because --

JUDGE CHUNG: Sure. Okay.

MR. FREDERICK: -- they forfeited their "but for" argument, and they asked for the wrong standard for causation and didn't properly preserve it.

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 47

JUDGE CHUNG:  Okay.

MR. FREDERICK:  So you've got multiple waiver problems on the causation instruction --

JUDGE CHUNG:  Can I ask you then --

MR. FREDERICK:  -- but --

JUDGE CHUNG:  Oh, sorry.

MR. FREDERICK:  I would like to answer --

JUDGE CHUNG:  Oh, the --

MR. FREDERICK:  -- the question --

JUDGE CHUNG:  Okay.

MR. FREDERICK:  -- though on the facts --

JUDGE CHUNG:  Uh-huh.

MR. FREDERICK:  -- which is that what Dr. Shaked did was he determined, in very precise ways, the more contacts the doctors had, the more they prescribed; the more money that was thrown at the doctors, the more that they --

JUDGE CHUNG:  I'm just aware we have limited time. And I assure you, I have read this record very well, including Dr. Shaked's testimony and his expert report.  So I just want to ask you about falsity.

It seems to me that by your own expert's evidence, Dr. Glatt, that in order for a lipid claim to be false, meaning legally false, not only would the patient have to have some kind of lipid issue, but they would have to not suffer from a jaundice susceptibility or a Reyataz resistance.  And I'm not

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 48

saying -- so in order to be false meaning, by your argument, reasonable and necessary, you would also have to have some evidence that the claim is not for someone who has jaundice or is Reyataz resistant.

MR. FREDERICK:  Well, Your Honor, I think your question goes to a number of different things.  And let me try to --

JUDGE CHUNG:  Okay.

MR. FREDERICK:  -- unpack them, and feel free to interrupt me if I don't get the answers that you are looking for.  What he testified to was that doing these prescriptions for Prezista to the lipid-conditioned people was a not reasonable and necessary prescription.  Why?  Reyataz didn't have the same lipid effect, okay?  What Iacobellis testified was that they were targeting those very patients, and thirty percent of the HIV patients who needed these had lipid conditions.  It's --

JUDGE CHUNG:  But I'm just asking as a matter of what the testimony was.  The testimony was it is reasonable and necessary for a patient, even if they have a lipid condition, if they have a jaundice condition or a Reyataz resistance.  So in order for it to be false, that patient had to not suffer -- in other words, for it not to be reasonable and necessary, they would not -- I'm just trying to get to just what is a false claim.  And it seems by your expert's own testimony, it is

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 49

reasonable and necessary to prescribe this to someone with a lipid condition if they have jaundice susceptibility or Reyataz resistance.

MR. FREDERICK:  And what Dr. Glatt testified to is -- and I don't have the cite for this --

JUDGE CHUNG:  Uh-huh.

MR. FREDERICK:  -- was that it was -- the jaundice was a very small percentage.

JUDGE CHUNG:  Five percent, he guessed.

MR. FREDERICK:  I believe that Dr. Shaked factored that out and took those out.  Shaked's --

JUDGE CHUNG:  I did not see any testimony to that effect.

MR. FREDERICK:  Well, the way the modeling and the testing worked was intended to scrape out those where there could be any question and --

JUDGE CHUNG:  But can you point to anything in the record that that was presented to the jury that they could --

MR. FREDERICK:  Well, the question before you, I think, is whether the jury would have been entitled to find false claims.  And what the jury ended up finding was that there was a subset of the totality of the evidence presented.  So on appeal the question is not is there testimony as to a certain subset?  The question is, is the verdict supportable by the evidence in the record?

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 50

The answer is yes, because the jury came in with a number that was lower than what we had presented at trial, and there was evidence that there were these various factors. They may well, Judge Chung, have been the kinds of things that influenced the jury not to come up with the maximum number of violations that we thought we proved, because the jury came in at roughly half of the number of violations.

JUDGE CHUNG: Okay. Can I ask you --

MR. FREDERICK: And so --

JUDGE CHUNG: -- something else? But I take your point. They only found like thirty percent of the --

MR. FREDERICK: Correct.

JUDGE CHUNG: -- submitted claims. But for ADAP, you identify 45 CFR 75.403(a). I mean, these numbers are crazy for these, but you point to that as the reason that ADAP required that prescriptions be reasonable and necessary, but my read of that CFR is that it was not effective until December 19th, 2014, the very end of your claims period or your action. So could you speak to that?

MR. FREDERICK: Yes. I would start with the 2005 CMS manual --

JUDGE CHUNG: Okay.

MR. FREDERICK: -- which covered also the ADAP program. And the reason why I started with the 2005 CMS manual is because it said that these will not be reimbursed unless

Page 51

they are reasonable and necessary.  The policy clarification notices, one was in 2007 that would have covered the period in question.  And the particular regulation that you're referring to, Your Honor, can't override the statute which says that for these particular 340B purchasing decisions, they have to be for reasonable and necessary indications.

JUDGE CHUNG:  And I'm only bringing it up because it was cited as authority for ADAP's requirement by you.

MR. FREDERICK:  Right.

JUDGE CHUNG:  And --

MR. FREDERICK:  And what I'm saying is that there were other authorities that helped to --

JUDGE CHUNG:  From the CMS manual.

MR. FREDERICK:  Correct.

JUDGE CHUNG:  But the CMS manual pages you're addressing simply refer back to the statutes, and the statutes are permissive for reasonable and necessary for both Medicare Part D and Medicaid.

MR. FREDERICK:  No, not if they are not reasonable and necessary.  What the manual says at the pages that I cited --

JUDGE CHUNG:  Okay.  Uh-huh.

MR. FREDERICK:  -- is that they will not be reimbursed.  The statute provides permissiveness as to -- for certain kinds of drugs, there's permissive structure there, but the drugs must be reasonable and necessary.  And the unrefuted

Page 52

testimony in the case from Dr. Glatt was that these were not reasonable and necessary prescriptions.

JUDGE CHUNG:  And when you're talking about the manual, are you still talking about 3250 in the record or what?

MR. FREDERICK:  Yes.

JUDGE CHUNG:  Okay.

MR. FREDERICK:  And I want to point out that they use a manual that they've cited on appeal that postdates the period in question, and so I think that should be completely disregarded as not relevant.  The manual that we're talking about is one that would have covered the entire period in which this fraud occurred.

Now, I want to make sure that I touch on other aspects of falsity.  Virginia Evans' unrebutted testimony was that no federal payor would cover where the uses had not been properly satisfied.  That's at page 1502 in the record.  And the jury's instruction at 19.1 has never been challenged.  What is falsity?  "Falsity" is if it is not reimbursable.

So you have testimony from Evans.  You had testimony from Mattis (ph.), who was the CEO, saying, we know that it's not legal and can't be reimbursed if these are done.  And you had two settlements.  You had Risperdal and a drug called Topamax, where the company knew that the Government was not going to reimburse these particular claims, and the jury would have been entitled to conclude that if these were not medically

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 53

accepted indications or reasonable and necessary, they wouldn't be reimbursed.

And that's why when Dr. Glatt testifies to the medical conditions, it's unrebutted. Janssen's got access to 5,000 doctors, and none of them came to testify about how these drugs actually helped the people in these particular conditions, which I think would have said a lot to the jury about the medically accepted indications that Prezista was not suitable for. And the fact that the company had already done this and been caught and paid a huge fine goes both to the knowledge and to the causation that this very same uplift in sales had been dramatically affected by this.

Now, the corporate integrity agreements that I just mentioned were also amplified by multiple sales representatives from all over the country who knew that the Government would not reimburse for these claims. And even Patel, their chief compliance officer, admitted that that also included dosing. So the twice-a-day versus once-a-day issue also was covered amply by the Government's own documents.

JUDGE CHUNG: That sounds more like a legal question rather than a sufficiency of the evidence. The reason I bring that up is because the statutory language is that the items are -- if they are not reasonable and necessary for the treatment of an illness. So the emphasis is on the items.

And so for instance, if I'm prescribed, like, a

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 54

walker, one walker could be, as an item, reasonable and necessary for my treatment.  Five walkers, probably walkers 2 through 5 are not reasonable and necessary for my treatment.  But the testimony, even by your experts, is that two Intelence pills a day is reasonable and necessary.  So if they're spread out, that doesn't seem to be addressed by the plain language of the statute.

MR. FREDERICK:  The prescription, though, was written for once-a-day usage, and that's where the misrepresentation --

JUDGE CHUNG:  For two pills, which there's two -- the item we're talking about is two Intelence pills.

MR. FREDERICK:  But the prescription, and this is where we went to the pharmacy records -- we had to subpoena them to get them -- indicating that the doctors were writing for once-daily uses.  So the --

JUDGE CHUNG:  Once daily but two pills?

MR. FREDERICK:  Exactly.  And that increased the toxicity to the patient --

JUDGE CHUNG:  Well, I'm not saying it's reasonable and necessary in that dosing, but that's not the language of the statute.  The statute seems to be, is the item --

MR. FREDERICK:  No.

JUDGE CHUNG:  -- which is two Intelence pills --

MR. FREDERICK:  Fundamentally, I think that's incorrect, Judge Chung.  Respectfully, the question is whether

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 55

it is reasonable and necessary for the indication.  And creating toxicity risks or a lack of medication later in the day risks is a huge problem that Dr. Glatt testified to.

And if I could just end my time, I'm happy to take any of your questions, of course, but I want to make sure I address the Government.  The Government doesn't contest that we had ample evidence to support the verdict.  The Government's quibbles are with one page of the District Court's post-trial opinion, in which the judge put falsity to the end and had discussed materiality and causation before then.

It's very clear in context when the judge is talking about this off-label marketing, he's doing it in the context of the evidence of the case, which showed that there was an effect on reimbursability and off-label marketing that had misrepresented the safety characteristics of the drug.  And so in a situation where you're asked to review a nonpublished, District Court opinion upholding a jury verdict, you are well within your power, under the Petratos case, to affirm on any basis in the record, and there is ample evidence to support the jury's verdict and the judge's conclusion that that verdict should not be disturbed.  I'm happy to answer any other questions you have.

JUDGE MATEY:  Thank you, Counsel.  We appreciate the argument.

Mr. Mosier?

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 56

MR. MOSIER:  So I want to start with the error in the post-trial ruling that we just heard was something that you could overlook and wasn't important to the decision.  What the court held on falsity is that off-label marketing violates a, quote, express condition of payment for reimbursement.  It didn't reach a similar holding with respect to medically accepted indication.  It didn't even address reasonable and necessary.

And if you look at medically accepted indication, the court did say that there is evidence on which a jury could find once-a-day dosing in treatment-naive patients were not for medically accepted indications, it didn't say that about lipids.  If you look at Dr. Shaked's testimony, lipids were over ninety percent of the claims.

And the reason the District Court didn't say that, the reason the District Court couldn't have said that, is the testimony from Dr. Glatt that Judge Chung pointed to.  The record was clear that both Prezista and Reyataz are preferred drugs.  There are some circumstances in which Prezista would be prescribed over Reyataz.  Jaundice is one, resistance thing.

So their own expert recognized that it would be reasonable and necessary to prescribe Prezista even with somebody for elevated lipids.  With respect to medically accepted indication that Dr. Glatt recognized, there's no limitation in the FDA-approved indication for lipids.  So

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 57

lipids is a medically accepted indication.

In opposing our motion for judgment as a matter of law, they conceded that and said we've never suggested that lipid conditions is not for medically accepted indication.  So it was accepted that the prescriptions, ninety percent of the prescriptions at issue in the case, were for a medically accepted indication.

That's why it was so critical, the move that the District Court made to say why the claims are false is because there was a express condition of payment related to off-label marketing.  No one defends that statement.  No one thinks there's an express condition of payment related to off-label marketing.

The question is whether was there an implied condition of payment?  The Government says no.  And I want to talk about some of the Government's points, because I don't think we're as far apart as they suggested.

We are not saying that off-label marketing could never lead to False Claims Act liability.  Off-label marketing is relevant to causation.  But the question when it comes to falsity and materiality is what representation was made in the claim to the Government.  Was that representation false, and was that representation material to the Government's payment decision?

What I was saying about -- the Government's position

Page 58

is that there was no falsity because there is no implied certification or representation to Medicare or Medicaid related to off-label promotion, because that is just not something that the healthcare payers look at.  If that's their position, which we agree with, that there is no certification, no representation to the Government related to marketing when it comes to reimbursement, that means that they can't establish falsity based on off-label marketing, which is what the Government says.

Our point is just the logical consequence of that is it means they also can't establish materiality based on off-label marketing.  If there is no representation of the first place related to off-label marketing, there can't be a false representation and there can't be a materially false representation.

So I wasn't meaning to suggest that the Government, in their brief, took the same position as to us on materiality. They're very explicit.  And they said it here again, that they aren't addressing materiality, but the logic of their position is that there's no representation made to the Government about off-label marketing.  It can't be false.  It can't be material.

We see all the logic of that position play out, Judge Chung, when you asked about the jury instruction on materiality.  They said, we haven't taken a position on materiality, but yes, based on our position of falsity, that

Page 59

would be an incorrect instruction on materiality because it links it to the off-label promotion.

I want to address the ADAP provision. The part D manual applies to part D. That's why they call it the part D manual. It doesn't address ADAP. The provisions they point to to try to establish certifications for ADAP relate to ADAPs, which is a joint, state-federal program -- they point to the -- for medically accepted indication, they point to a provision that says that ADAP programs can access discounted pricing like a 340B. That's not something a doctor or a physician or pharmacy would be certifying, whether or not an ADAP program can get access to discounted prices.

And on reasonable and necessary, they point to provisions that ADAP programs themselves, as receiving federal funds, have to make sure that their expenses are reasonable, but that's not something that somebody submitting a claim would be certifying to. So they don't have any basis to establish any requirement for ADAP other than the statutory requirement. You have a diagnosis of HIV or AIDS; you fall below a certain income level. Those are the only two things that are required to get coverage under ADAP. There's no basis beyond that.

I guess I see my time. If I could just wrap up briefly with the consequences and the logical consequences of accepting this position, that off-label marketing itself to a physician necessarily would render claims false. The result

Jessica Penelow; Christine Bancaccio v. Janssen Products, L.P.

Page 60

would mean that tens of thousands of patients who have HIV who are prescribed HIV drugs, should be and should have been denied coverage under federal health care programs access to these life-saving drugs.  I think there's a reason why the Government says off-label promotion enough alone should not be enough, because that is not what the programs take into account when they decide whether to reimburse for drugs.  Thank you.

JUDGE MATEY:  Thank you, Counsel.  Court will ask that a transcript be prepared.  Cost to be split by the parties. With that, the Court is adjourned.

(Whereupon these proceedings were concluded at 11:40 AM)

Page 61

C E R T I F I C A T I O N

I, Connie West, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

Connie West (CDLT-287)

TTA-Certified Digital Legal Transcriber

eScribers

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

Date:  March 26, 2026

**&**

**&** 2:3,20

**1**

**1** 5:22 25:13
**10,000** 33:15
**10:24** 1:16
**10th** 2:5
**11:40** 60:11
**12** 34:18
**1502** 52:16
**1615** 2:22
**16th** 61:14
**17** 7:10
**18** 1:15
**19.1** 52:17
**19104** 2:13
**1986** 19:22
 27:13
**19th** 50:17

**2**

**2** 19:11 20:4
 23:15 24:21,25
 25:3,12 26:9
 27:8,16 28:11
 28:24,25 29:13
 29:17 31:17
 34:6,16 36:1,4
 39:12,12 40:5
 54:2
**2's** 19:15
**20** 25:16

**20001** 2:7
**20036** 2:24
**2005** 43:2
 50:20,24
**2006** 13:15
 41:15
**2007** 51:2
**2012** 9:24
 13:16
**2013** 42:2
**2014** 41:15
 42:1,2,5 50:18
**2026** 1:15
 61:17
**20530** 2:18
**207** 61:14
**2470** 44:7
**25-1818** 1:7 3:3
**26** 61:17
**287** 61:10
**2929** 2:11

**3**

**3** 24:18 35:22
 36:4
**3235** 43:4
**3250** 43:4 52:4
**340b** 51:5
 59:10

**4**

**400** 2:23
**45** 50:14

**5**

**5** 54:3
**5,000** 43:17
 53:4
**50/50** 15:17

**7**

**7227** 61:14
**75.403** 50:14

**8**

**8** 6:1,10 24:21
**850** 2:5
**85020** 61:15

**9**

**9** 6:1,10
**950** 2:17

**a**

**ability** 18:13
 21:19
**able** 15:21
**absence** 10:24
 11:1 17:1,7
**absolutely**
 12:20 22:6
 41:12 43:4
**abundant**
 34:20
**abuse** 28:1
**abused** 27:11
**abuses** 27:9
**abusive** 28:3
**accepted** 4:12
 4:19 6:22 7:10

7:23,25 8:3
 17:23 30:16
 34:21 53:1,8
 56:7,9,12,24
 57:1,4,5,7 59:8
**accepting**
 59:24
**accepts** 23:3,17
 23:17
**access** 53:4
 59:9,12 60:3
**account** 5:5
 9:23 10:2 60:6
**accountability**
 19:16,19
**accounted**
 12:12
**accounts** 15:20
**accurate** 61:5
**acknowledged**
 12:13
**act** 17:8 20:9
 22:9,10 26:12
 29:11 30:11
 31:1,3 32:25
 33:8 36:9,15
 36:24 37:19,21
 38:2 39:7
 57:19
**acted** 32:19
**acting** 27:17
 37:25
**action** 11:9,10
 37:12 39:8,20

50:18
**activities** 45:20
**actual** 11:16
  12:18 16:19
  32:19 42:13
**actually** 15:14
  17:25 23:6
  27:24,25 33:7
  39:15 41:14
  42:14 46:20
  53:6
**ad** 40:19,25
**adams** 36:19
**adap** 3:16 5:5
  50:13,15,23
  59:3,5,6,9,11
  59:14,18,21
**adap's** 51:8
**adaps** 59:6
**add** 17:6
**address** 30:1
  55:5 56:7 59:3
  59:5
**addressed** 6:24
  31:14 32:5
  40:9,10 54:6
**addresses** 4:6
**addressing**
  30:6,19 32:23
  51:16 58:19
**adequately** 7:5
**adjourned**
  60:10

**adjudicated**
  36:14
**administrative**
  17:17
**admitted** 53:17
**adopt** 18:14
**adoption** 20:8
**adopts** 18:6
**adverse** 43:15
**advisory** 35:6
**affairs** 38:15
**affected** 13:11
  53:12
**affirm** 31:10
  55:18
**affirmed** 3:18
  8:10,11
**agencies** 18:19
**agnostic** 21:11
**ago** 9:13
**agree** 3:9 4:7
  5:3,12 37:9
  40:7 58:5
**agreements**
  18:11 53:13
**agrees** 3:17 4:3
  31:5
**ahead** 33:21
**aids** 59:19
**allegations**
  9:12,25 42:16
**alleged** 31:23
**alleging** 21:14

**allow** 17:15
  18:20 37:13
  38:5,7
**allowed** 28:3
  37:15
**allude** 46:11
**alternative**
  43:14
**alternatives** 9:3
  9:8
**america** 2:16
**american** 26:25
  34:17
**amici** 19:9
**amicus** 2:16
  30:3
**amount** 17:5
  27:10
**ample** 45:18
  55:7,19
**amplified**
  53:14
**amply** 53:19
**analogous**
  20:24
**analogues**
  37:11,13,15,16
  37:20 38:16
**analysis** 43:20
**anecdotal**
  35:17,21
**answer** 9:4
  30:4 37:8,20
  39:24 47:7

50:1 55:21
**answered**
  41:14
**answers** 23:4
  48:10
**antitrust** 34:9
**anybody's** 28:5
**anymore** 16:12
**apart** 11:18
  36:25 57:17
**appeal** 11:14
  49:23 52:8
**appeals** 1:2,12
**appellant** 1:9
  2:4,10 19:10
**appellants**
  22:25
**appellate** 2:15
**appellee** 2:16
  2:21
**appendix** 43:4
  44:7
**applied** 9:7
  24:10 25:9
**applies** 11:24
  59:4
**apply** 10:15
  17:3 18:6 31:6
  31:9
**appointed**
  19:14 40:15,19
**appointment**
  21:10 28:10

**[appointments - brief]** Page 3

**appointments** 19:15 20:11,17 21:11,23 22:17 29:18 38:18,22 38:23 41:3

**appraisals** 40:21

**appraisers** 40:20

**appreciate** 55:23

**appropriate** 37:10,13,14,16 38:4 42:21,25 45:3

**approved** 30:15 56:25

**arch** 2:11

**areas** 38:13

**argue** 10:8

**argued** 11:24

**arguing** 6:2,3 14:9,10 26:20 38:12

**argument** 3:2 4:18 5:21 6:7 7:14 12:3 28:19 32:14 38:19,23 39:13 45:1 46:24 48:1 55:24

**arguments** 24:3

**arianna** 1:20

**arisen** 40:2

**article** 19:11,15 20:4 23:15 24:18,21,25 25:3,12 26:9 27:8,16 28:11 28:24,25 29:13 29:17 31:17 34:6,16 35:22 36:1,4,4 39:12 40:5

**aside** 36:5

**asked** 5:16 42:22 46:24 55:16 58:23

**asking** 9:2 32:7 32:10 33:3,4 37:18 48:18

**aspects** 52:13

**asserting** 41:25

**associated** 41:18

**assumption** 13:9,24 14:2,7 15:18,19

**assumptions** 12:5,25 13:1,1 13:3 15:22 45:25

**assure** 47:18

**attention** 36:20 38:3

**attorneys** 2:4 2:10,16,21

**attributed** 15:6 15:19 45:8

**auffmordt** 40:12,17,20

**authorities** 51:12

**authority** 20:15 20:17 29:11 38:14 51:8

**authorize** 34:8

**authorized** 32:23 33:24 37:2

**authors** 36:16

**automatically** 26:11

**available** 19:1 43:15

**avenue** 2:17

**average** 46:11 46:15

**aware** 47:17

**awareness** 9:10

**az** 61:15

**b**

**b** 1:18 17:24 18:5,5

**back** 3:20 7:21 8:6 15:6,15,19 17:10 26:24 27:11,24 51:16

**bankruptcy** 22:10,10

**based** 3:10 6:1 6:18 7:20 9:20 43:25 58:8,11 58:25

**basic** 39:3,7 41:1

**basis** 5:6 27:23 35:11 40:19 55:19 59:17,21

**behalf** 3:5 19:9 19:14,20 22:9 24:7 29:1,17 37:2

**believe** 49:10

**best** 20:1 39:24

**better** 21:21

**beyond** 59:21

**big** 25:1

**body** 36:3 37:9 37:20

**bothered** 26:17

**bounty** 25:20 25:23 37:12

**brancaccio** 1:6 2:21

**branch** 27:3,5 27:15 34:21

**break** 24:23

**brian** 1:19

**brief** 6:11,15 6:24 7:7 8:21 9:17 16:7

25:16 31:14,16
32:18 58:17
**briefing** 22:8
**briefly** 30:6
31:12 34:24
38:21 59:23
**briefs** 4:14
**bring** 21:14
34:8,14 37:2
38:2 53:21
**bringing** 51:7
**brings** 39:8
**broad** 18:20
**broader** 24:4
**broadly** 19:1
**brought** 27:10
34:10 36:14,17
**bruen** 25:13
**buckley** 20:16
**burling** 2:3

**c**

**c** 2:2,25 3:1
61:2,2
**call** 13:4 59:4
**called** 20:23
52:22
**campaign**
45:16
**care** 9:3,7,22
13:21 14:20
19:12 22:18
29:19 34:7
38:21 60:3

**careful** 32:22
33:5,19
**carefully** 6:8
19:15
**carve** 37:4
**case** 1:6 3:3,18
3:20,24 4:25
5:1 6:12 7:16
7:19 8:21
20:25 21:13,18
21:19 22:6,8,9
22:11,12,22
23:3,3,18 25:2
28:12,23 29:3
29:10,14,14
30:24,24 33:8
35:1,4,10,12
39:23 41:14
42:18,23 43:7
45:2 52:1
55:13,18 57:6
**cases** 10:14
22:4 27:20
35:2,9 40:2,10
40:11,11,12,21
**caught** 53:10
**causal** 44:20
**causation** 7:4,4
10:6,8,13,19
11:16,23 12:3
12:8,18,19
13:13 15:24
16:6,14,24
41:11 44:18

45:3,10 46:24
47:3 53:11
55:10 57:20
**causative** 44:15
**cause** 10:11,16
10:20 11:8,11
11:14 13:16
16:19,20,24
17:6 30:11
37:12 45:21
46:3
**caused** 13:23
33:17 46:5,9
46:19
**causes** 11:25
**causing** 33:1,6
33:8,10,12
42:8
**cdlt** 61:10
**center** 2:6
**centre** 2:12
**ceo** 52:20
**certain** 49:24
51:24 59:19
**certainly** 7:24
8:14 10:20
28:12 29:13
31:1,2 36:22
37:9 39:25
40:7,8 46:3
**certification**
6:18 58:2,5
**certifications**
59:6

**certified** 61:11
**certify** 61:4
**certifying**
59:11,17
**cetera** 22:4
**cfr** 50:14,17
**chadha** 26:14
26:15
**challenge** 11:13
22:25,25 25:8
25:8,8,9 28:9
28:13,13 34:25
35:1
**challenged** 7:9
52:17
**challenges**
44:13
**chamber** 2:10
**change** 17:17
17:18 20:25
**changed** 14:16
39:5
**characteristics**
42:5 55:15
**charged** 19:12
**chief** 36:18
39:2 53:16
**chiefly** 34:13
**choice** 29:6
**chosen** 4:10
**christine** 1:6
**chung** 1:21
5:20 6:2 10:4,6
10:8,17,22

11:3,6,11,15,18
12:2,12,21
13:19 14:4,6,9
14:19,22 16:16
18:2,4,9 22:24
23:9,11,16,25
24:3,15,19,22
24:24 25:7,17
25:25 26:19
31:18,20 32:1
32:7,10,16
33:3,10,12,20
33:22 34:1,4
34:25 41:10
42:22 45:23
46:13,16,22
47:1,4,6,8,10
47:12,17 48:8
48:18 49:6,9
49:12,17 50:4
50:8,10,13,22
51:7,10,13,15
51:21 52:3,6
53:20 54:10,16
54:19,23,25
56:17 58:23
**chung's** 28:9
28:18
**cindy** 1:21
**cira** 2:12
**circuit** 1:3,22
16:8 45:9
**circuit's** 27:21

**circumstance**
11:24 35:14
**circumstances**
8:18 23:1,12
23:19 24:10
28:19 56:19
**cite** 6:11,12
16:7 49:5
**cited** 51:8,20
52:8
**citizen** 24:6
**city** 2:6
**civil** 2:15 27:9
40:18
**claim** 4:12,25
6:6 7:20,25 8:2
32:1,3,12,21
33:2 36:24
47:22 48:3,25
57:22 59:16
**claims** 3:23
6:21,21 8:19
9:16,20 10:1
17:12 19:20
27:10 30:11,22
31:1,3 32:25
37:19,21 38:2
39:7 42:15
45:8 49:21
50:13,18 52:24
53:16 56:14
57:9,19 59:25
**clarification**
17:13 51:1

**classic** 42:12
**clause** 19:15
20:12,17 21:11
21:23 22:17,18
29:18,19,19
34:7 38:23
41:3
**clauses** 38:21
**clear** 18:19
27:16 28:24
30:9 43:5
44:12 45:5
55:11 56:18
**clearly** 5:23
8:24 40:13
**close** 38:17
**closely** 20:23
**cms** 18:25 43:2
43:4 44:3
50:20,24 51:13
51:15
**codes** 43:24
**coding** 43:21
44:3
**coin** 29:20
**coke** 28:2
**colleague** 46:1
**come** 12:2
15:13 21:3
27:2 40:1 50:5
**comes** 17:24
23:13 57:20
58:7

**coming** 7:21
8:6
**commerce** 2:10
38:15
**common** 11:22
16:3 39:14
**companies**
22:21 30:25
**company** 30:10
42:2,7 52:23
53:9
**complaint** 38:2
**completely**
52:9
**compliance**
53:17
**component**
45:25
**conceded** 6:20
57:3
**concept** 16:19
**concepts** 40:6
**concerns** 38:11
**conclude** 45:19
52:25
**concluded**
60:11
**conclusion** 5:14
15:11 55:20
**concurrent**
11:25
**condition** 48:20
48:21 49:2
56:5 57:10,12

57:14
**conditioned**
48:12
**conditions**
43:13,25 44:2
48:17 53:4,6
57:4
**conduct** 38:3
40:19,20
**confusing**
16:10,13
**congress** 17:14
17:19 19:22
20:8,10,14,22
26:6,11,16
27:6,10,13,16
34:7,20 36:6,8
36:10 38:12
**congresses** 36:9
**connie** 61:4,10
**consensus**
35:18
**consequence**
58:10
**consequences**
59:23,23
**consider** 3:13
3:14 17:12
**consideration**
8:23
**considered**
27:20 30:13
**considering**
27:7

**consistent**
19:14 28:12
32:13 36:23
**constitutional**
20:3 24:1,2
26:12,21 30:1
30:4 31:16
36:14 37:3,21
38:11 39:14
**constitutional...**
27:20 35:2
**constitutional...**
34:22
**constructed**
14:14
**construction**
24:25
**contact** 13:25
**contacts** 47:14
**contest** 55:6
**context** 5:11
22:17 55:11,12
**continue** 10:1
24:8 39:4
**continued** 9:18
31:15
**continues** 8:16
22:9,10
**continuing**
20:18,25 21:19
22:2 38:24,24
39:2,22 41:1
41:24 42:13

**continuity**
13:21 14:20
**control** 37:22
37:24 38:7
44:9
**controlled**
19:21
**controlling**
39:25
**core** 19:19
**corporate** 42:6
42:6 53:13
**correct** 11:17
26:2,23 32:9
39:16 50:12
51:14
**correspond**
39:15
**corresponding**
40:16
**cost** 60:9
**counsel** 13:1
19:3,23 20:18
20:24 21:1,3,4
29:21 35:24
41:4 55:23
60:8
**counsels** 21:3
**count** 15:8,15
**country** 53:15
**couple** 9:5
31:18 37:8
**course** 21:11
31:19 34:5,5

55:5
**court** 1:2,12
3:5,19 4:3,4
5:24 7:1,5 8:7
8:11,14,14,15
9:7,8 10:12
19:9 20:2
24:20 26:17
29:25 30:17
31:4,6,8,9
34:18 35:5,10
35:22 36:18
40:4,18,24
41:8 44:12
55:17 56:4,10
56:15,16 57:9
60:8,10
**court's** 8:9 30:4
45:2 55:8
**courts** 17:4
34:21
**cover** 52:15
**coverage** 4:24
59:21 60:3
**covered** 41:21
50:23 51:2
52:11 53:18
**covington** 2:3
**crafted** 19:15
**crazy** 50:14
**create** 34:15
38:13
**created** 40:21

**creating** 55:2
**credit** 12:7
**criminal** 37:15
**critical** 4:17
  9:16 28:2
  41:17 57:8
**criticizing**
  35:20
**cross** 43:3
**customs** 40:21

**d**

**d** 3:1,16 4:22
  7:24 18:6,10
  18:11,13,15,17
  18:19,22 51:18
  59:3,4,4
**daily** 54:15,16
**dangers** 41:18
**daniel** 2:19
  29:25
**data** 43:20 44:1
**database** 44:4
**date** 61:17
**daubert** 44:13
**david** 2:25 41:8
**day** 53:18,18
  54:5,9 55:3
  56:11
**dc** 2:7,18,24
**deal** 22:3 40:13
**dealing** 40:3
**dealt** 40:18

**death** 22:8
**debate** 26:8,21
**decade** 9:13
**december**
  50:17
**dechert** 2:9
**decide** 24:13
  25:1,2 38:5
  60:7
**decided** 7:6 9:6
**deciding** 9:10
  24:21
**decision** 4:1,21
  5:3,18 8:9 15:5
  16:8 23:22
  24:18 27:21
  34:19 56:3
  57:24
**decisions** 3:13
  13:11 51:5
**declares** 21:17
**declined** 35:9
**deep** 34:19
**defect** 20:3
**defective** 28:11
**defends** 57:11
**defense** 19:25
**define** 17:3
**definitely** 6:4
**definition**
  39:24
**degree** 38:4
**deliberate** 20:4
  32:19

**deliver** 13:7
**delivering** 13:5
**denied** 4:24
  60:2
**department**
  2:15
**department's**
  19:23
**departure** 20:4
**describe** 16:23
**destroy** 19:18
**determination**
  15:7
**determine** 44:5
**determined**
  47:14
**deterring** 34:23
**development**
  34:17
**device** 19:22
**dew** 43:20
  45:11
**diagnosis** 59:19
**diagram** 44:6
**differ** 34:12
**difference**
  12:17 15:21
  25:1
**differences**
  34:15
**different** 9:15
  13:23 15:18,19
  15:21 16:3
  17:19,20 20:5

22:1 26:5
28:18 29:4
35:13 48:6
**differs** 37:19
**diffusion** 27:23
**digital** 61:11
**direct** 44:7
**disagree** 7:12
**disallow** 17:16
**discounted**
  12:6 59:9,12
**discretion**
  18:13
**discussed** 4:14
  46:1 55:10
**disfavor** 27:8
  28:1
**dismiss** 25:6
  38:6,9
**dismissal** 8:10
  22:11
**dismissed**
  35:11
**dismisses** 23:3
  23:17 25:4
  29:15
**dispositive**
  35:22
**dispute** 11:19
  31:7 36:2
**disputed** 9:9
**disregarded**
  52:10

**[dissent - escribers]** Page 8

dissent 26:15
distinction 7:8
distorted 46:15
district 7:1,4
30:17 31:6,8
55:8,17 56:15
56:16 57:9
disturbed
55:21
division 2:15
doctor 4:23
13:4,11,14
14:16,18,23
15:3,3,6,8,10
15:12,13,16
30:13 44:10
45:7,7,7 59:10
doctor's 45:8
doctors 12:13
12:15 14:17
30:10,11,25
42:8,24 43:17
43:17,22 44:16
45:11 46:2,5,6
47:15,16 53:5
54:14
documents
53:19
doing 24:15
27:14 31:8
43:16 48:11
55:12
dosing 53:17
54:20 56:11

dr 12:4,25
14:14,24 15:4
43:3,7,19,22
44:6,13 47:13
47:19,21 49:4
49:10 52:1
53:3 55:3
56:13,17,24
dramatically
53:12
drawn 10:11
draws 7:7
drug 15:11
18:6 33:15
42:3 43:14,18
46:18 52:22
55:15
drugs 18:20,23
19:1 41:17,21
42:8,21,25
43:5,11 44:12
51:24,25 53:5
56:19 60:2,4,7
duties 39:4,6

**e**

e 1:18,18 2:2,2
3:1,1 61:2
earlier 13:17
early 20:5,8
25:20 26:16
27:2,19 29:15
36:8 37:23

effect 43:14,15
48:14 49:13
55:13
effective 50:17
effects 43:18
egregious 29:7
eight 13:4,12
eighty 25:18
either 4:15
16:22,23 24:13
29:18
elaborate 44:17
elective 18:2,3
element 3:23
4:9 32:3 44:15
elements 41:11
elevated 4:23
56:23
eleven 12:13,17
46:6,10
eligibility 3:14
emphasis 6:18
53:24
empowered
20:14 29:2
empowers
17:20
enacted 36:6,9
enactment 36:7
ended 42:2,17
49:21
enforce 27:7,15
enforced 36:21

enforcement
20:17 36:13
enforcing 34:8
34:9
engaging 36:22
england 24:23
english 20:4
26:24 27:25
ensures 19:16
entire 7:19
44:11 46:8
52:11
entirely 36:23
entitled 5:24
45:19 49:20
52:25
entity 29:4
environmental
34:10
era 24:6,11
35:18 36:12
37:10,20
erred 30:17,18
erroneous
31:21,22
error 14:13
15:25 16:14
44:24 56:1
errors 7:10
escobar 8:8,15
8:24 9:2,5
42:12
escribers 61:13

especially 9:8
esq 2:8,14,19
  2:25
establish 4:15
  5:17 6:14 7:20
  8:4 12:8 58:7
  58:11 59:6,17
established
  3:15 6:20 8:2,8
  34:7 35:8
estate 22:9,10
et 22:4
evans 52:14,19
event 16:25
everybody
  36:20
evidence 4:18
  4:21 5:11,17
  5:25 8:16,17
  8:25 9:12,19
  10:3 13:6 18:9
  18:12,15,21
  26:6,8 31:2
  34:20 42:20
  45:10,18,24
  46:3,20 47:21
  48:3 49:22,25
  50:3 53:21
  55:7,13,19
  56:10
evidentiary
  46:21
ex 45:2

exactly 54:17
examination
  43:3
examinations
  40:19
example 17:1
  22:22 36:9,15
except 11:23
executed 19:13
executive 19:11
  19:13,19 20:15
  27:3,5,14,23
  34:21
executive's
  27:17
exercise 20:14
  38:14
exercised 23:14
  23:20 29:16
  42:19
exercising
  22:20
expediency
  27:2
expenses 59:15
expert 6:20
  43:3 47:19
  56:21
expert's 47:21
  48:25
experts 13:21
  54:4
explain 16:15
  17:3

explained 9:14
  16:3
explains 3:11
  31:14
explanation
  16:25 44:19
explicit 27:13
  37:23 58:18
explicitly 24:20
  25:25
express 39:21
  56:5 57:10,12
expressly 39:8
extensive 37:22
  38:7
extent 25:19
  30:18 37:18,25
  46:12

**f**

f 1:18 61:2
facial 22:25
  25:8,11 28:12
  28:13,22
fact 5:9,10 6:20
  8:7,15 9:9,16
  10:11,20 12:7
  16:24 19:22
  20:24 21:20
  22:4 26:14,17
  44:24 45:14
  53:9
factor 8:22
  9:22 10:2

  11:20,21,22
  12:11 15:24
  16:4,6,9,12,18
  16:20 17:2,4
  44:21,22 45:3
  45:10,20
factored 49:10
factors 50:3
facts 28:24
  31:10,10 47:11
fail 3:22
fails 4:7 6:25
  7:8 20:12
fair 40:1
faithfully 19:13
fall 59:19
falling 20:6
false 4:19 6:18
  30:9,11,20,21
  30:23,25 31:1
  31:3 32:1,11
  32:25 33:2,13
  33:17 36:24
  37:19,21 38:2
  39:7 45:8,20
  47:22,23 48:1
  48:22,24 49:21
  57:9,19,22
  58:13,14,21
  59:25
falsehoods
  43:18
falsely 41:16
  42:4

**[falsity - given]**

| | | | |
|---|---|---|---|
| **falsity** 4:6,8,10 4:11,15 6:5,6 6:14 8:4 17:22 30:2,19 31:21 32:1,2,3,9,11 32:12,14,15,20 32:21 33:13 41:10 42:22 47:20 52:14,18 52:18 55:9 56:4 57:21 58:1,8,25 | **feel** 48:9 | **forebears** 20:5 | 51:22 52:5,7 |
| | **fell** 27:25 | **foregoing** 61:4 | 54:8,12,17,22 |
| | **fifty** 15:1 | **foreign** 38:15 | 54:24 |
| | **figel** 2:20 | **foreseeability** | **free** 48:9 |
| | **fight** 12:10 | 16:21 | **freeman** 1:20 |
| | **file** 38:2 | **foreseeable** | **freytag** 21:25 |
| | **finally** 22:12 | 11:9 | 40:3 |
| | 31:12 | **forfeited** 5:21 | **friend** 46:21 |
| | **find** 5:25 10:18 | 46:23 | **friends** 27:20 |
| | 45:7 49:20 | **forth** 34:10 | **front** 42:11 |
| | 56:10 | **fortiori** 37:21 | **full** 42:19 |
| **far** 11:11 12:3 12:18 13:24 57:17 | **finding** 49:21 | **forward** 26:25 29:9 38:8 | **function** 38:13 40:22 |
| | **fine** 25:4,10 53:10 | **found** 5:7,7 35:22 50:11 | **fundamentally** 40:25 54:24 |
| **fashion** 30:18 | **finer** 22:18 | **founded** 36:16 | **funding** 41:13 |
| **faulty** 14:7 | **fines** 22:21 | **founding** 24:6 24:11 34:20 35:18 36:12 37:10,20 | **funds** 59:15 |
| **favor** 20:7 27:12 28:7 | **first** 15:6 20:10 21:9 23:5 24:17 26:11 27:4 31:20 35:19 36:6,8 58:12 | | **further** 3:20 21:22 |
| **fca** 3:10 20:6 21:5 25:24 27:22 31:20 37:3 | | **frankly** 25:6 33:11 | **g** |
| | | **fraud** 21:15 41:15 42:1,17 52:12 | **g** 3:1 |
| | **firsthand** 42:2 | | **general** 18:16 32:24 33:25 |
| **fca's** 19:10,18 | **five** 3:6 13:10 36:7 49:9 54:2 | **frederick** 2:20 2:25 41:6,7,8 44:24 46:10,14 46:20,23 47:2 47:5,7,9,11,13 48:5,9 49:4,7 49:10,14,19 50:9,12,20,23 51:9,11,14,19 | **generally** 5:9 18:13 32:8,24 |
| **fda** 3:12 17:20 30:15 56:25 | | | **germaine** 40:11 40:17,18 |
| **feature** 39:7 | **flawed** 3:21 | | **getting** 10:15 33:21 |
| **federal** 3:12 9:22 18:18 19:1 34:8,23 52:15 59:7,14 60:3 | **flaws** 12:24 | | **give** 16:25 |
| | **focus** 4:10 17:22 | | **given** 6:9 11:12 13:1 46:5 |
| | **footnote** 24:21 34:18 | | |
| | **forced** 23:22 | | |
| **federalist** 36:17 | **forcing** 29:5 | | |

**glatt** 43:7,22 47:22 49:4 52:1 53:3 55:3 56:17,24

**go** 10:10 14:17 21:4 25:21 26:24,25 29:9 41:10

**goes** 11:11 25:19,19 45:23 48:6 53:10

**going** 8:17 13:2 15:7,12 17:10 17:15 27:17,24 38:5,8 43:16 52:24

**good** 3:4 10:17 19:8 29:24

**gotten** 44:1

**govern** 3:15

**government** 3:9,11,17,18 4:3,6 5:4 6:12 7:12,14,16 8:16,19,25 9:13,13,17,24 18:18 21:18,21 23:2,5,13,17,17 23:22 24:15,16 25:4,5,21,23 27:10 29:5,7 29:11,12,15,25 35:3,9,14 37:22 38:3,5,8

39:9 41:13,20 41:22,23 42:4 42:14,18,19 52:23 53:15 55:6,6 57:15 57:22 58:6,9 58:16,20 60:4

**government's** 4:1,20 5:3,18 6:11 7:7 8:21 9:10,17,25 19:25 20:10 23:7 30:5 42:13 53:19 55:7 57:16,23 57:25

**governmental** 40:14

**grant** 23:23

**granted** 3:7

**great** 26:8

**grievous** 31:15

**grounding** 38:16

**group** 6:21

**guess** 46:16 59:22

**guessed** 49:9

**h**

**h** 2:14

**half** 50:7

**handed** 39:20

**handful** 26:5

**hansen** 2:20

**happen** 35:3

**happened** 13:17 16:25 25:22 29:16

**happens** 29:1

**happy** 4:14 31:16 55:4,21

**harass** 28:4

**harm** 12:1

**health** 9:22 60:3

**healthcare** 3:12 58:4

**hear** 3:2 19:5 44:19,21,22

**heard** 15:23 35:16 44:20 56:2

**held** 56:4

**helped** 51:12 53:6

**high** 14:24 15:1

**highly** 28:2

**historical** 20:1 34:19 38:16 41:15

**history** 11:22 20:1,2 25:12 25:15 26:24,25 27:25 28:5,7 35:16,17,20,21 36:2,3,12,22

37:7 38:10

**hiv** 4:22 18:18 18:20,20,23,23 19:1,1 41:17 41:21 43:10 48:16 59:19 60:1,2

**hoc** 40:19,25

**holding** 56:6

**hon** 1:19,20,21

**honor** 3:4 23:4 24:18 29:22,24 32:9 34:6 37:18 39:16 40:13 41:5 45:18 48:5 51:4

**honors** 19:8

**hoodwinked** 42:24

**house** 18:25

**huge** 53:10 55:3

**huh** 47:12 49:6 51:21

**hum** 10:22 11:3 25:17

**hundred** 15:16

**hundreds** 44:4

**i**

**iacobellis** 48:14

**idea** 18:21 35:17 36:19

**[identify - investigation]** Page 12

identify 50:14
ignored 30:19
illness 53:24
illuminated
16:1 17:13
illuminating
16:13
immateriality
8:25
immunize 20:3
implausible
13:13
implied 57:14
58:1
important 7:1
12:10 13:13
22:2 46:14
56:3
importantly
26:7
imposed 18:1
18:23
improper 44:15
44:25 45:7,16
inaction 8:25
include 7:4
included 53:17
includes 11:23
16:6
including 38:8
47:18
income 59:20
incorporates
11:23 15:24

incorrect 12:6
35:18,19 54:25
59:1
increased
41:19 43:1
54:17
increases 41:20
independent
11:25 15:10
21:4
independently
26:3 29:11
indicating
54:14
indication 4:13
4:19 6:22 7:11
8:1,3 17:23
55:1 56:7,9,24
56:25 57:1,4,7
59:8
indications
7:24 43:6,9
51:6 53:1,8
56:12
indifference
32:19
individual
19:16 21:6
29:4
individuals
19:21 22:22
28:4,4 37:1
influenced
12:14 14:15,17

14:25 15:3
43:21,23 44:10
45:14,15 46:5
50:5
information
42:11 44:3
informer 25:21
initial 13:22
15:7,8
initially 14:15
initiate 23:21
24:7
initiating 29:3
initiation 25:11
injury 17:8
26:4 29:12
34:14 37:14
installed 42:7
instance 53:25
instances 26:6
instruct 16:4
instructed
16:19 44:18
45:1
instruction 4:1
6:4,9 7:9,11
10:18 11:12,16
11:20 16:1,15
16:23,24 31:21
31:22 32:6,17
44:23 45:6
47:3 52:17
58:23 59:1

instructions
16:4
insufficient
31:3
integrity 53:13
intelence 8:20
13:6 41:19,24
45:13 54:4,11
54:23
intended 49:15
interesting
39:11 44:6
interests 30:5
interrupt 48:10
intervene 25:5
28:17 35:10
38:5,6,9 39:10
intervened
28:11 29:10,13
30:2 35:3
intervenes
21:18 23:2,3
35:15
intervention
28:23
introduced
43:2
invalidated
20:9
investigate
23:22
investigation
38:4

**involved** 13:5 21:25
**isolate** 43:22
**isolating** 44:14
**issue** 3:8 6:5 7:6,6,18,19 14:12 17:23 30:2,4,8,9,19 31:13,17 33:25 35:7,23 41:13 41:24 47:24 53:18 57:6
**issues** 7:2 9:9 11:20 30:1,1 31:16 32:23 34:6
**item** 54:1,11,21
**items** 53:22,24

**j**

**janssen** 1:8 2:4 3:3,5,9 4:3 13:4,15 32:18 41:16 42:3 43:16,23 44:15 45:4,12,16
**janssen's** 31:23 38:23 45:19 53:4
**jaundice** 47:25 48:3,21 49:2,7 56:20
**jena** 43:3

**jessica** 1:6 21:12
**jmol** 6:10,23 30:17
**joint** 59:7
**judge** 3:2,7 5:8 5:20 6:2 8:6,24 10:4,6,8,17,22 11:3,6,11,15,18 12:2,12,21 13:19 14:4,6,9 14:19,22 15:23 16:16 17:10 18:2,4,9 19:3,5 19:7 20:19 21:2,7,24 22:24 23:9,11 23:16,25 24:3 24:15,19,22,24 25:7,17,25 26:19 28:8,9 28:17,18 29:21 29:23 31:18,20 32:1,7,10,16 33:3,10,12,20 33:22 34:1,4 34:25 35:1,24 36:22 38:10 39:11,23 41:4 41:6,7,9,10,12 42:10,22 44:17 45:23 46:13,16 46:22 47:1,4,6 47:8,10,12,17

48:8,18 49:6,9 49:12,17 50:4 50:8,10,13,22 51:7,10,13,15 51:21 52:3,6 53:20 54:10,16 54:19,23,25 55:9,11,23 56:17 58:22 60:8
**judge's** 55:20
**judges** 1:22
**judgment** 3:17 4:4 5:23,24 6:15 8:11 15:10 31:5,9 57:2
**judiciary** 26:12
**julia** 1:20
**june** 16:8
**jury** 4:1 5:6,7 5:10,13,13,16 5:25 7:9,11 9:1 10:17,18 12:7 16:1,2,3,4,5,14 16:23,24 17:3 41:12 42:11,12 42:19 44:18 45:1,6,19 49:18,20,21 50:1,5,6 52:24 53:7 55:17 56:10 58:23

**jury's** 9:19 52:16 55:20
**justice** 2:15 19:23 26:15 36:18 39:2
**justifies** 27:23

**k**

**keep** 15:12
**keeping** 13:22
**kellogg** 2:20
**kelly** 27:21
**kept** 15:3
**kind** 14:14 25:14 47:24
**kinds** 40:5 50:4 51:24
**knew** 4:22 43:24,25 52:23 53:15
**knocked** 21:20
**know** 8:20,20 22:6 26:10 27:15 32:17,25 33:1,6,11,17 39:5 52:20
**knowing** 9:18
**knowingly** 32:17,18 33:12
**knowledge** 32:19,20 33:12 33:13 42:2,13 42:15 53:10

known 9:14
knows 24:18
kyounga 1:21

**l**

l.p. 1:8 2:4
label 3:10,19
3:22,25 4:7 5:2
5:17 6:1,5,13
6:19 7:8,20
8:22 9:21,25
10:24 11:2
12:2,14,15
13:5 14:1 15:1
15:5,6,9,14,15
15:16,18,20,22
15:22 17:1,14
30:21 31:23
42:7 43:9 44:9
46:2,4,7,8
55:12,14 56:4
57:10,12,18,19
58:3,8,12,13,21
59:2,24 60:5
lack 8:10 55:2
lacking 39:7
land 17:9
language 17:6
30:20 53:22
54:6,20
large 37:9 44:1
largely 27:8
largest 6:21

law 5:14,23,25
6:16 7:9 8:9
9:6,11 11:22
19:25 20:16
21:11 23:1
24:6,11 27:7
31:5,10 33:4
34:8,17,23
39:23 45:9,9
57:3
lawful 23:11,18
24:10,12,12
laws 19:12 26:6
27:15 34:9,10
34:10
lawyers 16:10
lay 16:5
lead 30:10
57:19
leading 11:25
leaves 20:10
led 41:20 43:1
left 26:5 42:1
legal 5:20 6:7
7:14 9:2 13:20
14:11 19:23
45:25 46:17
52:21 53:20
61:11
legality 6:3,3
legally 46:19
47:23
legislative
26:16,18

length 6:24
level 12:23
45:22 59:20
liability 30:11
31:1,3 57:19
liberty 19:17
lie 30:5
life 60:4
limit 40:5
limitation
56:25
limited 30:18
38:14 47:17
limits 38:10
links 59:2
lipid 6:21 43:13
43:14,15 47:22
47:24 48:12,14
48:16,20 49:2
57:4
lipids 4:23
14:24 15:2
56:13,13,23,25
57:1
litigation 36:14
38:20
little 29:14
logic 58:19,22
logical 58:10
59:23
long 20:2
look 5:9 8:13
18:9,10,16
22:14 25:14

27:19 29:18
36:5 37:17
43:2 56:9,13
58:4
looking 21:10
24:5,9 48:10
looks 18:11
25:14
lord 28:2
lot 6:17 25:15
25:20 28:6
36:13 53:7
lower 50:2
lucia 21:25
22:3 40:3
luminaries
36:15

**m**

m 2:22
ma 18:6
made 5:21 13:4
15:7 18:18
27:10 28:15
57:9,21 58:20
madison 20:9
26:13
main 1:6 7:14
14:7
make 5:13 6:14
19:1 23:22
26:11 29:5
30:3,22 42:23
44:23 45:1

52:13 55:5 59:15
**makes** 21:21 24:25 43:4
**making** 3:13 6:7,8 32:14
**manual** 43:2 50:21,24 51:13 51:15,20 52:4 52:8,10 59:4,5
**manumission** 36:16
**marbury** 20:9 26:13
**march** 1:15 61:17
**mark** 2:8 3:5
**marked** 20:4
**marketing** 3:10 3:11,13,19,22 4:7 5:2,6 6:5 9:21 10:24 11:2 12:2 14:1 17:1,14,20 30:21,25 31:23 32:2,12,21 33:14 42:7 44:9,15 46:5,9 55:12,14 56:4 57:11,13,18,19 58:6,8,12,13,21 59:24
**marshall** 36:19 39:3

**massive** 27:9
**match** 37:5
**matches** 38:16
**material** 3:25 4:20 5:2,18 6:6 8:5,17 17:12 31:24 32:2,4 32:11 57:23 58:21
**materiality** 3:23,25 4:9 5:2 5:7,10 6:1,3 7:21 8:1,7,8,11 8:12,13 9:11 17:10 31:12,13 31:22 32:8,10 41:9 42:10,11 55:10 57:21 58:11,17,19,24 58:25 59:1
**materially** 58:14
**matey** 1:19 3:2 3:7 5:8 8:24 15:23 17:10 19:3,5,7 20:19 21:2,7,24 28:8 28:17 29:21,23 35:1,24 36:22 38:10 39:11,23 41:4,6,7,12 42:10 44:17 55:23 60:8

**matey's** 8:6 41:9
**matter** 1:5 5:14 5:23,24 6:16 7:9 8:9 9:6,11 17:14 22:13 25:11 31:9 37:23 46:17 48:18 57:2
**mattis** 52:20
**maurice** 21:25 39:3
**maximum** 50:5
**mcginley** 2:14 19:7,8,9 20:21 21:6,8 22:5 23:4,10,13,20 24:2,14,17,20 24:23,25 25:10 25:18 26:2,23 28:16,21 29:22 35:16,20
**mean** 6:4 8:24 9:1 11:5 14:12 17:18 20:22 21:3,24 22:5 23:25 24:2,5 24:11,12 32:1 33:14,16,22 34:1 35:20 38:25 39:2,22 40:2,4 46:16 50:14 60:1

**meaning** 41:2 45:15 47:22 48:1 58:16
**means** 4:2 13:22 16:5 22:19,25 24:4 25:21 32:18 34:22 38:24 44:23 46:18 58:7,11
**meant** 22:3 39:3 40:4
**measures** 27:6
**mechanism** 38:16
**mechanisms** 37:22,24
**med** 13:22
**median** 45:15 46:11
**medicaid** 3:16 4:22 5:5 18:19 51:18 58:2
**medical** 42:20 43:7,18,21 53:3
**medically** 4:12 4:19 6:22 7:10 7:23,25 8:3 17:23 30:15 52:25 53:8 56:6,9,12,23 57:1,4,6 59:8

**medicare** 3:15 5:5 7:24 17:24 30:12 51:17 58:2
**medication** 15:4 43:11 55:2
**medications** 18:24
**meeting** 13:10 13:11,17
**mentioned** 26:10 53:14
**merchant** 40:20
**mere** 20:8 26:10,18
**merely** 22:16
**merits** 30:7 36:6
**message** 13:10
**messages** 13:5 13:8
**met** 13:14
**method** 44:14
**michael** 2:14 19:9
**millions** 44:4,4
**mind** 28:20
**minimum** 7:17
**minute** 13:10
**minutes** 3:6
**mis** 42:24

**misreading** 31:15
**misrepresent...** 54:9
**misrepresented** 41:16 55:15
**misrepresenti...** 41:18
**misunderstand** 30:8
**model** 12:23 13:2 14:25
**modeling** 49:14
**modern** 20:6 25:24 36:24 37:6,18,20 40:12
**moment** 17:11 39:1
**money** 25:23 47:15
**monitor** 42:6
**monitors** 42:6
**morning** 3:4 19:8 29:24
**morrison** 40:3
**mosier** 2:8 3:3 3:4,5,8 5:16,22 6:10 9:5 10:5,7 10:10,20,23 11:4,8,13,17,19 12:9,20,22 14:2,5,8,12,21 14:23 16:2,22

17:18 18:3,8 18:10 19:4,6 30:7 55:25 56:1
**motion** 5:22 6:11,15,23 57:2
**move** 57:8
**moved** 16:11
**muddled** 20:1
**multiple** 24:4 47:2 53:14

**n**

**n** 2:2 3:1 61:2
**naive** 43:10 56:11
**name** 20:16 21:14 29:4,12
**narrower** 37:7
**nascent** 27:4
**natural** 45:21
**naturally** 27:6
**nature** 21:16 34:24 41:22
**near** 44:19
**necessarily** 3:22 59:25
**necessary** 3:21 3:23 4:13,20 12:24 17:24 18:14 22:7 30:14 43:6,8 48:2,13,20,23

49:1 50:16 51:1,6,17,20,25 52:2 53:1,23 54:2,3,5,20 55:1 56:8,22 59:13
**need** 5:14 8:4 10:15 25:2 33:16 37:4
**needed** 16:2 27:4 48:16
**needs** 15:6 17:22 41:23
**neither** 30:15
**never** 4:17,18 4:21,25 5:21 7:21 8:19 9:13 9:14 12:19 36:21 45:9 52:17 57:3,18
**new** 22:12 36:15
**nigh** 35:22
**nine** 25:18
**ninety** 56:14 57:5
**ninth** 27:21
**non** 15:2
**noninfluenced** 12:13 46:2,6
**nonintervened** 28:12,13
**noninterventi...** 28:22

**nonofficers** 38:13

**nonpublished** 55:16

**nonreimburs...** 30:12

**north** 61:14

**northwest** 2:5 2:17,22

**noted** 31:21 40:13

**notices** 51:2

**notion** 24:11 31:14

**novel** 34:16

**number** 3:3 12:24 25:13 26:16 35:19 36:10,17 48:6 50:2,5,7

**numbers** 50:14

**o**

**o** 1:18 3:1 61:2

**obvious** 29:7

**obviously** 23:6 24:18

**occupies** 39:17

**occupy** 20:18 20:20 38:24 39:18

**occupying** 39:5

**occur** 11:10

**occurred** 41:15 52:12

**office** 19:23 20:18,19,21,21 21:1 22:3 38:24 39:4,6,7 39:12,13,15,17 39:18 40:9

**officer** 22:19 39:12,14,17,24 53:17

**officers** 19:13 20:11,13 40:24 41:2

**offices** 40:4,14 41:1

**oh** 47:6,8

**okay** 12:13,21 14:23 32:16 33:20 34:1 46:22 47:1,10 48:8,14 50:8 50:22 51:21 52:6

**olc** 25:18

**once** 21:17 53:18 54:9,15 54:16 56:11

**ones** 14:10 37:11,13,15 40:17

**opening** 6:15

**opinion** 4:4 25:18 30:18,20

35:6 36:19 55:9,17

**opportunities** 43:17

**opposed** 41:1

**opposing** 57:2

**opposite** 27:24

**opposition** 6:17 6:22

**order** 4:2 47:22 48:1,22

**original** 15:13

**outset** 38:6

**overlook** 56:3

**override** 51:4

**own** 13:7 15:10 47:21 48:25 53:19 56:21

**p**

**p** 2:2,2 3:1

**p.l.l.c.** 2:20

**pa** 2:13

**page** 5:22 6:1 6:10 25:16 52:16 55:8

**pages** 51:15,20

**paid** 53:10

**papers** 36:17

**parsing** 15:25

**part** 3:16 4:22 7:24 11:7,19 16:1 17:24 18:4,4,5,5,6,10

18:11,13,15,17 18:19,22 28:3 44:10,11,22 51:18 59:3,4,4

**participate** 21:19,20

**participating** 30:3

**particular** 4:12 4:22 12:23 31:17 39:19 41:23 51:3,5 52:24 53:6

**parties** 35:12 60:9

**passage** 26:10

**passed** 26:6

**patel** 53:16

**patently** 19:24

**patient** 4:22,24 14:16 15:5,9,9 30:14 41:22 42:25 43:9 47:23 48:20,22 54:18

**patients** 14:15 14:17,24 15:2 15:3 18:20 19:2 41:17 43:10,12 44:2 48:15,16 56:11 60:1

**pattern** 16:3

**paul** 1:19
**pay** 8:16 9:18
  9:20 10:1
  31:15 33:15
  36:20 41:24
  42:13
**payers** 17:25
  58:4
**paying** 8:19,22
**payment** 4:1,21
  5:3,18 56:5
  57:10,12,15,23
**payor** 52:15
**payors** 41:22
**pd** 18:6
**pedigree** 20:1
**peers** 45:13,14
**penalties** 19:20
  22:21 37:16
**penelow** 1:6
  2:21 3:3 21:12
**pennsylvania**
  2:17
**pension** 40:19
**people** 22:1
  27:18 40:15
  48:12 53:6
**percent** 12:13
  12:14,17 15:1
  15:14,16 43:12
  46:6,8,8,10,18
  48:16 49:9
  50:11 56:14
  57:5

**percentage**
  14:25 15:14
  49:8
**percentages**
  15:13
**perfect** 22:22
**perfectly** 44:14
**period** 13:5
  23:14,16 24:13
  25:3 29:1
  41:16 42:17
  50:18 51:2
  52:8,11
**permissible**
  21:5 34:22
**permissive**
  51:17,24
**permissiveness**
  51:23
**persists** 29:13
**person** 21:19
  25:23 39:5,6,9
**personal** 21:16
  34:14 37:14
  40:25
**persons** 34:8
**petratos** 8:9,15
  9:7 10:11 18:5
  55:18
**ph** 52:20
**pharma** 30:10
  30:25
**pharmaceutical**
  3:11

**pharmacies**
  44:1
**pharmacy**
  54:13 59:11
**philadelphia**
  2:13
**phoenix** 61:15
**phrase** 44:20
**physician**
  59:10,25
**pick** 36:25
**pills** 54:5,10,11
  54:16,23
**place** 58:13
**plain** 54:6
**plan** 18:6,11
**play** 12:3 27:2
  27:11 58:22
**pleading** 8:10
**please** 3:4 19:9
  29:24 41:8
**plenty** 18:24
**point** 4:17 16:7
  17:10 21:9,10
  21:24 22:8,18
  24:8 25:12,15
  26:14 27:21,21
  28:8,14,18,22
  38:9 41:25
  42:3 49:17
  50:11,15 52:7
  58:10 59:5,7,8
  59:13

**pointed** 14:13
  56:17
**points** 26:15
  28:15 36:7
  57:16
**polansky** 34:19
**policy** 19:1
  51:1
**populate** 27:4
**population**
  41:23 44:10
**populations**
  42:25
**position** 7:15
  9:14 12:18
  16:17,18 17:11
  28:10 30:7,8
  31:5,13,25
  32:17 34:4
  57:25 58:4,17
  58:19,22,24,25
  59:24
**positions** 21:25
**post** 4:2 7:2
  30:17 55:8
  56:2
**postdates** 52:8
**posture** 22:24
  25:7,8
**potentially**
  22:21
**power** 19:11,13
  19:19,19 22:20
  23:21 27:23

29:17 37:5 38:1,8 55:18

**powers** 40:16

**practice** 17:17 27:1

**precise** 38:25 47:14

**preclude** 9:10

**precursors** 26:16

**preferred** 56:18

**premised** 30:25

**prepared** 60:9

**prescribe** 15:5 33:15 42:8 49:1 56:22

**prescribed** 4:23 14:15 42:9 43:13 45:12 47:15 53:25 56:20 60:2

**prescriber's** 14:25

**prescribing** 13:11 42:24

**prescription** 13:15,16,23,25 15:12,15 18:6 30:14 48:13 54:8,12

**prescriptions** 10:23 11:1

14:14 15:1 30:12 43:25 45:8,18 46:2,4 46:7,9 48:11 50:16 52:2 57:5,6

**presence** 37:5

**present** 37:23 38:11

**presented** 5:11 9:12 49:18,22 50:2

**presents** 35:1 35:12

**preserve** 7:12 7:15 46:25

**preserved** 7:3,5 7:18

**preserves** 19:16

**president** 19:12 19:21

**prezista** 4:23 8:20 13:5 15:4 41:18,24 43:12 43:13 45:12 48:12 53:8 56:18,19,22

**prices** 59:12

**pricing** 59:9

**primary** 19:25

**principle** 26:22

**private** 19:21 22:21 24:6

26:3 27:18 28:4 29:4 34:8 34:9

**probably** 54:2

**problem** 4:8,9 5:19,20 8:1 22:18,23 24:21 29:13 38:18 55:3

**problematic** 23:23

**problems** 47:2

**procedural** 22:11

**procedures** 19:18

**proceed** 5:15

**proceedings** 3:20 60:11 61:5

**products** 1:8 2:4 3:3

**profile** 41:16

**program** 3:16 5:5 50:24 59:7 59:11

**programs** 3:12 3:12 9:22 59:9 59:14 60:3,6

**promotion** 3:25 5:17 6:1,13,19 7:8,20 8:22 9:25 58:3 59:2 60:5

**promotional** 43:17 45:20

**promotions** 15:19,22,22

**proper** 9:20 15:11 31:6

**properly** 7:3,12 7:15,18 27:15 45:1 46:25 52:15

**proposition** 31:7

**prosecute** 24:9

**prosecutes** 23:18

**prove** 3:9,22 12:19 13:21 31:23

**proved** 50:6

**proves** 27:24

**provide** 37:12

**provides** 51:23

**proving** 17:22

**provision** 36:10 59:3,8

**provisions** 19:10 20:5 28:3 34:13 35:2,8,13 36:7 36:8,13,20,23 37:10 39:9 59:5,14

**proximate** 10:13,16 11:7

11:8,11,14
16:20
**purchasing**
51:5
**pure** 25:20
**purpose** 20:25
37:5
**purposes** 20:12
37:4
**pursue** 19:20
22:20 38:7
**pursued** 25:23
42:15
**pursuing** 39:19
**pursuit** 23:8
**put** 6:17,23
18:12 33:22
34:1 55:9
**puts** 22:17

**q**

**question** 5:10
8:6,7,13,23 9:1
9:4 13:20,24
17:25 35:13,24
40:14 41:13
42:12 46:21
47:9 48:6
49:16,19,23,24
51:3 52:9
53:20 54:25
57:14,20
**questions** 9:9
28:9 30:4

31:20 34:16,25
41:9,10 55:5
55:22
**qui** 19:10,18,22
20:5 28:2
34:12,16,19,21
35:2,8,13
36:10 37:6,10
38:20 39:9,19
**quibble** 11:12
**quibbles** 55:8
**quirk** 22:6
**quite** 30:8
35:12 46:14
**quote** 6:11
19:24 20:15
56:5

**r**

**r** 1:18 2:2 3:1
61:2
**raised** 4:11
11:13
**rampant** 28:1
**range** 42:19
**rare** 11:24
**rarely** 20:6
**rather** 13:20
31:24 53:21
**reach** 56:6
**read** 24:6 26:21
44:19 47:18
50:16

**reading** 40:1
**reality** 15:16
**really** 33:15
35:17 36:21
37:5 44:23
**realm** 5:9
**reason** 22:11
36:3 38:22
41:2 50:15,24
53:21 56:15,16
60:4
**reasonable**
4:13,20 16:21
17:23 18:14
30:14 43:6,8
45:21 48:2,13
48:19,23 49:1
50:16 51:1,6
51:17,19,25
52:2 53:1,23
54:1,3,5,19
55:1 56:7,22
59:13,15
**reasonably**
11:9
**reasoning** 4:2
**reasons** 42:20
**rebuttal** 3:6
19:5
**receiving** 59:14
**recognize**
34:12
**recognized**
6:19 8:8 9:6

10:12 34:15,18
56:21,24
**recognizes** 9:8
**record** 13:14
18:12,22,24
31:7 47:18
49:18,25 52:4
52:16 55:19
56:18 61:5
**records** 44:5
54:13
**redressing**
34:22
**refer** 51:16
**referring** 51:3
**reflect** 35:17
**regard** 32:21
35:7
**regarding**
45:25
**regimes** 17:21
**regressed**
12:16
**regulate** 17:20
**regulated** 3:11
**regulation** 51:3
**regulations**
3:15
**regulatory**
17:21
**reimbursability**
30:19 55:14
**reimbursable**
52:18

**reimburse** 52:24 53:16 60:7

**reimbursed** 9:15 43:5 44:8 50:25 51:23 52:21 53:2

**reimbursement** 3:13,14 17:16 17:21 18:20 56:5 58:7

**reimburseme...** 41:21 43:1

**reimbursing** 18:23

**reinforce** 37:24

**reinstate** 31:8

**reject** 3:19

**rejecting** 38:22 44:13

**rel** 45:2

**relate** 59:6

**related** 57:10 57:12 58:2,6 58:13

**relation** 7:10

**relator** 3:9 20:22,23 21:12 21:13,15,17,17 22:7,9,12 23:14,20 26:3 29:9,10 37:6 38:7 39:18,19 39:20

**relator's** 13:7

**relators** 3:22 3:24 4:11 6:17 9:24 20:11,13 20:18 31:22 34:13 37:14,25 38:1,23 40:23 41:2,8 42:1,16

**relevance** 36:2

**relevant** 21:9 37:19 40:11,11 40:17 44:20 52:10 57:20

**reliable** 13:2,2

**relied** 12:25 13:3

**relies** 19:25

**rely** 25:25

**remand** 31:6

**remanded** 7:17

**removal** 21:22

**render** 59:25

**rep** 13:4,15

**repealed** 27:11

**replaced** 22:16

**replicate** 38:13

**reply** 6:24

**report** 47:19

**representation** 4:19 57:21,22 57:23 58:2,6 58:12,14,15,20

**representations** 30:10,21,22

32:15

**representatives** 53:14

**representing** 42:5

**republic** 27:3

**required** 10:9 10:14 50:15 59:20

**requirement** 7:25 10:13 18:14 40:8 51:8 59:18,18

**requirements** 3:14 39:4

**requiring** 16:13

**reserve** 3:6

**reserved** 35:24 36:1

**resistance** 47:25 48:21 49:3 56:20

**resistant** 48:4

**resolve** 22:12

**resolving** 35:11

**respect** 7:11 9:21 21:13 35:18 56:6,23

**respectfully** 54:25

**respects** 35:19

**response** 10:1

**restatement** 11:21 16:9,11

**restriction** 21:22

**restrictions** 18:23

**result** 11:10 14:1 59:25

**resuscitated** 19:22

**reverse** 4:4

**review** 55:16

**reviewed** 6:8

**reyataz** 43:14 47:25 48:4,13 48:21 49:2 56:18,20

**right** 3:2 5:9 8:24 10:24,25 12:4 14:4,19 18:2,4 21:3,20 23:10 29:21 30:23 32:5,13 33:18 35:25 36:23,24 37:4 37:6,11,16 38:19 39:15 40:1,2 41:4,12 51:9

**rights** 35:11

**rise** 12:23

**risks** 55:2,3

**risperdal** 42:3 42:5 52:22

| | | | |
|---|---|---|---|
| **road** 7:22 | 54:19 57:18,25 | **seemed** 46:3 | **showed** 55:13 |
| **role** 39:18,19 | **says** 6:12 7:16 | **seems** 5:21 9:1 | **shows** 11:22 |
| **roles** 40:22,25 | 8:24 15:4 | 9:4 13:19,23 | 28:5 34:20 |
| 41:1 | 20:22 21:13,17 | 24:5 30:20 | 37:3 38:17 |
| **roots** 34:19 | 24:21 25:20 | 46:7 47:21 | 44:8 |
| **rough** 12:15 | 39:8 43:9 51:4 | 48:25 54:21 | **side** 28:5 35:8 |
| **roughly** 50:7 | 51:20 57:15 | **seila** 20:16 | **sideline** 23:7 |
| **rubric** 22:14 | 58:9 59:9 60:5 | **self** 21:17 | **sidelines** 29:8 |
| **ruinous** 22:21 | **scenario** 25:5 | **send** 3:20 | **sides** 29:20 |
| **rule** 18:17 | **scheme** 40:22 | **sense** 12:16,16 | **significant** |
| **rules** 3:15 | **schmidt** 45:2 | 34:13 | 20:15 34:16 |
| **ruling** 7:2 8:12 | **scope** 28:8 | **series** 42:6 | 36:12 38:14 |
| 56:2 | **score** 45:15 | **serious** 22:20 | **sillup** 45:11 |

| | | | |
|---|---|---|---|
| **s** | 46:11 | **seriously** 30:8 | **similar** 56:6 |
| **s** 2:2 3:1 | **scrape** 49:15 | 36:4 | **similarly** 27:22 |
| **safety** 41:16 | **scrubbed** 43:20 | **set** 23:1,11,18 | **simply** 3:19 |
| 42:5 55:15 | **seal** 38:2 42:16 | 24:10 26:2 | 8:22 22:3 31:4 |
| **salerno** 35:7 | 42:18 | 28:18 36:5 | 37:1 51:16 |
| **sales** 13:3,15 | **sealing** 23:14 | **settlements** | **single** 13:25 |
| 41:19,20 43:1 | 23:16 24:13 | 52:22 | 43:22 46:18 |
| 44:5,8,11 | 25:3 28:25 | **seven** 15:14 | **singularly** |
| 53:11,14 | **second** 11:7 | **shaked** 12:4,25 | 19:12 |
| **satisfied** 52:16 | 15:10,12 16:9 | 14:14 15:4 | **situation** 23:24 |
| **save** 20:12 | 36:12 | 43:19 44:6,13 | 42:14 55:16 |
| **saving** 60:4 | **section** 39:12 | 45:11 47:13 | **six** 13:17 |
| **saw** 6:7 27:25 | **securities** 34:9 | 49:10 | **sixty** 15:14 |
| **saying** 11:15 | **see** 5:8 6:7 | **shaked's** 14:25 | **slave** 36:9,15 |
| 12:4 14:7 23:7 | 26:25 45:23 | 47:19 49:11 | **small** 26:5,20 |
| 23:16 25:2,10 | 49:12 58:22 | 56:13 | 49:8 |
| 27:14,22 28:15 | 59:22 | **shoes** 27:18 | **society** 36:16 |
| 39:21 45:24 | **seeing** 46:17 | **show** 8:4 10:25 | **solely** 3:10 |
| 46:17 48:1 | **seem** 14:10 | 15:21 45:11 | **solicitor** 32:24 |
| 51:11 52:20 | 45:24 54:6 | 46:3 | 33:24 |

**solis** 6:11
**somebody** 22:16,19 29:16 56:23 59:16
**somewhat** 22:5 34:12
**sorry** 33:22 34:1 47:6
**sort** 24:4 36:20 37:19
**sounds** 26:19 53:20
**sovereign** 37:2
**spay** 8:11
**speak** 32:24 34:24 50:19
**speaking** 32:24 38:20
**special** 20:18 20:24 21:1,3,3
**specific** 20:25 33:3 38:19
**specifically** 18:16,17
**specified** 40:4
**split** 60:9
**sponsor** 18:11 18:11,14,15,17 18:22
**sponsors** 18:19
**spread** 54:5
**square** 2:23
**stage** 8:10

**standard** 5:12 9:2,3 10:12 11:4 12:9 17:15,19 31:6 32:25 44:18,20 45:4 46:24
**standing** 23:7 26:3
**stands** 29:8
**start** 3:8 12:18 34:6 41:9 50:20 56:1
**started** 13:24 50:24
**starters** 20:13
**state** 10:17 18:19 59:7
**stated** 11:8
**statement** 32:11 33:14,16 57:11
**statements** 18:25 32:20
**states** 1:2,12 2:16 17:12 19:14,20 20:14 20:16 21:14 22:20 23:21 24:7 29:2,5,5 29:17 36:25 38:1
**statistical** 43:19

**statistically** 12:16 46:14,15
**stats** 12:19
**statute** 20:12 20:22 24:4 39:21 51:4,23 54:7,21,21
**statutes** 25:15 25:20,20 37:23 40:10,21,22 51:16,16
**statutory** 17:21 29:11 40:22 53:22 59:18
**step** 22:12 27:18
**steps** 29:15
**stevens** 24:5,17 25:19,25 35:19 35:23 36:5
**stop** 42:7
**stopped** 8:19 8:21 42:1
**stopping** 42:17
**straightforward** 38:22
**street** 2:5,11,22 61:14
**striking** 26:17
**strong** 8:16
**structure** 19:16 20:3 51:24
**subject** 26:20 38:7

**submission** 33:2,7,9,13,17
**submitted** 50:13
**submitting** 33:1,6 59:16
**subpoena** 54:13
**subsequent** 30:22
**subset** 26:20 37:7,17 41:17 43:1 44:8 49:22,24
**substantial** 11:20,21,22 12:11 15:24 16:4,6,9,12,18 16:20 17:2,4 44:21,22 45:3 45:10,20
**substitution** 21:5,6
**sue** 20:15
**suffer** 47:24 48:22
**suffered** 26:4 34:14
**sufficiency** 6:2 6:9 13:20 14:10 53:21
**sufficient** 6:14 10:9,9 31:11 45:24

**sufficiently** 38:17

**suggest** 7:5 18:22 30:20 58:16

**suggested** 31:4 57:3,17

**suggesting** 31:2

**suggestion** 7:22 20:11

**suggests** 3:18

**suit** 21:14 23:21 24:7 25:11 34:14 37:13 38:6,9

**suitable** 53:8

**suite** 2:23 61:14

**suits** 34:8,9,12 34:12,16,21 36:17 37:2,4

**summary** 8:11

**sumner** 2:23

**support** 6:13 13:6 19:10 24:11 31:1,3 55:7,19

**supportable** 49:24

**supreme** 8:7,14 20:2 35:22 36:18 40:18,24

**sure** 10:5 23:9 24:14,19,22

28:14 30:3 33:7 42:23 46:13,22 52:13 55:5 59:15

**surgeons** 40:18

**susceptibility** 47:25 49:2

**sustain** 28:14

**swapped** 22:1,7

**t**

**t** 61:2,2

**take** 5:5 7:15 8:23 9:22 10:2 19:12 22:18 29:19 31:13 34:7 38:6,12 38:21 45:21 50:10 55:4 60:6

**taken** 9:14 27:12 31:25 36:3 43:10,20 58:24

**takes** 21:18 22:16 24:4

**talismanic** 20:9

**talk** 57:15

**talked** 13:15

**talking** 4:6 14:19 16:8 17:11 18:5 45:4 52:3,4,10 54:11 55:11

**talks** 42:12

**tam** 19:10,18 19:22 20:5 28:2 34:12,16 34:19,21 35:2 35:8,13 36:10 37:6,10 38:20 39:9,19

**targeted** 45:12

**targeting** 48:15

**teaches** 25:13

**tell** 20:19

**telling** 43:18

**tens** 60:1

**tenth** 16:7

**term** 11:17 16:8,12 17:2

**terms** 11:8 38:20 43:21

**test** 22:3 32:25

**testified** 12:25 48:11,14 49:4 55:3

**testifies** 53:3

**testify** 53:5

**testimony** 12:5 12:7 13:7 43:7 47:19 48:19,19 48:25 49:12,23 52:1,14,19,19 54:4 56:13,17

**testing** 49:15

**thank** 19:3,4,6 29:21,22 34:5

41:4,5,7 55:23 60:7,8

**theories** 4:10 4:16

**theory** 3:20,22 3:24 4:7,25 5:1 5:4,15 6:18,23 6:24 7:8 39:14 41:14 42:23

**thing** 24:17 25:22 29:3 56:20

**things** 9:5 21:8 24:9 28:6 30:7 40:13 48:6 50:4 59:20

**think** 3:21 4:15 4:17 5:11,20 6:19 7:1,17,23 9:16,20 10:13 11:21 12:10 13:12 14:3,12 16:2,5,14,22 17:8,22 20:23 21:9 22:5,14 22:15,17,22 23:8,23,24 25:4,6,12,22 26:4,24 27:19 27:24 28:4,6 28:21,21,24 29:6,13,19 30:8,9,23,24 31:15 33:18

35:1,5,6,6,7,12
35:18 36:25
37:24 39:11,16
39:17 40:1,8
45:23 46:12
48:5 49:20
52:9 53:7
54:24 57:16
60:4
**thinks** 31:10
38:4 57:11
**third** 1:3 16:10
36:10 45:9
**thirty** 43:12
48:15 50:11
**thought** 14:6
15:23 16:10
18:21 50:6
**thoughtless**
35:21
**thousands** 60:1
**three** 30:1
36:16 44:1
**thrown** 47:16
**time** 3:6 9:15
13:8 21:9,10
26:9 34:11
38:14 47:17
55:4 59:22
**today** 9:18
**todd** 2:20
**told** 9:17
**took** 44:3 49:11
58:17

**topamax** 52:23
**totality** 49:22
**totally** 12:6
**touch** 52:13
**toxicity** 54:18
55:2
**trade** 36:9,15
**transcriber**
61:11
**transcript** 60:9
61:4
**treated** 14:14
**treatment**
43:10 53:24
54:2,3 56:11
**trial** 4:2 7:2
9:19 30:17
42:15 44:12
45:11 50:2
55:8 56:2
**tried** 3:24
**triggers** 20:17
**trivial** 17:5
**true** 21:1 30:13
33:14,16 40:23
61:4
**trust** 27:14
**truth** 32:20
**try** 37:8 48:6
59:6
**trying** 16:16
48:24
**tta** 61:11

**turn** 31:16
**turned** 27:6
**twenty** 12:14
46:7,8,18
**twice** 53:18
**two** 12:14
14:17 21:8
29:20 36:16
44:11,13 46:8
46:8,18 52:22
54:4,10,10,11
54:16,23 59:20
**type** 21:15
**typically** 41:21

**u**

**u.s.** 2:15 45:2
**uh** 47:12 49:6
51:21
**um** 10:22 11:3
25:17
**uncomfortable**
34:4
**unconstitutio...**
19:11,24 35:9
35:14
**under** 4:15
5:15 7:24 12:9
20:16 21:5
22:14 23:1
28:11 29:18,19
34:13 36:15
38:1,2 39:8
40:2 42:16,18

45:2 55:18
59:21 60:3
**underlying**
12:5
**understand**
12:4 14:7 16:5
21:24 24:3
28:9 39:13
42:23 46:13
**understanding**
22:2 39:14
40:5
**understood**
39:25
**unilateral** 38:1
**unitary** 20:3
**united** 1:2,12
2:16 17:12
19:14,20 20:14
20:16 21:14
22:20 23:21
24:7 29:2,5,5
29:17 36:25
37:25
**universe** 44:9
44:11
**unlawful** 23:8
25:22
**unpack** 48:9
**unprecedented**
3:17
**unrebutted**
52:14 53:4

**unrefuted** 51:25
**unsupported** 13:14
**upfront** 27:22
**upheld** 26:13
**upholding** 55:17
**uplift** 44:5 53:11
**urging** 37:1
**usage** 54:9
**use** 16:11 17:2 30:15 52:7
**used** 15:10 16:17 20:6 26:7
**uses** 16:9 39:12 52:15 54:15

**v**

**v** 1:7 3:3 20:9 26:13 36:19 45:2
**vacate** 31:5
**vacated** 7:17
**valid** 23:2,2 44:14
**various** 50:3
**venn** 44:6
**verdict** 9:19 49:24 55:7,17 55:20,20

**versus** 53:18
**vesting** 19:19 22:18 29:19 34:6 38:21
**vests** 19:11
**veto** 26:16,18
**viable** 5:4
**view** 6:13 10:9
**viewed** 19:23
**vintage** 26:18
**violated** 26:9 27:8
**violates** 21:22 56:4
**violating** 33:8
**violation** 3:10 25:3,11 27:16 28:24,25 29:6 29:17
**violations** 31:23 34:23 50:6,7
**virginia** 52:14

**w**

**w** 2:8
**waiver** 44:25 47:2
**walk** 4:14 8:2
**walker** 54:1,1
**walkers** 54:2,2
**waned** 27:1
**want** 17:1 18:10,16,19

28:10 30:3,6 32:16,22 33:5 33:18 34:24 38:25 42:22 44:7 47:19 52:7,13 55:5 56:1 57:15 59:3
**wanted** 25:1 45:5,6
**wants** 31:9
**war** 27:9
**warned** 20:2
**washington** 2:7 2:18,24
**waxed** 27:1
**way** 8:18 14:13 16:22 28:5 33:8 37:19 40:15 49:14
**ways** 37:9 46:15 47:14
**we've** 7:17 30:2 31:4,7,13,25 34:15 57:3
**weaker** 29:14
**weigh** 5:10
**weight** 6:23
**weird** 46:7
**went** 9:24 15:2 21:4 27:8 36:18 44:3,4 54:13

**west** 61:4,10
**whatnot** 38:15
**white** 18:25 26:15
**widely** 26:7
**wield** 19:13
**wind** 37:6
**winik** 2:19 29:23,24,25 31:19,25 32:5 32:8,13,22 33:5,11,18,21 33:24 34:3,5 36:1 37:8 38:19 39:16 40:7 41:5
**woods** 36:19
**word** 16:17
**words** 14:16 48:23
**worked** 49:15
**workforce** 40:14
**works** 22:15
**worlds** 23:7
**worried** 17:13
**worries** 34:3
**worse** 21:21
**worst** 23:6
**wrap** 59:22
**write** 12:14,15 30:11 43:19
**writing** 45:17 54:14

**[written - zimmer]**                                    Page 27

| |
|---|
| **written**  10:24 11:1 13:16 54:8 **wrong**  20:13 46:24 **wrote**  36:19 43:24 46:6 |
| **x** |
| **x**  1:4,10 21:13 |
| **y** |
| **y**  21:13 **yeah**  11:13,19 14:5,22,23 16:2 21:7,8 28:16 32:8 33:3,11 **year**  13:4 **years**  13:12,17 **york**  36:16 **yup**  24:24 |
| **z** |
| **z**  21:13 **zero**  45:15 **zimmer**  45:2,3 |